Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | ) Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS
## (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
## FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL,
## (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING
## ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY,
## (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

Patriot Coal Corporation and certain of its affiliates, as debtors and debtors-in-possession

(collectively, the "Debtors") file this motion seeking entry of an interim order, substantially in

the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final DIP order (the

"Final DIP Order,"[1] and together with the Interim DIP Order, the "DIP Orders"):  (a) authorizing the Debtors to obtain senior secured postpetition financing on a priming basis pursuant to the term loan facility (the "DIP Facility") set forth in that certain loan agreement, attached hereto as **Exhibit 1** to **Exhibit A** (the "DIP Loan Agreement")[2] and enter into the commitment letter, substantially in the form attached hereto as **Exhibit B** (the "Commitment Letter") and the fee letter with the DIP Agent, substantially in the form attached hereto as **Exhibit C** (the "DIP Agent Fee Letter"); (b) authorizing the Debtors to use Cash Collateral; (c) granting liens and providing superpriority claims with respect to such postpetition financing;  (d) approving the form of adequate protection to be provided by the Debtors to the Adequate Protection Parties; (e) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim DIP Order; (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (g) granting related relief.  In support of this Motion, the Debtors have filed contemporaneously herewith:  (a) the *Declaration of Marc Puntus in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Use of Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "Puntus Declaration"), attached hereto as **Exhibit D**; and (b) the *Declaration of Ray Dombrowski in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully state as follows.

---

[1]    The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Loan Agreement, the Interim DIP Order, or the First Day Declaration (as defined herein), as applicable.

## Preliminary Statement

1.      The Debtors require immediate access to liquidity to ensure that they are able to continue operating during the chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest.  The Debtors filed these chapter 11 cases because they have run out of cash.  The Debtors would be forced to cease operations immediately absent additional liquidity.  To that end, the Debtors have secured a $100 million postpetition debtor-in-possession financing from a group of their prepetition lenders holding a majority of the Debtors' prepetition first lien term debt and second lien notes to ensure that ongoing business operations—and overall enterprise value—can be preserved.

2.      As described more fully below, the Debtors' capital structure is generally comprised of the following:  (a) a senior secured asset-based revolving credit facility with a maximum availability of $65 million, secured by first priority liens on the Debtors' extracted minerals and certain other collateral (collectively, the "ABL Collateral") and second priority liens on substantially all of the Debtors' other assets, including minerals that have not yet been extracted from real property (collectively, the "Term Loan Collateral"); (b)  a $247 million term loan and $200 million letter of credit facility secured by first priority liens on the Term Loan Collateral and second priority liens on the ABL Collateral (with the issuers of the letters of credit having a "first out" and the term loan lenders having a "second out"); and (c) approximately $306 million in second lien notes secured by a junior lien on the ABL Collateral and the Term Loan Collateral.

3.      The proceeds from the DIP Facility will be used to honor employee wages and benefits, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and allow the Debtors to maintain favorable relationships with their

vendors, suppliers, employees, and customers—each of which is necessary to effectuate a value-maximizing going concern sale and/or restructuring transaction, which must occur by the end of November 2015 in accordance with the milestones set forth in the DIP Loan Agreement.

4.     Moreover, the Debtors do not believe that alternative sources of financing are readily available.  As noted in the Puntus Declaration, the Debtors engaged in discussions with both agents for their prepetition secured debt facilities as well as a number of reputable third-party financial institutions, each of whom declined to participate, underwrite, or arrange a postpetition financing facility for the Debtors.  Nor do the Debtors believe it would be possible to administer these chapter 11 estates on a "cash collateral" basis—the Debtors have practically no cash on hand and do not expect to be able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases.

5.     The Debtors' inability to access the DIP Facility on day one would be catastrophic for the Debtors' estates, creditors, and all other parties in interest.  As discussed in greater detail in both the First Day Declaration and the Puntus Declaration, absent the liquidity provided by the DIP Facility, the Debtors would, among other things:  (a) not have money to pay their safety equipment vendors and would be without the materials necessary to ensure the well-being of their coal mining employees, resulting in an immediate cessation of business operations; (b) be unable to fund employee wages, benefits, and related obligations, an event that likely would result in attrition to the Debtors' highly trained workforce and negatively impact morale among remaining employees; (c) lack the necessary services and materials to remain in compliance with their permitting and environmental regulatory requirements, resulting in a shutdown of operations and the likely loss of necessary permits and accrual of significant

remediation obligations; (d) lose access to critical third-party equipment necessary to the Debtors' mining operations; and (e) be unable to continue paying their vendors or meeting obligations under their supply contracts, likely resulting in an inability to retain significant customer and vendor relationships to the great detriment of the Debtors' future business prospects.

6.     In light of these circumstances, the Debtors, over the past few weeks, accelerated their ongoing discussions with a subset of their prepetition lenders—who control a majority of the Debtors' first lien term debt and second lien notes—for the provision of a DIP Facility that would satisfy the Debtors' financing needs through these chapter 11 cases.  Through this process, the Debtors, in good faith and at arm's length, successfully negotiated the DIP Facility on terms that are fair and reasonable under the facts and circumstances of these chapter 11 cases.  The DIP Facility generally provides for:

- a multi-draw term loan of approximately $100 million secured by first priority priming liens on substantially all of the Debtors' assets, subject only to the Carve Out,  liens that were senior to the liens of the Debtors' prepetition lenders as of the Petition Date, and, with respect to the Debtors' collateral under their ABL facility, the ABL lenders' liens;

- interest payable at a rate of 12 percent plus 2 percent default interest, as applicable, payable in kind;

- borrowings and disbursements to be made pursuant to the terms of an agreed 13-week budget;

- an initial interim advance of $30 million to be funded upon entry of the Interim DIP Order, followed by intermittent borrowings after entry of the Final DIP Order, pursuant to the terms and conditions set forth in the DIP Loan Agreement;  and

- adequate protection for the Debtors' prepetition secured creditors in the form of, among other things, replacement liens, superpriority claims, and the payment of certain fees and expenses for certain of the Debtors' prepetition lenders.

7.      Any DIP facility must be evaluated in light of a debtor's individual facts and circumstances.  Here, the DIP Facility is necessary to avoid massive harm to the Debtors' business and loss of value for all stakeholders, and also to give the Debtors the opportunity to pursue a going concern transaction.  It is no secret that these are challenging times for the coal industry.  The Debtors had a very difficult time arranging DIP financing, and were unable to secure third-party financing proposals, even on a priming basis.  It is therefore no surprise that the subset of the Debtors' prepetition first lien term loan lenders and second lien noteholders who agreed to provide $100 million in new money require that their new money come in on a senior priming basis on prepetition term loan collateral.  The DIP Facility would also receive a second priority lien on the Debtors' prepetition ABL collateral, but would not prime their ABL credit facility.  Without access to the DIP Facility, the Debtors' ability to operate and ultimately maximize the value of their estates through a going concern transaction will be materially—if not irreparably—jeopardized, all to the great detriment of the prepetition first lien letter of credit lenders and term loan lenders and second lien noteholders who are being primed by the DIP Facility.  Those same lenders also stand to benefit significantly from a potential going concern transaction, which is only possible if the Debtors obtain immediate access to the DIP Facility.  Therefore, the Debtors believe priming financing is warranted under the facts of these chapter 11 cases and applicable law.  Moreover, alternative financing is not otherwise available.

8.      In sum, the relief requested by this Motion is a necessary step to both preserving the Debtors' operations and thousands of employee jobs as well as a bridge to a going concern transaction that maximizes value for their estates.  At the same time, the relief requested by this Motion is also narrowly tailored to address the Debtors' business needs and adequately protect the interests of affected parties.  On this record, and as the Debtors are prepared to demonstrate

at the Court's hearing on this Motion, the relief requested herein presents a sound exercise of business judgment and should be approved.

## Jurisdiction

9.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001(a)-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Relief Requested

12.     By this Motion, the Debtors respectfully request that the Court grant the following relief:

- **The DIP Facility**:  authorizing the Debtors to obtain senior secured postpetition financing up to an aggregate principal amount of $100 million through a multiple delayed draw term loan.

- **Commitment Letter and DIP Agent Fee Letter**: authorizing the Debtors to enter into the Commitment Letter (providing for a 2% upfront fee to each DIP Lender on each DIP Lender's commitment and a 3% exit fee on repayment or termination of the DIP Facility) and the DIP Agent Fee Letter (generally providing for a payment of $75,000 to the DIP Agent) with respect to the DIP Facility.

- **DIP Liens**:  authorizing the Debtors to grant a first-priority, fully perfected lien on all assets subject to the Carve Out and certain other exceptions as more fully set forth in the Interim DIP Order.

- **Adequate Protection**:  approval of the form and manner of adequate protection to be provided to the Adequate Protection Parties pursuant to sections 361 and 363(c) of the Bankruptcy Code.

- **DIP Claims**:  authority to grant a superpriority administrative expense claim with respect to all loans made and obligations incurred by the Debtors pursuant to the DIP Loan Agreement, subject only to the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code.

- **Cash Collateral**:  authority to use Cash Collateral on an interim and final basis pursuant to the terms of the DIP Orders.

### Background

13.     As of the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

### The Debtors' Prepetition Capital Structure

14.     As of the Petition Date, the Debtors' secured debt claims include those arising under an asset-based lending revolving credit facility, a term loan facility that has a first-out letter of credit sub-facility, and second lien notes.  The outstanding balances are:

| Debt | Balance[3] |
|------|-----------|
| ABL Revolving Facility | $38 million |
| L/C Facility | $200 million |
| Term Loan Facility | $247 million |
| Second Lien Notes | $306 million |
| **Total** | **$791.0 million** |

1.     ABL Revolving Facility

15.     Patriot, as borrower, and the remaining Debtors, as guarantors, are party to that Credit Agreement (as amended, supplemented, modified, or amended and restated from time to time, the "ABL Revolving Credit Agreement") by and between the Debtors and, among others, Deutsche Bank AG New York Branch, as administrative agent, and the lenders party thereto. The ABL Revolving Credit Agreement provides the Debtors with a senior secured asset-based revolving credit facility (the "ABL Revolving Facility") in aggregate principal amount of up to $65.0 million, including a $50.0 million letter of credit sub-limit and a swing line sub-limit of up to $10.0 million, subject to the terms and conditions set forth therein.  The ABL Revolving Facility matures in 2018 and bears interest at a rate per annum equal to the Eurocurrency Rate (as defined in the ABL Revolving Credit Agreement) plus 2.25%, 2.50%, or 2.75% based on historical excess availability, or the Base Rate (as defined in the ABL Revolving Credit Agreement) plus 1.25%, 1.50%, or 1.75% based on historical excess availability.  There is an unused line fee of 0.375 % or 0.50% based on historical excess availability.

16.     The ABL Revolving Facility is subject to a borrowing base that consists of (a) 100% qualified cash up to a $50 million cap; plus (b) 85% of eligible billed and unbilled accounts receivable; plus (c) the lesser of: (i) 85% of the appraised net orderly liquidation value of eligible inventory, including saleable and raw coal; or (ii) 80% of the value of eligible inventory that constitutes saleable coal and 40% of the value of eligible inventory that constitutes

---

3     Excludes accrued and unpaid interest.

raw coal; less (d) reserves.  As of the Petition Date, under the ABL Revolving Facility, approximately $38 million in letters of credit were issued and outstanding.

17.    Obligations arising under the ABL Revolving Facility are guaranteed by each of the Debtor subsidiaries and are secured by first priority liens on all accounts receivable (excluding any accounts arising from the sale of collateral securing the L/C Facility and Term Facility on a first priority basis), minerals that have been extracted from real property, inventory (excluding any minerals that have not yet been extracted from real property), as well as deposit, securities, and commodity accounts (excluding such accounts used as collateral with respect to the L/C Facility and Term Facility) and second priority liens on substantially all of the Debtors' other assets, equity interests in the Debtors, and all minerals not yet extracted from real property.

2.    The L/C Facility

18.    Patriot has a $200 million first-out letter of credit facility (the "L/C Facility"), under that certain Credit Agreement (L/C Facility and Term Facility) (as amended, supplemented, modified, or amended and restated from time to time, the "L/C and Term Loan Credit Agreement"), by and between the Debtors and, among others, Barclays Bank PLC, as administrative agent for the L/C Lenders (as defined therein), the L/C Lenders party thereto, Cortland Capital Market Services LLC, as administrative agent for the Term Lenders (as defined therein), the Term Lenders, and Wilmington Trust, National Association, as collateral agent.  As of the Petition Date, approximately $200 million in letters of credit under the L/C Facility were issued and outstanding.

19.    The L/C Facility matures in 2018 and bears interest on undrawn principal amounts of any outstanding letters of credit at a rate per annum equal to (A) for letters of credit that are not cash collateralized, (i) for the first three years, 5.25%, (ii) for year four, 6.00% and (iii) for year five, 6.50% or (B) for letters of credit that are cash collateralized, 0.25%.  Letter of

credit borrowings carry an interest rate per annum equal to (A) the Eurocurrency Rate (as defined in the L/C and Term Loan Credit Agreement) plus (i) for the first three years, 7.00%, (ii) for year four, 7.50% and (iii) for year five, 8.00% or (B) the Base Rate (as defined in the L/C and Term Loan Credit Agreement) plus (i) for the first three years, 6.00%, (ii) for year four, 6.50%, and (iii) for year five, 7.00%.

20.     Obligations arising under the L/C and Term Loan Credit Agreement are guaranteed by each of the Debtors and are secured by first priority liens on substantially all of the Debtors' fixed assets, equity interests in the Debtors, and all minerals not yet extracted from real property.  Obligations under the L/C and Term Loan Credit Agreement are also secured by a second lien on all minerals that have been extracted from real property, accounts receivable, inventory, as well as deposit, securities, and commodity accounts.

3.     The Term Facility

21.     The L/C and Term Loan Credit Agreement also provides for a senior secured term loan facility (the "Term Facility"), with Cortland Capital Market Services LLC as administrative agent for the Term Lenders (as defined therein).   As of the Petition Date, approximately $247 million in direct borrowings under the Term Facility were outstanding.

22.     The Term Facility matures in 2018 and bears interest at a rate per annum equal to the Eurocurrency Rate (as defined in the L/C and Term Loan Credit Agreement) plus 8.00% or the Base Rate (as defined in the L/C and Term Loan Credit Agreement) plus 7.00%.  As of December 31, 2014, the effective interest rate on the Term Loan Facility was 13.1%. Upon the occurrence and during the continuance of an event of default under the L/C and Term Loan Credit Agreement, the interest rate increases by 2.00% per annum.

4.     The Second Lien Notes

23.     Patriot Coal Corporation, as issuer, and the remaining Debtors, as guarantors, are party to that certain indenture (as amended, supplemented, modified, or amended and restated from time to time, the "Notes Indenture") by and between the Debtors and U.S. Bank National Association, as indenture trustee, under which the Patriot issued the Second Lien Notes.  The Second Lien Notes mature in 2023 and carry an interest rate of 15%, with interest compounding semi-annually, and such interest may be settled in-kind or in cash, at Patriot's option.  As of the Petition Date, approximately $306 million aggregate principal amount of Second Lien Notes were outstanding.

24.     Obligations arising under the Second Lien Notes are guaranteed by each of the Debtor subsidiaries and are secured by second priority liens on substantially all of the same assets securing the Term Facility and the ABL Revolving Facility.

**Summary of Principal Terms of DIP Facility**

25.     Pursuant to Bankruptcy Rule 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Facility, as specified in the DIP Loan Agreement and the DIP Orders:[4]

| MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Parties to DIP Loan Agreement**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Borrower**: | Patriot Coal Corporation (the "Borrower") |
| | **Guarantor**: | The subsidiaries of the Borrower listed on Schedule 1.01(a) to the DIP Loan Agreement (collectively, the "Guarantors") |
| | **Administrative Agent**: | Cantor Fitzgerald Securities as post-petition administrative agent (in such capacity, the "DIP Agent") |
| | **DIP Lenders**: | The lenders from time to time party to the DIP Loan Agreement (collectively, the "DIP Lenders") |

---

[4]   This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Agreement or the DIP Orders, as applicable.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Loan Agreement or the DIP Orders, the provisions of the DIP Loan Agreement or the DIP Orders, as applicable, shall control.

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | *See* DIP Loan Agreement, Preamble. |
| **Termination Date**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The earliest to occur of (i) November 30, 2015 (ii) the date of termination of the Commitments pursuant to <u>Section 2.06</u> of the DIP Loan Agreement, (iii) the date of termination of the Commitment of each Lender pursuant to <u>Section 9.02</u> of the DIP Loan Agreement, (iv) the Prepayment Date, (v) the Consummation Date and (vi) the date of dismissal of the Cases by the Bankruptcy Court.<br><br>*See* DIP Loan Agreement § 1.01. |
| **Purpose**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The proceeds of the DIP Facility will be used for working capital, capital expenditures and other general corporate purposes in compliance with the 13-Budget covenant in <u>Section 7.11</u> of the DIP Loan Agreement.<br><br>*See* DIP Loan Agreement § 6.11; Interim DIP Order ¶ 3. |
| **Interest Rates**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Interest Rate**: Interest rate of 12.00 percent per annum.<br><br>**Default Interest Rate**: The Interest Rate <u>plus</u> 2.00 percent per annum.<br><br>*See* DIP Loan Agreement § 1.01. |
| **Commitments**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Total aggregate term loan commitment of $100 million, $30 million of which shall be available to be drawn on the Closing Date.<br><br>*See* DIP Loan Agreement §§ 1.01, 2.01. |
| **Conditions to Closing**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | The closing of the DIP Facility will be subject to the satisfaction of all conditions precedent deemed necessary or appropriate by the DIP Agent including but not limited to:<br><br>(i) the receipt of the executed DIP Loan Agreement and other loan documents;<br><br>(ii) the receipt of copies of all required organizational documents;<br><br>(iii) the receipt of required officer certificates;<br><br>(iv) the receipt of all required costs, fees, disbursements, and expenses;<br><br>(v) he Petition Date shall have occurred on or prior to May 15, 2015;<br><br>(vi) all first day motions and related orders entered by the Court in the chapter 11 cases shall be in form and substance satisfactory to the Required Lenders and the DIP Agent;<br><br>(vii) the Court shall have entered the Interim DIP Order within three business days of the Petition Date; and<br><br>(viii) the DIP Agent and the DIP Lenders shall have received the Budget, which shall be in form and substance reasonably satisfactory to the DIP Agent at the direction of the Required DIP Lenders; and<br><br>*See* DIP Loan Agreement § 4.01. |
| **Fees**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | **Commitment Fee**: (i) An upfront fee upon funding in the amount of 2% of each DIP Lender's total commitment and (ii) an exit fee upon the repayment or termination of the DIP Facility in the amount of 3% of such DIP Lender's total commitment at such time<br><br>**Administrative Agent Fee**: $75,000 |

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | *See* DIP Loan Agreement § 2.10; **Exhibit B** and **Exhibit C** attached hereto. |
| **Liens, Priorities, and Adequate Protection**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(i), (ii)* | DIP Liens and Collateral<br><br>Subject to Paragraph 14(b), and as more fully set forth in the DIP Loan Documents, as security for the full and timely payment of the DIP Obligations, the DIP Agent on its behalf and on behalf of the DIP Lenders is hereby granted:  (i) pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all tangible and intangible unencumbered assets of the Debtors (now or hereafter acquired and all proceeds thereof) and shall include without limitation property subject to avoided liens; *provided* that, in no event shall such assets include Priority ABL DIP Collateral; (ii) pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on the Segregated Operating Account and any new DIP Loan Funding Account established pursuant to Paragraph 7, the funds maintained in such accounts, and all proceeds thereof; pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on and security interest in all Priority ABL DIP Collateral; *provided further* that such lien on the Priority ABL DIP Collateral shall be junior in priority and subordinate to the Prepetition ABL Liens and the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, and senior in priority to any other lien on the Priority ABL DIP Collateral (including, without limitation, the Prepetition LC Liens, the Prepetition Term Loan Liens and the Prepetition Notes Liens) securing any other indebtedness or obligations of the Debtors; and (iv) pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and security interest in all assets of the Debtors, including but not limited to Cash Collateral, encumbered by a first priority lien under the Prepetition LC Facility or the Prepetition Term Loan Facility or a lien under the Prepetition Notes Documents not otherwise described in clauses (i) through (iii) above (now or hereafter acquired and all proceeds thereof) (the "Priming Lien Collateral"); *provided further* that such lien on the Priming Lien Collateral shall be senior in priority to the Prepetition LC Liens, the Prepetition Term Loan Liens, the Prepetition Notes Liens and the Prepetition ABL Liens on the Priming Lien Collateral; *provided further* that, upon entry of the Final Order, the DIP Liens (as defined below) shall attach to and encumber claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise.<br><br>*See* DIP Loan Agreement § 2.06; Interim DIP Order ¶ 14.<br><br><br>Adequate Protection<br><br>As adequate protection of the interests of the Prepetition Lenders, subject to the terms of the Interim DIP Order, (a) the Prepetition ABL Agent is granted adequate protection liens, superpriority administrative expense claims, rights to certain application of proceeds, certain financial reporting and access rights, prepetition and postpetition interest and fees at the non-default rate, certain limited professional fees, and certain milestones; (b) the Prepetition LC Agent is granted adequate protection liens, superpriority administrative expense claims, certain financial reporting and access rights, accrual of postpetition interest at the default rate, certain limited professional fees, and certain milestones; (c) the Prepetition Term Agent is granted adequate protection liens, superpriority administrative expense claims, certain financial reporting rights, and certain limited professional fees; and (d) the Prepetition Notes Trustee is granted adequate protection liens, superpriority administrative expense claims, and certain financial reporting rights. |

| **MATERIAL TERMS OF DIP FACILITY** | |
|---|---|
| | *See* Interim DIP Order ¶ 25. |
| **Events of Default**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B), (vi)* | **Events of Default.**  Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest, and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, incurrence of certain ERISA liability, and relief from automatic stay.  The DIP Loan Agreement contains case milestones, the failure of which to satisfy would constitute an Event of Default thereunder, including, milestones relating to filing a plan of reorganization, reaching agreements with the Debtors' prepetition unions or otherwise commencing section 1113 and/or 1114 proceedings, filing a motion for a sale of the Debtors' assets, and confirmation and consummation of a Plan.  Additionally, certain actions, if taken, or pleadings, if filed, would constitute an Event of Default under the DIP Loan Agreement, including, but not limited to, filing a Plan that is not an Acceptable Reorganization Plan and filing of a Plan that does not propose to repay the DIP Obligations in full in cash.<br><br>*See* DIP Loan Agreement § 9.01; Interim DIP Order ¶ 32.<br><br>**Remedies Upon an Event of Default.**  Subject to certain requirements of the DIP Loan Agreement and the Interim DIP Order, the DIP Lenders may take certain actions in connection with the occurrence of an Event of Default, including to immediately terminate the Debtors' use of any Cash Collateral; cease making any extensions of credit under the DIP Facility to the Debtors; declare all DIP Obligations to be immediately due and payable; and take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order, the DIP Loan Documents, or applicable law to effect the repayment of the DIP Obligations.<br><br>*See* DIP Loan Agreement § 9.02; Interim DIP Order ¶ 33. |
| **Acknowledgements**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary admissions and stipulations with respect to (i) the aggregate amount of prepetition indebtedness owing to the the Prepetition ABL Lenders, the Prepetition LC Lenders, the Prepetition Term Lenders, and the Prepetition Noteholders (collectively, the "Prepetition Lenders"), (ii) the validity, enforceability, and priority of the liens and security interests granted to the Prepetition Lenders, (iii) the binding nature of the obligations under the Debtors' Prepetition Financing Documents, and (iv) the waiving of claims and defenses against the Lenders regarding the obligations under the Prepetition Financing Documents; *provided* that, until the later of (a) thirty days following appointment of the Committee or (b) forty-five days following entry of the Interim DIP Order, the Committee shall be entitled to investigate the validity, priority, and enforceability of the liens securing the Prepetition Obligations or to assert any other claim or cause of action related to such obligations against the Prepetition Lenders.<br><br>*See* Interim DIP Order ¶¶ E, F, 36. |
| **Automatic Stay**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iv)* | The automatic stay is modified as necessary to permit (i) the Debtors to grant the liens and security interests to the DIP Agent, the DIP Lenders, and the Adequate Protection Parties, as contemplated by the Interim DIP Order; (ii) the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, and the Prepetition LC Agent to exercise, upon the occurrence and during the continuance of certain defaults all rights and remedies provided for in the Interim DIP Order and take any or all actions provided therein (subject to the limitations set forth therein); and (vi) the implementation of the terms of |

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | the Interim DIP Order. |
| | *See* DIP Loan Agreement § 4.01(i); Interim DIP Order ¶¶ 16, 23(b), 33. |
| **Waivers, Indemnification, and Causes of Action**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(vii), (viii), (ix), (x), and (xi)* | **Non-Bankruptcy Law**:  The DIP Liens and other interests granted to the DIP Agent and the DIP Lenders are deemed valid, binding, and enforceable as of the Petition Date.<br><br>*See* Interim DIP Order ¶ 4.<br><br>**Claims and Causes of Action**:  The DIP Obligations are secured by DIP Liens on, among other things, upon entry of the Final DIP Order, all avoidance actions and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.<br><br>*See* Interim DIP Order ¶ 14(a).<br><br>**Indemnification**:  Usual and customary for financings of this type, including that Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Lender, and each of their Related Parties from and against any and all losses, claims, damages, liabilities and related reasonable fees and out-of-pocket costs and expenses arising out of, in connection with, or relating to, among other things, the DIP Facility and the transactions contemplated thereby.<br><br>*See* DIP Loan Agreement ¶ 12.03(b).<br><br>**Sections 506(c)**:  Usual and customary section 506(c) waivers subject to entry of the Final DIP Order.<br><br>*See* Interim DIP Order ¶¶ 14(b), 24. |
| **Carve Out** | Generally, the DIP Obligations and the Prepetition Obligations, including the Adequate Protection Liens and any and all other forms of adequate protection, liens, security interests, and other claims granted in the Interim DIP Order to the Prepetition Agents, the Prepetition Lenders, the DIP Agent, or the DIP Lenders shall be subject to the following:  the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid costs, fees, and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Estate Professionals") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by the Court or payable by the Debtors prior to or after delivery of a Carve Out Trigger Notice (the "Pre-Termination Amount"); and (iv) Professional Fees of Estate Professionals in an aggregate amount equal to $5,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice plus any restructuring fee, sale fee, or other success fee of any investment banker or financial advisor of the Debtors or the Committee that has not previously been funded into the Professional Fees Account, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Termination Amount," and together with the Pre-Termination Amount, the "Carve Out Reserve").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee providing notice |

| MATERIAL TERMS OF DIP FACILITY | |
|---|---|
| | that the Termination Date has occurred.  Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay (i) fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and (ii) fees, expenses, indemnities, and other amounts to the DIP Agent or any DIP Lender or any of the foregoing's respective attorneys, advisors, as the same may be due and payable, and the same shall not reduce the Carve Out; *provided* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described in Paragraph 5(a) of the Interim DIP Order; *provided*, that, solely with respect to the ABL Lenders and ABL Agent and all forms of adequate protection, liens, or claims securing obligations arising under the Prepetition ABL Agreement, any reference to the "Carve Out" shall mean, on any date of determination, an amount of the Carve Out equal to the amount, if any, by which (x) the Borrowing Base then in effect (determined in accordance with paragraph 25(a)(iv) of this Interim Order, giving effect to the $10,000,000 reduction thereto described in such paragraph) exceeds (y) the Total Outstandings, net of ABL Cash Collateral then held in the ABL Cash Collateral Account). *See* Interim DIP Order ¶ 5. |

## Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain PostPetition Financing through the DIP Facility**

**A.     Entering into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

26.     The determination to obtain postpetition financing is a question of business judgment.  *See In re YL W. 87th Holdings I, LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").  Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest."  *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

27.     To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

28.     And, in exercising its business judgment, courts recognize that a debtor is entitled (if not required) to consider non-economic benefits offered by a proposed postpetition facility:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. Jul. 6, 2009).

29.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment and should be approved.  Specifically, and in the face of depleted liquidity, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Accordingly, the Debtors negotiated the DIP Loan Agreement with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors.  The DIP Facility provides the Debtors with the capital necessary to meet their working capital needs and the costs of these chapter 11 cases.  The DIP Facility also provides the Debtors with a path towards an exit from chapter 11 by the fourth quarter of 2015.

This determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974 (finding that the debtor's entry into the financing that served as the "framework" and "cornerstone" for the debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

30.     Indeed, the Debtors negotiated the DIP Facility in conjunction with their overall efforts to determine a path forward for these chapter 11 cases.    There can be no reasonable dispute that the DIP Facility is an important step toward achieving this goal:  the DIP Facility will support not only the Debtors' near term liquidity needs, but will also "bridge" the Debtors' operations to a value-maximizing restructuring transaction, as reflected in the milestones set forth in the DIP Loan Agreement.    Accordingly, the DIP Facility reflects an exercise of sound business judgment that should be approved.    *See ION Media*, 2009 WL 2902568, at *4 ("[C]ooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

> **B.     The Debtors Should Be Authorized to Obtain PostPetition Financing on a Senior Secured and Superpriority Basis**

31.     Section 364(c) of the Bankruptcy Code authorizes a debtor to incur credit with priority over administrative claims or secured by junior liens on encumbered property or first priority liens on unencumbered property.    To incur credit on this basis, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n*, 789 F.2d 1085, 1088 (4th Cir. 1986).    Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*    When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

32.    Given, among other things, the fact that the Debtors' prepetition lenders are secured by substantially all the Debtors' assets, and in light of the Debtors' advisors prepetition discussions with potential postpetition lenders, the Debtors do not believe financing would be available on commercially reasonable terms solely on an administrative priority basis.  Indeed, as set forth in the Puntus Declaration, neither the agents for the Prepetition ABL Facility or the Prepetition LC/Term Loan Facility nor sophisticated third-party lenders were willing to extend financing even on a priming basis.  Therefore, the Debtors believe their securing the DIP Facility with superpriority administrative claims, priming liens on encumbered property, and first priority liens on the Debtors' unencumbered property is appropriate under the circumstances of these chapter 11 cases**.**

### C.    The Debtors Should Be Authorized to Obtain PostPetition Financing Secured by First Priority Priming Liens

33.    Section 364(d)(1) authorizes the Debtors to obtain postpetition credit secured by a lien that is senior to existing liens on the encumbered property, without the consent of the existing lienholders, if the Debtors cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

34.    Courts have identified a number of factors that support a debtor's determination to obtain credit secured by a "priming" lien, including:

(a)  whether the party subject to a priming lien has consented to such treatment;

(b)  whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

(c) whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

(d) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

(e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Barbara K. Enter.*, No. 08-11474, 2008 WL 2439649 at *13 (Bankr. S.D.N.Y. Jun. 16, 2008); *see also* 3 Collier on Bankruptcy ¶ 364.05 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

35.     The Debtors respectfully submit the DIP Facility is appropriate under this analysis and the facts of these chapter 11 cases.  <u>First</u>, on information and belief, the DIP Lenders hold a majority of both the term debt outstanding under the Prepetition Term Loan Facility and a majority of the notes issued under the Prepetition Indenture.  With respect to the Prepetition Indenture, therefore, the DIP Lenders have affirmatively consented to the priming feature of the DIP Facility on behalf of the Prepetition Noteholders.  With respect to the Prepetition Term/LC Facility, the Debtors have negotiated the form of the DIP Facility and DIP Orders with agents under both the Prepetition Term/LC Facility, as well as the Prepetition ABL Facility, and the Debtors are aware of no objections at this time.  The DIP Facility, moreover, leaves the Prepetition ABL Facility in place and does not seek to prime the Prepetition ABL Facility.

36.     <u>Second</u>, the Debtors and their advisors determined that the DIP Facility is the only alternative readily available for such liquidity.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility.  The Debtors are only able to obtain these negotiated terms by agreement to provide first priority priming liens.  The Debtors

do not believe, moreover, that the financing necessary to fund these chapter 11 cases and prevent an immediate liquidation of the Debtors' estates is available from other parties on comparable terms.

37.     Third, as set forth in detail in the Puntus Declaration and the First Day Declaration, the Debtors require immediate access to the DIP Facility to provide adequate liquidity for the operation and maintenance of the Debtors' assets.  Absent such relief, the Debtors will suffer material and irreparable harm, as they simply cannot operate or maintain their operations in the ordinary course without cash on hand, and would face an immediate liquidity crisis.  Accordingly, value will be lost and the Debtors' ability to effectuate a going concern transaction will be significantly threatened.  Conversely, the Debtors' access to liquidity will benefit all stakeholders—including the Debtors' prepetition secured lenders—by facilitating the Debtors' efforts to preserve and enhance the value of the Debtors' assets.

38.     Fourth, as set forth herein and in the Puntus Declaration, and as the Debtors are prepared to demonstrate at the Court's hearing on this Motion, the Debtors and the DIP Lenders negotiated the DIP Facility in good faith and at arm's-length.  The Debtors' entry into the DIP Facility is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

39.     Fifth, and as discussed more fully below, the Debtors will provide adequate protection for their prepetition secured lenders' interests in the collateral that will be subject to priming liens arising under the DIP Facility.

## II.     The Debtors' Proposed Adequate Protection Should be Approved

40.     Parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection.  *See* 11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate

that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  11 U.S.C. § 364(d)(1)(B).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012).  At the same time, it is well-recognized that "adequate protection" is not equivalent to "absolute protection."  *In re Beker Indus., Inc.*, 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard.").

41.     The DIP Orders provide for Adequate Protection for the Adequate Protection Parties generally consisting of:[5]

(a) in the case of the ABL Adequate Protection Parties:

i.   **Adequate Protection Liens**.  Subject to the Carve Out, the DIP Liens, Permitted Liens (as defined in the Prepetition ABL Agreement), and, solely with respect to the Prepetition LC/Term Loan Collateral, the Prepetition LC/Term Loan Liens, liens on and security interests in unencumbered collateral and replacement liens and security interests on the Debtors' assets;

ii.   **Superpriority Claims**.  Subject to the Carve-Out and the Claims of the DIP Lenders, superpriority administrative expense claims against the Debtors as provided in section 507(b) of the Bankruptcy Code to be shared *pari passu* with the superpriority claim granted to the Prepetition LC/Term Collateral Agent;

iii.   **Borrowing Base**.  A borrowing base cushion equal to $10 million;

iv.   **Access**.  Certain access, review, and appraisal rights with respect to the Debtors' property;

---

[5]   This summary is qualified in its entirety by reference to the applicable provisions of the DIP Loan Agreement or the DIP Orders, as applicable.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Loan Agreement or the DIP Orders, the provisions of the DIP Loan Agreement or the DIP Orders, as applicable, shall control.

v. **Milestones**. Certain milestones for the sale of the Debtors' assets through a chapter 11 plan.

vi. **Fees and Interest**.   Certain accrued but unpaid prepetition fees and interest and postpetition fees and interest and certain professional fees on a postpetition basis; and

vii. **Reporting**.   Financial reporting consisting of borrowing base reports required to be delivered under the Prepetition ABL Agreement on a bi-weekly basis and cash flow projections, weekly budget variance reports, and other reports required to be delivered to the DIP Agent under the DIP Facility.

(b) In the case of the LC Adequate Protection Parties:

i. **Adequate Protection Liens**. Subject to the Carve Out, the DIP Liens, Permitted Liens (as defined in the Prepetition LC/Term Loan Agreement), and, solely with respect to the Priority ABL Collateral, the Prepetition ABL Liens securing the Prepetition ABL Collateral, liens on and security interests in unencumbered collateral and replacement liens and security interests on the Debtors' assets;

ii. **Superpriority Claims**.  Subject to the Carve-Out and the Claims of the DIP Lenders, superpriority administrative expense claims against the Debtors as provided in section 507(b) of the Bankruptcy Code to be shared *pari passu* with the superpriority administrative expense claim granted to the ABL Adequate Protection Parties;

iii. **Access**.  Certain access and review rights with respect to the Debtors' property.

iv. **Professional Fees**.  Certain accrued but unpaid prepetition professional fees and certain professional fees on a postpetition basis; and

v. **Reporting**.  Financial reporting consisting of cash flow projections, weekly budget variance reports, and other reports required to be delivered to the DIP Agent under the DIP Facility.

(c) In the case of the Term Adequate Protection Parties:

i. **Adequate Protection Liens**.  Subject to the Carve Out, the DIP Liens, the Prepetition LC Liens, the LC Adequate Protection Liens, and the Permitted Liens (as defined in the Prepetition LC/Term Loan Agreement), and, solely with respect to the Priority ABL Collateral, the Prepetition ABL Liens securing the Prepetition ABL Collateral, liens on and security interests in unencumbered collateral and replacement liens and security interests on the Debtors' assets;

   ii. **Superpriority Claims**. Subject to the Carve-Out, the Claims of the DIP Lenders, and the superpriority administrative expense claims granted to the ABL Adequate Protection Parties and the LC Adequate Protection Parties, superpriority administrative expense claims against the Debtors as provided in section 507(b) of the Bankruptcy Code;

   iii. **Professional Fees**.  Certain professional fees for one lead counsel; and

   iv. **Reporting**.   Financial reporting consisting of cash flow projections, weekly budget variance reports, and other reports required to be delivered to the DIP Agent under the DIP Facility.

  (d) In the case of the Note Adequate Protection Parties:

   i. **Adequate Protection Liens**.   Subject to the Carve Out, the DIP Liens, liens under the Debtors' prepetition secured facilities, and the adequate protection liens set forth above, liens on and security interests in unencumbered collateral and replacement liens and security interests on the Debtors' assets;

   ii. **Superpriority Claims**. Subject to the Carve-Out, the Claims of the DIP Lenders, and the superpriority administrative expense claims granted as adequate protection as set forth above, superpriority administrative expense claims against the Debtors as provided in section 507(b) of the Bankruptcy Code; and

   iii. **Reporting**.   Financial reporting consisting of cash flow projections, weekly budget variance reports, and other reports required to be delivered to the DIP Agent under the DIP Facility.

  42. The Debtors submit that the foregoing adequate protection package is consistent with what is customarily granted to parties whose prepetition liens on a debtor's assets are primed by liens granted to lenders providing debtor-in-possession financing.

## II. The Debtors Should Be Authorized to Use the Cash Collateral

  43. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.

Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

44.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral on a final basis. <u>First</u>, as noted above, the DIP Lenders, who control material portions of debt in the Debtors' capital structure, have consented to the Debtors' use of the Cash Collateral subject to the conditions set forth in the DIP Loan Documents. The Debtors are not aware, and have no reason to believe, that the remaining lenders under their prepetition credit facilities will object. <u>Second</u>, the Debtors' prepetition secured creditors' interests in the Cash Collateral are adequately protected. As described above, the Debtors are providing such creditors with the Adequate Protection which is fair and reasonable and adequately protects such creditors' interests in the Debtors' prepetition collateral from diminution. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent Under the DIP Loan Documents**

45.     Under the DIP Facility, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders and the DIP Agent. In particular, as noted above, the Debtors have agreed to pay: (a) each DIP Lender (i) an upfront fee equal to 2% of such DIP Lender's total commitment and (ii) an exit fee upon the repayment or termination of the DIP Facility in the amount of 3% of such DIP Lender's total commitment at such time; and (b) the DIP Agent an administrative fee equal to $75,000.

46.     The fees the Debtors have agreed to pay to the DIP Lenders, together with the other provisions of the DIP Facility, represent the most favorable terms to the Debtors on which

the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the

fees described above when determining in their sound business judgment that the DIP Facility

constituted the best terms on which the Debtors could obtain the postpetition financing necessary

to continue their operations and prosecute their chapter 11 cases.  The Debtors also submit that

the fee set forth in the fee letter in respect of fees payable to the DIP Agent are in line with

transactions of this type, and should be approved under the facts and circumstances of these

chapter 11 cases.

**IV.     The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

47.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under
> this section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

48.     As explained in detail herein and in the Puntus Declaration, the DIP Facility is the

result of the Debtors' reasonable and informed determination that the DIP Lenders offered the

most favorable terms on which to obtain needed postpetition financing, and of arm's-length,

good faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of

the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only

for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being

provided to any party to the DIP Facility other than as described herein.  Accordingly, the Court

should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of

the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should be Modified on a Limited Basis**

49.      The proposed Interim DIP Order provides that the automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified to the extent necessary, upon the

occurrence and during the continuation of any Event of Default, to permit the DIP Agent to

exercise all rights and remedies provided for in the DIP Loan Agreement, and to take various

actions without further order of or application to the Court.  However, the DIP Agent must

provide the Debtors, the official committee of unsecured creditors appointed in these chapter 11

cases (if any), and the U.S. Trustee with written notice five business days prior to exercising any

enforcement rights or remedies in respect of the Debtors' collateral.

50.      Stay modification provisions of this sort are ordinary and usual features of DIP

financing facilities and, in the Debtors' business judgment, are reasonable under the present

circumstances.   Accordingly, the Court should modify the automatic stay to the extent

contemplated by the DIP Loan Agreement and the proposed DIP Orders.

**VI.     The Debtors Require Immediate Access to the Cash Collateral and DIP Facility**

51.      The Court may grant interim relief in respect of a motion filed pursuant to

section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to

avoid   immediate   and   irreparable   harm   to   the   estate   pending   a   final   hearing."

Fed. R. Bankr. P. 4001(b)(2), (c)(2).

52.      Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to

obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

53.   The Debtors have an immediate postpetition need to access the funds provided by the DIP Facility.  As described in greater detail in the First Day Declaration and the Puntus Declaration, the Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will be unable to operate their business as a going concern in the near term without the ability to access the DIP Facility and use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  On the other hand, the Debtors will use liquidity obtained under the DIP Facility and Cash Collateral to, among other things, procure goods and services from vendors, pay their employees, and satisfy other working capital needs during these chapter 11 cases.  In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of the DIP Facility and Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates.

54.   The Debtors, therefore, seek immediate authority to access the DIP Facility on an interim basis and as set forth in this Motion and in the Interim DIP Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c).  Accordingly, to the extent that the Debtors require the use of Cash Collateral and postpetition financing, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate DIP Facility and Cash Collateral availability on an interim basis.

## Request for Final Hearing

55.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

56.    To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Waiver of Memorandum of Points and Authorities

57.    The Debtors respectfully request that the Court treat this motion as a written memorandum of points and authorities or waive any requirement that this motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

## Notice

58.    The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Eastern District of Virginia; (b) the administrative agents for the Debtors' prepetition credit facilities; (c) the indenture trustee for the Debtors' prepetition notes; (d) counsel for each of the foregoing referenced in clauses (b)-(c);  (e) counsel to lenders for the debtor in possession facility; (f) those creditors holding the 30 largest unsecured claims against the Debtors' estates on a consolidated basis; (g) the Internal Revenue Service; (h) the United States Environmental Protection Agency, (i) the state attorneys general for states in which the Debtors conduct business; (j) the Office of the United States Attorney for the Eastern District of Virginia; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The

Debtors submit that, in light of the nature of the relief requested, no other of further notice need be given.

## **No Prior Request**

59.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders

granting the relief requested herein and granting such other relief as is just and proper.

Dated:  May 12, 2015
Richmond, Virginia

*/s/ Michael A. Condyles*
_____

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia  23219-3500
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Counsel for the*
*Debtors and Debtors in Possession*

## EXHIBIT A

**Proposed Interim DIP Order**

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

James H.M. Sprayregen, P.C
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION

```
--------------------------------------------------------- X
                                                          :
In re:                                                    :   Chapter 11
                                                          :
PATRIOT COAL CORPORATION, et al.,                         :   Case No. 15-32450 (KLP)
                                                          :
                    Debtors.                              :   (Joint Administration Requested)
                                                          :
--------------------------------------------------------- X   Re:  Docket No. [__]
```

## INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[1] of Patriot Coal Corporation and certain of its affiliates,

as debtors and debtors in possession in the above-captioned cases (each, a "<u>Debtor</u>" and

collectively, the "<u>Debtors</u>") for entry of an interim order (this "<u>Interim Order</u>") and a final order

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

(the "Final Order") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Rules"), *inter alia* (a) authorizing Patriot Coal Corporation (the "Borrower") to obtain, and each of the other Debtors to guarantee, postpetition financing in the form of a term loan facility as set forth in that certain Debtor-in-Possession Term Loan Agreement attached hereto as **Exhibit 1** (as amended, supplemented or otherwise modified from time to time, the "DIP Loan Agreement"), by and among the Borrower, the other Debtors, Cantor Fitzgerald Securities, as administrative agent (in such capacity and its capacity as the collateral agent for the DIP Facility (as defined below), the "DIP Agent"), and the lenders party thereto (the "DIP Lenders"), of up to $100.0 million (the "DIP Facility"), of which $30.0 million shall be available on an interim basis, under the terms of this Interim Order and the other DIP Loan Documents (as defined below), and authorizing the Debtors to utilize the proceeds of drawings under the DIP Facility from time to time to cash collateralize letters of credit to be issued by one or more banks for the account of Debtors during the Chapter 11 Cases, (b) authorizing the use of Cash Collateral (as defined below) by the Debtors effective as of the Petition Date, (c) allowing superpriority administrative expense status of the DIP Obligations (as defined below) in the Debtors' chapter 11 cases (the "Chapter 11 Cases") and authorizing the Debtors to grant to the DIP Agent on its behalf and on behalf of the DIP Lenders automatically perfected security interests in and liens on the DIP Collateral (as defined below) to the extent set forth herein, (d) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and

effectuate the terms and provisions of this Interim Order and the Final Order, (e) granting adequate protection to the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Notes Trustee, and the Prepetition Noteholders (each such capitalized term being used herein as defined below), (f) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and (g) granting related relief; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court on May 13, 2015 (the "Interim Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion, the *Declaration of Ray Dombrowski in Support of First Day Motions*, dated as of May 12, 2015 (the "First Day Declaration"), the Declaration of Marc Puntus in support of the Motion, dated as of May 12, 2015 (the "Puntus Declaration"), and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND CONCLUDED THAT:

A.      Disposition.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.   Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled are hereby denied and overruled.

B.      Commencement of Chapter 11 Cases.  On May 12, 2015 (the "Petition Date"), each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are in possession of their properties and are continuing to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the

Bankruptcy Code.  No official committee of unsecured creditors (a "<u>Committee</u>") has been appointed in the Chapter 11 Cases.

     C.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Local Rule 4001-2.

     D.    <u>Adequate Notice</u>.  On the Petition Date, the Debtors filed the Motion with this Court pursuant to Bankruptcy Rules 2002, 4001 and 9014, and provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the Office of the U.S. Trustee; (b) counsel to the Prepetition Term Agent; (c) counsel to the Prepetition LC Agent; (d) counsel to the Prepetition ABL Agent; (e) counsel to the Prepetition Notes Trustee; (f) counsel to the Prepetition LC/Term Collateral Agent; (g) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' voluntary petitions; and (h) all parties requesting service in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>").

E.    <u>The Prepetition Obligations</u>.    The Debtors acknowledge, admit, represent, stipulate and agree that:

(i)    *Prepetition ABL Agreement*.    Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Credit Agreement, dated as of December 18, 2013 (as amended, modified, supplemented or restated from time to time, the "<u>Prepetition ABL Agreement</u>"), by and among the Borrower, the other Debtors, the L/C issuers party thereto (the "<u>Prepetition ABL Facility Issuers</u>"), the lenders party thereto (together with the Prepetition ABL Facility Issuers and all other Secured Parties (as defined in the Prepetition ABL Agreement), the "<u>Prepetition ABL Lenders</u>"), and Deutsche Bank AG New York Branch, in its capacity as administrative agent for the Prepetition ABL Lenders (in such capacity and its capacity as collateral agent with respect to the Prepetition ABL Facility, and together with any of its successors in such capacities, the "<u>Prepetition ABL Agent</u>"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and/or any of the Prepetition ABL Lenders, including, without limitation, the Intercreditor Agreements (as defined below), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition ABL Agreement, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "<u>Prepetition ABL Financing Documents</u>"), the Prepetition ABL Lenders agreed to make revolving loans to, and issue letters of credit for the account of, the Borrower and other Debtors and to otherwise extend credit to the Debtors, in an aggregate principal amount not to exceed $65.0 million (the "<u>Prepetition ABL Facility</u>").  All obligations of

the Debtors arising under the Prepetition ABL Agreement or any other Prepetition ABL Financing Document, including under the Prepetition ABL Facility and all Secured Obligations under and as defined in the Prepetition ABL Agreement, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers', field examiners' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition ABL Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition ABL Financing Documents shall hereinafter be referred to collectively as the "Prepetition ABL Obligations".  All extensions of credit under the Prepetition ABL Facility are subject to a Borrowing Base (as defined in the Prepetition ABL Agreement).

(ii)     *Prepetition LC/Term Loan Agreement*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Credit Agreement (L/C Facility and Term Facility), dated as of December 18, 2013 (as amended, modified, supplemented or restated from time to time, the "Prepetition LC/Term Loan Agreement"), by and among the Borrower, the other Debtors, the lenders party thereto as Term Lenders (as defined therein, and together with all other Term Secured Parties (as defined in the Prepetition LC/Term Loan Agreement), the "Prepetition Term Lenders"), the L/C issuers party thereto (the "Prepetition LC Facility Issuers"), the lenders party thereto as L/C Lenders (as defined therein, and together with the Prepetition LC Facility Issuers and all other L/C Secured Parties (as defined in the Prepetition LC/Term Loan Agreement) the "Prepetition LC Lenders"), Barclays Bank PLC, in its capacity as L/C

6

Administrative Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition LC Agent"), Cortland Capital Markets Services LLC ("Cortland"), in its capacity as successor Term Administrative Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition Term Agent"), and Wilmington Trust, National Association, in its capacity as Collateral Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition LC/Term Collateral Agent"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Term Agent, any of the Prepetition Term Lenders, the Prepetition LC Agent, any of the Prepetition LC Lenders, and/or the Prepetition LC/Term Collateral Agent (the foregoing, collectively, the "Prepetition LC/Term Secured Parties"), including, without limitation, the Intercreditor Agreements, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition LC/Term Loan Agreement, as all of the same have been or may be supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date or in connection with any resignation or appointment of the role of the Prepetition Term Agent or Prepetition LC Agent, collectively, the "Prepetition LC/Term Loan Financing Documents"), the Prepetition Term Lenders agreed to make term loans to the Borrower and to otherwise extend credit to the Debtors, in an aggregate principal amount of up to $250.0 million (the "Prepetition Term Loan Facility") and the Prepetition LC Lenders agreed to extend credit to the Debtors under certain letters of credit in the aggregate original undrawn available amount of $200,147,031.55 and to otherwise extend credit to the Debtors (including in the form of extensions of such letters

of credit and advances in connection with drawings thereunder) (the "Prepetition LC Facility" and together with the Prepetition Term Loan Facility, the "Prepetition LC/Term Loan Facility").  All obligations of the Debtors arising under the Prepetition LC/Term Loan Agreement or any other Prepetition LC/Term Loan Financing Document, including the Prepetition Term Loan Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees (including fees of the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent), costs, charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition LC/Term Loan Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable, in respect of any of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents, in each case to the extent relating to the Prepetition Term Loan Facility, including all "Secured Term Facility Obligations" as defined in the Prepetition LC/Term Loan Agreement, shall hereinafter be referred to collectively as the "Prepetition Term Loan Obligations."   All obligations of the Debtors arising under the Prepetition LC/Term Loan Agreement or any other Prepetition LC/Term Loan Financing Document, including the Prepetition LC Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees (including fees of the Prepetition LC/Term Collateral Agent and the Prepetition LC Agent), costs, charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition LC/Term Loan Financing Documents), or other amounts, of

any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable, in respect of any of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents, in each case to the extent relating to the Prepetition LC Facility, including all "Secured L/C Facility Obligations" as defined in the Prepetition LC/Term Loan Agreement, shall hereinafter be referred to collectively as the "Prepetition LC Obligations."  As used herein: "Prepetition LC Secured Parties" means the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition LC Obligations and/or LC Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral Agent for the benefit or on behalf of any other Prepetition LC Secured Party), and all other L/C Secured Parties (as defined in the Prepetition LC/Term Loan Agreement).  "Prepetition Term Secured Parties" means the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition Term Loan Obligations and/or Term Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral Agent for the benefit or on behalf of any other Prepetition Term Secured Party), and all other Term Secured Parties (as defined in the Prepetition LC/Term Loan Agreement).

(iii)    *Prepetition Notes.*  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Indenture, dated December 18, 2013, with respect to the Borrower's 15.0% Senior Secured Second Lien PIK Toggle Notes due 2023 (as amended, modified, supplemented or restated from time to time, the "Prepetition Indenture"), by and among the Borrower, as issuer, the other Debtors, U.S. Bank National Association, in its capacity as

9

trustee (in such capacity and its capacity as collateral trustee for the Prepetition Noteholders with respect to the Prepetition Notes, and together with any of its successors in such capacities, the "Prepetition Notes Trustee", together with the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent, the "Prepetition Agents") for the Holders (as defined in the Prepetition Indenture) (the "Prepetition Noteholders"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Notes Trustee and/or the Prepetition Noteholders, including, without limitation, the Intercreditor Agreements, all security agreements, collateral trust agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition Indenture, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition Notes Documents", and together with the Prepetition LC/Term Loan Financing Documents and the Prepetition ABL Financing Documents, the "Prepetition Financing Documents"), the Prepetition Noteholders agreed to purchase the Borrower's Senior Secured Second Lien PIK Toggle Notes due 2023 in an initial aggregate principal amount of $262,499,992.00 (such initial notes, together with any additional notes issued or increases to the principal amount of existing notes as of the Petition Date, in each case representing interest "paid in kind", the "Prepetition Notes" and together with the Prepetition LC/Term Loan Facility and the Prepetition ABL Facility, the "Prepetition Facilities").  All obligations of the Debtors arising under the Prepetition Indenture or any other Prepetition Notes Document, including under the Prepetition Notes, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs,

charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Notes Documents), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Notes Documents shall hereinafter be referred to collectively as the "Prepetition Notes Obligations".   The Prepetition LC Obligations, the Prepetition /Term Loan Obligations, Prepetition ABL Obligations and Prepetition Notes Obligations shall hereinafter be referred to collectively as the "Prepetition Obligations".

(iv)   *Guarantors*.   The Prepetition Obligations are guaranteed, on a joint and several basis, by substantially all wholly-owned domestic subsidiaries of the Borrower under the terms of the applicable Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents, and the Prepetition Notes Documents, respectively (collectively, the "Guarantors"), and the Prepetition ABL Obligations are also guaranteed by the Borrower.

(v)   *Prepetition ABL Liens*.   Pursuant to certain Prepetition ABL Financing Documents, each Debtor granted to the Prepetition ABL Agent for its benefit and the benefit of the Prepetition ABL Lenders, to secure the Prepetition ABL Obligations a security interest in and continuing lien on (the "Prepetition ABL Liens") all of the "Collateral" (as defined in the Prepetition ABL Agreement), subject to certain exclusions as set forth in the Prepetition ABL Financing Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "Prepetition ABL Collateral").

(vi)   *Prepetition Term Loan Liens*.   Pursuant to certain Prepetition LC/Term Loan Financing Documents, each Debtor granted to the Prepetition LC/Term Collateral Agent,

for its benefit and the benefit of the Prepetition Term Agent and the Prepetition Term Lenders, to secure the Prepetition Term Loan Obligations, a security interest in and continuing lien on (the "<u>Prepetition Term Loan Liens</u>") all of the "Collateral" (as defined in the Prepetition LC/Term Loan Agreement), subject to certain exclusions as set forth in the Prepetition LC/Term Loan Financing Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "<u>Prepetition LC/Term Loan Collateral</u>").

      (vii)   *Prepetition LC Liens*.  Pursuant to certain Prepetition LC/Term Loan Financing Documents, each Debtor granted to the Prepetition LC/Term Collateral Agent, for its benefit and the benefit of the Prepetition LC Agent and the Prepetition LC Lenders, to secure the Prepetition LC Obligations, a security interest in and continuing lien on (the "<u>Prepetition LC Liens</u>" and together with the Prepetition Term Loan Liens, the "<u>Prepetition LC/Term Loan Liens</u>") all of the Prepetition LC/Term Loan Collateral.

      (viii)   *Prepetition Notes Liens*.  Pursuant to certain Prepetition Notes Documents, each Debtor granted to the Prepetition Notes Trustee for its benefit and the benefit of the Prepetition Noteholders, to secure the Prepetition Notes Obligations, a security interest in and continuing lien on (the "<u>Prepetition Notes Liens</u>"; together with the Prepetition Term Loan Liens, the Prepetition LC Liens, and the Prepetition ABL Liens, the "<u>Prepetition Liens</u>") all of the "Collateral" (as defined in the Indenture), subject to certain exclusions as set forth in the Prepetition Notes Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "<u>Prepetition Notes Collateral</u>,"  and together with the Prepetition LC/Term Loan Collateral and the Prepetition ABL Collateral, the "<u>Prepetition Collateral</u>").

(ix)    *Prepetition Intercreditor Agreements.*  The Debtors, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent are parties to that certain First-Lien Intercreditor Agreement dated as of December 18, 2013 (as amended, supplemented or otherwise modified from time to time, the "First-Lien Intercreditor Agreement"), which governs, among other things, the relative priorities of the applicable Prepetition Liens in respect of the applicable Prepetition Collateral.  The First-Lien Intercreditor Agreement provides that the Prepetition LC Liens and the Prepetition Term Loan Liens have priority over and are senior to the Prepetition ABL Liens with respect to the LC/Term Priority Collateral (as used herein, as defined in the First-Lien Intercreditor Agreement) and that the Prepetition ABL Liens have priority over and are senior to the Prepetition LC Liens and the Prepetition Term Loan Liens with respect to the ABL Priority Collateral (as used herein, as defined in the First-Lien Intercreditor Agreement). The Prepetition LC/Term Loan Financing Documents include certain subordination agreements with respect to the relative rights and priorities of the Prepetition Term Loan Obligations and the Prepetition Term Secured Parties, compared to the Prepetition LC Obligations and the Prepetition LC Secured Parties (including, without limitation, Sections 9.04, 10.15, 10.17, and 12.06(j) of the Prepetition LC/Term Loan Agreement and the related provisions set forth in any Affiliate Assignment Agreement (as defined in the Prepetition LC/Term Loan Agreement)), which provide, among other things, that the Prepetition LC Obligations are "first out" in payment priority versus the Prepetition Term Loan Obligations (the "Term Loan Subordination Agreement").  The Debtors, the Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, and the Prepetition Notes Trustee are parties to that certain Junior-Lien Intercreditor Agreement dated as of December 18, 2013 (as amended, supplemented or otherwise modified

from time to time, the "Junior-Lien Intercreditor Agreement", together with the First-Lien

Intercreditor Agreement and the Term Loan Subordination Agreement, the "Intercreditor

Agreements"), which governs, among other things, the relative priorities of the Prepetition Liens

in respect of the Prepetition Collateral.  The Junior-Lien Intercreditor Agreement provides that the

Prepetition ABL Liens, the Prepetition LC Liens and the Prepetition Term Loan Liens

collectively have priority over and are senior to the Prepetition Notes Liens with respect to the

Common Collateral (as defined in the Junior-Lien Intercreditor Agreement).    Each of the

Intercreditor Agreements remains in full force and effect in accordance with the terms thereof.

    (x)    *No Other Liens*.  As of the Petition Date, other than as expressly permitted

under the Prepetition Financing Documents, there were no liens on or security interests in the

Prepetition Collateral other than the Prepetition Liens.

    (xi)    *DIP Facility*.    After good faith, arm's length negotiations, certain

Prepetition Term Lenders and Prepetition Noteholders have agreed to provide the Debtors

additional funding as contemplated by, and subject to the terms and conditions of, the DIP

Facility to preserve the Debtors' business operations.

    F.    <u>Debtors' Stipulations</u>.  Subject to the rights of any Committee or other parties-in-

interest as and to the extent set forth in Paragraph 36 below (which rights are subject to any other

applicable limitations set forth herein on the use of Cash Collateral), the Debtors acknowledge,

admit, represent, stipulate and agree that:

    (i)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL

Obligations for which the Debtors were truly and justly indebted to the Prepetition ABL Lenders,

without defense, counterclaim, recoupment or offset of any kind, aggregated not less than

approximately $38,410,655.81 in issued and undrawn letters of credit (and, if applicable, unpaid

borrowings as a result of any drawing on any letters of credit), plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses (including fees and expenses of counsel, field examiners, consultants and other advisors of the Prepetition ABL Agent and the Prepetition ABL Lenders) to the extent required under the terms of the Prepetition ABL Financing Documents. The Prepetition ABL Obligations are (x) legal, valid, binding and enforceable against the Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such Prepetition ABL Obligations are expressly subordinated in right of payment in accordance with the provisions of this Interim Order and except for the rights and remedies set forth in the First-Lien Intercreditor Agreement of the Prepetition Secured Parties party thereto or bound thereby).

(ii)    *Prepetition ABL Liens Not Subject to Avoidance*.  The Prepetition ABL Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition ABL Collateral that secure all of the Prepetition ABL Obligations, (b) are and remain senior in priority over any and all other liens on the ABL Priority Collateral (subject only to (i) after entry of this Interim Order, the the ABL Adequate Protection Liens and the Carve Out and (ii) "Specified Permitted Liens" as defined in and to the extent expressly permitted to be senior to the Prepetition ABL Liens under the Prepetition ABL Agreement), (c) are and remain senior in priority over any and all other liens on the LC/Term Priority Collateral (subject only to (i) the Prepetition LC Liens and the Prepetition Term Loan Liens, (ii) after entry of this Interim

15

Order, the Carve Out, DIP Liens, the ABL Adequate Protection Liens, and the LC/Term Adequate Protection Liens (as defined below) and (iii) "Specified Permitted Liens" as defined in and to the extent expressly permitted to be senior to the Prepetition ABL Liens under the Prepetition ABL Agreement), and (d) are not subject to any attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such liens are subordinated to (i) the Carve Out, (ii) the ABL Adequate Protection Liens and (iii) other than with respect to ABL Priority Collateral, the DIP Liens (as defined below), the LC/Term Adequate Protection Liens and the Prepetition LC/Term Loan Liens, in accordance with the provisions of this Interim Order, the other DIP Loan Documents, and the First-Lien Intercreditor Agreement).

(iii)     *Prepetition LC Obligations and Prepetition Term Loan Obligations*.  As of the Petition Date, the Prepetition Term Loan Obligations for which the Debtors were truly and justly indebted to the Prepetition Term Agent, the Prepetition LC/Term Collateral Agent and the Prepetition Term Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $246,875,000.00 in outstanding aggregate principal amount of term loans, plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses as required under the terms of the Prepetition LC/Term Loan Financing Documents.  As of the Petition Date, the Prepetition LC Obligations for which the Debtors were truly and justly indebted to the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent and the Prepetition LC Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $198,420,869.55 in issued and undrawn letters of credit

(and, if applicable, unpaid borrowings as a result of any drawing on any letters of credit), plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses (including fees and expenses of counsel, field examiners, consultants and other advisors of the Prepetition LC Agent and the Prepetition LC Lenders) as required under the terms of the Prepetition LC/Term Loan Financing Documents, plus any L/C Related Obligations (as defined in the Prepetition LC/Term Loan Facility).  The Prepetition Term Loan Obligations and the Prepetition LC Obligations are (x) legal, valid, binding and enforceable against the Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such Prepetition Obligations are expressly subordinated in right of payment in accordance with the provisions of this Interim Order and except for (1) the rights and remedies set forth in the First-Lien Intercreditor Agreement of the Prepetition Secured Parties party thereto or bound thereby and (2) solely with respect to the Prepetition Term Loan Obligations, pursuant to the Term Loan Subordination Agreement).

(iv)    *Prepetition Term Loan Liens Not Subject to Avoidance*.  The Prepetition Term Loan Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition LC/Term Loan Collateral that secure all of the Prepetition Term Loan Obligations, (b) are and remain senior in priority over any and all other liens on the LC/Term Priority Collateral (subject only to (i) the Prepetition LC Liens, (ii) after the entry of this Interim Order, the Carve Out, the DIP Liens, and the LC/Term Adequate Protection Liens and (iii) liens

to the extent expressly permitted to be senior to the Prepetition Term Loan Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), (c) are and remain senior in priority over any and all other liens on the ABL Priority Collateral (subject only to (i) the Prepetition ABL Liens, (ii) the Prepetition LC Liens, (iii) after entry of this Interim Order, the Carve Out, the DIP Liens, the ABL Adequate Protection Liens and the LC/Term Adequate Protection Liens and (iv) liens to the extent expressly permitted to be senior to the Prepetition Term Loan Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), and (d) are not subject to any attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL Liens on the ABL Priority Collateral, the Prepetition LC Liens, the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, the LC/Term Adequate Protection Liens and the Carve Out, in accordance with the provisions of this Interim Order, the other DIP Loan Documents, the First-Lien Intercreditor Agreement and the Term Loan Subordination Agreement).

(v)      *Prepetition LC Liens Not Subject to Avoidance.*  The Prepetition LC Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition LC/Term Loan Collateral that secure all of the Prepetition LC Obligations, (b) are and remain senior in priority over any and all other liens on the LC/Term Priority Collateral (subject only to (i) after the entry of this Interim Order, the Carve Out, the DIP Liens and the interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and (ii) liens to the extent expressly permitted to be senior to the

18

Prepetition LC Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), (c) are and remain senior in priority over any and all other liens on the ABL Priority Collateral (subject only to (i) the Prepetition ABL Liens, (ii) after the entry of this Interim Order, the Carve Out, the DIP Liens, the ABL Adequate Protection Liens and the interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and (iii) liens to the extent expressly permitted to be senior to the Prepetition Term Loan Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), and (d) are not subject to any attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL Liens on the ABL Priority Collateral, the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, the interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and the Carve Out, in accordance with the provisions of this Interim Order, the other DIP Loan Documents and the First-Lien Intercreditor Agreement).

(vi)    *Prepetition Notes Obligations*.  As of the Petition Date, the Prepetition Notes Obligations for which the Debtors were truly and justly indebted to the Prepetition Noteholders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $324,104,989.00 (inclusive of original issue discount, if any), plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses as required under the terms of the Prepetition Notes Documents.  The Prepetition Notes Obligations are (x) legal, valid, binding and enforceable against the Debtors, each in accordance with its terms (other than in

respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such Prepetition Obligations are expressly subordinated in right of payment in accordance with the provisions of this Interim Order and except for the rights and remedies set forth in the Junior-Lien Intercreditor Agreement of the Prepetition Secured Parties party thereto or bound thereby).

(vii)  *Prepetition Notes Liens Not Subject to Avoidance*.  The Prepetition Notes Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Notes Collateral, (b) are and remain senior in priority over any and all other liens on the Prepetition Collateral (except for (x) liens expressly permitted under the Prepetition Indenture, (y) the Prepetition ABL Liens, the Prepetition LC Liens, and the Prepetition Term Loan Liens and (z) after the entry of this Interim Order, the Carve Out, the DIP Liens, and the Adequate Protection Liens (as defined below)), and (c) are not subject to avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL Liens, the Prepetition LC Liens, the Prepetition Term Loan Liens, the Adequate Protection Liens and the Carve Out, in accordance with the provisions of this Interim Order, the other DIP Loan Documents, and the Junior-Lien Intercreditor Agreement).

(viii)  *No Claims*.  The Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against any of the Prepetition Term

Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the Prepetition ABL Agent, the Prepetition Notes Trustee, the Prepetition Term Lenders, the Prepetition LC Lenders, the Prepetition ABL Lenders or the Prepetition Noteholders with respect to the Prepetition Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code.

(ix)    *Release.*    The Debtors hereby stipulate and agree that they forever, unconditionally and irrevocably release, discharge and acquit the DIP Agent, the DIP Lenders and the Consenting Secured Parties (as defined below), and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition Facilities, the Prepetition Financing Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (as defined below).    The Debtors further waive and release any defense, right of

counterclaim, right of set-off or deduction to the payment of the Prepetition Obligations and the

DIP Obligations which the Debtors now have or may claim to have against the Releasees, arising

out of, connected with or relating to any and all acts, omissions or events occurring prior to the

Court entering this Interim Order.  For purposes hereof, the term "Consenting Secured Party"

shall mean any Prepetition Secured Party that has not opposed or objected to neither this Interim

Order nor the Final Order by objecting at the Interim Hearing or Final Hearing or by filing an

objection with the Court to either this Interim Order or the Final Order; provided, that for the

avoidance of doubt, no expression of a reservation of rights or statement in response (whether by

a filing or otherwise) shall constitute an objection or opposition to this Interim Order for purposes

of this definition.

       G.     Cash Collateral.  For purposes of this Interim Order the term "Cash Collateral"

shall mean and include any and all "cash collateral" as defined in section 363 of the Bankruptcy

Code, in which the Prepetition LC/Term Collateral Agent (on its behalf and on behalf of the

Prepetition LC/Term Secured Parties), the Prepetition Term Agent (on its behalf and on behalf of

the Prepetition Term Lenders), the Prepetition ABL Agent (on its behalf and on behalf of the

Prepetition ABL Lenders), the Prepetition LC Agent (on its behalf and on behalf of the

Prepetition LC Lenders) or the Prepetition Notes Trustee (on its behalf and on behalf of the

Prepetition Noteholders) has a lien or security interest, in each case whether existing on the

Petition Date, arising pursuant to this Interim Order or any Final Order, or otherwise.

       H.     Use of DIP Facility and Cash Collateral.  The Debtors have an immediate and

critical need to use the DIP Facility and Cash Collateral to preserve and operate their businesses

and effectuate a reorganization of their businesses, which will be used in accordance with the

terms of this Interim Order.  Without the use of the DIP Facility and Cash Collateral, the Debtors

will not have sufficient liquidity to be able to continue to operate their businesses. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to avoid the objection of certain parties. Absent authorization to immediately use a portion of the DIP Facility and Cash Collateral, the Debtors' estates and their creditors would suffer immediate and irreparable harm.

I.      Other Financing Unavailable. As discussed in the First Day Declaration and the Puntus Declaration, the Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(l) of the Bankruptcy Code or (b) under section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order in order to satisfy their postpetition liquidity needs.

J.      Best Financing Presently Available. The DIP Lenders have indicated a willingness to provide the Debtors with financing solely on the terms and conditions set forth in this Interim Order (and, subject to entry by the Court, the Final Order) and the applicable DIP Loan Documents. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this Interim Order (and, subject to entry by the Court, the Final Order)

23

and the DIP Loan Documents, represents the best financing presently available.   The DIP

Lenders are good faith financiers.   The DIP Lenders' and the DIP Agent's claims, superpriority

claims, security interests, liens and other protections granted pursuant to this Interim Order (and,

subject to entry by the Court, the Final Order) and the applicable DIP Loan Documents will not

be affected by any subsequent reversal, modification, vacatur or amendment of this Interim

Order, the Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

K.    Good Cause for Immediate Entry.   Good cause has been shown for immediate

entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule

4001-2.   In particular, the authorization granted herein for the Debtors to enter into the DIP

Facility, to continue using Cash Collateral and to obtain interim financing, including on a

priming lien basis as set forth herein, is necessary to avoid immediate and irreparable harm to the

Debtors and their estates.   Entry of this Interim Order is in the best interest of the Debtors, their

estates and creditors. The terms of the DIP Facility (including the Debtors' continued use of

Cash Collateral, subject to Paragraph 31) are fair and reasonable under the circumstances, reflect

the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and are

supported by reasonably equivalent value and fair consideration.

L.    Arm's Length Negotiation.   The Debtors, the DIP Agent, the DIP Lenders, the

Prepetition ABL Agent, the Prepetition LC Agent, and certain of the Prepetition ABL Lenders

have negotiated the terms and conditions of the DIP Facility (including the Debtors' continued

use of Cash Collateral, subject to Paragraph 31) and this Interim Order in good faith and at arm's

length, and any credit extended and loans made to the Debtors pursuant to this Interim Order

shall be, and hereby are, deemed to have been extended, issued or made, as the case may be, in

"good faith" within the meaning of section 364(e) of the Bankruptcy Code.

M.      <u>Adequate Protection for the Prepetition Secured Parties</u>.  The Prepetition Secured

Parties have acted in good faith regarding the DIP Facility and the Debtors' use of the Prepetition

Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and

continued operation of their businesses, in accordance with the terms hereof.  The Prepetition

ABL Agent, the Prepetition LC Agent and the Prepetition Term Agent have agreed to not object

at this time to the Debtors' use of the Prepetition Collateral, including the Cash Collateral, in

accordance with the terms hereof.  The Prepetition Secured Parties are entitled to the adequate

protection provided in this Interim Order as and to the extent set forth herein pursuant to §§ 361,

363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the

Court at the Interim Hearing, as of the Petition Date the terms of the proposed adequate

protection arrangements and of the use of the Prepetition Collateral (including the Cash

Collateral, subject to Paragraph 31) are fair and reasonable, reflect the Debtors' prudent exercise

of business judgment and constitute reasonably equivalent value and fair consideration for the

use of Cash Collateral; <u>provided</u>, that nothing in this Interim Order or the other DIP Loan

Documents shall (x) be construed as the affirmative consent by a n y  o f  the Prepetition

Secured Parties for the use of Cash Collateral, (y) be construed as a consent to the terms of any

financing or any lien encumbering the P r e p e t i t i o n  Collateral (whether senior or junior), or

(z) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party (for its benefit

or the benefit of the other Prepetition Secured Parties), subject to any applicable provisions of the

Intercreditor Agreements, to seek new, different or additional adequate protection or assert the

interests of any Prepetition Secured Party (for its benefit or the benefit of the other Prepetition

Secured Parties).

N.      <u>Value of the Prepetition ABL Collateral</u>.  As of the Petition Date, the aggregate

value of the Prepetition ABL Lenders' interest in the Prepetition ABL Collateral securing the

Prepetition ABL Obligations exceeds the aggregate amount of the Prepetition ABL Obligations.

O.      <u>Order of the Court</u>.  Based upon the foregoing findings, acknowledgements, and

conclusions, and upon the record made before this Court at the Interim Hearing, and good and

sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED**

**THAT:**

1.      <u>Motion Granted</u>.  The Motion is granted on an interim basis, subject to the terms

set forth herein.  Any objections to the Motion that have not previously been withdrawn or

resolved are hereby overruled on their merits.  This Interim Order shall be valid, binding on all

parties in interest, and fully effective immediately upon entry notwithstanding the possible

application of Bankruptcy Rules 6004(h), 7062, and 9014.

2.      <u>Authority to Enter Into DIP Facility</u>.  The Debtors are hereby authorized to incur

and perform the obligations arising from and after the date of this Interim Order under the DIP

Facility, on the terms set forth in this Interim Order, including entry into, execution and delivery

of the DIP Loan Agreement attached hereto as **<u>Exhibit 1</u>** and such additional documents,

instruments and agreements as may be reasonably required by the DIP Agent and the DIP

Lenders to implement the terms or effectuate the purposes of and transactions contemplated by

this Interim Order, the Final Order (when entered by the Court) and the DIP Loan Agreement

(collectively, this Interim Order, the Final Order, the DIP Loan Agreement, the Commitment

letter, the Administrative Fee Letter, and such additional documents, instruments and

agreements, including any fee letters, the "<u>DIP Loan Documents</u>").  The Debtors are hereby

26

authorized (a) to execute and deliver the DIP Loan Documents and borrow money under the DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $30.0 million, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrower's obligations under the DIP Facility and the DIP Loan Documents, all in accordance with the terms of this Interim Order and the other DIP Loan Documents, and (b) to obtain the issuance of, and to utilize the proceeds of drawings under the DIP Facility (at any time and from time to time and in such amounts as the Debtors may elect to the extent not exceeding in the aggregate the amount authorized by this Interim Order) to cash collateralize, one or more letters of credit to be issued by one or more issuing banks for the account of Debtors during the Chapter 11 Cases.

3.      Use of Cash Collateral and DIP Extensions of Credit.  Subject to Paragraph 31 of this Interim Order, the Debtors are hereby authorized to use Cash Collateral and the proceeds of any borrowings under the DIP Facility in accordance with the DIP Loan Agreement and the other terms and conditions set forth in this Interim Order and the DIP Loan Documents (including but not limited to cash collateralizing letters of credit to be issued from time to time by one or more issuing banks for the account of Debtors during the Chapter 11 Cases) and subject to and in accordance with the Budget.

4.      Validity of DIP Loan Documents.  The DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the DIP Loan Documents as approved under this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.      <u>Carve Out</u>.

(a)      For purposes of this Interim Order, "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid costs, fees, and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors or any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Estate Professionals</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether allowed by the Court or payable by the Debtors prior to or after delivery of a Carve Out Trigger Notice (the "<u>Pre-Termination Amount</u>"); and (iv) Professional Fees of Estate Professionals in an aggregate amount equal to $5,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice <u>plus</u> any restructuring fee, sale fee, or other success fee of any investment banker or financial advisor of the Debtors or the Committee that has not previously been funded into the Professional Fees Account, to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post- Termination Amount</u>," and together with the Pre-Termination Amount, the "<u>Carve Out Reserve</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee providing notice that the Termination Date has occurred.  A copy of the Carve Out Trigger

Notice shall concurrently be delivered by the DIP Agent to the Prepetition ABL Agent and the Prepetition LC Agent.  Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay (i) fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and (ii) fees, expenses, indemnities, and other amounts to the DIP Agent or any DIP Lender or any of the foregoing's respective attorneys, advisors, as the same may be due and payable, and the same shall not reduce the Carve Out; provided that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described in this Paragraph 5(a).

(b)      On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors, with a copy to its lead restructuring counsel, and the U.S. Trustee, (i) the DIP Agent shall fund to the Debtors, and the Debtors shall transfer to the Professional Fees Account (as defined herein), cash in an amount equal to (a) the Pre-Termination Amount (which amount may be estimated by the Debtors in good faith in a written notice to the DIP Agent (provided that such estimate shall not operate to limit or cap the Pre-Termination Amount)) plus (b) the Post-Termination Amount; provided, that all funds held in the Professional Fees Account shall be held in trust to pay Professional Fees prior to any and all other claims; provided, further, that in the event the aforesaid funding does not occur within three business days of delivery of the Carve Out Trigger Notice, or if such funding is less than an amount equal to the Carve Out Reserve, the Debtors are authorized to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve Out in an amount equal to any such

shortfall.  The DIP Agent shall fund the Carve Out Reserve notwithstanding any other provision of this Interim Order or the DIP Loan Documents to the contrary, including with respect to the existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for withdrawals under the DIP Loan Agreement, any termination of the DIP Loan Agreement following an Event of Default, or the occurrence of the Maturity Date.  Further, notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserve to satisfy in full the Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Budget, Carve Out Reserve, any estimate by the Debtors of the Pre-Termination Amount, or any of the foregoing operate or be construed as a cap or limitation on the Carve Out, nor shall any of the foregoing or the Carve Out operate or be construed as a cap or limitation on the amount of Professional Fees due and payable by the Debtors; provided, that upon funding of the Carve Out Reserve, the proceeds deposited therein shall be used to pay the Carve Out prior to any other DIP Collateral or proceeds thereof being utilized for purposes of paying the Carve Out.  For the avoidance of doubt, and notwithstanding anything to the contrary herein (other than Paragraph 25(a)(iv)), in any other order, in the DIP Loan Documents, or the Prepetition Financing Documents, the Carve Out shall be senior to any and all liens on, claims against, or obligations secured by any of the Debtors' assets, including Cash Collateral, including all liens, claims, and/or obligations arising under, related to, and/or securing the DIP Facility, the Prepetition Financing Documents, the Prepetition Obligations, the Adequate Protection Obligations, the Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing obligations arising under the DIP Loan or the Prepetition Obligations. Further, for the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, this Interim Order, the DIP Loan Documents, or any other order of the Court, the

DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserve has been fully funded in accordance with this Paragraph 5(b).

(c)       Neither the Carve Out nor any portion of the DIP Facility or Cash Collateral shall be used in connection with (1) preventing, hindering or delaying the DIP Lenders' or the DIP Agent's enforcement or realization upon the DIP Collateral once an Event of Default has occurred and is continuing in accordance with the DIP Loan Documents and this Interim Order, or, until the Payment in Full[2] of the Prepetition ABL Obligations, preventing or delaying the Prepetition ABL Lenders' or the Prepetition ABL Agent's enforcement or realization upon the Priority ABL DIP Collateral (as hereinafter defined) once an Adequate Protection Default (as hereinafter defined) has occurred and is continuing in accordance with this Interim Order and the Prepetition ABL Financing Documents, (2) disputing the DIP Liens or Superpriority Claims provided herein, (3) using or seeking to use any insurance proceeds related to the DIP Collateral except as permitted by the DIP Loan Documents or otherwise with the consent of the DIP Agent or the "Required Lenders" (as defined in the DIP Loan Agreement, and hereafter referred to as the "Required DIP Lenders"), (4) a request, without the prior consent of the DIP Agent (or the Required DIP Lenders), for authorization to obtain debtor in possession financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly discharge in full in cash the DIP Obligations immediately upon the closing of such financing, (5) prior to the Payment in Full of the Prepetition ABL Obligations, using or seeking to use Priority

---

[2]       As used in this Interim Order and the other DIP Loan Documents, (a) with respect to the Prepetition ABL Obligations, "Payment in Full" or "Paid in Full" shall be as defined in the Prepetition ABL Agreement and (b) with respect to the Prepetition LC Obligations, "Payment in Full" or "Paid in Full" shall be as defined in the Prepetition LC/Term Loan Agreement (but without regard to the Secured Term Facility Obligations (as defined therein)).

ABL DIP Collateral without the prior written consent of the Prepetition ABL Agent or the Required Lenders (as defined in the Prepetition ABL Agreement), (6) any act that seeks to modify any of the rights and remedies granted to the DIP Agent or any DIP Lender hereunder or under any of the DIP Loan Documents, unless otherwise agreed to by the DIP Agent or the Required DIP Lenders, or any act that seeks to modify any of the rights and remedies granted to any Prepetition ABL Secured Party or any Prepetition LC Secured Party under this Interim Order or any other DIP Loan Document, unless otherwise agreed to by the Prepetition ABL Agent or the Prepetition LC Agent, respectively, and (7) asserting any claims or defenses or causes of action against the DIP Agent, the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors or preventing, hindering or otherwise delaying the DIP Agent's or the DIP Lenders' assertion, enforcement or realization on the DIP Collateral or DIP Superpriority Claims once an Event of Default has occurred and is continuing in accordance with the DIP Loan Documents or this Interim Order, or asserting any claims or defenses or causes of action against the Prepetition ABL Agent, the Prepetition ABL Lenders or their respective agents, affiliates, representatives, attorneys or advisors or preventing, hindering or otherwise delaying the Prepetition ABL Agent's or the Prepetition ABL Lenders' assertion, enforcement or realization on the Priority ABL DIP Collateral once an Adequate Protection Default has occurred and is continuing in accordance with the Prepetition ABL Financing Documents or this Interim Order.

(d)     Notwithstanding anything in this Interim Order or the DIP Loan Agreement to the contrary, solely with respect to the ABL Lenders and ABL Agent and all forms of adequate protection, liens, or claims securing obligations arising under the Prepetition ABL Agreement, any reference to the "Carve Out" shall mean, on any date of determination, an

amount of the Carve Out equal to the amount, if any, by which (x) the Borrowing Base (as defined herein) then in effect (determined in accordance with paragraph 25(a)(iv) of this Interim Order, giving effect to the $10,000,000 reduction thereto described in such paragraph) exceeds (y) the Total Outstandings (as defined in the Prepetition ABL Agreement), net of ABL Cash Collateral (as defined herein) then held in the ABL Cash Collateral Account).

6.      <u>DIP Extensions of Credit</u>.  All loans made to or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP Loan Documents (collectively, the "<u>DIP Extensions of Credit</u>"), all interest thereon and all fees, costs, expenses, indemnification obligations and other liabilities, owing by the Debtors to the DIP Lenders or the DIP Agent in accordance with and relating to this Interim Order and the other DIP Loan Documents, including all Obligations as defined in the DIP Loan Agreement, are herein referred to as the "<u>DIP Obligations</u>."  The DIP Extensions of Credit:  (a) shall be evidenced by the books and records of the DIP Agent or the DIP Lenders, as applicable; (b) shall bear interest payable and incur fees at the rates set forth in the applicable provisions of the DIP Loan Agreement; (c) shall be secured in the manner specified below; (d) shall be payable in accordance with the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth in this Interim Order and the other DIP Loan Documents.

7.      <u>DIP Loan Funding Account; Segregated Operating Account</u>.  Notwithstanding anything to the contrary contained herein or any DIP Loan Document, (i) every provision set forth in this Paragraph 7 is subject in all respect to the Carve Out and the Carve Out Reserves and (ii) nothing herein shall be construed as a consent by a n y  o f  the Prepetition Secured Parties for the use of Cash Collateral constituting proceeds from a Disposition of any Priority LC/Term DIP Collateral outside of the ordinary course of business or a consent or deemed

consent under section 363(f) to a sale or other Disposition of any Priority LC/Term DIP Collateral outside of the ordinary course of business free and clear.  The proceeds of the DIP Extensions of Credit drawn under the DIP Facility shall be funded into an account established by the Borrower for the purpose of holding such proceeds (the "DIP Loan Funding Account"); provided, that until such time as a new account is established for such purpose as the DIP Loan Funding Account following the date of entry of this Interim Order, such proceeds may be deposited into and held in such other operating account(s) of the Debtors (and such amounts shall be deemed the DIP Loan Funding Account for purposes hereof) as the Debtors may elect (with the DIP Agent's consent), together with the net cash proceeds of any dispositions of any assets other than assets constituting Priority ABL DIP Collateral (such proceeds of DIP Extensions of Credit and cash proceeds of such dispositions are referred to as "DIP Funded Amounts"), and promptly upon the opening of such new DIP Loan Funding Account any theretofore unapplied portions of such DIP Funded Amounts previously deposited in such other operating account(s) of the Debtors shall be transferred (and shall be permitted to be transferred without consent of any other Prepetition Secured Party or otherwise) into such DIP Loan Funding Account.  Notwithstanding anything to the contrary contained in this Interim Order, DIP Funded Amounts shall be subject to a first-priority, perfected lien of the DIP Agent and shall be subject to no other liens; provided that, in the event any amounts remain on deposit therein after the indefeasible payment in full of the DIP Obligations, such remaining amounts shall be transferred to the Segregated Operating Account for application in accordance with the terms hereof.  The DIP Agent shall have the right to deduct from and pay interest, fees and expenses that are DIP Obligations (solely to the extent such interest, fees or expenses are due and payable at such time pursuant to the DIP Loan Documents and this Interim Order) from the proceeds in

the DIP Loan Funding Account (including the fees and expenses of the DIP Lenders and DIP Agent). Disbursements from the DIP Loan Funding Account and cash proceeds from any disposition of any assets other than assets constituting Priority ABL DIP Collateral shall be deposited by the Debtors in a segregated deposit account established by the Debtors for the sole purpose of receipt of the proceeds of the DIP Facility (the "Segregated Operating Account"), and, other than Disbursements from the DIP Loan Funding Account, no other cash or securities (including any proceeds from the disposition of the Priority ABL DIP Collateral) shall be deposited, maintained or credited to the Segregated Operating Account. The outstanding balance in the Segregated Operating Account shall be subject to a cap equal to the sum of (i) $15,000,000 and (ii) the net cash proceeds of any disposition or dispositions of any or all of the Debtors' right, title and interest in the Federal mining complex in northern West Virginia, including but not limited to the Pittsburgh seam, any other related real property, any permits with respect thereto, any mining rights and approvals related to such permits, and any related equipment or other personal property assets (such sum, the "Segregated Operating Account Cap"). The net cash proceeds from any disposition of any assets other than assets constituting Priority ABL DIP Collateral shall be deposited in the Segregated Operating Account; provided, that if at any time the deposit of such net cash proceeds into the Segregated Operating Account would cause the outstanding balance in the Segregated Operating Account to exceed the Segregated Operating Account Cap, then such excess shall be deposited in the DIP Loan Funding Account, or, if the DIP Loan Funding Account has not yet been established, shall be deposited in such other operating account(s) of the Debtors as the Debtors may elect (with the DIP Agent's consent) and shall increase the DIP Funded Amount. Upon the Termination Date (as defined in the DIP Loan Agreement) all proceeds remaining in the DIP Loan Funding Account and the Segregated

35

Operating Account shall be applied by the DIP Agent to repay the DIP Obligations in accordance with the DIP Loan Agreement (prior to the application of any other amounts or property). Notwithstanding anything to the contrary herein or in the Prepetition Loan Documents (including, without limitation, the Intercreditor Agreements), (i) prior to the indefeasible payment in full of the DIP Obligations, the Prepetition ABL Agent and Prepetition ABL Lenders shall not have any right to sweep any of the funds in the DIP Loan Funding Account and the Segregated Operating Account and shall not have any liens on, security interests in, claims to or rights with respect to the DIP Loan Funding Account or the Segregated Operating Account or the funds maintained therein except for amounts, if any, remaining after the indefeasible payment in full of the DIP Obligations, and (ii) the DIP Facility or any of the funds maintained in the DIP Loan Funding Account or the Segregated Operating Account shall not be used to repay any of the Prepetition Obligations unless and until the indefeasible payment in full of the DIP Obligations has occurred.

8.      <u>Professional Fee Account Funding</u>.  The Debtors shall (a) as soon as practicable after the interim borrowing under Paragraph 2 of this Interim Order, transfer Cash Collateral and cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly Professional Fees for the first two weekly periods set forth in the Budget and (b) thereafter on a weekly basis transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly Professional Fees for the next unfunded week set forth in the Budget, in each case into a segregated account not subject to the control of the DIP Lender (the "<u>Professional Fees Account</u>").  With respect to any success, restructuring, and/or other transaction fee provided for under any Court-approved engagement agreement of an Estate Professional retained by the Debtors, the Debtors shall transfer Cash Collateral and cash proceeds from the DIP Facility in an

amount equal to such fee in four equal installments over the first four months, commencing with the month in which the Court approves such professionals' engagement, into the Professional Fees Account; <u>provided</u>, that such fee shall only be payable in accordance with the terms and conditions of the Court order approving such engagement agreement and only after such fee has been earned in full.

9.     <u>Rights and Benefits Under Intercreditor Agreements</u>.  Notwithstanding anything to the contrary herein (including Paragraph 36) or in any other DIP Loan Document, (a) the terms and conditions of the Intercreditor Agreements shall not be mitigated or modified as a result of entry of this Interim Order, entry into or the terms of the DIP Loan Documents or the incurrence of the DIP Obligations and (b) all rights, remedies, powers and privileges of the Prepetition Secured Parties pursuant to the Intercreditor Agreements (or applicable Intercreditor Agreements) are reserved.  Nothing herein shall constitute a release, waiver or discharge of any obligations thereunder owed by any Prepetition Secured Party to any other Prepetition Secured Party pursuant to the terms thereof or prejudice the rights of any of the Prepetition Secured Parties party to or bound by any of the Intercreditor Agreements to enforce the terms and conditions thereof against the other Prepetition Secured Parties party thereto or bound thereby.

10.     <u>Other Use of DIP Extensions of Credit and Cash Collateral</u>.  Subject to Paragraph 31 of this Interim Order and the other terms and conditions set forth in this Interim Order and the other DIP Loan Documents, the Debtors may use the DIP Extensions of Credit and the Cash Collateral, in compliance with the DIP Loan Agreement and subject to and in accordance with the Budget covenant limitations in the DIP Loan Agreement.

11.     <u>Budget</u>.  The budget annexed hereto as **<u>Exhibit 2</u>** (and as it may be updated periodically in accordance with the DIP Loan Documents, but only with the consent of the DIP

Agent or the Required DIP Lenders, the "Budget") hereby is approved.  Proceeds of the DIP

Extensions of Credit and Cash Collateral under this Interim Order shall be used by the Debtors in

accordance with the DIP Loan Agreement and this Interim Order (including but not limited to

cash collateralizing letters of credit to be issued from time to time by one or more issuing banks

for the account of Debtors during the Chapter 11 Cases) and subject to and in accordance with

the Budget, and in any event such use shall be subject to any Permitted Variance; provided that it

is agreed that payments benefiting from the Carve Out shall not be limited by the Budget.

Subject to the Carve Out, the DIP Lenders' consent to the Budget shall not be construed as

consent to the use of DIP Extensions of Credit or Cash Collateral beyond the Termination Date

(as defined in the DIP Loan Agreement) with respect to the DIP Extensions of Credit, regardless

of whether the aggregate funds shown on the Budget have been expended.  The Debtors shall

provide a copy of any revised or updated budget to the U.S. Trustee, the Prepetition ABL Agent,

the Prepetition LC Agent and counsel to the Committee, if any.  In no way shall the Budget

operate or be construed as a cap or limitation on the Adequate Protection Obligations payable

pursuant to Paragraph 25.

12.    Permitted Variance.  So long as the Termination Date has not occurred and

subject to Paragraph 31, the Debtors shall be authorized to use proceeds of the DIP Extensions of

Credit and Cash Collateral, in accordance with the DIP Loan Documents and this Interim Order,

and subject to and in accordance with the Budget covenant limitations in the DIP Loan

Agreement, including the variances permitted therein with respect to the Budget to the extent

applicable (each a "Permitted Variance").

13.    Continuation of Prepetition Liens.  (a) Until the Payment in Full of the Prepetition

ABL Obligations, all liens and security interests of the Prepetition ABL Agent and the

Prepetition ABL Lenders securing the Prepetition ABL Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; (b) until the Payment in Full of the Prepetition LC Obligations, all liens and security interests of the Prepetition LC/Term Collateral Agent, the Prepetition LC Agent and the Prepetition LC Lenders securing the Prepetition LC Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; (c) until the Debtors have indefeasibly paid in full all Prepetition Term Loan Obligations, all liens and security interests of the Prepetition LC/Term Collateral Agent (to the extent securing the Prepetition Term Loan Obligations), the Prepetition Term Agent and the Prepetition Term Lenders (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; and (d) until the Debtors have indefeasibly paid in full all Prepetition Notes Obligations, all liens and security interests of the Prepetition Notes Trustee and the Prepetition Noteholders securing the Prepetition Notes Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein.

14.    <u>DIP Liens and Collateral</u>.

(a)    Subject to Paragraph 14(b), and as more fully set forth in the DIP Loan Documents, as security for the full and timely payment of the DIP Obligations, the DIP Agent on its behalf and on behalf of the DIP Lenders is hereby granted:

i.    pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all tangible and intangible unencumbered assets of the Debtors

(now or hereafter acquired and all proceeds thereof) and shall include without limitation property subject to avoided liens; <u>provided</u> that, in no event shall such assets include Priority ABL DIP Collateral;

ii. pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on the Segregated Operating Account and any new DIP Loan Funding Account established pursuant to Paragraph 7, the funds maintained in such accounts, and all proceeds thereof;

iii. pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on and security interest in all assets of the Debtors that constitutes, or that would constitute but for the commencement of the Chapter 11 Cases, ABL Priority Collateral, including but not limited to Cash Collateral, now or hereafter acquired and all proceeds thereof (the "<u>Priority ABL DIP Collateral</u>," which definition shall include, subject to Paragraph 25(a)(iii), the ABL Cash Collateral Accounts and all deposits therein); <u>provided</u> <u>further</u> that such lien on the Priority ABL DIP Collateral shall be junior in priority and subordinate to the Prepetition ABL Liens and the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, and senior in priority to any other lien on the Priority ABL DIP Collateral (including, without limitation, the Prepetition LC Liens, the Prepetition Term Loan Liens and the Prepetition Notes Liens) securing any other indebtedness or obligations of the Debtors; and

iv. pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and security interest in all assets of the Debtors, including but not limited to Cash Collateral, encumbered by a first priority lien under the Prepetition LC Facility or

the Prepetition Term Loan Facility or a lien under the Prepetition Notes Documents not otherwise described in clauses (i) through (iii) above (now or hereafter acquired and all proceeds thereof) (the "<u>Priming Lien Collateral</u>"); <u>provided</u> <u>further</u> that such lien on the Priming Lien Collateral shall be senior in priority to the Prepetition LC Liens, the Prepetition Term Loan Liens, the Prepetition Notes Liens and the Prepetition ABL Liens on the Priming Lien Collateral;

<u>provided</u> further that, upon entry of the Final Order, the DIP Liens (as defined below) shall attach to and encumber claims and causes of action under Chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, the "<u>Avoidance Actions</u>").    The liens and security interests identified in this Paragraph are referred to herein as the "<u>DIP Liens</u>" and the collateral to which such DIP Liens attach, the "<u>DIP Collateral</u>."    The DIP Collateral described in clauses (i), (ii) and (iv) above is referred to herein as the "<u>Priority LC/Term DIP Collateral</u>."

(b)    The DIP Liens shall be subject and subordinate to the Carve Out (as defined in the DIP Loan Agreement) and, with respect to the Priority ABL DIP Collateral, the Prepetition ABL Liens and the ABL Adequate Protection Liens.    Except as otherwise set forth herein and in the Intercreditor Agreements or by any court order heretofore or hereafter entered in the Chapter 11 Cases, the DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "<u>Successor Cases</u>"),

and/or upon the dismissal of any of the Chapter 11 Cases; provided further that the DIP Liens described in Paragraph 14(a) shall remain subject to any "Specified Permitted Liens" as such term is defined in the Prepetition ABL Agreement; provided, further, that, notwithstanding the reference to "Specified Permitted Liens" in this Interim Order, nothing herein shall adversely affect the rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP Lenders, or the other Prepetition Secured Parties.  The DIP Liens and the Adequate Protection Liens shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, and, subject to the entry of the Final Order, the DIP Liens, Adequate Protection Liens, Prepetition Liens, DIP Collateral, Priority LC/Term Loan Collateral, and Priority ABL DIP Collateral shall not be subject to section 506(c) of the Bankruptcy Code.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by this Interim Order, the DIP Loan Documents or as otherwise authorized by the Court. All proceeds of DIP Collateral, other than proceeds of the Priority ABL DIP Collateral until the Payment in Full of the Prepetition ABL Obligations, shall be applied to the DIP Obligations and paid to the DIP Lenders in accordance with the DIP Loan Documents.

(c)    Notwithstanding anything to the contrary in the Motion, the DIP Loan Documents or this Interim Order, for purposes of this Interim Order, in no event shall the DIP Collateral include or the DIP Liens granted under this Interim Order attach to, any lease, license, contract, or agreement or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (x) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (y) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract,

agreement, or other property right pursuant to any provision thereof, unless, in the case of each of clauses (x) and (y), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "Specified Contracts"); provided, that the foregoing shall not preclude any counterparty to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable nonbankruptcy law or the Bankruptcy Code renders such provision ineffective. Notwithstanding the foregoing, the DIP Liens and Adequate Protection Liens shall in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of any and all Specified Contracts in accordance with the priorities set forth herein.

(d)     In the event that proceeds of DIP Collateral are received by the DIP Agent or any DIP Lender in connection with a sale, transfer or other disposition of DIP Collateral that directly or indirectly involves some or all of the Priority ABL DIP Collateral and some or all of the Priority LC/Term DIP Collateral (including, without limitation, by virtue of the sale or other disposition of a division or line of business or any equity interests of any Debtor) (if a Debtor is sold or otherwise disposed of and such sale or other disposition is structured as a sale of equity interests, such sale shall be treated as a sale of assets), the portion of such proceeds that constitute or are to be treated as proceeds of Priority ABL DIP Collateral shall be allocated as set forth in Section 25(a)(iii) until the Prepetition ABL Obligations shall have been Paid in Full; provided that the portion of such proceeds that shall be allocated as proceeds of accounts and inventory shall be an amount not less than the book value of such accounts and inventory.

15.  <u>Preservation of Liens and Rights Granted Under this Interim Order</u>.

(a)  Except as otherwise expressly provided for herein, or permitted under the DIP Loan Agreement, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders or to the Prepetition Secured Parties (as defined herein), respectively, shall be granted or allowed while any portion of the DIP Facility (or any refinancing thereof in accordance with the DIP Loan Documents) or the commitments thereunder or the DIP Obligations remain outstanding or until the Payment in Full of the Prepetition ABL Obligations, the Prepetition LC Obligations, the Prepetition Notes, and the DIP Liens, the Adequate Protection Liens and the Prepetition Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, in each case other than the Carve Out (or the Carve Out, as applicable); or (iii) subordinated to or made pari passu with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors.

(b)  Unless all DIP Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the right of the Debtors to use Cash Collateral if any of the Debtors seeks, or there is entered, (i) any modification or extension of this Interim Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, (ii) any other order granting adequate protection or authorizing the use of Cash

Collateral or any modification or extension of this Interim Order without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by any of the Prepetition Secured Parties, (iii) any modification or extension of this Interim Order with respect to the Cash Collateral or the cash collateralization or other satisfaction of any letters of credit under any Prepetition Facility without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by any of the Prepetition Secured Parties, (iv) an order converting or dismissing any of the Chapter 11 Cases without the prior written consent of the DIP Agent, (v) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases without the prior written consent of the DIP Agent (vi) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases without the prior written consent of the DIP Agent, and (vii) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral or authorizing debtor in possession financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in cash of the DIP Obligations (other than any contingent obligations not yet due and payable) upon the consummation thereof without the prior written consent of the DIP Agent.  If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy code) that (x) the DIP Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agent and the DIP Lenders, including the DIP Liens, pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such DIP Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest,

including the priorities set forth herein and in the DIP Loan Documents) until all DIP Obligations shall have been paid and satisfied in full (or in the case of any existing letter of credit, such existing letter of credit has been replaced, cash collateralized in connection with the refinancing or backstopped, in each case to the satisfaction of the applicable issuing bank) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interest referred to in clause (x) above.

(c)    Unless all Prepetition ABL Obligations and Prepetition LC Obligations shall have been indefeasibly paid in full in cash, and unless otherwise ordered by the Court, the right of the Debtors to use Cash Collateral shall terminate after seven days after any of the following, if any of the Debtors seek, or there is entered, (i) any order granting adequate protection or authorizing the use of Cash Collateral or any modification or extension of this Interim Order without the prior written consent of the Prepetition ABL Agent and the Prepetition LC Agent, and no such consent shall be implied by any other action, inaction or acquiescence by any of the Prepetition Secured Parties, (ii) any modification or extension of this Interim Order with respect to the Cash Collateral or the cash collateralization or other satisfaction of any letters of credit under any Prepetition Facility without the prior written consent of the Prepetition ABL Facility Issuers and the Prepetition LC Facility Issuers, and no such consent shall be implied by any other action, inaction or acquiescence by any of the Prepetition Secured Parties, (iii) an order converting or dismissing any of the Chapter 11 Cases without the prior written consent of the the Prepetition ABL Agent and the Prepetition LC Agent, (iv) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases without the prior written consent of the the Prepetition ABL Agent and the Prepetition LC Agent, (v) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases without the prior written consent of the the Prepetition

ABL Agent and the Prepetition LC Agent and (vi) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral or authorizing debtor in possession financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not provide for the Payment in Full of the Prepetition ABL Obligations and the Prepetition LC Obligations upon the consummation thereof without the prior written consent of the Prepetition ABL Agent and the Prepetition LC Agent.  If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy code) that (x) the priming liens, security interests and replacement security interests granted to the the Prepetition Secured Parties pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest, including the priorities set forth herein) until the Payment in Full of the Prepetition ABL Obligations, the Prepetition LC Obligations, and the Prepetition Notes and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interest referred to in clause (x) above.

16.     _Automatic Effectiveness of Liens_.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtors to grant the liens and security interests to the DIP Agent, the DIP Lenders and the Adequate Protection Parties (as defined below) contemplated by this Interim Order and the other DIP Loan Documents.

17.     [Reserved].

18.    <u>Automatic Perfection of DIP Liens</u>.    The DIP Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable and duly perfected first priority security interests and liens (subject to the priorities set forth in this Interim Order), and the DIP Agent and the DIP Lenders shall not be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession or control, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens or deliver possessory DIP Collateral shall in no way affect the validity, enforceability, perfection or priority of such liens. The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent or the DIP Lenders shall file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise take any action to validate, perfect, or confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination (except as a result of the relative lien priorities set forth in this Interim Order), at the time and as of the date of entry of this Interim Order.  Upon the request of the DIP Agent, the Debtors, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Agent or DIP Lenders to further validate, perfect, preserve and

enforce the DIP Liens consistent with the terms of this Interim Order.  A certified copy of this

Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu

of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments,

and all filing offices are hereby authorized to accept such certified copy of this Interim Order for

filing and recording; provided that nothing herein shall be construed as granting any exemption

from transfer taxes within the meaning of Bankruptcy Code section 1146(a).

19.    Other Automatic Perfection Matters.  To the extent that the Prepetition LC/Term

Collateral Agent, the Prepetition LC Agent, the Prepetition Term Agent, the Prepetition ABL

Agent and/or the Prepetition Notes Trustee is the secured party under any account control

agreements (other than with respect to an ABL Cash Collateral Account), listed as loss payee or

additional insured under any of the Debtors' insurance policies or is the secured party under any

Prepetition Financing Document, the DIP Agent, on its behalf and on behalf of the DIP Lenders,

is also deemed to be the secured party under such account control agreements (other than with

respect to an ABL Cash Collateral Account), loss payee or additional insured under the Debtors'

insurance policies and the secured party under each such Prepetition Financing Document (in

any such case with the same priority of liens and claims thereunder relative to the priority of the

Prepetition Liens and Adequate Protection Liens as set forth in Paragraph 14(a)), and shall have

all rights and powers in each case attendant to that position (including, without limitation, rights

of enforcement, but subject in all respects to the terms of this Interim Order), and shall, subject to

the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or

received in accordance with the terms of this Interim Order and/or the Final Order, as applicable,

and the other DIP Loan Documents.  The Prepetition LC/Term Collateral Agent, the Prepetition

LC Agent, the Prepetition Term Agent or the Prepetition ABL Agent, as applicable, shall serve

as agent for the DIP Agent, as applicable, for purposes of perfecting the DIP Agent's security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party; provided that nothing herein shall be deemed to grant the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition Notes Trustee or the Prepetition Noteholders, any liens on, security interests in, or rights with respect to the Segregated Operating Account and the funds contained therein (unless and until the DIP Obligations are indefeasibly paid in full).

20.    <u>Automatic Perfection of Adequate Protection Liens</u>.    The Adequate Protection Liens granted pursuant to this Interim Order shall constitute valid, enforceable, nonavoidable and duly perfected security interests and liens (having the priorities set forth in this Interim Order), and the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition LC Agent, the other Prepetition LC Secured Parties, the Prepetition LC/Term Collateral Agent, the Prepetition Notes Trustee and the Prepetition Noteholders (collectively, the "<u>Adequate Protection Parties</u>") shall not be required to file or serve financing statements, mortgage deeds, deeds of trust, notices of lien or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession or control, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Adequate Protection Liens or deliver possessory collateral shall in no way affect the validity, enforceability, perfection or priority of such liens.    The Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings,

50

mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any

other action in order to validate and perfect the liens and security interests granted to them

hereunder.  Whether or not the Adequate Protection Parties shall file such financing statements,

trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar

instruments or otherwise take any action to validate, perfect or confirm perfection of the liens

and security interests granted to them hereunder, such liens and security interests shall be

deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge,

dispute or subordination (except as a result of the relative lien priorities set forth in this Interim

Order), at the time and as of the date of entry of this Interim Order.  Upon the request of any

Prepetition Agent, the Debtors, without any further consent of any party, are authorized to take,

execute and deliver such instruments (in each case without representation or warranty of any

kind except as set forth in the DIP Loan Documents) to enable such Prepetition Agent or other

applicable Prepetition Secured Parties to further validate, perfect, preserve and enforce the

Adequate Protection Liens of such Prepetition Agent consistent with the terms of this Interim

Order.  A certified copy of this Interim Order may be filed with or recorded in filing or recording

offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of

lien or similar instruments, and all filing offices are hereby authorized to accept such certified

copy of this Interim Order for filing and recording; provided that nothing herein shall be

construed as granting any exemption from transfer taxes within the meaning of Bankruptcy Code

section 1146(a).

     21.    <u>DIP Superpriority Claims</u>.  In addition to the liens and security interests granted to

the DIP Agent on its behalf and on behalf of the DIP Lenders pursuant to this Interim Order,

subject and subordinate to the Carve Out and in accordance with sections 364(c)(1), 503 and 507

of the Bankruptcy Code, all of the DIP Obligations (including, without limitation, all DIP Extensions of Credit) shall constitute allowed superpriority administrative expense claims (the "DIP Superpriority Claims") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code; provided, that upon the entry of the Final Order, the DIP Superpriority Claims shall attach to the Avoidance Actions.

22.    Real Property Leases.  As a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims provided for in this Interim Order and pursuant to the DIP Loan Documents, which are payable from and have recourse to all of the Debtors' pre- and post-petition property including, among other things, each Financing Lease, Material Lease, Real Property Lease or other Contractual Obligation (each as defined in the DIP Loan Agreement) to which a Debtor is a counterparty (each, a "Real Property Lease"), the DIP Lenders shall have the following protections with respect to the Debtors' Real Property Leases, regardless of whether any particular Real Property Lease or group of Real Property Leases constitutes Collateral, which protections shall be enforced by the DIP Agent or DIP Lenders as authorized, approved, and granted pursuant to the provisions of this Interim Order and in accordance with the terms of the DIP Loan Agreement (and, after the indefeasible payment in full of the DIP Obligations, the rights of the DIP Agent and the DIP Lenders shall automatically transfer and be available to the Prepetition LC Agent and the Prepetition LC Lenders (and defined terms used in this Paragraph 22 relating to the DIP Facility

shall be deemed to be references to corresponding defined terms relating to the Prepetition LC Facility):

(a)    <u>Remedies Upon an Event of Default</u>.  If an Event of Default shall have occurred and be continuing, the DIP Agent for the benefit of the DIP Lenders shall, with respect to any Real Property Lease or group of Real Property Leases to which any of the Debtors are party, be permitted, and are hereby authorized, approved, and granted the following rights and remedies:

(i)    to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s) and, subject to this Court's approval after notice and hearing, assign any such Real Property Lease(s) in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts;

(ii)    to require any Debtor to complete promptly, pursuant to Section 363 of the Bankruptcy Code, subject to the rights of the DIP Agent, DIP Lenders or Prepetition Secured Parties (if applicable) to credit bid, a Disposition (as defined in the DIP Loan Agreement) of any such Real Property Lease(s) in one or more parcels at public or private sales, at any of the DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the DIP Agent or DIP Lenders may deem commercially reasonable;

(iii)    to access to the leasehold interests of the Debtors or debtors in possession in any such Real Property Lease(s) for the purpose of (a) marketing such property or properties for sale and (b) removing any Collateral thereon or arranging for the sale of any such Collateral except to the extent prohibited by the terms of the Real Property Lease (unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy

Code); provided that the foregoing shall not preclude any counterparty to a Real Property Lease

from an opportunity to be heard in this Court on notice with respect to the foregoing;

(iv)     (a) to find an acceptable (in the DIP Agent's or Required DIP

Lenders' good faith and reasonable discretion) replacement lessee, which may include the DIP

Agent, DIP Lenders or any of its affiliates, to whom such Real Property Lease(s) may be

assigned, (b) to hold, and manage all aspects of, an auction or other bidding process to find such

acceptable replacement lessee, (c) in connection with any such auction, agree, on behalf of the

Debtors, to reimburse reasonable fees and expenses of any stalking horse bidder, if necessary,

and/or (d) to notify the Debtors of the selection of any replacement lessee pursuant to this

Paragraph 22, upon receipt of which the Debtors shall promptly (1) file a motion seeking, on an

expedited basis, approval of the Debtors' assumption and assignment of such Real Property

Lease(s) to such proposed assignee, and (2) cure any defaults, if any, that have occurred and are

continuing under such Real Property Lease(s) to the extent required by the Court (subject to the

DIP Lenders' right to cure defaults as set forth in Paragraph 22(e) of this Interim Order); or

(v)     to direct the Debtors to (a) assign any such Real Property Lease(s)

to the DIP Agent or DIP Lenders as Collateral securing the DIP Obligations, subject to clause (b),

if applicable, (b) seek this Court's approval of the assumption of any such Real Property Lease(s)

to the extent that this Court determines pursuant to a final order that an assumption is required in

order to assign such lease or leases as Collateral, and (c) promptly cure any default that has

occurred and is continuing under such Real Property Lease(s) to the extent required by the Court;

provided that any assignment of any such Real Property Lease(s) as Collateral securing the DIP

Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed)

and assign such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to

enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(b)    <u>Right to Credit Bid</u>.  Prior to any assignment of any Real Property Lease or group of Real Property Leases, the Debtors shall first provide at least five (5) business days' prior written notice (the "<u>Initial Notice Period</u>") to the DIP Agent and DIP Lenders (unless such notice provision is waived by the DIP Agent and DIP Lenders), which Initial Notice Period may be extended up to a further twenty-five (25) days by the DIP Agent or Required DIP Lenders in each of their sole discretion by delivering written notice of such extension to the Debtors prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the DIP Agent or Required DIP Lenders and the Borrower (such notice period being the "<u>Aggregate Notice Period</u>").  During such notice period, the DIP Agent shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) outstanding under the DIP Facility as consideration in exchange for any such Real Property Lease(s); <u>provided</u> that to the extent the Borrower is entitled to retain a portion of the total consideration paid in respect of such assignment in accordance with the DIP Loan Agreement, the applicable portion of the consideration to be retained by Borrower shall be paid in cash (provided that such proceeds shall continue to be DIP Collateral and Cash Collateral subject to Paragraph 10 and any other applicable provisions hereof). In addition, in connection with the exercise of any of the DIP Agent's or Required DIP Lenders' rights pursuant to the DIP Loan Agreement or this Interim Order to direct or compel a sale or assignment of any Real Property Lease(s), the DIP Agent, on behalf of the applicable DIP Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations (in an amount equal to at least the consideration offered by

any other party in respect of such sale or assignment) as consideration in exchange for such Real Property Lease(s); provided, that to the extent the Borrower is entitled to retain all or a portion of the total consideration paid in respect of such assignment in accordance with the DIP Loan Agreement, the applicable portion of the consideration to be retained by Borrower shall be paid in cash (provided that such proceeds shall continue to be DIP Collateral and Cash Collateral subject to Paragraph 10 and any other applicable provisions hereof). Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the DIP Lenders' right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Interim Order to obtain credit and incur debt as and in accordance with the terms set forth herein.

(c)    Right of First Refusal with Respect to Proposed Assignments and Rejections of Real Property Leases. Unless all DIP Obligations shall have indefeasibly been satisfied pursuant to the DIP Loan Agreement, the Debtors shall not seek, and it shall constitute, an Event of Default and terminate the right of the Debtors under the DIP Loan Agreement and this Interim Order if any of the Debtors seeks, the assignment or other sale of, or the rejection or other termination of, or if there is entered an order pursuant to section 365 of the Bankruptcy Code assigning or rejecting, any Real Property Lease or group of Real Property Leases, or if any Real Property Lease or group of Real Property Leases is deemed rejected due to the expiration of the assumption period provided for in Section 365(d)(4) (the "Statutory Rejection Date"), without the Debtors' first providing thirty (30) days' prior written notice to the DIP Agent and DIP Lenders (unless such notice requirement is waived by the DIP Agent or Required DIP Lenders in their sole discretion), or if such notice is given more than thirty (30) days in advance of the Statutory Rejection Date, prior written notice at least equal to the Aggregate Notice

Period; provided, however, that the right of first refusal of the DIP Agent as set forth in this

Paragraph 22(c) shall not apply to (x) any assignment or sale of a Real Property Lease or group

of Real Property Leases to a winning bidder at an auction authorized by this Court, and (y) so

long as there has not occurred an Event of Default or that an Event of Default is ongoing, any

assignment or sale of a Real Property Lease or group of Real Property Leases that are not

Material Leases generating Net Cash Proceeds up to $2,500,000 in the aggregate value for all

such sales or assignments. During such notice period, the DIP Agent shall be permitted to:

(i)        (a) notify the Debtors that it elects to take action pursuant to this

Paragraph, upon receipt of which the Debtors shall promptly withdraw any previously filed

rejection motion, (b) find an acceptable (in the DIP Agent's or Required DIP Lenders' good faith

and reasonable discretion) replacement lessee, which may include the DIP Agent, DIP Lenders or

any of its affiliates, to whom any such any Real Property Lease or group of Real Property Leases

may be assigned, (c) hold, and manage all aspects of, an auction or other bidding process to find

such acceptable replacement lessee, (d) in connection with any such auction, agree, on behalf of

the Debtors, to reimburse the reasonable fees and expenses of any stalking horse bidder, if

necessary, and (e) notify the Debtors of the selection of any replacement lessee pursuant to this

Paragraph, upon receipt of which the Debtors shall (1) not seek to reject any such Real Property

Lease(s), (2) promptly withdraw any pending motion to reject any such Real Property Lease(s),

(3) promptly file a motion seeking, on an expedited basis, approval of the Debtors' assumption

and assignment of such Real Property Lease(s) to the DIP Lenders' proposed assignee, and

(4) promptly cure any defaults that have occurred and are continuing under such Real Property

Lease(s) to the extent required by the Court; or

(ii)       direct the Debtors to (a) assign any Real Property Lease or group of Real Property Leases as Collateral securing the DIP Obligations, (b) seek the Court's approval of the assumption of any such Real Property Lease(s) if it is determined pursuant to a final order of this Court that an assumption is required in order to assign such lease(s) as Collateral, and (c) promptly cure any defaults that have occurred and are continuing under such Real Property Lease(s) (subject to the DIP Lenders' right to cure defaults as set forth in Paragraph 22(e) of this Interim Order) to the extent required by the Court; provided that any assignment of any Real Property Lease(s) as Collateral securing the DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign any such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

Notwithstanding anything to the contrary herein, the foregoing right of the DIP Agent set forth in this Paragraph shall not apply to Real Property Leases that are rejected, terminated, sold, or assigned (i) pursuant to a filing made on the Petition Date or (ii) on the effective date of a Plan (as defined below) for one or more of the Debtors that, among other things, indefeasibly repays the DIP Obligations in full on the effective date thereof. For the avoidance of doubt, on or prior to the thirtieth (30) day prior to the Statutory Rejection Date (as provided in Section 365(d)(4) of the Bankruptcy Code), the Debtors shall have delivered written notice to the DIP Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through statutory rejection on the Statutory Rejection Date) from and after the date of such notice (or, if applicable, notice that the Debtors have obtained the applicable landlord's consent to extension of the Statutory Rejection Date); provided that if the Debtors fail to deliver any such notice to the DIP Agent prior to such date with respect to any such Real Property Lease(s) (or a notice

indicating that no such Real Property Lease(s) shall be rejected), the Debtors shall be deemed, for all purposes hereunder, to have delivered notice to the DIP Agent as of such date that they intend to reject all outstanding Real Property Leases.

(d)     <u>Assumption Orders</u>. Any order of this Court approving the assumption of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to, and to enjoy the protections of, section 365(f) of the Bankruptcy Code subsequent to the date of such assumption. To the extent that such provision is for any reason not included in any order of the Court approving the assumption of any Real Property Lease, then such Real Property Lease may not be assumed by the applicable Debtor unless the order approving the assumption provides for the assignment of such Real Property Lease, on the date of such order, to an acceptable (DIP Agent's or Required DIP Lenders' good faith and reasonable discretion) replacement lessee (which may include the DIP Agent, DIP Lenders, or their respective affiliates).

(e)     <u>DIP Lenders' Right to Cure Defaults</u>. If any of the Debtors are required to cure any monetary defaults under any Real Property Lease pursuant to any order of this Court or otherwise in connection with any assumption or assumption and assignment of any such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code, and such monetary default is not, within five (5) business days of the receipt by such Debtor of notice from the DIP Agent pursuant to the applicable provision(s) of the DIP Loan Agreement or any other notice from the DIP Agent requesting the cure of such monetary default, cured in accordance with the provisions of such applicable court order as arranged by the DIP Agent, the DIP Agent may cure any such monetary defaults on behalf of the applicable Debtor(s).

(f)     Notwithstanding anything to the contrary herein or in the DIP Loan Documents, nothing set forth in this Paragraph 22 shall permit the DIP Agent, the DIP Lenders or any of their designees or agents to exercise any rights or remedies with respect to Priority ABL DIP Collateral until the Payment in Full of the Prepetition ABL Obligations.

23.     Protection of DIP Lenders' Rights.

(a)     So long as there are any borrowings or letters of credit or other amounts outstanding, or the DIP Lenders have any Commitments (as defined in the DIP Loan Agreement) under the DIP Loan Agreement, and so long as an Adequate Protection Default has not occurred and is continuing, the Prepetition Secured Parties (defined below) shall (i) have no right to and take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Financing Documents or this Interim Order, or otherwise seek to exercise or exercise any enforcement rights or remedies against any DIP Collateral or in connection with any Adequate Protection Liens or on account of any claims, other than as set forth herein (but the foregoing shall not be construed to limit the exercise of any rights or remedies against any other Prepetition Secured Party pursuant to the Intercreditor Agreements), (ii) be deemed to have consented to any Disposition (as defined in the DIP Loan Agreement) of, or release of liens on, any DIP Collateral, to the extent such Disposition or release is authorized under the DIP Loan Documents (other than a section 363(f) sale outside of the ordinary course of business) or otherwise agreed to by the DIP Agent, (iii) not file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent or any DIP Lender files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue

the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or disposition in accordance with the terms hereof.

(b)     Consistent with the provisions set forth in the DIP Loan Agreement (but subject to the terms of the Collateral Documents (as defined in the DIP Loan Agreement)), the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary upon the occurrence of an Event of Default (as defined in the DIP Loan Documents) so as to permit the DIP Agent and the DIP Lenders to, among other things, immediately declare (1) the commitment of the DIP Lenders as to the DIP Facility to be terminated, whereupon such commitments and obligation shall be terminated; (2) all DIP Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; (3) require any Debtor to promptly complete, pursuant to Section 363 and 365 of the Bankruptcy Code, subject to the rights of the DIP Lenders or Prepetition Secured Parties to credit bid, a Disposition (as defined in the DIP Loan Agreement) of its Real Property Leases or any portion thereof in one or more parcels at public or private sales, at any of the DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the DIP Agent may deem commercially reasonable; and (4) exercise any of their rights with respect to Real Property Leases under Paragraph 22 hereof; provided, however, that with respect to any enforcement of DIP Liens or remedies (including, all remedies that may be enforced pursuant to this Interim Order), the DIP Agent shall provide the Borrower (with a copy to counsel for the Committee and

to the U.S. Trustee, the Prepetition ABL Agent and the Prepetition LC Agent) with seven (7)

days' prior written notice prior to taking the actions contemplated thereby; provided further, that,

until the Payment in Full of the Prepetition ABL Obligations, none of the DIP Agent, the DIP

Lenders nor any of their designees or agents shall be permitted to exercise any rights or remedies

(including to credit bid) with respect to the Priority ABL DIP Collateral. In any hearing

regarding any exercise of rights or remedies other than with respect to the Priority ABL DIP

Collateral, except as otherwise provided in Paragraph 40, the only issue that may be raised by

any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is

continuing, and the Debtors, the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties

(other than the Prepetition ABL Lenders and the Prepetition ABL Agent) shall not be entitled to

seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent

that such relief would in any way impair or restrict the rights and remedies of the DIP Agent or

the DIP Lenders set forth in this Interim Order or the DIP Loan Documents; provided that the

Prepetition Secured Parties shall not be limited in exercising their respective rights in accordance

with the terms of the Intercreditor Agreements, as applicable.  The automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified to the extent necessary upon the

occurrence of an Adequate Protection Default so as to permit the Prepetition ABL Agent and the

Prepetition ABL Lenders to, among other things, exercise any of their rights and remedies

available pursuant to the Prepetition ABL Financing Documents with respect to the Priority ABL

DIP Collateral; provided, however, that with respect to any such enforcements of remedies, the

Prepetition ABL Agent shall provide the Borrower (with a copy to counsel for the Committee

and to the U.S. Trustee and the Prepetition LC Agent) with seven (7) days' prior written notice

prior to taking the actions contemplated thereby. In any hearing regarding any exercise of rights

or remedies with respect to the Priority ABL DIP Collateral, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Adequate Protection Default has occurred and is continuing, and the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties (other than the Prepetition ABL Lenders and the Prepetition ABL Agent) shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition ABL Agent or the Prepetition ABL Lenders set forth in this Interim Order or the Prepetition ABL Financing Documents, subject to the terms of the Intercreditor Agreements.

(c)     In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(d)     No rights, protections, or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Order or the DIP Loan Documents shall be limited, modified, or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to use Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to use Cash Collateral, or (iii) the terms of this Interim Order or any other order or stipulation related to the Debtors' use of Cash Collateral or the provision of adequate protection to any party.

24.     Limitation on Charging Expenses Against Collateral. Subject to entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law,

without the prior written consent of the DIP Agent or DIP Lenders and the Prepetition Agents, as the case may be with respect to their respective interests, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, respectively.

       25.    <u>Adequate Protection</u>.

       (a)    The Prepetition ABL Agent and the Prepetition ABL Lenders shall be granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition ABL Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the sale, lease or use by the Debtors of the collateral securing the Prepetition ABL Obligations (including, without limitation, Cash Collateral), or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise (each, an "<u>ABL Diminution Claim</u>").  As security for and solely to the extent of any ABL Diminution Claim, the Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following adequate protection (collectively, the "<u>ABL Adequate Protection Obligations</u>"):

       i.    <u>ABL Adequate Protection Lien</u>.  The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, is hereby granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest and lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) (together, the "<u>ABL Adequate Protection Liens</u>"), subject and subordinate only to (x) the Carve Out, (y) other than

with respect to the Priority ABL DIP Collateral, the DIP Liens, the LC/Term Adequate Protection Liens, and the Prepetition LC/Term Loan Liens and (z) "Specified Permitted Liens" (as defined in and to the extent permitted to be senior to the Prepetition ABL Liens under the Prepetition ABL Agreement); provided that the ABL Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order; provided, further, that, notwithstanding the reference to "Specified Permitted Liens" in this Interim Order, nothing herein shall adversely affect the rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP Lenders, the Prepetition ABL Lenders, the Prepetition ABL Agent, the Prepetition Term Agent, or the Prepetition Term Lenders. Notwithstanding anything to the contrary in this Interim Order, the ABL Adequate Protection Liens on the Priority ABL DIP Collateral shall not, without the consent of the Prepetition ABL Agent, be made subject to, or *pari passu* with, any other lien or security interest, and the ABL Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases or commencement of a Successor Case.

ii.   ABL Adequate Protection Superpriority Claims.  The Prepetition ABL Agent and the Prepetition ABL Lenders shall be granted, subject to the payment of the Carve Out, superpriority administrative expense claims (the "ABL Superpriority Claims") junior only to the DIP Superpriority Claims, and *pari passu* with the LC Superpriority Claims; provided that the ABL Superpriority Claims shall only attach to the Avoidance Actions upon the entry of the Final Order; provided, further, that, other than with respect to proceeds of Priority ABL DIP Collateral, the Prepetition ABL

Agent and the Prepetition ABL Lenders shall not receive or retain any payments, property or other amounts in respect of the ABL Superpriority Claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full.

iii. <u>Priority ABL DIP Collateral Proceeds</u>.  To the extent any proceeds are received from the sale or other disposition of the Priority ABL DIP Collateral (whether such sale or disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority ABL DIP Collateral, with the treatment of proceeds of disposition of DIP Collateral to be determined pursuant to Paragraph 14(d)), such proceeds shall be delivered to the Prepetition ABL Agent to be applied in accordance with Section 9.03 of the Prepetition ABL Agreement, including, to the extent provided for thereunder, deposited into a Cash Collateral Account (as defined in the Prepetition ABL Agreement, which accounts shall be deemed an ABL Cash Collateral Account for all purposes hereunder) under the exclusive dominion and control of the Prepetition ABL Agent. Notwithstanding anything to the contrary in this Interim Order, until the Payment in Full of the Prepetition ABL Obligations, any funds on deposit in any Cash Collateral Account (as defined in the Prepetition ABL Agreement, which accounts shall be deemed an ABL Cash Collateral Account for all purposes hereunder) shall not be subject to the Carve Out; <u>provided</u> that, in the event any amounts remain on deposit in any ABL Cash Collateral Account after the Payment in Full of the Prepetition ABL Obligations, such remaining amounts shall be transferred to the Segregated Operating Account for application in accordance with the terms hereof.  Until the Payment in Full of the Prepetition ABL Obligations, any

Priority ABL DIP Collateral or proceeds thereof received by the DIP Agent or the DIP Lenders shall be segregated and held in trust for the benefit of, and forthwith paid over to, the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders.

iv. <u>Borrowing Base</u>.  Any and all reserves that may be implemented by the Prepetition ABL Agent against (including reserves contemplated in the calculation of) the Borrowing Base (as defined in the Prepetition ABL Agreement) in the discretion of the Prepetition ABL Agent during the Chapter 11 Cases shall be consistent with terms of the Prepetition ABL Agreement as in effect on the Petition Date and with prior practices of Prepetition ABL Agent with respect to the Debtors and the Borrowing Base (as defined in the Prepetition ABL Agreement) in effect as of May 5, 2015, and, other than as contemplated therein or this Interim Order, no new reserves shall be implemented by the Prepetition ABL Agent against the Borrowing Base as of May 5, 2015; <u>provided</u> that, on and after the Petition Date, the Borrowing Base shall be reduced by an amount equal to $10,000,000, which reduction shall be reflected in each Borrowing Base Certificate delivered pursuant to Paragraph 25(a)(v).  In the event that the Total Outstandings (as defined in the Prepetition ABL Agreement) (net of ABL Cash Collateral (as defined below) then held in the ABL Cash Collateral Account) exceeds the Borrowing Base reflected in a Borrowing Base Certificate delivered pursuant to Paragraph 25(a)(v) (such excess, the "<u>Excess Outstandings</u>"), the Debtors shall within two business days after delivery of such Borrowing Base Certificate: (x) deposit cash (such cash deposited, "<u>ABL Cash Collateral</u>") into a segregated account under the exclusive control and dominion of the Prepetition ABL

Agent (and, notwithstanding anything to the contrary in this Interim Order (including Paragraph 25(a)(i)), any funds so deposited shall not be subject to the Carve Out or any other liens of the DIP Agent, DIP Lenders or any other Prepetition Secured Parties other than the Prepetition ABL Agent and the Prepetition Lenders) (an "ABL Cash Collateral Account") and/or (y) irrevocably repay funded Prepetition ABL Obligations, in either case in an amount equal to Excess Outstandings.  A failure of the Debtors to post the required ABL Cash Collateral or repay the Prepetition ABL Obligations when and in such amounts required in accordance with the immediately preceding sentence shall constitute an Adequate Protection Default hereunder, and the Prepetition ABL Agent and the Prepetition ABL Lenders shall be permitted to exercise all rights and remedies available pursuant to the Prepetition ABL Financing Documents and this Interim Order subject to the terms of Paragraphs 23(b), 31 and 33.  The Prepetition ABL Agent shall not be required to reimburse, or release any cash collateral to, the Debtors as a result of any increase in the Borrowing Base (whether as a result of any reduction to reserves or otherwise).

v.   Financial Reporting.  The Debtors shall provide the Prepetition ABL Agent with (i) the monthly borrowing base certificate as of the last day of each month and the supporting information required to be delivered under the Prepetition ABL Agreement; (ii) as soon as reasonably practicable after the 15th day of each month, beginning with the first full calendar month following the Petition Date (but in no event later than the seventh business day following the 15th day of each month), an interim borrowing base report calculated as of the close of business on such 15th day, setting forth the Debtors' good faith estimate of the borrowing base as of such date

based on information reasonably available to the Debtors at that time; (iii) no later than one business day prior to the consummation of a sale or other disposition of (or including) Priority ABL DIP Collateral with an aggregate value in excess of $5,000,000 (whether such sale or disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority ABL DIP Collateral), a revised Borrowing Base Certificate demonstrating the pro forma effect of such sale or disposition on the Borrowing Base; (iv) all notices, financial statements, certificates and information as and when required by the Prepetition ABL Financing Documents (subject to the modified Borrowing Base Certificate delivery requirements set forth above); and (v) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Interim Order or the DIP Loan Agreement (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders.  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition ABL Agent.

vi. Access. The Prepetition ABL Agent and its counsel, consultants, advisors and other representatives shall be given reasonable access to the Debtors' properties and records at any time in the Prepetition ABL Agent's reasonable discretion for purposes of monitoring the business and assets of the Debtors and the value of the Priority ABL DIP Collateral including the right to conduct field examinations, ongoing maintenance and monitoring in connection with the computation of the Borrowing

Base and assets included in the Borrowing Base  and (ii) the Debtors shall permit the Prepetition ABL Agent and its counsel, consultants, advisors and other representatives, upon prior notice, to have reasonable access to the Debtors' personnel and provide to such persons all such nonprivileged information as they may reasonably request from time to time, in each case, for both clauses (i) and (ii) at the Debtors' expense; provided that the Prepetition ABL Agent shall only be allowed to conduct one appraisal of the Debtors' inventory, which appraisal shall be in accordance with Section 6.10 of the Prepetition ABL Agreement and at the Debtors' expense, and, if no Adequate Protection Default has occurred and is continuing, the Prepetition ABL Agent shall only be able to conduct one field examination without the Debtors' consent (which shall be at the Debtors' expense) and shall coordinate all diligence and/or other requests directly though the Debtors' proposed restructuring advisor, Alvarez & Marsal North America.

vii. Interest.  Upon entry of this Interim Order and the initial funding of the DIP Facility, the Debtors shall pay in cash all accrued and unpaid interest on the Loans (as defined in the Prepetition ABL Agreement) and all accrued and unpaid Letter of Credit Fees (as defined in the Prepetition ABL Agreement) and other fees and disbursements owing to the Prepetition ABL Agent, the Prepetition ABL Lenders or the Prepetition ABL Facility Issuers.  After entry of this Interim Order, the Debtors shall pay in cash in arrears on the last business day of each month all postpetition interest on the Loans (as defined in the Prepetition ABL Agreement) and all Letter of Credit Fees (as defined in the Prepetition ABL Agreement) and other fees and disbursements owing to the Prepetition ABL Agent, the Prepetition ABL Lenders or the Prepetition ABL

Facility Issuers accruing after the Petition Date, all at the non-Default Rate (as defined in the Prepetition ABL Agreement).

viii.   <u>Professional Fees</u>. Upon entry of this Interim Order and the initial funding of the DIP Facility, the Debtors shall pay in cash all accrued and unpaid reasonable and documented prepetition fees and expenses of the Prepetition ABL Agent, including the fees and expenses of counsel, financial advisors, field examiners and other consultants for the Prepetition ABL Agent, and, to the extent such fees and expenses are payable pursuant to the Prepetition ABL Agreement, all accrued and unpaid prepetition reasonable and documented fees and expenses of the Prepetition ABL Facility Issuers.   After entry of this Interim Order, the Debtors shall pay such postpetition fees and expenses (but only fees and expenses (i) of one lead counsel to the Prepetition ABL Agent, (ii) of one local counsel in Virginia and each other relevant jurisdiction reasonably requested by either the Prepetition ABL Agent, the Prepetition LC Agent, or the Prepetition LC/Term Collateral Agent to be shared by the Prepetition ABL Agent, the Prepetition LC Agent, and the Prepetition LC/Term Collateral Agent (<u>provided</u> that in the case of a conflict of interest, one additional local counsel in each relevant jurisdiction shall be permitted), (iii) of one financial advisor shared by the Prepetition ABL Agent, the Prepetition LC Agent, and the Prepetition LC/Term Collateral Agent, and (iv) associated with one field exam during the Chapter 11 Cases) to the extent such fees and expenses are reasonable and documented and would have been payable pursuant to the Prepetition ABL Agreement, in cash on a monthly basis subject to the receipt of invoices (redacted for privilege).   The Debtors shall pay such invoice within ten business days (if no written

objection is received with such ten business days' period) after such professional has delivered such invoice to the Debtors. Parties in interest may deliver written objections to payment of such fees and expenses within ten business days following receipt of such invoice for such fees and expenses. If an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.

ix. <u>Milestones</u>. Unless otherwise agreed-to by the Prepetition ABL Agent or ordered by the Court, the use of Cash Collateral shall terminate after seven days of the Debtors' failure to achieve any of the following milestones (the "<u>ABL/LC Milestones</u>"): (i) enter into a binding stalking horse asset purchase agreement (an "<u>APA</u>") for the sale of at least four mines and related assets through an auction (an "<u>Auction</u>") to be consummated through a chapter 11 plan (a "<u>Plan</u>") by June 30, 2015; (ii) entry of a Court order approving the winning bidder at the Auction by September 18, 2015; and (iii) closing/effective date of the Plan by November 30, 2015; <u>provided</u>, that the DIP Agent may extend the ABL/LC Milestones in its sole discretion for a period up to but no more than four weeks, and any such extension shall be binding on the Prepetition ABL Agent and Prepetition ABL Lenders.

(b) The Prepetition LC Secured Parties shall be granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition LC/Term Loan Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the sale, lease or use by the Debtors of the collateral securing the Prepetition

LC Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition

LC/Term Loan Liens or the stay of enforcement of any prepetition security interest arising from

section 362 of the Bankruptcy Code, or otherwise (each, a "LC Diminution Claim").  As security

for and solely to the extent of any LC Diminution Claim, the Prepetition LC Secured Parties are

hereby granted the following adequate protection (collectively, the "LC Adequate Protection

Obligations"):

> i.   LC/Term Adequate Protection Lien.  The Prepetition LC/Term Collateral Agent, on
>
> behalf of itself and the Prepetition LC/Term Secured Parties, is hereby granted for
>
> their benefit, effective and perfected as of the date of entry of this Interim Order and
>
> without the necessity of the execution or filing of mortgages, security agreements,
>
> pledge agreements, financing statements or other agreements, a security interest in
>
> and lien on all assets of the Debtors (now or hereafter acquired and all proceeds
>
> thereof) (together, the "LC/Term Adequate Protection Liens"), subject and
>
> subordinate only to (w) the Carve Out, (x) the DIP Liens, (y) with respect to the
>
> Priority ABL DIP Collateral, the ABL Adequate Protection Liens and the Prepetition
>
> ABL Liens and (z) liens to the extent expressly permitted to be senior to the
>
> Prepetition LC Liens in accordance with the terms of the Prepetition LC/Term Loan
>
> Agreement); provided that the LC/Term Adequate Protection Liens shall only
>
> encumber the Avoidance Actions upon entry of the Final Order; provided, further,
>
> that, notwithstanding the reference to liens permitted  in accordance with the terms of
>
> the Prepetition LC/Term Loan Agreement in this Interim Order, nothing herein shall
>
> adversely affect the rights of any third party who asserts a lien senior or *pari passu* to
>
> the DIP Agent, the DIP Lenders, the Prepetition ABL Lenders, the Prepetition ABL

Agent or the Prepetition LC/Term Secured Parties. Notwithstanding anything to the contrary in this Interim Order, the LC/Term Adequate Protection Liens shall not, without the consent of the Prepetition LC Agent, be made subject to, or *pari passu* with, any other lien or security interest, and the LC/Term Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases or commencement of a Successor Case.

ii. <u>LC Adequate Protection Superpriority Claim</u>. The Prepetition LC Secured Parties shall be granted, subject to the payment of the Carve Out, superpriority administrative expense claims (the "<u>LC Superpriority Claims</u>") junior only to the DIP Superpriority Claims, and pari passu with the ABL Superpriority Claims; <u>provided</u> that the LC Superpriority Claims shall only attach to the Avoidance Actions upon the entry of the Final Order; <u>provided</u>, <u>further</u>, that the Prepetition LC Secured Parties shall not receive or retain any payments, property or other amounts in respect of such LC Superpriority Claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full.

iii. <u>Priority LC/Term DIP Collateral Proceeds</u>. After the payment in full of the DIP Obligations, the proceeds received from any sale or other disposition of any Priority LC/Term DIP Collateral shall be applied as set forth in a further order of the Court.

iv. <u>Interest</u>.  All postpetition interest on the Loans (as defined in the LC/Term Credit Agreement) and all Letter of Credit Fees (as defined in the LC/Term Credit Agreement) and other fees and disbursements owing to the LC/Term Secured Parties or the L/C Issuers (as defined in the LC/Term Credit Agreement) shall continue to

accrue after the Petition Date, all at the Default Rate (as defined in the LC/Term Credit Agreement).

v. <u>Financial Reporting</u>.  The Debtors shall deliver (i) all notices, financial statements, certificates and information as and when required by the Prepetition LC/Term Loan Financing Documents (including information required pursuant to Section 6.02(m) of the Prepetition LC/Term Loan Agreement), (ii) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Interim Order or the DIP Loan Agreement (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders, and (iii) no later than one business day prior to the consummation of a sale or other disposition of (or including) Priority LC/Term DIP Collateral with an aggregate value in excess of $5,000,000 (whether such sale or disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority LC/Term DIP Collateral), prompt notice thereof shall be delivered by Debtors to the LC Agent. Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition LC Agent.

vi. <u>Access</u>. The Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, and their respective counsel, consultants, advisors and other representatives shall be given reasonable access to the Debtors' properties and records upon the Debtors' prior consent for purposes of monitoring the business and assets of the Debtors and the value of the DIP Collateral, but shall coordinate all diligence and/or other requests

directly though the Debtors' proposed restructuring advisor, Alvarez & Marsal North America.

vii. <u>Professional Fees</u>. Upon entry of this Interim Order and the initial funding of the DIP Facility, the Debtors shall pay in cash all accrued and unpaid reasonable and documented prepetition fees and expenses of the Prepetition LC Agent, including the fees and expenses of counsel, financial advisors, field examiners and other consultants for the Prepetition LC Agent, and, to the extent such fees and expenses are payable pursuant to any of the Prepetition LC/Term Loan Financing Documents, all accrued and unpaid reasonable and documented prepetition fees and expenses of the Prepetition LC/Term Collateral Agent and the Prepetition LC Facility Issuers. After entry of this Interim Order, the Debtors shall pay such postpetition fees and expenses (but only fees and expenses (i) of one lead counsel, (ii) of one local counsel in Virginia and each other relevant jurisdiction reasonably requested by either the Prepetition ABL Agent, the Prepetition LC Agent, or the Prepetition LC/Term Collateral Agent to be shared by the Prepetition ABL Agent, the Prepetition LC Agent, and the Prepetition LC/Term Collateral Agent (provided that in the case of a conflict of interest, one additional local counsel in each relevant jurisdiction shall be permitted), (iii) one financial advisor shared by the Prepetition LC Agent, the Prepetition ABL Agent, and the Prepetition LC/Term Collateral Agent, and (iv) associated with one field exam during the Chapter 11 Cases) to the extent such fees and expenses are reasonable and documented and would have been payable pursuant to the Prepetition LC/Term Loan Agreement, in cash on a monthly basis subject to the receipt of invoices (redacted for privilege). The Debtors shall pay such

76

invoice within ten business days (if no written objection is received with such ten business days' period) after such professional has delivered such invoice to the Debtors.  Parties in interest may deliver written objections to payment of such fees and expenses within ten business days following receipt of such invoice for such fees and expenses.  If an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.

viii.    <u>Milestones</u>.  The Prepetition LC Agent shall be authorized to request a hearing from the Court on an expedited basis, and the Debtors and the DIP Agent consent to the timing of such hearing, to request additional adequate protection in the event the Debtors fail to achieve the ABL/LC Milestones; <u>provided</u>, that the DIP Agent may extend the ABL/LC Milestones in its sole discretion for a period up to but no more than four weeks, and any such extension shall be binding on the Prepetition LC Agent and Prepetition LC Lenders.

(c)    The Prepetition Term Secured Parties shall be granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition LC/Term Loan Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the sale, lease or use by the Debtors of the collateral securing the Prepetition Term Loan Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition LC/Term Loan Liens or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise (each, a "<u>Term Diminution</u>

Claim"). As security for and solely to the extent of any Term Diminution Claim, the Prepetition

Term Secured Parties are hereby granted the following adequate protection (collectively, the

"Term Adequate Protection Obligations" and together with the LC Adequate Protection

Obligations, the "LC/Term Adequate Protection Obligations"):

    i.   <u>LC/Term Adequate Protection Lien</u>. The LC/Term Adequate Protection Liens and

the other adequate protection set forth in Paragraph 25(b)(i) shall also constitute Term

Adequate Protection Obligations. Such Term Adequate Protection Obligations are,

among other things, subject to the Term Loan Subordination Agreement.

    ii.   <u>Term Adequate Protection Superpriority Claim</u>. The Prepetition Term Secured Parties

shall be granted, subject to the payment of the Carve Out, superpriority administrative

expense claims (the "Term Superpriority Claims") junior only to the DIP

Superpriority Claims, the ABL Superpriority Claims and the LC Superpriority

Claims; <u>provided</u> that the Term Superpriority Claims shall only attach to the

Avoidance Actions upon the entry of the Final Order; <u>provided</u>, <u>further</u>, that the

Prepetition Term Secured Parties shall not receive or retain any payments, property or

other amounts in respect of such Term Superpriority Claims unless and until the

obligations under the DIP Facility have indefeasibly been paid in cash in full and the

Prepetition ABL Obligations and Prepetition LC Obligations have been Paid in Full.

    iii.   <u>Financial Reporting</u>. The Debtors shall provide the Prepetition Term Agent with the

information required to be delivered by any of the Debtors to the Prepetition LC

Agent pursuant to Paragraph 25(b)(iv). Any notices delivered by the DIP Agent or

the DIP Lenders to any of the Debtors shall be delivered concurrently to the

Prepetition Term Agent.

iv. <u>Professional Fees</u>. Upon entry of this Interim Order and the initial funding of the DIP Facility, the Debtors shall pay $100,000 in cash to the lead counsel to the Prepetition Term Agent on account of all accrued and unpaid fees and expenses of the Prepetition Term Agent.

(d)     The Prepetition Notes Trustee for the benefit of itself and the Prepetition Noteholders (collectively, the "<u>Note Adequate Protection Parties</u>"), shall be granted the following protection, pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its Prepetition Notes Liens for the consent of the Prepetition Notes Trustee and the Prepetition Noteholders to the priming effectuated by the DIP Facility, consent to the use of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP Facility, and for the diminution in the value of the prepetition security interests of such party, whether or not such diminution in value results from the sale, lease or use by the Debtors of the collateral securing the Prepetition Notes Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition Notes Liens or the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise (each, a "<u>Note Diminution Claim</u>").  As security for and solely to the extent of any Note Diminution Claim, the Note Adequate Protection Parties are granted the following adequate protection (collectively, the "<u>Note Adequate Protection Obligations</u>" and together with the ABL Adequate Protection Obligations and the LC/Term Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>"):

i. <u>Note Adequate Protection Lien</u>.  The Prepetition Notes Trustee, on behalf of itself and the Prepetition Noteholders shall be granted for their benefit, effective and perfected as of the date of entry of this Interim Order and without the necessity of

79

the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Debtors (together, the "Note Adequate Protection Liens"; together with the ABL Adequate Protection Liens and the LC/Term Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate only to (w) the Carve Out, (x) the DIP Liens securing the DIP Facility, (y) the Prepetition ABL Liens, the Prepetition LC Liens and the Prepetition Term Loan Liens, and (z) the ABL Adequate Protection Liens, the LC/Term Adequate Protection Liens and liens permitted in accordance with the terms of the Prepetition LC/Term Loan Agreement; provided that the Note Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order; provided, further, that, notwithstanding the reference to liens permitted in accordance with the terms of the Prepetition LC/Term Loan Agreement in this Interim Order, nothing herein shall adversely affect the rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP Lenders, Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition Notes Trustee or the Prepetition Noteholders.

ii. Note Adequate Protection Superpriority Claim. The Prepetition Notes Trustee and the Prepetition Noteholders shall be granted, subject to the payment of the Carve Out, superpriority administrative expense claims (the "Notes Superpriority Claims" and together with the DIP Superpriority Claims, the ABL Superpriority Claims, the LC Superpriority Claims and the Term Superpriority Claims, the

"Superpriority Claims") junior only to the DIP Superpriority Claims, the ABL Superpriority Claims, the LC Superpriority Claims and the Term Superpriority Claims; provided that the Notes Superpriority Claims shall only attach to the Avoidance Actions upon the entry of the Final Order; provided, further, that the Prepetition Notes Trustee and the Prepetition Noteholders shall not receive or retain any payments, property or other amounts in respect of such Notes Superpriority Claims unless and until (x) the obligations under the DIP Facility have indefeasibly been paid in cash in full, (y) the Prepetition ABL Obligations and the Prepetition LC Obligations have been Paid in Full and (z) the Prepetition Term Loan Obligations have indefeasibly been paid in full or otherwise satisfied.

iii. Financial Reporting. The Debtors shall provide the Prepetition Notes Trustee with the information required to be delivered by any of the Debtors to the Prepetition LC Agent pursuant to Paragraph 25(b)(iv).  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition Notes Trustee.

(e)    Amendments, Etc.  No amendment, modification, termination or waiver of any provision of Paragraph 25(a) or 25(b), or consent to any departure by any of the Debtors from such provisions, shall be effective without the prior written consent of the Prepetition ABL Agent and the Prepetition LC Agent in their sole discretion. The rights of the Prepetition Secured Parties set forth in this Paragraph 25 are incremental and not in lieu of any right to seek to terminate the use of Cash Collateral or to seek new, additional or different adequate protection.

26.    Investigation Budget.  The Debtors shall not assert or prosecute, and no portion of the DIP Facility, the DIP Collateral (including the Prepetition Collateral and the Cash

Collateral), or the Carve Out, and no disbursements set forth in the Budget, shall be used for the

payment of professional fees, disbursements, costs or expenses incurred by any party in interest

in connection with (a) asserting or prosecuting any claims or causes of action arising under or

related to the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the

Prepetition ABL Financing Documents or the Prepetition Notes Documents, or the liens or

security interests securing the obligations under any of the foregoing or to pursue a Challenge (as

defined in Paragraph 36 of this Interim Order) against the Prepetition Term Lenders, the

Prepetition Term Agent, the Prepetition ABL Lenders, the Prepetition ABL Agent, the

Prepetition LC Lenders, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the

Prepetition Notes Trustee and/or the Prepetition Noteholders, or (b) asserting any Challenge or

raising any defenses to the Prepetition Obligations, the DIP Obligations, or the Prepetition Liens;

provided, however, that not more than $100,000 in the aggregate of proceeds of any Cash

Collateral or any proceeds of the DIP Facility or the DIP Collateral may be used to pay any

allowed fees of the Committee or professionals retained by the Committee and incurred in

connection with investigating the matters covered by the stipulations contained in recital

Paragraphs E and F of this Interim Order (the "Investigation Budget").

     27.    Consensual Plan Treatment in Respect of the DIP Lenders.  To the extent any

obligations under the DIP Facility remain outstanding on the date of confirmation of any Plan for

one or more of the Debtors under chapter 11 of the Bankruptcy Code, such obligations shall be

repaid in cash or such other treatment as agreed-to by the Required DIP Lenders.

     28.    Binding Nature of Order.  The provisions of this Interim Order shall be binding

upon the Debtors and their respective successors and assigns (including, without limitation, any

trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property).

29.    <u>Survival of Order</u>.  Solely with respect to the DIP Agent, the DIP Lenders and the Adequate Protection Parties, the provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until (x) all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Loan Documents and (y) the obligations of the Adequate Protection Parties are paid in full.  The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Chapter 11 Cases that does not provide for payment in full of the DIP Obligations or such other treatment of the DIP Obligations as may be agreed to by the DIP Agent as directed by the Required DIP Lenders pursuant to Paragraph 27.

30.    <u>Protection under Section 364(e) of the Bankruptcy Code</u>.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, or the Adequate Protection Parties, as applicable, incurred prior to the actual receipt by such entities of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or

pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders or the Adequate Protection Parties, as applicable.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations owing to the Adequate Protection Parties by the Debtors prior to the actual receipt by the Adequate Protection Parties of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order and the other DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate Protection Obligations owing to the Adequate Protection Parties.

31.     <u>Termination of DIP Facility and Use of Cash Collateral</u>.  Unless otherwise agreed to by the DIP Agent or the Required DIP Lenders in writing in accordance with this Interim Order and the DIP Loan Agreement, the Debtors' right to use the DIP Facility and Cash Collateral shall terminate upon the Termination Date as defined in the DIP Loan Agreement. Unless otherwise agreed to in writing by the Prepetition ABL Agent and the Prepetition LC Agent in their sole discretion, the Debtors' right to use the Priority ABL DIP Collateral and, after the elapse of seven (7) days, any Cash Collateral, shall terminate upon the Debtors' breach of, or non-compliance with, any of their obligations in Paragraph 15(c) or 22(c) (to the extent such breach or non-compliance results from a failure to obtain any consent or approval of the Prepetition ABL Agent, any Prepetition ABL Lender and/or any Prepetition LC Secured Party) or Paragraph 25(a), 25(b) or 25(e) (an "<u>Adequate Protection Default</u>"). Furthermore, upon the occurrence and continuation of an Adequate Protection Default the Prepetition ABL Agent and

Prepetition ABL Lenders may exercise the rights and remedies available to them under the Prepetition ABL Financing Documents with respect to the Priority ABL DIP Collateral, subject to the terms hereof and the Intercreditor Agreements; provided, however, that with respect to any such enforcements of remedies, the Prepetition ABL Agent shall provide the Borrower (with a copy to counsel for the Committee, the DIP Agent, the DIP Lenders, the U.S. Trustee, and the Prepetition LC Agent) with seven (7) days' prior written notice prior to taking the actions contemplated thereby.

32.    Events of Default.  Except as otherwise provided in this Interim Order or to the extent the Required DIP Lenders may otherwise agree in writing, any violation of any of the terms of this Interim Order or any occurrence of an "Event of Default" under and as defined in the DIP Loan Agreement shall constitute an event of default (each, an "Event of Default"). Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Agreement.

33.    Remedies.  The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit (a) the DIP Agent or the DIP Lenders, to exercise, following the occurrence and continuance of an Event of Default (as defined in the applicable DIP Loan Documents), all rights and remedies provided in this Interim Order and the DIP Loan Documents, as applicable, and (b) the Prepetition ABL Agent or the Prepetition ABL Lenders, to exercise, following the occurrence and continuation of an Adequate Protection Default, all rights and remedies provided in this Interim Order and the Prepetition ABL Financing Documents with respect to the Priority ABL DIP Collateral, subject to Paragraph 31 herein.  The Debtors or any party in interest may seek a determination from this

Court that no Event of Default or Adequate Protection Default, as applicable, has occurred and is continuing, and request appropriate relief from this Court.

34.    <u>Limitations on Borrowings</u>.  Except as expressly permitted herein (including in connection with any borrowing or deemed borrowing under the Prepetition ABL Facility or Prepetition LC Facility as a result of any drawing on or extension of any letter of credit thereunder), it shall constitute an Event of Default if any of the Debtors borrows money from any person other than the DIP Lenders as contemplated herein to the extent that the repayment of such borrowings is to be secured pursuant to section 364(d)(1) of the Bankruptcy Code by a security interest, lien or mortgage that is senior to or *pari passu* with any of the security interests, liens or mortgages held by the DIP Agent on its behalf and on behalf of the DIP Lenders, including the DIP Liens, unless in connection with such borrowings (a) the DIP Obligations are indefeasibly paid in full in cash, in any such case, as a condition to the closing of such borrowings.

35.    <u>Modifications of DIP Loan Documents and Budgets</u>.  The Debtors are hereby authorized, without further order of this Court, but upon notice to counsel for each of the Prepetition Agents, to enter into agreements with the DIP Agent and/or the DIP Lenders providing for any consensual non-material modifications to the Budget or the DIP Loan Documents, or of any other modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan Documents to this Interim Order; <u>provided</u>, however, that the Debtors shall not enter into any material modification or amendment to the Budget or the DIP Loan Documents absent further order of this Court and receipt by the Debtors of any requisite consents or approvals of, or notices to, the Prepetition Secured Parties in accordance with this Interim Order.  Notwithstanding the foregoing but subject to the last sentence of this Paragraph 35,

updates and supplements to the Budget required to be delivered by the Debtors under the DIP

Loan Documents and extensions of the maturity date of the DIP Loan Agreement in accordance

therewith shall not be considered material amendments or modifications to the Budget or the DIP

Loan Documents for solely for purposes of this Paragraph 35.   No amendment, update,

supplement or other modification to the Budget or any DIP Loan Documents (including, without

limitation, any extension of the maturity date of the DIP Loan Agreement) shall (x) be construed

as the affirmative consent by a n y  o f  the Prepetition Secured Parties for the use of Cash

Collateral or the terms of any financing or any lien encumbering the P r e p e t i t i o n  Collateral

(whether senior or junior) or (y) prejudice, limit or otherwise impair the rights of any Prepetition

Secured Party (for its benefit or the benefit of the other Prepetition Secured Parties), subject to

any applicable provisions of the Intercreditor Agreements, to seek new, different or additional

adequate protection or assert the interests of any Prepetition Secured Party (for its benefit or the

benefit of the other Prepetition Secured Parties).

36.    Stipulations Regarding Prepetition Obligations and the Prepetition Liens Binding

on Parties in Interest.  The stipulations and admissions contained in this Interim Order, including,

without limitation, in recital Paragraphs E and F of this Interim Order, shall be binding on the

Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or

chapter 11 trustee appointed or elected for any of the Debtors) and all parties in interest,

including, without limitation, any Committee, unless (a) any Committee, or another party in

interest (other than any of the Debtors) with standing and requisite authority, has timely

commenced a contested matter or adversary proceeding (a "Challenge") challenging the amount,

validity or enforceability of the Prepetition Obligations or the perfection or priority of the

Prepetition Liens or otherwise asserting any objections, claims or causes of action (including,

without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) on behalf of the Debtors' estates against the Prepetition Secured Parties relating to the Prepetition Obligations or the Prepetition Liens no later than the earlier of (i) thirty (30) days after the appointment of a Committee, or (ii) forty-five (45) days after from the date of entry of this Interim Order, and (b) the Court enters an order sustaining the Challenge within forty-five (45) days from the date of the timely commencement of such Challenge.  If no such Challenge is timely commenced and sustained as of such dates then, without further order of the Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, (x) the claims, liens and security interests of the Prepetition LC Agent, the other Prepetition LC Secured Parties, the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition Note Agent, the Prepetition Noteholders, the Prepetition ABL Agent and the Prepetition ABL Lenders (collectively, the "Prepetition Secured Parties") shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount or otherwise, and (y) without further order of the Court, the Debtors and their estates shall be deemed to have released any and all claims or causes of action against the Prepetition Secured Parties with respect to the Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents, or the Prepetition Notes Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in recital Paragraphs E and F of this Interim Order shall be binding on the Debtors' estates, any Committee and all parties in interest. If any such Challenge is timely commenced and/or sustained, the stipulations contained in recital Paragraphs E and F shall nonetheless remain binding on the Debtors' estates, any Committee and

all parties in interest, except to the extent that such stipulations were expressly challenged in such Challenge. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges.

37.     <u>Waiver of Requirement to File Proofs of Claim</u>.

(a)     The DIP Agent and the DIP Lenders shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of the DIP Obligations under the applicable DIP Loan Documents. The statements of claim in respect of the DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b)     The Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims for payment of the Prepetition Obligations under the applicable Prepetition Financing Documents or for payment and performance of the Adequate Protection Obligations. The statements of claim in respect of the Prepetition Obligations and the Adequate Protection Obligations set forth in this Interim Order, together with the evidence accompanying the Motion and presented at the Interim Hearing are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

38.     <u>Final Hearing</u>. The Final Hearing is scheduled for _____, 2015, at _____ a.m./p.m. (prevailing Eastern Time) before this Court. Any objections by creditors or other parties in interest to any provisions of this Interim Order shall be deemed waived unless

timely filed and served in accordance with this Paragraph 38.  The Debtors shall promptly serve notice of entry of this Interim Order and the Final Hearing on the appropriate parties in interest in accordance with the Bankruptcy Rules and the Local Rules.  Without limiting the foregoing, the Debtors shall promptly serve a notice of entry of this Interim Order and the Final Hearing, together with a copy of this Interim Order, by first class mail, postage prepaid, facsimile, electronic mail or overnight mail upon the Notice Parties.  The notice of the entry of this Interim Order and the Final Hearing shall state that objections to the entry of a Final Order shall be filed with the United States Bankruptcy Court for the Eastern District of Virginia by no later than ____ a.m./p.m. (prevailing Eastern Time) on _____, 2015.

39.    <u>DIP Agent, Prepetition Agent Authorization</u>.  For the avoidance of doubt and notwithstanding any provision of the Prepetition Financing Documents or the DIP Loan Documents, each of the DIP Agent, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent and the Prepetition Notes Trustee is hereby authorized to make any and all account transfers requested by the Debtors in accordance with the Budget and this Interim Order, and is further authorized to take any other action reasonably necessary to implement the terms of this Interim Order.

40.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly (a) the DIP Agent's, the DIP Lenders' and any of the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors, including the right to seek new, different or additional adequate protection, as applicable, subject to the terms of the Intercreditor Agreements, or the Debtors' rights to oppose such relief, or (b) any of the rights of the Debtors, the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the

Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreements).  Nothing contained in this Interim Order shall be deemed a finding by the Court or an acknowledgement by any of the Prepetition Secured Parties that the adequate protection granted in this Interim Order does in fact adequately protect the relevant Prepetition Secured Parties against any diminution in value of the Prepetition Collateral.

41.     <u>Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Loan Documents, the Intercreditor Agreements and this Interim Order, the terms and provisions of this Interim Order shall govern.

42.     <u>Entry of Interim Order; Effect</u>.  This Interim Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Interim Order on this Court's docket in the Chapter 11 Cases.

43.     <u>Limitation of Liability</u>.  Subject to the entry of the Final Order, in determining to make any DIP Extensions of Credit, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents, as applicable, none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, or any successor of any of the foregoing or any predecessors of the Prepetition Agents, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any

similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, or any successor of any of the foregoing or any predecessors of the Prepetition Agents, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

49.    <u>Exculpation</u>. Nothing in this Interim Order, the DIP Loan Documents, the Prepetition Financing Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, any Prepetition Agent (or any predecessor thereof) or any other Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agent, the DIP Lenders, the Prepetition Agents (and any predecessor thereof) and the other Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

50.    <u>Credit Bidding</u>.    Subject to and effective upon entry of the Final Order, and subject to the terms of the Intercreditor Agreements and in accordance with their respective rights under their respective Prepetition Facilities, the Prepetition Secured Parties or their representatives on their behalf shall have the unqualified right to credit bid up to the full amount of their respective Prepetition Obligations in any sale of the DIP Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.    Subject to and effective upon entry of the Final Order, the DIP Agent and DIP Lenders shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations as consideration in any sale of Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether that sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; <u>provided</u>, that to the extent the Borrower is entitled to retain all or a portion of the total consideration paid in respect of such sale of Collateral in accordance with the DIP Loan Agreement, the applicable portion of the consideration to be retained by Borrower shall be paid in cash (provided that such proceeds shall continue to be DIP Collateral and Cash Collateral subject to Paragraph 10 and any other applicable provisions hereof). Notwithstanding anything to the contrary set forth in this Paragraph 50, the DIP Agent and the DIP Lenders may not credit bid in the sale of any Priority ABL DIP Collateral until the Payment in Full of the Prepetition ABL Obligations.

51.    <u>No Third Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any party, creditor, equity holder or other

entity other than the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors, and their respective successors and assigns.

52.   <u>Intercreditor Issues</u>.  Except as expressly set forth in this Interim Order, nothing in this Interim Order shall be construed to convey on any individual DIP Lender or Prepetition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents, the Prepetition Notes Documents and the Intercreditor Agreements, as applicable.

53.   <u>DIP Fees and Expenses</u>.  The Debtors are authorized and directed to pay all fees and expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility, as applicable, as provided in the applicable DIP Loan Documents, whether or not the transactions contemplated hereby are consummated, whether or not incurred prepetition or postpetition, including, without limitation, agency fees, the professional fees and expenses of Kramer Levin Naftalis & Frankel LLP, McGuireWoods LLP, and Shipman & Goodwin LLP (counsel to the DIP Lenders and DIP Agent), in each case promptly upon receipt of summary form invoices which may be redacted for privileged information. The Debtors shall pay such invoice within ten business days (if no written objection is received with such ten business days' period) after such professional has delivered such invoice to the Debtors.  Parties in interest may deliver written objections to payment of such fees and expenses within ten business days following receipt of such invoice for such fees and expenses.  If an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Subject to entry of the Final Order and approval by

the Court of the application for retention by Debtors of Centerview Partners LLC, the Debtors are authorized and directed to pay Centerview Partners fees and expenses earned in connection with the DIP Facility, as set forth in its retention agreement.

54.    _Enforceability_.    This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.  Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

55.    _Retention of Jurisdiction_.    Notwithstanding any provision in the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents, this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order, the DIP Facility or the DIP Loan Documents.

Dated:
Richmond, Virginia

_____
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

*/s/ Michael A. Condyles*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

- and -

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Michael A. Condyles*

## **<u>EXHIBIT 1</u>**

**DIP Loan Agreement**

**<u>EXHIBIT 2</u>**

**Budget**

Summary Weekly CF Forecast – Patriot Coal

*Dollars in thousands*
*Confidential and Non-Public Information*

Starting Week End

| Cash Flow Forecast | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *First Day of Period* | 5/9/2015 | 5/16/2015 | 5/23/2015 | 5/30/2015 | 6/6/2015 | 6/13/2015 | 6/20/2015 | 6/27/2015 | 7/4/2015 | 7/11/2015 | 7/18/2015 | 7/25/2015 | 8/1/2015 | 5/9/2015 |
| *Last Day of Period* | 5/15/2015 | 5/22/2015 | 5/29/2015 | 6/5/2015 | 6/12/2015 | 6/19/2015 | 6/26/2015 | 7/3/2015 | 7/10/2015 | 7/17/2015 | 7/24/2015 | 7/31/2015 | 8/7/2015 | 8/7/2015 |
| | | | | | | | | | | | | | | |
| Week Ended Friday, | May 15 | May 22 | May 29 | June 5 | June 12 | June 19 | June 26 | July 3 | July 10 | July 17 | July 24 | July 31 | August 7 | 13-Week |
| *Week Number* | *1* | *2* | *3* | *4* | *5* | *6* | *7* | *8* | *9* | *10* | *11* | *12* | *13* | *Total* |
| **Beginning Cash Balance – Book** | **$27,487** | **$49,321** | **$33,168** | **$31,567** | **$26,142** | **$20,685** | **$10,001** | **$24,843** | **$34,220** | **$27,385** | **$34,961** | **$31,829** | **$24,423** | **$27,487** |
| **Receipts** | | | | | | | | | | | | | | |
| **Total Receipts** | **$38,148** | **$25,127** | **$24,655** | **$24,276** | **$21,890** | **$16,481** | **$43,062** | **$38,146** | **$13,939** | **$33,133** | **$17,665** | **$15,836** | **$14,253** | **$326,613** |
| **Disbursements** | | | | | | | | | | | | | | |
| Total Operating Disbursements | $4,955 | $38,815 | $23,218 | $26,476 | $25,504 | $25,271 | $26,705 | $24,627 | $19,015 | $23,346 | $19,372 | $20,901 | $23,333 | $301,539 |
| Total Non-Operating Disbursements | $8,551 | $1,292 | $1,913 | $1,966 | $717 | $767 | $494 | $2,995 | $731 | $1,066 | $404 | $1,211 | $2,879 | $24,985 |
| **Total Disbursements** | **$13,506** | **$40,107** | **$25,131** | **$28,442** | **$26,221** | **$26,039** | **$27,199** | **$27,622** | **$19,745** | **$24,412** | **$19,776** | **$22,112** | **$26,212** | **$326,524** |
| **Net Cash Flow - Operating (Excl Restructure + Debt)** | **$24,642** | **($14,980)** | **($475)** | **($4,165)** | **($4,331)** | **($9,558)** | **$15,863** | **$10,525** | **($5,807)** | **$8,721** | **($2,111)** | **($6,276)** | **($11,959)** | **$89** |
| **Ending Cash Balance – Book (Excl Restructure + Debt)** | **$52,129** | **$34,341** | **$32,693** | **$27,402** | **$21,811** | **$11,127** | **$25,864** | **$35,368** | **$28,413** | **$36,106** | **$32,850** | **$25,553** | **$12,464** | **$27,576** |
| Total - Restructuring & Debt | $2,809 | $1,173 | $1,126 | $1,260 | $1,126 | $1,126 | $1,021 | $1,148 | $1,028 | $1,145 | $1,021 | $1,130 | $1,011 | $16,123 |
| **Ending Cash Balance – Book (Inc Restructure + Debt)** | **$49,321** | **$33,168** | **$31,567** | **$26,142** | **$20,685** | **$10,001** | **$24,843** | **$34,220** | **$27,385** | **$34,961** | **$31,829** | **$24,423** | **$11,453** | **$11,453** |

## EXHIBIT B

**Commitment Letter**

Patriot Coal Corporation
12312 Olive Boulevard
St. Louis, Missouri 63141

May [__], 2015

To the Lenders set forth
on Schedule I hereto

## PATRIOT COAL CORPORATION
### Superpriority Secured Debtor-In-Possession Credit Agreement
### Fee Letter

This Fee Letter (the "*Fee Letter*") sets forth certain fees payable by Patriot Coal Corporation (the "*Borrower*") to Caspian SC Holdings, L.P. , M.H. Davidson & Co., Cantor Fitzgerald Securities and Knighthead Master Fund, L.P., and certain of their affiliates, as lenders (each, a "*Lender*" and, collectively, the Lenders) in connection with the $100,000,000 Superpriority Secured Debtor-In-Possession Credit Agreement (the "*Facility*"), among the Borrower, the Loan Parties party thereto, the Lenders party thereto and Cantor Fitzgerald Securities, the administrative agent for the Lenders (the "*Administrative Agent*"). The Borrower agrees the fees set forth below are Obligations under the Facility and agrees to pay the fees in accordance with the terms hereof.  Capitalized terms used herein and not defined shall have the meanings set forth in the Facility.

| | |
|---|---|
| **Commitment Fee:** | The Borrower will pay a commitment fee to each Lender in the amount of 3% of the aggregate principal amount of the Commitment of such Lender on the Closing Date (and prior to any Borrowing), such fee to be earned on the Closing Date and due and payable upon  the earlier of (i) date of consummation of a Buyer Refinancing or other refinancing or payment that in each case results in repayment in full or refinancing in full of the Loans (and not a partial repayment) and (ii) the acceleration of the Loans. |
| **Upfront Fee**: | The Borrower will pay an upfront fee to each Lender in the amount of 2% of the aggregate principal amount of the Commitment of such Lender on the Closing Date (and prior to any Borrowing), such fee to be earned and paid on the Closing Date and deducted from the first Borrowing of the Loans. |

The foregoing fees will be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable once paid under all circumstances, shall be payable in U.S. Dollars in immediately available funds, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and shall be in addition to any other fees which may be agreed to by the Borrower in any other fee letter or definitive loan document.

This Fee Letter and may not be relied upon or enforced by any other person or entity other than the parties hereto.  This Fee Letter is delivered to you on the condition that the contents of the Fee Letter shall not be disclosed by you, directly or indirectly, to any other person or entity except (i) to your directors, officers, employees, auditors and advisors on a "need-to-know" basis and only in connection with the evaluation of the transactions contemplated hereby, (ii) as may be required in connection with obtaining the approval of a bankruptcy court to the payment of the fees and other amounts contemplated

hereby, (iii) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly thereof and to cooperate with us in securing a protective order in respect thereof to the extent lawfully permitted to do so), (iv) in accordance with the Issuer's disclosure obligations under the Securities Exchange Act of 1934, as amended, and (v) as consented to in writing by the Lender.

This Fee Letter may be executed in counterparts, each of which shall be deemed an original and all of which counterparts shall constitute one and the same document.  Delivery of an executed signature page of this Fee Letter by facsimile or electronic (including "PDF") transmission shall be effective as delivery of a manually executed counterpart hereof.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Fee Letter, including, without limitation, its validity, interpretation, construction, performance and enforcement and any claims sounding in contract law or tort law arising out of the subject matter hereof.

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

PATRIOT COAL CORPORATION

By: _____
Name:
Title:

Schedule I

Caspian SC Holdings, L.P.

M.H. Davidson & Co. and certain of its affiliates (including Midtown Acquisitions L.P.)

Cantor Fitzgerald Securities

Knighthead Master Fund, L.P. and certain of its affiliates

## <u>EXHIBIT C</u>

**DIP Agent Fee Letter**

**CANTOR**
*Fitzgerald*

**[CFS DRAFT 5/11/15]**

**CANTOR FITZGERALD SECURITIES**
**110 E. 59th Street**
**New York, NY 10022**

May __, 2015

Patriot Coal Corporation
[PLEASE PROVIDE]

Re:   Patriot Coal Corporation Superpriority Secured Debtor-in-Possession
      Credit Agreement Agency Fee Letter

Ladies and Gentlemen:

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement (the "Credit Agreement"), originally dated as May [      ], 2015, among Patriot Coal Corporation, as the borrower ("you" or the "Borrower"), certain subsidiaries of the Borrower, as guarantors, the lenders from time to time parties thereto (the "Lenders") and Cantor Fitzgerald Securities ("us" or "CFS"), as administrative agent (the "Agent").  Capitalized terms not otherwise defined in this letter (the "Fee Letter") shall have the same meanings as specified in the Credit Agreement.

In connection with, and in consideration of the agreements contained in this Fee Letter and the Credit Agreement, you agree to pay CFS in immediately available funds, for its own account as Agent for the Lenders under the Credit Agreement, an agent fee of $75,000.00 (the "Fee") payable on the date hereof (the "Effective Date"), and on each anniversary thereafter until the Loans are paid in full.

In addition to the Fee, you agree to pay or reimburse CFS and its affiliates for all reasonable out-of-pocket costs and incurred expenses (including such expenses incurred prior to the Effective Date) in connection with the preparation, execution, delivery and administration of this Fee Letter, the Credit Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions thereof, including, but not limited to all reasonable fees, expenses and disbursements of counsel to the Agent; including, without limitation, an annual fee of $3,000.00 for creating and maintaining an electronic document delivery service (*e.g.* IntraLinks or similar services). All provisions of the Credit Agreement providing for the payment of fees and expenses of, and providing indemnities for the benefit of, the Agent shall apply to fees and expenses set forth herein for the benefit of CFS.

All of the fees described above in this Fee Letter shall be fully earned upon becoming due and payable in accordance with the terms hereof, shall be nonrefundable for any reason whatsoever and shall be in addition to any other fees, costs and expenses payable pursuant to the Loan Documents. Your obligation to pay the foregoing fees will not be subject to counterclaim or setoff for, or be otherwise affected by, any claim or dispute you may have.

The parties hereto hereby agree that the Borrower's obligations under this Fee Letter shall constitute Obligations.

-2-

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing.  This Fee Letter may not be amended nor any provision hereof waived or modified except by an instrument in writing signed by CFS and you.

You acknowledge that CFS and its affiliates (the term "CFS" being understood hereinafter in this paragraph to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  CFS will not use confidential information obtained from you by virtue of the transactions contemplated by this Fee Letter or any other Loan Document or its other relationships with you in connection with the performance by CFS of services for other companies, and CFS will not furnish any such information to other companies.  CFS shall have no obligation to use in connection with the transactions contemplated by this Fee Letter, or to furnish to you, confidential information obtained from other companies.  CFS is a full service securities firm and CFS may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of the Borrower, their subsidiaries and their respective affiliates and of other companies that may be the subject of the transactions contemplated by this Fee Letter.  CFS may employ the services of its affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by this Fee Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits afforded CFS hereunder.

This Fee Letter is delivered to you on the understanding that neither this Fee Letter nor any of its terms or substance shall be (subject to the next sentence) disclosed by you, directly or indirectly, to any other person except (a) you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, and (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent permitted by law, to inform us promptly in advance thereof and the parties agree to take reasonable actions as shall be necessary to prevent, if practicable, the terms of this Fee Letter from becoming publicly available.  The confidentiality provisions contained herein shall remain in full force and effect notwithstanding the termination of this Fee Letter.

This Fee Letter and the Loan Documents state the entire agreement and supersede all prior agreements, written or verbal, between the parties hereto with respect to the subject matter hereof and may not be amended except in writing signed by a duly authorized representative of each of the respective parties hereto.

No delay or failure on the part of any party hereto in exercising any right, power or remedy hereunder shall effect or operate as a waiver thereof, nor shall any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.

Each party hereto hereby irrevocably and unconditionally: (a) submits for itself and its property in any legal action or proceeding relating to this Fee Letter, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York and appellate courts from any thereof and (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in

-3-

any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.

THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS FEE LETTER OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

THIS FEE LETTER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (EXCEPT TO THE EXTENT NEW YORK LAW IS SUPERSEDED BY THE BANKRUPTCY CODE).

Any provision of this Fee Letter that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

This Fee Letter may be executed by one or more of the parties to this Fee Letter on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Fee Letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

[*signatures on following page*]

If the foregoing is in accordance with your understanding, please sign and return to CFS the enclosed copy of this Fee Letter.

Very truly yours,

CANTOR FITZGERALD SECURITIES

By:_____
    Name:
    Title:

ACCEPTED AND AGREED TO
AS OF MAY __, 2015

PATRIOT COAL CORPORATION

By:_____
    Name:
    Title:

[GUARANTORS]

By:_____
    Name:
    Title:

# EXHIBIT D

**Puntus Declaration**

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:     (804) 644-1700
Facsimile:     (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | )    Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | )    (Joint Administration Requested) |
| | ) |

## DECLARATION OF MARC D. PUNTUS
## IN SUPPORT OF THE DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING
## THE DEBTORS TO OBTAIN POST PETITION FINANCING,
## (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND
## PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
## (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, Marc D. Puntus, hereby declare as follows:

1.       I submit this declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "DIP Motion"),[1] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors") contemporaneously herewith.   Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management team or the Debtors' advisors.  If I were called to testify, I could and would testify competently to the facts set forth herein.

**Professional Background**

2.      I am a Partner and co-head of the Debt Advisory and Restructuring Group of Centerview Partners LLC ("Centerview"), which is a full-service independent investment banking firm providing financial advisory services, including mergers and acquisitions and restructuring advice, across a broad range of industries.  Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

3.      Prior to and since joining Centerview in 2011, I have advised companies in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations, and I have experience in procuring, structuring, and negotiating debtor-in-possession financing facilities.  Before Centerview, I was a Managing Director of Miller Buckfire & Co., an investment bank and advisory firm that provided financial advisory services to constituents in a broad range of restructuring and corporate finance transactions.  Prior to that I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW"), and prior to

---

[1]     Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the DIP Motion.

joining DrKW I was a partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP.  I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

### The Debtors Require Immediate Access to the DIP Facility

4.      The Debtors are in need of an immediate infusion of capital.  As of the Petition Date, the Debtors lack sufficient funds to operate their enterprise of eight active mining complexes and continue paying their approximately 2,870 employees.

5.      Anticipating this liquidity crunch, Centerview, together with management and the Debtors' other advisors, analyzed the incremental liquidity that would be necessary to maintain operations in connection with the filing of the chapter 11 cases and bridge the Debtors to a going concern restructuring transaction.  As part of this process, Centerview relied on the debtor-in-possession financing budget (the "DIP Budget") that the Debtors created with the assistance of Alvarez & Marsal North America, LLC ("A&M"), the Debtors' proposed restructuring advisor.  The DIP Budget takes into account anticipated cash receipts and disbursements during the projected period and considers a number of factors, including the impact of the chapter 11 filing on the operations of the business, fees and interest expense associated with postpetition financing, professional fees, and required vendor payments.

6.      The Debtors and their advisors discussed and contemplated the use of cash collateral, with or without any additional financing, to fund operations during the chapter 11 cases.  Based on the Debtors' current cash levels and financial projections, however, the Debtors determined that cash collateral alone would not be sufficient to fund operations and chapter 11 administrative expenses.

3

7.      In light of the Debtors' minimal cash balances, their inability to access the DIP

Facility as provided by the DIP Motion will materially and perhaps irreparably harm the

Debtors' value as a whole.  Among other things, and as described more fully in the First Day

Declaration, the Debtors would not have money to pay their safety equipment vendors and would

be without the materials necessary to ensure the well-being of their coal mining employees.  It is

my understanding that the Debtors would immediately cease operations if they lacked necessary

safety equipment and related materials.  The Debtors would also be unable to fund employee

wages, benefits, and related obligations, an event that likely would result in attrition to the

Debtors' highly trained workforce and negatively impact morale among remaining employees,

even if operations were restarted at a future date.

8.      In addition, the Debtors would be unable to continue paying their vendors or

meeting obligations under their supply contracts, likely resulting in an inability to retain

significant customer and vendor relationships to the great detriment of the Debtors' future

business prospects.  The Debtors would also be unable to comply with their permitting and

environmental regulatory requirements on a postpetition basis, which could result in the loss of

necessary permits and significant remediation obligations.   In sum, absent the ability to

immediately access the liquidity provided under the DIP Facility, the Debtors face a material

diminution in value of their assets and operations.  Continuing operations as a going concern is

the best way to maximize value and avoid massive value destruction, and the Debtors' only way

to continue their operations is to obtain immediate access to the DIP Facility.

**The Debtors Do Not Have Readily Available Sources of Alternative Financing**

9.      Beginning in April 2015, Centerview initiated a process to source

debtor-in-possession financing.  Before reaching out to potential third party lenders, Centerview

4

discussed the need for DIP financing with the agents and advisors to certain of the Debtors'

prepetition lenders under the Prepetition LC Facility, the Prepetition Term Loan Facility, and the

Prepetition ABL Facility.   Although the agents for both the Prepetition LC Facility and the

Prepetition ABL Facility provided non-binding term sheets providing for some amount of

postpetition financing on a priming basis, after an in-person meeting on May 5, 2015 involving a

day of arm's length negotiations, both agents ultimately withdrew their proposals and declined to

pursue further discussions.   In light of these circumstances, the Debtors accelerated their ongoing

discussions with a subset of their prepetition lenders—who control a majority of the Debtors'

second lien notes and term debt—for the provision of a DIP Facility that would satisfy the

Debtors' financing needs through these chapter 11 cases.   Through this process, the Debtors, in

good faith and at arm's length, successfully negotiated the DIP Facility on terms that I believe

are fair and reasonable under the facts and circumstances of these chapter 11 cases.

      10.    Recognizing the urgent need for financing, in parallel with the above-described

discussions, I and my colleagues at Centerview reached out to a number of traditional third-party

financial institutions to inquire whether such parties would be willing to extend financing to the

Debtors on a junior, unsecured, superpriority unsecured, or ***even a priming basis***.   Each of these

parties confirmed that, in light of the facts and circumstances, including the Debtors' financial

position and the sector in which they operate, they would have no interest in extending financing

to the Debtors.   Furthermore, in my experience, it is not customary for lenders to extend

financing to a debtor-in-possession on a junior or unsecured basis, particularly in the context of

Debtors with approximately $790 million of prepetition secured debt on their collective balance

sheets.   I therefore believe that the Debtors are not reasonably able to obtain financing on

something other than a priming basis and, indeed, do not have readily available sources of financing that are alternative to the proposed DIP Facility even on a priming basis.

**The Debtors' Proposed Financing Will Preserve and Enhance Value**

11.      The Debtors' access to the liquidity provided by the DIP Facility will benefit all stakeholders by avoiding an immediate shutdown of the Debtors' operations and facilitating the Debtors' efforts to preserve and enhance the value of their assets.  I do not believe the Debtors could adequately fund the ongoing costs of these chapter 11 cases without the liquidity provided by the DIP Facility.

12.      I furthermore believe the proposed DIP Facility represents the best and most favorable financing option available to the Debtors under the circumstances.  Accordingly, I believe that the proposed DIP Facility is in the best interests of the Debtors' estates and should be approved on the terms and conditions described in the Motion.

*[Remainder of Page Intentionally Left Blank]*

6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

                       Respectfully submitted,

Dated:  May 12, 2015                 */s/ Marc D. Puntus*
                                     Marc D. Puntus
                                     Partner of Centerview Partners LLC, proposed
                                     financial advisor and investment banker to the
                                     Debtors