## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.* | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## AMENDED OBJECTION OF THE OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS
## TO DEBTORS' MOTION FOR ENTRY OF INTERIM
## AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING, (B) AUTHORIZING THE USE OF CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

James M. Peck, Esquire (*admitted pro hac vice*)
Lorenzo Marinuzzi, Esquire (*admitted pro hac vice*)
Jennifer L. Marines, Esquire (*admitted pro hac vice*)
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone: (212) 468-8000
Telecopy: (212) 468-7900

Lynn L. Tavenner, Esquire (VA Bar No. 30083)
Paula S. Beran, Esquire (VA Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA 23219
Telephone: (804)783-8300
Telecopy: (804) 783-0178

    Proposed Counsel for the Official
    Committee of Unsecured Creditors

    Proposed Local Counsel for the Official
    Committee of Unsecured Creditors

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

ARGUMENT ................................................................................................................. 5

    I.    THE PROPOSED DIP FACILITY DOES NOT SATISFY THE REQUIREMENTS OF SECTION 364 OF THE BANKRUPTCY CODE ........................................................... 5

    II.    THE INTERIM ORDER AND DIP FACILITY PROVIDE THE DIP LENDERS WITH INAPPROPRIATE CONTROL OF THE CHAPTER 11 CASES FOR THE DIP LENDERS' SOLE BENEFIT ..................................................................................... 7

        A.    The Milestones Incorporated Into the DIP Facility Provide Only One Predetermined Course for These Chapter 11 Cases ........................... 8

        B.    The DIP Lenders Should Not Have Control Over the Debtors' Real Property Lease Rights ............................................................................ 11

    III.    THE GRANTING OF LIENS ON AVOIDANCE ACTIONS IS INAPPROPRIATE ................ 14

    IV.    THE DEBTORS' WAIVER OF RIGHTS UNDER SECTION 506(C) OF THE BANKRUPTCY CODE IS UNWARRANTED ................................................................. 17

    V.    THE INTERIM ORDER UNDULY RESTRICTS THE COMMITTEE'S ABILITY TO CONDUCT ITS INVESTIGATION .............................................................................. 19

    VI.    OTHER PROVISIONS CONTAINED THE INTERIM ORDER ARE UNREASONABLE ....... 20

CONCLUSION .............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

CASES

*Brookfield Production Credit Assoc. v. Borron*,
    738 F.2d 951 (8th Cir. 1984) ................................................................18

*Buncher v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*,
    229 F.3d 245 (3d Cir. 2000)................................................................15

*Gen. Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)*,
    143 B.R. 840 (Bankr. W.D. Mich. 1992)................................................10

*Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*,
    223 B.R. 170 (B.A.P. 8th Cir. 1998)................................................17

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000)................................................................18

*In re Adams*,
    275 B.R. 274 (Bankr. N.D. Ill. 2002) ................................................15

*In re Ames Dept't Stores, Inc.*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)................................................3, 10

*In re Aqua Assocs.*,
    123 B.R. 192 (Bankr. E.D. Pa. 1991) ................................................3

*In re Crouse Grp., Inc.*,
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ................................................3

*In re Dana Corp.*,
    Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006) [Docket No. 721]....................19

*In re DPH Holdngs Corp.*,
    Case No. 05-44481(RDD) (Bankr. S.D.N.Y. Oct. 28, 2005) [Docket No. 797] ....................19

*In re Farmland Indus., Inc.*,
    294 B.R. 855 (Bankr. W.D. Mo. 2003)................................................3

*In re In re Free Lance Star Publishing Co. of Fredericksburg Va.*,
    512 B.R. 798 (Bankr. E.D. Va. 2003)................................................20

*In re Fisker Automotive Holdings, Inc.*,
    510 B.R. 55 (Bankr. D. Del. 2014) ................................................20

*In re Integrated Agri, Inc.*,
    313 B.R. 419 (Bankr. C.D. Ill. 2004)................................................10

ny-1189320

# TABLE OF AUTHORITIES

(continued)

**Page**

*In re Old Razor Co., LLC (f/k/a American Safety Razor, LLC)*,
   Case No. 10-12351(MFW), (Bankr. D. Del. Aug. 27, 2010) [Docket No. 174] ....................19

*In re PCAA Parent, LLC*,
   Case No. 10-10250(MFW), (Bankr. D. Del. Mar. 2, 2010) [Docket No. 179] ......................19

*In re Pliant Corp.*,
   Case No. 09-10443(MFW) (Bankr. D. Del. Mar. 20, 2009) [Docket No. 337] ....................19

*In re Quebecor World (USA) Inc.*,
   Case No. 08-10152(JMP) (Bankr. S.D.N.Y. Apr. 1, 2008) [Docket No. 470]......................19

*In re RML Dev., Inc.*,
   528 B.R. 150 (Bankr. W.D. Tenn. 2014) ..............................................................................20

*In re Roblin Indus., Inc.*,
   52 B.R. 241 (Bankr. W.D.N.Y. 1985) ......................................................................................9

*In re Silver*,
   338 B.R. 277 (Bankr. E.D. Va. 2004)......................................................................................10

*In re Tenney Villiage Co., Inc.*,
   104 B.R. 562 (Bankr. D.N.H. 1989) .........................................................................................9

*In re Texas Gen. Petroleum Corp.*,
   58 B.R. 357 (Bankr. S.D. Tex. 1986) .......................................................................................2

*In re The Colad Grp., Inc.*,
   324 B.R. 208 (Bankr. W.D.N.Y. 2005) ...................................................................................12

*McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*,
   136 B.R. 470 (W.D. Mich. 1991) ............................................................................................17

*Kivitz v. CIT Grp./Sales Fin., Inc.*,
   272 B.R. 332 (D. Md. 2000) ....................................................................................................17

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*,
   716 F.3d 736 (3d Cir.2013).....................................................................................................16

*McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*,
   210 B.R. 27 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998) .........................................16

*Mid-State Raceway, Inc. v. Mid-State Dev. Corp. (In re Mid-State Raceway, Inc.)*,
   323 B.R. 40 (Bankr. N.D.N.Y. 2005) .....................................................................................3, 9

-ii-

# TABLE OF AUTHORITIES

(continued)

**Page**

*Mellon Bank v. Glick (In re Integrated Testing Products Corp.),*
    69 B.R. 901 (D.N.J. 1987) ...............................................................................15

*Norris Square Sivic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.),*
    86 B.R. 393 (Bankr. E.D. Pa. 1988) ...................................................................8

*Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re
    Cybergenics Corp.),*
    226 F.3d 237 (3d Cir. 2000)..............................................................................16

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.),*
    57 F.3d 321 (3d Cir. 1995)................................................................................17

*Resolution Trust Corp. v. Official Comm. Of Unsecured Creditors (In re Defender Drug
    Stores, Inc.),*
    145 B.R. 312 (B.A.P. 9th Cir. 1992 ....................................................................9

## STATUTES

11 U.S.C § 364................................................................................................ *passim*

11 U.S.C § 365(f)...................................................................................................11

11 U.S.C § 506(c) .............................................................................................17, 18

11 U.S.C § 1102.......................................................................................................4

11 U.S.C § 1103(c)(2)............................................................................................18

## OTHER AUTHORITIES

Transcript of Hearing, *In re Innkeepers USA Trust*,
    Case No. 10-13800 (SC), (Bankr. S.D.N.Y. Sept. 2, 2010)....................................15

Transcript of Hearing, *In re Bear Island Paper Company, LLC*,
    Case No. 10-31202 (DOT), (Bankr. E.D. Va. Mar. 22, 2010)................................17

The Official Committee of Unsecured Creditors (the "Committee") of Patriot Coal Corporation, *et al.* (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby files this objection ("Objection") to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 30] (the "Motion").[1]  In support of the Objection, the Committee submits the Declaration of Leon Szlezinger (the "Szlezinger Declaration") contemporaneously herewith, and respectfully represents as follows:

## INTRODUCTION

1.      The Committee does not object to debtor-in-possession financing that is necessary, reasonable and adequate to fund the Debtors' operational and reorganization efforts in these cases.  However, the currently proposed debtor-in-possession financing (i) is insufficient to fund the Debtors' needs through these cases, (ii) contains overly aggressive case milestones that limit the Debtors' ability to explore value maximizing reorganization alternatives, (iii) burdens the Debtors' estates with excessive costs, and (iv) encumbers assets that are presently available for general unsecured creditors.  This Objection is calculated not to defeat or derail the financing package before the Court but to improve its terms for the benefit of all stakeholders and to protect the rights of unsecured creditors.  The accompanying Szlezinger Declaration provides expert support for certain modifications to the proposed financing, hopefully to be achieved with the consent of the DIP Lenders.  Stated simply, the Debtors need more liquidity under a less restrictive and less expensive post-petition financing facility.  These improvements to the

---

[1] Capitalized terms used herein, but not otherwise defined shall have the meaning ascribed to such terms in the Motion.

proposed financing, described in detail in the Szlezinger Declaration, will increase the likelihood

of a successful outcome for the Debtors.

2. Specifically, the Committee raises the following objections with respect to the

proposed debtor-in-possession financing:

- **Case Milestones Improperly Restrict Debtors' Reorganization Prospects**. The delayed draw feature of the DIP Facility is tied directly to the Debtors achieving specific operational milestones within these Chapter 11 cases (the "Chapter 11 Cases"). If a milestone is not met, then an Event of Default occurs and the DIP Lenders can terminate the entirety of the DIP Facility. (*See* DIP Loan Agreement §§ 4.03, 6.26, 9.01, 9.02.) As a result, the Debtors' ability to operate as a debtor-in-possession depends on adherence to a predetermined case timeline set by the DIP Lenders, thereby severely impinging upon the Debtors' ability to explore other value-maximizing reorganization alternatives under a different—but still reasonable—timeframe and funding structure.

- **Improper Transfer of Unsecured Value (in the form of Avoidance Actions) to the DIP & Prepetition Lenders**. The DIP Lenders and Prepetition Lenders (together, the "Lenders") are receiving a post-petition superpriority administrative expense claim against as well as liens on the Debtors' previously unencumbered assets, pursuant to 11 U.S.C. §364(c)(2), as well as Chapter 5 avoidance actions. (Interim Order, ¶¶ 14, 25.) Such causes of action cannot be encumbered as a matter of law.[2] Taking causes of action created by the Bankruptcy Code in order to create value for unsecured creditors and transferring those actions to pre- and post-petition secured lenders under the guise of adequate protection represents an impermissible transfer of unencumbered value.

- **The Proposed DIP Facility is Inadequate in Light of the Debtors' Projections**. As discussed in the Szlezinger Declaration, by the Debtors' own estimates the DIP Facility is not sufficient to support the Debtors' administrative costs for the anticipated duration of these Chapter 11 Cases.

- **The DIP Lenders Profit Handsomely Without Sufficiently Demonstrating The Adequacy of The Post-petition Financing**. The commitment fees of 2% upfront and 3% upon closing amount to a five million dollar bonus to the DIP Lenders that is among the richest set of fees obtained by post-petition lenders in recent chapter 11 cases for comparable companies. The proposed fees are particularly inappropriate in light of the noticeable lack of evidence in the Puntus Declaration demonstrating that the proposed funding will be sufficient to sustain the Debtors through confirmation of a Chapter 11 plan. In addition, the DIP

---

[2] In re Texas Gen. Petroleum Corp., 58 B.R. 357, 358 (Bankr. S.D. Tex. 1986) ("neither a trustee in bankruptcy nor a debtor-in-possession can assign, sell, or otherwise transfer, the right to maintain a suit to avoid a preference. If a trustee or a debtor-in-possession makes such an assignment, the assignment is of no effect.").

Lenders earn the entirety of their fees whether or not the transactions contemplated under the DIP Facility are consummated. (*See* DIP Loan Agreement, § 2.10; Interim Order, ¶53.)

- **The DIP Lenders Improperly Exercise Unfettered Control Over Disposition Of The Debtors' Assets**.  The DIP Lenders obtain substantial control over the Debtors' rights to dispose of real property leases (the "Real Property Lease Rights"), including the right to credit bid prior to any assignment of a Real Property Lease, as well as the right of first refusal ("ROFR") with respect to the Debtors' proposed rejection of Real Property Lease Rights.  These provisions will not only unduly impair the Debtors' ability to assign such lease rights, they could also chill any competitive bidding for such leases.  In addition, besides usurping the Debtors' business judgment without notice to the Court, the ROFR imposes substantial monetary costs on the estates that serve to benefit only the DIP Lenders.  Ultimately, these provisions provide the DIP Lenders with an improper means to obtain potentially valuable assets at a substantially reduced price. (Interim Order, ¶ 22.)

- **DIP Lenders Are Not Entitled To Broad Releases As Part Of DIP Financing**.  The DIP Facility grants broad releases to the DIP Lenders and the Consenting Secured Parties[3] in connection with the DIP Facility, the DIP Loan Documents, the Prepetition Facilities, the Prepetition Financing Documents including for claims and actions under the Bankruptcy Code, set-off and recoupment, and determinations of validity, priority and extent of the Lenders' liens.  Despite an impending investigation by the Committee, such releases would become final after the passage of an extremely short period for a case of this size (*i.e.*, a mere 30 days from the Committee's formation). (Interim Order, ¶ F(ix).)  Greater time is needed for the Committee to complete its investigation, and to the extent that those lenders are entitled to a release, they can obtain it through a confirmed chapter 11 plan, not a financing order entered within weeks of the commencement of the bankruptcy proceedings.

- **Unrestricted Credit Bidding Rights For DIP Lenders Risk Chilling Competitive Bidding For Debtors' Assets**.  Credit bidding by the DIP Lenders of both their prepetition claims and the DIP Obligations is preauthorized, which will have the effect of chilling competitive bidding for the Debtors' assets.  This provision disproportionately favors the Lenders and exceeds the ambit of section 363(k) of the Bankruptcy Code. (Interim Order, ¶ 50.)

- **The Debtors Should Not Waive The Right To Surcharge The Lenders' Collateral**.  At this early stage of the Chapter 11 Cases, there is nothing to suggest that a disposition of the Lenders' collateral will yield a recovery for unsecured creditors, which means that it is entirely appropriate for the Debtors to

---

[3] The term "Consenting Secured Parties" is defined to include "any Prepetition Secured Party that has not opposed or objected to neither the Interim Order nor the Final Order by objecting at the Interim Hearing or Final Hearing or by filing an objection with the Court to either the Interim Order or the Final Order..." (Interim Order, ¶ F(ix).)

recover from the Lenders the reasonable, necessary costs and expenses of preserving, or disposing of, the Debtors' encumbered assets. (Interim Order, ¶ 24.) The Debtors' waiver of the right to surcharge the collateral provides secured creditors with an inappropriate windfall at the expense of the unsecured creditors.

3.     The Committee has been working with the Debtors and the DIP Lenders to address its concerns with respect to the proposed debtor-in-possession financing and final order;[4] however, as of the objection deadline, the parties have not been able to reach consensus. Thus, the Committee respectively submits that, as proposed, the terms of the debtor-in-possession financing are unduly restrictive, both as to the adequacy of available funding in light of the Debtors' projected capital needs and the lender-mandated performance milestones.

## **BACKGROUND**

4.     On May 12, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court, District of Eastern Virginia. On May 13, 2015, the Court entered an order directing joint administration of the Debtors' cases under Case Number 15-32450 [Docket No. 48]. No trustee or examiner has been appointed in these cases.

5.     On May 21, 2015, the United States Trustee for the Eastern District of Virginia appointed a seven (7) member Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 115].[5]

6.     On the Petition Date, the Debtors filed the Motion, and on May 13, 2015, the Court entered the *Interim Order (A) Authorizing the Debtors to Obtain Post-petition Financing,*

---

[4] At the time this Objection was filed, the Committee's professionals had only seen a proposed form of final order that was still being revised by the DIP Agent and the Debtors. Therefore, the Committee shall only specifically reference the disputed provisions of the Interim Order.

[5] The Committee members include: (i) U.S. Bank National Association; (ii) the United Mine Workers of America; (iii) the United Mine Workers of America 1974 Pension Plan and Trust; (iv) Raleigh Mine & Industrial; (v) Strata Mine Services, LLC; (vi) Enviromine, Inc.; and (vii) Crown Parts & Machine, Inc.

ny-1189320

(B) *Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, and (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 67] (the "Interim Order").  A final hearing with respect to the Motion is presently scheduled for June 3, 2015 at 1:00 p.m. (prevailing Eastern Time).

## ARGUMENT

7.    When determining whether to approve debtor-in-possession financing, a Court must balance the interests of the Debtors and its creditors.  *In re Ames Dep't. Stores, Inc.*, 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); *see also In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).  The burden rests with the Debtors to demonstrate that the terms of the proposed financing are fair and reasonable and in the best interests of their estates and creditors.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  The Debtors have not satisfied that burden on the record presently before the Court.

## I.    THE PROPOSED DIP FACILITY DOES NOT SATISFY THE REQUIREMENTS OF SECTION 364 OF THE BANKRUPTCY CODE

8.    Section 364 of the Bankruptcy Code sets forth the applicable standards for a debtor to obtain post-petition financing, and the DIP Facility as currently contemplated, fails to satisfy such standards on multiple grounds.  The Debtors neither present any credible evidence that the proposed DIP Facility is an exercise of their sound and reasonable business judgment, that the financing is in the best interests of the Debtors' estates and their creditors, nor that the terms of the transaction are "fair, reasonable and adequate."  *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).[6]  On the contrary, the information the Debtors have

---

[6] Generally, factors to be considered in connection with a request for approval of debtor-in-possession financing include:  "(1) that the proposed financing is an exercise of sound and reasonable business judgment; (2) that the financing is in the best interests of the estate and its creditors; (3) that the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors'

presented to this Court illustrates that in addition to granting the DIP Lenders extreme levels of control over the Debtors' Chapter 11 process (discussed in detail below), the Debtors have enriched the DIP Lenders by agreeing to provide the DIP Lenders with an above-market interest rate and excessive commitment and termination fees.  (*See* Szlezinger Decl., ¶ 17-19.)  The commitment fees of 2% upfront and 3% upon closing amount to a five million dollar bonus to the DIP Lenders that is well above market for post-petition loans in recent chapter 11 cases for comparable companies.  (*See* Szlezinger Decl., ¶ 18.)  Additionally, the terms of the DIP Loan Agreement provide that the DIP Lenders obtain such fees regardless of whether or not the Debtors are ever able to draw on the full amount of the DIP Facility.  (*See* DIP Loan Agreement, § 2.10.)  Even more troubling for the Committee than the elevated interest rate and fees in the DIP Facility is that the Debtors are seeking approval of this costly financing in circumstances where it is entirely uncertain whether the proceeds of this financing, funded incrementally, are sufficient to fund the Chapter 11 Cases through to confirmation of a Chapter 11 plan—which plan is required by the DIP Facility to effectuate the sale of the Debtors' assets.  (*See* Szlezinger Decl., ¶ 9-10.)

9.      The Debtors cannot satisfy their burden under section 364 of the Bankruptcy Code to establish that the DIP Facility is in the estates' best interests and that its terms are "fair, reasonable and adequate" when there is a complete deficiency of any discussion by the Debtors of whether the proceeds of the DIP Facility, and the manner in which they are funded, are sufficient to finance this Chapter 11 process, the process dictated by the DIP Lenders.  The Debtors have failed to provide this Court with (i) a detailed long-term budget, thereby inhibiting

---

businesses; (4) that the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (5) that the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand." *Mid-State Raceway*, 323 B.R. at 60 (citing *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003)).

the Court from properly evaluating the sufficiency of the DIP Facility to enable a restructuring; and (ii) Schedule 4.03 of the DIP Facility, which contains the milestones the Debtors must adhere to (and the corresponding term loan draws), which is the most fundamental element of the DIP Facility.[7]  The record currently before the Court establishes that the DIP Facility (i) provides the DIP Lenders with above-market pricing terms, (ii) enables the DIP Lenders to incrementally fund the DIP Facility thereby controlling the Debtors' Chapter 11 process, and (iii) is likely to be insufficient to fund these Chapter 11 Cases through a plan process.  Indeed, greater disclosure is needed to explain, among other things, why the milestones are reasonable, why the Lenders should be given extreme levels of control, and how such provisions are beneficial to the Debtors' estates.  Without such disclosures, the Debtors cannot carry their burden under section 364 of the Bankruptcy Code.  Needless to say, the Committee has serious concerns about the material terms of the DIP Facility.

## II.    THE INTERIM ORDER AND DIP FACILITY PROVIDE THE DIP LENDERS WITH INAPPROPRIATE CONTROL OF THE CHAPTER 11 CASES FOR THE DIP LENDERS' SOLE BENEFIT

10.    The Committee objects to the DIP Facility because it provides the DIP Lenders with absolute control over the Debtors' Chapter 11 process, a process that, as currently proposed, will inure only to the DIP Lenders' benefit at the expense of the Debtors' other creditors.  The Chapter 11 process dictated by the DIP Facility seeks to effectuate a quick sale of the Debtors' assets that will only benefit the DIP Lenders and their post-and prepetition investments.  The DIP Lenders' excessive control over the Debtors' Chapter 11 process is plainly evident by:  (i) the milestones the Debtors are required to achieve, which are laid out in Schedule 4.03 of the DIP

---

[7] Debtors' counsel identified the relevant milestone dates during the first day hearing but did not identify the corresponding funding commitments.

Loan Agreement;[8] and (ii) the extraordinary rights accorded to the DIP Lenders to dictate the manner in which the Debtors utilize their Real Property Lease Rights in paragraph 22 of the Interim Order.  The terms of the Interim Order and the DIP Facility have the effect of turning the Debtors into mere conduits to effectuate the DIP Lenders' will, and therefore, the proposed financing arrangement should not be approved in its current form.  *See Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (rejecting post-petition financing arrangement where lenders acted as "the puppeteer of a marionette-debtor").

A.     **The Milestones Incorporated Into the DIP Facility Provide Only One Predetermined Course for These Chapter 11 Cases**

11.     The funding available to the Debtors under the DIP Facility is illusory because the DIP Facility funds the Debtors' estates on an incremental basis that is premised on the Debtors' strict adherence to the DIP Lenders' predetermined course for these Chapter 11 Cases.  The DIP Loan Agreement provides that the Debtors are required to achieve the milestones set forth on Schedule 4.03 within the time periods listed therein in order to access incremental amounts of post-petition financing, or else the Debtors risk having the financing facility terminate.  (DIP Loan Agreement, §§ 6.26; 9.01(b)).  For example, assuming the DIP Facility is approved on a final basis, the Debtors will not immediately gain access to the full $100 million contemplated under the DIP Facility.  Instead, the DIP Lenders are only required to fund an additional $20 million to the Debtors.  Thereafter, if the Debtors are able to enter into a stalking horse asset purchase agreement by June 30, 2015 "for sale of at least four mines and related assets [ ]

---

[8] Schedule 4.03 of the DIP Loan Agreement dictates that (i) by June 30, 2015, the Debtors must enter into a binding stalking horse asset purchase agreement for the sale of at least four mines and related assets through a chapter 11 plan to a potential acquirer, in a form acceptable to the DIP Lenders; and (ii) by July 15, 2015 the Debtors must file a chapter 11 plan and disclosure statement acceptable to the DIP Lenders through which to consummate a sale of the Debtors assets.  Thus, the DIP Facility requires the Debtors to seek approval of a sale transaction through a Chapter 11 plan in approximately 60 days from the Petition Date.

ny-1189320

**through a chapter 11 plan** to a potential acquirer, in form and substance reasonably acceptable to the [DIP Lenders,]" then the DIP Lenders will fund an additional $15 million of the DIP Facility.  (*See* DIP Loan Agreement, Schedule 4.03 (emphasis added).)  The Debtors will only gain full access to the DIP Facility in mid-September provided that the Court enters an Order approving a winning bidder for the acquisition of the Debtors' assets.  Such onerous restrictions on the availability of post-petition financing substitutes the DIP Lenders' judgment in place of the Debtors' business judgment in these Chapter 11 Cases.  Moreover, the DIP Facility's terms require strict adherence to a predetermined course of action to emerge from the Chapter 11 Cases, and do not permit the Debtors adequate time to explore alternate value-maximizing transactions.

12.    Numerous courts have held that a financing arrangement may not be so favorable to the lender so as to cause Bankruptcy Code protections to serve only that lender, contrary to the intent of Congress.  *See Mid-State Raceway*, 323 B.R. at 59 ("bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender" (quoting *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)); *In re Tenney Village Co., Inc.,* 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (characterizing the proposed financing facility as one that would "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt"); *In re Roblin Indus., Inc.,* 52 B.R. 241, 243-44 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor-in-possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties).

13.    In *Tenney Village*, the bankruptcy court denied the debtor's motion for approval of a post-petition financing arrangement because, similar to the circumstances in these Chapter 11 Cases, it incorporated terms that were too overreaching, such as a prohibition on the debtor asserting avoidance actions against the lender, terms that prevented the cram-down of a plan on the lender and provisions that disabled independent operation of the debtor's businesses. 104 B.R. at 568 ("[u]nder the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors in numerous ways").    Stated differently, the DIP Facility is not consistent with the requirements of section 364 of the Bankruptcy Code because it would "skew the conduct of the bankruptcy case" and "destroy the adversary process." *Ames*, 115 B.R. at 38; *see also Gen. Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) ("this court will not authorize post-petition financing pursuant to § 364 where a creditor leverages a debtor-in-possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit").

14.    A fundamental tenet of bankruptcy law is that the bankruptcy process is designed to create benefits for the unsecured creditors.    Bankruptcy should not be used as an express foreclosure court—a tool for secured creditors to liquidate collateral at the expense of junior creditors.    *See Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 425 (Bankr. C.D. Ill. 2004) ("It is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors"); *In re Silver*, 338 B.R. 277, 282 (Bankr. E.D. Va. 2004) (Chapter 7 trustee's proposed sale denied because unsecured creditors would receive nothing or "next to nothing").    Here, the DIP Facility is designed to benefit only the Lenders.    As noted above, courts have expressed the view that secured creditors should understand that in order to use the Chapter 11

10

process to foreclose on their collateral, secured creditors must be prepared to carve out of their recovery consideration to unsecured creditors as part of the process.  Unsecured creditors deserve some value, and absent the opportunity to obtain value for the benefit of unsecured creditors, the DIP Facility should not be approved in its current form.  It would be more advantageous for the Debtors' estates if the milestones set forth in Schedule 4.03 of the DIP Loan Agreement were modified in order to provide the Debtors additional time to complete the proposed sale and plan process.  Such modifications, which are reflected in the Szlezinger Declaration, will place the Debtors in a more advantageous posture because they will be in a better position to undertake a more robust and competitive sale process, as well as pursue the possibility of alternate plan structures.  Ultimately, this will benefit all parties in interest, including both secured and unsecured creditors, and it will not prejudice the DIP Lenders because the end of the milestone timeline (as modified) remains the same.

> **B.     The DIP Lenders Should Not Have Control Over the Debtors' Real Property Lease Rights**

15.     In addition to the significant level of control provided to the DIP Lenders through the current milestones, the DIP Lenders gain an even greater degree of control over the Debtors' Chapter 11 process by obtaining authority over how the Debtors exercise their Real Property Lease Rights. These unusual lender-friendly provisions usurp the Debtors' powers provided under section 365 of the Bankruptcy Code in favor of the DIP Lenders and dictate the manner in which the Debtors may deal with their Real Property Lease Rights.  Such provisions are entirely improper in a post-petition financing order and must be stricken.  In particular, paragraph 22 of the Interim Order provides, among other things, that the DIP Lenders:

- are permitted "to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s)" (Interim Order, ¶ 22(a)(i));[9]

- may "require any Debtor to complete promptly . . . a Disposition of any such Real Property Lease(s) . . . upon such [ ] terms as the DIP Agent or DIP Lenders may deem commercially reasonably" (Interim Order, ¶ 22(a)(ii));

- prior to any assignment of a Real Property Lease, "the DIP Agent shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations outstanding under the DIP Facility as consideration in exchange for any such Real Property Lease" (Interim Order, ¶ 22(b));

- may exercise a ROFR (*i.e.*, right of first refusal) preventing the Debtors from assuming and assigning, or rejecting any Real Property Lease(s) without the DIP Lenders' approval of such action, where failure to provide such ROFR is an event of default (Interim Order, ¶ 22(c)); and

- may "direct the Debtors to assign any Real Property Lease or group of Real Property Leases as Collateral securing the DIP Obligations[.]" (Interim Order, ¶ 22(c)(ii).)

16.    The Real Property Leases include leasehold interests of the Debtors in properties including "any water or surface right with respect to Real Property not owned in fee by [the Debtors], any right to timber and natural gas (including coalbed methane and gob gas) necessary to recover Coal from any portion of Real Property not owned in fee by [the Debtors] or the right to extract minerals from any portion of Real Property[.]" (DIP Loan Agreement, § 1.01.)  Thus, the Real Property Leases constitute a substantial aspect of the Debtors' coal mining business, and through the DIP Facility, the Debtors have given the DIP Lenders the ability to prescribe the manner in which such assets will be utilized "regardless of whether any particular Real Property Lease or group of Real Property Leases constitutes Collateral[.]"  (Interim Order, ¶ 22.)[10]

---

[9] Section 365(f) of the Bankruptcy Code provides:  "[N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease, the trustee may assign such contract or lease… if the trustee assumes such contract or lease in accordance with the provisions of this section; and adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(1)-(2).

[10] *See* ¶ 18, *infra*.

ny-1189320

Furthermore, the Interim Order presently allows the DIP Lenders to exercise the Debtors' rights under section 365(f) of the Bankruptcy Code.  There is no authority for a lender to exercise the powers of a debtor-in-possession.  *See In re The Colad Grp., Inc.,*324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and its secured creditor do not constitute a legislature.  Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights").

17.    Such provisions improperly limit the Debtors' most basic right under section 365 of the Bankruptcy Code to assess their contractual rights and relieve themselves of burdensome obligations.  These provisions also replace the business judgment of a fiduciary with the self-serving motivation of a non-fiduciary.  Given the early stages of these Chapter 11 Cases, and the fact that the Committee has not had the time to assess properly the value of the Real Property Leases, the Court should strike any provisions of the Interim Order that provide the DIP Lenders with such extensive and unilateral control over such significant assets, because providing such rights to the DIP Lenders will likely chill bidding at any auction for the Debtors' assets and diminish potential recovery value for the Debtors' estates.

18.    Moreover, the Committee believes certain of the Real Property Leases were likely unencumbered as of the Petition Date.  Pursuant to the terms of the Prepetition ABL Financing Documents, the Prepetition LC/Term Loan Financing Documents and the Prepetition Notes Documents (collectively, the "Prepetition Financing Documents"), the Prepetition Lenders' liens did not attach to "Excluded Property."  The term "Excluded Property" is defined by the Prepetition Financing Documents to include Real Property Leases "where the terms of the applicable Real Property Lease prohibit a mortgage thereof[.]"  (*See* Prepetition ABL Agreement, § 1.01; Prepetition LC/Term Loan Agreement, § 1.01; Junior-Lien Intercreditor Agreement, § 1(b).)  As such, the DIP Lenders should not be provided with control to dictate the

13

manner in which to dispose of such assets without first permitting the Debtors and the Committee to assess the value thereof. Permitting the DIP Lenders to exercise unilateral control will deprive the Debtors of the ability to maximize the value of their Real Property Lease Rights for the benefit of the Debtors' entire creditor body.

### III.    THE GRANTING OF LIENS ON AVOIDANCE ACTIONS IS INAPPROPRIATE

19.    The Committee has not yet had an opportunity to investigate potential Avoidance Actions, and the Debtors have not yet filed their schedules of assets and liabilities or statements of financial affairs (together, the "Schedules"). [11]   As such, the extent of overall value encompassed by the Avoidance Actions is presently unknown. The terms of the DIP Facility transfer all of that value to the Lenders to the detriment of the unsecured creditors. (Interim Order, ¶¶ 14, 25.) Avoidance Actions may be one of the few unencumbered assets available to provide value to unsecured creditors. The Debtors' proposal to grant the DIP Lenders liens and superpriority claims on the Avoidance Actions, as well as grant the Prepetition Lenders adequate protection liens and superpriority claims on the Avoidance Actions puts potential recoveries to unsecured creditors precariously at risk. Thus, to the extent any viable Avoidance Actions or other commercial tort claims (to the extent they are unencumbered) exist, the value of such assets would immediately shift from the Debtors' general unsecured creditors to the Lenders. Additionally, the Prepetition Lenders' collateral package never included the Avoidance Actions.

---

[11] Pursuant to the *Order (I) Extending Time to File Schedules and Statements of Financial Affairs, (II) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Mailing Matrix for Each Debtors, (III) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (IV) Granting Related Relief* [Docket No. 85], the Debtors are not required to file their Schedules until June 26, 2015. Additionally, the Debtors recently filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code (II) Setting a Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (III) Establishing the Amended Schedules Bar Date and the Rejections Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including 503(b)(9) Requests, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 113], wherein the Debtors request the "General Bar Date" be established as July 27, 2015.

14

Therefore, to provide these parties with a lien and superpriority claim would impart a windfall upon them at the expenses of unsecured creditors.[12]

20.      Absent exigent circumstances or consent, avoidance actions should not be burdened by liens or super-priority lender claims.

> Courts have refused to allow assignment or sale of avoidance claims by the Trustee because such transfers would run contrary to two primary policies underlying the Bankruptcy Code.  First, the Code allows only the trustee or debtor-in-possession to sue on a preference because only that trustee or debtor-in-possession represents the interests of all creditors in maximizing the value of the debtor's estate. . . . Second, permitting trustees alone to sue on a preference 'facilitate[s] the prime bankruptcy policy of equality…

*McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 33 (N.D.N.Y. 1997), aff'd, 142 F.3d 571 (2d Cir. 1998) (citations omitted); *In re Adams*, 275 B.R. 274, 283 (Bankr. N.D. Ill. 2002) ("[T]he grant of a superpriority claim to a prepetition secured creditor violates the Code's policy of equality of distribution, particularly where there is no showing that such a grant will benefit the debtors' bankruptcy estate.").  *See also* Transcript of Hearing at 14:22 – 15:4, *In re Innkeepers USA Trust*, Case No. 10-13800 (SC) (Bankr. S.D.N.Y. Sept. 2, 2010) [Docket No. 433] ("Regarding the committee's objection to the granting of superpriority claims with respect to avoidance actions or the proceeds thereof, I agree with the committee's position and decline to grant the superpriority claims.  Even though their [re]quest for liens on the avoidance actions was withdrawn, I believe the committee's objection should be sustained as the withdrawal of the request for liens gives relatively empty protection if the superpriority

---

[12] To the extent the Court determines the Lenders are entitled to superpriority administrative expense claims under sections 364(c)(1) and 507(b) of the Bankruptcy Code, the Lenders should be required to waive any right to satisfaction of such superpriority claim under section 364(c)(1) and 507(b) of the Bankruptcy Code through proceeds derived from the Avoidance Actions, because granting the Lenders a superpriority claim with respect to the Avoidance Actions has the same practical effect as approving liens on Avoidance Actions and their proceeds.

claims still remain.");[13] *Mellon Bank v. Glick (In re Integrated Testing Products Corp.)*, 69 B.R. 901, 904 (D.N.J. 1987) ("It is well settled that generally it is the trustee alone, acting on behalf of all the creditors, that has a right to recover payments made as preferences. And this right cannot be assigned.") (citations omitted); *Buncher v. Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (citations omitted); *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) ("A debtor is not entitled to benefit from any avoidance, … and 'courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves'") (citing *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 226 F.3d 237, 244 (3d Cir. 2000)).

21.    The extraordinary lender-friendly terms within the proposed DIP Facility strongly suggest that the Debtors are running these Chapter 11 Cases primarily for the benefit of the Lenders.  At this point in time, the level of recovery unsecured creditors can expect is entirely unknown.  The Avoidance Actions may be one of the only sources of recovery for unsecured creditors.  As a result, the Debtors should not be permitted to dissipate these critical assets by granting liens and superpriority claims on such assets to the Lenders.[14]

---

[13] Due to the voluminous nature of the hearing transcript cited herein, the Committee has not attached this hearing transcript as an exhibit; however, copies of this hearing transcript are available upon the Court's request.

[14] To the extent the Court overrules the Committee's objection and determines that the Lenders should receive a lien on the Avoidance Actions and/or the Debtors' unencumbered property, the Committee submits that paragraph 23(c)

16

### IV.    THE DEBTORS' WAIVER OF RIGHTS UNDER SECTION 506(C) OF THE BANKRUPTCY CODE IS UNWARRANTED

22.    The Committee objects to the Debtors' waiver of its rights to recover the reasonable and necessary costs and expenses of preserving or disposing of property securing an allowed secured claim of the Lenders to the extent that the Lenders fail to include as part of the budget the costs and expenses of administration of the Debtors' estates.  The Debtors' estates should not be forced to bear such a burden in these Chapter 11 Cases where substantially all of the Debtors' assets are to be liquidated for the benefit of the Lenders and where it does not appear that the Lenders are providing sufficient funding to accomplish even that.

23.    Courts have routinely rejected the waiver of surcharge rights under section 506(c) of the Bankruptcy Code.  *See*, *e.g.*, *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("Thus, like the equitable common law rule that preceded it, § 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant.  The rule understandably shifts to the secured party, who has benefited from the claimant's expenditure, the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate, providing that such unencumbered assets exist.") (citations omitted); *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (provision in financing order that purports to immunize post-petition lender from Bankruptcy Code Section 506(c) surcharge is unenforceable); *Kivitz v. CIT Grp./Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (Section 506(c) of the Bankruptcy Code exists so that unsecured creditors are not required to bear the cost of protecting collateral that is not theirs and to require

---

of the Interim Order, which provides that the Lenders are not subject to the equitable doctrine of "marshaling", should be deleted, and additional language should be inserted to protect the unsecured creditors' interests in these assets.

the secured party to bear the costs of preserving or disposing its own collateral); *McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (cash collateral order unenforceable to extent its provisions attempted to immunize post-petition lender from surcharge payment obligations pursuant to Section 506(c) of the Bankruptcy Code); *see also* Transcript of Hearing at 143:1-6, *In re Bear Island Paper Company, LLC*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 22, 2010) [Docket No. 422].[15]

24.     By waiving this right under section 506(c) of the Bankruptcy Code, the Debtors are agreeing to pay for any and all expenses associated with the preservation and disposition of the Lenders' collateral.  The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984).  Such immunizing provisions have been found unenforceable on the basis that they "operate as a windfall to the secured creditor at the expense of the administrative claimants."  *In re Lockwood Corp.*, 223 B.R. at 176.

25.     The Supreme Court, in *Hartford Underwriters Ins. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000), held that such waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for anything but the most compelling of reasons, because immunizing provisions such as these are binding on all the parties in interest.  *Id.* (debtor's decision to waive rights under section 506(c) of the Bankruptcy Code must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").  Given the fact that the Debtors have not

---

[15] Due to the voluminous nature of the hearing transcript cited herein, the Committee has not attached this hearing transcript as an exhibit; however, copies of this hearing transcript are available upon the Court's request.

ny-1189320

demonstrated any extraordinary circumstances justifying a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code, the Court should not permit such waiver.

### V.    THE INTERIM ORDER UNDULY RESTRICTS THE COMMITTEE'S ABILITY TO CONDUCT ITS INVESTIGATION

26.    Section 1103(c)(2) of the Bankruptcy Code provides that one of the duties of the Committee is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the formulation of the plan." 11 U.S.C. § 1103(c)(2). These statutory duties clearly include the investigation of the purported liens of, and potential claims against, the Prepetition Lenders. The Interim Order, however, includes provisions limiting the Committee's ability to conduct its investigation.

27.    The Interim Order contemplates that the Committee is afforded very limited time to investigate the Lenders' claims, thereby impairing its ability to vigorously represent its unsecured creditor constituency. Accordingly, any final order approving the use of cash collateral must address the following issues:

- _Challenge Period_. The period within which the Committee must conduct its investigation and commence a Challenge against the Lenders must be extended from 30 days to 60 days from the date of the Committee's appointment.

- _Committee Standing_. The Final Order should confer standing on the Committee to commence an adversary proceeding challenging the Debtors' stipulations contained in the Final Order.[16]

- _Recharacterization of Adequate Protection Payments_. To the extent any interest and fees are paid on a current basis,[17] the Final Order should expressly preserve the Committee's right to recharacterize any such payments paid as adequate

---

[16] Orders conferring standing are routine. _See In re Old Razor Company, LLC (f/k/a American Safety Razor, LLC)_, Case No. 10-12351 (Bankr. D. Del. Aug. 27, 2010) [Docket No. 174]; _In re PCAA Parent, LLC_, Case No. 10-10250 (Bankr. D. Del. Mar. 2, 2010) [Docket No. 179]; _In re Pliant Corp._, Case No. 09-10443 (Bankr. D. Del. Mar. 20, 2009) [Docket No. 337]; _In re Quebecor World (USA) Inc._, 08-10152 (Bankr. S.D.N.Y. Apr. 1, 2008) [Docket No. 470]; _In re Dana Corp._, Case No. 06-10354 (Bankr. S.D.N.Y. Mar. 29, 2006) [Docket No. 721]; _In re DPH Holdings Corp._, Case No. 05-44481 (Bankr. S.D.N.Y. Oct. 28, 2005) [Docket No. 797].

[17] _See_ Interim Order, §§ 25(a)(vii), (viii); 25(b)(vii); 25(c)(vii).

19

protection into principal repayments in the event that a determination is made that any of the subject Lenders are undersecured.

## VI.    OTHER PROVISIONS CONTAINED IN THE INTERIM ORDER ARE UNREASONABLE

28.    In addition to the objectionable provisions of the Interim Order noted above, the Committee believes that certain other provisions must be modified in the Final Order to clarify the parties' rights.  Some of these proposed changes are highlighted below for the Court:

- Releases.  The Interim Order provides the DIP Lenders and the Consenting Secured Parties with general releases.  *See* Interim Order, Recital ¶ F.  Such broad releases are inappropriate in the context of approving the DIP Facility.  The proposed releases are especially offensive here, where the Lenders, through their control of the post-petition financing and sales process, are dictating the outcome of these Chapter 11 Cases.  The Committee should be given time to review and analyze the relationship between the Debtors and the Lenders to determine if any viable causes of action or claims should be brought.  If full releases are warranted at the end of the day, they should be provided only pursuant to a confirmed plan of reorganization.

- Credit Bid.  Paragraph 50 of the Interim Order, which permits the Lenders to credit bid under section 363(k) of the Bankruptcy Code all or any portion of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a chapter 11 plan of reorganization should be stricken.  The Final Order should not limit the power of the Court granted in section 363(k) of the Bankruptcy Code to restrict credit bidding for cause.  *See, e.g., In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 59 (Bankr. D. Del. 2014) (denying credit bid where credit bidding would freeze competitive bidding all together); *In re Free Lance Star Publishing Co. of Fredericksburg Va.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (cause existed to limit creditor's right to bid at auction sale even as to assets to which creditor has security interest); *In re RML Dev., Inc.*, 528 B.R. 150, 156 (Bankr. W.D. Tenn. 2014) (limiting secured creditor's ability to credit bid because a "bona fide dispute exists to the extent of the amount of that claim").

- Budget and Reporting.  Paragraphs 11 and 25 of the Interim Order should be revised to expressly provide that the Committee is an additional recipient of the budgets, reports, and forecasts, and is also permitted reasonable access to the Debtors' books and records.

- Payments Outside of a Chapter 11 Plan.  Paragraph 7 of the Interim Order provides that the DIP Facility and certain related funds shall not be used to repay any of the Prepetition Obligations "unless and until the indefeasible payment in full of the DIP Obligations has occurred[.]"  The Committee believes this quoted

language should be stricken to ensure that the Debtors may not repay any of the Prepetition Obligations except through a confirmed Chapter 11 plan.

- <u>Real Property Lease Rights</u>.  Paragraph 22 of the Interim Order provides the DIP Lenders relief from the automatic stay to exercise any rights conferred upon the DIP Lenders with respect to the Real Property Lease Rights.  To the extent the Court determines the rights conferred upon the DIP Lenders under paragraph 22 of the Interim Order are improper (as discussed above), the related relief from automatic stay provisions should also be stricken.

- <u>Debtors Stipulations and Challenge</u>.  Paragraph 36 of the Interim Order provides, in connection with a Challenge, that the Committee may contest the subject matter of the Debtors' stipulations and admissions contained in the recital Paragraphs E and F of the Interim Order.  The Committee believes the Challenge should be extended to also include recital Paragraph N.

## **<u>CONCLUSION</u>**

29.    The Committee has been in discussions with the Debtors and the DIP Lenders and is hopeful that they can agree to modifications that address some or all of the concerns identified above.  However, in the event that the Debtors and the DIP Lenders are unwilling to make acceptable modifications, the Committee respectfully requests that the Court condition approval of the Motion on changes being made to the proposed Final Order as set forth herein.

*[Remainder of page intentionally left blank.]*

21

WHEREFORE, the Committee respectfully requests that the Court: (a) deny the Motion;
(b) modify the proposed Final Order as set forth herein; or (c) grant such other and further relief
as the Court may deem just and proper.


Dated: Richmond, Virginia
      June 1, 2015

**MORRISON & FOERSTER LLP**
James M. Peck
Lorenzo Marinuzzi
Jennifer Marines
250 West 55th Street
New York, New York 10019-9601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: jpeck@mofo.com
      lmarinuzzi@mofo.com
      jmarines@mofo.com

-and-

*/s/Paula S. Beran*
Lynn L. Tavenner (Va. Bar No. 30083)
Paula S. Beran (Va. Bar No. 34679)
**TAVENNER & BERAN, PLC**
20 North Eighth Street
Richmond, Virginia 23219
Telephone: (804) 783-8300
Facsimile: (804) 783-0178
E-mail: ltavenner@tb-lawfirm.com
      pberan@tb-lawfirm.com

*Proposed Counsel for The Official
Committee of Unsecured Creditors of
Patriot Coal Corporation, et al.*


## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2015, a true and correct copy of the
foregoing was served through the Court's CM/ECF System to all parties participating
electronically through CM/ECF in these cases.

*/s/ Paula S. Beran*