Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Counsel for the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.*, | Case No. 15-32450 (KLP) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF (I) AN
ORDER (A) APPROVING BIDDING PROCEDURES AND
BID PROTECTIONS IN CONNECTION WITH THE SALES OF CERTAIN
OF THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER
OF NOTICE, (C) SCHEDULING AUCTIONS AND A SALE HEARING,
(D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
OF CONTRACTS, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER
(A) APPROVING THE SALE OF ASSETS PURSUANT TO THE BIDDING PROCEDURES,
(B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF**

Patriot Coal Corporation and certain of its affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), file this motion (this "Motion") seeking entry of:  (I) an order,

substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"),

(a) authorizing and approving the bidding procedures attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") and approving the Bid Protections (as defined below) in connection with the sale of certain assets; (b) approving the form and manner of notice of the Auctions (as defined herein) and sale hearing (the "Sale Hearing") with respect to the sales of the assets free and clear of liens, claims, encumbrances, and other interests; (c) scheduling the Auctions and Sale Hearing; (d) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sales (as defined herein); and (e) granting related relief; and (II) at the conclusion of the Sale Hearing, if applicable, an order, in a form to be submitted prior to any such Sale Hearing: (a) approving all asset purchase agreements in respect of the Sales; (b) authorizing and approving the Sales of the Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the asset purchase agreements; (c) authorizing the assumption and assignment of the Contracts; and (d) granting related relief.  In support of this motion, the Debtors submit the declaration of Marc D. Puntus, attached hereto as **Exhibit B** (the "Puntus Declaration"), and respectfully state as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in the Court pursuant to 28 U.S.C. § 1408.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 503, 507, and 1146(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 6004, and 9013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-2 and 9013-1 of the Local Rules of the

United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Background[1]

4.     On May 12, 2015 (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On May 13, 2015, the Court entered an order [Docket No. 48] authorizing joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.  On May 21, 2015, pursuant to section 1102 of the Bankruptcy Code, the Office of the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") appointed a seven-member Official Committee of Unsecured Creditors (the "Committee").

## Preliminary Statement[2]

### I.      Introduction

5.     For a number of reasons, including the extremely challenging coal market environment and the Debtors' significant secured financial indebtedness (approximately $900 million including the Debtors' debtor-in-possession financing ("DIP Financing")), the Debtors, in consultation with their advisors, have determined that a transaction or series of transactions whereby the Debtors sell substantially all of their assets is likely to maximize the value of the Debtors' estates for their stakeholders.  To that end, prior to and subsequent to the Petition Date, the Debtors and their advisors engaged in extensive negotiations with Blackhawk

---

[1]     A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Ray Dombrowski, Chief Restructuring Officer of Patriot Coal Corporation, et al., in Support of First Day Motions* [Docket No. 22] (the "First Day Declaration").

[2]     Capitalized terms used in this section have the meanings given to such terms elsewhere in this Motion.

Mining LLC ("Blackhawk") regarding a structured transaction that would result in the going concern sale of a substantial majority of the Debtors' operating assets (the "Blackhawk Assets"). The transaction excludes certain assets of the Debtors, including the Debtors' Federal Complex (defined and described in greater detail below) (such assets, the "Federal Assets"), as well as certain other mine complexes and idle properties (the "Excluded Assets" and, together with the Blackhawk Assets and Federal Assets, collectively, the "Assets"). The key components of such transaction, including the elements of consideration to be provided to Patriot's creditors, are set forth in the letter of intent and term sheet, which are attached hereto as **Exhibit C** (including all exhibits and schedules, the "Blackhawk Term Sheet").

6.      The purpose of this Motion is two-fold: *first*, to seek approval of the Bidding Procedures, which set forth a comprehensive process for soliciting bids and holding one or more Auctions for the Sales of the Debtors' Assets, to approve the form and manner of notices to schedule the Auctions and Sale Hearing, if necessary, and to approve procedures for the assumption and assignment of contracts; and *second*, to approve the Sale or Sales of the Debtors' Assets pursuant to the Bidding Procedures, to authorize the Sale or Sales of Assets free and clear of liens, claims, encumbrances and interests, and authorizing the assumption and assignment of the Contracts.[3]

## II.      The Blackhawk Sale

7.      The transaction proposed by Blackhawk is complex and multi-faceted. At a high level, Blackhawk has agreed to purchase certain assets and assume certain liabilities through the creation of a new company (the "Combined Company") that will be capitalized with a combination of debt, equity, and cash (such transaction, the "Blackhawk Sale"), as set forth more

---

[3]     The Debtors presently expect to consummate the Blackhawk Sale through a chapter 11 plan, but the Debtors reserve all rights to request approval of the sale of any Assets under either a chapter 11 plan or a sale under Section 363 of the Bankruptcy Code.

fully in the Blackhawk Term Sheet.  In exchange for the release of liens, if not otherwise refinanced, the Debtors' prepetition secured lenders will be offered take-back debt in the Combined Company.  The Debtors also expect that a significant number of their executory contracts will be assumed by the Combined Company, that the Combined Company will take on significant reclamation and environmental obligations associated with the Blackhawk Assets, and that most of the Debtors' employees associated with the Blackhawk Assets will be offered jobs in the Combined Company.

## III.   The Blackhawk Sale Term Sheet

8.     The specific terms of the Blackhawk Sale have been memorialized in the Blackhawk Term Sheet, which is attached hereto as **Exhibit C**.  The principal terms of the Blackhawk Term Sheet are summarized in the following chart:[4]

| Term Sheet Provision | Summary Description |
| --- | --- |
| **Assets** | Purchased Assets.  Blackhawk will acquire the Panther, Rock Lick, Wells, Kanawha Eagle, Midland Trail/Blue Creek, Paint Creek and Logan County (limited to Stanley Fork, Cub Branch and the Franco preparation plant and load-out) complexes and all Controlled River Docks.  Additionally, Blackhawk will acquire certain other non-mining assets. |
|  | Excluded Assets.  Blackhawk will not acquire the Federal complex, Corridor G, Jupiter, all other Logan County assets or certain other non-mining assets. |
| **Liabilities** | Assumed Liabilities.  Blackhawk will assume liabilities in relation to the Purchased Assets, to include:<br><br>• all liabilities with respect to Assumed Permits, including the obligation to replace all associated bonds with respect to thereto;<br><br>• post-closing regulatory violations and obligations, post-closing obligations as to leases and sub-leases and post-closing |

---

[4]   This summary is provided for the convenience of the Court and parties in interest.  Capitalized terms used in this summary have the meanings given to such terms in the Blackhawk Term Sheet.  For the avoidance of doubt, to the extent there is any conflict between this summary and the Blackhawk Term Sheet, the Blackhawk Term Sheet shall govern in all respects.

| Term Sheet Provision | Summary Description |
|---|---|
| | liabilities arising as to former Patriot employees hired by Blackhawk; and |
| | • certain obligations arising from the Modified Consent Decree Ohio Valley Environmental Coalition, Inc. (Nov. 15, 2012) and the Consent Decree with the United States et al. (April 30, 2009). |
| | Excluded Liabilities.  Blackhawk will not assume the following liabilities: |
| | • liabilities associated with permits that are not being assumed; |
| | • pre-closing liabilities (other than Assumed Liabilities); |
| | • cure claims; |
| | • liabilities associated with the Debtors' employees not hired by Blackhawk, Patriot collective bargaining agreements and Patriot employee benefit plans; |
| | • liabilities or obligations of Patriot for retiree medical or other retiree welfare benefits and liabilities associated with contributions to the UMWA 1974 Pension Plan (including withdrawal liabilities); and |
| | • any liabilities not expressly listed as Assumed Liabilities. |
| Consideration | Blackhawk will purchase the Purchased Assets and Assumed Liabilities for the following consideration: |
| | • from the proceeds of new first lien credit facilities (comprised of an estimated $634 million First Lien Term Loan, a New ABL and a First Lien L/C Facility, to be incurred by Post Closing Blackhawk and allocated as follows: |
| | • replacement in full of Blackhawk's existing funded debt of up to $300 million with the First Lien Term Loans; |
| | • replacement of up to $109 million of indebtedness under Patriot's existing DIP facility with First Lien Term Loans; and |
| | • replacement of approximately $237 million of (a) Existing Drawn L/Cs with First Lien Term Loans and (b) Existing Undrawn L/Cs with new letters of credit issued under the First Lien L/C Facility. |
| | • Post Closing Blackhawk issuing to holders of (i) existing Patriot senior secured term loan (up to $247 million) and (ii) existing Patriot second lien PIK note (up to $50 million), up to |

| Term Sheet Provision | Summary Description |
|---|---|
| | $297 million of Second Lien PIK Loan; and<br><br>• Post Closing Blackhawk issuing Class B membership interests to the holders (or affiliated entities) of the Patriot second lien PIK notes.<br><br>The aggregate amount of the First Lien Term Loans allocated to the Existing L/Cs and the DIP Facility above shall not exceed $346 million.   To the extent the existing Blackhawk debt exceeds $300 million, the amount of the First Lien Term Loans shall be increased on a dollar for dollar basis (up to a cap of such increase of $20 million). To the extent the TIP/LC Improvement is less than $346 million, the following adjustments shall be made:<br><br>• With respect to a DIP/LC Improvement of $20 million or less, an amount equal to the DIP/LC Improvement may be issued at Blackhawk's election to fund working capital for Post Closing Blackhawk or to reduce the amount of First Lien Term Loans;<br><br>• With respect to a DIP/LC Improvement of $39 million or less, the first $20 million shall be treated pursuant to the above and the amount of cash to be raised in the Patriot First Lien Rights Offering shall be reduced on a dollar for dollar basis in an amount equal to the remainder of the DIP/LC Improvement; and<br><br>• With respect to a DIP/LC Improvement of greater than $39 million, the first $20 million and $19 million, respectively, shall be treated pursuant to the above and the amount of cash to be raised in the Patriot Second Lien Rights Offering, as defined below, shall be reduced on a dollar for dollar basis in an amount equal to the remainder of the DIP/LC Improvement.<br><br>• To the extent the DIP/LC Improvement exceeds $70 million, the remaining amount shall reduce the total amount of the First Lien Term Loans issued.<br><br>To the extent of any reduction in the amount of cash raised in the Patriot First Lien Rights Offering and Patriot Second Lien Rights Offering, a like amount of First Lien Term Loans shall be backstopped by certain funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP and Davidson Kempner Capital Management LP for cash at a price of $0.85 if Blackhawk is unable to issue First Lien Term Loans in the market in order to provide cash on the balance sheet to satisfy the condition to closing. |

| Term Sheet Provision | Summary Description |
|---|---|
| **Conditions** | The transaction is conditioned upon the following:<br><br>• The requisite orders having been entered by the Bankruptcy Court, to include (i) an order approving a Disclosure Statement (by July 21, 2015) and (ii) a final Confirmation Order (by September 11, 2015) approving the sale of Purchased Assets to Blackhawk free and clear of all liens;<br><br>• Confirmation Order will also provide that Blackhawk and Post Closing Blackhawk are not successors to, or subject to liability for, Patriot (particularly in regards to (a) collective bargaining agreements, (b) the Coal Act or (c) in relation to the 1974 Plan withdrawal liability);.<br><br>• all Purchased Assets are free and clear of all liens, claims, encumbrances and other interests other than the assumed liabilities and permitted encumbrances to be agreed;<br><br>• the refinancing or roll over of the Blackhawk Funded Debt, the refinancing or roll over of the DIP Facility and the Existing L/Cs and the final terms of the Second Lien PIK Loans, in each case, to be substantially similar to terms agreed to in the Term Sheet;<br><br>• terms of the Class B Units in the Post-Closing Blackhawk to be consistent with the existing Operating Agreement of Blackhawk;<br><br>• Post-Closing Blackhawk having received at least $50 million of cash from the proceeds of the Rights Offerings and Blackhawk providing at least $30 million of cash, net of any draws on the Blackhawk ABL, net of any draws on the Blackhawk New ABL; *provided, however* that any reduction in the previous amounts shall be reduced pro rata;<br><br>• the backstop agreements referenced herein shall be entered into at the time of the Asset Purchase Agreement; and<br><br>• Blackhawk enters into new CBAs ratified by the UMWA or the Bankruptcy Court enters final order(s) permitting Debtors to reject all CBAs. |

| Term Sheet Provision | Summary Description |
|---|---|
| **Purchase Protections** | Blackhawk will be entitled to the following Bid Protections: |

- <u>Blackhawk Breakup Fee</u>.  In the event that either (a) Blackhawk terminates the Asset Purchase Agreement due to material, uncured breach by Patriot that would cause the failure of any condition to closing; (b) an Alternate Transaction Trigger occurs; or (c) Blackhawk terminates the Asset Purchase Agreement due to a failure of the closing to occur prior to September 25, 2015 (other than if closing failed to occur as a result of the failure of Blackhawk's existing secured creditors to agree to exchange their debt obligations for the debt in Post Closing Blackhawk and Blackhawk is unable to raise new money financing elsewhere to satisfy its obligations) and Patriot subsequently consummates a superior transaction on or prior to December 1, 2015, Debtors shall pay Blackhawk the Blackhawk Breakup Fee equal to $19,000,000.

- <u>Expense Reimbursement</u>.  In the event the contemplated sale is not consummated with Blackhawk for any reason (other than Blackhawk's material breach of the Asset Purchase Agreement or the failure of Blackhawk's existing secured creditors to agree to exchange their debt obligations for the debt in Post Closing Blackhawk and Blackhawk is unable to raise new money financing elsewhere to satisfy its obligations), then the Debtors shall reimburse Blackhawk for its reasonable and documented expenses as follows: the Debtors shall reimburse Blackhawk for the first $3,000,000 of its reimbursable expenses and thereafter for 50% of tis reimbursable expenses until the Debtors have reimbursed Blackhawk for an aggregate amount of $5,000,000.

Claims on account of the Blackhawk Breakup Fee and Blackhawk Expense Reimbursement shall be senior to all administrative expenses, other than those afforded to the DIP lenders, Debtors' prepetition lenders and the Carve Out.  The Bankruptcy Court shall enter an order approving Bid Protections by no later than June 30, 2015.

| Term Sheet Provision | Summary Description |
|---|---|
| **Rights Offering** | The Patriot Plan includes a Rights Offering to raise cash on the balance sheet for Post Closing Blackhawk in the following amounts: (i) up to $19 million from the Patriot First Lien Rights Offering and (ii) up to $31 million from the holders of the Patriot Second Lien Rights Offering.  Participation in either rights offering is on a Pro Rata Percentage.  The Rights Offering is to be backstopped by Knighthead Capital Management, LLC, Caspian Capital LP and Hudson Bay Absolute Return Credit Opportunities Master Fund Ltd.<br><br>Each participant in the Patriot First Lien Rights Offering that subscribes for its full pro rata share will receive 100% of its allocable portion of the senior secured term loan in the form of Second Lien PIK Loans. Each non-participant shall receive 60% of its allocable portion of the senior secured term loan in the form of Second Lien PIK Loans.<br><br>Each participant in the Patriot Second Lien Rights Offering that subscribes for its full pro rata share will receive (a) its allocable portion of the Patriot second lien PIK notes in the form of Second Lien PIK Loans and (b) Class B Units of the Post-Closing Blackhawk representing a percentage amount of the aggregate equity of the Post-Closing Blackhawk determined as follows: 30% multiplied by such participant's Pro Rata Percentage of Patriot second lien PIK notes. Each non-participant will receive its allocable portion of the Patriot second lien PIK notes in the form of Second Lien PIK Notes and a number of Class B Units equal to 20% of each of the Second Lien PIK Loans and Class B Units the non-participant would have received had it participated in the Patriot Second Lien Rights Offering.<br><br>In each Rights Offering, parties that participate in the Backstop shall acquire the forgone amounts (but no greater) of debt and equity had the non-participants participate in the applicable Rights Offering for the consideration paid by participants. |
| **Transition Services** | Blackhawk will provide Patriot's residuary estate with certain operational, general and administrative services for a six-month period that is extendable for two successive three-month periods. |
| **Employment** | Blackhawk shall, in its sole discretion, choose which Patriot employees it will, or will not, hire. |
| **Termination** | The closing must occur no later than September 25, 2015. |

## IV.     The Blackhawk Sale Process and Auction

9.      The Blackhawk Term Sheet is the result of substantial efforts on behalf of the Debtors and their advisors to negotiate and consummate a strategic transaction that will maximize the value of the Debtors' estates.  In late 2014, the Debtors and their advisors began exploring an out-of-court sale or merger transaction with a potential strategic partner.  By early 2015, it became clear that such a transaction was not going to materialize.  Since that time, the Debtors and their advisors have engaged in discussions or negotiations with two additional entities, one of which is Blackhawk.  Both entities insisted that they would only consummate a transaction through a chapter 11 process and delivered preliminary bids.  After analysis and review, the Debtors and their advisors concluded that the proposed Blackhawk Sale provided the best option for maximizing value for the benefit of the Debtors' stakeholders.  As such, the Debtors and their advisors, joined prior to and after the Petition Date by an ad hoc group of lenders holding a majority of the Debtors' senior secured term loan facility and second lien PIK notes and their advisors, have engaged in extensive negotiations with Blackhawk and its advisors, and have agreed upon the terms set forth in the Blackhawk Term Sheet.

10.      The Blackhawk Sale, if consummated, would deliver to the Debtors' secured creditors $643 million of debt securities plus 30% of the pro forma Blackhawk equity, and provide for the assumption of certain other liabilities, including certain surety bonds and related obligations.  The Blackhawk Sale represents the highest and best transaction presently available for the Blackhawk Assets.  Importantly, the Debtors are committed to achieving the highest or otherwise best bid for the all of their assets and operations, including the Blackhawk Assets, by marketing such assets and conducting a competitive bidding process, as set forth in the Bidding Procedures and, if necessary, by conducting an auction (the "Blackhawk Auction").

11.     In connection with such process, Blackhawk has agreed to serve as the stalking horse bidder (such bid, the "Blackhawk Bid") in exchange for the Debtors' agreement—subject to Court approval—to provide certain customary bid protections as fully set forth in the Term Sheet (the "Blackhawk Bid Protections"), including payment of a break-up fee equal approximately 3.0% of the $643 million of new debt securities that Blackhawk would issue to the Debtors' secured lenders in connection with the transaction.  As set forth below and in the Puntus Declaration, the Debtors submit that the Blackhawk Bid Protections were necessary to induce Blackhawk to provide the Blackhawk Bid.

**V.      The Federal Complex**

12.     As set forth in the Blackhawk Term Sheet, the Blackhawk Sale contemplates the acquisition of a substantial majority of the of the Debtors' operating assets with one notable exception:  the Federal No. 2 longwall mine, a 1,350 TPH preparation plant, and certain related assets (collectively, the "Federal Complex").  The Debtors engaged in prepetition marketing of the Federal Complex and determined at that time, in consultation with their lenders and advisors, to defer the sale of the Federal Complex until after the filing of these chapter 11 cases.

13.     Unlike the Blackhawk Sale, the Debtors do not yet have a stalking horse candidate for the sale of the Federal Complex (the "Federal Sale" and together with the Blackhawk Sale, collectively, the "Sales").   But as described in greater detail below, the proposed Bidding Procedures are designed to encourage bids for the Federal Complex and any other Excluded Assets, and would give the Debtors the opportunity, after notice, to appoint a stalking horse bidder later in the sale process.

**VI.     The Federal Complex Sale Process**

14.     In consultation with their advisors, the Debtors have determined that selling the Federal Complex could generate material value for their estates and may provide an additional

source of recovery for the Debtors' stakeholders.    Accordingly, contemporaneous with the marketing process for the assets to be sold in connection with the Blackhawk Sale, the Debtors intend to market and obtain the highest or otherwise best bid for the Federal Complex through competitive bidding as set forth in the Bidding Procedures and, if necessary, via an auction (the "Federal Complex Auction" and together with the Blackhawk Auction, collectively, the "Auctions"), all as described more fully in the Puntus Declaration.

15.    At this stage, the Debtors have not identified a stalking horse bidder with respect to the Federal Complex (a "Federal Stalking Horse Bidder").  In the event the Debtors select a Federal Stalking Horse Bidder, the Debtors may elect to offer bid protections to the Federal Stalking Horse Bidder (the "Federal Bid Protections" and, together with the Blackhawk Bid Protections, collectively, the "Bid Protections"), including a breakup fee of up to three percent of the cash portion of the purchase price of the Federal Stalking Horse Bidder's bid for the Federal Complex (the "Federal Stalking Horse Bid").  If the Debtors select a Federal Stalking Horse Bidder, the Debtors will cause notice of the Federal Stalking Horse Bid, including the proposed Federal Bid Protections, to be served on the U.S. Trustee, the Committee, all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Federal Complex, all parties that have expressed interest in purchasing the Federal Complex, and all parties that have requested service pursuant to Bankruptcy Rule 2002.

## VII.    Proposed Dates and Deadlines

16.    As highlighted at the first day hearing and discussed in the Puntus Declaration, the Debtors entered chapter 11 with significant liquidity constraints.    Indeed, the Debtors' businesses suffer each day that the Debtors remain in chapter 11.    Separately, for important business reasons discussed in detail in the Puntus Declaration, including the need for the

Combined Company to be in the marketplace by the fall of 2015 negotiating coal sales for delivery in 2016, the Blackhawk Sale requires a closing on or before September 25, 2015.  For these reasons, it is imperative that the Debtors act quickly and efficiently in these chapter 11 cases.

17.     The key milestone dates set forth in the Blackhawk Term Sheet include:

| Date | Milestone |
|---|---|
| **Approval of Bid Protections** | The Bankruptcy Court shall enter an order approving the Bid Protections by no later than **June 30, 2015**. |
| **Approval of Disclosure Statement** | The Bankruptcy Court shall have entered an order approving a Disclosure Statement, in form and substance reasonably acceptable to Blackhawk, by **July 21, 2015**. |
| **Conformation Order** | The Bankruptcy Court shall have entered a Confirmation Order by no later than **September 11, 2015**. |
| **Termination Date** | Blackhawk requires that the closing occur no later than **September 25, 2015**. |

**Relief Requested**

18.     By this Motion, the Debtors seek entry of the Bidding Procedures Order:

a.      approving the Bidding Procedures;

b.      approving the Bid Protections;

c.      approving the form and manner of notice of the Bidding Procedures and the Auction schedule, substantially in the form annexed as **Exhibit 2** to **Exhibit A** attached hereto (the "Notice of Order Establishing Bidding Procedures and Auction Schedule" or the "Notice of Order") and the notice of sale by auction and Sale Hearing, substantially in the form annexed as **Exhibit 3** to **Exhibit A** attached hereto (the "Sale Notice"); and

d.      establishing the following dates and deadlines for the submission of any Bids, the Auctions, if necessary, and certain related dates and deadlines, all of which are subject to modification:

- Federal Stalking Horse Notice Deadline:  **July 14, 2015, at 5:00 p.m., prevailing Eastern Time**, as the deadline by which the Debtors shall

cause notice of a stalking horse bidder for the Federal Complex to be served (the "Federal Stalking Horse Notice Deadline"), if any;

- Bid Deadlines:  **August 7, 2015, at 5:00 p.m., prevailing Eastern Time**, as the deadline by which all bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline");

- Sale Objection Deadline:  if applicable, 4:00 p.m., prevailing Eastern Time, on the date that is seven days prior to the proposed Sale Hearing, as the deadline to object to a Sale or the Sales, as applicable;

- Notice of Qualified Bids:  **August 11, 2015, at 5:00 p.m., prevailing Eastern Time**, as the date and time by which Bidders shall be notified whether their Bids are Qualified Bids;

- The Auctions:  **August 13, 2015, at 10:00 a.m., prevailing Eastern Time**, as the date and time by which the Auctions, if needed, would be held at the offices of Kirkland & Ellis LLP, located at:  601 Lexington Avenue, New York, New York 10022;

- Hearing to Designate Winning Bidder:  **August 18, 2015**, as the date by which the Debtors shall seek approval from the Court to designate the Winning Bidders in connection with the Sales;

- Contract Cure Objection Deadline:  if applicable, 4:00 p.m., prevailing Eastern Time, on the date that is seven days from the date that the Contract Notice (as defined herein) is served, as the deadline to object to the cure amounts listed in the Contract Notice;

- Sale Hearing:  if applicable, the Debtors will cause notice of the Sale Hearing to be served on all applicable parties not less than 21 days prior to the proposed Sale Hearing, in accordance with Bankruptcy Rule 2002(a); and

- Contract Assignment Objection Deadline:  if applicable, 4:00 p.m., prevailing Eastern Time, on the date that is seven days from service of the Assumption Notice (as defined herein), as the deadline to object to the assignment of the Contracts.

19.    By this Motion, the Debtors also seek entry of the Sale Order at the conclusion of

the Sale Hearing, if necessary:

a.    authorizing and approving each Sale to a Winning Bidder on the terms substantially set forth such Winning Bidder's asset purchase agreement; and

     b.     authorizing and approving the assumption and assignment of the Contracts to a Winning Bidder.

**Bidding Procedures Order**

## I.    The Bidding Procedures

20.    To efficiently solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, annexed as **Exhibit 1** to the Bidding Procedures Order, to govern the Sales.   The Bidding Procedures are designed to encourage all entities to put their best bids forward and to maximize the value of the Debtors' estates.  The salient points of the Bidding Procedures are as follows:[5]

     a.     <u>Bid Requirements</u>.  Any bid (each a "<u>Bid</u>") in connection with the Sales must be submitted in writing and determined by the Debtors, in their reasonable business judgment, to have satisfied the below requirements.

     b.     <u>Purchased Assets and Assumed Liabilities</u>:  Each Bid must clearly identify the particular assets and liabilities the bidder seeks to acquire, whether in connection with the Blackhawk Sale, the Federal Sale, both, or some combination of the Assets, which combination is determined by the Debtors to be a Qualified Bid.

     c.     <u>Deposit</u>:  Each Bid must be accompanied by a cash Deposit in amount acceptable to the Debtors, after consultation with the DIP Lenders, which amount shall not exceed ten percent of the Purchase Price of the Bid, and such Deposit will be held in an interest bearing escrow account to be identified and established by the Debtors (each a "<u>Deposit</u>").

     d.     <u>Purchase Price; Minimum Bid</u>:  Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any (the "<u>Purchase Price</u>").

         i.     Each Bid submitted in connection with the Blackhawk Sale must (i) match the structure provided in the Blackhawk Bid and must satisfy the Blackhawk Initial Overbid, (ii) propose an alternative transaction that provides substantially similar or better terms as the

---

[5]    This summary is qualified in its entirety by the Bidding Procedures annexed as **Exhibit 1** to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

Blackhawk Bid, or (iii) propose to purchase the Blackhawk Assets, and assume the corresponding liabilities, in cash.

ii.  Each Bid submitted in connection with the Federal Sale must (i) match the structure provided in the Federal Stalking Horse Bid, if any, and must satisfy the Federal Initial Overbid, (ii) propose an alternative transaction that provides substantially similar or better terms as the Federal Stalking Horse Bid including the Federal Initial Overbid, if any, or (iii) propose to purchase the Federal Assets for cash, and assume the corresponding liabilities; *provided that* if a Federal Stalking Horse Bid is not selected, Bidders may propose any transaction with respect to the acquisition of the Federal Assets, which proposals the Debtors, in consultation with the DIP Lenders, will evaluate and determine whether such proposals constitute a Qualified Bid.

e.  <u>Blackhawk Sale Initial Overbid</u>:  The aggregate consideration proposed by each Bid seeking to acquire all of the assets to be acquired pursuant to the Blackhawk Bid must equal or exceed the sum of:

i.  cash or non-cash consideration in an amount equal to the Blackhawk Bid; ***plus***

ii.  cash in an amount equal to the Blackhawk Bid Protections; ***plus***

iii.  $5 million in cash or cash equivalents (together with (i) and (ii) above, collectively, the "<u>Blackhawk Initial Overbid</u>"); *provided, however*, any party entitled under applicable law to do so may submit a credit bid in an amount equal to the Blackhawk Initial Overbid; *provided that* any such credit bid, or any Bid that includes a credit bid, must include cash in an amount necessary to satisfy the Blackhawk Bid Protections, if the Debtors are obligated to pay such protections.

f.  <u>Federal Sale Initial Overbid</u>:  The aggregate consideration proposed by each Bid seeking to acquire all of the assets to be acquired pursuant to the Federal Stalking Horse Bid, if any, must equal or exceed the sum of:

i.  cash or non-cash consideration in an amount equal to the Federal Stalking Horse Bid, if any; ***plus***

ii.  cash in an amount equal to the Federal Bid Protections, if any; ***plus***

iii.  $2 million in cash or cash equivalents (together with (i) and (ii) above, collectively, the "<u>Federal Initial Overbid</u>"); *provided, however*, any party entitled under applicable law to do so may submit a credit bid in an amount equal to the Federal Initial Overbid; *provided that* any such credit bid, or any Bid that

includes a credit bid, must include cash in an amount necessary to satisfy the Federal Bid Protections, if the Debtors are obligated to pay such protections.

g.      <u>Markup of Blackhawk APA</u>:  The Debtors expect to file the final form asset purchase agreement in connection with the Blackhawk Sale (the "<u>Blackhawk APA</u>") on or around June 25, 2015, in connection with the filing of their proposed chapter 11 plan and disclosure statement.  Each Bid submitted in connection with the Blackhawk Sale must expressly include the Bidder's proposed markup of the Blackhawk APA with an electronic blackline clearly marked to show changes requested by the applicable Bidder.

h.      <u>Markup of Federal APA</u>:  If the Debtors select a Federal Stalking Horse Bidder, then the Debtors shall cause a proposed asset purchase agreement (the "<u>Federal APA</u>" and together with the Blackhawk APA and any Winning Bidder's asset purchase agreement, collectively, the "<u>APAs</u>"), to be served on applicable parties in connection with service of the Federal Stalking Horse Notice.  Each Bid submitted in connection with the Federal Sale must expressly include the Federal APA with a blackline clearly marked to show changes requested by the applicable Bidder.  If no Federal Stalking Horse Bid has been selected, any Bidder submitting a Bid in connection with the Federal Assets shall include a proposed Federal APA in connection with such Bid.

i.      <u>Bids for Blackhawk Assets and Excluded Assets</u>:  To the extent a Bidder bids on a combination of Blackhawk Assets and Excluded Assets (including the Federal Assets), such Bidder may make such Bid by submitting a markup of the Blackhawk APA only.

j.      <u>Bids for Individual Assets or Combinations of Assets</u>:  Bidders may submit Bids for individual Assets or combinations of Assets and are not required to submit Bids for all Assets proposed to be included in the Blackhawk Sale or the Federal Sale (a "<u>Partial Bid</u>").  Partial Bids must include a markup of the Blackhawk APA.  The Debtors shall determine, after consultation with the DIP Lenders, whether Partial Bids constitute Qualified Bids.  Generally, to be considered a Qualified Bid, the Debtors, in consultation with the DIP Lenders, must conclude that the Partial Bid, when taken together with other Bids or Partial Bids, satisfies the criteria for being a Qualified Bid.

k.      <u>Bids for Other Excluded Assets</u>:  The Debtors are also soliciting Bids by the Bid Deadline for all other Excluded Assets, in addition to the Federal Complex, and such Bids may be made in conjunction with the Blackhawk Sale and/or the Federal Sale, or may be made for individual or collections of Excluded Assets.  The Debtors reserve the right to conduct auctions for one or more Excluded Assets and to sell Excluded Assets if the Debtors

determine, after consultation with the DIP Lenders, that a Bid for an Excluded Asset is acceptable. The Debtors also reserve the right not to sell any Excluded Assets if the Debtors determine, after consultation with the DIP Lenders, that there are no acceptable Bids for such Assets.

l.  <u>Same or Better Terms; Bid Documents</u>: Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, after consultation with the DIP Lenders, substantially on the same or better terms than the terms of the applicable APA(s). Each Bid must include duly executed, ancillary transaction documents necessary to effectuate the transactions contemplated in the Bid (such documents, the "<u>Bid Documents</u>").

m.  <u>Employee Obligations</u>: To be a Qualified Bid, each Bid must expressly propose a treatment of the Debtors' prepetition collective bargaining agreements (the "<u>CBAs</u>"), pension obligations, and other post-employment benefits (collectively, the "<u>Employee Obligations</u>").

n.  <u>Demonstrated Financial Capacity; Committed Financing</u>: Any Bidder must have, in the Debtors' reasonable business judgment, after consultation with the DIP Lenders, the necessary financial capacity to consummate the proposed transactions required by its Bid. Each Bid must also include, by the Bid Deadline, committed financing, documented to the Debtors' reasonable satisfaction, after consultation with the DIP Lenders, that demonstrates the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid, including the identity and contact information of the specific person(s) or entity(s) responsible for such committed financing whom Centerview and Kirkland & Ellis LLP should contact regarding such committed financing. Such funding commitments or other financing shall not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors after consultation with the DIP Lenders.

o.  <u>Identity</u>: Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s) whom Centerview and Kirkland & Ellis LLP should contact regarding such Bid.

p.    <u>Contingencies; No Financing or Diligence Outs</u>:  Any Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment after consultation with the DIP Lenders, than those set forth in the applicable APA.

q.    <u>Irrevocable</u>:  A Bidder's Bid shall be irrevocable unless and until the Debtors, after consultation with the DIP Lenders, accept a higher Qualified Bid or Bids and such Bidder is not selected as the Backup Bidder.

r.    <u>Expenses</u>:  Each Bidder presenting a Bid or Bids shall bear its own costs and expenses (including legal fees) in connection with the proposed transaction.

s.    <u>Authorization:</u> Each Bid must contain evidence that the Bidder has obtained authorization or approval from its Board of Directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

t.    <u>As-Is, Where-Is</u>:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith or the Auctions, except as expressly stated in the Bidder's proposed APA(s).

u.    <u>Adequate Assurance of Future Performance</u>.  Each Bid must demonstrate, in the Debtors' and Centerview's reasonable business judgment, and after consultation with the DIP Lenders, that the potential Bidder can provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed pursuant to any proposed Sale.

v.    <u>Government Approvals</u>.  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sales, together with evidence satisfactory to the Debtors, after consultation with the DIP Lenders, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be

imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

### A.    Bid Deadline

21.    Each Bid in connection with the Blackhawk Sale and/or Federal Sale must be transmitted via email (in .pdf or similar format) so as to be actually received on or before August 7, 2015, at 5:00 p.m., prevailing Eastern Time, by the Recipient Parties (as defined in the Bidding Procedures).

### B.    The Auctions

22.    If two or more Qualified Bids are submitted in connection with the Blackhawk Sale and/or Federal Sale, the Debtors will conduct the Auctions to determine the Winning Bidder(s).  If only one Qualified Bid is submitted with respect to each Sale, the Debtors may adjourn or cancel the Auctions and may decide, in their reasonable business judgment without further approval of the Court, to designate such Qualified Bids as the Winning Bids.  If no Qualified Bids are submitted, the Debtors may adjourn or cancel the Auctions.  For the avoidance of doubt, the Blackhawk Bid and the Federal Stalking Horse Bid, if any, shall be deemed Qualified Bids.

### C.    Terms of Overbids

23.    During the course of the Auction, the Debtors shall, after the submission of each Overbid, promptly inform each Qualified Bidder which Overbids reflect, in the Debtors' view, the highest or otherwise best Bids for the Blackhawk Assets, the Federal Assets, and/or the Excluded Assets, or any combination of the forgoing, as applicable.

### D.    Backup Bidders

24.    If the Auctions are conducted, with respect to each Sale, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bids at the Auctions for the Blackhawk

Assets, the Federal Assets, and/or the Excluded Assets, or any combination of the forgoing, as applicable, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a Backup Bidder.  Each Backup Bidder, if any, shall be required to keep its Qualified Bid (or if the applicable Backup Bidder submitted one or more Overbids at the Auctions, its final Overbid) open and irrevocable until the closing of the transactions with each Winning Bidder (or, in the case of Blackhawk, until September 25, 2015).   The applicable Backup Bidder's Deposit shall be held in escrow until the earlier of 24 hours after (a) the closing of a transaction with a Winning Bidder and (b) the Outside Backup Date.

### E.    Highest or Otherwise Best Bid

25.    When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may, in their sole discretion, consider the following factors in addition to any other factors that the Debtors deem appropriate:  (a) the amount and nature of the total consideration; (b) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the proposed treatment of the Employee Obligations.

### F.    Federal Stalking Horse Bid

26.    In the event the Debtors select a Federal Stalking Horse Bidder, the Debtors may offer Bid Protections, including a breakup fee of up to three percent of the cash portion of the purchase price of the Federal Stalking Horse Bid.  If the Debtors identify a Federal Stalking Horse Bidder, the Debtors will file a supplemental notice (the "Federal Stalking Horse Notice") with the Court by no later than July 14, 2015, identifying the Federal Stalking Horse Bidder and the terms of the Federal Stalking Horse Bid, including the terms and conditions for payment of

any Bid Protections and the Federal Stalking Horse APA.  The Debtors will also cause the Federal Stalking Horse Notice to be served on:  (a) the U.S. Trustee; (b) counsel to the the Committee; (c) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Federal Assets; (d) all parties that have expressed interest in the Federal Assets; and (e) all parties that have requested service pursuant to Bankruptcy Rule 2002.

27.     Any entity wishing to object to the Federal Bid Protections proposed for the Federal Stalking Horse Bidder shall have five days from the filing of the Federal Stalking Horse Notice to file an objection with the Court and serve it on:  (a) the Debtors; (b) the U.S. Trustee; (c) counsel to the the Committee; (d) counsel to the Federal Stalking Horse Bidder, if any; and (e) all parties that have requested service pursuant to Bankruptcy Rule 2002.

28.     In the event an objection is filed and such objection cannot be resolved consensually, the Debtors will seek to schedule a hearing with the Court for approval of the Federal Bid Protections. If no objections to the Federal Bid Protections are received, the Debtors submit that the Federal Bid Protections shall be deemed approved by the Court, without the need for a further order.

### G.     Fiduciary Out

29.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all proposals, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.  For the avoidance of doubt, the Debtors retain the right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates.

## II.      Form and Manner of Notice

30.      On or within three business days of entry of the Bidding Procedures Order, the Debtors will cause the Notice of Order to be served on:  (a) U.S. Trustee; (b) counsel to the Committee; (c) counsel to Blackhawk; (d) all parties who have expressed a written interest in some or all of the Debtors' assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Debtors' Assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) each governmental agency that is an interested party with respect to the Sales and transactions proposed thereunder; and (i) all parties that have requested service pursuant to Bankruptcy Rule 2002.  The Debtors shall also publish an abbreviated version of the Notice of Order in the *Wall Street Journal* (National Edition) and *The Charleston Gazette* within fourteen days of entry of the Order.

31.      The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Notice of Order, and the Federal Stalking Horse Notice as provided for herein, constitutes good and adequate notice of the Bidding Procedures and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

32.      In the event the Debtors elect to pursue approval of any of the Sales pursuant to section 363 of the Bankruptcy Code separate and apart from a chapter 11 plan, at least 21 days prior to any proposed Sale Hearing, the Debtors will cause the Sale Notice to be served on the following parties:  (a) U.S. Trustee; (b) counsel to the Committee; (c) counsel to Blackhawk; (d) counsel to the Federal Stalking Horse Bidder, if any; (d) counterparties to the Contracts (the "Contract Counterparties"); (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets;

(f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) each governmental agency that is an interested party with respect to the Sales and transactions proposed thereunder; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002. The Debtors will also publish an abbreviated version of the Sale Notice in *Wall Street Journal* (National Edition) and *The Charleston Gazette* at least fifteen days prior to the Sale Hearing, if any.

## III.    Summary of the Assumption Procedures

33.    The Debtors are also seeking approval of certain procedures, if necessary, to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sales (the "Assumption Procedures"). Because the Bidding Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein. Generally, however, the Assumption Procedures: (a) outline the process by which the Debtors will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary.

## Basis for Relief

## I.    The Bidding Procedures Are Fair, Appropriate, and Should Be Approved

34.    "When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus of the bankruptcy court, is the maximization of the value of the assets sold." John J. Jerome & Robert D. Drain, *Bankruptcy Court Is Newest Arena for M&A Action*, N.Y.L.J., June 3, 1991. In furtherance of that goal, bidding procedures, such as those proposed here, may be used in court-supervised asset sales because they streamline the acquisition process, "help to provide an adequate basis by which to compare offers," and, ultimately, maximize value. *See*

*id.*; *see also In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures

"are important tools to encourage bidding and to maximize the value of the debtor's assets").

Bidding procedures should be approved when they provide a benefit to a debtor's estate by

maximizing the value of a debtor's assets. *See In re Edwards*, 228 B.R. 552, 361 (Bankr. E.D.

Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale

designed to maximize value for the estate.").

35.    In overseeing a sale subject to an auction process, the bankruptcy court balances

considerations between:

> on the one hand, providing for an orderly bidding process,
> recognizing the danger that absent such a fixed and fair process
> bidders may decline to participate in the auction; and, on the other
> hand, retaining the liberty to respond to differing circumstances so
> as to obtain the greatest return for the bankrupt estate.

*In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992).    Because the court must

perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in

conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly

followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily

have to enhance the value of the estates before it." *See id.* at 169-70.

36.    Here, the Bidding Procedures are designed to ensure that a process is put in place

that will maximize recoveries for creditors and other parties in interest.    Among other things, the

Bidding Procedures contemplate a marketing process that provides sufficient time for interested

parties to Bid, and sets forth clear guidelines along the way.    Interested parties will be afforded

ample time to conduct or complete their diligence, arrange financing, and construct and submit

informed, competing bids, further increasing the likelihood that the contemplated marketing and

sale process ultimately produces Winning Bidders.

## II.    The Bidding Procedures are the Product of the Debtors' Sound Business Judgment

37.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  Section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate; however, bankruptcy courts within this jurisdiction have required that the authorization of such use, sale, or lease of property of the estate, not in the ordinary course of business, must be based upon the sound business judgment of the debtor.  *See In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (adopting the "sound business purpose" test for section 363 purposes and citing *Lionel* as authority therefor); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (same); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease of property outside the ordinary course of business).

38.    A sound business purpose for the sale of a debtor's assets or equity interests outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors, or interest holders.  *See, e.g.*, *Lionel Corp.*, 722 F.2d at 1070.  Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose."  *In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); *accord Integrated Res.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a

27

business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be authorized under section 363(b)(1) of the Bankruptcy Code.

39.     Here, the Bidding Procedures set forth an appropriate process through which the value of the Debtors' assets will be tested. The fairness and reasonableness of the consideration to be paid by the Winning Bidders ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. Moreover, notice of this process will be widely circulated to interested parties. The Bidding Procedures will help ensure that the Debtors are maximizing creditor recoveries through the chapter 11 cases, while also ensuring the completion of the chapter 11 cases in a timely manner.

40.     Thus, the Debtors believe the Bidding Procedures will provide the Debtors' marketing process with finality. Importantly, the Bidding Procedures do not impact the Debtors' ability to exercise their fiduciary duties to pursue an alternative restructuring strategy. As such, the Debtors' determination to market their assets through the Bidding Procedures and potential Auctions is a valid and sound exercise of the Debtors' business judgment.

41.     Moreover, similar procedures in complex chapter 11 cases have been previously approved by the Court. *See, e.g.*, *In re RoomStore, Inc.*, No. 11–37790 (DOT) (Bankr. E.D. Va.

Jan. 3, 2012); *In re Movie Gallery, Inc.*, No. 10–30696 (DOT) (Bankr. E.D. Va. Oct. 27, 2010);

*In re LandAmerica Fin. Grp., Inc.*, No. 08–35994 (KRH) (Bankr. E.D. Va. April 16, 2009); *In re*

*Circuit City Stores, Inc.*, No. 08–35653 (KRH) (Bankr. E.D. Va. Mar. 3, 2009); *In re S & K*

*Famous Brands, Inc.*, No. 09–30805 (KRH) (Bankr. E.D. Va. Feb. 9, 2009); *In re Chesapeake*

*Corp.*, No. 08–36642 (DOT) (Bankr. E.D. Va. Jan. 20, 2009).[6]    Accordingly, the Bidding

Procedures should be approved.

### III.    The Bid Protections Have a Sound Business Purpose and Should Be Approved

42.    The use of a stalking horse in a public auction process for sales pursuant to

section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a

stalking horse bid is, in many circumstances, the best way to maximize value in an auction

process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of

that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL

2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).   As a result, stalking horse bidders virtually

always require break-up fees, expense reimbursements, and, in many cases, other forms of

bidding protections as an inducement for "setting the floor at auction, exposing its bid to

competing bidders, and providing other bidders with access to the due diligence necessary to

enter into an asset purchase agreement." *Id.* (internal citations omitted).   Thus, the use of

bidding protections, including expense reimbursements, has become an established practice in

chapter 11 cases.

43.    Indeed, expense reimbursements, break-up fees, and other forms of bidding

protections are a normal and, in many cases, necessary component of significant sales conducted

under section 363 of the Bankruptcy Code:  "Break-up fees are important tools to encourage

---

[6]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

bidding and to maximize the value of the debtor's assets . . . .   In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Resources*, 147 B.R. at 659–60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

44.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe that the allowance of the Bid Protections is in the best interests of the Debtors' estates and their creditors, as the Blackhawk Bid and Federal Stalking Horse Bid, if any, will establish a floor for further bidding that may increase the consideration given in exchange for the Assets for the benefit of the Debtors' estates.

45.     Here, the Blackhawk Bid Protections were, and remain, a critical component of the Blackhawk's commitment.  Blackhawk has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Blackhawk Sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.  The parties negotiated the requested Blackhawk Bid Protections

in good faith and at arm's length with significant give-and-take with respect to proposed bid protections.  As a result, by agreeing to the Blackhawk Bid Protections, the Debtors ensured that their estates would have the benefit of the transaction with Blackhawk without sacrificing the potential for interested parties to submit overbids at the Auctions.

46.    If the Court does not approve the Blackhawk Bid Protections, Blackhawk may elect not to serve as the "stalking horse" to the detriment of the Debtors' estates.  Further, if the Blackhawk Bid Protections were to be paid, it would be because the Debtors have received higher or otherwise superior offers for the Blackhawk Assets, and the Debtors have accepted a superior offer.  In short, the proposed Blackhawk Bid Protections are fair and reasonable under the circumstances because they constitutes a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser."  *Integrated Resources*, 147 B.R. at 662 (*quoting 995 Fifth Ave.*, 96 B.R. at 28).  Accordingly, the Blackhawk Bid Protections should be approved.

47.    Additionally, if the Debtors select a Federal Stalking Horse Bidder, the Debtors respectfully submit that, for the same reasons, they should be permitted to provide the Federal Bid Protections in accordance with the Bidding Procedures Order.

**IV.    The Form and Manner of the Notice of Order Establishing Bidding
Procedures and Auction Schedule and Sale Notice, if Applicable, Are Sufficient**

48.    Bankruptcy Rule 2002(c) governs the content of notice of a proposed sale of property of the estate other than in the ordinary course of business.  Among other things, Bankruptcy Rule 2002(c) provides that notice shall include the "time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections."  The notice must furthermore comport with due process, which requires such "notice that is

reasonably calculated, under the circumstances, to apprise an interested party of the pendency of an action." *W.A. Mallory Co.*, 214 B.R. at 837.

49.      For the reasons outlined above, the Debtors respectfully submit that the Notice of Order and Sale Notice comply with Bankruptcy Rule 2002(c) and Local Bankruptcy Rule 2002-1, and include such information with respect to the Bidding Procedures and Sales as is necessary to inform and enable interested parties to submit Bids, participate in the Auctions, and review the proposed Sales.   Accordingly, the Debtors request that the Court approve the form and manner of the Notice of Order and Sale Notice proposed herein.

**V.      The Assumption Procedures Are Appropriate and Should Be Approved**

50.      As set forth above, the Sales, if done outside a chapter 11 plan, contemplate the assumption and assignment of the Contracts to Blackhawk, the Federal Stalking Horse Bidder, if any, or the Winning Bidders arising from the Auctions, if any.   In connection with these processes, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Contract Counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of the Contracts and/or related cure amounts (the "Assumption Procedures").

51.      As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Contract be deemed to consent to the assumption and assignment of the applicable Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, if any, along with the cure amounts identified in the Contract Notice.   *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

52.     The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Contract Counterparties, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof.   Accordingly, the Debtors request the Court approve the Assumption Procedures set forth in the Bidding Procedures Order.

## VI.     The Sale Should Be Approved as an Exercise of Sound Business Judgment

53.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *see also In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).  In this district, to sell assets pursuant to section 363(b) of the Bankruptcy Code, a debtor must demonstrate "(1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable." *In re WBQ P'ship*, 189 B.R. at 102.

54.     Importantly, once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill

1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate . . . .") (citations omitted); *Integrated Resources*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### A.    A Sound Business Purpose Exists for the Sale

55.    As set forth above, the Debtors have a sound business justification for selling the Assets.  **First**, the Debtors believe the Sales will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis.  Moreover, because the Blackhawk Term Sheet contemplates the assumption of certain of the Debtors' estates' Contracts, it will result in payment in full for a number of the Debtors' estates' creditors, particularly vendors and landlords.

56.    **Second**, the Sales of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auctions, if necessary, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

57.    **Third**, although the Debtors are in the process of pursuing and evaluating various other sources of recoveries for the benefit of the Debtors' creditors, the Debtors anticipate that

they could begin to lose key employees, vendors, or customers if they cannot execute on a transaction within the time frame contemplated by the APAs. Thus, the Debtors believe they have a critical window in which to capitalize on a sale, and this determination strongly supports the relief requested herein. *See, e.g.*, *In re Delaware & Hudson Railway*, 124 B.R. 169, 177 (D. Del. 1991) (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *In re Titusville Country Club*, 128 B.R. 396, 400 (W.D. Pa. 1991) (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366–69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) five weeks after the petition date where the debtor was suffering operating losses).

58.     Thus, the Debtors submit that any Winning Bidder's APA will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into such Winning Bidder's APA will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.      The Sale Has Been Proposed in Good Faith
and Without Collusion, and Blackhawk, the Federal Stalking
Horse Bidder, if any, or Winning Bidder Are a "Good-Faith Purchasers"**

59.     The Debtors request that the Court find that Blackhawk, the Federal Stalking Horse Bidder, if any, and/or any other Winning Bidders arising from the Auctions, if any, are

entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

60.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

61.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."   While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.   *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.* ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

62.    The Debtors submit that Blackhawk, the Federal Stalking Horse Bidder, if any, and/or any other Winning Bidders arising from the Auctions, if any, are or would be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the APAs, or any marked versions thereof, are or would be good-faith agreements on arm's-length terms entitled to

the protections of section 363(m) of the Bankruptcy Code.[7]  *First*, as set forth in more detail above, the consideration to be received by the Debtors pursuant to the APAs is substantial, fair, and reasonable.  *Second*, the parties entered into the APAs in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with any Winning Bidders will be the culmination of a competitive auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sales or APAs to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  *Finally*, Blackhawk's offer was evaluated and approved by the Debtors in consultation with their advisors, and any other bids that the Debtors ultimately determine to be a Winning Bid will have been evaluated in a similar fashion.  Accordingly, the Debtors believe that Blackhawk (or other Winning Bidder arising from the Auctions, if necessary), the Blackhawk APA (or marked version thereof), the Federal Stalking Horse Bidder (or other Winning Bidder arising from the Auctions, if necessary), if any, and the Federal APA should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

---

[7]   The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Winning Bidders arising from the Auctions.  Pursuant to the Bidding Procedures, any Winning Bidders will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Winning Bidders or Backup Bidders (as defined in the Bidding Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

**C.      The Sales and Purchase Prices Reflects a Fair Value Transaction**

63.      It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

64.      Moreover, as noted above, even as the Debtors move forward with process outlined above, Centerview will continue to market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive-auction process will be maximized, or, if no Auctions are held because no Auctions are necessary, the APAs' respective purchase prices will, conclusively, be fair value.

**D.      Adequate and Reasonable Notice of the Sales Will Be Provided**

65.      As described above, the Sale Notice:  (a) will be served in a manner that provides at least 21 days' notice of the date, time, and location of any Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by

this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served

on parties in interest.

### E.      The Sales Should be Approved "Free and Clear" Under § 363(f)

66.      Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and

clear of another party's interest in the property if:   (a) applicable nonbankruptcy law permits

such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the

sale price of the property exceeds the value of all liens on the property; (d) the interest is the

subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or

equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

67.      Section 363(f) is drafted in the disjunctive.   Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and

clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances), except

with respect to any interests that may be assumed liabilities under the applicable APA.  *See In re*

*Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens.").

68.      The Debtors submit that any interest that will not be an assumed liability satisfies

or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and

that any such interest will be adequately protected by either being paid in full at the time of

closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses

the Debtors may possess with respect thereto.  The Debtors accordingly request authority to

convey the Assets to Blackhawk, the Federal Stalking Horse Bidder, if any, and/or any other

Winning Bidders arising from the Auctions, if any, free and clear of all liens, claims, rights,

interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and

encumbrances to attach to the proceeds of the Sales.

**VII.    The Assumption and Assignment of the Contracts Should Be Approved**

   **A.    The Assumption and Assignment of the Contracts Reflects the Debtors' Reasonable Business Judgment**

69.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign or transfer the Contracts to Blackhawk, the Federal Stalking Horse Bidder, if any, and/or any other Winning Bidders arising from the Auctions, if any, to the extent required by such bidders.

70.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *In re Network Access Solutions, Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

71.     Here, the Court should approve the Debtors' decision to assume and assign the Contracts in connection with the Sales as a sound exercise of their business judgment. *First*, the Contracts are necessary to the Debtors' businesses and, as such, they are essential to inducing the best offer for the Assets. *Second*, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the contracts and leases needed to conduct the business and manage the day-to-day operations were included in the transaction. *Third*, the Blackhawk APA provides that the assumption and assignment of the Contracts is integral to, and inextricably integrated in, the Sale. *Finally*, the Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these chapter 11 cases.

72.     Accordingly, the Debtors submit that the assumption and assignment of the Contracts by way of the Assumption Procedures should be approved as a sound exercise of their business judgment.

**B.      Defaults Under the Assumed Contracts Will Be Cured Through the Sale**

73.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

74.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the APAs require the Winning Bidders to cure all defaults associated with, or that are required to properly assume, the Contracts.  Because the Bidding Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

**C.     Non-Debtor Parties Will Be Adequately Assured of Future Performance**

75.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

76.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Contracts to Blackhawk (or other Winning Bidders arising from the Auctions, if necessary) and the Federal Stalking Horse Bidder (or other Winning

Bidders arising from the Auctions, if necessary) will be satisfied.  As required by the Bidding

Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before

designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of

the interested party to perform under the Contracts) and will demonstrate such financial

wherewithal, willingness, and ability to perform under the Contracts assigned to any Winning

Bidders arising from the Auctions.  Further, the Assumption Procedures provide the Court and

other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of

any Winning Bidder arising from the Auctions to provide adequate assurance of future

performance and object to the assumption of the Contracts or proposed cure amounts.  The Court

therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign

the Contracts as set forth in the APAs.

### Waiver of Bankruptcy Rules 6004(h) and 6006(d)

77.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of fourteen days after the entry of the order,

unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an

"order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed

until the expiration of fourteen days after the entry of the order, unless the court orders

otherwise."  The Debtors request that the Bidding Procedures Order and Sale Order, if

applicable, be effective immediately upon entry by providing that the fourteen-day stays under

Bankruptcy Rules 6004(h) and 6006(d) are waived.

78.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).    Although Bankruptcy

Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court

should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

79.      To implement the schedule set forth above, the Debtors seek to implement the Bidding Procedures as soon as possible. Additionally, to maximize the value received for the Assets, the Debtors will seek to close the Sales as soon as possible after the Sale Hearing, if applicable. Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

80.      The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee; (b) the administrative agents for the Debtors' prepetition credit facilities; (c) the indenture trustee for the Debtors' prepetition notes; (d) the Committee; (e) counsel for each of the foregoing referenced in clauses (b) through (d); (f) counsel to lenders for the debtor in possession facility; (g) the Internal Revenue Service; (h) the United States Environmental Protection Agency, (i) the state attorneys general for states in which the Debtors conduct business; (j) any party that has expressed interest in the Assets; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other of further notice need be given.

## No Prior Request

81.      No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein solely with respect to the Bidding Procedures and such other and further relief as the Court deems appropriate.

Dated:  June 2, 2015
Richmond, Virginia

*/s/ Michael A. Condyles*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

- and -

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200


*Proposed Counsel for the*
*Debtors and Debtors in Possession*

## Exhibit A

**Proposed Bidding Procedures Order**

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.*, | ) |
|  | ) Case No. 15-32450 (KLP) |
| Debtors. | ) |
|  | ) (Jointly Administered) |
|  | ) |

## ORDER (A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALES OF CERTAIN OF THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER OF NOTICE, (C) SCHEDULING AUCTIONS AND A SALE HEARING, (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, AND (E) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) authorizing and approving the bidding procedures attached hereto as **Exhibit 1** (the "Bidding Procedures") and approving the Bid Protections in connection with the Sales of certain of the Debtors' Assets;

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or Bidding Procedures, as applicable.

(b) approving the form and manner of notice of the Auctions and the Sale Hearing with respect to the Debtors' Assets; (c) scheduling the Auctions and a Sale Hearing; (d) approving procedures for the assumption and assignment of the Contracts; and (e) granting related relief; all as more fully set forth in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Debtors having provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and any objections to the relief requested herein having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C. The statutory bases for the relief requested in the Motion are:  (i) sections 105,

363, 365, 503, and 507 of the Bankruptcy Code; (ii) Rules 2002(a)(2), 6004, 6006, 9007,

and 9014 of the Bankruptcy Rules; and (iii) Rules 6004-2 and 9013-1 of the Local Bankruptcy

Rules.

D. Notice of the Motion has been given to:   (i) the U.S. Trustee; (ii) the

administrative agents for the Debtors' prepetition credit facilities; (iii) the indenture trustee for

the Debtors' prepetition notes; (iv) the Committee; (v) counsel for each of the foregoing

referenced in clauses (ii) through (iv); (vi) counsel to Blackhawk; (vii) all parties who have

expressed a written interest in some or all of the Debtors' Assets; (viii) all parties who are known

or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim,

or other interest in the Debtors' Assets; (ix) counsel to lenders for the debtor in possession

facility; (x) the Internal Revenue Service; (xi) the United States Environmental Protection

Agency, (xii) the state attorneys general for states in which the Debtors conduct business;  and

(xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E. The Debtors have articulated good and sufficient reasons for this Court to:

(i) approve the Bidding Procedures; (ii) schedule the Auctions and Sale Hearing, if necessary,

and approve the manner of notice of the Auctions and Sale Hearing; (iii) approve the procedures

for the assumption and assignment of the Contracts, including notice of proposed cure amounts;

and (iv) approve the Blackhawk Bid Protections and Federal Bid Protections, if applicable, as

provided in this Order.

F. The Bid Protections (i) shall, if triggered, be deemed an actual and necessary cost

and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by Blackhawk and the Federal Stalking Horse Bidder, if any; (iii) are reasonable and appropriate, including in light of the size and nature of the proposed Sales and comparable transactions, the substantial commitments that have been made, and the substantial efforts that have been and will be expended by Blackhawk and the Federal Stalking Horse Bidder, if any, notwithstanding that the proposed Sales are subject to better and higher offers; and (iv) were necessary to induce Blackhawk and the Federal Stalking Horse Bidder, if any, to pursue the APAs.

G.      The Bid Protections were a material inducement to, and express condition of, the Blackhawk's and the Federal Stalking Horse Bidder's, if any, willingness to submit a bid through execution of the Blackhawk Term Sheet and the Federal APA, if any, that will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely. Blackhawk and the Federal Stalking Horse Bidder, if any, have provided a material benefit to the Debtors and their creditors by increasing the likelihood that, given the circumstances, the best possible price for the Assets will be received.  Accordingly, the Bidding Procedures and the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

H.      The Bidding Procedures and the Blackhawk Term Sheet were negotiated by the parties at arms' length and in good faith by the Debtors and Blackhawk.

I.      **Assumption and Assignment Procedures**.  The Motion, this Order, and the assumption and assignment procedures set forth herein are reasonably calculated to provide counterparties to any Contracts to be assumed by the Debtors and assigned to the Winning

Bidder with proper notice of the intended assumption and assignment of their Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

J.      **Notice of Order**.  The service of notice of this Order, substantially in the form attached hereto as **Exhibit 2** (the "Notice of Order"), is reasonably calculated to provide interested parties with timely and proper notice of this Order, including, without limitation: (i) the date, time, and place of the Auctions (if held); (ii) the Bidding Procedures; and (iii) the dates and deadlines in connection therewith.  No other or further notice of the sale shall be required.

K.      **Sale Notice**.  The service of the sale notice, substantially in the form attached hereto as **Exhibit 3** (the "Sale Notice"), is reasonably calculated to provide interested parties with timely and proper notice of the proposed sale, including, without limitation:  (i) the deadline for filing objections to the Sales and entry of the applicable Sale Order, if any, and the date, time, and place of the Sale Hearing, if necessary; (ii) reasonably specific identification of the Assets to be sold; (iii) instructions for promptly obtaining copies of the APAs; (iv) a description of the Sales as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the applicable APA), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the proceeds of such Sales; and (v) notice of the proposed assumption and assignment of Contracts to the Winning Bidder pursuant to such Winning Bidder APA, and no other or further notice of the sale shall be required.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Motion is granted.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed

with the Court, are overruled.

## I.    Important Dates and Deadlines

3.    **Bid Deadlines**.  August 7, 2015, at 5:00 p.m., prevailing Eastern Time, is the deadline by which all Bids for the Debtors' Assets must be **actually received** by the parties specified in the Bidding Procedures (the "Bid Deadline").

4.    **The Auctions**.  August 13, 2015, at 10:00 a.m., prevailing Eastern Time, is the date and time the Auctions, if needed, will be held at the offices of counsel to the Debtors: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611, or such later time on such day or other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  As set forth more fully in the Bidding Procedures, only Qualified Bidders shall be permitted to participate at the Auctions.

## II.    Auctions, Bidding Procedures, and Related Relief

5.    The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the proposed sales of the Assets.  Any party desiring to bid on the Assets shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

6.    Blackhawk and the Federal Stalking Horse Bidder, if any, are deemed Qualified Bidders, and the Blackhawk Bid as set forth in the Blackhawk Term Sheet is deemed a Qualified Bid.

7.    If the Debtors do not receive any Qualified Bids (other than the Blackhawk Bid or the Federal Stalking Horse Bid, if any):    (a) the Debtors will not hold the Auctions; (b) Blackhawk will be deemed the Winning Bidder for the Blackhawk Assets, and the Federal Stalking Horse Bidder, if any, will be deemed the Winning Bidder for the Federal Assets; and

(c) the Debtors shall be authorized to seek approval of the Blackhawk APA and Federal APA at the Sale Hearing, if applicable.

8.      If the Debtors receive one or more Qualified Bids from Qualified Bidders (other than the Blackhawk Bid or the Federal Stalking Horse Bid, if any), the Debtors shall conduct the Auctions in accordance with the Bidding Procedures.

9.      In the event of a competing Qualified Bid, Blackhawk and the Federal Stalking Horse Bidder, if any, will be entitled, but not obligated, to submit overbids and will be entitled in any such overbids to credit bid the value of the Bid Protections.

10.      The rights of any party entitled under applicable law, including pursuant to section 363(k) of the Bankruptcy Code, to credit bid in connection with the Sales of the Assets are fully preserved.

11.      At the Auctions, the Debtors may, in their sole discretion:  (a) select, in their business judgment, pursuant to the Bidding Procedures, the highest or otherwise best Bid and the Winning Bidder or Backup Bidder; and (b) reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in the Debtors' business judgment, is (i) inadequate, insufficient, or not the highest or otherwise best Bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bidding Procedures, or (iii) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest.

12.      No person or entity, other than Blackhawk and the Federal Stalking Horse Bidder, if any, shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

### III.    Blackhawk Bid Protections

13.    The Blackhawk Bid Protections are approved on the terms set forth in the Blackhawk Term Sheet.  The Debtors are hereby authorized to pay any and all such amounts owing to Blackhawk on account of the Blackhawk Bid Protections in accordance with the terms of the Blackhawk Term Sheet without further action or order by the Court.

14.    The Blackhawk Bid Protections (if payable in accordance with the Blackhawk Term Sheet) shall be an allowed administrative expense claim in the Debtors' chapter 11 cases pursuant to sections 503(b)(1) and 507(a)(2) senior to all other administrative expense claims; *provided*, *that*, the Blackhawk Bid Protections shall be junior to any obligations, including the Carve Out (as defined in the DIP Order) (collectively, the "Senior Obligations"), provided for in the *Interim Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Authorizing Use Of Cash Collateral, (C) Granting Liens And Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying The Automatic Stay, (F) Scheduling A Final Hearing, And (G) Granting Related Relief* [Docket No. 67] (as may be amended in final form, the "DIP Order"), which Senior Obligations shall be senior in priority to the Debtors' obligation to pay the Blackhawk Bid Protections.

### IV.    Federal Bid Protections

15.    The Federal Bid Protections are approved on the following terms:  In the event the Debtors select a Federal Stalking Horse Bidder, the Debtors are authorized but not directed to offer a breakup fee of up to 3.0% of the cash portion of the purchase price of the Federal Stalking Horse Bid.

16.    If the Debtors identify a Federal Stalking Horse Bidder, the Debtors will file a supplemental notice (the "Federal Stalking Horse Notice") with the Court by no later than July 14, 2015, at 5:00 p.m., prevailing Eastern Time, identifying the Federal Stalking Horse

Bidder and the terms of the Federal Stalking Horse Bid, including the terms and conditions for

payment of any Bid Protections and the Federal Stalking Horse APA and shall serve the Federal

Stalking Horse Notice on (a) the U.S. Trustee, (b) the Committee, (c) all parties who are known

or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim,

or other interest in the Federal Complex, (d) all parties that have expressed interest in the Federal

Complex, and (e) all parties that have requested service pursuant to Bankruptcy Rule 2002.

17.     The Debtors are hereby authorized to pay any and all such amounts owing to the

Federal Stalking Horse Bidder, if any, on account of the Federal Bid Protections in accordance

with the terms of this Order.

18.     The Federal Bid Protections, if any, shall be an allowed administrative expense

claim in the Debtors' chapter 11 cases pursuant to sections 503(b)(1) and 507(a)(2) senior to all

other administrative expense claims; *provided*, *that*, the Federal Bid Protections shall be junior to

any Senior Obligations provided for in the DIP Order.

**V.     Assumption and Assignment Procedures**

19.     If applicable, the following procedures regarding the assumption and assignment

of the Contracts in connection with the Sales are hereby approved to the extent set forth herein,

and shall govern the assumption and assignment of all Contracts proposed to be assumed by the

Debtors pursuant to Section 365(b) of the Bankruptcy Code and assigned to the Winning Bidders

pursuant to section 365(f) of the Bankruptcy Code under the applicable APA.

20.     **Notices for Contracts**.  As soon as practicable, the Debtors shall serve on all

non-Debtor counterparties to any Contract (the "Contract Notice Parties") that may be assumed

by the Debtors and assigned to the Winning Bidder a "Contract Notice," substantially in the form

attached hereto as **Exhibit 4**, that identifies, to the extent applicable:  (i) the Contract that may be

assumed and assigned; (ii) the name of the non-Debtor counterparty to such Contract; (iii) the

Debtors' asserted cure amount for such Contract if it becomes assumed and assigned; (iv) the deadlines by which any such Contract counterparty must file an objection (each, a "Contract Objection") to the proposed cure amount, assumption and assignment, or adequate assurance; (v) identifying the Winning Bidder; and (vi) providing Contract counterparties with the Winning Bidder's assurance of future performance; *provided*, *that* the presence of a Contract on a Contract Notice does not constitute an admission that such Contract is an executory contract or unexpired lease; *provided*, *further*, *that* the presence of a Contract on the Contract Notice or Assumption Notice shall not prevent the Debtors from subsequently withdrawing such request for assumption or rejecting such Contract at any time before such Contract is actually assumed and assigned pursuant to an Order of the Court.  Such Contract Notice shall be without prejudice to the Winning Bidder's rights, if any, to subsequently exclude such items from assumption and assignment.

21.    As soon as practicable after the Bid Deadline, the Debtors shall file with the Court and serve on the Contract Notice Parties who are parties to a Contract to be assumed and assigned a further notice substantially in the form attached hereto as **Exhibit 5** (the "Assumption Notice") identifying all Qualified Bidders who will be permitted to participate in the Auctions, stating which Contracts may be assumed and assigned, and providing such parties with the Qualified Bidders' assurance of future performance.  To the extent the Debtors subsequently identify prior to the Sale Hearing, if applicable, any additional Contracts to be assumed by the Debtors and assigned to the Winning Bidder, the Debtors shall serve on any counterparty to such Contract the Contract Notice and/or Assumption Notice, as applicable, along with the Winning Bidder's assurance of future performance, as soon as practicable.  Such counterparty shall have seven days from service of the Contract Notice and/or Assumption Notice, as applicable, to file

an objection to the proposed cure amount or assumption and assignment of its Contract in
accordance with the procedures set forth herein.

22.    **Objections to Assumption of Contracts**.  Any non-Debtor counterparty to a
Contract who objects to the cure or assignment of their Contracts (the "Objecting Party") shall
file Contract Objections pursuant to the following procedures:

- Contract Objection.  All Contract Objections to the cure amounts listed in the Contract Notice, the Debtors' ability to assign a Contract, or adequate assurance of future performance solely by Blackhawk or the Federal Stalking Horse Bidder, if any, shall be filed with the Court by 5:00 p.m., prevailing Eastern Time, seven days from service of the Contract Notice or any amendment or supplement to the Contract Notice.

- Supplemental Adequate Assurance Objection.  All Contract Objections to adequate assurance of future performance of Contracts by any Winning Bidder shall be filed with the Court at or prior to the Sale Hearing, if applicable; *provided*, *however*, that for parties identified on any supplemental Assumption Notice issued by the Debtors after the initial Assumption Notice, such parties shall have seven days from service of such notice to file such Contract Objection.

- No Objection.  If no Objection is received in accordance with the deadlines set forth above, such counterparty:  (i) shall be deemed to have consented to the cure amounts and assumption and assignment of its Contract to the Winning Bidder; (ii) shall be forever barred, estopped, and enjoined from asserting any additional cure amount under the Contracts; and (iii) shall be forever barred from objecting to the assignment of the Contracts to the Winning Bidder or the adequacy of the Winning Bidder's assurance of future performance.

- Resolution Period.  If any timely filed Contract Objection cannot be resolved by the Winning Bidder and the Objecting Party, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the date such Objecting Party receives the Assumption Notice.  To the extent that any Contract Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Contract Objection, to be determined in the Winning Bidder's reasonable discretion, and until such time as the Contract Objection can be resolved, the Contract shall be conditionally assumed and assigned pending a resolution of the Contract Objection after notice and a hearing.

- Form of Objections.  Contract Objections must:  (a) be in writing; (b) state

with specificity the nature of such objection and alleged cure amount, including applicable and appropriate documentation in support of such alleged cure amount; and (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules.

## VI.    Notice of Order

23.    Within three business days of entry of this Order, the Debtors shall cause the Notice of Order to be (a) published in the *Wall Street Journal* (National Edition) and *The Charleston Gazette*, (b) made available on the Debtors' case information website located at http://cases.primeclerk.com/PatriotCoal, and (c) served upon the following parties or, in lieu thereof, to their counsel, if known:  (i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to Blackhawk; (iv) all parties who have expressed a written interest in some or all of the Debtors' Assets; (v) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Debtors' Assets; (vi) the Internal Revenue Service; (vii) all applicable state and local taxing authorities; (viii) each governmental agency that is an interested party with respect to the Sales and transactions proposed thereunder; and (x) all parties that have requested service pursuant to Bankruptcy Rule 2002.  Such notice is good, adequate, sufficient, and proper notice of this Order, the Bidding Procedures, and the Auctions, and any requirements for other notice are waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006, and 9007, and sections 102 and 105 of the Bankruptcy Code.

## VII.   Sale Hearing Notice.

24.    If the Debtors determine to pursue any Sales not in conjunction with confirmation of a chapter 11 plan, at least 21 days prior to the Sale Hearing, the Debtors shall cause the Sale Notice to be (a) published in the *Wall Street Journal* (National Edition) and *The Charleston Gazette*, (b) made available on the Debtors' case information website located at

http://cases.primeclerk.com/PatriotCoal, and (c) served upon the following parties or, in lieu

thereof, to their counsel, if known:   (i) U.S. Trustee; (ii) the Committee; (iii) counsel to

Blackhawk; (iv) counsel to the Federal Stalking Horse Bidder, if any; (v) the Contract

Counterparties; (vi) all parties who are known or reasonably believed, after reasonable inquiry,

to have asserted any lien, encumbrance, claim, or interest in the Assets; (vii) the Internal

Revenue Service; (viii) all applicable state and local taxing authorities; (ix) each governmental

agency that is an interested party with respect to the Sales and transactions proposed thereunder;

and (x) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  Such notice is

good, adequate, sufficient, and proper notice of the Sale Hearing, and any requirements for other

notice are waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006, and 9007,

and sections 102 and 105 of the Bankruptcy Code.

**VIII.    Miscellaneous**

25.    Notwithstanding anything to the contrary contained herein, (a) any payment to be

made, or authorization contained, hereunder shall be subject to the requirements imposed on the

Debtors under any order(s) regarding the debtor in possession financing and (b) to the extent

there is any inconsistency between the terms of such debtor in possession financing order(s) and

any action taken or proposed to be taken hereunder, the terms of the debtor in possession

financing order(s) shall control. For the avoidance of doubt, nothing herein shall modify, alter or

otherwise affect the rights or remedies of the agent or the lenders under the Debtors' debtor in

possession financing facility.

26.    In the event of any inconsistencies between this Order, the Motion, and the

Bidding Procedures, this Order shall govern in all respects.

27.    Nothing in this Order shall be construed to modify the requirements and

provisions of sections 365(b), 365(d)(3), 365(d)(4), or 365(f) of the Bankruptcy Code, or to

determine the effective date of rejection for any Lease or Contract which the Debtors may seek to reject.

28.     This Order shall be binding on all parties in the chapter 11 cases and all successors of any of the Debtors, including any chapter 7 or chapter 11 trustee and any plan agent, administrator, or trustee, no matter how denominated.

29.     The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order.

30.     Notice of the Motion as provided therein shall be deemed good and sufficient notice.

31.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32.     This Order shall be immediately effective and enforceable upon entry hereof.

33.     The Court shall retain exclusive jurisdiction with respect to any matters, claims, rights or disputes arising from, based upon or related to this Order.

Dated:
Richmond, Virginia                    _____
                                      UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

_/s/ Michael A. Condyles_
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

- and -

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and*
*Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

    Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

                    _/s/ Michael A. Condyles_

## <u>EXHIBIT 1</u>

**Proposed Bidding Procedures**

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | ) Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## BIDDING PROCEDURES FOR THE
## SUBMISSION, RECEIPT, AND CONSIDERATION OF
## BIDS IN CONNECTION WITH THE SALES OF THE DEBTORS' ASSETS

By the Debtors' *Motion for Entry of an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief* [Docket No. __], dated June 2, 2015 (the "Bidding Procedures Motion"),[1] Patriot Coal Corporation, and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), sought approval of, among other things, the procedures through which they will determine the highest or otherwise best price for the purchase of the Assets.

On May 12, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for

---

[1]  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Bidding Procedures Motion.

relief under chapter 11 of the Bankruptcy Code to permit them to restructure their balance sheets and operations to restore profitability.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  On May 14, 2015, the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Bankruptcy Court</u>") entered an order authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

On [____], 2015, the Bankruptcy Court entered an order (the "<u>Bidding Procedures Order</u>"), which, among other things, authorized the Debtors to solicit bids for the consideration of the highest or otherwise best price for the Assets through the process and procedures set forth below (the "<u>Bidding Procedures</u>").

## Marketing Process

### Assets to Be Sold

The Debtors are providing these Bidding Procedures, whereby prospective bidders may qualify for and participate in the Auctions (as defined herein), if any occur, thereby competing to make the highest or otherwise best offer for the purchase of (i) the Blackhawk Assets, (ii) the Excluded Assets, including the Federal Assets, and/or (iii) any combination of the Assets that qualifies as a Qualified Bid (as defined herein).

### Contact Parties

The Debtors, in consultation with Centerview Partners LLC ("<u>Centerview</u>"), have developed a list of parties whom the Debtors believe may potentially be interested in, and whom the Debtors reasonably believe would have the financial resources to consummate, a competing Sale Transaction, which list includes both strategic investors and potential financial investors (each, individually, a "<u>Contact Party</u>", and collectively, the "<u>Contact Parties</u>").  The Debtors and Centerview will contact the Contact Parties to explore their interest in pursuing a Sale.  The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest at such time in pursuing a transaction.  The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

The Debtors may distribute to each Contact Party and any other interested party or potential bidder an "<u>Information Package</u>" consisting of:  (i) a cover letter; (ii) a copy of the Bidding Procedures and the Bidding Procedures Motion; (iii) a copy of a confidentiality agreement; and (iv) such other materials as the Debtors and Centerview deem appropriate under the circumstances, including but not limited to preliminary "teaser" information appropriate to enable each Contact Party or other potential bidder to evaluate the proposed Sales.

### Access to Diligence Materials

To participate in the bidding process and receive access to due diligence information (the "<u>Diligence Materials</u>"), a party must submit to the Debtors (i) an executed confidentiality agreement in the form and substance satisfactory to the Debtors, and (ii) evidence demonstrating a reasonable likelihood to close on a Sale in a timely manner, including the ability to pay the

2

purchase price for the Assets (the "Purchase Price") and to receive any and all necessary governmental, licensing, regulatory, or other approvals.

A party who qualifies for access to the Diligence Materials shall be a "Bidder." All due diligence requests must be directed to Centerview.

For any Bidder who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise inappropriate for disclosure to such Bidder.

### Due Diligence from Bidders

Each Bidder and Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction.

### Auction Qualification Process

### Qualified Bids

To be eligible to participate in the Auctions, a Bidder must deliver, so as to be received by the Recipient Parties (as defined below) on or before **August 7, 2015, at 5:00 p.m., prevailing Eastern Time** (the "Bid Deadline"), or such later date as is reasonably determined by the Debtors in their business judgment, after consultation with the lenders under the Debtors' debtor-in-possession financing facility (such facility, the "DIP Facility" and such lenders, the "DIP Lenders"), a proposal, solicitation, or offer to effectuate a Sale (each, a "Bid") that meets the following requirements (collectively, the "Bid Conditions") (as reasonably determined by the Debtors and their advisors) which shall constitute a "Qualified Bid," and such Bidder submitting such Bid shall be a "Qualified Bidder":

A.  Purchased Assets and Assumed Liabilities:  Each Bid must clearly identify the particular assets and liabilities the bidder seeks to acquire, whether in connection with the Blackhawk Sale, the Federal Sale, both, or some combination of the Assets, which combination is determined by the Debtors, after consultation with the DIP Lenders, to be a Qualified Bid.

B.  Deposit:  Each Bid must be accompanied by a cash Deposit in amount acceptable to the Debtors, after consultation with the DIP Lenders, which amount shall not exceed ten percent of the Purchase Price of the Bid, and such Deposit will be held in an interest bearing escrow account to be identified and established by the Debtors (each a "Deposit").

C.  Purchase Price; Minimum Bid:  Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any (the "Purchase Price").

3

1.      Each Bid submitted in connection with the Blackhawk Sale must (i) match the structure provided in the Blackhawk Bid and must satisfy the Blackhawk Initial Overbid, (ii) propose an alternative transaction that provides substantially similar or better terms as the Blackhawk Bid including the Blackhawk Initial Overbid, or (iii) propose to purchase the Blackhawk Assets for cash, and assume the corresponding liabilities.

2.      Each Bid submitted in connection with the Federal Sale must (i) match the structure provided in the Federal Stalking Horse Bid, if any, and must satisfy the Federal Initial Overbid, (ii) propose an alternative transaction that provides substantially similar or better terms as the Federal Stalking Horse Bid including the Federal Initial Overbid, if any, or (iii) propose to purchase the Federal Assets for cash, and assume the corresponding liabilities; *provided that* if a Federal Stalking Horse Bid is not selected, Bidders may propose any transaction with respect to the acquisition of the Federal Assets, which proposals the Debtors, in consultation with the DIP Lenders, will evaluate and determine whether such proposals constitute a Qualified Bid.

D.      <u>Blackhawk Sale Initial Overbid</u>:  The aggregate consideration proposed by each Bid seeking to acquire all of the assets to be acquired pursuant to the Blackhawk Bid must equal or exceed the sum of:

1.      cash or non-cash consideration in an amount equal to the Blackhawk Bid; ***plus***

2.      cash in an amount equal to the Blackhawk Bid Protections; ***plus***

3.      $5 million in cash or cash equivalents (together with (1) and (2) above, collectively, the "<u>Blackhawk Initial Overbid</u>"); *provided*, *however*, any party entitled under applicable law to do so may submit a credit bid in an amount equal to the Blackhawk Initial Overbid; *provided that* any such credit bid, or any Bid that includes a credit bid, must include cash in an amount necessary to satisfy the Blackhawk Bid Protections, if the Debtors are obligated to pay such protections.

E.      <u>Federal Sale Initial Overbid</u>:  The aggregate consideration proposed by each Bid seeking to acquire all of the assets to be acquired pursuant to the Federal Stalking Horse Bid, if any, must equal or exceed the sum of:

1.      cash or non-cash consideration in an amount equal to the Federal Stalking Horse Bid, if any; ***plus***

2.      cash in an amount equal to the Federal Bid Protections, if any; ***plus***

3.      $2 million in cash or cash equivalents (together with (1) and (2) above, collectively, the "<u>Federal Initial Overbid</u>"); *provided*, *however*, any party entitled under applicable law to do so may submit a credit bid in an

4

amount equal to the Federal Initial Overbid; *provided that* any such credit bid, or any Bid that includes a credit bid, must include cash in an amount necessary to satisfy the Federal Bid Protections, if the Debtors are obligated to pay such protections.

F.      Markup of Blackhawk APA:  The Debtors expect to file the final form asset purchase agreement in connection with the Blackhawk Sale (the "Blackhawk APA") on or around June 25, 2015, in connection with the filing of their proposed chapter 11 plan and disclosure statement.  Each Bid submitted in connection with the Blackhawk Sale must expressly include the Bidder's proposed markup of the Blackhawk APA with an electronic blackline clearly marked to show changes requested by the applicable Bidder.

G.      Markup of Federal APA:  If the Debtors select a Federal Stalking Horse Bidder, then the Debtors shall cause a proposed asset purchase agreement (the "Federal APA" and together with the Blackhawk APA and any Winning Bidder's (as defined herein) asset purchase agreement, collectively, the "APAs"), to be served on applicable parties in connection with service of the Federal Stalking Horse Notice.  Each Bid submitted in connection with the Federal Sale must expressly include the Federal APA with a blackline clearly marked to show changes requested by the applicable Bidder.  If no Federal Stalking Horse Bid has been selected, any Bidder submitting a Bid in connection with the Federal Assets shall include a proposed Federal APA in connection with such Bid.

H.      Bids for Blackhawk Assets and Excluded Assets:  To the extent a Bidder bids on a combination of Blackhawk Assets and Excluded Assets (including the Federal Assets), such Bidder may make such Bid by submitting a markup of the Blackhawk APA only.

I.      Bids for Individual Assets or Combinations of Assets:  Bidders may submit Bids for individual Assets or combinations of Assets and are not required to submit Bids for all Assets proposed to be included in the Blackhawk Sale or the Federal Sale (a "Partial Bid").  Partial Bids must include a markup of the Blackhawk APA.  The Debtors shall determine, after consultation with the DIP Lenders, whether Partial Bids constitute Qualified Bids.  Generally, to be considered a Qualified Bid, the Debtors, in consultation with the DIP Lenders, must conclude that the Partial Bid, when taken together with other Bids or Partial Bids, satisfies the criteria for being a Qualified Bid.

J.      Bids for Other Excluded Assets:  The Debtors are also soliciting Bids by the Bid Deadline for all other Excluded Assets, in addition to the Federal Complex, and such Bids may be made in conjunction with the Blackhawk Sale and/or the Federal Sale, or may be made for individual or collections of Excluded Assets.  The Debtors reserve the right to conduct auctions for one or more Excluded Assets and to sell Excluded Assets if the Debtors determine, after consultation with the DIP Lenders, that a Bid for an Excluded Asset is acceptable.  The Debtors also reserve the right not to sell any Excluded Assets if

5

the Debtors determine, after consultation with the DIP Lenders, that there are no acceptable Bids for such Assets.

K.    <u>Same or Better Terms; Bid Documents</u>:  Except as otherwise provided in the Bidding Procedures, each Bid must be, in the Debtors' reasonable business judgment, after consultation with the DIP Lenders, substantially on the same or better terms than the terms of the applicable APA.  Each Bid must include duly executed, ancillary transaction documents necessary to effectuate the transactions contemplated in the Bid (such documents, the "<u>Bid Documents</u>").

L.    <u>Employee Obligations</u>:  To be a Qualified Bid, each Bid must expressly propose a treatment of the Debtors' prepetition collective bargaining agreements (the "<u>CBAs</u>"), pension obligations, and other post-employment benefits (collectively, the "<u>Employee Obligations</u>").

M.    <u>Demonstrated Financial Capacity; Committed Financing</u>:  Any Bidder must have, in the Debtors' reasonable business judgment, after consultation with the DIP Lenders, the necessary financial capacity to consummate the proposed transactions required by its Bid.  Each Bid must also include, by the Bid Deadline, committed financing, documented to the Debtors' reasonable satisfaction, after consultation with the DIP Lenders, that demonstrates the Bidder has received sufficient debt and/or equity funding commitments to satisfy the Bidder's Purchase Price and other obligations under its Bid, including the identity and contact information of the specific person(s) or entity(s) responsible for such committed financing whom Centerview and Kirkland & Ellis LLP should contact regarding such committed financing.  Such funding commitments or other financing shall not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors after consultation with the DIP Lenders.

N.    <u>Identity</u>:  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) whom Centerview and Kirkland & Ellis LLP should contact regarding such Bid.

O.    <u>Contingencies; No Financing or Diligence Outs</u>:  Any Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' reasonable business judgment after consultation with the DIP Lenders, than those set forth in the applicable APA.

P.      Irrevocable:  A Bidder's Bid shall be irrevocable unless and until the Debtors, after consultation with the DIP Lenders, accept a higher Qualified Bid or Bids and such Bidder is not selected as the Backup Bidder.

Q.      Expenses:  Each Bidder presenting a Bid or Bids shall bear its own costs and expenses (including legal fees) in connection with the proposed transaction.

R.      Authorization: Each Bid must contain evidence that the Bidder has obtained authorization or approval from its Board of Directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

S.      As-Is, Where-Is:  Each Bid must include a written acknowledgement and representation that the Bidder:  (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith or the Auctions, except as expressly stated in the Bidder's proposed APA.

T.      Adequate Assurance of Future Performance:  Each Bid must demonstrate, in the Debtors' and Centerview's reasonable business judgment, and after consultation with the DIP Lenders, that the potential Bidder can provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed pursuant to any proposed Sale.

U.      Government Approvals:  Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sales, together with evidence satisfactory to the Debtors, after consultation with the DIP Lenders, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.

V.      Government Approvals Timeframe:  Each Bid must set forth an estimated timeframe for obtaining any required internal, governmental, licensing, regulatory or other approvals or consents for consummating any proposed Sale.

W.      Acknowledgment:  Each Bid must include a written acknowledgement that the Bidder agrees to all of the terms for sale set forth in these Bidding Procedures.

X.      Bid Deadline:  Each Bid must be transmitted via email (in .pdf or similar format) to (collectively, the "Recipient Parties"):    (i) Patriot Coal Corporation, 63 Corporate Centre Drive, Scott Depot, West Virginia 25560, Attn:  Joseph W. Bean (JBean@patriotcoal.com); (ii) proposed investment bankers for the Debtors, Centerview Partners LLC, 31 West 52nd Street, 22nd Floor, New York, New

7

York 10019, Attn:  Marc D. Puntus (mpuntus@centerviewpartners.com) and Steven Bremer (sbremer@centerview.com); (iii) proposed counsel for the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Stephen E. Hessler, Esq. (SHessler@kirkland.com) and Patrick Evans, Esq. (patrick.evans@kirkland.com) and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Ross M. Kwasteniet, Esq. (rkwasteniet@kirkland.com); (iv) proposed co-counsel to the Debtors, Kutak Rock LLP, Bank of America Center, 1111 East Main Street, 8th Floor, Richmond, Virginia 23219, Attn:  Michael A. Condyles, Esq. (Michael.Condyles@KutakRock.com); and (v) counsel to the DIP Lenders, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Thomas Moers Mayer, Esq. (tmayer@kramerlevin.com), John Bessonette, Esq. (jbessonette@kramerlevin.com) and Gregory G. Plotko, Esq. (gplotko@kramerlevin.com), so as to be **actually received** on or before the Bid Deadline.

The Debtors reserve the right to work with any Bidder in advance of the Auctions to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors may, after consultation with the DIP Lenders, accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder for purposes of the Auctions).  The Debtors may, in their sole discretion, share all Qualified Bids, including proposed markups of the APAs, with Blackhawk and the Federal Stalking Horse Bidder, if any.

The Debtors shall notify each Bidder whether its Bid is a Qualified Bid no later than August 11, 2015, at 5:00 p.m., prevailing Eastern Time.

If no Qualified Bids are submitted by the Bid Deadline, the Debtors shall not hold the Auctions.  Notwithstanding anything herein to the contrary, the Debtors shall not be required to determine that any Bid is the Baseline Bid and may determine not to hold an Auctions if the Debtors determine, after consultation with the DIP Lenders, the Bids to be inadequate.

In the event that any Bid is determined by the Debtors, after consultation with the DIP Lenders, not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Deposit and all accumulated interest thereon within three business days after the Bid Deadline.

For the avoidance of doubt, the Blackhawk Bid and the Federal Stalking Horse Bid, if any, shall be deemed to be Qualified Bids for all purposes hereunder and at the Auctions, without regard for compliance with the qualification provisions contained herein, including, without limitation, the requirement to make a Deposit.

### *Baseline Bid*

After the Bid Deadline, the Debtors shall determine, after consultation with the DIP Lenders, which Qualified Bids represent the then highest or otherwise best Bid for each of the Blackhawk Assets, the Federal Assets, and/or a combination of some or all of the Assets (each

8

a "Baseline Bid"); *provided that* the cash consideration provided by any such Bid must be sufficient to pay the Blackhawk Bid Protections.

The determination of which Qualified Bids constitute Baseline Bids and which Qualified Bids constitute the Winning Bids (as defined herein) shall take into account any factors the Debtors, in consultation with the DIP Lenders, reasonably deem relevant to the value of the Qualified Bids to their estates, including, *inter alia*:   (a) the amount and nature of the consideration; (b) certainty of closing; (c) the net economic effect of any changes to the value to be received by each of the Debtors' classes of claims or interests from the transaction; and (d) tax consequences of such Qualified Bids (collectively, the "Bid Assessment Criteria").   A Qualified Bid selected as the Baseline Bid shall be provided to all other Qualified Bidders, as well as the DIP Lenders, at least twenty-four hours prior to the start of any Auction.

### The Auctions

If one or more Qualified Bids (in addition to the Blackhawk Bid and Federal Stalking Horse Bid, if any) are received by the Bid Deadline in connection with either the Blackhawk Sale or the Federal Sale, the Debtors will conduct auctions (the "Auctions") to determine the Winning Bidders.  The Auctions shall take place on **August 13, 2015, at 10:00 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP, at 601 Lexington Avenue, New York, New York 10022, or such later date and time as selected by the Debtors (in consultation with Blackhawk).  The Debtors shall send written notice of the date, time, and place of the Auctions to the Qualified Bidders no later than two business days before such Auctions, and will post notice of the date, time, and place of the Auctions no later than two business days before such Auction on the website of the Debtors' notice and claims agent at http://cases.primeclerk.com/PatriotCoal.  The Auctions shall be conducted by the Debtors in a timely fashion according to the following procedures.

### *Auction Procedures*

The Debtors and their professionals shall direct and preside over the Auctions.  At the start of the Auctions, the Debtors shall describe the terms of the applicable Baseline Bids.  All incremental bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a transcript of all bids made and announced at the Auctions, including the Baseline Bid, all Overbids, and the Winning Bids.

The DIP Lenders and their advisors, the Committee and its advisors, and all Qualified Bidders will be permitted to attend the Auctions, though only the Qualified Bidders shall be entitled to: (i) make any subsequent bids at the Auctions; (ii) make statements on the record at the Auctions; or (iii) otherwise participate at the Auctions in any manner whatsoever.  The Qualified Bidders shall appear in person at the Auctions, through a duly authorized representative, or as otherwise agreed by the Debtors.

In the event that a Qualified Bid is comprised of more than one entity (each a "Member," and collectively, the "Members"), if less than all of the Members of any Qualified Bidder elect to participate in any round of the Auction, such remaining participating Member or Members shall

9

be required to demonstrate such remaining Member's or Members' financial capacity to consummate the transactions required by such Member's or Members' Bid.

At all times from the submission of a Qualified Bid through the end of an Auction, the Debtors shall share information on an equal and no greater basis with each Qualified Bidder (including Blackhawk and the Federal Stalking Horse Bidder, if any), provided that the Debtors shall no longer be required to share any information with a Qualified Bidder (including the Purchaser) once it has ceased bidding in an Auction.

*Overbids*

All Qualified Bidders shall have the right to submit an Overbid.  An "Overbid" is any bid made at the Auctions subsequent to the Debtors' announcement of the Baseline Bids.  To submit an Overbid for purposes of the Auctions, a Qualified Bidder must comply with the following conditions:

A.    Minimum Overbid Increment:  With respect to any of the Sales, any Overbid after the Baseline Bid shall be made in cash in increments of at least $1,000,000 (the "Overbid Increments").

B.    Overbid Modifications:  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid, but shall otherwise comply with the terms of these Bidding Procedures.  Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, as applicable.  Any Overbid shall remain open and binding on the Bidder until and unless (i) the Debtors accept a higher Qualified Bid as an Overbid, and (ii) such Overbid is not selected as the Backup Bid.  Any modifications to the APAs on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors than such Qualified Bidder's previous bid.

C.    Closing Evidence:  To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, in consultation with the DIP Lenders, demonstrating such Qualified Bidder's ability to close in connection with the proposed Sale.

The Debtors shall announce at the Auctions the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria (after consultation with the DIP Lenders).

During the course of the Auctions, the Debtors shall, after the submission of each Overbid, promptly inform each participant which Overbid reflects, in the Debtors' view, after consultation with the DIP Lenders, the highest or otherwise best offer.  The Auctions may include individual negotiations between the Debtors with Qualified Bidders and/or open bidding in the presence of all other Qualified Bidders.

The Debtors reserve the right, in their reasonable business judgment with the consent of the agent under the DIP Facility (on behalf of the Required DIP Lenders (as defined in the DIP

Facility documents) to adjourn the Auctions one or more times to, among other things:  facilitate discussions between the Debtors and Qualified Bidders, allow Qualified Bidders to consider how they wish to proceed, and provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment, after consultation with the DIP Lenders, may require that the applicable Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

***Other Auction Procedures***

The rights of any entity to "credit bid" pursuant to section 363(k) of the Bankruptcy Code are preserved and may be exercised in accordance with applicable law.

The Debtors reserve the right to remove any Qualified Bidder from the Auctions if, at any point, the Debtors determine in their business judgment, after consultation with the DIP Lenders, that the applicable Qualified Bidder is no longer engaged in active bidding at the Auctions (including, without limitation, if such Qualified Bidder has failed to bid in previous rounds of bidding).

The Debtors, after consultation with the DIP Lenders, may announce at the Auctions additional procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auctions provided such additional rules are not inconsistent with these Bidding Procedures.

All Qualified Bidders at the Auctions shall be deemed to have consented to the jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auctions or the construction and enforcement of these Bidding Procedures.

Each Qualified Bidder participating at the Auctions will be required to confirm that (i) it has not engaged in any collusion with respect to the bidding (though Qualified Bidders are permitted to make joint bids), and (ii) its Qualified Bid is a good faith, bona fide offer and it intends to consummate the proposed transaction if selected as a Winning Bidder.

At all times from the submission of a Qualified Bid through the end of the Auctions, the Debtors shall share information on an equal and no greater basis with each Qualified Bidder (including Blackhawk and the Federal Stalking Horse Bidder, if any), provided that the Debtors shall no longer be required to share any information with a Qualified Bidder (including the Purchaser) once it has ceased bidding in the Auctions.

***The Winning Bids / Procedures for Closing the Auctions***

The Auctions shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with the DIP Lenders, is the highest or otherwise best Qualified Bid with respect to each Sale (each such Qualified Bid, a "<u>Winning Bid</u>", and such Qualified Bidder, a "<u>Winning Bidder</u>"), and that further bidding is unlikely to result in a Winning Bid that would be acceptable to the Debtors, at which point, the Auctions will be closed.  The Auctions shall not close unless and until all Qualified Bidders have

11

been given a reasonable opportunity to submit an Overbid at the Auctions to the then-existing Overbid.

With respect to each Sale, such acceptance by the Debtors, after consultation with the DIP Lenders, of the Winning Bid is conditioned upon approval by the Bankruptcy Court of the Winning Bid and the entry of an applicable order by August 18, 2015.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auctions and any and all such Bids and Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

With respect to each Sale, in selecting the Winning Bid, the Debtors, in consultation with the DIP Lenders, may consider all factors, including, without limitation, the Bid Assessment Criteria.

The Debtors may require that within two business days after adjournment of the Auctions, the Winning Bidders complete and execute all applicable definitive documents, instruments, or other documents evidencing and containing the terms and conditions upon which the Winning Bids were made.

The Deposits of each Qualified Bidder shall be held in one or more interest-bearing escrow accounts by the Debtors and shall be returned (other than with respect to the Winning Bidders and the Backup Bidders) upon or within three business days after the Auctions. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Winning Bidders (or the Backup Bidders, if applicable) timely close the Sales, their Deposits shall be credited towards the purchase price.

### *The Backup Bidders*

Notwithstanding anything in these Bidding Procedures to the contrary, if any Auction is conducted in connection with the Sales, the party or parties, as applicable, with the next-highest or otherwise second best Qualified Bids at the Auctions, as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the DIP Lenders, shall be required to serve as backup bidders (each a "Backup Bidder"). With respect to each Sale, the identity of the Backup Bidders and the amount and material terms of the Qualified Bid of the Backup Bidder (the "Backup Bid") shall be announced by the Debtors at the conclusion of the Auctions at the same time the Debtors announce the identity of the Winning Bids and the Winning Bidders. Each Backup Bidder shall be required to keep its Qualified Bid (or if a Backup Bidder submitted one or more Overbids at the Auctions, its final Overbid) open and irrevocable until the earlier of (i) 5:00 p.m., prevailing Eastern time, on the first business day that is 60 days after the date on which the Auctions are concluded, or (ii) the closing of the transaction with the Winning Bidder (the "Outside Backup Date"); *provided*, *however*, if Blackhawk is the Backup Bidder in connection with the Blackhawk Sale, then the Outside Backup Date shall be September 25, 2015.

With respect to either the Blackhawk Sale or the Federal Sale, if the applicable Winning Bidder fails to consummate an approved Sale, the Debtors, after consultation with the DIP Lenders, may select the applicable Backup Bidder as the Winning Bidder. The Debtors will be

authorized, but not required, to consummate the Sale with such Backup Bidder without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Winning Bidder.  The deposit of a Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Winning Bidder, and (b) the Outside Backup Date.

## Post-Auction Procedures

With respect to each Sale, upon selection of a Winning Bid (which will be subject to approval by the Bankruptcy Court), if any, the Debtors will file the Winning Bid with the Bankruptcy Court and shall proceed to the Confirmation Hearing, which Confirmation Hearing shall also constitute a hearing on the Sales.  Any such Confirmation Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Confirmation Hearing.

## Failure to Consummate Purchase by a Winning Bidder

With respect to each Sale, the Deposit of each Winning Bidder shall be applied to the Purchase Price at the closing of the applicable Sale.  If a Winning Bidder fails to reasonably promptly consummate a Sale consistent with the Winning Bid because of a breach or failure to perform on the part of such Winning Bidder, the applicable Backup Bidder will be deemed to be the new "Winning Bidder" and the Debtors will be authorized, after consultation with the DIP Lenders, but not required, to consummate a Sale with a Backup Bidder as contemplated by the Backup Bid without further order of the Bankruptcy Court.  In such case, (a) the defaulting Winning Bidder's Deposit shall be forfeited to the Debtors and (b) all parties in interest, and the Debtors specifically, reserve the right to seek all available damages from the defaulting Winning Bidder.

Except as otherwise provided herein, all Deposits shall be returned to each Qualified Bidder not selected by the Debtors as a Winning Bidder or a Backup Bidder by no later than the third business day following the date on which the Auctions are concluded.  The Deposit of a Backup Bidder shall be held by the Debtors and shall be (a) applied to the Purchase Price at the closing of the applicable Sale if the Debtors consummate a Sale with a Backup Bidder, (b) forfeited to the Debtors if a Backup Bidder becomes a Winning Bidder and the applicable Backup Bidder fails to reasonably promptly consummate the applicable Sale consistent with the Backup Bid because of a breach or failure to perform on the part of the Backup Bidder as set forth in the applicable APA, or (c) returned to the Backup Bidder within three business days after the Backup Bid Termination Date if the Backup Bidder does not become the Winning Bidder.

## Stalking Horse Rights

To provide an incentive and to compensate Blackhawk for performing the substantial due diligence and incurring the expenses necessary and entering into a stalking horse asset purchase agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay Blackhawk, under the conditions and in the

amount set forth in the Blackhawk Term Sheet and Bidding Procedures Order, a break-up fee in the amount of $19,000,000 (the "Break-Up Fee") and to reimburse Blackhawk for fees, costs and expenses associated with the Blackhawk Bid (including the fees, costs and expenses of its attorneys, accountants, consultants and other advisors) in an amount up to $5,000,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Blackhawk Bid Protections"). The Bid Protections shall be paid in accordance with the Blackhawk Term Sheet and the Bidding Procedures Order.

Blackhawk shall have standing to appear and be heard on all issues related to the Auctions, the Blackhawk Sale and related matters, including the right to object to the sale of the Blackhawk Assets or any portion thereof (including the conduct of the Auctions and interpretation of these Bidding Procedures).

## Reservation of Rights

Solely in connection with the exercise of the Debtors' fiduciary obligations, the Debtors reserve their rights to modify, with the reasonable consent of the DIP Agent (on behalf of the Required DIP Lenders), the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation, extending the deadlines set forth in the Bidding Procedures, modifying bidding increments, adjourning or canceling the Auctions at the Auctions and/or adjourning the Sale Hearing and/or the hearing on confirmation of any proposed chapter 11 plan, as applicable, in open court without further notice, withdrawing from the Auctions any or all of the Assets at any time prior to or during the Auctions, or canceling the Sale process or Auctions, and rejecting all Qualified Bids if, in the Debtors' business judgment no such bid is for a fair and adequate price.

## Fiduciary Out

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

*[Remainder of Page Intentionally Left Blank]*

14

Dated: _____ __, 2015          /s/ _____
Richmond, Virginia               Michael A. Condyles (VA 27807)
                                 Peter J. Barrett (VA 46179)
                                 Jeremy S. Williams (VA 77469)
                                 **KUTAK ROCK LLP**
                                 Bank of America Center
                                 1111 East Main Street, Suite 800
                                 Richmond, Virginia 23219-3500
                                 Telephone:    (804) 644-1700
                                 Facsimile:    (804) 783-6192

                                 - and -

                                 Stephen E. Hessler (admitted *pro hac vice*)
                                 Patrick Evans (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 446-4800
                                 Facsimile:    (212) 446-4900

                                 - and -

                                 James H.M. Sprayregen, P.C.
                                 Ross M. Kwasteniet (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 300 North LaSalle
                                 Chicago, Illinois 60654
                                 Telephone:    (312) 862-2000
                                 Facsimile:    (312) 862-2200


                                 *Proposed Counsel for the*
                                 *Debtors and Debtors in Possession*

KE 36272215

## <u>EXHIBIT 2</u>

**Proposed Notice of Order Establishing Bidding
Procedures and the Auction Schedule**

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.*, | )  Case No. 15-32450 (KLP) |
| Debtors. | ) )  (Jointly Administered) |

**NOTICE OF IMPLEMENTATION OF AN ORDER (I) APPROVING
THE BIDDING PROCEDURES, (II) SCHEDULING BID DEADLINES AND
THE AUCTION, (III) APPROVING THE FORM AND MANNER OF
NOTICE THEREOF, AND (IV) GRANTING RELATED RELIEF**

　　　　**PLEASE TAKE NOTICE THAT** on [_____], 2015, Patriot Coal Corporation and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. ___] (the "Motion").

KE 36272817

PLEASE TAKE FURTHER NOTICE THAT on [____], 2015, the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered an order (the "Bidding Procedures Order") approving, among other things, the bidding procedures (the "Bidding Procedures") contemplated by the Motion.  The Bidding Procedures create an overbid auction process whereby third parties can submit higher or better proposals than the Plan Transaction.[1]

PLEASE TAKE FURTHER NOTICE THAT the Bidding Procedures contemplate that the Debtors, in the exercise of their business judgment will proceed with an auction (the "Auctions") pursuant to the Bidding Procedures in the event that the Debtors receive one or more Qualified Bids.

PLEASE TAKE FURTHER NOTICE THAT pursuant to the Bidding Procedures, any party wishing to participate in the Auction must do so in accordance with the Bidding Procedures, including the submission of a Bid such that it is **actually received no later than August 7, 2015, at 5:00 p.m., prevailing Eastern Time**, by the Recipient Parties identified in the Bidding Procedures (the "Bid Deadline").

PLEASE TAKE FURTHER NOTICE THAT if the Debtors receive competing Qualified Bids within the requirements and timeframe specified by the Bidding Procedures, the Debtors will conduct the Auctions on **August 13, 2015, at 10:00 a.m., prevailing Eastern Time**, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at any such other location as the Debtors may hereafter designate (with notice of such of alternate location given to all Qualified Bidders under the Bidding Procedures).

PLEASE TAKE FURTHER NOTICE THAT the Motion, the Bidding Procedures Order, the Bidding Procedures, and further information regarding the chapter 11 cases may be obtained free of charge by visiting the website of the Debtors' notice, claims, and balloting agent, Prime Clerk LLC ("Prime Clerk"), at http://cases.primeclerk.com/PatriotCoal or by calling (844) 864-0639 (for domestic or Canadian callers).  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.vaeb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Bidding Procedures Order, to the extent that the Debtors determine, pursuant to the Bidding Procedures, there are Qualified Bids and that the Auctions are appropriate, the Debtors will, by first class mail, overnight delivery, facsimile, or electronic mail, as the case may be and in the Debtors' sole discretion, serve upon the Contract Parties the sections of all Qualified Bids related to the proposed assumption and assignment the Contracts and Leases on or before the Bid Deadline (the "Qualified Bid Notice").  If the Debtors do not receive any Qualified Bids or otherwise proceed with the Auctions, the Contract Parties will not receive the Qualified Bid Notice.

---

[1]   Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion. This notice is qualified in its entirety by reference to the Bidding Procedures.

KE 36272817

Dated: _____ __, 2015          /s/ _____
Richmond, Virginia               Michael A. Condyles (VA 27807)
                                 Peter J. Barrett (VA 46179)
                                 Jeremy S. Williams (VA 77469)
                                 **KUTAK ROCK LLP**
                                 Bank of America Center
                                 1111 East Main Street, Suite 800
                                 Richmond, Virginia 23219-3500
                                 Telephone:    (804) 644-1700
                                 Facsimile:    (804) 783-6192

                                 - and -

                                 Stephen E. Hessler (admitted *pro hac vice*)
                                 Patrick Evans (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 446-4800
                                 Facsimile:    (212) 446-4900

                                 - and -

                                 James H.M. Sprayregen, P.C.
                                 Ross M. Kwasteniet (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 300 North LaSalle
                                 Chicago, Illinois 60654
                                 Telephone:    (312) 862-2000
                                 Facsimile:    (312) 862-2200


                                 *Proposed Counsel for the*
                                 *Debtors and Debtors in Possession*

4

KE 36272817

# **EXHIBIT 3**

**Sale Notice**

Stephen E. Hessler (admitted *pro hac vice*)  
Patrick Evans (admitted *pro hac vice*)  
KIRKLAND & ELLIS LLP  
601 Lexington Avenue  
New York, New York 10022  
Telephone:      (212) 446-4800  
Facsimile:      (212) 446-4900  

\- and -

James H.M. Sprayregen, P.C.  
Ross M. Kwasteniet (admitted *pro hac vice*)  
KIRKLAND & ELLIS LLP  
300 North LaSalle  
Chicago, Illinois 60654  
Telephone:      (312) 862-2000  
Facsimile:      (312) 862-2200  

*Proposed Counsel for the Debtors and  
Debtors in Possession*

Michael A. Condyles (VA 27807)  
Peter J. Barrett (VA 46179)  
Jeremy S. Williams (VA 77469)  
KUTAK ROCK LLP  
Bank of America Center  
1111 East Main Street, Suite 800  
Richmond, Virginia 23219-3500  
Telephone:      (804) 644-1700  
Facsimile:      (804) 783-6192  

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | ) Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [_____], 2015, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. __] (the "Motion") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving:  (a) the sale of certain of the Debtors' assets (the "Assets") to [_____] (each, a "Winning Bidder") free and clear of liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the sale proceeds, except as set forth in the

Winning Bidder APA and subject to higher or otherwise better offers (each a "Sale"); and (b) procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts").  Please note that all capitalized terms used but not defined herein shall have the meanings set forth in the Motion.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of the Assets and assumption of the Assumed Obligations (as defined in the Winning Bidder APAs) of the Debtors consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by entry of an order on [____], 2015 [Docket No. ____] (the "Bidding Procedures Order").  **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order.**  To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction (the "Auctions") of the Assets on **August 13, 2015, at 10:00 a.m., prevailing Eastern Time,** at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022-4611 (or at any other location as the Debtors may hereafter designate on proper notice).

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sale at a hearing scheduled to commence on **[_____], 2015, at 10:00 a.m., prevailing Eastern Time** (the "Sale Hearing") before the Honorable Keith L. Phillips, United States Bankruptcy Judge for the Bankruptcy Court for the Eastern District of Virginia, at 701 East Broad Street, Courtroom 5100, Richmond, Virginia 23219.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to any objections to proposed cure amounts or the assumption and assignment of Contracts, objections to the relief requested in the Sale Motion **must**:  (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be **actually received** by **4:00 p.m., prevailing Eastern Time, seven days from the date that the Contract Notice is served** by the following parties (the "Notice Parties"):

3

| Proposed Counsel to the Debtors | Counsel to the Committee |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:  Stephen E. Hessler, Esq. and Patrick Evans, Esq.<br><br>– and –<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.:  Ross M. Kwasteniet, Esq.<br><br>– and –<br><br>Kutak Rock LLP<br>Bank of America Center<br>1111 East Main Street, 8th Floor<br>Richmond, Virginia 23219<br>Attn:  Michael A. Condyles, Esq | Morrison & Foerster, LLP<br>250 West 55th Street<br>New York, New York 10019-9601<br>Attn:  Lorenzo Marinuzzi, Esq., Jennifer L. Marines, Esq., Jordan Wishnew, Esq., and John T. Weber, Esq.<br><br>– and –<br><br>Tavenner & Beran PLC<br>20 North Eighth Street, Seconf Floor<br>Richmond, Virginia 23219<br>Attn:  Lynn L. Tavenner, Esq. and Paula S. Beran, Esq. |
| **Counsel to the Winning Bidders** | **The United States Trustee** |
| [_____] | Office of the United States Trustee<br>for the Eastern District of Virginia<br>701 East Broad Street<br>Suite 4304<br>Richmond, Virginia 23216<br>Attn.: Judy A. Robbins |

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE APA.**

## NO SUCCESSOR OR TRANSFEREE LIABILITY

The Winning Bidder APAs and proposed Sale Order provide that a Winning Bidder will have no responsibility for, and the Assets will be sold free and clear of, any successor liability, including the following:  (a) any liability or other obligation of the Debtors' estates or related to the Assets other than as expressly set forth in the applicable APA; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates.  Except as expressly provided in the Sale Order or the applicable APA, the Winning Bidders shall have no liability whatsoever with respect to the Debtors' estates' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' estates' (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liabilities of any kind or character, including,

4

but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, or substantial continuity, whether known or unknown as of the Closing Date (as defined in the applicable APA), now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the closing of the Sale, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the closing of the Sale.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, including the Winning Bidders APA and the proposed Sale Order, may be obtained free of charge by visiting the website of the Debtors' notice, claims, and balloting agent, Prime Clerk LLC ("Prime Clerk"), at http://cases.primeclerk.com/PatriotCoal or by calling (844) 864-0639 (for domestic or Canadian callers).  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.vaeb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that you may obtain additional information concerning the above-captioned chapter 11 cases at the website maintained in these chapter 11 cases at http://cases.primeclerk.com/PatriotCoal.

*[Remainder of Page Intentionally Left Blank]*

5

Dated: _____ __, 2015           /s/ _____
Richmond, Virginia              Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:    (804) 644-1700
Facsimile:     (804) 783-6192

- and -

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel for the
Debtors and Debtors in Possession*

## **EXHIBIT 4**

**Contract Notice**

KE 36274581

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.*, | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF CERTAIN
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that on [_____], 2015, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. __] (the "Motion") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving: (a) the sale of certain of the Debtors' assets (the "Assets") to [_____] (each, a "Winning Bidder") free and clear of liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests

attaching with the same validity and priority to the proceeds of such sales, except as set forth in the Winning Bidder APA (each, a "Sale"); and (b) procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts").  Please note that all capitalized terms used but not defined herein shall have the meanings set forth in the Motion and Bidding Procedures, as applicable.

   **PLEASE TAKE FURTHER NOTICE** that on [____], 2015, the Court entered an order [Docket No. ___] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the bidding procedures (the "Bidding Procedures") for the Sales of the Assets; and (b) procedures for the assumption and assignment of the Contracts (the "Assumption Procedures").

   **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Sales at a hearing scheduled to commence on **[_____], 2015, at 10:00 a.m., prevailing Eastern Time** (the "Sale Hearing") before the Honorable Keith L. Phillips, United States Bankruptcy Judge for the Bankruptcy Court for the Eastern District of Virginia, at 701 East Broad Street, Courtroom 5100, Richmond, Virginia 23219.

   **PLEASE TAKE FURTHER NOTICE** that upon the closing of the Sale, the Debtors intend to assume and assign to a Winning Bidder arising from the Auctions, the Contracts and any modifications thereto (collectively, the "Assigned Contracts") set forth on **Exhibit A** attached hereto, subject to (a) a Winning Bidder's right to designate additional Contracts as Assigned Contracts or remove certain Contracts from the list of Assigned Contracts or (b) any similar right of any other Winning Bidder arising from the Auctions.  In addition, the cure amounts, if any, necessary for the assumption and assignment of the Assigned Contracts (the "Cure Amounts") are set forth on **Exhibit A** attached hereto.

   **PLEASE TAKE FURTHER NOTICE** that the Debtors have evaluated the financial wherewithal of the Winning Bidders (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Contracts) and believe that the Winning Bidders' financial health, agreement to pay cure amounts related to the Assigned Contracts, and commitment to pay obligations as they come due satisfies the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

   **PLEASE TAKE FURTHER NOTICE** that, after the Bid Deadline has occurred, the Debtors will separately identify the Contracts designated for assumption and assignment by each Qualified Bidder and furnish adequate assurance information demonstrating the ability of each Qualified Bidder to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including, without limitation, each Qualified Bidder's financial wherewithal and willingness to perform under the Assigned Contracts.

   **PARTIES LISTED ON EXHIBIT A ATTACHED HERETO ARE RECEIVING THIS NOTICE BECAUSE THE WINNING BIDDER HAS IDENTIFIED THEM AS A COUNTERPARTY TO AN ASSIGNED CONTRACT**.  Under the terms of the Assumption Procedures, a Winning Bidder may modify the list of Assigned Contracts in accordance with the Winning Bidder APA.  Any counterparty added to the list of Assigned Contracts by such a modification will receive notice thereof (the "Assumption Notice") and will have an opportunity

3

to object to the proposed cure amount or assumption and assignment of the Assigned Contract, if applicable.

### Obtaining Additional Information

Additional copies of the Bidding Procedures Order, the Bidding Procedures, and any other related documents may be obtained free of charge by visiting the website of the Debtors' notice, claims, and balloting agent, Prime Clerk LLC ("Prime Clerk"), at http://cases.primeclerk.com/PatriotCoal or by calling (844) 864-0639 (for domestic or Canadian callers).  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.vaeb.uscourts.gov in accordance with the procedures and fees set forth therein.

### Filing Assumption and Assignment Objections

Pursuant to the Assumption Procedures, objections to the proposed assumption and assignment of an Assigned Contract, including any objection relating to the Cure Amount and/or adequate assurance of future performance (collectively, a "Contract Objection"), must:  (a) be in writing;  (b) state with specificity the nature of such objection and alleged Cure Amount, including applicable and appropriate documentation in support of such alleged Cure Amount; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of Virginia; (d) for Contract Objections to any Cure Amount set forth on **Exhibit A** attached hereto or to the assumption and assignment of an Assigned Contract to the Winning Bidder, be filed with the Court and served so as to be **actually received** by seven days from service of this notice; and (e) for Contract Objections to the adequate assurance of future performance by the Winning Bidders, be filed with the Court and served so as to be **actually received** at or prior to the Sale Hearing, which is scheduled for **[_____], 2015, at 10:00 a.m., prevailing Eastern Time**.

Any timely filed Contract Objections made prior to the Sale Hearing will be considered at the Sale Hearing, or another date agreed to by the parties, and must be served on the following parties:

KE 36274581

| Proposed Counsel to the Debtors | Counsel to the Committee |
|---|---|
| Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Stephen E. Hessler, Esq. and Patrick Evans, Esq.<br><br>– and –<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.: Ross M. Kwasteniet, Esq.<br><br>– and –<br><br>Kutak Rock LLP<br>Bank of America Center<br>1111 East Main Street, 8th Floor<br>Richmond, Virginia 23219<br>Attn: Michael A. Condyles, Esq | Morrison & Foerster, LLP<br>250 West 55th Street<br>New York, New York 10019-9601<br>Attn: Lorenzo Marinuzzi, Esq., Jennifer L. Marines, Esq., Jordan Wishnew, Esq., and John T. Weber, Esq.<br><br>– and –<br><br>Tavenner & Beran PLC<br>20 North Eighth Street, Seconf Floor<br>Richmond, Virginia 23219<br>Attn: Lynn L. Tavenner, Esq. and Paula S. Beran, Esq. |
| **Counsel to the Winning Bidders** | **The United States Trustee** |
| [_____] | Office of the United States Trustee<br>for the Eastern District of Virginia<br>701 East Broad Street<br>Suite 4304<br>Richmond, Virginia 23216<br>Attn.: Judy A. Robbins |

If any timely filed Contract Objection cannot be resolved by a Winning Bidder and the objecting party, the Court shall resolve such Contract Objection prior to assumption and assignment of such designated Contract, and upon entry of an order by the Court resolving such Contract Objection, the assignment, if approved by the Court, shall be deemed effective as of the date such objecting party receives the Assumption Notice. To the extent that any Contract Objection cannot be resolved by the parties, such Contract shall be assumed and assigned only upon satisfactory resolution of the Contract Objection, to be determined in the reasonable discretion of a Winning Bidder and until such time as the Contract Objection can be resolved, the Contract shall be conditionally assumed and assigned pending a resolution of the Contract Objection after notice and a hearing.

5

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY COUNTERPARTY TO AN ASSIGNED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED HERETO IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER AND THE ASSUMPTION PROCEDURES SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A ATTACHED HERETO, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE ASSIGNED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.**

*[Remainder of Page Intentionally Left Blank]*

KE 36274581

Dated: _____ __, 2015          /s/
Richmond, Virginia          _____

                             Michael A. Condyles (VA 27807)
                             Peter J. Barrett (VA 46179)
                             Jeremy S. Williams (VA 77469)
                             **KUTAK ROCK LLP**
                             Bank of America Center
                             1111 East Main Street, Suite 800
                             Richmond, Virginia 23219-3500
                             Telephone:    (804) 644-1700
                             Facsimile:    (804) 783-6192

                             - and -

                             Stephen E. Hessler (admitted *pro hac vice*)
                             Patrick Evans (admitted *pro hac vice*)
                             **KIRKLAND & ELLIS LLP**
                             601 Lexington Avenue
                             New York, New York 10022
                             Telephone:    (212) 446-4800
                             Facsimile:    (212) 446-4900

                             - and -

                             James H.M. Sprayregen, P.C.
                             Ross M. Kwasteniet (admitted *pro hac vice*)
                             **KIRKLAND & ELLIS LLP**
                             300 North LaSalle
                             Chicago, Illinois 60654
                             Telephone:    (312) 862-2000
                             Facsimile:    (312) 862-2200

                             *Proposed Counsel for the*
                             *Debtors and Debtors in Possession*

KE 36274581

## Exhibit A

## Assigned Contracts

**Assigned Contracts**[1]

| Debtor | Counterparty | Description of Assigned Contracts or Leases | Cure Amount |
|--------|-------------|---------------------------------------------|-------------|
|        |             |                                             |             |
|        |             |                                             |             |
|        |             |                                             |             |
|        |             |                                             |             |
|        |             |                                             |             |
|        |             |                                             |             |
|        |             |                                             |             |

---

[1]    The presence of a contract or lease on this **Exhibit A** does not constitute an admission by the Debtors that such contract is an executory contract or such lease is an unexpired lease pursuant to section 365 of the Bankruptcy Code or any other applicable law, and the Debtors reserve all rights to withdraw any proposed assumption and assignment or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

1

## <u>EXHIBIT 5</u>

**Assumption Notice**

KE 36274898

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Counsel for the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | ) Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF PROPOSED ASSIGNMENT OF
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that on [_____], 2015, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* [Docket No. __] (the "Motion") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") seeking, among other things, entry of an order (the "Sale Order") authorizing and approving:  (a) the sale of certain of the Debtors' assets (the "Assets") free and clear of liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to

the proceeds of such sale, to [_____] (each, a "<u>Winning Bidder</u>"), except as set forth in the Winning Bidder APA (each, a "<u>Sale</u>"); and (b) procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "<u>Contracts</u>").  Please note that all capitalized terms used but not defined herein shall have the meanings set forth in the Motion and Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that on [_____], 2015, the Court entered an order [Docket No. ___] (the "<u>Bidding Procedures Order</u>") granting certain of the relief sought in the Motion, including, among other things, approving:  (a) the bidding procedures (the "<u>Bidding Procedures</u>") for the Sales of the Assets; and (b) procedures for the assumption and assignment of the Contracts (the "<u>Assumption Procedures</u>").

**PLEASE TAKE FURTHER NOTICE** that, accordingly, pursuant to the Assumption Procedures and by this written notice, the Debtors hereby notify you that they have determined, in the exercise of their business judgment, that the Contracts and any modifications thereto set forth on **<u>Exhibit A</u>** attached hereto (collectively, the "<u>Assigned Contracts</u>") shall be assumed and assigned to a Winning Bidder, subject to the Winning Bidder's payment of the cure amounts set forth on **<u>Exhibit A</u>**, or such other cure amounts that are agreed to by the parties.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order and the Bidding Procedures and any other related documents may be obtained free of charge by visiting the website of the Debtors' notice, claims, and balloting agent, Prime Clerk LLC ("<u>Prime Clerk</u>"), at <u>http://cases.primeclerk.com/PatriotCoal</u> or by calling (844) 864-0639 (for domestic or Canadian callers).  You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at <u>http://www.vaeb.uscourts.gov</u> in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided by the Bidding Procedures Order, the time for filing objections to (a) the cure amounts related to the Assigned Contracts, (b) the Debtors' ability to assume and assign any Assigned Contract, and (c) adequate assurance of future performance by the assumption and assignment to the Winning Bidders has passed and no further notice or action is necessary with respect to such matters.

*[Remainder of Page Intentionally Left Blank]*

Dated: _____ __, 2015                /s/ _____
Richmond, Virginia                     Michael A. Condyles (VA 27807)
                                       Peter J. Barrett (VA 46179)
                                       Jeremy S. Williams (VA 77469)
                                       **KUTAK ROCK LLP**
                                       Bank of America Center
                                       1111 East Main Street, Suite 800
                                       Richmond, Virginia 23219-3500
                                       Telephone:    (804) 644-1700
                                       Facsimile:    (804) 783-6192

                                       - and -

                                       Stephen E. Hessler (admitted *pro hac vice*)
                                       Patrick Evans (admitted *pro hac vice*)
                                       **KIRKLAND & ELLIS LLP**
                                       601 Lexington Avenue
                                       New York, New York 10022
                                       Telephone:    (212) 446-4800
                                       Facsimile:    (212) 446-4900

                                       - and -

                                       James H.M. Sprayregen, P.C.
                                       Ross M. Kwasteniet (admitted *pro hac vice*)
                                       **KIRKLAND & ELLIS LLP**
                                       300 North LaSalle
                                       Chicago, Illinois 60654
                                       Telephone:    (312) 862-2000
                                       Facsimile:    (312) 862-2200

                                       *Proposed Counsel for the*
                                       *Debtors and Debtors in Possession*

# **Exhibit A**

## **Assigned Contracts**

**Assigned Contracts**[1]

| Debtor | Counterparty | Description of Assigned Contracts or Leases | Cure Amount (except as otherwise agreed to by the parties) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

---

[1]   The presence of a contract or lease on this **Exhibit A** does not constitute an admission by the Debtors that such contract is an executory contract or such lease is an unexpired lease pursuant to section 365 of the Bankruptcy Code or any other applicable law, and the Debtors reserve all rights to withdraw any proposed assumption and assignment, or to reject any contract or lease at any time before such contract or lease is assumed and assigned pursuant to an order of the Court.

## **Exhibit B**

**Puntus Declaration**

Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PATRIOT COAL CORPORATION, *et al.*, | ) Case No. 15-32450 (KLP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DECLARATION OF MARC D. PUNTUS IN SUPPORT
## OF THE DEBTORS' MOTION FOR ENTRY OF (I) AN
## ORDER (A) APPROVING BIDDING PROCEDURES AND
## BID PROTECTIONS IN CONNECTION WITH THE SALES OF CERTAIN
## OF THE DEBTORS' ASSETS, (B) APPROVING THE FORM AND MANNER
## OF NOTICE, (C) SCHEDULING AUCTIONS AND A SALE HEARING,
## (D) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT
## OF CONTRACTS, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER
## (A) APPROVING THE SALE OF ASSETS PURSUANT TO THE BIDDING PROCEDURES,
## (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION
## AND ASSIGNMENT OF CONTRACTS, AND (D) GRANTING RELATED RELIEF

Pursuant to 28 U.S.C. § 1746, I, Marc D. Puntus, hereby declare as follows:

1.      I submit this declaration (the "<u>Declaration</u>") in support of the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling Auctions and a Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts, and (E) Granting Related Relief and (II) an Order (A) Approving the Sale of Assets Pursuant to the Bidding Procedures, (B) Authorizing the Sale of Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "<u>Motion</u>"),[1] to which this Declaration is attached as **<u>Exhibit B</u>**.

2.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management team and the Debtors' advisors.  If I were called to testify, I could and would testify competently to the facts set forth herein.

<u>**Professional Qualifications**</u>

3.      I am a Partner and co-head of the Debt Advisory and Restructuring Group of Centerview Partners LLC ("<u>Centerview</u>").  Centerview is a full-service independent investment banking firm providing financial advisory services, including mergers and acquisitions, debt financing and restructuring advice, across a broad range of industries.  Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

---

[1]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

2

4.      Prior to and since joining Centerview in 2011, I have advised companies, creditors, shareholders and other stakeholders in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations.  I am experienced in procuring, structuring, and negotiating merger and acquisition and asset sale transactions.  Prior to joining Centerview, I was a Managing Director of Miller Buckfire & Co., an investment bank and advisory firm that provided financial advisory services to constituents in a broad range of restructuring and corporate finance transactions.  Prior to that, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW"), and prior to joining DrKW, I was a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP.  I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

## Situation Overview

5.      For a number of reasons, including the extremely challenging coal market environment and the Debtors' significant secured financial indebtedness (approximately $900 million including the Debtors' debtor-in-possession financing ("DIP Financing")), the Debtors, in consultation with their advisors, have determined that a transaction or series of transactions whereby the Debtors sell substantially all of their assets is likely to maximize the value of the Debtors' estates for their stakeholders.  To that end, prior to and subsequent to the Petition Date, the Debtors and their advisors engaged in extensive negotiations with Blackhawk regarding a structured transaction that would result in the going concern sale of a substantial majority of the Debtors' operating assets (the "Blackhawk Assets").  The transaction excludes certain assets of the Debtors, including the Debtors' Federal Complex, as well as other mine complexes and idled properties (the "Excluded Assets").  The key components of such

3

transaction, including the elements of consideration to be provided to Patriot's creditors, are set forth in the non-binding Blackhawk Term Sheet.

6.      The Blackhawk Term Sheet is the result of substantial efforts on behalf of the Debtors and their advisors to negotiate and consummate a strategic transaction that will maximize the value of the Debtors' estates.  In late 2014, the Debtors and their advisors began exploring an out-of-court sale or merger transaction with a potential strategic partner.  By early 2015, it became clear that such a transaction would not materialize.  Since that time, the Debtors and their advisors have engaged in discussions or negotiations with two additional entities, one of which is Blackhawk.  Both entities insisted that they would only consummate a transaction through a chapter 11 process and delivered preliminary bids.  After analysis and review, the Debtors and their advisors concluded that the proposed Blackhawk Sale provided the best option for maximizing value for the benefit of the Debtors' stakeholders.  As such, the Debtors and their advisors, joined prior to and after the Petition Date, by an ad hoc group of lenders holding a majority of the Debtors' senior secured term loan facility and second lien PIK notes (the "Ad Hoc Group") and their advisors, have engaged in extensive negotiations with Blackhawk and its advisors, and have agreed upon the terms set forth in the Blackhawk Term Sheet.

7.      I believe that the Blackhawk Sale, which, if consummated, would deliver to the Debtors' secured creditors $643 million of debt securities plus 30% of the pro forma Blackhawk equity, and provide for the assumption of certain other liabilities, including certain surety bonds and related obligations, represents the highest and best transaction presently available for the Blackhawk Assets.  Importantly, the Debtors are committed to achieving the highest or otherwise best bid for the all of their assets and operations, including the Blackhawk Assets, by marketing

such assets and conducting a competitive bidding process, as set forth in the Bidding Procedures and, if necessary, by conducting an auction.

### Sound Business Purpose for the Bidding Procedures

8.     In connection with negotiating the Blackhawk Term Sheet, the Debtors and their advisors worked diligently to develop the Bidding Procedures.  The Bidding Procedures are designed to ensure that a process is put in place that will minimize the risk that Blackhawk terminates negotiations, leaving the Debtors without a stalking horse bidder for a substantial majority of their operating assets, while at the same time attempting to maximize recoveries for creditors and other stakeholders.  With these goals in mind, I believe that the Bidding Procedures set forth an appropriate process to test the value of the Debtors' assets within the expedited timeframe required by Blackhawk.  The fairness and reasonableness of the consideration to be paid by the Winning Bidders ultimately will be demonstrated by "market exposure" and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid.  Moreover, notice of this process will be widely circulated to interested parties.  As such, I believe the Bidding Procedures will (a) help ensure that the Debtors are maximizing creditor recoveries through the chapter 11 cases, while also ensuring the completion of the chapter 11 cases in a timely manner, and (b) provide the Debtors' marketing process with finality.  Importantly, the Bidding Procedures do not impact the Debtors' ability to exercise their fiduciary duties to pursue an alternative restructuring strategy.

9.     The expedited timeframe set forth in the Bidding Procedures is explicitly required by Blackhawk.  Blackhawk has conditioned its proposed purchase of the Blackhawk Assets on the achievement of certain milestones, including a transaction closing date on or before September 23, 2015.  I have been advised by Blackhawk that this condition is driven by Blackhawk's need to begin the negotiation of 2016 coal sales contracts by mid-September.

5

Given the current state of distress in the coal industry and the significant recoveries provided for the Debtors' creditors pursuant to the Blackhawk Sale, the Debtors have acquiesced to the required timeframe.  In my opinion, the Debtors cannot risk losing Blackhawk as a stalking horse bidder in these chapter 11 cases.  Should that happen, the risk of a liquidation and a significant reduction in creditor recoveries in these cases will increase markedly.  The expedited timeframe also has the important benefit of allowing the Debtors to minimize their costly stay in chapter 11, reducing the risk that additional debtor-in-possession financing will be required.

10.     In the light of the foregoing, I believe that the Bidding Procedures increase the likelihood that the contemplated marketing and sale process ultimately produces a Winning Bidder that maximizes recoveries for creditors and other parties in interest, while at the same time minimizes the risk that the Debtors are left without a stalking horse bidder for the substantial majority of their operating assets in the worst coal market environment in decades. Accordingly, I believe that the Debtors' determination to market their assets through the Bidding Procedures and potential Auctions is a valid and sound exercise of the Debtors' business judgment.

**<u>Sound Business Purpose for the Use of a Stalking Horse and Bid Protections</u>**

11.     The Blackhawk Bid and Federal Stalking Horse Bid, if any, will establish a floor for further bidding that may increase the consideration received in exchange for the Assets, for the benefit of the Debtors' estates.  I believe that the Blackhawk Bid Protections are necessary to induce Blackhawk to provide the Blackhawk Bid and that the Federal Bid Protections (if granted) would be necessary to induce a Federal Stalking Horse Bidder to provide a stalking horse bid.  Accordingly, I believe that the Blackhawk Bid Protections and the Federal Bid Protections will maximize the value of the Debtors' estates and are a valid and sound exercise of the Debtors' business judgment.

12.     More specifically, the Blackhawk Bid Protections were, and remain, a critical component of Blackhawk's commitment.  Blackhawk has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Blackhawk Sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.  I believe the parties negotiated the requested Blackhawk Bid Protections in good faith and at arm's length with significant give-and-take.  I also believe that if the Court does not approve the Blackhawk Bid Protections, Blackhawk may elect not to serve as the "stalking horse" to the detriment of the Debtors' estates.

13.     The break-up fee contained in the Blackhawk Bid Protections represents approximately 3.0% of the $643 million of new debt securities that Blackhawk would issue to the Debtors' secured lenders in connection with the transaction.  In my experience, a break-up fee of this amount is in the range of break-up fees that I have seen and negotiated in prior sale transactions, including those conducted in chapter 11.  Moreover, the break-up fee, and the Blackhawk Bid Protections generally, were the subject of extensive, good-faith, and arms'-length negotiations among the Debtors, Blackhawk, and the Ad Hoc Group.  Accordingly, I believe that the Blackhawk Bid Protections are a valid and sound exercise of the Debtors' business judgment and should be approved.

14.     Additionally, to the extent the Debtors select a Federal Stalking Horse Bidder, I also believe that, for the same reasons, the Debtors should be permitted to provide the Federal Bid Protections in accordance with the Bidding Procedures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge and belief.

Respectfully submitted,

Dated:  June 2, 2015

*/s/ Marc D. Puntus*
Marc D. Puntus
Partner of Centerview Partners LLC,
proposed financial advisor and investment
banker to the Debtors

## **Exhibit C**

**Blackhawk Term Sheet**



**3228 Summit Square Place, Suite 180**
**Lexington, KY 40509**
**Office: (859) 543-0515    Fax: (859) 543-0516**

June 2, 2015

Patriot Coal Corporation
Mr. Robert W. Bennett
63 Corporate Center Drive
Scott Depot, WV 25560

Dear Mr. Bennett:

This letter of intent (this "***Letter of Intent***") and the term sheet attached hereto as <u>Exhibit A</u> (the "***Term Sheet***") sets forth the intention of Blackhawk Mining LLC and/or its affiliate ("***Blackhawk***", "***our***" or "***we***") to enter into agreements in which we will acquire certain reserves, equipment and other assets located at its mining complexes (or otherwise used or required in the operation thereof) and additional non-mining assets (the "***Transaction***") currently owned by Patriot Coal Corporation and/or its subsidiaries (collectively, "***Patriot***"). Capitalized terms not defined herein shall have the meaning given to them in the Term Sheet.

1. **Definitive Transaction Agreements**. Subject to our due diligence, we will negotiate in good faith to enter into a definitive purchase and sale agreement (the "***Asset Purchase Agreement***"), together with the other agreements necessary to consummate the transactions described in the Term Sheet with respect to the Transaction and based substantially on the terms set forth in the Term Sheet.

2. **Due Diligence**. Our representatives will require reasonable and complete access to the properties, management and employees of Patriot in order to conduct due diligence. If neither the Transaction nor an alternative transaction for a portion of the mining complexes is consummated, we will ensure that any information obtained in our investigations of Patriot will be returned to Patriot and not disclosed to any third parties. Some of our key assumptions in conducting our diligence is the accuracy of the information provided to us by Patriot and its representatives, and that no equipment or assets are removed from the mining complexes that were present during our diligence unless they are explicitly excluded from the Transaction.

3. **Acquisition Proposals; Go-Shop**. Notwithstanding anything to the contrary contained in this Letter of Intent, we acknowledge and agree that Patriot and its directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives retain the right to: (a) initiate, solicit and encourage any inquiry or the making of any proposals or offers that could constitute the acquisition of any of the Purchased Assets (an "***Acquisition Proposal***"), including by way of providing access to non-public information to any person pursuant to a confidentiality agreement on customary terms, (b) engage or enter into, continue or otherwise participate in any discussions or negotiations with any persons or groups of persons with respect to any Acquisition Proposals or otherwise cooperate with or assist or

participate in, or facilitate any such inquiries, proposals, discussions or negotiations or any effort or attempt to make any Acquisition Proposals with any persons solely to the extent necessary to permit such person to make or amend an Acquisition Proposal or otherwise engage with Patriot in discussions regarding an Acquisition Proposal or a proposal that could reasonably be expected to lead to an Acquisition Proposal, and (c) take, or refrain from taking, any action pursuant to Paragraph 12 (Fiduciary Out) of the Term Sheet.

4.    **Fees and Expenses**.  Subject to Paragraph 9 of the Term Sheet, we agree to pay (and hold Patriot harmless from) all of our expenses incurred in connection with the Transaction.

5.    **Governing Law**.  This Letter of Intent and the rights and obligations hereunder and all claims and controversies arising out of the subject matter hereof whether sounding in contract law, tort law or otherwise shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code, without regard to conflicts of law provisions that would result in the application of any other law.

6.    **Miscellaneous**.  This Letter of Intent is intended to be a binding and subject only to the conditions set forth herein or by order of the Bankruptcy Court.

Sincerely,

**BLACKHAWK MINING LLC**

By: _____

Name: Nicholas Glancy

Title: President

2

**Confidential Draft**

<u>**Annex A**</u>

**Term Sheet for the Acquisition of Certain Assets of Patriot Coal**

1.    <u>Assets</u>.  Blackhawk Mining LLC or an affiliate ("***Blackhawk***") will acquire from Patriot Coal Corporation and/or its subsidiaries (collectively, "***Patriot***" or the "***Debtors***" and, together with Blackhawk, collectively, the "***Parties***") all of the reserves (active and inactive), equipment and other assets of Patriot located at the mining complexes (or otherwise used or required in the operation thereof) and reserve areas set forth on <u>Schedule A</u> (collectively, the "***Purchased Mining Complexes***").  In addition, Blackhawk will acquire the non-mining assets of Patriot set forth on <u>Schedule B</u> (the "***Other Assets***" and collectively with the Purchased Mining Complexes, the "***Purchased Assets***").

Blackhawk will not purchase any of the mining complexes, reserve areas or equipment or other assets located thereon set forth on <u>Schedule C</u> (collectively, the "***Excluded Mining Complexes***").  In addition, Blackhawk will not acquire any of the non-mining assets set forth on <u>Schedule D</u> (together with the Excluded Mining Complexes, the "***Excluded Assets***").

The definitive agreements will set forth only the assets and liabilities that Blackhawk is acquiring and assuming.  Everything else shall remain with Patriot.

Blackhawk may, from time to time in its discretion, amend or revise the schedules to the Asset Purchase Agreement in order to (i) add or remove any lease, equipment, fixed asset or other tangible asset, permit, license or contract, as applicable, to such schedules up to thirty (30) days prior to the closing, solely to the extent that any such lease, equipment, fixed asset or other tangible assets, permit, license or contract is owned, held or used in the conduct of the Purchased Assets or (ii) eliminate any lease, equipment, fixed asset or other tangible asset, permit, license or contract, as applicable, from such schedules up to ten (10) days prior to the closing, solely to the extent that any such lease, equipment, fixed asset or other tangible assets, permit, license or contract is not owned, held or used in the conduct of the Purchased Assets and was included on schedules.

The parties will cooperate to (i) structure the transactions described herein in a tax efficient manner, (ii) reduce, to the extent practicable, the aggregate indebtedness of Post-Closing Blackhawk (as defined herein) as of the closing and (iii) facilitate, to the extent practicable, the disposition and/or resolution of assets and liabilities not being transferred to Post-Closing Blackhawk pursuant to the transactions contemplated herein.

2.    <u>Liabilities</u>.  Blackhawk will assume the following liabilities and obligations of Patriot (collectively, the "***Assumed Liabilities***"):

(i)    all liabilities with respect to the permits, licenses, and other regulatory obligations that are associated with the Purchased Assets and which are set forth on <u>Schedule E</u> (the "***Assumed Permits***");

(ii) regulatory violations and obligations on or in relation to the Purchased Assets or the Assumed Permits arising post-closing;

(iii) obligations arising post-closing under leases and sub-leases that are Purchased Assets;

(iv) certain obligations set forth in (A) the Modified Consent Decree Ohio Valley Environmental Coalition, Inc. et al, dated Nov. 15, 2012, Civil Action No. 3:11-cv-00115, including the outfall treatment technology requirements therein, and (B) the Consent Decree with the United States et al, dated April 30, 2009, Civil Action No. 2:09-cv-0099, each solely to the extent applicable to the Assumed Permits;

(v) the obligation to replace all associated bonds with respect to the Assumed Permits; and

(vi) with respect to the former Patriot employees to be hired by Blackhawk as discussed herein, all liabilities arising from the employment of such employees by Blackhawk after the closing, including federal Black Lung liabilities arising after Blackhawk becomes a "responsible operator" with respect to such employees under applicable law.

Blackhawk will not assume any of the following liabilities (the "***Excluded Liabilities***"):

(i) reclamation liabilities associated with permits that are not Assumed Permits;

(ii) bonds associated with permits that are not Assumed Permits;

(iii) pre-closing liabilities (other than the Assumed Liabilities);

(iv) cure claims;

(v) any liabilities associated with former Patriot employees who are lawfully rejected for employment by Blackhawk;

(vi) any liabilities associated with employees not hired by Blackhawk;

(vii) any liabilities associated with workers' compensation claims related to pre-closing occurrences;

(viii) any liabilities or obligations associated with any Patriot collective bargaining agreements;

(ix) any liabilities or obligations under or relating to employee benefit plans maintained or sponsored by Patriot;

2

(x)    any liabilities or obligations of Patriot for retiree medical or other retiree welfare benefits, including liabilities under or in relation to the Coal Industry Retiree Health Benefit Act (the "***Coal Act***");

(xi)    any liabilities for or associated with contributions to the UMWA 1974 Pension Plan, including Patriot's withdrawal liabilities under the plan;

(xii)    any tax liabilities of the Debtors for any taxable period and any taxes imposed on or with respect to the Purchased Assets with respect to the pre-closing taxable period (or portions thereof); and

(xiii)    any liabilities not expressly listed as Assumed Liabilities.

3.    Consideration.  Subject to negotiating an acceptable asset purchase agreement (the "***Asset Purchase Agreement***") and other definitive documentation, and satisfaction of the conditions precedent to closing to be set forth therein (including, without limitation, those conditions set forth in paragraph 7 below), Blackhawk would purchase the Purchased Assets and assume the Assumed Liabilities for the following consideration:

(a)    from the proceeds of new first lien credit facilities (comprised of an estimated $646 million senior secured first lien term loan (the "***First Lien Term Loan***"), and a new asset based loan pari passu with the First Lien Term Loan ("***New ABL***") and a new first lien L/C facility (pari passu with the First Lien Term Loan) (the "***First Lien L/C Facility***") based on the terms set forth on Schedule F (the "***First Lien Facilities***"), to be incurred by the combined company at the consummation of the Asset Purchase Agreement (the "***Post Closing Blackhawk'***"), which shall be allocated as follows:

(i)    replacement in full of existing Blackhawk funded debt of up to $300 million with First Lien Term Loans (the "***Blackhawk Funded Debt***");

(ii)    replacement of up to $109 million of indebtedness under Patriot's existing DIP Facility with First Lien Term Loans; and

(iii)    replacement of approximately $237 million of (a) drawn letters of credit issued under Patriot's existing ABL and TLB facility (the "***Existing Drawn L/Cs***") with First Lien Term Loans and (b) undrawn letters of credit issued under Patriot's existing ABL and TLB facility (the "***Existing Undrawn L/Cs***", and together with the Existing Drawn L/Cs, the "***Existing L/Cs***") with new letters of credit issued under the First Lien L/C Facility.

(b)    the Post Closing Blackhawk issuing to the holders of (i) the existing Patriot senior secured term loan (up to $247 million) and (ii) the existing Patriot second lien PIK note (up to $50 million), up to $297 million of

3

second lien debt based on the terms set forth on Schedule G (the "***Second Lien PIK Loan***"); and

(c)     the Post Closing Blackhawk issuing Class B membership interests as set forth on Schedule H (the "***Class B Units***") to the holders of the Patriot second lien PIK notes (or an entity affiliated with such holders).

The aggregate amount of First Lien Term Loans allocated to the Existing L/Cs and DIP Facility in (a)(ii) and (a)(iii) above shall not exceed $346 million. To the extent the existing Blackhawk debt exceeds $300 million, the amount of the First Lien Term Loans shall be increased on a dollar for dollar basis (up to a cap on such increase of $20 million). To the extent the permanent aggregate total face amount of Existing L/Cs and DIP Facility is less than $346 million (such improvement, the "***DIP/LC Improvement***"), the following adjustments shall be made:

(a)     With respect to a DIP/LC Improvement of $20 million or less, an amount equal to the DIP/LC Improvement of First Lien Term Loans may be issued at Blackhawk's election to fund working capital for Post-Closing Blackhawk or to reduce the amount of First Lien Term Loans;

(b)     With respect to a DIP/LC Improvement of $39 million or less, $20 million of the DIP/LC Improvement shall be treated pursuant to clause (a) above and the amount of cash to be raised in the Patriot First Lien Rights Offering, as defined below, shall be reduced on a dollar for dollar basis in an amount equal to the remainder of the DIP/LC Improvement; and

(c)     With respect to a DIP/LC Improvement of greater than $39 million, $20 million of the DIP/LC Improvement shall be treated pursuant to clause (a) above, another $19 million of the DIP/LC Improvement shall be treated pursuant to clause (b) above and the amount of cash to be raised in the Patriot Second Lien Rights Offering, as defined below, shall be reduced on a dollar for dollar basis in an amount equal to the remainder of the DIP/LC Improvement. To the extent the DIP/LC Improvement exceeds $70 million, the remaining amount shall reduce the total amount of First Lien Term Loans issued.

To the extent of any reduction in the amount of cash raised in the Patriot First Lien Rights Offering and Patriot Second Lien Rights Offering in accordance with (b) and (c) above, a like amount of First Lien Term Loans shall be backstopped by certain funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, and Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.) for cash at a price of $0.85 (the "***Purchase***") if Blackhawk is unable to issue First Lien Term Loans in the market in order to provide cash on the balance sheet to satisfy the condition to closing.

4

4.      Rights Offering.  The Patriot Chapter 11 reorganization plan (the "***Plan***") shall include a rights offering (the "***Rights Offering***") in order to raise cash on the balance sheet for the Post Closing Blackhawk in the following amounts (i) up to $19 million from the holders of the Patriot senior secured term loan (the "***Patriot First Lien Rights Offering***") and (ii) up to $31 million from the holders of the Patriot second lien PIK notes (the "***Patriot Second Lien Rights Offering***").  Any participation in the Patriot First Lien Rights Offering and Patriot Second Lien Rights Offering shall be pro rata for each owner of Patriot senior secured term loan or Patriot second lien PIK notes, as applicable, based on such owner's face amount ownership of Patriot senior secured term loan or Patriot second lien PIK notes, as applicable, relative to the total face amount of Patriot senior secured term loan or Patriot second lien PIK notes, as applicable (such owner's "***Pro Rata Percentage***").  The Rights Offering shall be backstopped by certain funds and/or accounts managed or advised by Knighthead Capital Management, LLC, Caspian Capital LP on behalf of its advisees, Davidson Kempner Capital Management LP, on behalf of funds and accounts managed by it (including Midtown Acquisitions L.P.), and Hudson Bay Absolute Return Credit Opportunities Master Fund Ltd.  Fees, if any, for the back-stop shall not be an obligation of Post-Closing Blackhawk.

Each participant in the Patriot First Lien Rights Offering that subscribes for its full pro rata share will receive 100% of its allocable portion of the senior secured term loan in the form of Second Lien PIK Loans.  Each non-participant shall receive 60% of its allocable portion of the senior secured term loan in the form of Second Lien PIK Loans.  By way of example and for the avoidance of doubt, (i) a participant in the Patriot First Lien Rights Offering that holds $10 million of the Patriot senior secured term loan that subscribes for its full pro rata share shall receive $10 million of Second Lien PIK Loans, and (ii) a participant in the Patriot First Lien Rights Offering that holds $10 million of the Patriot senior secured term loan that does not subscribe for its full pro rata share shall receive $6 million of Second Lien PIK Loans.

Each participant in the Patriot Second Lien Rights Offering that subscribes for its full pro rata share will receive (a) its allocable portion of the Patriot second lien PIK notes in the form of Second Lien PIK Loans and (b) Class B Units of the Post-Closing Blackhawk representing a percentage amount of the aggregate equity of the Post-Closing Blackhawk determined as follows: 30% multiplied by such participant's Pro Rata Percentage of Patriot second lien PIK notes. Each non-participant will receive its allocable portion of the Patriot second lien PIK notes in the form of Second Lien PIK Loans and a number of Class B Units equal to 20% of each of the Second Lien PIK Loans and Class B Units the non-participant would have received had it participated in the Patriot Second Lien Rights Offering. By way of example and for the avoidance of doubt, (i) a participant in the Patriot Second Lien Rights Offering that holds 10% of the Patriot second lien PIK notes that subscribes for its full pro rata share shall receive 10% of the Second Lien PIK Loans and Class B Units allocated to holders of Patriot second lien PIK notes, and (ii) a holder of 10% of the Patriot second

5

lien PIK notes that does not subscribe for its full pro rata share shall receive 20% of the Second Lien PIK Loans and Class B Units it would have received had it subscribed for its full pro rata share of the Rights Offering.

In each Rights Offering, parties that participate in the Backstop shall acquire the forgone amounts (but no greater than such amounts) of debt and equity had the non-participants participated in the applicable Rights Offering for the consideration paid by participants.

5.   Transition Services.  On the closing date, the Parties will enter into a Transition Services Agreement pursuant to which Blackhawk will provide to Patriot's residuary estate, on terms to be mutually agreed upon, certain operational, general and administrative services for a period of six (6) months following the closing and at no cost to Patriot, extendible for up to two successive three (3) month periods thereafter at Patriot's election, but with reasonable costs for such services during such extension periods to be agreed upon and set forth in the Transition Services Agreement. Access to records and employees must be reasonable and not materially interfere with Blackhawk's day-to-day operations.

6.   Interim Operating Covenant.  The Asset Purchase Agreement will include a customary interim operating covenant requiring Patriot to operate the Purchased Assets in the ordinary course of business consistent with past practice through the closing (which shall include a detailed list of restrictions subject to certain exceptions to be scheduled).

7.   Conditions.  Each of the parties shall use their commercially reasonable efforts to satisfy the conditions to closing.  Key conditions include (but are not limited to) the following:

(i)    the Bankruptcy Court shall have entered (a) an order approving a Disclosure Statement, in form and substance reasonably acceptable to Blackhawk, by July 21, 2015 and (b) an order (the "*Confirmation Order*"), by no later than September 11, 2015, which date Blackhawk may waive or extend in its sole discretion, (i) confirming the Plan, (ii) approving the sale of the Purchased Assets to Blackhawk free and clear of all liens, claims and encumbrances pursuant to *inter alia,* sections 105, 365, 1123(b)(4), 1129(b)(2)(A) and 1146(a) of the Bankruptcy Code, in each case to the extent set forth in the Asset Purchase Agreement, (iii) approving the assumption/assignment to Blackhawk of the assigned contracts pursuant to section 365 of the Bankruptcy Code, (iv) containing findings of fact and conclusions of law that Blackhawk is a good faith purchaser entitled to and granted the protections of Bankruptcy Code section 363(m), (v) containing findings of fact and conclusions of law that Blackhawk and the Post Closing Blackhawk are not successors to, or

6

subject to successor liability for, Patriot, and (vi) containing such other terms which are otherwise reasonably acceptable to Blackhawk[1];

(ii)    the Confirmation Order shall have become a final order which shall have remained in full force and effect and shall not have been stayed, vacated, reversed, modified or supplemented without Blackhawk's prior written consent given in its sole discretion;

(iii)    the Confirmation Order will explicitly provide that there are no successorship obligations for the Post Closing Blackhawk (a) under any collective bargaining agreements, (b) the Coal Act or (c) in relation to the 1974 Plan withdrawal liability;

(iv)    all Purchased Assets acquired by Blackhawk shall be free and clear of liens, claims, encumbrances and other interests, other than the Assumed Liabilities, and permitted encumbrances to be agreed;

(v)    the refinancing or roll over of the Blackhawk Funded Debt (into First Lien Term Loan), (b) the refinancing or roll over of the DIP Facility and the Existing L/Cs (into First Lien Term Loan and/or First Lien L/C Facility); and (c) the final terms of the Second Lien PIK Loans, in each case, to be substantially similar to the terms described herein and in the Schedules attached hereto;

(vi)    terms of the Class B Units in the Post-Closing Blackhawk to be consistent with the existing Operating Agreement of Blackhawk as set forth on Schedule H;

(vii)    Post-Closing Blackhawk having received at least $50 million of cash from the proceeds of the Rights Offerings (reduced if applicable to give account to the reduction in the amount of the Rights Offerings and the Purchase) and Blackhawk providing at least $30 million of cash, net of any draws on the Blackhawk New ABL; *provided, however* that any reduction in the previous amounts shall be reduced pro rata;

(viii)    the backstop agreements referenced herein shall be entered into at the time of the Asset Purchase Agreement; and

(ix)    with respect to each of Patriot's existing CBAs that cover employees at the Purchased Mining Complexes (a) the Bankruptcy Court shall have entered one or more orders permitting the Debtors to reject all CBAs and other retiree benefit plans pursuant to sections 1113 and 1114 of the Bankruptcy Code, and such order(s) shall be in full force and effect, shall have become final orders and shall not have been stayed, vacated, reversed, modified or

---

[1]    NTD: The definitive Asset Purchase Agreement shall include a schedule of certain required provisions of the Confirmation Order.

supplemented without Blackhawk's prior written consent or (b) Blackhawk shall have entered into new CBAs on terms and conditions acceptable to Blackhawk in its sole discretion and that have been ratified by the UMWA, which new CBAs will be assumed by the Post Closing Blackhawk.

8.   Representations and Warranties.  The Asset Purchase Agreement shall contain customary representations and warranties for a transaction of this nature, including, without limitation, due authorization, no conflict, government consents, owned and leased property, licenses and permits, environmental matters, title to assets and equipment, regulatory matters, taxes and FCPA matters.  Representations and warranties will be subject to certain materiality and knowledge (assuming reasonable inquiry) qualifications.

9.   Purchase Protections.  Subject to approval by the Bankruptcy Court in the order approving the Debtors' proposed bidding procedures (such procedures, the "**Bidding Procedures**"), and provided that Blackhawk has not materially breached the Asset Purchase Agreement (unless such breach is cured, if capable of cure), Blackhawk shall be entitled to the following protections (the "**Bid Protections**"):

(i)   Blackhawk Breakup Fee: In the event that either (a) Blackhawk terminates the Asset Purchase Agreement due to a material, uncured (if capable of cure) breach by Patriot that would cause the failure of any condition to closing; (b) the Asset Purchase Agreement has not already been terminated and Patriot (i) terminates the Asset Purchase Agreement and consummates a transaction for all or a material portion of the Purchased Assets that is a higher or otherwise better proposal as the Winning Bid (as defined in the Bidding Procedures); (ii) files a motion or motions to sell all or any material portion (in one or a series of transactions) of the Purchased Assets to a party other than Blackhawk pursuant to an order of the Bankruptcy Court; or (iii) files with the Bankruptcy Court a proposed Chapter 11 plan that proposes the disposition of all or any material portion of the Purchased Assets to a party other than Blackhawk (any of the foregoing, an "**Alternate Transaction Trigger**"); or (c) Blackhawk terminates the Asset Purchase Agreement due to a failure of the closing to occur prior to September 25, 2015 other than if such closing failed to occur primarily as a result of the failure of Blackhawk's existing secured creditors (other than holders of Patriot debt or their affiliate transferees that also hold Blackhawk debt) to agree to exchange their debt obligations for the debt in Post-Closing Blackhawk contemplated by the Asset Purchase Agreement and Blackhawk is unable to raise new money financing elsewhere to satisfy its obligations thereunder) and thereafter Patriot consummates a superior transaction (the definition and parameters of which are to be discussed and agreed to by the Parties) on or prior to December 1, 2015, then in any such case the

8

Debtors shall pay Blackhawk a fee in cash (the "**Blackhawk Breakup Fee**") equal to $19,000,000.

(ii)   Expense Reimbursement:  In the event that the sale to Blackhawk contemplated herein is not consummated with Blackhawk for any reason (other than Blackhawk's material breach of the Asset Purchase Agreement or the failure of Blackhawk's existing secured creditors (other than holders of Patriot debt or their affiliate transferees that also hold Blackhawk debt) to agree to exchange their debt obligations for the debt in Post-Closing Blackhawk contemplated by the Asset Purchase Agreement and Blackhawk is unable to raise new money financing elsewhere to satisfy its obligations thereunder), then the Debtors shall reimburse Blackhawk for its reasonable and documented out-of-pocket costs and expenses (including legal, accounting, and other consultant fees and expenses other than any success or similar fees payable to financial advisors or consultants) incurred in connection with the transactions contemplated hereby as follows: the Debtors shall reimburse Blackhawk for the first $3,000,000 of its reimbursable expenses and thereafter for fifty percent (50%) of its reimbursable expenses until the Debtors have reimbursed Blackhawk for an aggregate amount of reimbursable expenses of $5,000,000 in the aggregate.

The claims on account of the Blackhawk Breakup Fee and Blackhawk Expense Reimbursement shall be senior to all administrative expenses other than those afforded to the DIP lenders, the Debtors' prepetition lenders, and the Carve Out (as defined in the Interim DIP Order) as set forth in the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 67] (the "**Interim DIP Order**") or any subsequent  Interim Order and Final Order (both as defined in the Interim DIP Order).  The Bankruptcy Court shall enter an order approving the Bid Protections by no later than June 30, 2015 and such order shall not be stayed, vacated, reversed, modified or supplemented without Blackhawk's prior written consent.

10.   Termination Date.  In order to contract coal sales for 2016, Blackhawk requires that the closing occur no later than September 25, 2015.

11.   Employees.   Blackhawk expects to hire a material amount of the Patriot workforce currently associated with the Purchased Mining Complexes, but the final decision about which employees of Patriot to hire or not to hire will be made by Blackhawk in its sole discretion.

12.   Fiduciary Out.  Nothing in this Term Sheet shall require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to this Term Sheet to the extent

9

such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

13.     <u>Transfer Taxes</u>.  All real property transfer, personal property transfer, sales, use, stamp, documentary, and registration taxes and other similar taxes and charges arising from the transactions contemplated herein will be paid by the Debtors.

## Schedule A

**Purchased Mining Complexes**

1. Panther
2. Rock Lick
3. Wells
4. Kanawha Eagle
5. Midland Trail/Blue Creek
6. Paint Creek
7. Logan County (Stanley Fork, Cub Branch and the Fanco preparation plant and load-out)
8. All Controlled River Docks

[*NTD: Parties to build out detailed Schedules which, among other things, shall include the individual leases for Purchased Assets listed above.*]

## **Schedule B**

### **Other Assets**

1. Wildcat
2. CC/Shrewsbury
3. Broughton (IL)
4. Collinsville (IL)
5. Central Midland
6. Guffey/ Tygart Valley
7. Sunnyhill (OH)
8. All of the assets, including real property interests (mineral, surface and easements) owned by the Patriot land companies that are owned by such land holding companies, or without limiting the foregoing, allocated to the Purchased Mining Complexes and Other Assets as listed in Schedules A and B.
9. All of the properties associated with leased or subleased tracts with minimum or royalty income.
10. All owned office buildings, furniture, equipment, technology, software, leases associated with the Purchased Assets, and the contents of the Scott Depot office (subject to a statutory lien which shall be an Assumed Liability).
11. All contracted sales agreements related to the complexes listed in Schedules A and B along with any and all river dock leases, throughput agreements and terminal space.
12. All leases and real property owned for the complexes listed in Schedules A and B.
13. Any contracts relating to contract services, trucking, suppliers, vendors and office equipment that are to be Purchased Assets will be listed on the Schedules to the Asset Purchase Agreement.
14. Certain Joint Venture interests to be mutually agreed to by the Parties.

**<u>Schedule C</u>**

**Excluded Mining Complexes**

1. Federal
2. Corridor G
3. Jupiter
4. Logan County (everything not listed on Schedule A)

## **Schedule D**

### **Other Excluded Assets**

1. Big Mountain
2. Bluegrass
3. Paragon
4. Other Midwest (to be individually scheduled)
5. Other East (to be individually scheduled)
6. All contracts relating to contract services, trucking, supplies, vendors and office equipment are Excluded assets, unless specifically listed as a Purchased Asset in the Asset Purchase Agreement

## **Schedule E**

**Assumed Permits**

[*See Attached*]

[*NTD: The final Schedule E will also include all other permits, licenses and other regulatory obligations that are associated with the Purchased Assets that are related to the listed SMCRA permits.*]

## Assumed Permits

| Business Unit/Complex | PERMIT NUMBER | Permittee | DESCRIPTION AND LOCATION OF PROPERTY | STATE | ISSUING AGENCY |
|---|---|---|---|---|---|
| **Logan County** | O-149-83 | Apogee Coal Company, LLC | Fanco Loadout | WV | WV Dept of Environmental Protection |
| | O-1-85 | Apogee Coal Company, LLC | Fanco Beltline | WV | WV Dept of Environmental Protection |
| | O-5023-94 | Apogee Coal Company, LLC | Fanco Plant Complex | WV | WV Dept of Environmental Protection |
| | | | | | |
| | S-5011-12 | Coyote Coal Company, LLC | Brushy Fork Surface Mine | WV | WV Dept of Environmental Protection |
| | S-5019-08 | Coyote Coal Company, LLC | Stanley Fork Surface Mine | WV | WV Dept of Environmental Protection |
| | U-5015-07 | Coyote Coal Company LLC | Stanley Fork Deep Mine | WV | WV Dept of Environmental Protection |
| | O-5011-11 | Coyote Coal Company LLC | Cub Adkins Haulroad | WV | WV Dept of Environmental Protection |
| | U-5020-01 | Apogee Coal Company, LLC | Buffalo Deep Mine | WV | WV Dept of Environmental Protection |
| | | | | | |
| | | Coyote Coal Company LLC | Mitigation and Prospecting | | |
| | | | | | |
| **Paint Creek** | O-6009-86 | Catenary Coal Company, LLC | Tom's Fork Haulroad | WV | WV Dept of Environmental Protection |
| | S-3023-90 | Catenary Coal Company, LLC | Cabin Creek No. 2 | WV | WV Dept of Environmental Protection |
| | O-3002-05 | Catenary Coal Company, LLC | Samples Haulroad | WV | WV Dept of Environmental Protection |
| | U-3001-98 | Catenary Coal Company, LLC | Laurel Fork Deep Mine | WV | WV Dept of Environmental Protection |
| | U-3005-06 | Catenary Coal Company, LLC | Moccasin Hollow Deep Mine | WV | WV Dept of Environmental Protection |
| | S-3031-07 | Catenary Coal Company, LLC | Moccasin North Surface | WV | WV Dept of Environmental Protection |
| | | | | | |
| | U-3008-03 | Coyote Coal Company LLC | Winchester Deep Mine | WV | WV Dept of Environmental Protection |
| | O-3022-07 | Coyote Coal Company LLC | Three Mile Haulroad | WV | WV Dept of Environmental Protection |
| | S-3026-07 | Coyote Coal Company LLC | Three Mile Surface Mine | WV | WV Dept of Environmental Protection |
| | S-3007-14 | Coyote Coal Company, LLC | Three Mile Extension | WV | WV Dept of Environmental Protection |
| | S-6012-87 | Coyote Coal Company, LLC | Tom's Fork Prep. Plant | WV | WV Dept of Environmental Protection |
| | O-3017-93 | Coyote Coal Company, LLC | Tom's Fork Loadout | WV | WV Dept of Environmental Protection |
| | O-3012-98 | Coyote Coal Company, LLC | Tom's Fork Impoundment | WV | WV Dept of Environmental Protection |
| | S-3001-08 | Coyote Coal Company, LLC | Joes Creek Surface Mine | WV | WV Dept of Environmental Protection |
| | | Coyote/Cantenary | Mitigation and Prospecting | | |
| | | | | | |
| **Kanawha Eagle** | S-3001-95 | Kanawha Eagle Coal, LLC | Lease 1 | WV | WV Dept of Environmental Protection |
| | U-3019-01 | Kanawha Eagle Coal, LLC | Muira No. 1 | WV | WV Dept of Environmental Protection |
| | U-3009-03 | Kanawha Eagle Coal, LLC | Essex Deep Mine | WV | WV Dept of Environmental Protection |
| | U-3017-06 | Kanawha Eagle Coal, LLC | No. 2 Gas Deep Mine | WV | WV Dept of Environmental Protection |
| | H-228 | Kanawha Eagle Coal, LLC | Haulroad | WV | WV Dept of Environmental Protection |
| | H-300 | Kanawha Eagle Coal, LLC | Haulroad | WV | WV Dept of Environmental Protection |
| | R-752 | Kanawha Eagle Coal, LLC | Refuse Disposal | WV | WV Dept of Environmental Protection |

| Business Unit/Complex | PERMIT NUMBER | Permittee | DESCRIPTION AND LOCATION OF PROPERTY | STATE | ISSUING AGENCY |
|---|---|---|---|---|---|
| | U-179-83 | Kanawha Eagle Coal, LLC | Mine/Plant | WV | WV Dept of Environmental Protection |
| | U-5003-02 | Kanawha Eagle Coal, LLC | Coalburg No. 1 | WV | WV Dept of Environmental Protection |
| | U-5005-04 | Kanawha Eagle Coal, LLC | Peerless Deep Mine | WV | WV Dept of Environmental Protection |
| | U-5007-04 | Kanawha Eagle Coal, LLC | Winifrede Deep Mine | WV | WV Dept of Environmental Protection |
| | U-5007-10 | Kanawha Eagle Coal, LLC | White Oak No. 1 Deep Mine | WV | WV Dept of Environmental Protection |
| | U-5008-10 | Kanawha Eagle Coal, LLC | Coalburg No. 2A Mine | WV | WV Dept of Environmental Protection |
| | U-5010-04 | Kanawha Eagle Coal, LLC | Coalburg No. 3 Mine | WV | WV Dept of Environmental Protection |
| | U-5036-08 | Kanawha Eagle Coal, LLC | Eagle No. 2 | WV | WV Dept of Environmental Protection |
| | U-6010-87 | Kanawha Eagle Coal, LLC | Coalburg No. 2 Mine | WV | WV Dept of Environmental Protection |
| | | Kanawha Eagle Coal, LLC | Prospect Permits | | |
| | | | | | |
| Panther, LLC | UO-391 | Panther LLC | Speed/Eagle  Mine | WV | WV Dept of Environmental Protection |
| | O-2-82 | Panther LLC | Wet Branch Refuse Area | WV | WV Dept of Environmental Protection |
| | O-112-83 | Panther LLC | Wet Branch Prep. Plant and Haulroad | WV | WV Dept of Environmental Protection |
| | O-3014-08 | Panther LLC | Ancillary Area for the Speed Deep Mine | WV | WV Dept of Environmental Protection |
| | O-3010-08 | Panther LLC | Wet Branch Ref Facility | WV | WV Dept of Environmental Protection |
| | H-379 | Panther LLC | Haulroad | WV | WV Dept of Environmental Protection |
| | | Panther LLC | Prospect/Gas Wells | | |
| | | | | | |
| Docks | P-553 | Little Creek LLC | Little Creek Dock | WV | WV Dept of Environmental Protection |
| | | | | | |
| | O-53-83 | Winifrede Dock LLC | Loadout | WV | WV Dept of Environmental Protection |
| | | | | | |
| | O-49-85 | Mountain View Coal Company, LLC | Chelyan Dock | WV | WV Dept of Environmental Protection |
| | | | | | |
| Rocklick | O-72-82 | Eastern Associated Coal, LLC | Harris Preparation Plant | WV | WV Dept of Environmental Protection |
| | O-13-83 | Eastern Associated Coal, LLC | Harris Refuse Area | WV | WV Dept of Environmental Protection |
| | U-20-83 | Eastern Associated Coal, LLC | Harris No. 1 Mine | WV | WV Dept of Environmental Protection |
| | O-5006-86 | Eastern Associated Coal, LLC | Rocklick Haulroad | WV | WV Dept of Environmental Protection |
| | D-84-82 | Eastern Associated Coal, LLC | Gateway Eagle Mine/Eagle 2 | WV | WV Dept of Environmental Protection |
| | U-47-83 | Eastern Associated Coal, LLC | Farley Eagle Mine/Kopperston No. 1 | WV | WV Dept of Environmental Protection |
| | O-5091-86 | Eastern Associated Coal, LLC | Rocklick Preparation Plant | WV | WV Dept of Environmental Protection |
| | S-5020-86 | Eastern Associated Coal, LLC | Rocklick Refuse Area | WV | WV Dept of Environmental Protection |
| | U-149-82 | Eastern Associated Coal, LLC | Black Oak Mine | WV | WV Dept of Environmental Protection |
| | U-5010-10 | Eastern Associated Coal, LLC | Gateway No. 2 Mine | WV | WV Dept of Environmental Protection |
| | U-3007-12 | Eastern Associated Coal, LLC | Flying Eagle Deep Mine | WV | WV Dept of Environmental Protection |
| | U-5001-12 | Eastern Associated Coal, LLC | Gateway No. 3 Deep Mine | WV | WV Dept of Environmental Protection |

| Business Unit/Complex | PERMIT NUMBER | Permittee | DESCRIPTION AND LOCATION OF PROPERTY | STATE | ISSUING AGENCY |
|---|---|---|---|---|---|
| | | Eastern Associated Coal, LLC | Kopperston Mountian Road | | |
| | | Robin Land | Gas Wells | | |
| | | | | | |
| | | | | | |
| Wells | U-5049-92 | Hillside Mining Company | Hillside No. 3 - Chilton A Mine | WV | WV Dept of Environmental Protection |
| | U-5003-09 | Hillside Mining Company | Workman Branch Deep Mine | WV | WV Dept of Environmental Protection |
| | S-5005-05 | Hillside Mining Company | Casey Creek Surface Mine | WV | WV Dept of Environmental Protection |
| | EM-120 | Hillside Mining Company* | No. A & AA Mine | WV | WV Dept of Environmental Protection |
| | 0-5-82 | Hillside Mining Company* | Peachtree Refuse Area | WV | WV Dept of Environmental Protection |
| | U-18-83 | Hillside Mining Company* | Lower Eagle No. 3 Deep Mine | WV | WV Dept of Environmental Protection |
| | U-3017-10 | Hillside Mining Company* | Eagle 3 Deep Mine | WV | WV Dept of Environmental Protection |
| | U-4005-91 | Hillside Mining Company* | Eagle No. 1 & 2 Deep Mine | WV | WV Dept of Environmental Protection |
| | S-5006-13 | Hillside Mining Company* | Eagle Surface Mine | WV | WV Dept of Environmental Protection |
| | | | | | |
| | U-5013-04 | Black Stallion Coal Company, LLC | Mine No. 1 | WV | WV Dept of Environmental Protection |
| | U-144-82 | Eastern Associated Coal, LLC | Lightfoot No. 1 Mine | WV | WV Dept of Environmental Protection |
| | U-150-82 | Eastern Associated Coal, LLC | Lightfoot No. 2 Mine | WV | WV Dept of Environmental Protection |
| | H-607 | Eastern Associated Coal, LLC | Haulroad to Winifrede 6P | WV | WV Dept of Environmental Protection |
| | O-8-82 | Eastern Associated Coal, LLC | Jasper Workman Stockpile | WV | WV Dept of Environmental Protection |
| | O-6-83 | Eastern Associated Coal, LLC | Wharton Refuse Area | WV | WV Dept of Environmental Protection |
| | U-73-85 | Eastern Associated Coal, LLC | Hernshaw No. 14 | WV | WV Dept of Environmental Protection |
| | U-5006-93 | Eastern Associated Coal, LLC | Winifrede No. 13 | WV | WV Dept of Environmental Protection |
| | U-5007-93 | Eastern Associated Coal, LLC | Winifrede No. 14 | WV | WV Dept of Environmental Protection |
| | U-5018-96 | Eastern Associated Coal, LLC | Winifrede No. 15 | WV | WV Dept of Environmental Protection |
| | O-62-82 | Eastern Associated Coal, LLC | Haulroad - Grapevine Branch | WV | WV Dept of Environmental Protection |
| | U-143-82 | Eastern Associated Coal, LLC | Campbell Creek 10 | WV | WV Dept of Environmental Protection |
| | U-5004-97 | Eastern Associated Coal, LLC | Winifrede 13A | WV | WV Dept of Environmental Protection |
| | U-5008-98 | Eastern Associated Coal, LLC | Powellton No. 2 Mine | WV | WV Dept of Environmental Protection |
| | U-5009-98 | Eastern Associated Coal, LLC | Powellton No. 3 Mine | WV | WV Dept of Environmental Protection |
| | U-5016-01 | Eastern Associated Coal, LLC | Winifrede 12 | WV | WV Dept of Environmental Protection |
| | U-5006-02 | Eastern Associated Coal, LLC | Winifrede 16 | WV | WV Dept of Environmental Protection |
| | U-5016-02 | Eastern Associated Coal, LLC | Campbell Creek No. 14 | WV | WV Dept of Environmental Protection |
| | U-5004-05 | Eastern Associated Coal, LLC | Winifrede 17 | WV | WV Dept of Environmental Protection |
| | O-5023-07 | Eastern Associated Coal, LLC | Huff Creek Haulroad | WV | WV Dept of Environmental Protection |
| | S-4005-08 | Eastern Associated Coal, LLC | Huff Creek Surface | WV | WV Dept of Environmental Protection |
| | U-5004-09 | Eastern Associated Coal, LLC | Winifrede 18 | WV | WV Dept of Environmental Protection |
| | O-165-83 | Eastern Associated Coal, LLC | Wells Preparation Plant | WV | WV Dept of Environmental Protection |
| | O-4-83 | Eastern Associated Coal, LLC | Wells Refuse Area | WV | WV Dept of Environmental Protection |

| Business Unit/Complex | PERMIT NUMBER | Permittee | DESCRIPTION AND LOCATION OF PROPERTY | STATE | ISSUING AGENCY |
|---|---|---|---|---|---|
| | | Dakota Mining | Subsidence Monitoring | | |
| | | Eastern Associated/Hillside | Road Bond/Prospecting | | |
| | | | | | |
| | U-5031-96 | Dakota LLC | Casey No. 1 | WV | WV Dept of Environmental Protection |
| | U-5032-96 | Dakota LLC | Casey No. 2 | WV | WV Dept of Environmental Protection |
| | | | | | |
| | U-5027-00 | Rivers Edge Mining, Inc. | Mine No. 1 | WV | WV Dept of Environmental Protection |
| | | | | | |
| **Blue Creek** | S-6034-88 | Coyote Coal Company LLC | Campbells Creek Mine No. S-8 | WV | WV Dept of Environmental Protection |
| | U-3015-03 | Coyote Coal Company LLC | Stockton Deep Mine No. 1 | WV | WV Dept of Environmental Protection |
| | U-3016-03 | Coyote Coal Company LLC | Stockton Deep Mine No. 2 | WV | WV Dept of Environmental Protection |
| | S-6027-88 | Coyote Coal Company LLC | Jims Fork Mine | WV | WV Dept of Environmental Protection |
| | O-6032-88 | Coyote Coal Company LLC | Fivemile Haulroad | WV | WV Dept of Environmental Protection |
| | Prospecting | Robin Land | Blue Creek | | |
| | | | | | |

<u>Schedule F</u>

**Key Terms of First Lien Term Loan**

<u>Borrower</u>:

Blackhawk Mining LLC, a Kentucky limited liability company (the "***Borrower***").

<u>Administrative Agent</u>:

Deutsche Bank AG New York Branch ("***DBNY***") will act as sole administrative and collateral agent (in such capacities, the "***Administrative Agent***") for the lenders (the "***Lenders***"), and will perform the duties customarily associated with such roles.

<u>Sole Lead Arranger and
Book-Running Manager</u>:

Deutsche Bank Securities Inc. will act as sole lead arranger and sole book-running manager for the First Lien Term Loan (as defined below), and will perform the duties customarily associated with such roles (the "***Lead Bank Arranger***").

<u>Amount</u>:

A senior secured First Lien Term Loan in an aggregate principal amount of $646.0 million (the "***First Lien Term Loan***"), as may be adjusted by the Rights Offering.

<u>Use of Proceeds</u>:

As provided in the Term Sheet to which this Exhibit is attached.

<u>ABL</u>:

The First Lien Term Loan shall provide that Borrower may obtain an ABL (the "***New ABL***") of up to $[___] million [*NTD: to be reduced to reflect treatment of Patriot undrawn L/Cs as provided in Term Sheet*] and a ____ First Lien L/C facility of up to $[    ] million. [_____ to be adjusted]

<u>Maturity</u>:

The maturity date of the First Lien Term Loan shall be seven (7) years from the closing date (the "***Term Loan Maturity Date***"). The maturity date of the APL shall be six (6) years

<u>Amortization</u>:

Annual amortization (payable in 4 equal quarterly installments) of the First Lien Term Loan shall be required in an amount equal to 1.0% of the initial aggregate principal amount of the Term Loans.

<u>Incremental
Facilities</u>:

The Borrower will have the right to solicit existing Lenders and Additional Lenders (as defined below) to provide incremental commitments consisting of one or more increases to the Term Loan Facility and/or one or more new tranches of term loans to be made available under the Credit Documentation (hereinafter the "***Incremental Facilities***") in an aggregate amount not to exceed $50 million, on terms agreed by the Borrower, the Administrative Agent and the Lender or Lenders providing the respective Incremental Facility; <u>provided</u> that (i) no default or event of

default exists or would exist after giving effect thereto, except in the case of an Incremental Facility incurred to finance a permitted acquisition or other permitted investment where no payment or bankruptcy event of default will be the standard, (ii) all of the representations and warranties contained in the Credit Documentation shall be true and correct in all material respects (or, in all respects, if qualified by materiality), (except where customary "Sungard" or "certain funds" conditionality is otherwise agreed to by the lenders providing such Incremental Facility, in which case such limited conditionality shall apply), (iii) any such Incremental Facility shall benefit from the same guarantees as, and be secured on a pari passu basis by the same Collateral (as defined below) securing, the Term Loan Facility, (iv) the Borrower is in pro forma compliance with the Financial Covenant (as defined below) as of the most recently ended fiscal quarter for which financial statements are available (determined after giving effect to the full utilization of the commitments provided under such Incremental Facility), and (vi) unless such Incremental Term Loans are made a part of the Term Loan Facility (in which case all terms thereof shall be identical to those of the Term Loan Facility), the loans to be made under an Incremental Facility (each, an "Incremental Term Loan") shall be subject to the same terms as the Term Loans (including voluntary and mandatory prepayment provisions) with such changes as are reasonably satisfactory to the Administrative Agent, except that, (1) the interest margins for the Incremental Term Loans shall be determined by the Borrower and the lenders providing such incremental facility; provided that the "effective yield" on the respective Incremental Term Loans (which, for such purposes only, shall be deemed to take account of interest rate benchmark floors, recurring fees and all upfront or similar fees or original issue discount (amortized over the shorter of (A) the weighted average life of such Incremental Term Loans and (B) four years) payable to all Lenders providing such Incremental Term Loans, but exclusive of any arrangement, structuring or other fees payable in connection therewith that are not shared with all Lenders providing such Incremental Term Loans) may exceed the then "effective yield" on the Term Loans (determined on the same basis as provided in the preceding parenthetical) by more than 0.50% only if the "effective yield" on the Term Loans (determined on the same basis as provided in the second preceding parenthetical) is increased to be not less than (after giving effect to any increase to the "effective yield" on any Term Loans) the "effective yield" on such Incremental Term Loans minus 0.50% per annum, (2) the final stated maturity date for such Incremental Term Loans may be identical to or later (but not

earlier) than the final stated maturity date then applicable to the Term Loans, (3) the amortization requirements for such Incremental Term Loans may differ, so long as the average weighted life to maturity of such Incremental Term Loans is no shorter than the average weighted life to maturity applicable to the then outstanding Term Loans and (4) other terms may be included with respect to such Incremental Term Loans if applicable only to periods after the final stated maturity date then applicable to the Term Loans (or if such terms that are also provided for the benefit of the Term Facility).

The Borrower may seek commitments in respect of the Incremental Facilities from existing Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) and additional banks, financial institutions and other institutional lenders or investors who will become Lenders in connection therewith reasonably acceptable to the Administrative Agent (the "***Additional Lenders***").

<u>Guaranties:</u>

Each direct and indirect subsidiary of the Borrower other than: (i) immaterial subsidiaries, (ii) foreign subsidiaries that are controlled foreign corporations ("***CFCs***") within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended from time to time (the "***Code***"), and any subsidiaries of such CFCs, (iii) any subsidiary that has no material assets other than the equity and/or debt interests of one or more foreign subsidiaries that are CFCs ("***FSHCO***") and (iv) unrestricted subsidiaries (each, a "**Guarantor**" and, collectively, the "***Guarantors***") shall be required to provide an unconditional guaranty on a joint and several basis (collectively, the "***Guaranties***") of all amounts owing under the First Lien Term Loan. Such Guaranties shall be guarantees of payment and not of collection.

<u>Security:</u>

All amounts owing under the First Lien Term Loan (and all obligations under the Guaranties) will be secured by (x) a first priority perfected security interest in all stock, other equity interests, intercompany debt and promissory notes owned by the Borrower and the Guarantors ((1) limited to 65% of the voting stock and 100% of the non-voting stock in the case of equity interests of foreign subsidiaries and FSCHOs and (2) excluding equity interests of unrestricted subsidiaries) and (y) a first priority security interest in substantially all domestic assets, including without limitation, substantially all personal property, owned real property and mixed property of the Borrower and the Guarantors, in each case subject to certain customary exceptions to be set

forth in the definitive documentation for the First Lien Term Loan (the "***Credit Documentation***").

| | |
|---|---|
| <u>Intercreditor:</u> | The priority of the security interests in the collateral and related creditors' rights as between the First Lien Term Loan, the Second Lien PIK Loan, the New ABL, the First Lien L/C facility and any other debt will be set forth in one or more customary intercreditor agreements (the "***Intercreditor Agreement***"). |
| <u>Voluntary Prepayments:</u> | Voluntary prepayments may be made at any time on three business days' notice, without premium or penalty (except as otherwise provided under the heading "Prepayment Fee" below), in minimum principal amounts to be set forth in the Credit Documentation. |
| <u>Mandatory Repayments</u> | Subject to the Intercreditor Agreement, mandatory repayments shall be required from (a) 100% of the net proceeds from asset sales by the Borrower and its restricted subsidiaries (subject to certain exceptions and reinvestment rights to be set forth in the Credit Documentation), (b) 100% of the net proceeds from issuances or incurrences of debt (other than debt permitted to be incurred by the Credit Documentation) by the Borrower and its restricted subsidiaries, (c) 75% (reducing to 50% and 25% based on meeting total net leverage levels of 3.00x and 2.00x, respectively) of annual Excess Cash Flow (to be defined in the Credit Documentation) of the Borrower and its restricted subsidiaries and (d) 100% of the net proceeds from insurance recovery and condemnation events of the Borrower and its restricted subsidiaries (subject to certain exceptions and reinvestment rights to be set forth in the Credit Documentation). |
| | All mandatory repayments made pursuant to clauses (a) through (d), inclusive, above will, subject to the provisions described under the heading "Waivable Prepayments" below, be applied <u>pro rata</u> to each outstanding tranche of Term Loans and Incremental Term Loans (if any), and shall be applied, first, in direct order to the next eight scheduled amortization payments of the respective term loans being repaid and, second, pro rata to reduce the remaining amortization payments of the respective term loans being repaid. |
| <u>Waivable Prepayments:</u> | Lenders shall have the right to decline all or a portion of their pro rata share of any mandatory repayment as otherwise required above (excluding scheduled amortizations and mandatory repayments of the type described in clause (b) of the first paragraph of the section above entitled "Mandatory Repayments") on terms to be set forth in the Credit |

Documentation, in which case the amounts so declined shall retained by the Borrower.

|   |   |
|---|---|
| Prepayment Fee: | The occurrence of any voluntary prepayment (or mandatory prepayment with the proceeds of debt) of the First Lien Term Loan, in each case prior to the 24-month anniversary of the closing date, will require payment of a fee (the "***Prepayment Fee***") equal to 5% of the principal amount subject to such prepayment. |
|   | After such 24-month period all prepayments shall be at par with no additional fee |
| Interest Rates: | 10%, payable quarterly in arrears on the last business day of each calendar quarter.  Interest will also be payable at the time of repayment of any Loans (on the amount repaid) and at maturity.  All interest shall be based on a 360-day year and actual days elapsed.  The amount of OID on newly funded First Lien Term Loans shall not exceed 4%. |
| Default Interest: | Overdue principal, overdue interest and other overdue amounts shall bear interest at a rate per annum equal to 2% in excess of the rate then borne.  Such interest shall be payable on demand. |
| Yield Protection: | The First Lien Term Loan shall include customary protective provisions for such matters as [increased costs], reserves, funding losses, illegality and withholding taxes [(it being understood that, for purposes of determining increased costs arising in connection with a change in law, the Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III, and all requests, rules, guidelines or directives promulgated under, or issued in connection with, either of the foregoing shall be deemed to have been introduced or adopted after the date of the Credit Documentation, regardless of the date enacted, adopted or issued)]. |
| Conditions Precedent: | [Usual and customary for facilities of this type] [*NTD: Parties to Discuss*]. |
| Representations and Warranties: | The Credit Documentation will contain only the following representations and warranties (applicable to the Borrower and its restricted subsidiaries), with materiality and other exceptions to be agreed:  (i) company status, (ii) power and authority, (iii) due authorization, execution and delivery and enforceability, (iv) no violation or conflicts with laws, contracts or charter documents, (v) governmental approvals, (vi) financial statements, financial |

condition, projections, (vii) absence of material litigation, (viii) true and complete disclosure, (ix) use of proceeds and compliance with margin regulations, (x) income and other material tax returns and payments, (xi) ERISA matters, (xii) compliance with law, (xiii) ownership of property, (xiv) creation, validity, perfection and priority of security interests under the Security Documents (to be defined in the Credit Documentation), (xv) ownership of subsidiaries, (xvi) inapplicability of Investment Company Act, (xvii) employment and labor relations, (xviii) intellectual property, franchises, licenses, permits, etc., (xix) compliance with environmental laws, (xx) existing indebtedness, (xxi) maintenance of insurance, (xxii) Patriot Act/ "know your customer" laws, (xxiii) OFAC/anti-terrorism and sanctions laws and (xxiv) flood insurance.

Covenants:

The Credit Documentation will contain only the following covenants (applicable to the Borrower and its restricted subsidiaries), with materiality and other exceptions to be agreed: [*NTD: material baskets and other items TBD*]

(a)    Affirmative Covenants - (i) Compliance with laws and regulations (including, without limitation, ERISA and environmental laws); (ii) payment of income and other material taxes and other obligations; (iii) maintenance of adequate insurance; (iv) preservation of corporate existence, rights (charter and statutory), franchises, permits, licenses, copyrights, trademarks and patents necessary to the business; (v) visitation and inspection rights; (vi) keeping of proper books in accordance with generally accepted accounting principles; (vii) quarterly conference calls with Lenders; (viii) maintenance of properties; (ix) further assurances as to perfection and priority of security interests and additional guarantors; (x) notice of defaults, material litigation and certain other material events; (xi) financial and other reporting requirements (including, without limitation, unaudited quarterly and audited annual financial statements for the Borrower and its subsidiaries on a consolidated basis (in accordance with US GAAP), in each case with accompanying management discussion and analysis and, in the case of audited annual financial statements, accompanied by an opinion of a nationally recognized accounting firm (which opinion shall not be subject to any qualification as to "going concern" or scope of the audit), and budgets prepared by management of the Borrower and provided on an annual basis); (xii) use of proceeds; (xiii) maintenance of reserves for certain long-term liabilities and environmental matters; (xiv) use of commercially reasonable efforts to maintain public corporate credit rating from Standard & Poor's Ratings Services ("**S&P**") and a public corporate family

rating from Moody's Investors Service, Inc. ("**Moody's**"), in each case with respect to the Borrower, and a public rating of the First Lien Term Loan by each of S&P and Moody's; (xv) change in fiscal year and fiscal quarter; (xvi) performance of obligations and (xvii) designation of subsidiaries as "unrestricted subsidiaries" or "restricted subsidiaries".

(b)    <u>Negative Covenants</u> - Restrictions (with exceptions to be agreed) on (i) liens; (ii) debt (including guaranties and other contingent obligations), with exceptions to include the Second Lien PIK Loan (including any "AHYDO" catchup payments required to be made), the First Lien L/C facilities and the New ABL; (iii) mergers and consolidations; (iv) sales, transfers and other dispositions of property and assets (including sale-leaseback transactions but with exceptions to include (x) sales of inventory in the ordinary course of business and (y) sales of obsolete or worn out assets); (v) loans, acquisitions, joint ventures and other investments; (vi) dividends and other distributions to, and redemptions and repurchases from, equity holders (with an exception for tax distributions); (vii) prepaying, redeeming or repurchasing junior lien, unsecured and subordinated debt; (viii) transactions with affiliates; (ix) restrictions on distributions, advances and asset transfers by subsidiaries; (x) issuances of certain equity interests, (xi) changes in the nature of business; (xii) amending organizational documents; (xiv) hedging obligations; (xv) negative pledges; and (xvi) accounting changes.

(c)    <u>Financial Covenant</u>. [The following financial covenant (the "**Financial Covenant**") (with financial definitions and covenant levels to be set forth in the Credit Documentation), the first test date of which shall be _____, ____: maintenance of a maximum total net first lien leverage ratio of no greater than 5.00 to 1.00, with levels to be set forth in the Credit Documentation.] [*NTD: Parties to discuss*].

<u>Unrestricted Subsidiaries</u>:    The Credit Documentation will contain provisions pursuant to which, subject to no default or event of default, limitations on investments and other conditions to be set forth in the Credit Documentation, the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary; <u>provided</u> that no subsidiary may be designated as an unrestricted subsidiary if such subsidiary owns or operates Core Mining Property (to be defined in the Credit Documentation).  The designation of any subsidiary as an "unrestricted" subsidiary shall constitute an investment for

purposes of the investment covenant in the Credit Documentation, and the designation of any unrestricted subsidiary as a restricted subsidiary shall be deemed to be an incurrence of indebtedness and liens by a restricted subsidiary of any outstanding indebtedness or liens, as applicable, of such unrestricted subsidiary for purposes of the Credit Documentation. Unrestricted subsidiaries will not be subject to the representations and warranties, affirmative or negative covenants or events of default provisions of the Credit Documentation, and the cash held by, the results of operations, indebtedness and interest expense of unrestricted subsidiaries will not be taken into account for purposes of determining compliance with the Financial Covenant or any financial tests contained in such Credit Documentation.

Events of Default:

The Credit Documentation will include only the following Events of Default (to be applicable to the Borrower and its restricted subsidiaries) with certain customary exceptions, qualifications and grace periods to be set forth therein: (i) nonpayment of principal when due or interest, fees or other amounts after a grace period set forth in the Credit Documentation; (ii) failure to perform or observe covenants set forth in First Lien Term Loan , subject (where customary and appropriate) to notice and an appropriate grace period; (iii) any representation or warranty proving to have been incorrect in any material respect (or, in any respect, if qualified by materiality) when made or confirmed; (iv) cross-defaults and cross-acceleration to other indebtedness in an amount to be set forth in the Credit Documentation; (v) bankruptcy, insolvency proceedings, etc. (with a customary grace period for involuntary proceedings); (vi) inability to pay debts, attachment, etc.; (vii) monetary judgment defaults in an amount to be set forth in the Credit Documentation; (viii) customary ERISA defaults; (ix) actual invalidity of the security documentation or the Guarantees or impairment of security interests in the Collateral; (x) Change of Control and (xi) Intercreditor Agreement ceasing to be in full force and effect other than in accordance with its terms.

Assignments and Participations:

The Borrower may not assign its rights or obligations under the First Lien Term Loan without the prior written consent of the Lenders.  Any Lender may assign, and may sell participations in, its rights and obligations under the First Lien Term Loan , subject (x) in the case of participations, to customary restrictions on the voting rights of the participants and restrictions on participations to the Borrower and its affiliates and (y) in the case of assignments, to such limitations as set forth in the Credit Documentation (including (i) a minimum assignment amount of

F-8

$1,000,000 (or, if less, the entire amount of such assignor's commitments and outstanding Loans at such time), (ii) an assignment fee in the amount of $3,500 to be paid by the respective assignor or assignee to the Administrative Agent, (iii) restrictions on assignments to any entity that is not an Eligible Transferee (to be defined in the Credit Documentation), (iv) the receipt of the consent of the Administrative Agent (other than with respect to assignments to any Lender, its affiliates, or an "approved fund"), such consent not to be unreasonably withheld, delayed or conditioned and (v) the receipt of the consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned), <u>provided</u> that the Borrower's consent shall not be so required if (x) such assignment is to any Lender, its affiliates or an "approved fund" of a Lender, (y) during the "primary syndication" of the First Lien Term Loan , or (z) a default or event of default exists under the First Lien Term Loan ; <u>provided, further</u>, that such consent of the Borrower shall be deemed to have been given if the Borrower has not responded within five (5) business days of a request for such consent.

The Credit Documentation shall provide that the Borrower may offer to purchase Term Loans at a discount to the par value of such Term Loans through customary procedures to be agreed.

<u>Waivers and Amendments</u>:    Amendments and waivers of the provisions of the Credit Documentation will require the approval of Lenders holding commitments and/or outstandings (as appropriate) representing more than 50% of the aggregate commitments and outstandings under the First Lien Term Loan (the "***Required Lenders***"), except that the consent of each Lender directly and adversely affected thereby will be required with respect to (i) increases in commitment amounts of such Lender, (ii) reductions of principal, interest (other than default interest) or fees owing to such Lender, (iii) extensions of scheduled payments of any Loans (including at final maturity) of such Lender or times for payment of interest or fees owing to such Lender, (iv) modifications to the <u>pro rata</u> sharing and payment provisions, assignment provisions or the voting percentages and (v) releases of all or substantially all of the collateral; <u>provided</u> that if any of the matters described above is agreed to by the Required Lenders, the Borrower shall have the right to either (x) substitute any non-consenting Lender by having its Loans and commitments assigned, at par, to one or more other institutions, subject to the assignment provisions described above, or (y) with the express written consent of the Required Lenders, terminate the commitment of, and repay the obligations owing to, any non-consenting Lender, subject to repayment in full of all obligations of the Borrower owed to such Lender

relating to the Loans and participations held by such Lender with, in the case of either preceding clause (x) or (y), the payment by the Borrower to each non-consenting Lender of the applicable Prepayment Fee (if such assignment or repayment occurs prior to the 24-month anniversary of the closing date).

In addition, the Credit Documentation shall provide for the amendment (or amendment and restatement) of the Credit Documentation to provide for a new tranche of replacement term loans to replace all or part of the Term Loans, subject to customary limitations (including as to tenor, weighted average life to maturity, "effective yield" and applicable covenants prior to the Term Loan Maturity Date), with the consent of the Administrative Agent, the Borrower and the Lenders providing such replacement term loans.

<u>Indemnification; Expenses</u>:    The Credit Documentation will contain customary and appropriate provisions relating to indemnity, reimbursement, exculpation and other related matters.

<u>Governing Law</u>:    All Credit Documentation shall be governed by the internal laws of the State of New York (except security documentation that the Administrative Agent determines should be governed by local law).

## Schedule G

### Key Terms of Second Lien PIK Loan

| | |
|---|---|
| Borrower: | Blackhawk Mining LLC, a Kentucky limited liability company (the "***Borrower***"). |
| Administrative Agent: | Deutsche Bank AG New York Branch ("***DBNY***") will act as sole administrative agent and collateral agent (in such capacities, the "***Administrative Agent***") for the lenders (the "***Lenders***"), and will perform the duties customarily associated with such roles. |
| Sole Lead Arranger and Book-Running Manager: | Deutsche Bank Securities Inc. will act as sole lead arranger and sole book-running manager for the Second Lien PIK Loan (as defined below), and will perform the duties customarily associated with such roles (the "***Lead Bank Arranger***"). |
| Amount: | A second lien term loan in an aggregate principal amount of up to $297.0 million (the "***Second Lien PIK Loan***"), as may be adjusted in accordance with the Term Sheet to which this Exhibit is attached. |
| Use of Proceeds: | As provided in Term Sheet to which this Schedule is attached. |
| Maturity: | The maturity date of the Second Lien PIK Loan shall be eight (8) years from the closing date (the "***Second Lien Maturity Date***"). |
| Guaranties: | Same as First Lien Facilities. |
| Security: | Same as First Lien Facilities, except on a second lien basis. |
| Intercreditor: | The priority of the security interests in the collateral and related creditors' rights as between the First Lien Term Loan, the Second Lien PIK Loan, the New ABL, the First Lien L/C facility ___ and any other debt will be set forth in one or more customary intercreditor agreements (the "***Intercreditor Agreement***"). |
| Voluntary Prepayments: | None so long as First Lien Term Loan is outstanding. |
| Mandatory Repayments | Subject to prior repayment in full of First Lien; provided, that prior to the close of each accrual period ending on or after the fifth anniversary of the issue date of the Second Lien PIK Loan, the Borrower shall prepay the minimum amount of principal and accrued interest on the outstanding Second Lien PIK Loan necessary to prevent any of the accrued and unpaid interest or original issue discount on the Second Lien PIK Loan from being |

disallowed or deferred as a deduction under Section 163(e)(5) of the Internal Revenue Code (for the avoidance of doubt, taking into account Treasury Regulation Section 1.701-2(f)) (each such payment, an "***AHYDO Catch-Up Payment***").

Prepayment Fee:               None

Interest Rates:               In each case at the option of Borrower:

                              Years one and two: (a) 1% cash and 6% PIK or (b) 6% cash;

                              Years two and three: (a) 3% cash and 7% PIK or (b) 6% cash;

                              Thereafter: (a) 10% cash or (b) 12% PIK.

Incremental Amount:           Same as First Lien Term Loan *mutatis mutandis*.

Default Interest:             None

Yield Protection:             None

Conditions Precedent:         Usual and customary for facilities of this type.

Representations
and Warranties:               Same as First Lien Term Loan *mutatis mutandis*.

Covenants:                    TBD, excluding any financial covenants

Unrestricted Subsidiaries:    Same as First Lien Term Loan

Events of Default:            Same as First Lien Term Loan *mutatis mutandis*.

Assignments and
Participations:               Usual and customary for facilities of this type.

Waivers and Amendments:       Usual and customary for facilities of this type.

Indemnification; Expenses:    Same as First Lien Term Loan

Governing Law:                Same as First Lien Term Loan

G-2

### Schedule H

### Key Terms of Class B Units

| | |
|---|---|
| <u>Class B Units</u>: | Represent membership interests in Blackhawk as set forth in the Operating Agreement and described in this <u>Schedule H</u>. |
| <u>Blackhawk Capital Structure</u>: | Prior to the closing date, Blackhawk has authorized and issued 8,750 Class A Units and 1,250 Class B Units.  They are the only equity interests issued and outstanding.  The Blackhawk Board of Managers has the authority to increase the authorized number and issue additional equity interests as it shall determine from time to time, in each case subject to the Preemptive Rights described below. |
| <u>Distributions</u>: | The Class B Units are entitled to pro rata distributions (including tax distributions, redemptions, repurchases, etc.) on an equal basis as such distributions are made to holders of the Class A Units (excluding "one-off" redemptions and repurchases not on a class basis). |
| <u>Preemptive Rights</u>: | Before issuing new units or other equity interests in Blackhawk or its subsidiaries to a third party, each Member has the right to purchase its pro rata share new units or other equity interests, *provided that*, if the issuance is for Class A Units to an existing Class A Unit holder, any Class B Member that exercises its preemptive rights shall acquire the number of Class B Units in lieu of Class A Units.  If any Members do not exercise their preemptive rights, other Members shall have the right to purchase prior to the issuance and sale to a third party. |
| <u>Management</u>: | Blackhawk is controlled and managed by its Board of Managers.  There are currently three members on the Board of Managers.  In addition, Blackhawk has appointed non-voting observer rights to RWE.  The Board of Managers is elected by the holders of a majority of the Class A Units. |
| <u>Voting</u>: | The Class B Units do not vote in the election of directors and have no other voting rights, except the Board of Directors and Blackhawk are prohibited from (i) taking any material action that has the effect of benefiting the Class A Members to the detriment of the Class B Members, without the majority consent of the Class B Members and (ii) amending the Operating Agreement in a manner that would adversely affect the rights of any Class B Member as they relate to the rights of the Class A Members or |

the other Class B Members, or that would require capital contributions of a Class B Member, in each case without the consent of such Class B Member and (iii) entering into material affiliate transactions excluding existing affiliated arrangements, material change in the scope of business of Blackhawk beyond the mining and marketing of natural resources, associated real estate holdings and related matters.

Transfer:    The Class B Units are transferable pursuant to either (i) an exemption from registration under the federal securities laws and the securities laws of the applicable states or (ii) an effective registration statement.  In order to avoid the inclusion of Class B Members in regulatory filings, Class B Members cannot transfer to another Class B Member if the acquiring Member would own more than 9.9% of Blackhawk's total outstanding units (holdings in excess of 9.9% to be structured appropriately as mutually agreed).

The Class B Units are not subject to rights of first offer by other Members.  The Class A Units are subject to a right of first offer by other Class A Members.

Drag Along:    If a Member or Members desire to sell all (but not less than all) of their Units incompliance with the terms of the Operating Agreement and such Units represent more than 50% of the outstanding Units in the aggregate, then such selling Members shall have the right to require all (but not less than all) of the non-selling Members to sell all (but not less than all) of their Units in the same transaction for the highest consideration per Unit to be received by the selling Member or Members.  The drag-along rights do not apply to affiliate transfers.  Consideration for the transaction must be cash, unless at least 50% of the Units held by the non-selling members consent to another form of payment.

Upon receipt of notice from the selling Members exercising the drag along rights, the non-selling Members have the right to purchase all (but not less than all) of the Units of the selling Member or Members at a price equal to the drag-along price contained in the notice.

Tag Along:    If a Member desires to sell all or a portion of its Units (or multiple Members desire to sell all or a portion of their Units in a single transaction or related transactions) in compliance with the Operating Agreement and such Units to be sold equal 17.5% or more of the outstanding Units, then the selling Member shall provide notice to the other Members of such transfer.  Each other Member shall have the right, but not the obligation, to sell its pro

H-2

rata portion of such Units by including them in the sale on the same terms.

IPO:

Immediately prior to an initial public offering, each outstanding Class B Unit shall convert into a Class A Unit on 1:1 basis and be allowed to participate in the initial public offering on an equal basis. Class A Units (including Class B converted Units) to have customary registration rights post IPO.

Merger:

A "Merger" is defined as a merger, dissolution, liquidation or consolidation of Blackhawk with or into another person or the assignment or sale of all or substantially all of the assets of Blackhawk and its subsidiaries. Immediately prior to a Merger, all Class B Units shall convert to Class A Units on a 1:1 basis and be treated equally with regards to consideration.

Information Rights:

Class B Member information rights are identical to the Class A Member rights.

Within 45 days after the end of each fiscal year, Blackhawk shall provide a report of the business, operations and finances, including unaudited financial statements, subject to customary exceptions for a private company. No later than 120 days after the end of each year, Blackhawk shall provide audited financial statements.

Within 45 days after the end of each fiscal quarter (other than the end of each fiscal year), each Member shall receive unaudited financial statements, quarterly operating results, environmental reports and health and safety reports and [the financial forecast for the current and three subsequent years].

Within 105 days after each fiscal year, each Member tax and other information needed for a Member's tax returns. Within 60 days after the end of each year, each Member will receive an estimate of the tax information to be included on Schedule K-1 for such year.

LLC Agreement:

LLC Agreement to be amended if and as appropriate to permit the transactions contemplated hereby (including waiver of pre-emptive rights with respect to issuance of new Class B Units if necessary); Parties to discuss in good faith items not addressed by these Key Terms.

H-3