Stephen E. Hessler (admitted *pro hac vice*)
Patrick Evans (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

*Proposed Counsel for the Debtors and
Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION

```
--------------------------------------------------------- X
                                                           :
In re:                                                     :   Chapter 11
                                                           :
PATRIOT COAL CORPORATION, et al.,                          :   Case No. 15-32450 (KLP)
                                                           :
                 Debtors.                                  :   (Joint Administration Requested)
                                                           :
--------------------------------------------------------- X   Re: Docket No. 30, 67
```

### FINAL ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING USE OF CASH COLLATERAL, (C) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (D) GRANTING ADEQUATE PROTECTION, (E) MODIFYING THE AUTOMATIC STAY AND (G) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of Patriot Coal Corporation and certain of its affiliates,

as debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and

collectively, the "Debtors") for entry of an interim order (the "Interim Order") and this final

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Loan Agreement (as defined herein), as applicable.

order (this "<u>Final Order</u>") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and Rule 4001 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Local Rules</u>"), *inter alia* (a) authorizing Patriot Coal Corporation (the "<u>Borrower</u>") to obtain, and each of the other Debtors to guarantee, postpetition financing in the form of a term loan facility as set forth in that certain Debtor-in-Possession Term Loan Agreement attached hereto as **<u>Exhibit 1</u>** (as amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the terms of this Final Order, the "<u>DIP Loan Agreement</u>"), by and among the Borrower, the other Debtors, Cantor Fitzgerald Securities, as administrative agent (in such capacity and its capacity as the collateral agent for the DIP Facility (as defined below), the "<u>DIP Agent</u>"), and the lenders party thereto (the "<u>DIP Lenders</u>"), of up to $100.0 million (the "<u>DIP Facility</u>") under the terms of this Final Order and the other DIP Loan Documents (as defined below) (of which $30.0 million was authorized on an interim basis pursuant to the Interim Order), and authorizing the Debtors to utilize the proceeds of drawings under the DIP Facility from time to time to cash collateralize letters of credit to be issued by one or more banks for the account of Debtors during the Chapter 11 Cases, (b) authorizing the use of Cash Collateral (as defined below) by the Debtors effective as of the Petition Date, (c) allowing superpriority administrative expense status of the DIP Obligations (as defined below) in the Debtors' chapter 11 cases (the "<u>Chapter 11 Cases</u>") and authorizing the Debtors to grant to the DIP Agent on its behalf and on behalf of the DIP Lenders automatically perfected security interests in and liens on the DIP Collateral (as defined below) to the extent set forth herein, (d) vacating and modifying

the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and this Final Order, (e) granting adequate protection to the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Notes Trustee, and the Prepetition Noteholders (each such capitalized term being used herein as defined below), (f) scheduling a final hearing to consider entry of this Final Order, and (g) granting related relief; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court on May 13, 2015 (the "Interim Hearing"), with appearances of parties in interest noted in the transcript thereof, and at a hearing before the Court on June 3, 2015 (the "Final Hearing", and together with the Interim Hearing, the "Hearings"), with appearances of parties in interest noted in the transcript thereof, and this Court having entered the Interim Order on May 13, 2015; and the Court having determined that the legal and factual bases set forth in the Motion, the *Declaration of Ray Dombrowski in Support of First Day Motions*, dated as of May 12, 2015 (the "First Day Declaration"), the Declaration of Marc Puntus in support of the Motion, dated as of May 12, 2015 (the "Puntus Declaration"), and at the  Hearings establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND CONCLUDED THAT:

A.      Disposition.  The Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order

that have not been withdrawn, waived or settled, including without limitation the objection of

Barclays Bank PLC at [Docket No. 180], are hereby denied and overruled.

B.      Commencement of Chapter 11 Cases.   On May 12, 2015 (the "Petition Date"),

each Debtor filed with this Court a voluntary petition for relief under chapter 11 of the

Bankruptcy Code.   The Debtors are in possession of their properties and are continuing to

operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the

Bankruptcy Code.   An official committee of unsecured creditors (the "Committee") has been

appointed in the Chapter 11 Cases.

C.      Jurisdiction and Venue.   This Court has jurisdiction over the Chapter 11 Cases,

the Motion and the parties and property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and

1334.   Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).   The Court may enter a final order consistent with Article III of the United States

Constitution.   It appears that venue of the Chapter 11 Cases in this District is proper pursuant to

28 U.S.C. §§ 1408 and 1409.   The predicates for the relief sought herein are sections 105, 361,

362, 363(c), 363(e), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy

Rules 2002, 4001, 6004 and 9014, and Local Rule 4001-2.

D.      Adequate Notice.   On the Petition Date, the Debtors filed the Motion with this

Court pursuant to Bankruptcy Rules 2002, 4001 and 9014, and represent that they provided

notice of the Motion, the Hearings and the Interim Order by electronic mail, facsimile, hand

delivery or overnight delivery to the following parties and/or their respective counsel as

indicated below:  (a) the Office of the U.S. Trustee; (b) counsel to the Prepetition Term Agent;

(c) counsel to the Prepetition LC Agent; (d) counsel to the Prepetition ABL Agent; (e) counsel to

the Prepetition Notes Trustee; (f) counsel to the Prepetition LC/Term Collateral Agent; (g)

creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed

with the Debtors' voluntary petitions; and (h) all parties requesting service in these Chapter 11

Cases pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

      E.    The Prepetition Obligations.  The Debtors acknowledge, admit, represent,

stipulate and agree that:

      (i)    *Prepetition ABL Agreement*.  Prior to the Petition Date, pursuant to the

terms and conditions set forth in that certain (a) Credit Agreement, dated as of December 18,

2013 (as amended, modified, supplemented or restated from time to time, the "Prepetition ABL

Agreement"), by and among the Borrower, the other Debtors, the letter of credit issuers party

thereto (the "Prepetition ABL Facility Issuers"), the lenders party thereto (together with the

Prepetition ABL Facility Issuers and all other Secured Parties (as defined in the Prepetition ABL

Agreement), the "Prepetition ABL Lenders"), and Deutsche Bank AG New York Branch, in its

capacity as administrative agent for the Prepetition ABL Lenders (in such capacity and its

capacity as collateral agent with respect to the Prepetition ABL Facility, and together with any of

its successors in such capacities, the "Prepetition ABL Agent"); and (b) all other agreements,

documents and instruments executed and/or delivered with, to or in favor of the Prepetition ABL

Agent and/or any of the Prepetition ABL Lenders, including, without limitation, the Intercreditor

Agreements (as defined below), all security agreements, notes, guarantees, mortgages, Uniform

Commercial Code financing statements and all other related agreements, documents and

instruments, including any fee letters, executed and/or delivered in connection therewith or related

thereto (all the foregoing, together with the Prepetition ABL Agreement, as all of the same have

been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the

Petition Date, collectively, the "Prepetition ABL Financing Documents"), the Prepetition ABL

Lenders agreed to make revolving loans to, and issue letters of credit for the account of, the Borrower and other Debtors and to otherwise extend credit to the Debtors, in an aggregate principal amount not to exceed $65.0 million (the "Prepetition ABL Facility"). All obligations of the Debtors arising under the Prepetition ABL Agreement or any other Prepetition ABL Financing Document, including under the Prepetition ABL Facility and all Secured Obligations under and as defined in the Prepetition ABL Agreement, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers', field examiners' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition ABL Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition ABL Financing Documents shall hereinafter be referred to collectively as the "Prepetition ABL Obligations". All extensions of credit under the Prepetition ABL Facility are subject to a Borrowing Base (as defined in the Prepetition ABL Agreement).

(ii)     *Prepetition LC/Term Loan Agreement*.  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Credit Agreement (L/C Facility and Term Facility), dated as of December 18, 2013 (as amended, modified, supplemented or restated from time to time, the "Prepetition LC/Term Loan Agreement"), by and among the Borrower, the other Debtors, the lenders party thereto as Term Lenders (as defined therein, and together with all other Term Secured Parties (as defined in the Prepetition LC/Term Loan Agreement), the "Prepetition Term Lenders"), the letter of credit issuers party thereto (the "Prepetition LC Facility Issuers"),

the lenders party thereto as L/C Lenders (as defined therein, and together with the Prepetition LC Facility Issuers and all other L/C Secured Parties (as defined in the Prepetition LC/Term Loan Agreement) the "Prepetition LC Lenders"), Barclays Bank PLC, in its capacity as L/C Administrative Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition LC Agent"), Cortland Capital Market Services LLC ("Cortland"), in its capacity as successor Term Administrative Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition Term Agent"), and Wilmington Trust, National Association, in its capacity as Collateral Agent (as defined therein, in such capacity and together with any of its successors in such capacity, the "Prepetition LC/Term Collateral Agent"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Term Agent, any of the Prepetition Term Lenders, the Prepetition LC Agent, any of the Prepetition LC Lenders, and/or the Prepetition LC/Term Collateral Agent (the foregoing, collectively, the "Prepetition LC/Term Secured Parties"), including, without limitation, the Intercreditor Agreements, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition LC/Term Loan Agreement, as all of the same have been or may be supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date or in connection with any resignation or appointment of the role of the Prepetition Term Agent or Prepetition LC Agent, collectively, the "Prepetition LC/Term Loan Financing Documents"), the Prepetition Term Lenders agreed to make term loans to the Borrower and to otherwise extend credit to the Debtors, in an aggregate principal amount of up to $250.0 million (the "Prepetition

Term Loan Facility") and the Prepetition LC Lenders agreed to extend credit to the Debtors under certain letters of credit in the aggregate original undrawn available amount of $200,147,031.55 and to otherwise extend credit to the Debtors (including in the form of extensions of such letters of credit and advances in connection with drawings thereunder) (the "Prepetition LC Facility" and together with the Prepetition Term Loan Facility, the "Prepetition LC/Term Loan Facility").  All obligations of the Debtors arising under the Prepetition LC/Term Loan Agreement or any other Prepetition LC/Term Loan Financing Document, including the Prepetition Term Loan Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees (including fees of the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent), costs (including any and all costs of the Prepetition Term Lenders described in Section 12.04 of the Prepetition LC/Term Loan Agreement), charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition LC/Term Loan Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable, in respect of any of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents (including any amount by which letters of credit issued under the Prepetition LC/Term Loan Agreement increase after the Petition Date by their terms), in each case to the extent relating to the Prepetition Term Loan Facility, including all "Secured Term Facility Obligations" as defined in the Prepetition LC/Term Loan Agreement, shall hereinafter be referred to collectively as the "Prepetition Term Loan Obligations."  All obligations of the Debtors arising under the Prepetition LC/Term Loan Agreement or any other Prepetition LC/Term Loan Financing

Document, including the Prepetition LC Facility, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees (including fees of the Prepetition LC/Term Collateral Agent and the Prepetition LC Agent), costs (including any and all costs of the Prepetition LC Lenders described in Section 12.04 of the Prepetition LC/Term Loan Agreement), charges, indemnification obligations, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition LC/Term Loan Financing Documents), or other amounts, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable, in respect of any of the Debtors' obligations under the Prepetition LC/Term Loan Financing Documents, in each case to the extent relating to the Prepetition LC Facility, including all "Secured L/C Facility Obligations" as defined in the Prepetition LC/Term Loan Agreement, shall hereinafter be referred to collectively as the "Prepetition LC Obligations."  As used herein: "Prepetition LC Secured Parties" means the Prepetition LC Agent, the Prepetition LC Lenders, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition LC Obligations and/or LC Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral Agent for the benefit or on behalf of any other Prepetition LC Secured Party), and all other L/C Secured Parties (as defined in the Prepetition LC/Term Loan Agreement).  "Prepetition Term Secured Parties" means the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition LC/Term Collateral Agent (to the extent of any Prepetition Term Loan Obligations and/or Term Adequate Protection Obligations owing to the Prepetition LC/Term Collateral Agent or granted to or held by the Prepetition LC/Term Collateral

Agent for the benefit or on behalf of any other Prepetition Term Secured Party), and all other Term Secured Parties (as defined in the Prepetition LC/Term Loan Agreement).

(iii)    *Prepetition Notes.*  Prior to the Petition Date, pursuant to the terms and conditions set forth in that certain (a) Indenture, dated December 18, 2013, with respect to the Borrower's 15.0% Senior Secured Second Lien PIK Toggle Notes due 2023 (as amended, modified, supplemented or restated from time to time, the "Prepetition Indenture"), by and among the Borrower, as issuer, the other Debtors, U.S. Bank National Association, in its capacity as trustee (in such capacity and its capacity as collateral trustee for the Prepetition Noteholders with respect to the Prepetition Notes, and together with any of its successors in such capacities, the "Prepetition Notes Trustee", together with the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent, the "Prepetition Agents") for the Holders (as defined in the Prepetition Indenture) (the "Prepetition Noteholders"); and (b) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the Prepetition Notes Trustee and/or the Prepetition Noteholders, including, without limitation, the Intercreditor Agreements, all security agreements, collateral trust agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition Indenture, as all of the same have been supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Prepetition Notes Documents", and together with the Prepetition LC/Term Loan Financing Documents and the Prepetition ABL Financing Documents, the "Prepetition Financing Documents"), the Prepetition Noteholders agreed to purchase the Borrower's Senior Secured Second Lien PIK Toggle Notes

due 2023 in an initial aggregate principal amount of $262,499,992.00 (such initial notes, together with any additional notes issued or increases to the principal amount of existing notes as of the Petition Date, in each case representing interest "paid in kind", the "<u>Prepetition Notes</u>" and together with the Prepetition LC/Term Loan Facility and the Prepetition ABL Facility, the "<u>Prepetition Facilities</u>").  All obligations of the Debtors arising under the Prepetition Indenture or any other Prepetition Notes Document, including under the Prepetition Notes, and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including any and all reasonable attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Notes Documents), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Notes Documents shall hereinafter be  referred to collectively as the "<u>Prepetition Notes Obligations</u>".  The Prepetition LC Obligations, the Prepetition Term Loan Obligations, Prepetition ABL Obligations and Prepetition Notes Obligations shall hereinafter be referred to collectively as the "<u>Prepetition Obligations</u>".

(iv)     *Guarantors*.  The Prepetition Obligations are guaranteed, on a joint and several basis, by substantially all wholly-owned domestic subsidiaries of the Borrower under the terms of the applicable Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents, and the Prepetition Notes Documents, respectively (collectively, the "<u>Guarantors</u>"), and the Prepetition ABL Obligations are also guaranteed by the Borrower.

(v)     *Prepetition ABL Liens*.  Pursuant to certain Prepetition ABL Financing Documents, each Debtor granted to the Prepetition ABL Agent for its benefit and the benefit of

the Prepetition ABL Lenders, to secure the Prepetition ABL Obligations a security interest in and continuing lien on (the "Prepetition ABL Liens") all of the "Collateral" (as defined in the Prepetition ABL Agreement), subject to certain exclusions as set forth in the Prepetition ABL Financing Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "Prepetition ABL Collateral").

(vi)    *Prepetition Term Loan Liens*.  Pursuant to certain Prepetition LC/Term Loan Financing Documents, each Debtor granted to the Prepetition LC/Term Collateral Agent, for its benefit and the benefit of the Prepetition Term Agent and the Prepetition Term Lenders, to secure the Prepetition Term Loan Obligations, a security interest in and continuing lien on (the "Prepetition Term Loan Liens") all of the "Collateral" (as defined in the Prepetition LC/Term Loan Agreement), subject to certain exclusions as set forth in the Prepetition LC/Term Loan Financing Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "Prepetition LC/Term Loan Collateral").

(vii)    *Prepetition LC Liens*.  Pursuant to certain Prepetition LC/Term Loan Financing Documents, each Debtor granted to the Prepetition LC/Term Collateral Agent, for its benefit and the benefit of the Prepetition LC Agent and the Prepetition LC Lenders, to secure the Prepetition LC Obligations, a security interest in and continuing lien on (the "Prepetition LC Liens" and together with the Prepetition Term Loan Liens, the "Prepetition LC/Term Loan Liens") all of the Prepetition LC/Term Loan Collateral.

(viii)    *Prepetition Notes Liens*.  Pursuant to certain Prepetition Notes Documents, each Debtor granted to the Prepetition Notes Trustee for its benefit and the benefit of the Prepetition Noteholders, to secure the Prepetition Notes Obligations, a security interest in and continuing lien on (the "Prepetition Notes Liens"; together with the Prepetition Term Loan Liens,

the Prepetition LC Liens, and the Prepetition ABL Liens, the "Prepetition Liens") all of the "Collateral" (as defined in the Indenture), subject to certain exclusions as set forth in the Prepetition Notes Documents only to the extent such lien did not attach to the property purported to be subject to such exclusions (collectively, the "Prepetition Notes Collateral," and together with the Prepetition LC/Term Loan Collateral and the Prepetition ABL Collateral, the "Prepetition Collateral").

(ix)    *Prepetition Intercreditor Agreements*.  The Debtors, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent and the Prepetition LC/Term Collateral Agent are parties to that certain First-Lien Intercreditor Agreement dated as of December 18, 2013 (as amended, supplemented or otherwise modified from time to time, the "First-Lien Intercreditor Agreement"), which governs, among other things, the relative priorities of the applicable Prepetition Liens in respect of the applicable Prepetition Collateral.  The First-Lien Intercreditor Agreement provides that the Prepetition LC Liens and the Prepetition Term Loan Liens have priority over and are senior to the Prepetition ABL Liens with respect to the LC/Term Priority Collateral (as used herein, as defined in the First-Lien Intercreditor Agreement) and that the Prepetition ABL Liens have priority over and are senior to the Prepetition LC Liens and the Prepetition Term Loan Liens with respect to the ABL Priority Collateral (as used herein, as defined in the First-Lien Intercreditor Agreement). The Prepetition LC/Term Loan Financing Documents include certain subordination agreements with respect to the relative rights and priorities of the Prepetition Term Loan Obligations and the Prepetition Term Secured Parties, compared to the Prepetition LC Obligations and the Prepetition LC Secured Parties (including, without limitation, Sections 9.04, 10.15, 10.17, and 12.06(j) of the Prepetition LC/Term Loan Agreement and the related provisions set forth in any Affiliate Assignment Agreement (as defined

13

in the Prepetition LC/Term Loan Agreement)), which provide, among other things, that the Prepetition LC Obligations are "first out" in payment priority versus the Prepetition Term Loan Obligations  (the foregoing, subject only to the LC/Term Loan Agent Expenses Priority (as defined below) being referred to collectively as "Term Loan Subordination Agreement"), except that, notwithstanding anything herein to the contrary, that portion of the Prepetition LC Obligations and Prepetition Term Loan Obligations constituting fees, indemnities, expenses and other amounts (other than principal, interest and Letter of Credit Fees (as defined in the Prepetition LC/Term Loan Agreement), but including amounts payable under Section 12.04 of the Prepetition LC/Term Loan Agreement and amounts payable under Article III of the Prepetition LC/Term Loan Agreement) payable to each of the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, and the Prepetition Term Agent, in each case, in their respective capacities as such, are pari passu in priority of payment with each other pursuant to clause First of Section 9.04(a) of the Prepetition LC/Term Loan Agreement and are, collectively, "first out" in payment priority versus both all other Prepetition LC Obligations and all other Prepetition Term Loan Obligations on the terms set forth in Section 9.04(a) of the Prepetition LC/Term Loan Agreement (this exception being referred to as the "LC/Term Loan Agent Expenses Priority").  The Debtors, the Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, and the Prepetition Notes Trustee are parties to that certain Junior-Lien Intercreditor Agreement dated as of December 18, 2013 (as amended, supplemented or otherwise modified from time to time, the "Junior-Lien Intercreditor Agreement", together with the First-Lien Intercreditor Agreement and the Term Loan Subordination Agreement, the "Intercreditor Agreements"), which governs, among other things, the relative priorities of the Prepetition Liens in respect of the Prepetition Collateral.   The Junior-Lien Intercreditor

Agreement provides that the Prepetition ABL Liens, the Prepetition LC Liens and the Prepetition

Term Loan Liens collectively have priority over and are senior to the Prepetition Notes Liens with

respect to the Common Collateral (as defined in the Junior-Lien Intercreditor Agreement).  Each

of the Intercreditor Agreements remains in full force and effect in accordance with the terms

thereof.

(x)    *No Other Liens*.    Except  as  otherwise  set  forth  in  the  proviso  to

Paragraph 15(a) below, as of the Petition Date, other than as expressly permitted under the

Prepetition Financing Documents, there were no liens on or security interests in the Prepetition

Collateral other than the Prepetition Liens.

(xi)    *DIP Facility*.    After  good  faith,  arm's  length  negotiations,  certain

Prepetition Term Lenders and Prepetition Noteholders have agreed to provide the Debtors

additional funding as contemplated by, and subject to the terms and conditions of, the DIP

Facility to preserve the Debtors' business operations.

F.    <u>Debtors' Stipulations</u>.  Subject to the rights of the Committee or other parties-in-

interest as and to the extent set forth in Paragraph 36 below (which rights are subject to any other

applicable  limitations  set  forth  herein,  including  without  limitation  on  the  use  of  Cash

Collateral), the Debtors acknowledge, admit, represent, stipulate and agree that:

(i)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL

Obligations for which the Debtors were truly and justly indebted to the Prepetition ABL Lenders,

without defense, counterclaim, recoupment or offset of any kind, aggregated not less than

approximately $38,410,655.81 in issued and undrawn letters of credit (and, if applicable, unpaid

borrowings as a result of any drawing on any letters of credit), plus accrued but unpaid interest

and other unpaid fees, charges, costs and expenses (including fees and expenses of counsel, field

examiners, consultants and other advisors of the Prepetition ABL Agent and the Prepetition ABL

Lenders) to the extent required under the terms of the Prepetition ABL Financing Documents.

The Prepetition ABL Obligations are (x) legal, valid, binding and enforceable against the Debtors,

each in accordance with its terms (other than in respect of the stay of enforcement arising from

section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance,

reductions, recharacterization, set-off, subordination (whether equitable, contractual or

otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or

challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or

otherwise (except insofar as such Prepetition ABL Obligations are expressly subordinated in right

of payment in accordance with the provisions of this Final Order and except for the rights and

remedies set forth in the First-Lien Intercreditor Agreement of the Prepetition Secured Parties

party thereto or bound thereby).

(ii)     *Prepetition ABL Liens Not Subject to Avoidance*.  The Prepetition ABL

Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the

Prepetition ABL Collateral that secure all of the Prepetition ABL Obligations, (b) are and remain

senior in priority over any and all other liens on the ABL Priority Collateral (subject only to

(i) the ABL Adequate Protection Liens and the Carve Out and (ii) "Specified Permitted Liens" as

defined in and to the extent expressly permitted to be senior to the Prepetition ABL Liens under

the Prepetition ABL Agreement), (c) are and remain senior in priority over any and all other liens

on the LC/Term Priority Collateral (subject only to (i) the Prepetition LC Liens and the

Prepetition Term Loan Liens, (ii) the Carve Out, DIP Liens, the ABL Adequate Protection Liens,

and the LC/Term Adequate Protection Liens (as defined below) and (iii) "Specified Permitted

Liens" as defined in and to the extent expressly permitted to be senior to the Prepetition ABL

16

Liens under the Prepetition ABL Agreement), and (d) are not subject to any attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such liens are subordinated to (i) the Carve Out, (ii) the ABL Adequate Protection Liens and (iii) other than with respect to ABL Priority Collateral, the DIP Liens (as defined below), the LC/Term Adequate Protection Liens and the Prepetition LC/Term Loan Liens, in accordance with the provisions of this Final Order, the other DIP Loan Documents, and the First-Lien Intercreditor Agreement).

(iii)    *Prepetition LC Obligations and Prepetition Term Loan Obligations*.  As of the Petition Date, the Prepetition Term Loan Obligations for which the Debtors were truly and justly indebted to the Prepetition Term Agent, the Prepetition LC/Term Collateral Agent and the Prepetition Term Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $246,875,000.00 in outstanding aggregate principal amount of term loans, plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses (including fees and expenses of counsel, field examiners, consultants, and other advisors of the Prepetition Term Agent and the Prepetition Term Lenders) to the extent required under the terms of the Prepetition LC/Term Loan Financing Documents.  As of the Petition Date, the Prepetition LC Obligations for which the Debtors were truly and justly indebted to the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent and the Prepetition LC Lenders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less than approximately $198,420,869.55 in issued and undrawn letters of credit (and, if applicable, unpaid borrowings as a result of any drawing on any letters of credit), plus accrued but unpaid interest and other unpaid

fees, charges, costs and expenses (including fees and expenses of counsel, field examiners, consultants and other advisors of the Prepetition LC Agent and the Prepetition LC Lenders) as required under the terms of the Prepetition LC/Term Loan Financing Documents, plus any L/C Related Obligations (as defined in the Prepetition LC/Term Loan Facility). The Prepetition Term Loan Obligations and the Prepetition LC Obligations are (x) legal, valid, binding and enforceable against the Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such Prepetition Obligations are expressly subordinated in right of payment in accordance with the provisions of this Final Order and except for (1) the rights and remedies set forth in the First-Lien Intercreditor Agreement of the Prepetition Secured Parties party thereto or bound thereby and (2) pursuant to the LC/Term Loan Agent Expenses Priority and, solely with respect to the Prepetition Term Loan Obligations not payable as LC/Term Loan Agent Expenses Priority, pursuant to the other terms of the Term Loan Subordination Agreement).

(iv)    *Prepetition Term Loan Liens Not Subject to Avoidance*. The Prepetition Term Loan Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition LC/Term Loan Collateral that secure all of the Prepetition Term Loan Obligations, (b) are and remain senior in priority over any and all other liens on the LC/Term Priority Collateral (subject only to (i) the Prepetition LC Liens (except to the extent otherwise provided pursuant to the LC/Term Loan Agent Expenses Priority), (ii) the Carve Out, the DIP

Liens, and the LC/Term Adequate Protection Liens and (iii) liens to the extent expressly

permitted to be senior to the Prepetition Term Loan Liens in accordance with the terms of the

Prepetition LC/Term Loan Agreement), (c) are and remain senior in priority over any and all

other liens on the ABL Priority Collateral (subject only to (i) the Prepetition ABL Liens, (ii) the

Prepetition LC Liens  (except to the extent otherwise provided pursuant to the LC/Term Loan

Agent Expenses Priority), (iii) the Carve Out, the DIP Liens, the ABL Adequate Protection Liens

and the LC/Term Adequate Protection Liens and (iv) liens to the extent expressly permitted to be

senior to the Prepetition Term Loan Liens in accordance with the terms of the Prepetition

LC/Term Loan Agreement), and (d) are not subject to any attachment, recoupment, rejection,

avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or

otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or

challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or

otherwise (except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL

Liens on the ABL Priority Collateral, the Prepetition LC Liens (except to the extent otherwise

provided pursuant to the LC/Term Loan Agent Expenses Priority), the ABL Adequate Protection

Liens on the Priority ABL DIP Collateral, the LC/Term Adequate Protection Liens and the Carve

Out, in accordance with the provisions of this Final Order, the other DIP Loan Documents, the

First-Lien Intercreditor Agreement and the Term Loan Subordination Agreement).

      (v)    *Prepetition LC Liens Not Subject to Avoidance.*  The Prepetition LC Liens

(a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the

Prepetition LC/Term Loan Collateral that secure all of the Prepetition LC Obligations, (b) are and

remain senior in priority over any and all other liens on the LC/Term Priority Collateral (subject

only to (i) the LC/Term Loan Agent Expenses Priority,  (ii) the Carve Out, the DIP Liens and the

interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and (iii) liens to the extent expressly permitted to be senior to the Prepetition LC Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), (c) are and remain senior in priority over any and all other liens on the ABL Priority Collateral (subject only to (i) the LC/Term Loan Agent Expenses Priority, (ii) the Prepetition ABL Liens, (iii) the Carve Out, the DIP Liens, the ABL Adequate Protection Liens and the interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and (iv) liens to the extent expressly permitted to be senior to the Prepetition Term Loan Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement), and (d) are not subject to any attachment, recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except to the extent otherwise provided pursuant to the LC/Term Loan Agent Expenses Priority and except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL Liens on the ABL Priority Collateral, the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, the interests of the Prepetition LC Secured Parties in the LC/Term Adequate Protection Liens with respect to the Prepetition LC Obligations and the Carve Out, in accordance with the provisions of this Final Order, the other DIP Loan Documents and the First-Lien Intercreditor Agreement).

(vi)     *Prepetition Notes Obligations*.    As of the Petition Date, the Prepetition Notes Obligations for which the Debtors were truly and justly indebted to the Prepetition Noteholders, without defense, counterclaim, recoupment or offset of any kind, aggregated not less

than approximately $324,104,989.00 (inclusive of original issue discount, if any), plus accrued but unpaid interest and other unpaid fees, charges, costs and expenses as required under the terms of the Prepetition Notes Documents.   The Prepetition Notes Obligations are (x) legal, valid, binding and enforceable against the Debtors, each in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and (y) not subject to any recoupment, rejection, avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other claims, causes of action or challenges of any nature under the Bankruptcy Code, any other applicable law or regulation or otherwise (except insofar as such Prepetition Obligations are expressly subordinated in right of payment in accordance with the provisions of this Final Order and except for the rights and remedies set forth in the Junior-Lien Intercreditor Agreement of the Prepetition Secured Parties party thereto or bound thereby).

(vii)    *Prepetition Notes Liens Not Subject to Avoidance*.   The Prepetition Notes Liens (a) constitute valid, binding, enforceable, nonavoidable, and properly perfected liens on the Prepetition Notes Collateral, (b) are and remain senior in priority over any and all other liens on the Prepetition Collateral (except for (x) liens expressly permitted under the Prepetition Indenture, (y) the Prepetition ABL Liens, the Prepetition LC Liens, and the Prepetition Term Loan Liens and (z) the Carve Out, the DIP Liens, and the Adequate Protection Liens (as defined below)), and (c) are not subject to avoidance, reductions, recharacterization, set-off, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation (except insofar as such liens are subordinated to the DIP Liens, the Prepetition ABL Liens, the Prepetition LC Liens, the Prepetition Term Loan Liens, the Adequate Protection Liens and the Carve Out, in accordance

with the provisions of this Final Order, the other DIP Loan Documents, and the Junior-Lien

Intercreditor Agreement).

(viii)   *No Claims*.   The Debtors have no valid claims (as such term is defined in

section 101(5) of the Bankruptcy Code) or causes of action against any of the Prepetition Term

Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the Prepetition ABL

Agent, the Prepetition Notes Trustee, the Prepetition Term Lenders, the Prepetition LC Lenders,

the Prepetition ABL Lenders or the Prepetition Noteholders with respect to the Prepetition

Financing Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise, whether

arising at law or at equity, including, without limitation, any challenge, recharacterization,

subordination, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or

542 through 553, inclusive, of the Bankruptcy Code.

(ix)   *Release.*   Subject to the reservations of rights under Paragraph 36 hereof,

the Debtors hereby stipulate and agree that they forever, unconditionally and irrevocably release,

discharge and acquit the DIP Agent and the DIP Lenders and the Consenting Secured Parties (as

defined below) , and each of their respective successors, assigns, affiliates, subsidiaries, parents,

officers, shareholders, directors, employees, attorneys and agents, past, present and future, and

their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and

from any and all claims, controversies, disputes, liabilities, obligations, demands, damages,

expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions and

causes of action of any and every nature whatsoever, whether arising in law or otherwise, and

whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility,  the

DIP Loan Documents, the Prepetition Facilities, the Prepetition Financing Documents and/or the

transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called

"lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes

of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with

respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Agent,

the DIP Lenders and the Prepetition Secured Parties (as defined below).   Subject to the

reservation of rights under Paragraph 36 hereof, the Debtors further waive and release any

defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition

Obligations and the DIP Obligations which the Debtors now have or may claim to have against

the Releasees, arising out of, connected with or relating to any and all acts, omissions or events

occurring prior to the Court entering this Final Order.  For purposes hereof, the term "Consenting

Secured Party" shall mean any Prepetition Secured Party that has not opposed or objected to

either the Interim Order or this Final Order by objecting at the Interim Hearing or Final Hearing

or by filing an objection with the Court to either the Interim Order or this Final Order; provided,

that for the avoidance of doubt, no expression of a reservation of rights or statement in response

(whether by a filing or otherwise) shall constitute an objection or opposition to the Interim Order

or this Final Order for purposes of this definition.

      G.    <u>Cash Collateral</u>.  For purposes of this Final Order the term "<u>Cash Collateral</u>" shall

mean and include any and all "cash collateral" as defined in section 363 of the Bankruptcy Code,

in which the Prepetition LC/Term Collateral Agent (on its behalf and on behalf of the Prepetition

LC/Term Secured Parties), the Prepetition Term Agent (on its behalf and on behalf of the

Prepetition Term Lenders), the Prepetition ABL Agent (on its behalf and on behalf of the

Prepetition ABL Lenders), the Prepetition LC Agent (on its behalf and on behalf of the

Prepetition LC Lenders) or the Prepetition Notes Trustee (on its behalf and on behalf of the

Prepetition Noteholders) has a lien or security interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or this Final Order, or otherwise.

H.      Use of DIP Facility and Cash Collateral.   The Debtors have an immediate and critical need to use the DIP Facility and Cash Collateral to preserve and operate their businesses and effectuate a reorganization of their businesses, which will be used in accordance with the terms of this Final Order.  Without the use of the DIP Facility and Cash Collateral, the Debtors will not have sufficient liquidity to be able to continue to operate their businesses.  The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to avoid the objection of certain parties.  Absent authorization to immediately use a portion of the DIP Facility and Cash Collateral, the Debtors' estates and their creditors would suffer immediate and irreparable harm.

I.      Other Financing Unavailable.   As discussed in the First Day Declaration and the Puntus Declaration, the Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(l) of the Bankruptcy Code or (b) under section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code or (y) a junior lien on encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Final Order in order to satisfy their postpetition liquidity needs.

J.      <u>Best Financing Presently Available</u>.    The DIP Lenders have indicated a

willingness to provide the Debtors with financing solely on the terms and conditions set forth in

the Interim Order, this Final Order and the applicable DIP Loan Documents.    After considering

all of their alternatives, the Debtors have concluded, in an exercise of their sound business

judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of this

Final Order and the DIP Loan Documents, represents the best financing presently available.    The

DIP Lenders are good faith financiers.    The DIP Lenders' and the DIP Agent's claims,

superpriority claims, security interests, liens and other protections granted pursuant to this Final

Order and the applicable DIP Loan Documents will not be affected by any subsequent reversal,

modification, vacatur or amendment of the Interim Order, this Final Order or any other order, as

provided in section 364(e) of the Bankruptcy Code.

K.      <u>Good Cause for Entry</u>.    Good cause has been shown for  entry of this Final Order

pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2.    In particular, the

authorization granted herein for the Debtors to enter into the DIP Facility, to continue using Cash

Collateral and to obtain the full financing, including on a priming lien basis as set forth herein is

necessary to avoid immediate and irreparable harm to the Debtors and their estates.    Entry of this

Final Order is in the best interest of the Debtors, their estates and creditors. The terms of the DIP

Facility (including without limitation the Debtors' continued use of Cash Collateral, subject to

Paragraphs 31 and 39) are fair and reasonable under the circumstances, reflect the Debtors'

exercise of prudent business judgment consistent with its fiduciary duties, and are supported by

reasonably equivalent value and fair consideration.

L.      <u>Arm's Length Negotiation</u>.    The Debtors, the DIP Agent, the DIP Lenders, the

Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent, and certain of the

Prepetition ABL Lenders have negotiated the terms and conditions of the DIP Facility (including

the Debtors' continued use of Cash Collateral, subject to Paragraphs 31 and 39) and this Final

Order in good faith and at arm's length, and any credit extended and loans made to the Debtors

pursuant to this Final Order shall be, and hereby are, deemed to have been extended, issued or

made, as the case may be, in "good faith" within the meaning of section 364(e) of the

Bankruptcy Code.

M.      Adequate Protection for the Prepetition Secured Parties.  The Prepetition Secured

Parties have acted in good faith regarding the DIP Facility and the Debtors' use of the Prepetition

Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and

continued operation of their businesses, in accordance with the terms hereof.  The Prepetition

ABL Agent, the Prepetition LC Agent and the Prepetition Term Agent have agreed to not object

at this time to the Debtors' use of the Prepetition Collateral, including the Cash Collateral, in

accordance with the terms hereof.  The Prepetition Secured Parties are entitled to the adequate

protection provided in this Final Order as and to the extent set forth herein pursuant to §§ 361,

363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the

Court at the Hearings, as of the Petition Date the terms of the proposed adequate protection

arrangements and of the use of the Prepetition Collateral (including the Cash Collateral, subject

to Paragraphs 31 and 39) are fair and reasonable, reflect the Debtors' prudent exercise of

business judgment and constitute reasonably equivalent value and fair consideration for the use

of Cash Collateral; provided, that nothing in this Final Order or the other DIP Loan Documents

shall (x) be construed as the affirmative consent by a n y  o f  the Prepetition Secured Parties

for the use of Cash Collateral, (y) be construed as a consent to the terms of any financing or any

lien encumbering the P r e p e t i t i o n  Collateral (whether senior or junior), or (z) prejudice,

limit or otherwise impair the rights of any Prepetition Secured Party (for its benefit or the benefit

of the other Prepetition Secured Parties), subject to any applicable provisions of the Intercreditor

Agreements, to seek new, different or additional adequate protection or assert the interests of any

Prepetition Secured Party (for its benefit or the benefit of the other Prepetition Secured Parties).

N.    <u>Value of the Prepetition ABL Collateral</u>.  As of the Petition Date, the aggregate

value of the Prepetition ABL Lenders' interest in the Prepetition ABL Collateral securing the

Prepetition ABL Obligations exceeds the aggregate amount of the Prepetition ABL Obligations.

O.    <u>Order of the Court</u>.  Based upon the foregoing findings, acknowledgements, and

conclusions, and upon the record made before this Court at the Hearings, and good and sufficient

cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED
THAT:**

1.    <u>Motion Granted</u>.  The Motion is granted on a final basis, subject to the terms of

this Final Order.  Any objections to the Motion that have not previously been withdrawn or

resolved are hereby overruled on their merits.  This Final Order shall be valid, binding on all

parties in interest, and fully effective immediately upon entry notwithstanding the possible

application of Bankruptcy Rules 6004(h), 7062, and 9014.

2.    <u>Authority to Enter Into DIP Facility</u>.  The Debtors are hereby authorized to incur

and perform the obligations arising from and after the date of this Final Order under the DIP

Facility, on the terms set forth in this Final Order, including entry into, execution and delivery of

the DIP Loan Agreement attached hereto as **<u>Exhibit 1</u>** and such additional documents,

instruments and agreements as may be reasonably required by the DIP Agent and the DIP

Lenders to implement the terms or effectuate the purposes of and transactions contemplated by

the Interim Order, this Final Order and the DIP Loan Agreement (collectively, the Interim Order,

this Final Order, the DIP Loan Agreement, the Administrative Fee Agent Letter, and such

additional documents, instruments and agreements, including any fee letters and the milestones

attached hereto as **Exhibit 3** (which, notwithstanding anything to the contrary in the DIP Loan

Agreement, shall hereby replace Schedule 4.03 to the DIP Loan Agreement), the "DIP Loan

Documents"). The Debtors are hereby authorized (a) to execute and deliver the DIP Loan

Documents, borrow money under the DIP Facility, and pay all fees in connection therewith, on a

final basis in accordance with the terms of the DIP Loan Documents, and the Guarantors are

hereby authorized to guaranty such borrowings and the Borrower's obligations under the DIP

Facility and the DIP Loan Documents, all in accordance with the terms of this Final Order and

the other DIP Loan Documents, and (b) to obtain the issuance of, and to utilize the proceeds of

drawings under the DIP Facility  to cash collateralize, one or more letters of credit to be issued

by one or more issuing banks for the account of Debtors during the Chapter 11 Cases.

3.    Use of Cash Collateral and DIP Extensions of Credit.  Subject to Paragraphs 31

and 39 of this Final Order, the Debtors are hereby authorized to use Cash Collateral and the

proceeds of any borrowings under the DIP Facility in accordance with the DIP Loan Agreement

and the other terms and conditions set forth in this Final Order and the DIP Loan Documents

(including but not limited to cash collateralizing letters of credit to be issued from time to time

by one or more issuing banks for the account of Debtors during the Chapter 11 Cases) and

subject to and in accordance with the Budget.

4.    Validity of DIP Loan Documents.  The DIP Loan Documents shall constitute

valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in

accordance with the terms thereof.  No obligation, payment, transfer or grant of security under

the DIP Loan Documents as approved under this Final Order shall be stayed, restrained, voided,

voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law,

or subject to any defense, reduction, setoff, recoupment or counterclaim.

    5.    <u>Carve Out</u>.

    (a)    For purposes of this Final Order and the other DIP Loan Documents,

"<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the

Office of the United States Trustee under section 1930(a) of title 28 of the United States Code

plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all

reasonable fees and expenses up to $200,000 incurred by a trustee under section 726(b) of the

Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed

at any time, whether by interim order, procedural order, or otherwise, all unpaid costs, fees, and

expenses incurred by persons or firms retained by the Debtors or the Committee pursuant to

sections 327, 328, 363, or 1102 of the Bankruptcy Code (collectively, the "<u>Estate Professionals</u>,"

and such costs, fees, and expenses, the "<u>Professional Fees</u>") at any time before or on the first

business day following delivery by the DIP Agent of a Carve Out Trigger Notice, whether

allowed by the Court or payable by the Debtors prior to or after delivery of a Carve Out Trigger

Notice (the amounts set forth in this clause (iii) being the "<u>Pre-Termination Amount</u>"); and (iv)

Professional Fees in an aggregate amount equal to $5,000,000 incurred after the first business

day following delivery by the DIP Agent of the Carve Out Trigger Notice <u>plus</u> any restructuring

fee, sale fee, or other success fee of any investment banker or financial advisor of the Debtors or

the Committee that has not previously been funded into the Professional Fees Account, to the

extent allowed at any time, whether by interim order, procedural order, final order, or otherwise

(the amounts set forth in this clause (iv) being the "<u>Post-Termination Amount</u>," and together

with the Pre-Termination Amount, the "Carve Out Reserve").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the Prepetition Agents and their counsel, and the U.S. Trustee providing notice that the Termination Date has occurred. Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been issued, the Debtors shall be permitted to pay (i) fees to estate professionals and reimburse expenses incurred by estate professionals that are allowed by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code and compensation procedures approved by the Court and in form and substance reasonably acceptable to the Debtors and (ii) fees, expenses, indemnities, and other amounts to the DIP Agent or any DIP Lender or any of the foregoing's respective attorneys, advisors, as the same may be due and payable, and the same shall not reduce the Carve Out; provided that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation described in this Paragraph 5(a); provided that, in no event shall the DIP Lenders be obligated to lend amounts in excess of their respective Commitments as defined in the DIP Loan Agreements.

(b)        On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors, with a copy to its lead restructuring counsel, the Prepetition Agents and their counsel, and the U.S. Trustee, provided that the DIP Agent is in possession of funds or proceeds to do so under the DIP Facility, the DIP Agent shall transfer or cause to be transferred to the Professional Fees Account (as defined herein), cash in an amount equal to (a) the Pre-Termination Amount (which amount may be estimated by the Debtors in good faith in a written notice to the DIP Agent (provided that such estimate shall not operate to limit or cap the Pre-Termination Amount)) plus (b) the Post-Termination Amount; provided, that following delivery

of the Carve Out Trigger Notice (x) all funds held in the Professional Fees Account shall, subject to Paragraph 5(d), be applied to pay (to the extent allowed and payable), or held in trust to pay, Professional Fees prior to any and all other claims, (y) in the event the aforesaid funding does not occur within three business days of delivery of the Carve Out Trigger Notice, or if such funding is less than an amount equal to the Carve Out Reserve, the Debtors are authorized, subject to Paragraph 5(d), to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve Out Reserve (by way of a transfer to the Professional Fees Account) in an amount equal to any such shortfall, and (z) provided that the DIP Agent is in possession of funds or proceeds to do so under the DIP Facility, the DIP Agent shall fund the Carve Out Reserve notwithstanding any other provision of this Final Order or the DIP Loan Documents to the contrary, including with respect to the existence of a Default or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for withdrawals under the DIP Loan Agreement, any termination of the DIP Loan Agreement following an Event of Default, or the occurrence of the Maturity Date.  Further, notwithstanding anything to the contrary in this Final Order but subject to Paragraph 5(d), (i) the failure of the Carve Out Reserve to satisfy in full the Professional Fees shall not affect the priority of the Carve Out, (ii) in no way shall the Budget, Carve Out Reserve or any estimate by the Debtors of the Pre-Termination Amount operate or be construed as a cap or limitation on the Carve Out or on the amount of Professional Fees due and payable by the Debtors and (iii) in no way shall the Carve Out operate or be construed as a cap or limitation on the amount of Professional Fees due and payable by the Debtors; provided, that upon funding of the Carve Out Reserve, the proceeds deposited therein shall be used to pay the Carve Out prior to any other Cash Collateral, other proceeds of the DIP Facility or other amounts of the Debtors being utilized for purposes of

paying the Carve Out.  For the avoidance of doubt, and notwithstanding anything to the contrary

herein (other than Paragraphs 5(d), 25(a)(iii) and 25(a)(iv)), in any other order, in the other DIP

Loan Documents, or in the Prepetition Financing Documents, the Carve Out shall be senior to

any and all liens on, claims against, or obligations secured by any of the Debtors' assets,

including Cash Collateral, including all liens, claims, and/or obligations arising under, related to,

and/or securing the DIP Facility, the Prepetition Financing Documents, the Prepetition

Obligations, the Adequate Protection Obligations, the Superpriority Claims, and any and all

other forms of adequate protection, liens, or claims securing obligations arising under the DIP

Facility or the Prepetition Obligations.  Further, for the avoidance of doubt and notwithstanding

anything to the contrary in this Final Order, the other DIP Loan Documents, or any other order of

the Court, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result

of the Disposition of any assets) of the Debtors until the Carve Out Reserve has been fully

funded in accordance with this Paragraph 5(b); provided that, in no event shall the DIP Lenders

be obligated to lend amounts in excess of their respective Commitments as defined in the DIP

Loan Agreements.

(c)     Neither the Carve Out nor any portion of the DIP Facility or Cash

Collateral shall be used in connection with (1) preventing, hindering or delaying the DIP

Lenders' or the DIP Agent's enforcement or realization upon the DIP Collateral once an Event of

Default has occurred and is continuing in accordance with the DIP Loan Documents and this

Final Order, or, until the Payment in Full[2] of the Prepetition ABL Obligations, preventing or

---

[2]     As used in this Final Order and the other DIP Loan Documents, (a) with respect to the Prepetition ABL
Obligations, "Payment in Full" or "Paid in Full" shall be as defined in the Prepetition ABL Agreement,
(b) with respect to the Prepetition LC Obligations, "Payment in Full" or "Paid in Full" shall be as defined
in the Prepetition LC/Term Loan Agreement; and (c) with respect to the Prepetition Term Loan
Obligations, "Payment in Full" or "Paid in Full" shall be as defined in the Prepetition LC/Term Loan
Agreement.

delaying the Prepetition ABL Lenders' or the Prepetition ABL Agent's enforcement or realization upon the Priority ABL DIP Collateral (as hereinafter defined) once an Adequate Protection Default (as hereinafter defined) has occurred and is continuing in accordance with this Final Order and the Prepetition ABL Financing Documents, (2) disputing the DIP Liens or Superpriority Claims provided herein, (3) using or seeking to use any insurance proceeds related to the DIP Collateral except as permitted by the DIP Loan Documents or otherwise with the consent of the DIP Agent or the "Required Lenders" (as defined in the DIP Loan Agreement, and hereafter referred to as the "Required DIP Lenders"), (4) a request, without the prior consent of the DIP Agent (or the Required DIP Lenders), for authorization to obtain debtor in possession financing pursuant to section 364(c) or (d) of the Bankruptcy Code that does not indefeasibly discharge in full in cash the DIP Obligations immediately upon the closing of such financing, (5) prior to the Payment in Full of the Prepetition ABL Obligations, using or seeking to use Priority ABL DIP Collateral without the prior written consent of the Prepetition ABL Agent or the Required Lenders (as defined in the Prepetition ABL Agreement), (6) any act that seeks to modify any of the rights and remedies granted to the DIP Agent or any DIP Lender hereunder or under any of the DIP Loan Documents, unless otherwise agreed to by the DIP Agent or the Required DIP Lenders, or any act that seeks to modify any of the rights and remedies granted to any Prepetition ABL Secured Party, any Prepetition Term Secured Party, or any Prepetition LC Secured Party under this Final Order or any other DIP Loan Document, unless otherwise agreed to by the Prepetition ABL Agent, the Prepetition Term Agent, or the Prepetition LC Agent, respectively, and (7) asserting any claims or defenses or causes of action against the DIP Agent, the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors or preventing, hindering or otherwise delaying the DIP Agent's or the DIP Lenders' assertion,

enforcement or realization on the DIP Collateral or DIP Superpriority Claims once an Event of

Default has occurred and is continuing in accordance with the DIP Loan Documents or this Final

Order, or asserting any claims or defenses or causes of action against the Prepetition ABL Agent,

the Prepetition ABL Lenders or their respective agents, affiliates, representatives, attorneys or

advisors or preventing, hindering or otherwise delaying the Prepetition ABL Agent's or the

Prepetition ABL Lenders' assertion, enforcement or realization on the Priority ABL DIP

Collateral once an Adequate Protection Default has occurred and is continuing in accordance

with the Prepetition ABL Financing Documents or this Final Order.

(d)    Notwithstanding anything in this Final Order or the DIP Loan Agreement

to the contrary, solely with respect to the Prepetition ABL Lenders and the Prepetition ABL

Agent and all forms of adequate protection, liens, or claims securing obligations arising under

the Prepetition ABL Agreement, any reference to the "Carve Out" shall mean, on any date of

determination, an amount equal to the amount, if any, by which (x) the Borrowing Base (as

defined herein) then in effect (determined in accordance with Paragraph 25(a)(iv) of this Final

Order, giving effect to the $10,000,000 reduction thereto described in such Paragraph) exceeds

(y) the Total Outstandings (as defined in the Prepetition ABL Agreement), net of ABL Cash

Collateral (as defined herein) then held in the ABL Cash Collateral Account; provided that, in no

event shall the "Carve Out" amount determined pursuant to this Paragraph 5(d) exceed the

amount of the Carve Out as determined pursuant to Paragraph 5(a) without giving effect to this

Paragraph 5(d).

6.    <u>DIP Extensions of Credit</u>.  All loans made by any DIP Lender or the DIP Agent to

or for the benefit of any of the Debtors on or after the Petition Date in accordance with the DIP

Loan Documents (collectively, the "<u>DIP Extensions of Credit</u>"), all interest thereon and all fees,

costs, expenses, indemnification obligations and other liabilities, owing by the Debtors to the DIP Lenders or the DIP Agent (in their respective capacities as such) in accordance with and relating to this Final Order and the other DIP Loan Documents, including all Obligations as defined in the DIP Loan Agreement, are herein referred to as the "DIP Obligations." The DIP Extensions of Credit: (a) shall be evidenced by the books and records of the DIP Agent or the DIP Lenders, as applicable; (b) shall bear interest payable and incur fees at the rates set forth in the applicable provisions of the DIP Loan Agreement; (c) shall be secured in the manner specified below; (d) shall be payable in accordance with the DIP Loan Documents; and (e) shall otherwise be governed by the terms set forth in this Final Order and the other DIP Loan Documents.

7.     DIP Loan Funding Account; Segregated Operating Account.  Notwithstanding anything to the contrary contained herein or any DIP Loan Document, every provision set forth in this Paragraph 7 is subject in all respect to the Carve Out and the Carve Out Reserve.  The borrowings under the DIP Facility shall be maintained in a new segregated deposit account established by the Borrower and over which the DIP Agent (and only the DIP Agent) shall have a first priority perfected lien and security interest (the "DIP Loan Funding Account").  No other amounts, whether property of the Debtors or otherwise, shall be deposited into the DIP Loan Funding Account.  The Debtors may withdraw funds from the DIP Loan Funding Account if permitted by the DIP Loan Documents.  Furthermore, the DIP Agent shall have the right to deduct from and pay interest, fees and expenses that are DIP Obligations (solely to the extent such interest, fees or expenses are due and payable at such time pursuant to the DIP Loan Documents and this Final Order) from the proceeds in the DIP Loan Funding Account (including the fees and expenses of the DIP Lenders and DIP Agent).   Cash proceeds (net of reasonable

costs, expenses, and any applicable taxes) from any Disposition of "Additional Assets" as

defined in the DIP Loan Documents (other than, for the avoidance of doubt, assets constituting

Priority ABL DIP Collateral) (the "Specified Assets") shall be maintained by the Debtors in

another new segregated deposit account established by the Debtors (the "Segregated Operating

Account"); provided that until the indefeasible payment in full of the DIP Obligations, the

outstanding balance in the Segregated Operating Account shall not exceed (i) $15,000,000 plus

(ii) the cash proceeds (net of reasonable costs, expenses, and any applicable taxes) of any

Disposition or Dispositions of any or all of the Debtors' right, title and interest in the Federal

mining complex in northern West Virginia, including but not limited to the Pittsburgh seam, any

other related real property, any permits with respect thereto, any mining rights and approvals

related to such permits, and any related equipment or other personal property assets (such sum,

the "Segregated Operating Account Cap").  In the event that any such net cash proceeds from the

Disposition of the Specified Assets cannot be deposited into the Segregated Operating Account

because they would cause the cash in the Segregated Operating Account to otherwise exceed the

Segregated Operating Account Cap, such cash proceeds shall instead be deposited into the Initial

L/C & Term Priority Collateral Account (as defined in the Prepetition LC/Term Loan

Agreement) or a new Priority LC/Term Other Account (as defined below).  All cash proceeds

(net of reasonable costs, expenses, and any applicable taxes) any Debtor receives from any other

Disposition of all other Priority LC/Term DIP Collateral shall be deposited into the Initial L/C &

Term Priority Collateral Account (as defined in the Prepetition LC/Term Loan Agreement) or

one or more new bank accounts established by one or more of the Debtors (and into which

Priority ABL DIP Collateral or any other funds shall not be deposited) (such accounts, which

shall not include the Segregated Operating Account, collectively the "Priority LC/Term Other

36

Accounts"). Notwithstanding anything to the contrary in Section 2.06(b) or 6.22 of the DIP

Loan Agreement, except as otherwise permitted by Paragraphs 25(b)(iii) and 25(c)(iii), any

proceeds of Priority LC/Term DIP Collateral or other amounts required to be applied as a

mandatory prepayment of the DIP Obligations pursuant to Section 2.06(b) of the DIP Loan

Agreement shall be deposited in, and remain on deposit in, the Segregated Operating Account (to

the extent required by this Paragraph 7) or a Priority LC/Term Other Account subject to the

dominion and control of the DIP Agent, in any such case, until such proceeds or other amounts

are applied as mandatory prepayments. For the avoidance of any doubt, the Debtors shall not

have access to the funds in any Segregated Operating Account, Priority LC/Term Other Account

or Initial L/C & Term Priority Collateral Account, except as permitted by Paragraphs 25(b)(iii)

and 25(c)(iii) hereof. Until the DIP Loan Funding Account is established (which the Debtors

will use commercially reasonable efforts to do as soon as possible after the date hereof), the

proceeds that would otherwise be deposited into the DIP Loan Funding Account (the "DIP

Funded Amounts") shall instead be deposited into and held in such other operating account(s)

(the "Temporary DIP Account") of the Debtors (and such amounts shall be deemed the DIP

Loan Funding Account, as the context may require, for purposes hereof) as the Debtors may

elect. The Temporary DIP Account shall be an account with no amounts of deposit contained

therein at the time of the transfer of any proceeds of the DIP Facility. No amounts, other than

proceeds of DIP Extensions of Credit, shall be deposited in such Temporary DIP Account.

Nevertheless and notwithstanding anything in this Order to the contrary, the amounts in such

Temporary DIP Account shall be subject to a first priority, perfected lien of the DIP Agent and

shall be subject to no other liens, notwithstanding any existing control agreement on such

Temporary DIP Account, until the DIP Funded Amounts are transferred out of such account as

described below. Promptly upon the opening of the DIP Loan Funding Account, any theretofore unapplied portions of such DIP Funded Amounts shall be transferred (and shall be permitted to be transferred without consent of any other Prepetition Secured Party or otherwise) to the DIP Loan Funding Account, as would otherwise be required under this Order.  The Debtors shall promptly provide written notice to the DIP Agent and Prepetition Agents of the establishment of the DIP Loan Funding Account, the Segregated Operating Account and any Priority LC/Term Other Accounts.  In the event any amounts remain on deposit in the DIP Loan Funding Account after the indefeasible payment in full of the DIP Obligations, such remaining amounts shall be transferred to another account of the Debtors for application in accordance with the terms hereof, or after payment in full of the DIP Obligations, in accordance with a further court order.   No cash or securities (including any proceeds from the Disposition of the Priority ABL DIP Collateral) shall be deposited, maintained or credited to the Segregated Operating Account (other than the net cash proceeds from Specified Assets or as otherwise consented to by the DIP Agent, the Prepetition LC Agent and Prepetition Term Agent or pursuant to a further court order).  Upon the Maturity Date (as defined in the DIP Loan Agreement), all proceeds remaining in the DIP Loan Funding Account and the Segregated Operating Account shall be delivered by the Debtors to the DIP Agent and applied by the DIP Agent to repay the DIP Obligations in accordance with the DIP Loan Agreement (prior to the application of any other amounts or property). Notwithstanding anything to the contrary herein or in the Prepetition Loan Documents (including, without limitation, the Intercreditor Agreements), (i) prior to the indefeasible payment in full of the DIP Obligations, none of the Prepetition  Agents shall have any right to and shall not sweep  any of the funds in the DIP Loan Funding Account and the Segregated Operating Account, (ii) prior to the indefeasible payment in full of the DIP Obligations, none of

the Prepetition Secured Parties shall have any liens on, security interests in, claims to or rights with respect to the DIP Loan Funding Account or the funds maintained therein except for amounts, if any, remaining after the indefeasible payment in full of the DIP Obligations (and other than a right to require that, on the Maturity Date or other earlier Termination Date of the DIP Facility or in connection with any application of funds pursuant to Section 9.03 of the DIP Loan Agreement, such funds be applied first to pay any outstanding DIP Obligations pursuant to this Paragraph 7 prior to the application of other amounts, subject in all respects to the Carve Out and the Carve Out Reserve), and (iii) the DIP Facility and any of the funds maintained in the DIP Loan Funding Account and the Segregated Operating Account shall not be used to repay any of the Prepetition Obligations unless and until the indefeasible payment in full of the DIP Obligations has occurred (other than payment in respect of Adequate Protection Obligations as and when required pursuant to Paragraph 25).  The DIP Loan Funding Account, any Priority LC/Term Other Accounts and the Segregated Operating Account shall be subject to the terms of the Court order approving the Debtors' cash management motion filed at [Docket No. 4].  On the Termination Date of the DIP Facility or in connection with any application of funds pursuant to Section 9.03 of the DIP Loan Agreement, the amounts on deposit or credited to the DIP Loan Funding Account shall be applied first to any DIP Obligations required to be paid at such time, prior to the application of any proceeds of DIP Collateral or other amounts to pay any DIP Obligations.

8.    <u>Professional Fees Account Funding</u>.  The Debtors  shall (a) as soon as practicable after the entry of this Final Order,  transfer proceeds from <u>DIP Extensions of Credit</u> in an amount equal to the total budgeted weekly Professional Fees through the date of such transfer and (b) thereafter on a weekly basis transfer proceeds from <u>DIP Extensions of Credit</u> in an amount equal

to the total budgeted weekly Professional Fees for the next unfunded week set forth in the

Budget, in each case into a segregated account not subject to the control of the DIP Lender (the

"Professional Fees Account") (to the extent such budgeted Professional Fees have not already

been funded as part of the Carve Out Reserve pursuant to Paragraph 5).  With respect to any

success, restructuring, and/or other transaction fee provided for under any Court-approved

engagement agreement of an Estate Professional retained by the Debtors, the Debtors shall

transfer proceeds from DIP Extensions of Credit in an amount equal to such fee in four equal

installments over the first four months (to the extent such budgeted Professional Fees have not

already been funded as part of the Carve Out Reserve pursuant to Paragraph 5), commencing

with the month in which the Court approves such professionals' engagement, into the

Professional Fees Account; provided, that such fee shall only be payable in accordance with the

terms and conditions of the Court order approving such engagement agreement and any other

Court orders approving the procedures for the compensation of Estate Professionals and only

after such fee has been earned in full. The Prepetition Liens, the DIP Liens and the Adequate

Protection Liens shall attach to the Professional Fees Account and amounts deposited therein or

credited thereto, and the relative priorities of such liens and the relative interests of the DIP

Agent and Prepetition Agents in their respective liens shall be determined based on whether the

Cash Collateral deposited in the Professional Fees Account from time to time constituted Priority

ABL DIP Collateral or Priority LC/Term DIP Collateral immediately prior to such deposit.

Except as expressly contemplated by Paragraph 5 and this Paragraph 8, no cash or securities

shall be deposited, maintained or credited to the Professional Fees Account.  Subject to

Paragraph 5, the amounts on deposit or credited to the Professional Fees Account shall be

applied first to any allowed Professional Fees, prior to the application of any Cash Collateral,

any other proceeds of the DIP Facility or other amounts of the Debtors to pay any such Professional Fees.  Subject in all respects to the Carveout, no cash proceeds that any Debtor receives from any Disposition of Priority LC/Term DIP Collateral shall be transferred to the Professional Fees Account without the consent of each of the Prepetition LC Agent and the Prepetition Term Agent or further order of the Court.

9.    <u>Rights and Benefits Under Intercreditor Agreements</u>.  Notwithstanding anything to the contrary herein (including Paragraph 36) or in any other DIP Loan Document, (a) the terms and conditions of the Intercreditor Agreements shall not be mitigated or modified as a result of entry of the Interim Order or this Final Order, entry into or the terms of the DIP Loan Documents or the incurrence of the DIP Obligations and (b) all rights, remedies, powers and privileges of the Prepetition Secured Parties pursuant to the Intercreditor Agreements (or applicable Intercreditor Agreements) are reserved.  Nothing herein shall constitute a release, waiver or discharge of any obligations under any of the Intercreditor Agreements owed by any Prepetition Secured Party to any other Prepetition Secured Party pursuant to the terms thereof or prejudice the rights of any of the Prepetition Secured Parties party to or bound by any of the Intercreditor Agreements to enforce the terms and conditions thereof against the other Prepetition Secured Parties party thereto or bound thereby.

10.    <u>Other Use of DIP Extensions of Credit and Cash Collateral</u>.  Subject to Paragraphs 31 and 39 of this Final Order and the other terms and conditions set forth in this Final Order and the other DIP Loan Documents, the Debtors may use the DIP Extensions of Credit and the Cash Collateral, in compliance with the DIP Loan Agreement and subject to and in accordance with the Budget covenant limitations in the DIP Loan Agreement.

11.    Budget.  The budget annexed hereto as **Exhibit 2** (and as it may be updated periodically in accordance with the DIP Loan Documents, but only with the consent of the DIP Agent or the Required DIP Lenders, the "Budget") hereby is approved on a final basis.  Proceeds of the DIP Extensions of Credit and Cash Collateral under this Final Order shall be used by the Debtors in accordance with the DIP Loan Agreement and this Final Order (including but not limited to cash collateralizing letters of credit to be issued from time to time by one or more issuing banks for the account of Debtors during the Chapter 11 Cases) and subject to and in accordance with the Budget, and in any event such use shall be subject to any Permitted Variance; provided that it is agreed that payments benefiting from the Carve Out shall not be limited by the Budget.  Subject to the Carve Out, the DIP Lenders' consent to the Budget shall not be construed as consent to the use of DIP Extensions of Credit or Cash Collateral beyond the Termination Date (as defined in the DIP Loan Agreement) with respect to the DIP Extensions of Credit, regardless of whether the aggregate funds shown on the Budget have been expended. The Debtors shall provide a copy of any revised or updated budget to the U.S. Trustee, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition Term Agent, and counsel to the Committee.  In no way shall the Budget operate or be construed as a cap or limitation on the Adequate Protection Obligations payable pursuant to Paragraph 25.

12.    Permitted Variance.  So long as the Termination Date has not occurred and subject to Paragraphs 31 and 39, the Debtors shall be authorized to use proceeds of the DIP Extensions of Credit and Cash Collateral, in accordance with the DIP Loan Documents and this Final Order, and subject to and in accordance with the Budget covenant limitations in the DIP Loan Agreement, including the variances permitted therein with respect to the Budget to the extent applicable (each a "Permitted Variance").

13.     Continuation of Prepetition Liens.  (a) Until the Payment in Full of the Prepetition ABL Obligations, all liens and security interests of the Prepetition ABL Agent and the Prepetition ABL Lenders securing the Prepetition ABL Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; (b) until the Payment in Full of the Prepetition LC Obligations, all liens and security interests of the Prepetition LC/Term Collateral Agent, the Prepetition LC Agent and the Prepetition LC Lenders securing the Prepetition LC Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; (c) until the Payment in Full of the Prepetition Term Loan Obligations, all liens and security interests of the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent and the Prepetition Term Lenders (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein; and (d) until the Debtors have indefeasibly paid in full all Prepetition Notes Obligations, all liens and security interests of the Prepetition Notes Trustee and the Prepetition Noteholders securing the Prepetition Notes Obligations (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein.

14.     DIP Liens and Collateral.

(a)     Subject to Paragraph 14(b), and as more fully set forth in the DIP Loan Documents, as security for the full and timely payment of the DIP Obligations, the DIP Agent on its behalf and on behalf of the DIP Lenders is hereby granted:

i.  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on and security interest in all tangible and intangible unencumbered assets of the Debtors (now or hereafter acquired and all proceeds thereof) and shall include without limitation property subject to avoided liens; provided that, in no event shall such unencumbered assets on which the DIP Lenders are granted a first priority lien include Priority ABL DIP Collateral;

ii.  pursuant to Bankruptcy Code Section 364(c)(2), a first priority lien on the Segregated Operating Account, the Priority LC/Term Other Accounts, the Temporary DIP Account, and any new DIP Loan Funding Account established pursuant to Paragraph 7, the funds maintained in such accounts, and all proceeds thereof;

iii.  pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on and security interest in all assets of the Debtors that constitutes, or that would constitute but for the commencement of the Chapter 11 Cases, ABL Priority Collateral, including but not limited to Cash Collateral that is ABL Cash Collateral or that would constitute ABL Priority Collateral but for the commencement of the Chapter 11 Cases, now or hereafter acquired and all proceeds thereof (the "Priority ABL DIP Collateral," which definition shall include, subject to Paragraph 25(a)(iii), the ABL Cash Collateral Accounts and all deposits therein); provided further that such lien on the Priority ABL DIP Collateral shall be junior in priority and subordinate to the Prepetition ABL Liens and the ABL Adequate Protection Liens on the Priority ABL DIP Collateral, and senior in priority to any other lien on the Priority ABL DIP Collateral (including, without limitation, the Prepetition LC

44

Liens, the Prepetition Term Loan Liens and the Prepetition Notes Liens) securing

any other indebtedness or obligations of the Debtors; and

iv. pursuant to Bankruptcy Code Section 364(d), a first priority priming lien on and

security interest in all assets of the Debtors, including but not limited to Cash

Collateral not constituting Priority ABL DIP Collateral, encumbered by a first

priority lien under the Prepetition LC Facility or the Prepetition Term Loan

Facility or a lien under the Prepetition Notes Documents not otherwise described

in clauses (i) through (iii) above (now or hereafter acquired and all proceeds

thereof) (the "Priming Lien Collateral"); provided further that such lien on the

Priming Lien Collateral shall be senior in priority to the Prepetition LC Liens, the

Prepetition Term Loan Liens, the Prepetition Notes Liens and the Prepetition

ABL Liens on the Priming Lien Collateral.

The liens and security interests identified in this Paragraph are referred to herein as the "DIP

Liens" and the collateral to which such DIP Liens attach, the "DIP Collateral."  The DIP

Collateral described in clauses (i), (ii) and (iv) above is referred to herein as the "Priority

LC/Term DIP Collateral." For the avoidance of doubt, the DIP Liens and Adequate Protection

Liens shall not attach to and encumber claims and causes of action under sections 502(d), 544,

545, 547, 548 and 550 of the Bankruptcy Code and similar laws (collectively, the "Avoidance

Actions") and any proceeds thereof and property received thereby whether by judgment,

settlement or otherwise ("Avoidance Proceeds").

(b)    The DIP Liens shall be subject and subordinate to the Carve Out and, with

respect to the Priority ABL DIP Collateral, the Prepetition ABL Liens and the ABL Adequate

Protection Liens.  Except as otherwise set forth herein or by any court order heretofore or

hereafter entered in the Chapter 11 Cases, the DIP Liens shall not, without the consent of the DIP

Agent (acting at the direction of the Required DIP Lenders), be made subject to, or *pari passu*

with, any other lien or security interest, and shall be valid and enforceable against any trustee

appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case

under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the

foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of

the Chapter 11 Cases; provided further that the DIP Liens described in Paragraph 14(a)(iii) shall

remain subject to any "Specified Permitted Liens" as such term is defined in, and to the extent

permitted to be senior to the Prepetition ABL Liens under, the Prepetition ABL Agreement;

provided, further, that, notwithstanding the reference to "Specified Permitted Liens" in this Final

Order, nothing herein (except as otherwise provided in Paragraph 36) shall adversely affect the

rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP

Lenders, or the other Prepetition Secured Parties.  The DIP Liens and the Adequate Protection

Liens shall not be subject to sections 510(c), 549, 550 or 551 of the Bankruptcy Code, and the

DIP Liens, Adequate Protection Liens, Prepetition Liens, DIP Collateral, Priority LC/Term DIP

Collateral, and Priority ABL DIP Collateral shall not be subject to the "equities of the case"

exception of section 552 of the Bankruptcy Code or section 506(c) of the Bankruptcy Code.  The

Debtors shall not sell, transfer, lease, encumber or otherwise Dispose of any portion of the DIP

Collateral, except as permitted by this Final Order, the DIP Loan Documents or as otherwise

authorized by the Court. All proceeds of DIP Collateral, other than proceeds of the Priority ABL

DIP Collateral until the Payment in Full of the Prepetition ABL Obligations, shall be applied to

the DIP Obligations and paid to the DIP Lenders in accordance with the DIP Loan Documents.

(c)      Notwithstanding anything to the contrary in the Motion, the DIP Loan Documents or this Final Order, for purposes of this Final Order, in no event shall the DIP Collateral include or the DIP Liens granted under this Final Order attach to, any lease, license, contract, or agreement or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in: (x) the abandonment, invalidation, unenforceability, or other impairment of any right, title, or interest of any Debtor therein, or (y) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract, agreement, or other property right pursuant to any provision thereof, unless, in the case of each of clauses (x) and (y), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements, or other property rights are collectively referred to as the "Specified Contracts"); provided, that the foregoing shall not preclude any counterparty to a Specified Contract from an opportunity to be heard in this Court on notice with respect to whether applicable nonbankruptcy law or the Bankruptcy Code renders such provision ineffective. Notwithstanding the foregoing, the DIP Liens and Adequate Protection Liens shall in all events attach to all proceeds, products, offspring, or profits from all Dispositions or monetizations of any and all Specified Contracts in accordance with the priorities set forth herein.

(d)      In the event that proceeds of DIP Collateral are received by the DIP Agent or any DIP Lender in connection with a Disposition of DIP Collateral that directly or indirectly involves some or all of the Priority ABL DIP Collateral and some or all of the Priority LC/Term DIP Collateral (including, without limitation, by virtue of a Disposition of a division or line of business or any equity interests of any Debtor) (if a Debtor is Disposed of and such Disposition

is structured as a Disposition of equity interests, such Disposition shall be treated as a Disposition of assets), the portion of such proceeds that constitute or are to be treated as proceeds of Priority ABL DIP Collateral shall be allocated as set forth in Paragraph 25(a)(iii) until the Prepetition ABL Obligations shall have been Paid in Full; <u>provided</u> that the portion of such proceeds that shall be allocated as proceeds of accounts and inventory shall be an amount not less than the book value of such accounts and inventory.

      15.    <u>Preservation of Liens and Rights Granted Under this Final Order</u>.

      (a)    Except as otherwise expressly provided for herein, or permitted under the DIP Loan Agreement, no claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Agent and the DIP Lenders or to the Prepetition Secured Parties (as defined herein), respectively, shall be granted or allowed while any portion of the DIP Facility (or any refinancing thereof in accordance with the DIP Loan Documents) or the commitments thereunder or the DIP Obligations remain outstanding or until the Payment in Full of the Prepetition ABL Obligations, the Prepetition LC Obligations, the Prepetition Term Loan Obligations, the Prepetition Notes, and the DIP Liens, the Adequate Protection Liens and the Prepetition Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, in each case other than the Carve Out; or (iii) subordinated to or made pari passu with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; *provided*, however, that (x) nothing contained in

this Final Order shall affect the right of Penn Virginia Operating Co., LLC ("Penn Virginia") in

that certain Performance Escrow Agreement by and between Penn Virginia and Debtor Patriot

Coal Corporation dated January 7, 2010 (the "Escrow Agreement") and Penn Virginia shall

retain its first priority position in any and all funds in the account that is the subject of the

Escrow Agreement and its rights  in such account and such funds shall be paramount to any lien

interest or other right granted under this Final Order, and (y) for the avoidance of doubt, nothing

contained in this Final Order will prime the existing mechanics' lien of Daniels Electric, Inc.

("Daniels' Mechanics' Liens"), to the extent that such lien is perfected and valid pursuant to

applicable law, but nothing in this Final Order recognizes or acknowledges the validity and/or

perfection of the Daniels' Mechanics' Lien.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in

cash, the Debtors shall not seek, and it shall constitute an Event of Default and terminate the

right of the Debtors to use Cash Collateral if any of the Debtors seeks, or there is entered, (i) any

modification  or extension of this Final Order without the prior written consent of the DIP Agent

(acting at the direction of the Required DIP Lenders), and no such consent shall be implied by

any other action, inaction or acquiescence by the DIP Agent, (ii) any other order granting

adequate protection or authorizing the use of Cash Collateral or any modification or extension of

this Final Order without the prior written consent of the DIP Agent, and no such consent shall be

implied by any other action, inaction or acquiescence by any of the Prepetition Secured Parties,

(iii) any modification or extension of this Final Order with respect to the Cash Collateral or the

cash collateralization or other satisfaction of any letters of credit under any Prepetition Facility

without the prior written consent of the DIP Agent, and no such consent shall be implied by any

other action, inaction or acquiescence by any of the Prepetition Secured Parties, (iv) an order

converting or dismissing any of the Chapter 11 Cases without the prior written consent of the

DIP Agent, (v) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases without

the prior written consent of the DIP Agent (vi) an order appointing an examiner with enlarged

powers in any of the Chapter 11 Cases without the prior written consent of the DIP Agent, and

(vii) an order approving a plan of reorganization or the sale or other Disposition of all or

substantially all of the DIP Collateral or authorizing debtor in possession financing pursuant to

section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment in full in

cash of the DIP Obligations (other than any contingent obligations not yet due and payable) upon

the consummation thereof without the prior written consent of the DIP Agent.  If an order

dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise

is at any time entered, (x) the DIP Superpriority Claims, priming liens, security interests and

replacement security interests granted to the DIP Agent and the DIP Lenders, including the DIP

Liens, pursuant to this Final Order shall, pursuant to sections 105 and 349 of the Bankruptcy

Code, continue in full force and effect and shall maintain their priorities as provided in this Final

Order (and that such DIP Superpriority Claims, priming liens and replacement security interests,

shall, notwithstanding such dismissal, remain binding on all parties in interest, including the

priorities set forth herein and in the DIP Loan Documents) until all DIP Obligations shall have

been paid and satisfied in full (or in the case of any existing letter of credit, such existing letter of

credit has been replaced, cash collateralized in connection with the refinancing or backstopped,

in each case to the satisfaction of the applicable issuing bank) and (y) this Court shall retain

jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and

security interest referred to in clause (x) above.  The extension of credit pursuant to the DIP Loan

Documents constitute cause shown for the relief provided in this Paragraph 15(b).

(c)     Unless all Prepetition ABL Obligations, Prepetition Term Loan

Obligations, and Prepetition LC Obligations shall have been Paid in Full, and unless otherwise

ordered by the Court, the right of the Debtors to use Cash Collateral shall terminate seven days

after any of the Debtors seeking any of the following or any of the following being entered: (i)

any order granting adequate protection or authorizing the use of Cash Collateral or any

modification or extension of this Final Order without the prior written consent of the Prepetition

ABL Agent, the Prepetition Term Agent, and the Prepetition LC Agent, and no such consent

shall be implied by any other action, inaction or acquiescence by any of the Prepetition Secured

Parties, (ii) any modification or extension of this Final Order with respect to the Cash Collateral

or the cash collateralization or other satisfaction of any letters of credit under any Prepetition

Facility without the prior written consent of the Prepetition ABL Facility Issuers and the

Prepetition LC Facility Issuers, and no such consent shall be implied by any other action,

inaction or acquiescence by any of the Prepetition Secured Parties, (iii) an order converting or

dismissing any of the Chapter 11 Cases without the prior written consent of the Prepetition ABL

Agent, the Prepetition Term Agent, and the Prepetition LC Agent, (iv) an order appointing a

chapter 11 trustee in any of the Chapter 11 Cases without the prior written consent of the

Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition LC Agent, (v) an order

appointing an examiner with enlarged powers in any of the Chapter 11 Cases without the prior

written consent of the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition

LC Agent, or (vi) an order approving a plan of reorganization or the sale or other Disposition of

all or substantially all of the DIP Collateral or authorizing debtor in possession financing

pursuant to section 364(c) or (d) of the Bankruptcy Code that does not provide for the Payment

in Full of the Prepetition ABL Obligations, the Prepetition Term Loan Obligations, and the

Prepetition LC Obligations upon the consummation thereof without the prior written consent of

the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition LC Agent.  If an

order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or

otherwise is at any time entered, (x) the Superpriority Claims, priming liens, security interests

and replacement security interests granted to the Prepetition Secured Parties pursuant to this

Final Order shall, pursuant to sections 105 and 349 of the Bankruptcy Code, continue in full

force and effect and shall maintain their priorities as provided in this Final Order (and that such

Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding

such dismissal, remain binding on all parties in interest, including the priorities set forth herein)

until the Payment in Full of the Prepetition ABL Obligations, the Prepetition Term Loan

Obligations, the Prepetition LC Obligations, and the Prepetition Notes and (y) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens

and security interest referred to in clause (x) above.  The priming of the liens held by the

Prepetition Secured Parties constitutes cause shown for the relief provided in this

Paragraph 15(c).

16.    <u>Automatic Effectiveness of Liens</u>.  The automatic stay imposed under

section 362(a) of the Bankruptcy Code is hereby vacated and modified to permit the Debtors to

grant the liens and security interests to the DIP Agent, the DIP Lenders and the Adequate

Protection Parties (as defined below) contemplated by this Final Order and the other DIP Loan

Documents.

17.    <u>[Reserved]</u>.

18.    <u>Automatic Perfection of DIP Liens</u>.  The DIP Liens granted pursuant to this Final

Order shall constitute valid, enforceable, nonavoidable and duly perfected first priority security

interests and liens (subject to the priorities set forth in this Final Order), and the DIP Agent and the DIP Lenders shall not be required to file or serve financing statements, notices of lien, mortgage deeds, deeds of trust or similar instruments which otherwise may be required under federal, state or local law in any jurisdiction, or take any action, including taking possession or control, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the DIP Liens or deliver possessory DIP Collateral shall in no way affect the validity, enforceability, perfection or priority of such liens. The DIP Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent or the DIP Lenders shall file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise take any action to validate, perfect, or confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination (except as a result of the relative lien priorities set forth in this Final Order), at the time and as of the date of entry of the Interim Order. Upon the request of the DIP Agent (acting at the direction of the Required DIP Lenders), the Debtors, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except as set forth in the DIP Loan Documents) to enable the DIP Agent or DIP Lenders to further validate, perfect, preserve and enforce the DIP Liens consistent with the terms of this Final Order. A certified copy of this Final Order may be filed with or recorded in filing or recording offices in addition to

or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording; provided that nothing herein shall be construed as granting any exemption from transfer taxes within the meaning of Bankruptcy Code section 1146(a).

19.   <u>Other Automatic Perfection Matters</u>.  To the extent that the Prepetition LC/Term Collateral Agent, the Prepetition LC Agent, the Prepetition Term Agent, the Prepetition ABL Agent and/or the Prepetition Notes Trustee is the secured party under any account control agreements (other than with respect to an ABL Cash Collateral Account), listed as loss payee or additional insured under any of the Debtors' insurance policies or is the secured party under any Prepetition Financing Document, the DIP Agent, on its behalf and on behalf of the DIP Lenders, is also deemed to be the secured party under such account control agreements (other than with respect to an ABL Cash Collateral Account), loss payee or additional insured under the Debtors' insurance policies and the secured party under each such Prepetition Financing Document (in any such case with the same priority of liens and claims thereunder relative to the priority of the Prepetition Liens and Adequate Protection Liens as set forth in Paragraph 14(a)), and shall have all rights and powers in each case attendant to that position (including, without limitation, rights of enforcement, but subject in all respects to the terms of this Final Order), and shall, subject to the terms of this Final Order, act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Final Order and the other DIP Loan Documents. The Prepetition LC/Term Collateral Agent, the Prepetition LC Agent, the Prepetition Term Agent or the Prepetition ABL Agent, as applicable, shall serve as agent for the DIP Agent, as applicable, for purposes of perfecting the DIP Agent's security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished

only by possession or control by a secured party; provided that nothing herein shall be deemed to

grant the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition LC Agent, the

Prepetition LC Lenders, the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent,

the Prepetition Term Lenders, the Prepetition Notes Trustee or the Prepetition Noteholders, any

liens on, security interests in, or rights with respect to the DIP Loan Funding Account and the

funds contained therein (unless and until the DIP Obligations are indefeasibly paid in full) (other

than a right to require that, on the Maturity Date or other earlier Termination Date of the DIP

Facility or in connection with any application of funds pursuant to Section 9.03 of the DIP Loan

Agreement, such funds be applied first to pay any outstanding DIP Obligations pursuant to

Paragraph 7 prior to the application of other amounts, subject to the Carve Out and the Carve Out

Reserve).

      20.   <u>Automatic Perfection of Adequate Protection Liens</u>.  The Adequate Protection

Liens granted pursuant to this Final Order shall constitute valid, enforceable, nonavoidable and

duly perfected security interests and liens (having the priorities set forth in this Final Order), and

the Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition ABL Agent, the

Prepetition ABL Lenders, the Prepetition LC Agent, the other Prepetition LC Secured Parties,

the Prepetition LC/Term Collateral Agent, the Prepetition Notes Trustee and the Prepetition

Noteholders (collectively, the "<u>Adequate Protection Parties</u>") shall not be required to file or serve

financing statements, mortgage deeds, deeds of trust, notices of lien or similar instruments which

otherwise may be required under federal, state or local law in any jurisdiction, or take any action,

including taking possession or control, to validate and perfect such security interests and liens;

and the failure by the Debtors to execute any documentation relating to the Adequate Protection

Liens or deliver possessory collateral shall in no way affect the validity, enforceability,

perfection or priority of such liens.  The Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Adequate Protection Parties shall file such financing statements, trademark filings, copyright filings, mortgages, deeds of trust, notices of lien or similar instruments or otherwise take any action to validate, perfect or confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination (except as a result of the relative lien priorities set forth in this Final Order), at the time and as of the date of entry of the Interim Order.  Upon the request of any Prepetition Agent, the Debtors, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind except (i) as set forth in the DIP Loan Documents or (ii) to the extent reasonably requested by any Prepetition Agent and consistent with the terms of this Final Order, representations and warranties of the type provided to the DIP Agent and/or DIP Lenders pursuant to the DIP Loan Documents) to enable such Prepetition Agent or other applicable Prepetition Secured Parties to further validate, perfect, preserve and enforce the Adequate Protection Liens of such Prepetition Agent consistent with the terms of this Final Order.  A certified copy of this Final Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, deeds of trust, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording;

provided that nothing herein shall be construed as granting any exemption from transfer taxes within the meaning of Bankruptcy Code section 1146(a).

21.     <u>DIP Superpriority Claims</u>.  In addition to the liens and security interests granted to the DIP Agent on its behalf and on behalf of the DIP Lenders pursuant to this Final Order, subject and subordinate to the Carve Out and in accordance with sections 364(c)(1), 503 and 507 of the Bankruptcy Code, all of the DIP Obligations (including, without limitation, all DIP Extensions of Credit, but excluding Avoidance Actions and Avoidance Proceeds) shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") with priority over any and all administrative expenses of the Debtors, whether heretofore or hereafter incurred, of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code

22.     <u>Real Property Leases</u>.  Subject in all respects to Paragraph 14(c), as a requirement and precondition to the DIP Lenders' willingness to lend and in furtherance of the DIP Superpriority Claims provided for in this Final Order and pursuant to the DIP Loan Documents, which are payable from and have recourse to all of the Debtors' pre- and post-petition property including, among other things, each Financing Lease, Material Lease, Real Property Lease or other Contractual Obligation (each as defined in the DIP Loan Agreement) to which a Debtor is a counterparty (each, a "<u>Real Property Lease</u>"), the DIP Lenders shall have the following protections with respect to the Debtors' Real Property Leases, regardless of whether any particular Real Property Lease or group of Real Property Leases constitutes Collateral, which protections shall be enforced by the DIP Agent or DIP Lenders as authorized, approved, and granted pursuant to the provisions of this Final Order and in accordance with the terms of the

DIP Loan Agreement (and, after the indefeasible payment in full of the DIP Obligations, (i) the rights of the DIP Agent and the DIP Lenders shall automatically transfer and be available to the Prepetition LC/Term Collateral Agent and the Prepetition LC/Term Secured Parties, (ii) defined terms used in this Paragraph 22 relating to the DIP Facility shall be deemed to be references to corresponding defined terms relating to the Prepetition LC/Term Loan Facility, (iii) any notice herein required to be delivered pursuant to this Paragraph 22 to the DIP Agent shall instead be required to be delivered to each of the Prepetition LC Agent, the Prepetition Term Agent, and the Prepetition LC/Term Collateral Agent, and (iv) the automatic stay provisions pursuant to section 362 of the Bankruptcy Code are vacated and modified to the extent necessary so as to permit the Prepetition LC/Term Collateral Agent and the Prepetition LC/Term Secured Parties to exercise any of their rights with respect to Real Property Leases under this Paragraph 22):

(a)    Remedies Upon an Event of Default.  If an Event of Default shall have occurred and be continuing, the DIP Agent for the benefit of the DIP Lenders shall, with respect to any Real Property Lease or group of Real Property Leases to which any of the Debtors are party, be permitted, and are hereby authorized, approved, and granted the following rights and remedies:

(i)    to exercise the Debtors' rights pursuant to section 365(f) of the Bankruptcy Code with respect to any such Real Property Lease(s) and, subject to this Court's approval after notice and hearing, assign any such Real Property Lease(s) in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts;

(ii)    to require any Debtor to complete promptly, pursuant to Section 363 of the Bankruptcy Code, subject to the rights of the DIP Agent, DIP Lenders or Prepetition

Secured Parties (if applicable) to credit bid, a Disposition (as defined in the DIP Loan Agreement) of any such Real Property Lease(s) in one or more parcels at public or private sales, at any of the DIP Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the DIP Agent or DIP Lenders may deem commercially reasonable;

(iii)     to access to the leasehold interests of the Debtors or debtors in possession in any such Real Property Lease(s) for the purpose of (a) marketing such property or properties for sale and (b) removing any Collateral thereon or arranging for the Disposition of any such Collateral except to the extent prohibited by the terms of the Real Property Lease (unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code); provided that the foregoing shall not preclude any counterparty to a Real Property Lease from an opportunity to be heard in this Court on notice with respect to the foregoing;

(iv)     (a) to find an acceptable (in the DIP Agent's or Required DIP Lenders' good faith and reasonable discretion) replacement lessee, which may include the DIP Agent, DIP Lenders or any of its affiliates, to whom such Real Property Lease(s) may be assigned, (b) to hold, and manage all aspects of, an auction or other bidding process to find such acceptable replacement lessee, (c) in connection with any such auction, agree, on behalf of the Debtors, to reimburse reasonable fees and expenses of any stalking horse bidder, if necessary, and/or (d) to notify the Debtors of the selection of any replacement lessee pursuant to this Paragraph 22, upon receipt of which the Debtors shall promptly (1) file a motion seeking, on an expedited basis, approval of the Debtors' assumption and assignment of such Real Property Lease(s) to such proposed assignee, and (2) cure any defaults, if any, that have occurred and are continuing under such Real Property Lease(s) to the extent required by the Court (subject to the DIP Lenders' right to cure defaults as set forth in Paragraph 22(e) of this Final Order); or

(v)      to direct the Debtors to (a) assign any such Real Property Lease(s) to the DIP Agent or DIP Lenders as Collateral securing the DIP Obligations, subject to clause (b), if applicable, (b) seek this Court's approval of the assumption of any such Real Property Lease(s) to the extent that this Court determines pursuant to a final order that an assumption is required in order to assign such lease or leases as Collateral, and (c) promptly cure any default that has occurred and is continuing under such Real Property Lease(s) to the extent required by the Court; provided that any assignment of any such Real Property Lease(s) as Collateral securing the DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not already assumed) and assign such Real Property Lease(s) pursuant to section 365 of the Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with respect to any such assignment.

(b)      Right to Credit Bid.  Prior to any assignment of any Real Property Lease or group of Real Property Leases, the Debtors shall first provide at least five (5) business days' prior written notice (the "Initial Notice Period") to the DIP Agent and DIP Lenders (unless such notice provision is waived by the DIP Agent and DIP Lenders), which Initial Notice Period may be extended up to a further twenty-five (25) days by the DIP Agent or Required DIP Lenders in each of their sole discretion by delivering written notice of such extension to the Debtors prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the DIP Agent or Required DIP Lenders and the Borrower (such notice period being the "Aggregate Notice Period"). During such notice period, the DIP Agent shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) outstanding under the DIP Facility as consideration in exchange for any such Real Property Lease(s);

provided that to the extent the Borrower is entitled to retain a portion of the total consideration paid in respect of such assignment in accordance with the DIP Loan Agreement, the applicable portion of the consideration to be retained by Borrower shall be paid in cash (provided that such proceeds shall constitute DIP Collateral and Cash Collateral subject to Paragraphs 10, 25(b)(iii) and 25(c)(iii) and any other applicable provisions hereof). In addition, in connection with the exercise of any of the DIP Agent's or Required DIP Lenders' rights pursuant to the DIP Loan Agreement or this Final Order to direct or compel a sale or other Disposition of any Real Property Lease(s), the DIP Agent, on behalf of the applicable DIP Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations (in an amount equal to at least the consideration offered by any other party in respect of such sale or other Disposition) as consideration in exchange for such Real Property Lease(s).  Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the DIP Lenders' right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Final Order to obtain credit and incur debt as and in accordance with the terms set forth herein.

(c)     Right of First Refusal with Respect to Proposed Assignments and Rejections of Real Property Leases. Unless all DIP Obligations shall have indefeasibly been satisfied pursuant to the DIP Loan Agreement, the Debtors shall not seek, and it shall constitute, an Event of Default and terminate the right of the Debtors under the DIP Loan Agreement and this Final Order if any of the Debtors seeks, the sale or other Disposition of, or the rejection or other termination of, or if there is entered an order pursuant to section 365 of the Bankruptcy Code assigning or rejecting, any Real Property Lease or group of Real Property Leases, or if any Real Property Lease or group of Real Property Leases is deemed rejected due to the expiration of the assumption period provided for in Section 365(d)(4) (the "Statutory Rejection Date"),

without the Debtors' first providing thirty (30) days' prior written notice to the DIP Agent and

DIP Lenders, or if such notice is given more than thirty (30) days in advance of the Statutory

Rejection Date, prior written notice at least equal to the Aggregate Notice Period; provided,

however, that the right of first refusal of the DIP Agent as set forth in this Paragraph 22(c) shall

not apply to (x) any assignment or sale of a Real Property Lease or group of Real Property

Leases to a winning bidder at an auction authorized by this Court, and (y) so long as there has

not occurred an Event of Default or that an Event of Default is ongoing, any assignment or sale

of a Real Property Lease or group of Real Property Leases that are not Material Leases

generating cash proceeds (net of reasonable costs, expenses, and any applicable taxes) up to

$2,500,000 in the aggregate value for all such sales or assignments. During such notice period,

the DIP Agent shall be permitted to:

（i）      (a) notify the Debtors that it elects to take action pursuant to this

Paragraph, upon receipt of which the Debtors shall promptly withdraw any previously filed

rejection motion, (b) find an acceptable (in the DIP Agent's or Required DIP Lenders' good faith

and reasonable discretion) replacement lessee, in consultation with the Committee, which may

include the DIP Agent, DIP Lenders or any of its affiliates, to whom any such any Real Property

Lease or group of Real Property Leases may be assigned (subject to Court approval), (c) hold, and

manage, in consultation with the Committee, all aspects of, an auction or other bidding process to

find such acceptable replacement lessee, (d) in connection with any such auction, agree, on behalf

of the Debtors (and subject to Court approval) to reimburse the reasonable fees and expenses of

any stalking horse bidder, if necessary, and (e) notify the Debtors of the selection of any

replacement lessee pursuant to this Paragraph, upon receipt of which the Debtors shall (1) not

seek to reject any such Real Property Lease(s), (2) promptly withdraw any pending motion to

reject any such Real Property Lease(s), (3) promptly file a motion seeking, on an expedited basis,

approval of the Debtors' assumption and assignment of such Real Property Lease(s) to the DIP

Lenders' proposed assignee, and (4) promptly cure any defaults that have occurred and are

continuing under such Real Property Lease(s) to the extent approved by the Committee or

authorized by the Court; or

      (ii)  direct the Debtors to (a) assign any Real Property Lease or group

of Real Property Leases as Collateral securing the DIP Obligations (subject to Court approval),

(b) seek the Court's approval of the assumption of any such Real Property Lease(s) if it is

determined pursuant to a final order of this Court that an assumption is required in order to assign

such lease(s) as Collateral, and (c) promptly cure any defaults that have occurred and are

continuing under such Real Property Lease(s) (subject to the DIP Lenders' right to cure defaults

as set forth in Paragraph 22(e) of this Final Order) to the extent approved by the Committee or

authorized by the Court; provided that any assignment of any Real Property Lease(s) as Collateral

securing the DIP Obligations shall not impair the Debtors' ability to subsequently assume (if not

already assumed) and assign any such Real Property Lease(s) pursuant to section 365 of the

Bankruptcy Code or to enjoy the protections of section 365(f) of the Bankruptcy Code with

respect to any such assignment.

      (iii)  Notwithstanding anything to the contrary herein, the foregoing

right of the DIP Agent set forth in this Paragraph shall not apply to Real Property Leases that are

rejected, terminated, sold, or assigned (i) pursuant to a filing made on the Petition Date or (ii) on

the effective date of any plan of reorganization in any of the Chapter 11 Cases that, among other

things, indefeasibly repays the DIP Obligations in full on the effective date thereof.  For the

avoidance of doubt, on or prior to the thirtieth (30) day prior to the Statutory Rejection Date (as

provided in Section 365(d)(4) of the Bankruptcy Code), the Debtors shall have delivered written notice to the DIP Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through statutory rejection on the Statutory Rejection Date) from and after the date of such notice (or, if applicable, notice that the Debtors have obtained the applicable landlord's consent to extension of the Statutory Rejection Date); provided that if the Debtors fail to deliver any such notice to the DIP Agent prior to such date with respect to any such Real Property Lease(s) (or a notice indicating that no such Real Property Lease(s) shall be rejected), the Debtors shall be deemed, for all purposes hereunder, to have delivered notice to the DIP Agent as of such date that they intend to reject all outstanding Real Property Leases.

(d)     Assumption Orders. Any order of this Court approving the assumption of any Real Property Lease shall specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to, and to enjoy the protections of, section 365(f) of the Bankruptcy Code subsequent to the date of such assumption. To the extent that such provision is for any reason not included in any order of the Court approving the assumption of any Real Property Lease, then such Real Property Lease may not be assumed by the applicable Debtor unless the order approving the assumption provides for the assignment of such Real Property Lease, on the date of such order, to an acceptable (DIP Agent's or Required DIP Lenders' good faith and reasonable discretion) replacement lessee (which may include the DIP Agent, DIP Lenders, or their respective affiliates).

(e)     DIP Lenders' Right to Cure Defaults. If any of the Debtors are required to cure any monetary defaults under any Real Property Lease pursuant to any order of this Court or otherwise in connection with any assumption or assumption and assignment of any such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code, and such monetary default is

not, within five (5) business days of the receipt by such Debtor of notice from the DIP Agent

pursuant to the applicable provision(s) of the DIP Loan Agreement or any other notice from the

DIP Agent requesting the cure of such monetary default, cured in accordance with the provisions

of such applicable court order as arranged by the DIP Agent, the DIP Agent may cure any such

monetary defaults on behalf of the applicable Debtor(s).

(f)    Notwithstanding anything to the contrary herein or in the DIP Loan

Documents, nothing set forth in this Paragraph 22 shall permit the DIP Agent, the DIP Lenders

or any of their designees or agents to exercise any rights or remedies with respect to Priority

ABL DIP Collateral until the Payment in Full of the Prepetition ABL Obligations.

23.    <u>Protection of DIP Lenders' Rights</u>.

(a)    So long as there are any borrowings or letters of credit or other amounts

outstanding, or the DIP Lenders have any Commitments (as defined in the DIP Loan Agreement)

under the DIP Loan Agreement, and so long as an Adequate Protection Default has not occurred

and is continuing, the Prepetition Secured Parties (defined below) shall (i) have no right to and

take no action to foreclose upon or recover in connection with the liens granted thereto pursuant

to the Prepetition Financing Documents or this Final Order, or otherwise seek to exercise or

exercise any enforcement rights or remedies against any DIP Collateral or in connection with any

Adequate Protection Liens or on account of any claims, other than as set forth herein (but the

foregoing shall not be construed to limit the exercise of any rights or remedies against any other

Prepetition Secured Party pursuant to the Intercreditor Agreements), (ii) be deemed to have

consented to any Disposition of, or release of liens on, any DIP Collateral, to the extent such

Disposition or release is authorized under the DIP Loan Documents (in any such case, other than

a section 363(f) sale or other Disposition outside of the ordinary course of business) or otherwise

agreed to by the DIP Agent, (iii) not file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent or any DIP Lender files financing statements or other documents to perfect the liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any Disposition in accordance with the terms hereof (other than in connection with any Disposition to another Debtor or other Disposition in which such liens survive pursuant to this Final Order).

(b)    Consistent with the provisions set forth in the DIP Loan Agreement (but subject to the terms of this Final Order and the Collateral Documents (as defined in the DIP Loan Agreement)), the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary upon the occurrence of an Event of Default (as defined in the DIP Loan Documents) so as to permit the DIP Agent and the DIP Lenders to, among other things, immediately declare (1) the commitment of the DIP Lenders as to the DIP Facility to be terminated, whereupon such commitments and obligation shall be terminated; (2) all DIP Obligations immediately due and owing, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; (3) require any Debtor to promptly complete, pursuant to Section 363 and 365 of the Bankruptcy Code, subject to the rights of the DIP Lenders or Prepetition Secured Parties to credit bid, a Disposition (as defined in

the DIP Loan Agreement) of its Real Property Leases or any portion thereof in one or more

parcels at public or private sales, at any of the DIP Agent's offices or elsewhere, for cash, at such

time or times and at such price or prices and upon such other terms as the DIP Agent may deem

commercially reasonable; and (4) exercise any of their rights with respect to Real Property

Leases under Paragraph 22 hereof; provided, however, that with respect to any enforcement of

DIP Liens or remedies (including, all remedies that may be enforced pursuant to this Final

Order), the DIP Agent shall provide the Borrower (with a copy to counsel for the Committee and

to the U.S. Trustee, the Prepetition ABL Agent, the Prepetition Term Agent, and the Prepetition

LC Agent) with seven (7) days' prior written notice prior to taking the actions contemplated

thereby (notwithstanding anything to the contrary in Section 9.02(a) of the DIP Loan Agreement

or any other provision of any DIP Loan Document); provided further, that, until the Payment in

Full of the Prepetition ABL Obligations, none of the DIP Agent, the DIP Lenders nor any of

their designees or agents shall be permitted to exercise any rights or remedies (including to credit

bid) with respect to the Priority ABL DIP Collateral. Notwithstanding anything to the contrary in

Section 9.02(a) of the DIP Loan Agreement, in any hearing regarding any exercise of rights or

remedies other than with respect to the Priority ABL DIP Collateral, except as otherwise

provided in Paragraph 39, the only issue that may be raised by any party in opposition thereto

shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors, the

DIP Agent, the DIP Lenders, and the Prepetition Secured Parties (other than the Prepetition ABL

Lenders and the Prepetition ABL Agent) shall not be entitled to seek relief, including, without

limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any

way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in

this Final Order or the DIP Loan Documents; provided that the Prepetition Secured Parties shall

not be limited in exercising their respective rights in accordance with the terms of the Intercreditor Agreements, as applicable. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary upon the occurrence of an Adequate Protection Default so as to permit the Prepetition ABL Agent and the Prepetition ABL Lenders to, among other things, exercise any of their rights and remedies available pursuant to the Prepetition ABL Financing Documents with respect to the Priority ABL DIP Collateral; provided, however, that with respect to any such enforcements of remedies, the Prepetition ABL Agent shall provide the Borrower (with a copy to counsel for the Committee and to the U.S. Trustee and the Prepetition LC Agent) with seven (7) days' prior written notice prior to taking the actions contemplated thereby. In any hearing regarding any exercise of rights or remedies with respect to the Priority ABL DIP Collateral, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Adequate Protection Default has occurred and is continuing, and the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties (other than the Prepetition ABL Lenders and the Prepetition ABL Agent) shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Prepetition ABL Agent or the Prepetition ABL Lenders set forth in this Final Order or the Prepetition ABL Financing Documents, subject to the terms of the Intercreditor Agreements.

(c)      In no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral.

(d)      No rights, protections, or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Final Order or the DIP Loan Documents shall be limited,

modified, or impaired in any way by (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to use Cash Collateral, (ii) any actual or purported termination of the Debtors' authority to use Cash Collateral, or (iii) the terms of any other order or stipulation related to the Debtors' use of Cash Collateral or the provision of adequate protection to any party.

24.     <u>Limitation on Charging Expenses Against Collateral</u>. Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or DIP Lenders and the Prepetition Agents, as the case may be with respect to their respective interests, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties, respectively.

25.     <u>Adequate Protection</u>.

(a)     The Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition ABL Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the Disposition or use by the Debtors of the collateral securing the Prepetition ABL Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition ABL Liens with respect to the Prepetiton LC/Term DIP Collateral, the Carve Out or the stay of enforcement or attachment of any prepetition security interest arising from section

362 of the Bankruptcy Code or otherwise (each, an "ABL Diminution Claim").  As security for and solely to the extent of any ABL Diminution Claim, the Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following adequate protection (collectively, the "ABL Adequate Protection Obligations"):

    i.   ABL Adequate Protection Lien.  The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, is hereby granted for their benefit, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest and lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) (together, the "ABL Adequate Protection Liens"), subject and subordinate only to (x) the Carve Out, (y) other than with respect to the Priority ABL DIP Collateral, the DIP Liens, the LC/Term Adequate Protection Liens, and the Prepetition LC/Term Loan Liens and (z) "Specified Permitted Liens" (as defined in and to the extent permitted to be senior to the Prepetition ABL Liens under the Prepetition ABL Agreement); provided that, notwithstanding the reference to "Specified Permitted Liens" in this Final Order, nothing herein (except as otherwise provided in Paragraph 36) shall adversely affect the rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP Lenders, the Prepetition ABL Lenders, the Prepetition ABL Agent, the Prepetition Term Agent, or the Prepetition Term Lenders.   Notwithstanding anything to the contrary in this Final Order, the ABL Adequate Protection Liens on the Priority ABL DIP Collateral shall not, without the consent of the Prepetition ABL Agent, be made subject to, or *pari passu* with, any other lien or security interest, and the ABL

Adequate Protection Liens shall be valid and enforceable (maintaining the priorities as provided in this Final Order) against any trustee appointed in the Chapter 11 Cases or any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases or commencement of a Successor Case.  For the avoidance of doubt, the ABL Adequate Protection Liens shall not attach to or encumber Avoidance Actions and Avoidance Proceeds.

ii.    <u>ABL Adequate Protection Superpriority Claims</u>.  The Prepetition ABL Agent and the Prepetition ABL Lenders shall be granted, subject to the payment of the Carve Out, superpriority administrative expense claims (the "<u>ABL Superpriority Claims</u>") junior only to the DIP Superpriority Claims, and *pari passu* with the LC Superpriority Claims and the Term Superpriority Claims; <u>provided</u> that, the ABL Superpriority Claims shall not attached to the Avoidance Actions or the Avoidance Proceeds; <u>provided</u>, <u>further</u>, other than with respect to proceeds of Priority ABL DIP Collateral, the Prepetition ABL Agent and the Prepetition ABL Lenders shall not receive or retain any payments, property or other amounts in respect of the ABL Superpriority Claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full.

iii.   <u>Priority ABL DIP Collateral Proceeds</u>.  To the extent any proceeds are received from the Disposition of the Priority ABL DIP Collateral (whether such Disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority ABL DIP Collateral, with the treatment of proceeds of a Disposition of DIP Collateral to be determined pursuant to Paragraph 14(d)) to a non-Debtor, other than Dispositions of inventory and other assets in the ordinary course of business,

71

such proceeds shall be delivered to the Prepetition ABL Agent within two business days of receipt by the Debtors to be applied by the Prepetition ABL Agent in accordance with Section 9.03 of the Prepetition ABL Agreement, including, to the extent provided for thereunder, deposited into a Cash Collateral Account (as defined in the Prepetition ABL Agreement, which accounts shall be deemed an ABL Cash Collateral Account for all purposes hereunder) under the exclusive dominion and control of the Prepetition ABL Agent and which funds therein may, from time to time, be applied in accordance with the last sentence of Paragraph 25(a)(iv). Notwithstanding anything to the contrary in this Final Order, until the Payment in Full of the Prepetition ABL Obligations, any funds on deposit in any Cash Collateral Account (as defined in the Prepetition ABL Agreement, which accounts shall be deemed an ABL Cash Collateral Account for all purposes hereunder) shall not be subject to the Carve Out; provided that, in the event any amounts remain on deposit in any ABL Cash Collateral Account after the Payment in Full of the Prepetition ABL Obligations, such remaining amounts shall be transferred to the Segregated Operating Account for application in accordance with the terms hereof.  Until the Payment in Full of the Prepetition ABL Obligations, any Priority ABL DIP Collateral or proceeds thereof received by the DIP Agent, the DIP Lenders or any other Prepetition Secured Parties shall be segregated and held in trust for the benefit of, and forthwith paid over to, the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders, and none of the DIP Agent, the DIP Lenders or any other Prepetition Secured Parties shall be permitted to sweep or foreclose on or exercise any other remedies with respect to the ABL Cash Collateral Account and any ABL Cash Collateral.

iv. <u>Borrowing Base</u>.  Any and all reserves that may be implemented by the Prepetition

ABL Agent against (including reserves contemplated in the calculation of) the

Borrowing Base (as defined in the Prepetition ABL Agreement) in the discretion of

the Prepetition ABL Agent during the Chapter 11 Cases shall be consistent with

(x) terms of the Prepetition ABL Agreement as in effect on the Petition Date and

(y) prior practices of Prepetition ABL Agent with respect to the Debtors and the

Borrowing Base (as defined in the Prepetition ABL Agreement and, other than as

contemplated therein or in this Final Order, no new reserves shall be implemented by

the Prepetition ABL Agent against the Borrowing Base (without limiting the

Prepetition ABL Agent's right to apply the eligibility criteria in accordance with the

Prepetition ABL Agreement as in effect on the Petition Date); <u>provided</u> that, on and

after the Petition Date, the Borrowing Base shall be reduced by an amount equal

to $10,000,000, which reduction shall be reflected in each Borrowing Base Certificate

(as defined in the Prepetition ABL Agreement) delivered pursuant to

Paragraph 25(a)(v).  Other than as set forth in the preceding sentence, the Borrowing

Base shall be calculated in a manner consistent with the calculations thereof

immediately prior to the Petition Date as set forth in the Borrowing Base Certificate

delivered to the Prepetition ABL Agent on May 15, 2015; <u>provided</u> that, for the

avoidance of doubt, none of the Segregated Operating Account, the Professional Fees

Account or the Temporary DIP Account, nor any deposits therein, shall be included

in the Borrowing Base. In the event that the Total Outstandings (as defined in the

Prepetition ABL Agreement) (net of ABL Cash Collateral (as defined below) then

held in the ABL Cash Collateral Account) exceeds the Borrowing Base reflected in a

Borrowing Base Certificate delivered pursuant to Paragraph 25(a)(v) (such excess, the "Excess Outstandings"), the Debtors shall within two business days after delivery of such Borrowing Base Certificate deliver to the Prepetition ABL Agent cash in an amount equal to the Excess Outstandings, which the Prepetition ABL Agent shall apply in accordance with Section 9.03 of the Prepetition ABL Agreement including (x) depositing  cash (such cash deposited, "ABL Cash Collateral") into a segregated account under the exclusive control and dominion of the Prepetition ABL Agent (and, notwithstanding anything to the contrary in this Final Order (including Paragraph 25(a)(i)), any funds so deposited shall not be subject to the Carve Out or any other liens of the DIP Agent, DIP Lenders or any other Prepetition Secured Parties other than the Prepetition ABL Agent and the Prepetition ABL Lenders) (an "ABL Cash Collateral Account") and/or (y) irrevocably repaying funded Prepetition ABL Obligations, in either case in an amount equal to Excess Outstandings.  A failure of the Debtors to deliver to the Prepetition ABL Agent the cash when and in such amounts required in accordance with the immediately preceding sentence or the first sentence of Paragraph 25(a)(iii) shall constitute an Adequate Protection Default hereunder, and the Prepetition ABL Agent and the Prepetition ABL Lenders shall be permitted to exercise all rights and remedies available pursuant to the Prepetition ABL Financing Documents and this Final Order subject to the terms of Paragraphs 23(b), 31 and 33.  The Prepetition ABL Agent shall not be required to reimburse, or release any cash collateral to, the Debtors as a result of any increase in the Borrowing Base (whether as a result of any reduction to reserves or otherwise).  Upon any drawing under any outstanding Letter of Credit (as

defined in the Prepetition ABL Agreement), the Prepetition ABL Agent shall be permitted to immediately apply any ABL Cash Collateral in an ABL Cash Collateral Account to reimburse the amount of such drawings, together with any other amounts then due and owing under the Prepetition ABL Agreement, without the need for consent from the Court, the Debtors, any other Prepetition Secured Parties, the DIP Lenders or the DIP Agent.

v.  <u>Financial Reporting</u>.  The Debtors shall provide the Prepetition ABL Agent with (i) the monthly Borrowing Base Certificate as of the last day of each month and the supporting information required to be delivered under the Prepetition ABL Agreement; (ii) as soon as reasonably practicable after the 15th day of each month, beginning with the first full calendar month following the Petition Date (but in no event later than the seventh business day following the 15th day of each month), a Borrowing Base Certificate calculated as of the close of business on such 15th day, setting forth the Debtors' good faith estimate of the Borrowing Base as of such date based on information reasonably available to the Debtors at that time; (iii) no later than one business day prior to the consummation of a Disposition (whether of (or including) Priority ABL DIP Collateral or otherwise) with an aggregate value in excess of $5,000,000 (whether such Disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority ABL DIP Collateral), a revised Borrowing Base Certificate demonstrating the pro forma effect of such Disposition on the Borrowing Base; (iv) all notices, financial statements, certificates and information as and when required by the Prepetition ABL Financing Documents, including the Prepetition ABL Agreement (subject to the modified

Borrowing Base Certificate delivery requirements set forth above); provided that after the Petition Date the Debtors are not required to comply with Sections 6.01(a), 6.01(b), 6.01(c), 6.02(a), 6.02(b), 6.02(j), 6.02(p), and 6.03(a) of the Prepetition ABL Agreement (it being understood that noncompliance with the preceding sections shall not limit the Debtors obligations with respect to the information and reports relating to the Borrowing Base and the calculation thereof, which obligations continue post-petition); and (v) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Final Order or the DIP Loan Agreement (without regard to any amendment or waiver thereof by the DIP Agent or the DIP Lenders (other than to the extent any such amendment requires additional information from any of the Debtors), unless consented to by the Prepetition ABL Agent, such consent not to be unreasonably withheld) (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders.  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition ABL Agent. The Prepetition ABL Agent is authorized to share any information received pursuant to this Paragraph 25(a)(v) with any Prepetition ABL Lender, subject to applicable restrictions (if any) on sharing information as set forth in the Prepetition ABL Agreement.

vi. <u>Access</u>.  (i) The Prepetition ABL Agent and its counsel, consultants, advisors and other representatives shall be given reasonable access to the Debtors' properties and

records at any time in the Prepetition ABL Agent's reasonable discretion for purposes of monitoring the business and assets of the Debtors and the value of the Priority ABL DIP Collateral including the right to conduct field examinations, ongoing maintenance and monitoring in connection with the computation of the Borrowing Base and assets included in the Borrowing Base  and (ii) the Debtors shall permit the Prepetition ABL Agent and its counsel, consultants, advisors and other representatives, upon prior notice, to have reasonable access to the Debtors' personnel and provide to such persons all such nonprivileged information as they may reasonably request from time to time, in each case, for both clauses (i) and (ii) at the Debtors' expense; <u>provided</u> that so long as no Adequate Protection Default has occurred and is continuing, (x) the Prepetition ABL Agent shall only be allowed to conduct one appraisal of the Debtors' inventory (which appraisal shall be in accordance with Section 6.10 of the Prepetition ABL Agreement) and one field examination, in each case at the Debtors' expense and (y) the Prepetition ABL Agent shall coordinate all diligence and/or other requests directly though the Debtors' proposed restructuring advisor, Alvarez & Marsal North America.

vii. <u>Interest</u>.  To the extent not previously paid upon entry of the Interim Order, upon entry of this Final Order, the Debtors shall pay in cash all accrued and unpaid interest on the Loans (as defined in the Prepetition ABL Agreement) and all accrued and unpaid Letter of Credit Fees (as defined in the Prepetition ABL Agreement) and other fees and disbursements owing to the Prepetition ABL Agent, the Prepetition ABL Lenders or the Prepetition ABL Facility Issuers.  From and after entry of the Interim Order, the Debtors shall pay in cash in arrears on the last business day of each month

all postpetition interest on the Loans (as defined in the Prepetition ABL Agreement) and all Letter of Credit Fees (as defined in the Prepetition ABL Agreement) and other fees and disbursements owing to the Prepetition ABL Agent, the Prepetition ABL Lenders or the Prepetition ABL Facility Issuers accruing after the Petition Date, all at the non-Default Rate (as defined in the Prepetition ABL Agreement).

viii.    <u>Professional Fees</u>. To the extent not previously paid upon entry of the Interim Order, upon entry of this Final Order, the Debtors shall pay in cash all accrued and unpaid reasonable and documented prepetition fees and expenses of the Prepetition ABL Agent when due and owing under the Prepetition ABL Agreement, including the fees and expenses of counsel, financial advisors, field examiners and other consultants for the Prepetition ABL Agent, and, to the extent such fees and expenses are payable pursuant to the Prepetition ABL Agreement, all accrued and unpaid prepetition reasonable and documented fees and expenses of the Prepetition ABL Facility Issuers.  From and after entry of the Interim Order, the Debtors shall pay such reasonable and documented postpetition fees and expenses (but only fees and expenses (i) of one lead counsel to the Prepetition ABL Agent, (ii) of one local counsel in Virginia and each other relevant jurisdiction reasonably requested by either the Prepetition ABL Agent, the Prepetition LC Agent, or the Prepetition LC/Term Collateral Agent to be shared by the Prepetition ABL Agent, the Prepetition LC Agent, and the Prepetition LC/Term Collateral Agent (<u>provided</u> that in the case of a conflict of interest, one additional local counsel in each relevant jurisdiction shall be permitted), (iii) of one financial advisor shared by the Prepetition ABL Agent and the Prepetition LC Agent, and (iv) associated with field exams and inventory appraisal

(subject to the limitations set forth in Paragraph 25(a)(vi) when no Adequate Protection Default has occurred and is continuing) to the extent such fees and expenses are reasonable and documented and would have been payable pursuant to the Prepetition ABL Agreement, in cash on a monthly basis subject to the receipt of invoices (redacted for privilege).  The Debtors shall pay such invoice within ten business days (if no written objection is received with such ten business days' period) after such professional has delivered such invoice to the Debtors, the Committee, the DIP Agent, and the U.S. Trustee. Parties in interest may deliver written objections to payment of such fees and expenses within ten business days following receipt of such invoice for such fees and expenses.  If an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.

(b)     The Prepetition LC Secured Parties are hereby granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition LC/Term Loan Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the Disposition or use by the Debtors of the collateral securing the Prepetition LC Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition LC/Term Loan Liens, the Carve Out, or the stay of enforcement or attachment of any prepetition security interest arising from section 362 of the Bankruptcy Code or otherwise (each, a "<u>LC Diminution Claim</u>").  As security for and solely to the extent of any LC Diminution Claim, the

Prepetition LC Secured Parties are hereby granted the following adequate protection (collectively, the "LC Adequate Protection Obligations"):

    i.   LC/Term Adequate Protection Lien.  The Prepetition LC/Term Collateral Agent, on behalf of itself and the Prepetition LC/Term Secured Parties, is hereby granted for their benefit, effective and perfected as of the date of entry of the Interim Order and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) (together, the "LC/Term Adequate Protection Liens"), subject and subordinate only to (w) the Carve Out, (x) the DIP Liens, (y) with respect to the Priority ABL DIP Collateral, the ABL Adequate Protection Liens and the Prepetition ABL Liens and (z) liens to the extent expressly permitted to be senior to the Prepetition LC Liens in accordance with the terms of the Prepetition LC/Term Loan Agreement); provided that, notwithstanding the reference to liens permitted  in accordance with the terms of the Prepetition LC/Term Loan Agreement in this Final Order, nothing herein (except as otherwise provided in Paragraph 36) shall adversely affect the rights of any third party who asserts a lien senior or *pari passu* to the DIP Agent, the DIP Lenders, the Prepetition ABL Lenders, the Prepetition ABL Agent or the Prepetition LC/Term Secured Parties.  The LC Adequate Protection Obligations are subject to the LC/Term Loan Agent Expenses Priority.  Notwithstanding anything to the contrary in this Final Order, the LC/Term Adequate Protection Liens shall not, without the consent of the Prepetition LC Agent, be made subject to, or *pari passu* with, any other lien or security interest, and the LC/Term Adequate Protection Liens

shall be valid and enforceable (maintaining the priorities as provided in this Final

Order) against any trustee appointed in the Chapter 11 Cases or any Successor Case

and/or upon the dismissal of any of the Chapter 11 Cases or commencement of a

Successor Case.  For the avoidance of doubt, the LC/Term Adequate Protection Liens

shall not attach to or encumber Avoidance Actions and Avoidance Proceeds.

ii.  <u>LC Adequate Protection Superpriority Claim</u>. The Prepetition LC Secured Parties

shall be granted, subject to the payment of the Carve Out, superpriority administrative

expense claims (the "<u>LC Superpriority Claims</u>") junior only to the DIP Superpriority

Claims and, solely to the extent provided pursuant to the LC/Term Loan Agent

Expenses Priority, the Term Superpriority Claims, and *pari passu* with the ABL

Superpriority Claims; <u>provided</u> that the LC Superpriority Claims shall not attach to

the Avoidance Actions or the Avoidance Proceeds; <u>provided</u>, <u>further</u>, that the

Prepetition LC Secured Parties shall not receive or retain any payments, property or

other amounts in respect of such LC Superpriority Claims unless and until the

obligations under the DIP Facility have indefeasibly been paid in cash in full.  LC

Superpriority Claims and Term Superpriority Claims that are first out pursuant to the

LC/Term Loan Agent Expenses Priority shall be paid in full prior to the payment of

any other LC Superpriority Claims.

iii.  <u>Priority LC/Term DIP Collateral Proceeds</u>. Notwithstanding anything to the contrary

in Section 2.06(b) or 6.22 of the DIP Loan Agreement or any other provisions of the

DIP Loan Documents that would permit other uses (but subject to the Carve Out and

the Carve Out Reserve), if the DIP Obligations have not yet been paid in full, the cash

proceeds (net of reasonable costs, expenses, and any applicable taxes) received from

any Disposition of any Priority LC/Term DIP Collateral outside the ordinary course

of business or Extraordinary Receipts may only be (a) used to prepay or repay the

DIP Obligations, (b) solely with respect to any Extraordinary Receipt subject to

Section 2.06(b)(ii) of the DIP Loan Agreement, used by the Debtors (in consultation

with the DIP Agent, the Prepetition LC Agent and the Prepetition Term Agent) to

(i) replace or repair the equipment, fixed assets or real property  in respect of which

such Extraordinary Receipt was received to the extent required by applicable law or

to the extent the Borrower, in its reasonable judgment, determines such repair or

replacement is necessary or advisable in connection with the reorganization and/or

the sale process contemplated by the milestones, or (ii) repay obligations secured by a

lien senior in priority to the liens securing the Prepetition LC Obligations and the

Prepetition Term Loan Obligations on the asset(s) in respect of which such

Extraordinary Receipt was received, solely to the extent the Debtors are required to

make such repayment with such Extraordinary Receipt (by order of the Court or

otherwise) during the Chapter 11 Cases, or, if the relevant asset in respect of which

such Extraordinary Receipt was received is leased equipment, to buyout the relevant

lease, or (iii) reinvest such Extraordinary Receipts in government required

expenditures and/or safety expenditures relating to operations conducted at the

location(s) at which the related casualty or condemnation events occurred (in each

case, to the extent such use is otherwise permitted by Section 2.06(b)(ii) of the DIP

Loan Agreement and Paragraph 31 hereof), or (c) used by the Debtors for any other

purpose (I) with the prior written consent of each of the Prepetition LC Agent and the

Prepetition Term Agent (in addition to any consent required from the DIP Agent

and/or requisite DIP Lenders pursuant to the DIP Loan Agreement or any other applicable provision of this Final Order) or (II) as set forth in a further order of the Court; provided that, in the case of Dispositions, the Debtors may retain such cash proceeds in accordance with Section 2.06(b)(i) of the DIP Loan Agreement until 30 days after the receipt thereof (so long as such proceeds remain deposited in a segregated account in accordance with the requirements of Paragraph 7) unless such date is otherwise extended by the Required Lenders (as defined in the DIP Loan Agreement). Notwithstanding anything to the contrary in Section 2.06(b)(iii) of the DIP Loan Agreement or any other provisions of the DIP Loan Documents that would permit other uses (but subject to the Intercreditor Agreements, the Carve Out and the Carve Out Reserve), if the DIP Obligations have been paid in full, the proceeds received from any Disposition of any Priority LC/Term DIP Collateral outside the ordinary course of business may only be, in accordance with section 9.04 of the Prepetition LC/Term Loan Agreement, (a) used (i) first, to prepay or repay, on a pro rata and pari passu basis, the portion of the Prepetition LC Obligations, LC Adequate Protection Obligations, Prepetition Term Loan Obligations and Term Adequate Protection Obligations that are first out pursuant to the LC/Term Loan Agent Expenses Priority; (ii) second, after Payment in Full of the portion of the Prepetition LC Obligations, LC Adequate Protection Obligations, Prepetition Term Loan Obligations and Term Adequate Protection Obligations that are first out pursuant to the LC/Term Loan Agent Expenses Priority, to repay all other Prepetition LC Obligations and LC Adequate Protection Obligations until Paid in Full; and (iii) third, after Payment in Full of the Prepetition LC Obligations and the LC Adequate

Protection Obligations, and the portion of the Prepetition Term Loan Obligations and Term Adequate Protection Obligations that are first out pursuant to the LC/Term Loan Agent Expenses Priority, to repay the portion of the Prepetition Term Loan Obligations and Term Adequate Protection Obligations that are not first out pursuant to the LC/Term Loan Agent Expenses Priority; or (b) used by the Debtors for any other purpose (I) with the prior written consent of each of the Prepetition LC Agent and the Prepetition Term Agent or (II) as set forth in a further order of the Court.

iv.   Interest.  All postpetition interest on the L/C Borrowings (as defined in the Prepetition LC/Term Loan Agreement) and all Letter of Credit Fees (as defined in the Prepetition LC/Term Loan Agreement) and other fees and disbursements owing to the LC/Term Secured Parties or the L/C Issuers (as defined in the Prepetition LC/Term Loan Agreement) shall continue to accrue after the Petition Date, all at the Default Rate (as defined in the Prepetition LC/Term Loan Agreement).

v.   Financial Reporting.  The Debtors shall deliver to the Prepetition LC Agent (i) all notices, financial statements, certificates and information as and when required by the Prepetition LC/Term Loan Financing Documents, including the Prepetition LC/Term Loan Agreement; provided that after the Petition Date the Debtors are not required to comply with Sections 6.01(a), 6.01(b), 6.02(a), 6.02(b), 6.02(j), 6.02(l), 6.02(n) and 6.03(a) of the Prepetition LC/Term Loan Agreement, (ii) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Final Order or the DIP Loan Agreement (without regard to any amendment or waiver thereof by the DIP Agent or the DIP Lenders (other than to the extent any

such amendment requires additional information from any of the Debtors), unless consented to by the Prepetition LC Agent, such consent not to be unreasonably withheld) (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders, and (iii) no later than one business day prior to the consummation of a Disposition of (or including) Priority LC/Term DIP Collateral with an aggregate value in excess of $5,000,000 (whether such Disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority LC/Term DIP Collateral), prompt notice thereof shall be delivered by Debtors to the Prepetition LC Agent.  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition Agents. The Prepetition LC Agent is authorized to share any information received pursuant to this Paragraph 25(b)(v) with any other Prepetition LC Secured Party, subject to applicable restrictions (if any) on sharing information as set forth in the Prepetition LC/Term Loan Agreement.

vi. Access. The Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, and their respective counsel, consultants, advisors and other representatives shall be given reasonable access to the Debtors' properties and records upon the Debtors' prior reasonable consent for purposes of monitoring the business and assets of the Debtors and the value of the DIP Collateral and the Prepetition Collateral, but shall coordinate all diligence and/or other requests directly though the Debtors' proposed restructuring advisor, Alvarez & Marsal North America.

vii. <u>Professional Fees</u>. To the extent not previously paid upon entry of the Interim Order,

upon entry of this Final Order, the Debtors shall pay in cash all accrued and unpaid

reasonable and documented prepetition fees and expenses of the Prepetition LC

Agent when due and owing under the Prepetition LC/Term Loan Agreement,

including the fees and expenses of counsel, financial advisors, field examiners and

other consultants for the Prepetition LC Agent, and, to the extent such fees and

expenses are payable pursuant to any of the Prepetition LC/Term Loan Financing

Documents, all accrued and unpaid reasonable and documented prepetition fees and

expenses of the Prepetition LC/Term Collateral Agent and the Prepetition LC Facility

Issuers.  From and after entry of the Interim Order, the Debtors shall pay such

reasonable and documented postpetition fees and expenses (but only fees and

expenses (i) of one separate lead counsel to each of the Prepetition LC Agent and the

Prepetition LC/Term Collateral Agent, (ii) of one local counsel in Virginia and each

other relevant jurisdiction reasonably requested by either the Prepetition ABL Agent,

the Prepetition LC Agent, or the Prepetition LC/Term Collateral Agent to be shared

by the Prepetition ABL Agent, the Prepetition LC Agent, and the Prepetition

LC/Term Collateral Agent (provided that in the case of a conflict of interest, one

additional local counsel in each relevant jurisdiction shall be permitted), (iii) one

financial advisor shared by the Prepetition LC Agent and the Prepetition ABL Agent,

and (iv) associated with one field exam during the Chapter 11 Cases) to the extent

such fees and expenses are reasonable and documented and would have been payable

pursuant to the Prepetition LC/Term Loan Agreement, in cash on a monthly basis

subject to the receipt of invoices (redacted for privilege).  The Debtors shall pay such

invoice within ten business days (if no written objection is received with such ten business days' period) after such professional has delivered such invoice to the Debtors, the Committee, the DIP Agent, and the U.S. Trustee. Parties in interest may deliver written objections to payment of such fees and expenses within ten business days following receipt of such invoice for such fees and expenses. If an objection to a professional's invoice is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.

(c)    The Prepetition Term Secured Parties are hereby granted the following protection, pursuant to Sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code or otherwise, of their respective interests in Prepetition LC/Term Loan Liens for the diminution in the value of the prepetition security interests of such parties, whether or not such diminution in value results from the Disposition or use by the Debtors of the collateral securing the Prepetition Term Loan Obligations (including, without limitation, Cash Collateral), the priming of the Prepetition LC/Term Loan Liens, the Carve Out, or the stay of enforcement or attachment of any prepetition security interest arising from section 362 of the Bankruptcy Code or otherwise (each, a "Term Diminution Claim"); provided, that notwithstanding anything in this Final Order to the contrary, nothing shall affect the rights of any of the Prepetition Term Loan Lenders to instruct or direct the Prepetition Term Agent in accordance with the terms of the Prepetition LC/Term Loan Financing Documents. As security for and solely to the extent of any Term Diminution Claim, the Prepetition Term Secured Parties are hereby granted the following adequate

protection (collectively, the "Term Adequate Protection Obligations" and together with the LC

Adequate Protection Obligations, the "LC/Term Adequate Protection Obligations"):

    i.   LC/Term Adequate Protection Lien.  The LC/Term Adequate Protection Liens and

the other adequate protection set forth in Paragraph 25(b)(i) shall also constitute Term

Adequate Protection Obligations.  Such Term Adequate Protection Obligations are,

among other things, subject to the Term Loan Subordination Agreement.

Notwithstanding anything to the contrary in this Final Order, the LC/Term Adequate

Protection Liens shall not, without the consent of the Prepetition Term Agent, be

made subject to, or *pari passu* with, any other lien or security interest, and the

LC/Term Adequate Protection Liens shall be valid and enforceable (maintaining the

priorities as provided in this Final Order) against any trustee appointed in the Chapter

11 Cases or any Successor Case and/or upon the dismissal of any of the Chapter 11

Cases or commencement of a Successor Case.  For the avoidance of doubt, the

LC/Term Adequate Protection Liens shall not attach to or encumber Avoidance

Actions and Avoidance Proceeds.

    ii.   Term Adequate Protection Superpriority Claim. The Prepetition Term Secured Parties

shall be granted, subject to the payment of the Carve Out, superpriority administrative

expense claims (the "Term Superpriority Claims") (x) junior only to the DIP

Superpriority Claims and, except to the extent otherwise provided pursuant to the

LC/Term Loan Agent Expenses Priority, the LC Superpriority Claims, and (y) pari

passu with the ABL Superpriority Claims; provided  that the Term Superpriority

Claims shall not attach to the Avoidance Actions or Avoidance Proceeds; provided,

further, that the Prepetition Term Secured Parties shall not receive or retain any

payments, property or other amounts in respect of such Term Superpriority Claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full and, extent to the extent otherwise provided pursuant to the LC/Term Loan Agent Expenses Priority, the Prepetition LC Obligations have been Paid in Full.

iii. <u>Priority LC/Term DIP Collateral Proceeds</u>. Notwithstanding anything to the contrary in Section 2.06(b) or 6.22 of the DIP Loan Agreement or any other provisions of the DIP Loan Documents that would permit other uses (but subject to the Carve Out and the Carve Out Reserve), if the DIP Obligations have not yet been paid in full, the cash proceeds (net of reasonable costs, expenses, and any applicable taxes) received from any Disposition of any Priority LC/Term DIP Collateral outside the ordinary course of business or Extraordinary Receipts may only be (a) used to prepay or repay the DIP Obligations, (b) solely with respect to any Extraordinary Receipt subject to Section 2.06(b)(ii) of the DIP Loan Agreement, used by the Debtors (in consultation with the DIP Agent, the Prepetition LC Agent and the Prepetition Term Agent) to (i) replace or repair the equipment, fixed assets or real property  in respect of which such Extraordinary Receipt was received to the extent required by applicable law or to the extent the Borrower, in its reasonable judgment, determines such repair or replacement is necessary or advisable in connection with the reorganization and/or the sale process contemplated by the milestones, or (ii) repay obligations secured by a lien senior in priority to the liens securing the Prepetition LC Obligations and the Prepetition Term Loan Obligations on the asset(s) in respect of which such Extraordinary Receipt was received, solely to the extent the Debtors are required to make such repayment with such Extraordinary Receipt (by order of the Court or

otherwise) during the Chapter 11 Cases, or, if the relevant asset in respect of which

such Extraordinary Receipt was received is leased equipment, to buyout the relevant

lease, or (iii) reinvest such Extraordinary Receipts in government required

expenditures and/or safety expenditures relating to operations conducted at the

location(s) at which the related casualty or condemnation events occurred (in each

case, to the extent such use is otherwise permitted by Section 2.06(b)(ii) of the DIP

Loan Agreement and Paragraph 31 hereof), or (c) used by the Debtors for any other

purpose (I) with the prior written consent of each of the Prepetition LC Agent and the

Prepetition Term Agent (in addition to any consent required from the DIP Agent

and/or requisite DIP Lenders pursuant to the DIP Loan Agreement or any other

applicable provision of this Final Order) or (II) as set forth in a further order of the

Court; provided that, in the case of Dispositions, the Debtors may retain such cash

proceeds in accordance with Section 2.06(b)(i) of the DIP Loan Agreement until 30

days after the receipt thereof (so long as such proceeds remain deposited in a

segregated account in accordance with the requirements of Paragraph 7) unless such

date is otherwise extended by the Required Lenders (as defined in the DIP Loan

Agreement). Notwithstanding anything to the contrary in Section 2.06(b)(iii) of the

DIP Loan Agreement or any other provisions of the DIP Loan Documents that would

permit other uses (but subject to the Intercreditor Agreements, the Carve Out and the

Carve Out Reserve), if the DIP Obligations have been paid in full, the proceeds

received from any Disposition of any Priority LC/Term DIP Collateral outside the

ordinary course of business may only be, in accordance with section 9.04 of the

Prepetition LC/Term Loan Agreement, (a) used (i) first, to prepay or repay, on a pro

rata and pari passu basis, the portion of the Prepetition LC Obligations, LC Adequate

Protection Obligations, Prepetition Term Loan Obligations and Term Adequate

Protection Obligations that are first out pursuant to the LC/Term Loan Agent

Expenses Priority; (ii) second, after Payment in Full of the portion of the Prepetition

LC Obligations, LC Adequate Protection Obligations, Prepetition Term Loan

Obligations and Term Adequate Protection Obligations that are first out pursuant to

the LC/Term Loan Agent Expenses Priority, to repay all other Prepetition LC

Obligations and LC Adequate Protection Obligations until Paid in Full; and (iii) third,

after Payment in Full of the Prepetition LC Obligations and the LC Adequate

Protection Obligations, and the portion of the Prepetition Term Loan Obligations and

Term Adequate Protection Obligations that are first out pursuant to the LC/Term

Loan Agent Expenses Priority, to repay the portion of the Prepetition Term Loan

Obligations and Term Adequate Protection Obligations that are not first out pursuant

to the LC/Term Loan Agent Expenses Priority; or (b) used by the Debtors for any

other purpose (I) with the prior written consent of each of the Prepetition LC Agent

and the Prepetition Term Agent or (II) as set forth in a further order of the Court.

iv. <u>Interest</u>.  All postpetition interest on the Term Loans (as defined in the Prepetition

LC/Term Loan Agreement) and other fees and disbursements owing to the LC/Term

Secured Parties shall continue to accrue after the Petition Date, all at the Default Rate

(as defined in the Prepetition LC/Term Loan Agreement).

v. <u>Financial Reporting</u>.  The Debtors shall deliver to the Prepetition Term Agent (i) all

notices, financial statements, certificates and information as and when required by the

Prepetition LC/Term Loan Financing Documents, including the Prepetition LC/Term

Loan Agreement; *provided* that after the Petition Date the Debtors are not required to comply with Sections 6.01(a), 6.01(b), 6.02(a), 6.02(b), 6.02(j), 6.02(l), 6.02(n) and 6.03(a) of the Prepetition LC/Term Loan Agreement, (ii) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Final Order or the DIP Loan Agreement (without regard to any amendment or waiver thereof by the DIP Agent or the DIP Lenders (other than to the extent any such amendment requires additional information from any of the Debtors), unless consented to by the Prepetition Term Agent, such consent not to be unreasonably withheld) (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders, and (iii) no later than one business day prior to the consummation of a Disposition of (or including) Priority LC/Term DIP Collateral with an aggregate value in excess of $5,000,000 (whether such Disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority LC/Term DIP Collateral), prompt notice thereof shall be delivered by Debtors to the Prepetition Term Agent.  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition Agents.  The Prepetition Term Agent is authorized to share any information received pursuant to this Paragraph 25(c)(v) with any Prepetition Term Lender, subject to applicable restrictions (if any) on sharing information as set forth in the Prepetition LC/Term Loan Agreement.

vi. <u>Access</u>.  The Prepetition Term Agent and its respective counsel, consultants, advisors and other representatives shall be given reasonable access to the Debtors' properties and records upon the Debtors' prior reasonable consent for purposes of monitoring the business and assets of the Debtors and the value of the DIP Collateral and the Prepetition Collateral, but shall coordinate all diligence and/or other requests directly though the Debtors' proposed restructuring advisor, Alvarez & Marsal North America.

vii. <u>Professional Fees</u>. To the extent not previously paid upon entry of the Interim Order, upon entry of this Final Order, the Debtors shall pay in cash all accrued and unpaid reasonable and documented prepetition fees and expenses of the Prepetition Term Agent when due and owing under the Prepetition LC/Term Loan Agreement, including the fees and expenses of counsel, financial advisors, field examiners and other consultants for the Prepetition Term Agent.  From and after entry of the Interim Order, the Debtors shall pay such reasonable and documented postpetition fees and expenses (but only fees and expenses (i) of one separate lead counsel to the Prepetition Term Agent, (ii) of one local counsel in Virginia and each other relevant jurisdiction reasonably requested by the Prepetition Term Agent, (iii) one financial advisor whose fees and expenses shall be subject to a budget agreed-to between the Debtors and the Prepetition Term Agent, to the extent such fees and expenses are reasonable and documented and would have been payable pursuant to the Prepetition LC/Term Financing Documents, in cash on a monthly basis subject to the receipt of invoices (redacted for privilege).  The Debtors shall pay such invoice within ten business days (if no written objection is received with such ten business days' period)

after such professional has delivered such invoice to the Debtors, the DIP Agent, the

Committee, and the U.S. Trustee.  Parties in interest may deliver written objections to

payment of such fees and expenses within ten business days following receipt of such

invoice for such fees and expenses.  If an objection to a professional's invoice is

timely received, the Debtors shall only be required to pay the undisputed amount of

the invoice and this Court shall have jurisdiction to determine the disputed portion of

such invoice if the parties are unable to resolve the dispute consensually.

(d)     The Prepetition Notes Trustee for the benefit of itself and the Prepetition

Noteholders (collectively, the "Note Adequate Protection Parties"), are hereby granted the

following protection, pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy

Code or otherwise, of its Prepetition Notes Liens for the consent of the Prepetition Notes Trustee

and the Prepetition Noteholders to the priming effectuated by the DIP Facility, consent to the use

of its collateral (including Cash Collateral), consent to the transaction contemplated by the DIP

Facility, and for the diminution in the value of the prepetition security interests of such party,

whether or not such diminution in value results from the sale, lease or use by the Debtors of the

collateral securing the Prepetition Notes Obligations (including, without limitation, Cash

Collateral), the priming of the Prepetition Notes Liens or the stay of enforcement of any

prepetition security interest arising from section 362 of the Bankruptcy Code or otherwise (each,

a "Note Diminution Claim").  As security for and solely to the extent of any Note Diminution

Claim, the Note Adequate Protection Parties are granted the following adequate protection

(collectively, the "Note Adequate Protection Obligations" and together with the ABL Adequate

Protection Obligations and the LC/Term Adequate Protection Obligations, the "Adequate

Protection Obligations"):

i. <u>Note Adequate Protection Lien</u>.  The Prepetition Notes Trustee, on behalf of itself

and the Prepetition Noteholders shall be granted for their benefit, effective and

perfected as of the date of entry of the Interim Order and without the necessity of

the execution or filing of mortgages, security agreements, pledge agreements,

financing statements or other agreements, a security interest in and lien on all

assets of the Debtors (together, the "<u>Note Adequate Protection Liens</u>"; together

with the ABL Adequate Protection Liens and the LC/Term Adequate Protection

Liens, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (w) the

Carve Out, (x) the DIP Liens securing the DIP Facility, (y) the Prepetition ABL

Liens, the Prepetition LC Liens and the Prepetition Term Loan Liens, and (z) the

ABL Adequate Protection Liens, the LC/Term Adequate Protection Liens and

liens permitted in accordance with the terms of the Prepetition LC/Term Loan

Agreement; <u>provided</u> that, notwithstanding the reference to liens permitted in

accordance with the terms of the Prepetition LC/Term Loan Agreement in this

Final Order, nothing herein (except as otherwise provided in Paragraph 36) shall

adversely affect the rights of any third party who asserts a lien senior or *pari*

*passu* to the DIP Agent, the DIP Lenders, Prepetition ABL Agent, the Prepetition

ABL Lenders, the Prepetition LC Agent, the Prepetition LC Lenders, the

Prepetition Term Agent, the Prepetition Term Lenders, the Prepetition Notes

Trustee or the Prepetition Noteholders.  For the avoidance of doubt, the Note

Adequate Protection Liens shall not attach to or encumber Avoidance Actions and

Avoidance Proceeds.

ii.  <u>Note Adequate Protection Superpriority Claim</u>.  The Prepetition Notes Trustee and the Prepetition Noteholders shall be granted, subject to the payment of the Carve Out, superpriority administrative expense claims (the "<u>Notes Superpriority Claims</u>" and together with the DIP Superpriority Claims, the ABL Superpriority Claims, the LC Superpriority Claims and the Term Superpriority Claims, the "<u>Superpriority Claims</u>") junior only to the DIP Superpriority Claims, the ABL Superpriority Claims, the LC Superpriority Claims and the Term Superpriority Claims; <u>provided</u> hat the Notes Superpriority Claims shall not attach to the Avoidance Actions or the Avoidance Proceeds; <u>provided</u> <u>further</u>, that the Prepetition Notes Trustee and the Prepetition Noteholders shall not receive or retain any payments, property or other amounts in respect of such Notes Superpriority Claims unless and until (x) the obligations under the DIP Facility have indefeasibly been paid in cash in full, (y) the Prepetition ABL Obligations, the Prepetition Term Loan Obligations, and the Prepetition LC Obligations have been Paid in Full.

iii.  <u>Financial Reporting</u>. The Debtors shall deliver to the Prepetition Notes Trustee (i) the financial information, the Budget, weekly budget variance reports and other reporting or notices that are provided to, or required to be provided to, the DIP Agent or the DIP Lenders under this Final Order or the DIP Loan Agreement (including any information provided or required to be provided pursuant to Section 6.01, 6.02 or 6.03 of the DIP Loan Agreement), in each case at such times as required to be delivered to the DIP Agent or DIP Lenders, and (ii) no later than one business day prior to the consummation of a Disposition of (or including)

Priority LC/Term DIP Collateral with an aggregate value in excess of $5,000,000 (whether such Disposition occurs directly, or indirectly through a sale of equity in, or a merger of, an entity that holds such Priority LC/Term DIP Collateral), prompt notice thereof shall be delivered by the Debtors to the Prepetition Notes Trustee.  Any notices delivered by the DIP Agent or the DIP Lenders to any of the Debtors shall be delivered concurrently to the Prepetition Notes Trustee.

(e)     <u>Amendments, Etc</u>.  No amendment, modification, termination or waiver of any provision of Paragraph 25(a), 25(b), or 25(c) or consent to any departure by any of the Debtors from such provisions, shall be effective without the prior written consent of the Prepetition ABL Agent, the Prepetition LC Agent, or the Prepetition Term Agent, as applicable, in their sole discretion. The rights of the Prepetition Secured Parties set forth in this Paragraph 25 are incremental and not in lieu of any right to seek to terminate the use of Cash Collateral or to seek new, additional or different adequate protection.

26.     <u>Investigation Budget</u>.  The Debtors shall not assert or prosecute, and no portion of the DIP Facility, the DIP Collateral (including the Prepetition Collateral and the Cash Collateral), the Carve Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred by any party in interest in connection with (a) asserting or prosecuting any claims or causes of action arising under or related to the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents or the Prepetition Notes Documents, or the liens or security interests securing the obligations under any of the foregoing or to pursue a Challenge (as defined in Paragraph 36 of this Final Order) against the DIP Agent, DIP Lenders, Prepetition Term Lenders, the Prepetition Term Agent, the Prepetition ABL Lenders, the Prepetition ABL

Agent, the Prepetition LC Lenders, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the Prepetition Notes Trustee and/or the Prepetition Noteholders, or (b) asserting any Challenge or raising any defenses to the Prepetition Obligations, the DIP Obligations, or the Prepetition Liens; provided, however, that not more than $250,000 in the aggregate of proceeds of any Cash Collateral or any proceeds of the DIP Facility or the DIP Collateral may be used to pay any allowed fees of the Committee or professionals retained by the Committee and incurred in connection with investigating the matters covered by the stipulations contained in recital Paragraphs E, F and N of this Final Order subject to the limitations contained in Paragraph 36 of this Final Order (the "Investigation Budget").

27.    Consensual Plan Treatment in Respect of the DIP Agent and DIP Lenders.  To the extent any obligations under the DIP Facility remain outstanding on the date of confirmation of any Plan for one or more of the Debtors under chapter 11 of the Bankruptcy Code, such obligations shall be repaid in cash or such other treatment as agreed-to by the Required DIP Lenders, and, with respect to obligations owing to the DIP Agent, shall be repaid in cash.

28.    Binding Nature of Order.  The provisions of this Final Order shall be binding upon the Debtors and their respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter elected or appointed for or on behalf of any Debtor's estate or with respect to its property).

29.    Survival of Order.  Solely with respect to the DIP Agent, the DIP Lenders and the Adequate Protection Parties, the provisions of this Final Order and any actions taken pursuant hereto (a) shall survive the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases; and (b) shall continue in

full force and effect notwithstanding the entry of any such order described in clause (a) above, and the claims, liens, and security interests granted pursuant to this Final Order shall maintain their priority as provided by this Final Order, in any such case, until (x) all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Loan Documents, (y) all of the Prepetition Obligations and Adequate Protection Obligations owed to the Adequate Protection Parties are indefeasibly paid in full.  The DIP Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in any of the Chapter 11 Cases that does not provide for payment in full of the DIP Obligations or such other treatment of the DIP Obligations as may be agreed to by the DIP Agent as directed by the Required DIP Lenders pursuant to Paragraph 27.

30.    Protection under Section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders, or the Adequate Protection Parties, as applicable, incurred prior to the actual receipt by such entities of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) the validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the DIP Agent, the DIP Lenders or the Adequate Protection Parties, as applicable. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations or Adequate Protection Obligations owing to the Adequate Protection Parties by the Debtors prior to the actual receipt by the Adequate Protection Parties of written notice of the effective date of such reversal, modification, vacation or stay, shall be

governed in all respects by the provisions of this Final Order, and the Adequate Protection

Parties shall be entitled to all of the rights, remedies, protections and benefits granted under

section 364(e) of the Bankruptcy Code, this Final Order and the other DIP Loan Documents with

respect to all uses of Cash Collateral and the incurrence of DIP Obligations and Adequate

Protection Obligations owing to the Adequate Protection Parties.

31.    <u>Termination of DIP Facility and Use of Cash Collateral</u>.  Unless otherwise agreed

to by the DIP Agent or the Required DIP Lenders in writing in accordance with this Final Order

and the DIP Loan Agreement, the Debtors' right to use the DIP Facility and Cash Collateral shall

terminate upon the Termination Date as defined in the DIP Loan Agreement.  The Debtors' right

to use the Priority ABL DIP Collateral (unless otherwise agreed to in writing by the Prepetition

ABL Agent in its sole discretion)  and, after the elapse of seven (7) days, any Cash Collateral

(unless otherwise agreed to in writing by the Prepetition ABL Agent, the Prepetition Term

Agent, and the Prepetition LC Agent, in their sole discretion but subject in all respects to the

Intercreditor Agreement), in each case shall terminate upon the Debtors' breach of, or non-

compliance with, any of their obligations in Paragraph 15(c) (to the extent such breach or non-

compliance results from a failure to obtain any consent or approval of the Prepetition ABL

Agent, the Prepetition Term Agent, any Prepetition ABL Lender, any Prepetition Term Lender,

and/or any Prepetition LC Secured Party) or Paragraph 25(a), 25(b) or 25(e) (an "<u>Adequate</u>

<u>Protection Default</u>").  Furthermore, upon the occurrence and continuation of an Adequate

Protection Default, the Prepetition ABL Agent and Prepetition ABL Lenders may exercise the

rights and remedies available to them under the Prepetition ABL Financing Documents with

respect to the Priority ABL DIP Collateral, subject to the terms hereof and the Intercreditor

Agreements; <u>provided</u>, <u>however</u>, that with respect to any such enforcements of remedies, the

Prepetition ABL Agent shall provide the Borrower (with a copy to counsel for the Committee, the DIP Agent, the DIP Lenders, the U.S. Trustee, the Prepetition Term Agent, and the Prepetition LC Agent) with seven (7) days' prior written notice prior to taking the actions contemplated thereby.

32.    <u>Events of Default</u>.  Except as otherwise provided in this Final Order or to the extent the Required DIP Lenders may otherwise agree in writing, any violation of any of the terms of this Final Order or any occurrence of an "Event of Default" under and as defined in the DIP Loan Agreement shall constitute an event of default (each, an "<u>Event of Default</u>").  Interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan Agreement.

33.    <u>Remedies</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit (a) the DIP Agent or the DIP Lenders, to exercise, following the occurrence and continuance of an Event of Default (as defined in the applicable DIP Loan Documents), all rights and remedies provided in this Final Order and the DIP Loan Documents, as applicable, and (b) the Prepetition ABL Agent or the Prepetition ABL Lenders, to exercise, following the occurrence and continuation of an Adequate Protection Default, all rights and remedies provided in this Final Order and the Prepetition ABL Financing Documents with respect to the Priority ABL DIP Collateral, subject to Paragraph 31 herein.  The Debtors or any party in interest may seek a determination from this Court that no Event of Default or Adequate Protection Default, as applicable, has occurred and is continuing, and request appropriate relief from this Court.

34.    <u>Limitations on Borrowings</u>.  Except as expressly permitted herein (including in connection with any borrowing or deemed borrowing under the Prepetition ABL Facility or

Prepetition LC Facility as a result of any drawing on or extension of any letter of credit thereunder), it shall constitute an Event of Default if any of the Debtors borrows money from any person other than the DIP Lenders as contemplated herein to the extent that the repayment of such borrowings is to be secured pursuant to section 364(d)(1) of the Bankruptcy Code by a security interest, lien or mortgage that is senior to or *pari passu* with any of the security interests, liens or mortgages held by the DIP Agent on its behalf and on behalf of the DIP Lenders, including the DIP Liens, unless in connection with such borrowings (a) the DIP Obligations are indefeasibly paid in full in cash, in any such case, as a condition to the closing of such borrowings.

35.     <u>Modifications of DIP Loan Documents and Budgets</u>.   The Debtors are hereby authorized, without further order of this Court, but upon notice to counsel for each of the Prepetition Agents, to enter into agreements with the DIP Agent and/or the DIP Lenders providing for any consensual non-material modifications to the Budget or the DIP Loan Documents, or of any other modifications to the DIP Loan Documents necessary to conform the terms of the DIP Loan Documents to this Final Order; <u>provided</u>, however, that the Debtors shall not enter into any material modification or amendment to the Budget or the DIP Loan Documents absent further order of this Court and receipt by the Debtors of any requisite consents or approvals of, or notices to, the Prepetition Secured Parties in accordance with this Final Order. Notwithstanding the foregoing but subject to the last sentence of this Paragraph 35, updates and supplements to the Budget required to be delivered by the Debtors under the DIP Loan Documents and extensions of the maturity date of the DIP Loan Agreement in accordance therewith shall not be considered material amendments or modifications to the Budget or the DIP Loan Documents solely for purposes of this Paragraph 35.  No amendment, update, supplement

or other modification to the Budget or any DIP Loan Documents (including, without limitation, any extension of the maturity date of the DIP Loan Agreement) shall (x) be construed as the affirmative consent by a n y o f the Prepetition Secured Parties for the use of Cash Collateral or the terms of any financing or any lien encumbering the P r e p e t i t i o n Collateral (whether senior or junior) or (y) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party (for its benefit or the benefit of the other Prepetition Secured Parties), subject to any applicable provisions of the Intercreditor Agreements, to seek new, different or additional adequate protection or assert the interests of any Prepetition Secured Party (for its benefit or the benefit of the other Prepetition Secured Parties).

36.     Stipulations Regarding Prepetition Obligations and the Prepetition Liens Binding on Parties in Interest.  The stipulations and admissions contained in this Final Order, including, without limitation, in recital Paragraphs E, F and N of this Final Order, shall be binding on the Debtors' estates and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) and all parties in interest, including, without limitation, the Committee, but subject in all respects to Paragraph 35 hereof, unless (a) the Committee or another party in interest (other than any of the Debtors) with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (a "Challenge") (subject to the limitations contained herein, including, inter alia, in Paragraph 26 of this Final Order) challenging the amount, validity or enforceability of the Prepetition Obligations or the perfection or priority of the Prepetition Liens or otherwise asserting any objections, claims or causes of action (including, without limitation, any actions for preferences, fraudulent conveyances, or other avoidance power claims) on behalf of the Debtors' estates against the Prepetition Secured Parties relating to the Prepetition Obligations or the

Prepetition Liens no later than forty-five (45) days after the appointment of the Committee,

provided that such time period may be extended (i) upon agreement of the subject Prepetition

Secured Parties, as applicable and each in their sole discretion or (ii) as has been ordered by this

Court for "cause"; and (b) the Court enters an order sustaining the Challenge within forty-five

(45) days from the date of the timely commencement of such Challenge.  If no such Challenge is

timely commenced and sustained as of such dates then, without further order of the Court, to the

extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, (x) the claims,

liens and security interests of the Prepetition LC Agent, the other Prepetition LC Secured Parties,

the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent, the Prepetition Term

Lenders, the Prepetition Note Agent, the Prepetition Noteholders, the Prepetition ABL Agent and

the Prepetition ABL Lenders (collectively, the "Prepetition Secured Parties") shall, without

further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11

Cases and any subsequent Chapter 7 cases and shall not be subject to challenge or objection by

any party in interest as to validity, priority, amount or otherwise, and (y) without further order of

the Court, the Debtors and their estates shall be deemed to have released any and all claims or

causes of action against the Prepetition Secured Parties with respect to the Prepetition LC/Term

Loan Financing Documents, the Prepetition ABL Financing Documents, or the Prepetition Notes

Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no

Challenge is timely commenced, the stipulations contained in recital Paragraphs E and F of this

Final Order shall be binding on the Debtors' estates, the Committee and all parties in interest.  If

any such Challenge is timely commenced and sustained, the stipulations contained in recital

Paragraphs E, F and N shall nonetheless remain binding on the Debtors' estates, the Committee

and all parties in interest, except to the extent that such stipulations were expressly and

successfully challenged in such Challenge.  Nothing in this Final Order vests or confers on any

Person (as defined in the Bankruptcy Code), including the Committee, standing or authority to

pursue any cause of action belonging to the Debtors or their estates, including, without

limitation, any Challenges.  For the avoidance of doubt none of the foregoing challenge

provisions set forth in this Paragraph 36 shall apply to the DIP Agent and each DIP Lender, in

their capacities as such, and in no event shall the DIP Facility or DIP Obligations be subject to

challenge pursuant to this Paragraph 36 on avoidance or any other grounds by any other party.

37.    <u>Waiver of Requirement to File Proofs of Claim</u>.

(a)    The DIP Agent and the DIP Lenders shall not be required to file proofs of

claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims

for payment of the DIP Obligations under the applicable DIP Loan Documents.  The statements

of claim in respect of the DIP Obligations set forth in this Final Order, together with the evidence

accompanying the Motion and presented at the Hearings are deemed sufficient to and do

constitute proofs of claim in respect of such obligations and such secured status.

(b)    The Prepetition Secured Parties shall not be required to file proofs of

claim in the Chapter 11 Cases or any Successor Case in order to maintain their respective claims

for payment of the Prepetition Obligations under the applicable Prepetition Financing

Documents or for payment and performance of the Adequate Protection Obligations.  The

statements of claim in respect of the Prepetition Obligations and the Adequate Protection

Obligations set forth in this Final Order, together with the evidence accompanying the Motion

and presented at the Hearings are deemed sufficient to and do constitute proofs of claim in

respect of such obligations and such secured status.

38.    <u>DIP Agent, Prepetition Agent Authorization</u>.  For the avoidance of doubt and notwithstanding any provision of the Prepetition Financing Documents or the DIP Loan Documents, each of the DIP Agent, the Prepetition ABL Agent, the Prepetition LC Agent, the Prepetition LC/Term Collateral Agent, the Prepetition Term Agent and the Prepetition Notes Trustee is hereby authorized to make any and all account transfers requested by the Debtors in accordance with the Budget and this Final Order, and is further authorized to take any other action reasonably necessary to implement the terms of this Final Order.

39.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of the Interim Order and this Final Order are without prejudice to, and do not constitute a waiver of, expressly or implicitly (a) the DIP Agent's, the DIP Lenders' and any of the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors, including the right to seek new, different or additional adequate protection, as applicable, subject to the terms of the Intercreditor Agreements, or the Debtors' rights to oppose such relief, or (b) any of the rights of the Debtors, the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties under the Bankruptcy Code or applicable nonbankruptcy law (including, and subject to the terms of, the Intercreditor Agreements).  The reservation of rights contained in this Paragraph 39 includes, but is not limited to, the right of the Prepetition Secured Parties to seek any other or supplemental relief from the Court if the Debtors fail to achieve any of the milestones contained in the DIP Loan Agreement or this Final Order without regard to amendment or extension thereof by the DIP Agent or the DIP Lenders.  Nothing contained in this Final Order shall be deemed a finding by the Court or an acknowledgement by any of the Prepetition Secured Parties that the adequate protection granted in this Final Order does in fact adequately protect any of the

Prepetition Secured Parties against diminution in the value of their respective interests in any Prepetition Liens on the Prepetition Collateral.

40.    <u>Reservation of Rights</u>.  Notwithstanding anything else to the contrary in this Final Order or any DIP Loan Documents, the Debtors do not waive the right to seek Court approval of a confirmation of a plan of reorganization or liquidation that (a) treats the claims, obligations, or collateral of any of the Prepetition Secured Parties, including without limitation the Prepetition ABL Lenders, Prepetition LC Lenders, Prepetition Term Lenders, or Prepetition Noteholders in accordance with section 1129(b) of the Bankruptcy Code, or (b) provides for the distributions on account of any class of such claims of a value less than the allowed amount of such claims upon obtaining the affirmative vote of such class.

41.    <u>Priority of Terms</u>.  To the extent of any conflict between or among the Motion, the DIP Loan Documents, the Intercreditor Agreements, the Interim Order and this Final Order, the terms and provisions of this Final Order shall govern.

42.    <u>Entry of Final Order; Effect</u>.  This Final Order shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Final Order on this Court's docket in the Chapter 11 Cases.

43.    <u>Limitation of Liability</u>.  In determining to make any DIP Extensions of Credit, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order, the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents, as applicable, none of the DIP Agent, the DIP Lenders

or the Prepetition Secured Parties, or any successor of any of the foregoing or any predecessors of the Prepetition Agents, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Furthermore, nothing in the Interim Order, this Final Order, the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, or any successor of any of the foregoing or any predecessors of the Prepetition Agents, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors.

44.    Exculpation. Nothing in the Interim Order, this Final Order, the DIP Loan Documents, the Prepetition Financing Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, any Prepetition Agent (or any predecessor thereof) or any other Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agent, the DIP Lenders, the Prepetition Agents (and any predecessor thereof) and the other Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii)

any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

45.     <u>Credit Bidding</u>.  The DIP Agent and DIP Lenders shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Obligations as consideration in any sale of Collateral (or any part thereof), without the need for further Court order authorizing the same, and whether that sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.  Notwithstanding anything to the contrary set forth in this Paragraph 45, the DIP Agent and the DIP Lenders may not credit bid in the sale of any Priority ABL DIP Collateral until the Payment in Full of the Prepetition ABL Obligations.  Subject to the prior or contemporaneous satisfaction of the DIP Obligations, nothing herein shall be construed to limit or abridge the Prepetition Secured Parties' rights to credit bid under the Prepetition Financing Documents and applicable law.

46.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any party, creditor, equity holder or other entity other than the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors, and their respective successors and assigns.

47.     <u>Intercreditor Issues</u>.  Except as expressly set forth in this Final Order, nothing in this Final Order shall be construed to convey on any individual DIP Lender or Prepetition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition ABL Financing Documents, the Prepetition Notes Documents and the Intercreditor Agreements, as applicable.

48.    <u>DIP Fees and Expenses</u>.  The Debtors are authorized and directed to pay all fees

and expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility, as

applicable, as provided in the applicable DIP Loan Documents, whether or not the transactions

contemplated hereby are consummated, whether or not incurred prepetition or postpetition,

including, without limitation, agency fees, the professional fees and expenses of Kramer Levin

Naftalis & Frankel LLP, McGuireWoods LLP, and Shipman & Goodwin LLP (counsel to the

DIP Lenders and DIP Agent), in each case promptly upon receipt of summary form invoices

which may be redacted for privileged information. The Debtors shall pay such invoice within ten

business days (if no written objection is received with such ten business days' period) after such

professional has delivered such invoice to the Debtors, the Committee, the Prepetition Secured

Parties, and the U.S. Trustee.  Parties in interest may deliver written objections to payment of

such fees and expenses within ten business days following receipt of such invoice for such fees

and expenses.  If an objection to a professional's invoice is timely received, the Debtors shall

only be required to pay the undisputed amount of the invoice and this Court shall have

jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve

the dispute consensually.  Subject to approval by the Court of the application for retention by

Debtors of Centerview Partners LLC, the Debtors are authorized and directed to pay Centerview

Partners fees and expenses earned in connection with the DIP Facility, as set forth in its retention

agreement.

49.    <u>No Impact on Compliance with Laws</u>.  Prior to the date on which Cash Collateral

use may be terminated under this Final Order and subject to Paragraphs 25(a)(iii), (b)(iii), and

(c)(iii), nothing in the Budget or this Final Order is intended to limit or restrict in any fashion the

Debtors' ability to use Cash Collateral to perform those activities required to remain in, or return

to compliance with laws in accordance with 28 U.S.C. Section 959 including, if necessary, obtaining additional surety or other financial assurance for such compliance.

50.    <u>Surety Bond Program</u>. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the sureties under:  (i) indemnity and related agreements with the Debtors; (ii) applicable law; or (iii) any related letters of credit, all of which rights are expressly reserved.

51.    <u>Amendments to the DIP Loan Documents</u>.   This Final Order expressly amends the DIP Loan Documents as follows, and the DIP Lenders shall have been deemed to have consented to the following amendments:

(a)  Section 1.01 of the DIP Loan Agreement is hereby amended such that (i) the definitions set forth below for capitalized terms already defined in the DIP Loan Agreement as in effect immediately prior to the entry of this Final Order are hereby amended and restated in their entirety as set forth below and (ii) the definitions set forth below which are not set forth in the DIP Loan  Agreement are hereby inserted in proper alphabetical order.

**"Termination Date"** means the earliest of (i) the Maturity Date, (ii) the date of termination of the Commitments pursuant to Section 2.07, (iii) the date of termination of the Commitment of each Lender pursuant to Section 9.02, (iv) the Prepayment Date, (v) the Consummation Date and (vi) the date of dismissal of the Cases by the Bankruptcy Court.

**"Principal Asset Sale"** means the Disposition of at least four of any of the following mines (whether through one or more related or unrelated Dispositions): the mines known as Panther, Rock Lick, Wells, Kanawha Eagle, Midland Trail/ Blue Creek or Paint Creek, it being understood and agreed that, in the event one of more (but less than four) of any such mines has been Disposed of, the Principal Asset Sale shall be deemed to have not yet occurred.

111

(b)  Section 2.07 is hereby amended and restated in its entirety as set forth below:

"The Borrower may, upon written notice to the Administrative Agent, terminate, or from time to time permanently reduce, the Commitments; provided, that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $250,000 in excess thereof. The Administrative Agent will promptly notify the Lenders of any such notice of termination or reduction of the Aggregate Commitments. Any reduction of the Aggregate Commitments shall be applied to the Commitment of each Lender according to its Applicable Percentage. All Commitments shall terminate on May 19, 2015 if the Closing Date has not occurred by such date.  If not sooner terminated, all Commitments shall terminate on the earlier of (x) the date all of the Loans are prepaid or repaid and (y) the date the Borrower and/or any of its Subsidiaries receives any proceeds from the Principal Asset Sale.

52.    Enforceability.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.   Any findings of fact shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law shall constitute a conclusion of law even if it is stated as a finding of fact.

53.    Retention of Jurisdiction.   Notwithstanding any provision in the DIP Loan Documents, the Prepetition LC/Term Loan Financing Documents, the Prepetition Notes Documents or the Prepetition ABL Financing Documents, this Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Final Order, the DIP Facility or the DIP Loan Documents.

Dated:  Jun 4 2015
Richmond, Virginia

/s/ Keith L. Phillips
_____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket:  Jun 4 2015

112

WE ASK FOR THIS:

*/s/ Michael A. Condyles*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
KUTAK ROCK LLP
Bank of America Center
1111 East Main Street, Suite 800
Richmond, Virginia 23219-3500
Telephone:       (804) 644-1700
Facsimile:        (804) 783-6192

- and -

Stephen E. Hessler (*pro hac vice* pending)
Patrick Evans (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Ross M. Kwasteniet (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Counsel for the Debtors and
Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Michael A. Condyles*

## EXHIBIT 1

**DIP Loan Agreement**

Execution Copy

SUPERPRIORITY SECURED

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of May 13, 2015
among

PATRIOT COAL CORPORATION,
a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

CANTOR FITZGERALD SECURITIES,
as Administrative Agent

a n d

The Lenders Party Hereto

# TABLE OF CONTENTS

**Page**

**ARTICLE 1** Definitions and Accounting Terms ............................................................ 1

Section 1.01.    *Defined Terms* ............................................................................... 1

Section 1.02.    *Other Interpretive Provisions* ..................................................... 30

Section 1.03.    *Accounting Terms* ........................................................................ 31

Section 1.04.    *Times of Day* ................................................................................ 31

**ARTICLE 2** The Commitments and Credit Extensions ........................................... 32

Section 2.01.    *The Loans* ..................................................................................... 32

Section 2.02.    *Borrowings, Conversions and Continuations of Loans* ................ 32

Section 2.03.    *[Reserved]* ................................................................................... 33

Section 2.04.    *[Reserved]* ................................................................................... 33

Section 2.05.    *[Reserved]* ................................................**Error! Bookmark not defined.**

Section 2.06.    *Prepayments* ................................................................................ 33

Section 2.07.    *Termination or Reduction of Commitments* ................................ 34

Section 2.08.    *Repayment of Loans* ................................................................... 34

Section 2.09.    *Interest* ........................................................................................ 34

Section 2.10.    *Fees* .............................................................................................. 35

Section 2.11.    *Computation of Interest and Fees* ............................................... 35

Section 2.12.    *Evidence of Debt* ......................................................................... 35

Section 2.13.    *Payments Generally; Administrative Agent's Clawback* ............. 36

Section 2.14.    *Sharing of Payments by Lenders* ................................................ 38

Section 2.15.    *Defaulting Lender* ....................................................................... 38

Section 2.16.    *Priority and Liens* ....................................................................... 40

Section 2.17.    *No Discharge; Survival of Claims* .............................................. 41

**ARTICLE 3** Taxes, Yield Protection and Illegality ................................................ 41

Section 3.01.    *Taxes.  Payments Free of Taxes* ................................................. 41

Section 3.02.    *[Reserved]* ................................................................................... 44

Section 3.03.    *[Reserved]* ................................................................................... 44

Section 3.04.    *Increased Costs* ........................................................................... 44

Section 3.05.    *[Reserved]* ................................................................................... 45

Section 3.06.    *Mitigation Obligations; Replacement of Lenders* ....................... 45

Section 3.07.    *Survival* ....................................................................................... 45

i

**ARTICLE 4** Conditions Precedent To Credit Extensions ........................................... 46

    Section 4.01.    *Conditions of Initial Credit Extension* ......................................... 46

    Section 4.02.    *Conditions to All Credit Extensions* ........................................ 48

    Section 4.03.    *Delayed Draw Funding Date Milestones* ..................................... 49

**ARTICLE 5** Representations and Warranties .................................................. 49

    Section 5.01.    *Existence, Qualification and Power* ......................................... 49

    Section 5.02.    *Authorization; No Contravention* ........................................... 50

    Section 5.03.    *Governmental Authorization; Other Consents* ........................... 50

    Section 5.04.    *Binding Effect* ....................................................... 50

    Section 5.05.    *Financial Statements* ................................................. 50

    Section 5.06.    *Litigation* ........................................................... 51

    Section 5.07.    *No Default* .......................................................... 51

    Section 5.08.    *Ownership of Property; Liens; Investments* ............................. 51

    Section 5.09.    *Environmental Compliance* ........................................... 52

    Section 5.10.    *Mining* ............................................................. 53

    Section 5.11.    *Insurance* .......................................................... 54

    Section 5.12.    *Taxes* .............................................................. 54

    Section 5.13.    *ERISA Compliance* .................................................. 54

    Section 5.14.    *Subsidiaries; Equity Interests; Loan Parties* ........................... 55

    Section 5.15.    *Margin Regulations; Investment Company Act* ........................ 55

    Section 5.16.    *Disclosure* ......................................................... 56

    Section 5.17.    *Compliance With Laws* .............................................. 56

    Section 5.18.    *Intellectual Property; Licenses, Etc.* ................................... 56

    Section 5.19.    *[Reserved]* ......................................................... 56

    Section 5.20.    *Casualty, Etc.* ...................................................... 56

    Section 5.21.    *Labor Matters* ...................................................... 56

    Section 5.22.    *Collateral Documents* ............................................... 57

    Section 5.23.    *Use of Proceeds* .................................................... 57

    Section 5.24.    *Coal Act; Black Lung Act* ............................................ 57

    Section 5.25.    *Activities and Liabilities of EACC Camps, Inc.* ........................ 58

    Section 5.26.    *Anti-Terrorism Laws* ................................................ 58

    Section 5.27.    *No Unlawful Contributions or Other Payments* ....................... 59

KL2 2896702.11

**ARTICLE 6** Affirmative Covenants....................................................................... 59

Section 6.01.    *Financial Statements* ...................................................... 59

Section 6.02.    *Certificates; Other Information* ..................................... 60

Section 6.03.    *Notices*............................................................................. 62

Section 6.04.    *Payment of Post-Petition Obligations* ............................ 63

Section 6.05.    *Preservation of Existence, Etc.*........................................ 63

Section 6.06.    *Maintenance of Properties*............................................... 63

Section 6.07.    *Maintenance of Insurance* ............................................... 64

Section 6.08.    *Compliance with Laws*...................................................... 64

Section 6.09.    *Books and Records* ........................................................... 64

Section 6.10.    *Inspection Rights; Field Exams* ....................................... 64

Section 6.11.    *Use of Proceeds* ............................................................... 65

Section 6.12.    *Covenant to Guarantee Obligations and Give Security*.......... 65

Section 6.13.    *Compliance With Environmental Laws* ........................... 67

Section 6.14.    *Preparation of Environmental Reports*............................ 67

Section 6.15.    *Further Assurances*.......................................................... 68

Section 6.16.    *Delivery of Leases; Compliance with Terms of Leasehold*......... 68

Section 6.17.    *[RESERVED]*...................................................................... 68

Section 6.18.    *First Day Orders* .............................................................. 68

Section 6.19.    *Mining Financial Assurances* .......................................... 68

Section 6.20.    *Post-Closing Obligations*................................................. 68

Section 6.21.    *Administration of Accounts and Inventory* ...................... 68

Section 6.22.    *Cash Management System* ................................................ 69

Section 6.23.    *[RESERVED]*...................................................................... 70

Section 6.24.    *Anti-Terrorism Laws*........................................................ 70

Section 6.25.    *No Unlawful Contributions or Other Payments* ............... 70

Section 6.26.    *Milestones* ........................................................................ 70

**ARTICLE 7** Negative Covenants........................................................................ 70

Section 7.01.    *Liens*.................................................................................. 71

Section 7.02.    *Indebtedness*..................................................................... 73

Section 7.03.    *Investments*....................................................................... 74

Section 7.04.    *Fundamental Changes*...................................................... 75

Section 7.05.    *Dispositions*...................................................................... 75

Section 7.06.    *Restricted Payments* ........................................................ 76

Section 7.07.    *Change in Nature of Business* ........................................................ 77

Section 7.08.    *Transactions With Affiliates* ...................................................... 77

Section 7.09.    *Burdensome Agreements* .......................................................... 77

Section 7.10.    *Use of Proceeds* ...................................................................... 78

Section 7.11.    *Variance from Budget and Projected Revenues* ........................... 78

Section 7.12.    *Amendments of Organization Documents* ................................... 78

Section 7.13.    *Accounting Changes* ................................................................ 78

Section 7.14.    *Prepayments, Etc. of Indebtedness* ............................................ 78

Section 7.15.    *Amendment, Etc.* ..................................................................... 78

Section 7.16.    *Limitation on Negative Pledge Clauses* ...................................... 78

Section 7.17.    *Minimum Liquidity* .................................................................. 79

**ARTICLE 8** Real Property Leases ........................................................... 79

Section 8.01.    *Special Rights with respect to Real Property Leases* ................... 79

**ARTICLE 9** Events of Default and Remedies .............................................. 82

Section 9.01.    *Events of Default* ..................................................................... 82

Section 9.02.    *Remedies Upon Event of Default* ............................................... 85

Section 9.03.    *Application of Funds* ................................................................ 86

**ARTICLE 10** Administrative Agent .......................................................... 87

Section 10.01.    *Authorization and Action* ........................................................ 87

Section 10.02.    *Administrative Agent's Reliance, Etc.* ....................................... 89

Section 10.03.    *Posting of Approved Electronic Communications* ......................... 90

Section 10.04.    *The Administrative Agent Individually* ...................................... 91

Section 10.05.    *Activities of Agent's Group* ..................................................... 91

Section 10.06.    *Lender Credit Decision* ............................................................ 92

Section 10.07.    *Indemnification* ...................................................................... 93

Section 10.08.    *Successor Administrative Agent* ................................................ 94

Section 10.09.    *Concerning the Collateral and the Collateral Documents* ............. 94

Section 10.10.    *[Reserved]* ............................................................................. 96

Section 10.11.    96

*Delivery of Certain Financial Information* ................................................. 96

Section 10.12.    *Buyer Refinancing* .................................................................. 96

**ARTICLE 11** Guarantee ........................................................................ 96

Section 11.01.    *Guarantee* ............................................................................. 96

Section 11.02.  *Right of Contribution* ................................................................. 97

Section 11.03.  *No Subrogation, Etc.* .................................................................. 98

Section 11.04.  *Amendments, etc. with Respect to the Borrower Obligations* ......................... 99

Section 11.05.  *Guarantee Absolute and Unconditional* ................................................ 99

Section 11.06.  *Waiver by Subsidiary Guarantors* ................................................... 101

Section 11.07.  *[Reserved]* ......................................................................... 101

Section 11.08.  *Releases* ........................................................................... 101

Section 11.09.  *Subordination of Other Obligations* ................................................. 102

Section 11.10.  *Authority of Subsidiary Guarantors or Borrower* ..................................... 102

Section 11.11.  *Financial Condition of Borrower* .................................................... 102

Section 11.12.  *Taxes and Payments* ................................................................. 102

Section 11.13.  *Assignments* ........................................................................ 102

Section 11.14.  *Reinstatement* ...................................................................... 102

**ARTICLE 12** Miscellaneous ......................................................................... 103

Section 12.01.  *Amendments, Etc.* ................................................................... 103

Section 12.02.  *Notices; Effectiveness; Electronic Communications* .................................. 104

Section 12.03.  *No Waiver; Cumulative Remedies* ..................................................... 106

Section 12.04.  *Expenses; Indemnity; Damage Waiver* ................................................. 106

Section 12.05.  *Payments Set Aside* ................................................................. 108

Section 12.06.  *Successors and Assigns* ............................................................. 108

Section 12.07.  *Treatment of Certain Information; Confidentiality* ................................... 111

Section 12.08.  *Right of Setoff* .................................................................... 112

Section 12.09.  *Interest Rate Limitation* ........................................................... 113

Section 12.10.  *Counterparts; Integration; Effectiveness* ........................................... 113

Section 12.11.  *Survival of Representations and Warranties* ......................................... 113

Section 12.12.  *Severability* ....................................................................... 113

Section 12.13.  *Replacement of Lenders* ............................................................. 113

Section 12.14.  *Governing Law; Jurisdiction; Etc.* .................................................. 114

Section 12.15.  *Waiver of Jury Trial* ............................................................... 115

Section 12.16.  *[Reserved]* ......................................................................... 116

Section 12.17.  *No Advisory or Fiduciary Responsibility* ............................................ 116

Section 12.18.  *USA Patriot Act Notice* ............................................................. 116

Section 12.19.  *Time of the Essence* ................................................................ 116

Section 12.20.  *Independence of Covenants* .......................................................... 116

v

Section 12.21.   *Force Majeure* ........................................................................................... 117

Section 12.22.   *Orders Govern* ........................................................................................... 117

SCHEDULES

| | |
|---|---|
| 1.01(a) | Subsidiary Guarantors |
| 2.01 | Commitments |
| 4.03 | Milestones |
| 5.06 | Litigation |
| 5.08(a) | Material Owned Real Property |
| 5.08(b) | Material Leased Real Property |
| 5.08(c) | Real Property |
| 5.09 | Environmental Matters |
| 5.14 | Subsidiaries and Other Equity Investments; Loan Parties |
| 5.18 | Intellectual Property Matters |
| 5.21 | Labor Matters |
| 6.21 | Post-Closing Obligations |
| 7.01 | Existing Liens |
| 7.02 | Existing Indebtedness |
| 7.03 | Existing Investments |
| 12.02 | Agent's Offices, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Borrowing Notice |
| B | [Reserved] |
| C | Term Note |
| D | Compliance Certificate |
| E | Assignment and Acceptance |
| F | 13-Week Projection |
| G | [Reserved] |
| H | Security Agreement |
| I | [Reserved] |
| J | Interim Order |
| K | Assumption Agreement |

KL2 2896702.11

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("**Agreement**") is entered into as of May 13, 2015, among PATRIOT COAL CORPORATION, a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the subsidiaries of the Borrower listed on Schedule 1.01(a), and each other subsidiary of the Borrower that from time to time becomes party hereto pursuant to Section 6.12 as guarantors, each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**"), and CANTOR FITZGERALD SECURITIES, as administrative agent for the Lenders and collateral agent for the Secured Parties (in such capacities, the "**Administrative Agent**").

INTRODUCTORY STATEMENT

On May 13, 2015 (the "**Petition Date**"), the Borrower and the Subsidiary Guarantors (as defined herein) (collectively, the "**Debtors**") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "**Cases**" and each a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrower has applied to the Lenders for a term loan facility in an aggregate principal amount of  $100,000,000 (not including increases on account of any PIK Payments, as defined herein) (the "**Facility**"). All of the Borrower's obligations under the Facility are to be guaranteed by the Subsidiary Guarantors. The Lenders are willing to extend or continue, as the case may be, such credit to the Borrower on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE 1**
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.  *Defined Terms.* As used in this Agreement, the following terms shall have the meanings set forth below:

"**13-Week Projection**" means cash flow projections of the Borrower and its Subsidiaries on a consolidated, line-item and weekly basis, which shall include projected cash receipts and disbursements, for the 13 calendar weeks commencing on the Saturday that begins the week during which such 13-Week Projection is required to be delivered, in substantially the form of Exhibit F, which shall include the anticipated uses of cash, including the Loans, for each week during such period.

"**ABL Obligations**" means the "Secured Obligations" as defined in the Existing ABL Credit Agreement.

"**ABL Priority Collateral**" means the "Priority ABL DIP Collateral" as defined in the Orders.

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that provides for the treatment of the Commitments and the Obligations (including the repayment or refinancing thereof) upon the earlier of (i) substantial consummation of such Reorganization Plan or (ii) the effective date of such Reorganization Plan, in a manner reasonably acceptable to the Required Lenders.

"**Account**" has the meaning specified in the UCC.

"**Account Debtor**" has the meaning given to such term in the UCC.

"**Accounting Change**" means a change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"**Activities**" has the meaning specified in Section 10.05(a).

"**Additional Assets**" means any one or more of the following:  (a) any and all right, title and interest of the Borrower and its Subsidiaries in the Federal mining complex in northern West Virginia, including but not limited to the Pittsburgh seam, any other related real property, any permits with respect thereto, any mining rights and approvals related to such permits, any related equipment or other personal property assets, and/or any liabilities associated with such assets that are assumed by the transferee of such assets; (b) those certain "draglines" (including but not limited to Bucyrus Erie Model 1570 Draglines) located at the Borrower's Paint Creek mine complex and Corridor G mine complex on the Closing Date, that certain Bucyrus Erie 495 Shove located at the Corridor G complex, those certain 5 Komatsu 830E Rock Trucks located at the Corridor G complex and the Komatsu 5500 Excavator located at the Logan County complex, in each case, and accessories, equipment and spare parts related to such draglines, shovels, excavators and other goods; (c) any and all right title and interest of the Borrower and its subsidiaries in the Highland mining complex, together with any related real property, any permits with respect thereto, any mining rights and approvals related to such permits, any related equipment or other personal property assets, and/or any liabilities associated with such assets that are assumed by the transferee of such assets, (d) sublease of the underground reserves at the Huff Creek property and (e) any and all right, title and interest of the Borrower and its Subsidiaries in those mining complexes, reserve areas and non-mining assets that have been, in each case, identified in writing by the Borrower to the Lenders prior to the Closing Date or otherwise approved by the Required Lenders as mining complexes, reserve areas and non-mining assets that the Borrower (as of the Closing Date) expects would be excluded from a strategic combination transaction with a potential third party buyer, together with any related real property, any permits with respect thereto, any mining rights and approvals related to such permits, any related equipment or other personal property assets, and/or any liabilities associated with such assets that are assumed by the transferee of such assets.

"**Additional Credit**" has the meaning specified in Section 4.02(e).

"**Administrative Agent**" has the meaning specified in the introductory statement hereto.

2

"**Administrative Agent Fee Letter**"  means the fee letter, dated May 13, 2015, among the Administrative Agent and the Borrower.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.02, or such other address or account of the Administrative Agent as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Agent Affiliate**" has the meaning specified in Section 10.03(c).

"**Agent's Group**" has the meaning specified in Section 10.05(a).

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding the foregoing, for purposes of this Agreement, unless otherwise specified herein, with respect to the Borrower and any of its Subsidiaries, "Affiliate" shall also include any Person that directly, or indirectly through one or more intermediaries, is the Beneficial Owner, or has the right to own or acquire Voting Stock that would result in such Person becoming the Beneficial Owner (including if such Person owns, directly or indirectly, interests in a voting trust or other similar entity that owns Voting Stock of the Borrower that may be distributed to such Person or any Subsidiary of such Person upon the distribution of assets or liquidation of such trust or other entity or withdrawn from such trust or other entity), of more than 10% of the Voting Stock of the Borrower (or 10% of the voting power of such Voting Stock) (for purposes of determination of the foregoing with respect to holders of securities convertible, exercisable or exchangeable for Voting Stock of the Borrower, such calculation shall be made giving effect to the conversion, exercise or exchange of any such securities Beneficially Owned by such Person and any other Person).

"**Aggregate Commitments**" means, at any time, the sum of the Commitments of all Lenders at such time.  As of the Closing Date, the Aggregate Commitments are $100,000,000.

"**Agreement**" has the meaning assigned in the introductory statement hereto.

"**Anti-Terrorism Laws**" has the meaning specified in Section 5.26.

"**Applicable Percentage**" means, with respect to any Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place) the numerator of which is the amount of such Lender's Commitment at such time, and the denominator of which is the amount of the Aggregate Commitments at such time (or, if the Commitment of each Lender shall have been terminated or expired, then the percentage of Total Outstandings represented by the aggregate Outstanding Amount of such Lender's Loans).  The initial Applicable Percentage of each Lender in respect of the Aggregate Commitments is set forth on Schedule 2.01 or in the Assignment and Acceptance or Joinder Agreement pursuant to which such Lender becomes a party hereto, as applicable.

3

"**Approved Electronic Communications**" means each notice, demand, communication, information, document and other material that any Loan Party is obligated to, or otherwise chooses to, provide to the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein, including (a) any supplement to the Agreement, any joinder to any Collateral Document and any other written Contractual Obligation delivered or required to be delivered in respect of any Loan Document or the transactions contemplated therein and (b) any Financial Statement, financial and other report, notice, request, certificate and other information material; provided, however, that, "Approved Electronic Communication" shall exclude (i) any notice of Borrowing, conversion or continuation, and any other notice, demand, communication, information, document and other material relating to a request for a new, or a conversion of an existing, Borrowing, (ii) any notice pursuant to Section 2.06 and any other notice relating to the payment of any principal or other amount due under any Loan Document prior to the scheduled date therefor, (iii) all notices of any Default or Event of Default and (iv) any notice, demand, communication, information, document and other material required to be delivered to satisfy any of the conditions set forth in Article 3 or any other condition to any Borrowing hereunder or any condition precedent to the effectiveness of this Agreement.

"**Approved Electronic Platform**" has the meaning specified in Section 10.03(a).

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender; *provided*, that in no event shall any Loan Party, any Affiliate or any Subsidiary of a Loan Party, or any Defaulting Lender be an "Approved Fund".

"**As-Extracted Collateral**" has the meaning specified in the UCC.

"**Assignee Group**" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"**Assignment and Acceptance**" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required hereunder), and accepted by the Administrative Agent, in substantially the form of Exhibit E or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" means, on any date, in respect of any Capital Lease Obligations of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Automatic Rejection Date**" means the final day of the 120-day period (or, if extended by the Bankruptcy Court, 210-day period) provided for in Section 365(d)(4) of the Bankruptcy Code for the Loan Parties to assume leases in the Cases.

"**Availability Period**" means the period from and including the Closing Date to but not including the Termination Date.

"**Bankruptcy Code**" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

KL2 2896702.11

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, or any appellate court having jurisdiction over the Cases from time to time.

"**Beneficial Owner**" has the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act. "**Beneficially Owned**" has a meaning correlative thereto.

"**Beneficiary**" means the Administrative Agent and each Lender.

"**Black Lung Act**" means the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901, et seq., the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq., the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, Title 11, 95 Stat. 1643, in each case as amended.

"**Black Lung Liability**" means any liability or benefit obligations related to black lung claims and benefits under the Black Lung Act, and liabilities and benefits related to pneumoconiosis, silicosis, exposure to isocyanates or other lung disease arising under any federal or state law, including any Mining Law.

"**Blocked Account Agreement**" means, with respect to any Deposit Account, Securities Account, Commodities Contract or Commodities Account of any Loan Party, an agreement which is reasonably satisfactory to the Administrative Agent (it being understood that a Blocked Account Agreement which includes an indemnification obligation by the Administrative Agent in its individual capacity shall not be reasonably satisfactory to the Administrative Agent) among the Administrative Agent, such Loan Party and such depository bank, securities intermediary or commodity intermediary, as applicable, sufficient to grant "control" to the Administrative Agent (a) under 9-104 of the UCC with respect to any Deposit Account, (b) under 9-106 of the UCC with respect to any Commodities Contract or Commodities Account or (c) under 8-106 with respect to any Securities Account.

"**Borrower**" has the meaning specified in the introductory statement hereto.

"**Borrower Materials**" has the meaning specified in Section 10.03(e).

"**Borrower Obligations**" means the Obligations of the Borrower.

"**Borrowing**" means a borrowing consisting of simultaneous Term Loans made by each of the Lenders pursuant to Section 2.01.

"**Borrowing Notice**" means a notice of a Borrowing which, in each case, shall be substantially in the form of Exhibit A.

"**Budget**" means at any time, collectively, (a) the initial "Budget" delivered to the Administrative Agent in connection with the initial borrowings under the Facility authorized by the Interim Order and dated not more than 5 days prior to the Petition Date, and (b) the most recent supplement and modification to such initial Budget delivered by the Borrower in accordance with Section 6.02(k)(iii), and all intervening supplements to such initial budget,

delivered to the Administrative Agent in accordance with the other terms and conditions hereof, in each case, in form and substance satisfactory to Required Lenders (which satisfaction in each case shall not be unreasonably withheld or delayed (it being agreed that (x) each such supplement to the Budget shall allow the Borrower to "carry-forward" (for purposes of compliance with Section 7.11) any benefit of the cumulative variance of actual Cumulative Net Cash Flow for the Testing Period prior to such supplement versus the projected amount of Cumulative Net Cash Flow as reflected in the Budget prior to such supplement, and (y) any Lender shall be deemed satisfied if it shall not have objected in writing to such supplement by the third Business Day following delivery thereof to the Administrative Agent)).

"**Business**" has the meaning specified in Section 5.09(b).

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"**Buyer Refinancing**" means the assumption, payment or refinancing of all of the Loans (including applicable exit fees) by the buyer of the Borrower's assets through a plan of reorganization, order approving the sale of assets or otherwise on such terms that are acceptable to the Required Lenders in their sole discretion.

"**Cantor**" means Cantor Fitzgerald Securities.

"**Capital Lease Obligations**" means of any Person as of the date of determination, the aggregate liability of such Person under Financing Leases reflected on a balance sheet of such Person under GAAP.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants or options to purchase any of the foregoing, but excluding any securities convertible into or exchangeable for shares of Capital Stock.

"**Carve-Out**" has the meaning given to that term in the Interim Order (or, when entered, the Final Order).

"**Cash Collateral Account**" means a cash deposit account established and maintained at a depositary bank reasonably acceptable to the Borrower and the Administrative Agent and over which the Administrative Agent has sole dominion and control, upon terms as may be reasonably satisfactory to the Administrative Agent.

"**Cash Equivalents**" means any of the following types of Investments:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the federal government of the United States of America or any agency or instrumentality thereof having maturities of not more than 12 months from the date of acquisition thereof;

(b)      time deposits or eurodollar time deposits with, or overnight bank deposits and bankers' acceptances of, any (i) (A) Lender or (B) commercial bank that is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, any foreign bank, or its branches or agencies (fully protected against currency fluctuations) that, at the time of acquisition, are rated at least "*A-1*" by S&P or "*P-1*" by Moody's, in each case with maturities of not more than twelve months from the date of acquisition thereof;

(c)      (i) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) entered into with any financial institution meeting the qualifications specified in clause (b) above or (ii) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America, in each case maturing within 12 months or less from the date of acquisition, *provided,* that the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions With Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985;

(d)      commercial paper issued by any Person rated at least "*A-1*" by S&P or "*P-1*" by Moody's, in each case with maturities of not more than 270 days from the date of acquisition thereof; and

(e)      shares of any money market fund that (i) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (a), (b), (c) and (d) above, (ii) has net assets whose value exceeds $500,000,000 and (iii) is rated at least "A-1" by S&P or "P-1" by Moody's.

"**CFC**" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means:

7

(a)    an event or series of events occurring after the Closing Date by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) excluding Permitted Holders becomes the Beneficial Owner, directly or indirectly, of 50% or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis; or

(b)    during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)    any "Change of Control" (or comparable term) in the Existing Credit Agreements or the Existing Junior Notes Indenture.

"**Closing Date**" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 12.01.

"**Coal**" means coal owned by any Loan Party, or coal that any Loan Party has the right to extract, in each case located on, under or within, or produced or severed from the Real Property of any Loan Party.

"**Coal Act**" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq., as amended.

"**Coal Reserves**" means reserves that constitute that part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination, as defined in accordance with SEC Industry Guide 7.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all of the property of the Loan Parties that is under the terms of the Collateral Documents and the Orders (subject in all respects to the terms and provisions thereof), subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties as security for the Obligations.

KL2 2896702.11

"**Collateral Documents**" means, collectively, the Security Agreement, the Mortgages and each of the mortgages, collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties. The Collateral Documents shall implement, and shall not limit, the grant of Collateral pursuant to the Orders.

"**Collection Account**" has the meaning specified in Section 6.22.

"**Commitment**" means, as to each Lender, the obligation to make Term Loans to the Borrower pursuant to Section 2.01 in the amount set forth under the caption "Commitment" opposite such Lender's name on Schedule 2.01, or, as the case may be, opposite such caption in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. As of the Closing Date, the aggregate amount of the Commitments is $100,000,000.

"**Commodities Account**" has the meaning specified in the UCC.

"**Commodities Contact**" has the meaning specified in the UCC.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et. seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit D.

"**Consummation Date**" means the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Account**" means any Deposit Account, Securities Account or Commodities Account (a) with, and under the sole dominion and control of, the Administrative Agent or (b) that is subject to a Blocked Account Agreement.

"**Credit Extension**" means a Borrowing.

"**Creditors' Committee**" has the meaning specified in the definition of "Carve-Out".

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" has the meaning specified in the introductory statement.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (i) the Interest Rate *plus* (ii) 2% per annum.

"**Defaulting Lender**" means, subject to Section 2.16(b) any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.16(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"**Delayed Draw Funding Date**" has the meaning assigned to such term in Section 2.01.

"**Deposit Account**" has the meaning specified in the UCC.

"**Designated Amount**" has the meaning specified in Section 12.16.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any comprehensive territorial Sanction.

"**Designation Notice**" has the meaning specified in Section 12.16.

"**DIP Loan Funding Account**" shall mean a deposit account of the Borrower and one or more other Debtors.  For the avoidance of doubt, the DIP Loan Funding Account shall be a Control Account from and after 30 days after the Closing Date (or such later date as the Required Lenders shall agree in their sole discretion). The DIP Loan Funding Account is the "DIP Loan Funding Account" as defined in and subject to the terms of the Orders.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any Real Property Leases, notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), in each case, prior to the date that is 91 days after the Maturity Date at the time of the issuance thereof, except, in the case of clauses (i) and (ii), as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior payment in full of all Obligations.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary of the Borrower that is organized under the laws of any political subdivision of the United States or the District of Columbia.

"**ECP**" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"**Eligible Assignee**" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; (d) the Administrative Agent; and (e) any other Person (other than a natural person) (i) accepted by, except in the case of an assignment to an existing Lender or an Affiliate of an existing Lender, the Administrative Agent and (ii) consented to by, in the case of an assignment of a Commitment, unless an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed, *provided* that the Borrower shall be deemed to have consented to such Person if the Borrower has not responded within 10 Business Days of a request for such approval); *provided*, *further*, that in no event shall any Loan Party or Defaulting Lender be an "Eligible Assignee".

"**Environment**" means ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata or sediment, natural resources such as flora or fauna or as otherwise defined in any Environmental Law.

"**Environmental Laws**" means any and all current and future federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, concessions, grants, franchises, agreements or other governmental restrictions or common law causes of action applicable to the Borrower's properties and operations relating to (a) protection of the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous materials, substances or wastes into the environment including ambient air, surface water, ground water, or land, (b) SMCRA, (c) MSHA, (d) human health as affected by hazardous or toxic substances, (e) acid mine drainage and (f) mining operations and activities to the extent relating to environmental protection or reclamation; *provided*, that "**Environmental Laws**" do not include any laws relating to worker or retiree benefits, including benefits arising out of occupational diseases.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the Environment, (e) Reclamation or (f) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permits**" means any and all permits, licenses, registrations, certifications, notifications, exemptions and any other authorization required under any applicable Environmental Law (including, without limitation, those necessary under any applicable Environmental Laws for the construction, maintenance and operation of any coal mine or related processing facilities or Reclamation).

"**Equity Interests**" means, with respect to any Person, (a) any and all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests in) such Person, (b) any and all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, and (c) all of the securities convertible into or

12

exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), in the case of clauses (a) through (c) above, whether voting or nonvoting, and whether or not such shares, participations, warrants, options, rights or other interests are outstanding on any date of determination.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"**Event of Default**" has the meaning specified in Section 9.01.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) branch profits taxes or taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), as a result of a present or former connection between the Administrative Agent or such Lender (or such other recipient) and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender (or such other recipient) having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any Loan Document), (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 12.13), any United States withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or any tax that is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law after the date such Foreign Lender becomes a party hereto) to comply with Section 3.01(e); except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of the designation of a new Lending Office (or assignment), to receive additional amounts from

13

Borrower with respect to such withholding tax pursuant to Section 3.01(a), or (c) any United States withholding Taxes imposed under FATCA.

"**Executive Order**" has the meaning specified in Section 5.26.

"**Existing ABL Agent**" means Deutsche Bank AG New York Branch, in its capacity as administrative agent for the lenders under the Existing ABL Credit Agreement.

"**Existing Agents**" means the Existing ABL Agent, the Existing LC Agent, the Existing Term Agent and the Existing LC/Term Collateral Agent.

"**Existing Credit Agreements**" means the Existing ABL Credit Agreement and the Existing LC/Term Credit Agreement.

"**Existing ABL Credit Agreement**" means that certain Credit Agreement, dated as of December 18, 2013, among the Borrower and certain of its Subsidiaries, as borrowers, certain of the Borrower's Subsidiaries, as guarantors, the lenders party thereto, and Deutsche Bank AG New York Branch, as administrative agent, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time.

"**Existing Junior Notes**" means the 15.0% Senior Secured Second Lien PIK Toggle Notes due 2023 issued pursuant to the Existing Junior Notes Indenture as in effect on the Closing Date.

"**Existing Junior Notes Indenture**" means the Indenture in respect of the Existing Junior Notes dated as of December 18, 2013 among the Borrower, certain of its Subsidiaries and U.S. Bank National Association, as trustee and collateral trustee, as the same may be amended, supplemented or otherwise modified from time to time.

"**Existing LC Agent**" means Barclays Bank PLC in its capacity as LC administrative agent under the Existing LC/Term Credit Agreement, together with its successors and assigns.

"**Existing LC/Term Collateral Agent**" means Wilmington Trust, National Association, as collateral agent for the LC/Term Secured Parties under the Existing LC/Term Credit Agreement, together with its successors and assigns.

"**Existing LC/Term Credit Agreement**" means the Credit Agreement (L/C Facility and Term Facility), dated as of December 18, 2013, among the Borrower, certain of the Borrower's Subsidiaries, as guarantors, the lenders and L/C Issuers party thereto, Barclays Bank PLC, as administrative agent for the L/C Facility, Cortland Capital Market Services, LLC, as administrative agent for the Term Facility, Wilmington Trust, National Association, as collateral agent for the LC/Term Secured Parties thereunder, and the arrangers and bookrunners party thereto as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Term Agent**" means the Cortland Capital Market Services LLC, in its capacity as term administrative agent under the Existing LC/Term Credit Agreement, together with its successors and assigns.

14

"**Extraordinary Receipt**" means any cash received by the Borrower or any of its Subsidiaries as proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings) or condemnation awards (and payments in lieu thereof) with respect to casualty or condemnation events that occur after the Closing Date.

"**Facility**" has the meaning specified in the introductory statement.

"**Fair Market Value**" means with respect to any asset or group of assets at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined in good faith by the Borrower or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic assumptions underlying which have not materially changed since its date, the value set forth in such appraisal; *provided*, *however* that if the value of the consideration obtainable in a sale of such asset would exceed $25,000,000, such determination as to value shall be made by the Board of Directors of the Borrower and evidenced by a resolution of the Board of Directors certified by a Responsible Officer and delivered to the Administrative Agent.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Federal Reserve Board**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Fee Letter**" means the fee letter, dated May 13, 2015, between each Lender and the Borrower.

"**Final Order**" means a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to the Required Lenders in their sole discretion) and authorizing the Term Loans.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Day Orders**" means all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date.

"**First Lien Intercreditor Agreement**" means the First-Lien Intercreditor Agreement, dated as of December 18, 2013, among the Existing Agents, the Borrower and the other Loan Parties, as amended, restated, supplemented or otherwise modified from time to time.

"**Financial Statements**" means the financial statements of the Borrower and its Subsidiaries delivered in accordance with Section 4.01(e) and Section 6.01.

"**Financing Lease**" means any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.

"**First Segregated Account**" means the deposit account designated after the Closing Date at a depositary bank to be selected by the Loan Parties and acceptable to the Required Lenders.  For the avoidance of doubt, the First Segregated Account shall be a Control Account from and after the date that is 30 days after the Closing Date (or such later date as the Required Lenders shall agree in their sole discretion).  The First Segregated Account is the "Segregated Operating Account" as defined in and subject to the terms of the Orders.

"**Foreign Lender**" means, with respect to the Borrower, any Lender that is organized under the laws of a jurisdiction other than the United States, any state thereof or the District of Columbia.

"**Foreign Subsidiary**" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia and any Subsidiary thereof.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, that are applicable to the circumstances as of the date of determination.

"**Governmental Authority**" means the government of the United States or any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Grantor**" means each entity defined as a Grantor under the Security Agreement.

"**Guarantee**" means, as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to the extent the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation in order to induce the creation of such obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, reimbursement obligations under letters of credit and any obligation of the guaranteeing person, whether or not contingent, to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee shall not include (i) ordinary course performance guarantees by any Loan Party of the obligations (other than for the payment of borrowed money) of any other Loan Party and (ii) endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Hazardous Materials**" means (i) any explosive or radioactive substances or wastes and any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under, or that could reasonably be expected to give rise to liability under, any applicable Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any coal ash, coal combustion by-products or waste, boiler slag, scrubber residue or flue desulphurization residue.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     all obligations (contingent or otherwise) of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, bid, performance and reclamation bonds, surety and appeal bonds and similar instruments issued for the account of such Person;

17

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices and accrued expenses incurred in the ordinary course of business);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) Capital Lease Obligations;

(g) Disqualified Equity Interests; and

(h) all Guarantees of such Person in respect of any of the foregoing Indebtedness of any other Person.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, to the extent such person is liable therefor as a result of such Person's ownership interest in such entity or otherwise, except (other than in the case of general partner liability) to the extent that the terms of such Indebtedness expressly provide that such person is not liable therefor. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any Capital Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"**Indemnified Matters**" has the meaning specified in Section 12.04.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnitees**" has the meaning specified in Section 12.04(b).

"**Information**" has the meaning specified in Section 12.07.

"**Interest Payment Date**" means, the last Business Day of each month and the Termination Date.

"**Interest Rate**" means 12% per annum.

"**Interim Order**" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit J, with changes to such form as are reasonably

satisfactory to the Required Lenders in their sole discretion, approving the Loan Documents, which Interim Order shall, among other things (i) have been entered on such prior notice to such parties as may be satisfactory to the Required Lenders in their sole discretion, (ii) authorize the extensions of credit in respect of the Facility, each in the amounts and on the terms set forth herein, (iii) grant the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, (iv) approve the payment by the Borrower of the fees provided for herein and (v) provide for approval of certain provisions and protections to the Secured Parties relating to Real Property Leases.

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or other securities of another Person, (b) a loan, advance (excluding intercompany liabilities incurred in the ordinary course of business in connection with the cash management operations of the Borrower and its Subsidiaries) or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be (i) the amount actually invested, as determined immediately prior to the time of each such Investment, without adjustment for subsequent increases or decreases in the value of such Investment *minus* (ii) the amount of dividends or distributions received in connection with such Investment and any return of capital and any payment of principal received in respect of such Investment that in each case is received in cash, Cash Equivalents or short-term marketable debt securities.

"**Inventory**" has the meaning specified in the UCC.

"**IP Rights**" has the meaning specified in Section 5.18.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Venture**" means any Person (other than a Subsidiary) in which the Borrower and its Subsidiaries collectively hold an ownership interest.

"**Laws**" means, as to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes, and determinations of arbitrators or courts or other Governmental Authorities, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**LC/Term Obligations**" means the "Secured Obligations" as defined in the Existing LC/Term Credit Agreement.

"**Lender**" has the meaning specified in the introductory statement hereto.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire or Assignment and Acceptance by which it became a Lender or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Financing Lease having substantially the same economic effect as any of the foregoing).

"**Liquidity**" means, on any date of determination, the aggregate amount of Qualified Cash maintained by each Loan Party in a Control Account on such date.

"**Loan**" means an extension of credit by a Lender to the Borrower under Article 2 in the form of a Term Loan.

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Notes, (c) the Collateral Documents, (d) the Administrative Agent Fee Letter and (e) the Fee Letter.

"**Loan Parties**" means, collectively, the Borrower and each Subsidiary Guarantor.

"**Material Adverse Effect**" means a material adverse effect upon (a) the business, properties, assets, condition (financial or otherwise) or results of operations of the Borrower and its Subsidiaries, taken as a whole, other than (i) as customarily would occur as a result of the filing of the Cases or the effect of bankruptcy or those circumstances and events leading up thereto or (ii) as a result, indirectly or directly, of Borrower's and the ERISA Affiliates' withdrawal from, or termination of, the United Mine Workers of America 1974 Pension Plan; (b) the ability of the Loan Parties, taken as a whole, to perform their obligations under the Loan Documents to which they are parties; or (c) the validity or enforceability of any of the Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"**Material Lease**" means any Real Property Lease or other Contractual Obligations in respect of Material Leased Real Property.

"**Material Leased Real Property**" means (a) all Real Property listed on Schedule 5.08(b) and (b) any other Real Property subject to a Real Property Lease with respect to which a Loan Party acquires an interest with Coal Reserves having a fair market value reasonably estimated by the Borrower (or, at the reasonable request of the Required Lenders, by an independent appraiser acceptable to the Required Lenders) to be in excess of $1,000,000.

"**Material Owned Real Property**" means (a) all Real Property listed on Schedule 5.08(a) and (b) any other Real Property owned in fee by any Loan Party having a fair market value reasonably estimated by the Borrower (or, at the reasonable request of the Required Lenders, by an independent appraiser acceptable to the Required Lenders) to be in excess of $1,000,000.

20

"**Maturity Date**" means November 30, 2015.

"**Milestone**" has the meaning specified in Section 6.26.

"**Mining Financial Assurances**" has the meaning specified in Section 5.10.

"**Mining Title**" means good record or valid title to surface lands and/or Coal or an undivided interest in good record or valid title thereto or a leasehold or other Real Property interest in all or an undivided interest in surface lands and/or Coal together with (A) for Real Property designated for surface mining, no less than those easements, licenses, privileges, rights and appurtenances as are necessary to mine, remove, and transport Coal by surface mining methods on such Real Property; (B) for Real Property designated for underground mining, no less than those easements, licenses, privileges, rights and appurtenances as are necessary to mine, remove, and transport Coal by underground mining methods on such Real Property; and (C) for Real Property where any Loan Party has facilities currently used in the Coal mining business, including office and administrative buildings, mine openings, air shafts, preparation and processing plants, slurries and gob disposal areas, retention and drainage ponds, unfinished reclamation areas, coal terminals, and coal loading and storage facilities, no less than those easements, licenses, privileges, rights, and appurtenances as are necessary to operate such facilities in the manner presently operated on such Real Property.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means a deed of trust, trust deed, deed to secure debt, mortgage, leasehold mortgage and leasehold deed of trust in form and substance reasonably satisfactory to the Required Lenders, in each case as amended, restated, supplemented or otherwise modified from time to time.

"**MSHA**" means the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801 et seq., as amended.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)      with respect to any Disposition by the Borrower or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of the Borrower or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by the Borrower or such Subsidiary in connection with such transaction and (C) income taxes reasonably estimated to be actually payable within

21

two years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided, that if the amount of any estimated taxes pursuant to subclause (C) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds; and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by the Borrower or such Subsidiary in connection therewith; and

(c)    with respect to any cash capital contribution to the Borrower or the issuance of any Equity Interests (other than Disqualified Equity Interests) by the Borrower, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Note**" means a promissory note made by the Borrower in favor of a Lender evidencing Term Loans made by such Lender, substantially in the form of Exhibit C.

"**Obligations**" means all advances to, and debts, liabilities and obligations of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, including without limitation, the Subsidiary Guarantor Obligations.

"**Obligee Guarantor**" shall have the meaning given to such term in Section 11.09.

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to any recipient of a payment under any Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other

22

transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loans or Loan Document).

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (and interest, fines, penalties and additions related thereto) arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 12.13).

"**Outstanding Amount**" means with respect to Loans on any date, the aggregate outstanding principal amount thereof, after giving effect to any prepayments or repayments thereof occurring on such date.

"**Overnight Rate**" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

"**Participant**" has the meaning specified in Section 12.06(d).

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA, or any successor thereto.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"**Permitted Holders**" means (a) the Voting Trust, (b) the UMWA, (c) the Backstop Parties (as defined on the Closing Date in the Existing LC/Term Credit Agreement) and their respective Affiliates and (d) a group of related persons (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) that include one or more of the entities set forth in clauses (a) through (c) of this definition.

"**Permitted Land Swap**" means any transfer conducted in the ordinary course of business, consistent with past practice, of Real Property by a Loan Party in which at least 90% of the consideration received by the transferor consists of Real Property; *provided*, that, unless otherwise agreed by the Required Lenders (i) the aggregate Fair Market Value of the Real Property being received by the applicable Loan Party is approximately equal to or greater than the Fair Market Value of the Real Property being transferred by such Loan Party in such exchange, (ii) the Real Property received by such Loan Party will be used by such Loan Party in a line of business that the Loan Parties engaged in on the Closing Date, (iii) the exchange of assets by the parties to the transaction is substantially simultaneous, (iv) in evaluating any such transfer, such Loan Party shall use sound mining and business practices, including conducting engineering and geologic reviews of such property, internal or third-party appraisals and cash flow analyses or assessments of the impact of such transfer on the Borrower's five year business

KL2 2896702.11

plan, (v) the Real Property received by such Loan Party shall not be subject to any Contractual Obligation that limits the ability of such Loan Party to create, incur, assume or suffer to exist any Lien on such Real Property except to the extent that the Real Property being transferred by such Loan Party is subject to such a Contractual Obligation and (vi) the aggregate Fair Market Value of all Real Property transferred since the Closing Date by the Loan Parties in any such transfer or transfers shall not exceed $5,000,000.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the introductory statement hereto.

"**PIK Payment**" means an interest payment with respect to the Loan made by increasing the principal amount of the Loans by the amount of the interest due in accordance with Section 2.09(d).

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, by any ERISA Affiliate.

"**Pledged Debt**" has the meaning specified in Section 1.1 of the Security Agreement.

"**Pledged Equity Interests**" has the meaning specified in Section 1.1 of the Security Agreement.

"**Prepayment Date**" means (i) June 22, 2015 if the Final Order has not been entered by the Bankruptcy Court on or prior to June 19, 2015 or (ii) such later date as approved by the Required Lenders.

"**Pre-Petition Debt**" means, collectively, the Indebtedness and any and all claims (as such term is defined in Section 101(5) of the Bankruptcy Code) of each Debtor outstanding and unpaid on the date on the Petition Date, or such later date on which such Person becomes a Debtor by commencing a Case.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical or foreign vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other pre-petition claims against any Debtor.

"**Production Payments**" means with respect to any Person, all production payment obligations and other similar obligations with respect to coal and other natural resources of such Person that are recorded as a liability or deferred revenue on the financial statements of such Person in accordance with GAAP.

"**Properties**" means the facilities and properties currently or formerly owned, leased or operated by the Borrower or any of its Subsidiaries.

"**Public Lender**" has the meaning specified in Section 10.03(e).

24

"**Qualified Cash**" means unrestricted cash or Cash Equivalents of the Loan Parties that are subject to the valid, enforceable and first priority perfected security interest of the Administrative Agent, and which cash and Cash Equivalents are not subject to any other Lien or claim, except to the extent that the holder of any of the same has entered into an intercreditor agreement with the Administrative Agent, in form and substance reasonably satisfactory to the Required Lenders (other than customary Liens or rights of setoff of the institution maintaining such accounts permitted hereunder solely in its capacity as a depository).

"**Ratable Portion**" or (other than in the expression "equally and ratably") "ratably" means, with respect to any Lender, the percentage obtained by dividing (a) the Commitment of such Lender by (b) the aggregate Commitments of all Lenders (or, at any time after the Termination Date or when the Commitments are terminated or fully drawn, the percentage obtained by dividing the aggregate outstanding principal balance of the Total Outstandings owing to such Lender by the aggregate outstanding principal balance of the Total Outstandings owing to all Lenders).

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all improvements, fixtures, easements, hereditaments, permits and appurtenances relating thereto, and including, with respect to the Loan Parties, all property listed on Schedule 5.08(a) and Schedule 5.08(b).

"**Real Property Lease**" means any lease, license, letting, concession, occupancy agreement, sublease, easement, option or right of way to which such Person is a party and is granted a possessory interest in or a right to use or occupy all or any portion of any Real Property (including, without limitation, any water or surface right with respect to Real Property not owned in fee by such Person, any right to timber and natural gas (including coalbed methane and gob gas) necessary to recover Coal from any portion of Real Property not owned in fee by such Person or the right to extract minerals from any portion of Real Property not owned in fee by such Person) and every amendment or modification thereof, and including, without limitation, with respect to the Loan Parties, the leases with respect to Real Property listed on Schedule 5.08(b) or 5.08(c) under the heading "Leased Real Property".

"**Reclamation**" means the reclamation and restoration of land, water and any future, current, abandoned or former mines, and of any other Environment affected by such mines, as required pursuant to SMCRA, any other Environmental Law or any Environmental Permit.

"**Register**" has the meaning specified in Section 12.06(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and such Person's and such Person's Affiliates' respective managers, administrators, trustees, members, partners, directors, officers, employees, agents, fund managers and advisors.

"**Reorganization Plan**" means a liquidation plan or plan of reorganization in any or all of the Cases of the Debtors.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"**Request for Credit Extension**" means a Borrowing Notice.

"**Required Lenders**" means, as of any date of determination, Lenders holding more than 66⅔% of the sum of (a) the Outstanding Amount of Term Loans and (b) the aggregate unused Commitments; *provided*, in each case, that the unused Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Requirement of Law**" means as to any Person, the Organizational Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" means the chief executive officer, president, or any vice president of the Borrower or, with respect to financial matters, the chief financial officer or treasurer of the Borrower.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent Person thereof).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Sanctioned Entity**" means any of (a) a Designated Jurisdiction or a government of a Designated Jurisdiction, (b) an agency of the government of a Designated Jurisdiction, (c) an organization directly or indirectly controlled by a Designated Jurisdiction or its government, (d) a Person resident in or determined to be resident in a Designated Jurisdiction, or (e) a Person named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list.

"**Sanctions**" means any international economic sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Asset Control, the U.S. Department of State, the U.S. Department of Commerce, the United Nations Security Council, the European Union or Her Majesty's Treasury or other relevant sanctions authority.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Second Segregated Account**" means the deposit account designated after the Closing Date Date at a depositary bank to be selected by the Loan Parties and acceptable to the Required

26

Lenders.  For the avoidance of doubt, the Second Segregated Account shall be a Control Account from and after the date that is 30 days after the Closing Date (or such later date as the Required Lenders shall agree in their sole discretion). The Second Segregated Account is the  "Priority L/C Term Other Accounts" as defined in and subject to the terms of the Orders.

"**Secured Parties**" means the Administrative Agent, the Lenders, and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 10.08.

"**Securities Account**" has the meaning specified in the UCC.

"**Security Agreement**" means that certain Debtor-in-Possession Pledge and Security dated as of the date hereof, by and among the Administrative Agent and each of the Grantors party thereto, substantially in the form of Exhibit H, as amended, restated, supplemented or otherwise modified from time to time.

"**Segregated Operating Account Cap**" has the meaning specified in the Orders.

"**Similar Business**" means coal production, coal mining, coal gasification, coal liquefaction, other BTU conversions, coal brokering, coal transportation, mine development, coal supply contract restructurings, ash disposal, environmental remediation, Reclamation, coal and coal bed methane exploration, production, marketing, transportation and distribution and other related businesses, and activities of the Borrower and its Subsidiaries as of the date hereof and any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"**SMCRA**" means the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 et seq., as amended.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**" means any Subsidiary of the Borrower that is (a) a debtor in a case then pending under chapter 11 of the Bankruptcy Code or any ancillary proceedings, (b) a Domestic Subsidiary and (c) a Foreign Subsidiary, in the case of clause (c) to the extent the Borrower determines in good faith and in its reasonable discretion that no material adverse tax consequences would result; *provided*, that such term shall not include (i) the SPV, (ii) EACC Camps Inc., a West Virginia corporation, so long as Section 5.25 continues to be true and correct in all respects or (iii) (A) WWMV, LLC, (B) Rhino Eastern LLC, (C) White Stallion Coal, LLC, (D) Squaw Creek Coal Company or (E) Tecumseh Coal Corporation, each of which is a non-wholly owned joint venture with a third party; *provided*, *further*, that any Subsidiary that (x) is an obligor under the Existing Credit Agreements shall be a Subsidiary Guarantor hereunder or (y) Guarantees any other Indebtedness of the Borrower or any other Loan Party that is permitted pursuant to Section 7.02(c) or 7.02(m) shall be a Subsidiary Guarantor hereunder.

"**Subsidiary Guarantor Obligations**" mean, with respect to any Subsidiary Guarantor, the collective reference to (i) the Obligations and (ii) all obligations and liabilities of such Subsidiary Guarantor which may arise under or in connection with this Agreement or any other Loan Document to which such Subsidiary Guarantor is a party, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent and counsel to the Lenders that are required to be paid by such Subsidiary Guarantor pursuant to the terms of this Agreement or any other Loan Document.

"**Superpriority Claim**" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"**Swap Contract**" means any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any valid netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Commitment Fee**" has the meaning specified in Section 2.10(b).

28

"**Term Priority Collateral**" means all Collateral other than ABL Priority Collateral.

"**Term Cash Collateral Account**" means the account established by, and under the sole dominion and control of, the Administrative Agent maintained with the Administrative Agent and designated as the "Patriot Term Cash Collateral Account".

"**Term Lender**" means, at any time, a Lender with an outstanding Term Loan or a Commitment at such time.

"**Term Loan**" has the meaning specified in Section 2.01.

"**Termination Date**" means the earliest of (i) the Maturity Date, (ii) the date of termination of the Commitments pursuant to Section 2.06, (iii) the date of termination of the Commitment of each Lender pursuant to Section 9.02, (iv) the Prepayment Date, (v) the Consummation Date and (vi) the date of dismissal of the Cases by the Bankruptcy Court.

"**Testing Period**" means, (a) in the case of the first Testing Period and second Testing Period following the Closing Date, the period commencing with the first day of the first week for which cash receipts and disbursements have been projected in the Budget, and ending (i) in the case of the first Testing Period, on the last day of the week ending May 29, 2015, and (ii) in the case of the second Testing Period, on the last day of the week ending June 26, 2015, and (b) in the case of each consecutive 13-week period following the second Testing Period, the three periods each commencing with the first day of the first week for which cash receipts and disbursements have been projected in the Budget, and ending on the last day of the fourth, the eighth and the thirteenth week, as applicable, of such 13-week period. For purposes of this definition, each calendar week is deemed to end on Friday.

"**Threshold Amount**" means $10,000,000.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Term Loans.; *provided* that at no time shall the Total Outstandings exceed the amounts set forth in Schedule 2.01.

"**Transaction**" means, collectively, the entering into by the Loan Parties of the Loan Documents to which they are a party and the payment of the fees and expenses incurred in connection with the consummation of the foregoing.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York; *provided*, that if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Unfunded Pension Liability**" means the excess of a Pension Plan's accrued benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the actuarial assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"**United States**" and "**U.S.**" mean the United States of America.

"**Unrestricted Cash**" means cash or Cash Equivalents of the Borrower or any of its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower and its Subsidiaries.

"**Variance Report**" means a reconciliation report prepared by the Borrower which shall (a) compare the actual cash receipts and disbursements for the immediately preceding one-week period to the cash receipts and disbursements projected for such period in the 13-Week Projection delivered most recently prior to the required delivery of such Variance Report, (b) indicate the percentage variance, if any, of the actual results of aggregate cash receipts and aggregate cash disbursements versus the projections therefor for such period, together with an explanation for any such significant variances, and (c) in the case of any such Variance Report delivered with respect to a week ending on the last day of a Testing Period, compare the actual Cumulative Net Cash Flow for such Testing Period to the projected Cumulative Net Cash Flow for such Testing Period as set forth in the Budget, including the applicable percentage variances.

"**Voting Stock**" means the Class A Common Stock, the Class B Common Stock and any other Equity Interests (as used in this definition, without regard to clause (c) of such definition) of the Borrower that is at the time entitled to vote in the election of the board of directors of the Borrower.

"**Voting Trust**" means that certain voting trust established pursuant to that certain Voting Trust Agreement dated as of December 18, 2013, by and between the Borrower and Torque Point Advisors, LLC, as may be amended, restated, supplemented or otherwise modified from time to time.

Section 1.02.   *Other Interpretive Provisions.* With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "**include,**" "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation.**" The word "**will**" shall be construed to have the same meaning and effect as the word "**shall.**" Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**herein,**" "**hereof**" and "**hereunder,**" and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and

KL2 2896702.11

regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "**asset**" and "**property**" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "**from and including;**" the words "**to**" and "**until**" each mean "**to but excluding;**" and the word "**through**" means "**to and including.**"

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03.   *Accounting Terms.*  (a) *Generally*. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, *except* as otherwise specifically prescribed herein. Notwithstanding the foregoing, all financial statements delivered hereunder shall be prepared, and all financial ratios and other financial calculations contained herein or required hereby shall be calculated, (i) without giving effect to any election under the Financial Accounting Standards Board Accounting Standards Codification 825-10-25 previously referred to as Statement of Financial Accounting Standards No. 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Restricted Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b)      *Changes in GAAP*. If at any time any Accounting Change or any other change as permitted by Section 7.15 would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such Accounting Change as if such Accounting Change has not been made; *provided*, that until so amended, all financial covenants, standards, and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.

Section 1.04.   *Times of Day*. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

KL2 2896702.11

# ARTICLE 2
## THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01.  *The Loans.*  Subject to the terms and conditions set forth herein and in the Orders, each Term Lender severally, agrees to make loans (each such loan, a "**Term Loan**") to the Borrower on the Closing Date and from time to time, on any Business Day thereafter during the Availability Period in up to six additional draws, in an aggregate principal amount not to exceed the amount of such Lender's Commitment. Each Lender's Commitment shall (i) reduce on a dollar-for-dollar basis immediately following any and each making of a Loan by it pursuant to this Section 2.01 by the principal amount of such Loan and (ii) terminate immediately and without further action on the Termination Date. Subject to the terms and conditions set forth herein, the Borrower may make borrowings under the Lenders' collective Commitments during the Availability Period in accordance with the terms hereof (the date of any such borrowing, a "Delayed Draw Funding Date") in an aggregate principal amount, when combined with the aggregate principal amount of all Loans made pursuant to Section 2.01, not to exceed the aggregate principal amount of the Commitments. Each Borrowing shall be in aggregate amount of $1,000,000 or an integral multiple of $250,000 in excess thereof (or the full remaining amount); *provided*, that (x) the first Borrowing shall be in the amount authorized by the Bankruptcy Court in the Interim Order but in no event more than $30,000,000 and (y) each subsequent Borrowing shall be in a maximum amount, together with prior borrowings, set forth in Schedule 4.03 but in no event greater than the difference between (i) the lesser of (A) the full amount authorized by the Bankruptcy Court in the Final Order and (B) the aggregate amount of Commitments and (ii) the amount of all prior Borrowings (without giving effect to any prepayments). Term Loans prepaid or repaid may not be reborrowed.

Section 2.02.  *Borrowings, Conversions and Continuations of Loans.*

(a)  Each Borrowing, shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to the date of any Borrowing, except that with respect to the Borrowing on the Closing Date, such notice may be given at any time prior to 2:00 p.m. on the Closing Date. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed within one Business Day by delivery to the Administrative Agent of a written Borrowing Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing shall be in a principal amount of $1,000,000 or a whole multiple of $250,000 in excess thereof. Each Borrowing Notice (or irrevocable telephonic notice) shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of Loans to be borrowed.

(b)  Following receipt of a Borrowing Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the Loan. In the case of any Borrowing, each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Notice, except that in the case of the Borrowing on the Closing Date, if notice of such Borrowing is given at or after 12:00 p.m.  on the Closing Date, each Lender shall make its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not

later than one hour after such notice is given. . Unless the Administrative Agent has received written notice from a Loan Party or a Lender that the applicable conditions set forth in Section 4.02 and Section 4.03 (and, if such Borrowing is the initial Credit Extension, Section 4.01) have not been satisfied, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)     *[Reserved]*.

Section 2.03.   *[Reserved]*.

Section 2.04.   *[Reserved]*.

Section 2.05.   *[Reserved]*.

Section 2.06.   *Prepayments*.  *Optional*. (a) The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided*, that (A) such notice must be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment and (B) any prepayment shall be in a principal amount of $500,000 or a whole multiple of $250,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Any prepayment of a Term Loan may not be reborrowed.

(b)     *Mandatory*.

(i)     If the Borrower or any of its Subsidiaries Disposes of any property (other than any Disposition (x) permitted by Section 7.05(a), (b), (c), (k) or (l) or (y) or ABL Priority Collateral, the proceeds of which shall be applied as set forth in the Orders), the Borrower shall apply any such Net Cash Proceeds toward the prepayment of Loans within 30 days of receipt, unless otherwise agreed to by the Required Lenders.

(ii)     Upon any Extraordinary Receipt (other than any such Extraordinary Receipts in respect of any ABL Priority Collateral , the proceeds of which shall applied as set forth in the Orders) received by or paid to or for the account of the Borrower or any of its Subsidiaries, and not otherwise included in clause (i) of this Section 2.06(b), the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within three Business Days after receipt thereof by the Borrower or such Subsidiary (such prepayments to be applied as set forth in clause (iii) below); *provided*, *however*, that with the consent of the Required Lenders and, and so long as no Default shall have occurred and be continuing, the

33

Borrower or such Subsidiary may apply such cash proceeds to replace or repair the equipment, fixed assets or real property in respect of which such cash proceeds were received or reinvest in other operating assets.

(iii)    In the case of prepayments of the Facility required pursuant to clauses (i) and (ii) of this Section 2.06(b), the amount remaining after payment in full of outstanding Term Loans plus accrued but unpaid interest thereon may be retained by the Borrower for use in the ordinary course of its business.

(c)    All prepayments of Loans pursuant to this Section 2.06 shall first be applied to pay that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) then due and payable to the Administrative Agent in its capacity as such.

Section 2.07.    *Termination or Reduction of Commitments.*  The Borrower may, upon written notice to the Administrative Agent, terminate, or from time to time permanently reduce, the Commitments; *provided*, that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $250,000 in excess thereof. The Administrative Agent will promptly notify the Lenders of any such notice of termination or reduction of the Aggregate Commitments. Any reduction of the Aggregate Commitments shall be applied to the Commitment of each Lender according to its Applicable Percentage. All Commitments shall terminate on May 19, 2015 if the Closing Date has not occurred by such date.

Section 2.08.    *Repayment of Loans*. The Borrower shall repay the Lenders on the Termination Date the aggregate principal amount of all Term Loans outstanding on such date.

Section 2.09.    *Interest.*  (a) Subject to the provisions of Section 2.09(b), each Term Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Interest Rate.

(b)    Subject to Section 2.10(c), if any amount of principal or interest of any Loan (or any other Obligation) is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(i)    While any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.

34

(d)      If the Borrower elects to make any interest payment in cash, the Borrower shall give the Administrative Agent three Business Days' notice prior to the date of such payment. To the extent any amounts due to the Lenders hereunder (whether interest, fees, expenses or otherwise) are not paid in cash when due, such amounts shall automatically be due and payable in-kind by making a PIK Payment, and such increased principal amount of Loans outstanding will thereafter accrue interest at the Interest Rate.  For the avoidance of doubt, for the purposes of the Loan Documents, all references to "principal amount" of the Loans shall include any PIK Payments made in respect thereof (and any increase in the principal amount of the Loans) as a result of a PIK Payment.  Notwithstanding the foregoing, following declaration of acceleration pursuant to Section 9.02, all Obligations, including all interest due hereunder, are due in cash, without the necessity of demand.  All PIK Payments shall be reflected in the Register. For the avoidance of doubt, no amounts due and owing to the Administrative Agent hereunder shall be satisfied by a PIK Payment.

Section 2.10.   *Fees.*

(a)      *Lender Fees*. The Borrower shall pay to the Administrative Agent, for the account of each Lender, fees in the amounts and at the times specified in the Fee Letter.

(b)      *Other Fees*. The Borrower shall pay to each Lender and the Administrative Agent for their own respective accounts fees in the amounts and at the times specified in the Fee Letter and the Administrative Agent Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)      *Defaulting Lender Fees*. Notwithstanding anything herein to the contrary, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will not be entitled to any fees accruing during such period pursuant to clauses (a) and (b) above (without prejudice to the rights of the Non-Defaulting Lenders in respect of such fees).

(d)      *Administrative Agent Fees*.  The Borrower shall pay to the Administrative Agent any fees and expenses due pursuant to the Administrative Agent Fee Letter.

Section 2.11.   *Computation of Interest and Fees.*  (a) All computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, *provided*, that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.13(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(b)      *[Reserved].*

Section 2.12.   *Evidence of Debt.*  (a) The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments

thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender (including, without limitation, as set forth in a Note) and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender to the Borrower made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans to the Borrower in addition to such accounts or records. Each Lender may attach schedules to a Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(b)　　[Reserved]

(c)　　Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.12(a), and by each Lender in its account or accounts pursuant to Section 2.12(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Loan Parties under this Agreement and the other Loan Documents.

Section 2.13.　*Payments Generally; Administrative Agent's Clawback.*　(a) *General*.　All payments to be made by the Borrower or the other Loan Parties shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower or the other Loan Parties hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its ratable share of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)　　*Funding by Lenders; Presumption by Administrative Agent*. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may (but shall not be obligated), in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in

36

immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate, *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the Interest Rate. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(i)      *Payments by Borrower; Presumptions by Administrative Agent*. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated), in reliance upon such assumption, distribute to such Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.13(b) shall be conclusive, absent manifest error.

(c)      *Failure to Satisfy Conditions Precedent*. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender to the Borrower as provided in the foregoing provisions of this Article 2, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article 4 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall promptly return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)      *Obligations of Lenders Several*. The obligations of (i) the Lenders hereunder to make Loans, and (ii) all Lenders hereunder make payments pursuant to Section 12.04(c) are several and not joint. The failure of (y) any Lender to make any Loan, or (z) any Lender to make payment under Section 12.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to do so.

(e)      *Funding Source*. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a

representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

Section 2.14. *Sharing of Payments by Lenders.* If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all Lenders at such time or (b) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (i) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, *provided*, that:

(i)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this Section shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply), or (C) any payments pursuant to the Fee Letters.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 2.15. *Defaulting Lender*.

(a)      *Defaulting Lender Adjustments*. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until

such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

      (i)    *Waivers and Amendments.* Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders; and

      (ii)    *Defaulting Lender Waterfall.* Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 9 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 12.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any fees, expenses or other amounts owing by such Defaulting Lender to the Administrative Agent hereunder or otherwise in performing its duties under this Agreement and the Loan Documents; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders *pro rata* in accordance with the Commitments under the Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.14(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

      (iii)    *[Reserved].*

      (iv)    *[Reserved].*

      (v)    *[Reserved].*

(vi)    *Certain Fees.*  No Defaulting Lender shall be entitled to receive any fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    *Defaulting Lender Cure.*  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility), whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.16.   *Priority and Liens.*  (a) The Borrower hereby covenants and agrees that upon the entry of, and subject to the terms and provisions of, the Interim Order (and when applicable, the Final Order):

(i)    the Obligations pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases subject only to the Carve-Out;

(ii)    [*Reserved*];

(iii)    the Obligations pursuant to Section 364 of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected (A) first priority Lien on all of the Term Priority Collateral of each Loan Party and (B) second-priority Lien (but senior to such Liens securing the LC/Term Obligations), junior and subject only to the Liens securing the ABL Obligations as described, and to the extent provided, in the Orders, on all of the ABL Priority Collateral of each Loan Party subject, in each case, to the Carve-Out;

(b)    [*Reserved*].

(c)    The relative priorities of the Liens described in this Section 2.16 with respect to the ABL Priority Collateral of the Debtors and the Term Priority Collateral of the Debtors shall be as set forth in the Interim Order (and, when entered, the Final Order). All of the Liens described in this Section 2.16 shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order.

40

(d)    Notwithstanding anything to the contrary herein, not more than 65% of the voting equity interests of any CFC shall be pledged in favor of any Lender or the Administrative Agent.

Section 2.17.    *No Discharge; Survival of Claims.* The Borrower agrees that to the extent that its obligations under the Loan Documents have not been satisfied in full in cash, (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and the Liens granted to the Administrative Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

# ARTICLE 3
### TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01.    *Taxes.  Payments Free of Taxes.* (a) Any and all payments by or on behalf of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, *provided*, that if the Borrower or other Person making payments on behalf of the Borrower shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions including deductions applicable to additional sums payable under this Section 3.01(a) (after payment of all Indemnified Taxes and Other Taxes) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or other Person shall make such deductions and (iii) the Borrower or other Person shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    *Payment of Other Taxes by the Borrower*. Without limiting the provisions of Section 3.01(a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    *Indemnification by the Borrower*. The Borrower shall indemnify the Administrative Agent and each Lender, within 30 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Administrative Agent or such Lender or any of their respective Affiliates, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    *Evidence of Payments*. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by

41

such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    *Status of Lenders*. Each Lender that is a "U.S. Person" as defined in section 7701(a)(30) of the Code that has not otherwise established to the reasonable satisfaction of the Borrower (or, in the case of a Participant purchasing its participation from a Foreign Lender, to the Lender from which the related participation shall have been purchased) that it is an exempt recipient (as defined in section 6049(b)(4) of the Code and the regulations thereunder) shall deliver to the Borrower and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower or Administrative Agent), two duly completed and executed copies of Internal Revenue Service Form W-9.

Each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), two copies of whichever of the following is applicable or any subsequent version thereof or successor thereto:

(i)    duly completed and executed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)    duly completed and executed copies of Internal Revenue Service Form W-8ECI relating to all payments to be received by such Foreign Lender hereunder or under any other Loan Document,

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (A) a certificate to the effect that such Foreign Lender is not (1) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (3) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (B) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E, or

(iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed and executed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

In the event that, pursuant to Section 12.06(d), a Participant is claiming the benefits of this Section 3.01, such Participant shall provide the forms required above to the Lender from which the related participation was purchased, and if such Lender is a Foreign Lender, such Lender shall, promptly upon receipt thereof (but in no event later than the next scheduled payment under this Agreement) forward such documentation to the Borrower and the Administrative Agent, together with such additional forms as are required by law.

42

Without limiting the obligations of the Lenders set forth above regarding delivery of certain forms and documents to establish each Lender's status for U.S. withholding tax purposes, each Lender agrees promptly to deliver to the Administrative Agent or the Borrower, as the Administrative Agent or the Borrower shall reasonably request, on or prior to the Effective Date, and in a timely fashion thereafter (including upon the expiration or obsolescence of any such forms or documents and promptly after the occurrence of any event requiring a change from the most recent forms previously delivered), such other documents and forms as would reduce or avoid any Indemnified Taxes in respect of all payments to be made to such Lender outside of the U.S. pursuant to this Agreement or otherwise to establish such Lender's status for withholding tax purposes in such other jurisdiction; *provided*, that in such Lender's reasonable judgment such documentation or forms would not materially prejudice such Lender. Each Lender shall promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any such claimed exemption or reduction. Notwithstanding any other provision of this Section 3.01(e), a Lender shall not be required to deliver any form, document or other information pursuant to this Section 3.01(e) that such Lender is not legally able to deliver.

If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 3.01(e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)      *Treatment of Certain Refunds*. If the Administrative Agent or any Lender receives a refund with respect to Indemnified Taxes or Other Taxes paid by the Borrower, which in the sole discretion and good faith judgment of the Administrative Agent or any Lender is allocable to such payment, it shall promptly pay such refund (but only to the extent of the Indemnified Taxes or Other Taxes paid by the Borrower giving rise to such refund) to the Borrower, net of all out-of-pocket expenses of the Administrative Agent or such Lender incurred in obtaining such refund (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or such Lender in good faith and in its sole discretion, and as will leave the Administrative Agent or such Lender in no worse position than it would be in if no such Indemnified Taxes or Other Taxes had been imposed and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however*, that the Borrower agrees to promptly return such amount (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority), net of any reasonable incremental additional costs, to the Administrative Agent or the Lender, as the case may be, if it receives notice from the Administrative Agent or Lender that the Administrative Agent or the Lender is required to repay such refund. This subsection shall not be construed to require the

Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

Section 3.02.   *[Reserved].*

Section 3.03.   *[Reserved].*

Section 3.04.   *Increased Costs.*  (a) *Increased Costs Generally.* If any Change in Law shall:

(i)      subject any Recipient to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (c) of the definition of Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(ii)      impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon written request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      *Capital Requirements.* If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such L/C Issuer or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, after submission to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      *Certificates for Reimbursement.* A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section, describing the basis therefore and showing the calculation thereof in reasonable detail, and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)      *Delay in Requests.* Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided, that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than 90-days prior to the date that such

Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90- day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)      *Additional Reserve Requirements*. The Borrower shall pay to each Lender, as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error), which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least 10 Business Days' prior notice (with a copy to the Administrative Agent) of such additional interest or costs from such Lender describing the basis therefor and showing the calculation thereof in reasonable detail. If a Lender fails to give notice 10 Business Days prior to the relevant Interest Payment Date, such additional interest or costs shall be due and payable within 30 days from receipt of such notice.

Section 3.05.    *[Reserved]*.

Section 3.06.    *Mitigation Obligations; Replacement of Lenders.*  (a) *Designation of a Different Lending Office*. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender, the Administrative Agent or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      *Replacement of Lenders*. If any Lender requests compensation under Section 3.04, if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, if any Lender gives a notice pursuant to Section 3.02 or if any Lender is at such time a Defaulting Lender, then the Borrower may replace such Lender in accordance with Section 12.13.

Section 3.07.    *Survival.* All of the Borrower's obligations under this Article 3 shall survive termination of the Commitments and repayment of all other Obligations hereunder.

45

## ARTICLE 4

### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.    *Conditions of Initial Credit Extension.* The effectiveness of this Agreement and the obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or electronic copies (followed promptly by originals) unless otherwise specified, each properly executed by a duly authorized officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Required Lenders:

(i)    executed counterparts of this Agreement executed by each Lender and each Loan Party;

(ii)    Notes executed by the Borrower in favor of each Lender requesting a Note or Notes;

(iii)    the Security Agreement executed by each Loan Party;

(iv)    proper financing statements (except for any as-extracted collateral filing or UCC fixture filing) in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that are necessary or that the Administrative Agent or the Required Lenders may reasonably request in order to perfect the Liens and security interests created or purported to be created under the Interim Order and the Security Agreement, covering the Collateral described therein;

(v)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of duly authorized officers of each Loan Party as the Administrative Agent or the Required Lenders may reasonably require evidencing the identity, authority and capacity of each officer of a Loan Party executing the Loan Documents to which such Loan Party is a party;

(vi)    such documents and certifications as the Administrative Agent or the Required Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect;

(vii)    a certificate signed by a Responsible Officer of the Borrower certifying that the conditions specified in Sections 4.02(a) and (b) have been satisfied; and

(viii)    such other assurances, certificates and documents as the Administrative Agent or any Lender reasonably may require.

(b)      Any fees required to be paid on or before the Closing Date to the Administrative Agent or the Lenders (i) pursuant to the Fee Letter and the Administrative Agent Fee Letter or (ii) otherwise for which invoices have been received at least one Business Day prior to the Closing Date shall have been paid.

(c)      Unless waived by the Administrative Agent and the Required Lenders, the Borrower shall have paid all reasonable fees, charges and disbursements of counsel to the Administrative Agent and Lenders (directly to such counsel if requested by the Administrative Agent or the Lenders) to the extent invoiced at least one Business Day prior to the Closing Date, *plus* such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing and customary post-closing proceedings included in such invoices (*provided*, that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent and the Lenders).

(d)      The Administrative Agent and the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the PATRIOT Act, to the extent requested at least 5 Business Days prior to the Closing Date.

(e)      The Administrative Agent and the Required Lenders shall be satisfied, in their sole discretion, with the cash management arrangements of the Loan Parties (or with the cash management arrangements required to be put in place by the Loan Parties pursuant to Section 6.22), it being understood and agreed that cash management arrangements consistent with Section 6.22 are satisfactory to the Administrative Agent and the Required Lenders.

(f)      The Petition Date shall have occurred on or prior to May 15, 2015.

(g)      The First Day Orders sought by the Borrower and entered on the Closing Date (including a cash management order) shall be satisfactory to the Required Lenders and the Administrative Agent (with respect to its rights, privileges and immunities).

(h)      The Interim Order Entry Date shall have occurred prior to the Closing Date and not later than 5 Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Required Lenders and the Administrative Agent (with respect to its rights, privileges and immunities) and shall not be subject to a stay.

(i)      All of the Liens described in Section 2.16 shall have been created and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order. The Interim Order shall have been effective to create the relative priorities of the Liens described in Section 2.16 with respect to the Collateral. The automatic stay under the Bankruptcy Code shall have been automatically vacated, subject to the terms of the Interim Order, to permit enforcement of the Secured Parties' rights and remedies under this Agreement and the other Loan Documents.

KL2 2896702.11

(j)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(k)     The initial 13-Week Projection (in form and substance satisfactory to the Required Lenders) shall have been received by the Lenders prior to the date hereof.

(l)     The Required Lenders shall be satisfied in their sole discretion that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or its Subsidiaries' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

(m)     There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Borrower) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

Section 4.02.   *Conditions to All Credit Extensions.* The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

(a)     The representations and warranties of each Loan Party contained in this Agreement and each other Loan Document or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(a) and (b), respectively.

(b)     No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)     The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     The Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the written consent of the Required Lenders.

(e)     The making of such Loan shall not violate any requirement of applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(f)     In the case of any Borrowing after the Closing Date, the Bankruptcy Court shall have entered the Final Order and the Final Order shall (i) be in full force and effect (ii) not

KL2 2896702.11

have been vacated or reversed (iii) not have been modified or amended other than as acceptable to the Required Lenders and (iv) not be subject to a stay.

(g)     The Loan Parties shall have achieved the Milestones on or prior to the corresponding dates set forth in Schedule 4.03, to the extent applicable at the time of such Borrowing (it being understood, for the avoidance of doubt, that any Delayed Draw Funding Date may occur prior to the dates on Schedule 4.03, so long as the Milestones set forth on such schedule corresponding to the aggregate amount of Loans to be funded have been satisfied or waived on or before such date).

(h)     Since the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect, except as previously disclosed in writing to the Administrative Agent and the Lenders, including in any bankruptcy pleadings filed with the bankruptcy court on or before the Closing Date or in filings made with the SEC and press releases.

Section 4.03.   *Delayed Draw Funding Date Milestones.* The obligation of each Lender to honor any Request for Credit Extension after the Closing Date and on any proposed Delayed Draw Funding Date is subject to the satisfaction of the Milestones on or prior to the corresponding dates set forth in Schedule 4.03 (it being understood, for the avoidance of doubt, that any Delayed Draw Funding Date may occur prior to the dates on Schedule 4.03, so long as the Milestones set forth on such schedule corresponding to the aggregate amount of Loans to be funded have been satisfied or waived on or before such date).

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a), (b) and (f) and (for Borrowings after the Closing Date) 4.03 have been satisfied on and as of the date of the applicable Credit Extension.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

The Borrower and, to the extent that the following representations and warranties relate to the Loan Parties, each Loan Party represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01.   *Existence, Qualification and Power.*   (a) Each Loan Party is duly organized or formed and validly existing and (i) in good standing under the Laws of the jurisdiction of its incorporation or organization, except, with respect to this clause (ii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)     Subject to the entry of the Orders and subject to the terms thereof, each Loan Party has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the Transaction, and (iii) is duly qualified and is licensed and, as applicable, in good standing, under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each

49

case referred to in clause (iii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02.  *Authorization; No Contravention.* Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document, (a) have been duly authorized by all necessary corporate or other organizational action, and (b) do not and will not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien (except for any Liens that may arise under the Loan Documents) under, or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect.

Section 5.03.  *Governmental Authorization; Other Consents.* (a) Subject to the entry of the Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority and (b) no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with any other Person, in each case, is necessary or required in connection with (i) the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transaction, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents or (iii) the perfection of the Liens created under the Collateral Documents (including the first priority nature thereof to the extent provided for in the Orders) except for (x) those approvals, consents, exemptions, authorizations or other actions which have already been obtained, taken, given or made and are in full force and effect, and (z) those landlord consents required with respect to Real Property Leases that constitute Collateral.

Section 5.04.  *Binding Effect.* Subject to the entry of the Orders, this Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. Subject to the entry of the Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and an implied covenant of good faith and fair dealing.

Section 5.05.  *Financial Statements.*  (a) The draft unaudited consolidated balance sheet of the Borrower and its Subsidiaries dated December 31, 2014, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date have been provided to the Lenders.

(b)  *[RESERVED]*

(c)  *[RESERVED]*

(d)    The consolidated forecasted balance sheet and statements of income and cash flows of the Borrower and its Subsidiaries delivered pursuant to Section 4.01 or Section 6.02(k) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable in light of the conditions existing at the time of delivery of such forecasts.

Section 5.06.    *Litigation.* There are no unstayed actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues (a) that purport to affect or pertain to this Agreement, any other Loan Document or the consummation of the Transaction, or (b), other than the Cases and except as specifically disclosed in public filings prior to the date hereof or on Schedule 5.06, as to which there is a reasonable possibility of an adverse determination and that could reasonably be expected to result in liability of the Loan Parties greater than the Threshold Amount.

Section 5.07.    *No Default.* Neither the Borrower nor any Subsidiary is in default under or with respect to any Contractual Obligation (a) with respect to any Material Leased Real Property (except for non-material non-payment defaults and defaults which do not or, with the giving of any notice, the passage of time, or both, would not give rise a right of termination by the lessor) or (b) that would permit the exercise remedies thereunder on a post-petition basis. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

Section 5.08.    *Ownership of Property; Liens; Investments.* (a) The Borrower and each of its Subsidiaries has (i) subject to the Liens permitted by Section 7.01, good and marketable Mining Title to the Material Owned Real Property and the Material Leased Real Property for the ordinary conduct of the business and operations of the Loan Parties as presently conducted on the date hereof and (ii) good record title to, or valid leasehold, easement or other real property interests in all other Real Property necessary for the ordinary conduct of the business and operations of the Loan Parties as presently conducted, subject to such defects in title as could not reasonably be expected to materially interfere with the ordinary conduct of the business and operations of any Loan Party.

(b)    Subject to the exceptions listed thereon, Schedule 7.01 sets forth a complete and accurate list as of the Closing Date of all Liens (other than any Liens permitted under Section 7.01 (other than Section 7.01(b)) on the property or assets of the Borrower and each of its Subsidiaries, showing as of the date hereof the lienholder thereof.

(c)    As of the Closing Date, (i) all Real Properties owned or leased by any Loan Party that are critical to the business of the Borrower and its Restricted Subsidiaries are included in Schedule 5.08(c) (it being understood that Schedule 5.08(c) also includes real property not critical to the business of the Borrower and its Restricted Subsidiaries) and (ii) the Real Properties listed on Schedule 5.08(c) account for at least 93% of the Coal Reserves of the Borrower and its Subsidiaries.

51

(d)     Schedule 5.08(c) sets forth a complete and accurate list as of the Closing Date of the locations of all mines owned or leased by the Borrower or any of its Subsidiaries, including active and idled mines or mines in development, but not closed mines.

(e)     The Borrower and each of its Subsidiaries has good record title to, or valid leasehold, easement or other property interests in all personal property necessary for the ordinary conduct of the business and operations of the Loan Parties as presently conducted.

(f)     Schedule 7.03 sets forth a complete and accurate list as of the Closing Date of all Investments held by the Borrower and any of its Subsidiaries on the date hereof, showing as of the date hereof the amount, obligor or issuer and maturity, if any, thereof.

(g)     To the knowledge of the Loan Parties on the Closing Date, all Material Owned Real Property and the Material Leased Real Property that is being mined or operated as of the Closing Date is in a physical condition that would permit mining or operations as presently conducted.

(h)     The Perfection Certificate delivered in connection with the Existing Credit Agreements remains true and correct (unless otherwise disclosed to the Lenders).

Section 5.09.   *Environmental Compliance.* Except as disclosed in the Borrower's most recent annual, quarterly or other reports filed with the SEC or on Schedule 5.09, or as otherwise could not reasonably be expected to have a Material Adverse Effect:

(a)     The Properties do not contain, and have not previously contained, any Hazardous Materials in amounts or concentrations which (i) constitute or constituted a violation of, or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(b)     None of the Borrower nor any of its Subsidiaries has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by the Borrower or any of its Subsidiaries (the "**Business**"), or any prior business for which the Borrower has retained liability under any Environmental Law.

(c)     Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could reasonably be expected to give rise to liability under, any applicable Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could reasonably be expected to give rise to liability under, any applicable Environmental Law.

(d)     No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened under any Environmental Law to which the Borrower or any of its Subsidiaries is or, to the knowledge of the Borrower, will be named as a party or with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other similar

administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business.

(e)    There has been no release or threat of release of Hazardous Materials at or from the Properties, or arising from or related to the operations of the Borrower or any of its Subsidiaries in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could reasonably be expected to give rise to liability under any applicable Environmental Laws.

(f)    The Properties and all operations at the Properties are in compliance in all material respects with all applicable Environmental Laws.

(g)    The Borrower and each of its Subsidiaries (i) hold all Environmental Permits (each of which is in full force and effect and is not subject to appeal, except in such instances where the requirement to hold an Environmental Permit is being contested in good faith by the Borrower or any of its Subsidiaries by appropriate proceedings diligently conducted) required for any of their current operations or for the current ownership, operation or use of the Properties, including all Environmental Permits required for the coal mining-related operations of the Borrower or any of its Subsidiaries or, to the extent currently required, any pending construction or expansion related thereto; (ii) are, or have been, in compliance with all Environmental Permits, except in such instances where the requirement of an Environmental Permit is being contested in good faith by the Borrower or any of its Subsidiaries by appropriate proceedings diligently conducted; and (iii) have used commercially reasonable efforts to cause all contractors, lessees and other Persons occupying, operating or using the mines on the Properties to comply with all Environmental Laws and obtain all Environmental Permits required for the operation of the mines.

(h)    To the knowledge of the Borrower, none of the Properties have any associated direct or indirect acid mine drainage which (i) constitutes or constituted a violation of, or (ii) could reasonably be expected to give rise to liability under, any applicable Environmental Law.

Section 5.10.    *Mining*.

(a)    Borrower and each of its Subsidiaries has, in the amounts and forms required pursuant to Environmental Law, obtained all performance bonds and surety bonds, or otherwise provided any financial assurance, in each case required under Environmental Law (collectively, "**Mining Financial Assurances**"), except for such Mining Financial Assurances that do not exceed $20,000,000 in the aggregate. To the knowledge of the Borrower the costs of any Reclamation that the Borrower and its Subsidiaries are required to perform in excess of those costs for which Mining Financial Assurances have been obtained would not reasonably be expected to have a Material Adverse Effect.

(b)    Since December 31, 2014, there have been no accidents, explosions, implosions, collapses or flooding at or otherwise related to the Properties that have, directly or indirectly, resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

(c)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, to the knowledge of the Borrower, none of the Borrower or any Restricted Subsidiary has been notified in writing by the Federal Office of Surface Mining or the agency of any state administering SMCRA, or any comparable state statute that it is (i) ineligible to receive additional surface mining permits; or (ii) under investigation to determine whether their eligibility to receive any Environmental Permit should be revoked, i.e., "permit blocked."

Section 5.11.    *Insurance.* The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

Section 5.12.    *Taxes.* The Borrower and its Subsidiaries have filed all Federal, state and other tax returns and reports required to be filed, and have paid all material Federal, state and other Taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable (other than those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP); no tax Lien has been filed (other than Liens for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in good faith and by appropriate proceedings and (ii) post-petition Taxes not to exceed the Threshold Amount not yet due or which are being contested in good faith and by appropriate proceedings) and, to the knowledge of the Borrower, no material claim is being asserted or audit being conducted, with respect to any material Tax, fee or other charge of the Borrower or any of its Subsidiaries. There is no proposed tax assessment against the Borrower or any Subsidiary that would, reasonably be likely to result in liability of the Loan Parties greater than the Threshold Amount. Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement, other than the Tax Separation Agreement.

Section 5.13.    *ERISA Compliance.* (a) Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (i) each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws (except that with respect to any Multiemployer Plan which is a Plan, such representation is deemed made only to the knowledge of the Borrower) and (ii) with respect to each Plan, no failure to satisfy the minimum funding standards of Sections 412 or 430 of the Code has occurred, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made.

(b)     There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no nonexempt "prohibited transaction" (as defined in Section 406 of ERISA) or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur (except as may occur as a result of relief granted pursuant to section 1113 of the Bankruptcy Code), any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

Section 5.14.    *Subsidiaries; Equity Interests; Loan Parties*.

(a)    As of the Closing Date, the Borrower has no Subsidiaries other than those specifically disclosed in Schedule 5.14, and all of the outstanding Equity Interests in such Subsidiaries are owned by each Person in the percentages specified on Schedule 5.14(a) free and clear of all Liens except those created under the Collateral Documents or permitted by this Agreement and the other Loan Documents. Schedule 5.14(a) indicates which Subsidiaries are Loan Parties as of the Closing Date showing (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business, its organizational identification number and its U.S. taxpayer identification number. The Equity Interests of each of the Borrower's Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. Except as set forth on Schedule 5.14(a), as of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which any of the Borrower's Subsidiaries is a party requiring, and there are no Equity Interests of any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by any of the Borrower's Subsidiaries of any additional Equity Interests of any of the Borrower's Subsidiaries or other securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, Equity Interests of any of the Borrower's Subsidiaries.

Section 5.15.    *Margin Regulations; Investment Company Act.*  (a) The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board), or extending credit for the purpose of purchasing or carrying margin stock. Following the application of the proceeds of each Borrowing, not more than 25% of the value of the assets (either of the Borrower only or of the Borrower and its Subsidiaries on a consolidated basis) subject to the provisions of Section 7.01, Section 7.04 or Section 7.05 or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Indebtedness and within the scope of Section 9.01(e) will be margin stock.

(b)    None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is required to register as an "investment company" under the Investment Company Act of 1940.

55

Section 5.16.  *Disclosure.* No report, financial statement, certificate or other information furnished (in writing) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document, taken as a whole with any other information furnished or publicly available, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date when made or delivered; *provided*, that with respect to any forecast, projection or other statement regarding future performance, future financial results or other future developments, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time such information was prepared (it being understood that any such information is subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the future developments addressed in such information can be realized).

Section 5.17.  *Compliance With Laws.* The Borrower and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws (including any zoning, building, ordinance, code or approval or any building or mining permits) and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, or (b) the failure to comply therewith has been disclosed in the Borrower's most recent annual, quarterly or other report filed with the SEC.

Section 5.18.  *Intellectual Property; Licenses, Etc.*  The Borrower and each of its Subsidiaries own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, except where the failure to own or possess the right to use such IP Rights could not reasonably be expected to have a Material Adverse Effect. To the knowledge of the Borrower, the use of such IP Rights by the Borrower or any Subsidiary does not infringe upon any rights held by any other Person, except for any infringement that could not reasonably be expected to have a Material Adverse Effect. Except as specifically disclosed in Schedule 5.18, no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.19.  *[Reserved].*

Section 5.20.  *Casualty, Etc.*  Neither the businesses nor the properties of the Borrower or any of its Subsidiaries have been affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.21.  *Labor Matters.*  (a) Except as specifically disclosed on Schedule 5.21, there are no collective bargaining agreements or Multiemployer Plans covering the employees of the Borrower or any of its Subsidiaries as of the Closing Date.

KL2 2896702.11

(b)       There is (i) no unfair labor practice complaint pending or, to the knowledge of the Borrower, threatened against the Borrower or its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against the Borrower or its Subsidiaries which arises out of or under any collective bargaining agreement, (ii) no strike, walkout, labor dispute, slowdown, work stoppage or other labor difficulty pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or its Subsidiaries, or (iii) to the knowledge of the Borrower, after due inquiry, no union representation question existing with respect to the employees of the Borrower or its Subsidiaries and no union organizing activity taking place with respect to any of the employees of the Borrower or its Subsidiaries, with respect to any matter specified in clauses (i), (ii) or (iii) above, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(c)       Neither the Borrower and nor any of its Subsidiaries has incurred any material liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains due and owing under applicable law, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(d)       The hours worked and payments made to employees of the Borrower and each of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)       All material payments due from the Borrower and each of its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary, except where the failure to do so could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.22.   *Collateral Documents.* Subject to the entry of the Orders, the provisions of the Collateral Documents when executed and delivered (and at all times thereafter) are effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on all right, title and interest of the Collateral owned by the Loan Parties and described therein.

Section 5.23.   *Use of Proceeds.* The Borrower will use the proceeds of the Loans solely as provided for in Section 6.11.

Section 5.24.   *Coal Act; Black Lung Act.*

(a)       The Borrower, each of its Subsidiaries and its "related persons" (as defined in the Coal Act) are in compliance in all material respects with the Coal Act and any regulations promulgated thereunder except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Code by virtue of commencement of the Cases or by the Bankruptcy Court, and none of the Borrower, its Subsidiaries or its "related persons" (as defined in the Coal Act) has any liability under the Coal Act, except as disclosed in the Borrower's financial statements or which could not reasonably be

expected to have a Material Adverse Effect, or with respect to premiums or other material payments required thereunder which have been paid when due, or which liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Code by virtue of commencement of the Cases or by the Bankruptcy Court.

(b)       The Borrower and each of its Subsidiaries are in compliance in all material respects with the Black Lung Act except which compliance is being contested in good faith by appropriate proceedings diligently conducted or excused by the Bankruptcy Code by virtue of commencement of the Cases or by the Bankruptcy Court, and neither the Borrower nor any of its Subsidiaries has either incurred any Black Lung Liability or assumed any other Black Lung Liability, except as disclosed in the Borrower's financial statements or which could not reasonably be expected to have a Material Adverse Effect, or with respect to premiums, contributions or other material payments required thereunder which have been paid when due or which Black Lung Liability is being contested in good faith by appropriate proceedings diligently conducted or the current payment of which is excused by the Bankruptcy Code by virtue of commencement of the Cases or by the Bankruptcy Court.

Section 5.25.   *Activities and Liabilities of EACC Camps, Inc.*  EACC Camps, Inc., a West Virginia corporation, owns no material assets, material Indebtedness or other material liabilities, direct or contingent, including material liabilities for Taxes and material commitments, and conducts no material business or operations.

Section 5.26.   *Anti-Terrorism Laws.*

(a)       None of the Loan Parties, Subsidiaries or, to the knowledge of any of the Loan Parties, any of their Affiliates, is (i) in violation of any applicable laws relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including, but not limited to, (x) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, (y) the Laws comprising or implementing the Bank Secrecy Act, and (z) the Laws administered by the United States Department of the Treasury's Office of Foreign Asset Control ("**OFAC**") (as any of the foregoing Laws described in this Section 5.26(a)(i) may from time to time be amended, renewed, extended, or replaced), (ii) currently a Sanctioned Entity. No Loan, nor the proceeds from any Loan, has been used by the Borrower or any of its Subsidiaries, to lend, contribute, provide, or has otherwise been made available by the Borrower or any of its Subsidiaries, to fund, any activity or business in any Designated Jurisdiction or to fund any activity or business of any Sanctioned Entity, or in any other manner that will result in any violation by any Lender, the Administrative Agent or any of their respective Affiliates, of Sanctions.

(b)       No Loan Party, Subsidiary or, to the knowledge of any Loan Party, any of its Affiliates or any of their respective agents acting in any capacity in connection with the Loans or other transactions hereunder (i) conducts any business or engages in making or receiving any contributions of funds, goods or services to or for the benefit of any Sanctioned Entity, except to the extent not in violation of Sanctions or (ii) knowingly engages in or conspires to knowingly engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any applicable Anti-Terrorism Law.

Section 5.27.  *No Unlawful Contributions or Other Payments*.  The Borrower and its Subsidiaries are in compliance in all material respects with the Foreign Corrupt Practices Act, as amended, and rules and regulations thereunder ("**FCPA**").  No part of the proceeds of the Loans will be used directly or indirectly for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

# ARTICLE 6
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than in respect of contingent obligations, indemnities and expenses related thereto not then payable or in existence as of the later of the Termination Date), the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01 and 6.02 (a) – (g)) cause each Subsidiary to:

Section 6.01.  *Financial Statements.* Deliver to the Administrative Agent and each Lender, in form and detail reasonably satisfactory to the Required Lenders:

(a)     *[RESERVED]*

(b)     as soon as available, but in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended June 30, 2015), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes; and

(c)     as soon as available, but in any event within 20 days after the end of each fiscal month of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related consolidated statements of income or operations, changes in shareholders' equity and cash flows for such fiscal month and for the portion of the Borrower's fiscal year then ended, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

As to any information contained in materials furnished pursuant to Section 6.02(d), the Borrower shall not be separately required to furnish such information under Section 6.01(a) or

(b) above, but the foregoing shall not be in derogation of the obligation of the Borrower to furnish the information and materials described in Section 6.01(a) or (b) above at the times specified therein.

Section 6.02.   *Certificates; Other Information.* Deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Required Lenders:

(a)    [reserved];

(b)    concurrently with the delivery of the financial statements referred to in Section 6.01(c) (commencing with the delivery of the financial statements for the fiscal month ended April 30, 2015), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, which shall include detailed computations of the financial covenant set forth in Section 7.17;

(c)    promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of the Borrower or any of its Subsidiaries, or any audit of any of them;

(d)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(e)    unless otherwise required to be delivered to the Lenders hereunder, promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(f)    as soon as available, but in any event prior to the date annual financial statements are required to be delivered, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(g)    promptly, and in any event within five Business Days after receipt thereof by the Borrower or any Subsidiary, copies of each material notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any material investigation or possible material investigation or other material inquiry by such agency regarding financial or other operational results of the Borrower or any Subsidiary;

KL2 2896702.11

(h)    unless otherwise required to be delivered to the Lenders hereunder, not later than ten days after receipt thereof by the Borrower or any Subsidiary, copies of all notices of default, non-compliance or any other material matters (excluding those delivered pursuant to the relevant agreement in the ordinary course of business), material requests and other material documents (including amendments, waivers and other modifications) so received and, from time to time upon request by the Administrative Agent, such other information and reports as the Administrative Agent or any Lender may reasonably request;

(i)    as soon as available, but in any event within the time period in which the Borrower must deliver its financials under Section 6.01(c), a report supplementing Schedules 5.08(a), 5.08(b) and 5.08(c) and identifying all Material Owned Real Property and Material Leased Real Property acquired or disposed of by any Loan Party during such fiscal year;

(j)    promptly, such additional information regarding the business, financial, legal or corporate affairs of the Borrower or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request;

(k)    (i) weekly, on or before the third Business Day following the end of every calendar week (for purposes of this section, each calendar week being deemed to end on Friday), commencing with the calendar week commencing May 16, 2015, a 13-Week Projection; (ii) weekly, on May 19, 2015 and on the Business Day immediately after the delivery of the 13-Week Projection for each week thereafter, a Variance Report for the week most recently ended; and (iii) on or before the third Business Day following the end of each Testing Period, a supplement to the Budget (it being understood that the Borrower may designate the 13-Week Projection required to be delivered by such date to be the supplement required under this clause (iii)) setting forth cash flow projections of the Borrower and its Subsidiaries on a consolidated, line-item and weekly basis, which shall include projected cash receipts and disbursements, for the 13 week period commencing on the immediately preceding Saturday and the anticipated uses of the proceeds of the Facility for each week during such period, which supplement shall be in substantially the form of Exhibit F and shall be in substance satisfactory to the Required Lenders (which satisfaction shall not be unreasonably withheld or delayed (it being agreed that (x) each such supplement to the Budget shall allow the Borrower to "carry-forward" (for purposes of compliance with Section 7.11) any benefit of the cumulative variance of actual Cumulative Net Cash Flow for the Testing Period prior to such supplement versus the projected amount of Cumulative Net Cash Flow as reflected in the Budget prior to such supplement, and (y) any Lender shall be deemed satisfied if it shall not have objected in writing to such supplement by the third Business Day following delivery thereof to the Administrative Agent));

(l)    unless otherwise required to be delivered to the Lenders hereunder, promptly after the furnishing thereof, copies of any statement, report or other documentation furnished to or received from any agent or lender by any Loan Party or of any of its Subsidiaries pursuant to the Existing Credit Agreements and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02; and

(m)      all pleadings, motions and other documents directly related to the Facility (including, without limitation, any requests for relief under sections 363 or 365 or to approve any compromise and settlement of claims), any Reorganization Plan or any disclosure statement related thereto, or any request for relief under section 1113 or 1114 of the Bankruptcy Code five Business Days prior to being filed (and if impracticable, then promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court, it being agreed that the Borrower shall be deemed in compliance with this covenant if it uses good faith efforts to comply.

Documents required to be delivered pursuant to Section 6.01(a), (b) or (c) or Section 6.02(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 12.02; (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); or (iii) on which such documents are filed for public availability of the SEC's Electronic Data Gathering and Retrieval system; *provided*, that the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of the documents required to be delivered pursuant to Section 6.01(a), (b) or (c) or Section 6.02(a) or (b). The Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

Section 6.03.    *Notices.* Notify the Administrative Agent:

(a)      promptly, of the occurrence of any Default or Event of Default;

(b)      promptly, of any event which could reasonably be expected to have a Material Adverse Effect;

(c)      of the occurrence of any ERISA Event that, individually, or in the aggregate, would be reasonably likely to have a Material Adverse Effect, as soon as possible and in any event within 30 days after the Borrower knows or has obtained notice thereof;

(d)      of any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(e)      promptly after receipt of notice or knowledge of any Loan Party thereof, of any unstayed action, suit, proceeding or claim alleging any Environmental Liability against or by such Loan Party or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect;

(f)      promptly after receipt of notice or knowledge of the Borrower thereof, of any accidents, explosions, implosions, collapses or flooding at or otherwise related to the

Properties that result in (i) any fatality or (ii) the trapping of any Person in any mine for more than twenty-four hours;

(g)     promptly after receipt of notice or knowledge of the Borrower thereof, of the issuance of any closure order pursuant to any Environmental Law or pursuant to any Environmental Permit that could reasonably be expected to directly or indirectly result in the closure or cessation of operation of any mine for a period of more than 5 consecutive days; and

(h)     promptly after receipt of notice or knowledge of any Loan Party of any default by such Loan Party of any of its Subsidiaries under any Contractual Obligation with respect to Material Leased Real Property (except for non-material non-payment defaults and defaults which do not or, with the giving of any notice, the passage of time, or both, would not give rise a right of termination by the lessor).

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04.   *Payment of Post-Petition Obligations.* In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay and discharge as the same shall become due and payable (a) all post-petition Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, except where failure to do so could not reasonably be expected to result in a Material Adverse Effect or (b) all lawful claims which, if unpaid, would by law become a Lien upon any material portion of the Collateral, unless, in each of clause (a) or (b) above, such liabilities, assessments, governmental charges, levies or claims are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary.

Section 6.05.   *Preservation of Existence, Etc.* With respect to the Borrower and each of its Subsidiaries, (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary for the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

Section 6.06.   *Maintenance of Properties.* With respect to the Borrower and each of its Subsidiaries, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition (ordinary wear and tear and damage by fire or other casualty or taking by condemnation excepted); except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. The Loan Parties shall use, store and maintain all Inventory with reasonable care and caution, in accordance with applicable standards of any insurance and in conformity with all applicable law.

Section 6.07.   *Maintenance of Insurance.* Maintain with financially sound and reputable insurance companies which may be Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or Similar Business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried by companies engaged in Similar Businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates. Without limiting the generality of the foregoing, the Borrower and its Subsidiaries will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System, (b) liability insurance, (c) business interruption insurance, and (d) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as would be carried or maintained under similar circumstances by Persons of established reputation engaged in Similar Businesses. Each such policy of insurance shall (i) name the Administrative Agent, on behalf of Secured Parties, as an additional insured thereunder as its interests may appear, (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to the Administrative Agent, that names the Administrative Agent, on behalf of the Secured Parties, as the loss payee thereunder and provide for at least thirty days' prior written notice to the Administrative Agent of any modification or cancellation of such policy.

Section 6.08.   *Compliance with Laws.* Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by the Borrower or any of its Subsidiaries by appropriate proceedings diligently conducted; (b) the failure to comply therewith, in addition to the risk thereof, is disclosed in the Borrower's most recent annual, quarterly or other reports filed with the SEC or on Schedules 5.09, or (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

Section 6.09.   *Books and Records.* (a) Maintain proper books of record and account, in which in all material respects full, true and correct entries in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be; and (c) each Loan Party shall keep accurate and complete records of its Inventory, including costs and daily withdrawals and additions.

Section 6.10.   *Inspection Rights; Field Exams.* (a) Permit representatives and independent contractors of the Administrative Agent and each Lender to, at the Borrower's expense, visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom (except to the extent (i) any such access is restricted by a Requirement of Law or (ii) any such agreements, contracts or the like are subject to a written confidentiality agreement with a non-Affiliate that prohibits the Borrower or any of its Subsidiaries from granting such access to the Administrative Agent or the Lenders; *provided*, that

64

with respect to such confidentiality restrictions affecting the Borrower or any of its Subsidiaries, a Responsible Officer is made available to such Lender to discuss such confidential information to the extent permitted), and to discuss the business, finances and accounts with its officers and independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, *provided*, that the Administrative Agent or such Lender shall give Borrower reasonable advance notice prior to any contact with such accountants and give the Borrower the opportunity to participate in such discussions; *provided*, *further*, that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 6.10(a) and the Administrative Agent shall not exercise such rights more often than twice during any calendar year, which shall be at the Borrower's expense; *provided*, *further*, that when an Event of Default has occurred and is continuing, the Administrative Agent or any such Lender (or any of their representatives or independent contractors) may do any of the foregoing at the expense of the Borrower; *provided*, *further*, that any visit solely pursuant to this clause (a) shall not account as a visit for purposes of clause (b) below.

(b)     At any reasonable time and from time to time during regular business hours, upon reasonable notice, permit representatives and independent contractors of the Administrative Agent or any of the Lenders, at the Borrower's expense, to visit the Real Property of the Borrower and its Subsidiaries to conduct evaluations, appraisals, surveys and environmental assessments in connection with monitoring the Collateral and, after the occurrence and during the continuance of an Event of Default, in order to market any Real Property (including any Leased Real Property) for sale.

Section 6.11.   *Use of Proceeds.* Use the proceeds of the Credit Extensions for working capital, capital expenditures and other general corporate purposes in compliance with the 13-Budget covenant in Section 7.11.

Section 6.12.   *Covenant to Guarantee Obligations and Give Security.*  (a) Upon the formation or acquisition of any new direct or indirect Subsidiary Guarantor by any Loan Party, then the Borrower shall, at the Borrower's expense:

(i)     within 10 days (or such longer period as the Required Lenders may agree) after such formation or acquisition, cause such Subsidiary Guarantor, to duly execute and deliver to the Administrative Agent a supplement to this Agreement and to the Security Agreement, in each case in form and substance reasonably satisfactory to the Required Lenders, whereby such Subsidiary Guarantor shall (A) become a party to this Agreement and the Security Agreement upon execution and delivery by such Subsidiary Guarantor of an Assumption Agreement in the form of Exhibit K hereto, and any supplements to the Security Agreement or other security and pledge agreements, in all such cases, as specified by and in form and substance reasonably satisfactory to the Required Lenders (including delivery of all Pledged Equity Interests and Pledged Debt in and of such Subsidiary Guarantor, and other instruments representing the Pledged Equity Interests in certificated form accompanied by undated stock powers executed in blank or the Pledged Debt indorsed in blank to the extent required by the Security Agreement), in all such cases to the same extent that such documents and instruments would have been required to have been delivered by Persons that were Subsidiary Guarantors on the

65

Closing Date, securing payment of all the Obligations of such Subsidiary Guarantor under the Loan Documents (B) guarantee the other Loan Parties' obligations and become a Subsidiary Guarantor for all purposes under the Loan Documents and (C) grant a security interest in substantially all of its assets to secure such obligations; and

(ii)      within 10 days (or such longer period as the Required Lenders may agree) after such formation or acquisition, furnish to the Administrative Agent a description any Material Owned Real Property and Material Leased Real Property of such Subsidiary Guarantor, in detail reasonably satisfactory to the Required Lenders.

(b)      At the reasonable request of the Required Lenders, each Loan Party shall, at the Borrower's expense:

(i)      (A) with respect to Material Owned Real Property, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent within 45 days (or such longer period as the Required Lenders may agree) after such request, deeds of trust, trust deeds, deeds to secure debt and/or mortgages, (B) with respect to Material Leased Real Property where the terms of the lease of such Material Leased Real Property (or applicable state law, if such lease is silent on the issue) do not prohibit a mortgage thereof, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent within 30 days (or such longer period as the Required Lenders may agree) after such request, leasehold mortgages or leasehold deeds of trust, and (C) with respect to Material Leased Real Property where the terms of the lease of such Material Leased Real Property (or applicable state law, if such lease is silent on the issue) prohibit a mortgage thereof, (1) cause the applicable Loan Party to use commercially reasonable efforts to promptly obtain estoppel and consent agreements executed by the lessors of such Material Leased Real Property and duly execute and deliver to the Administrative Agent, leasehold mortgages or leasehold deeds of trust or (2) cause the applicable Loan Party to file the Interim Order with the government authority responsible for recording mortgages in the jurisdiction in which such Material Leased Real Property is located, in the case of clauses (A), (B) and (C), in form and substance satisfactory to the Required Lenders, securing payment of all the Obligations of the applicable Loan Party under the Loan Documents;

(ii)      within 45 days (or such longer period as the Required Lenders may agree) after such request take whatever additional action (including the recording of mortgages and the filing of Uniform Commercial Code financing statements) may be necessary or that may be reasonably requested by the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on any Material Owned Real Property or Material Leased Real Property, enforceable against all third parties;

(iii)      within 45 days (or such longer period as the Required Lenders may agree) after such request, cause the applicable Loan Party to provide the Administrative Agent with a legal description of any Material Owned Real Property or any Material Leased Real Property, as applicable, from which any As-Extracted Collateral will be severed or to which As-Extracted Collateral otherwise relates, together with the name of

66

the record owner of such Material Owned Real Property or Material Leased Real Property, as applicable, the county in which such Material Owned Real Property or Material Leased Real Property, as applicable, is located, accurate real estate descriptions sufficient to locate such real property on the ground and such other information as may be necessary or desirable to file real property related financing statements, deeds of trust, trust deeds, deeds to secure debt, mortgages, leasehold mortgages and/or leasehold deeds of trust under Section 9-502(b) or 9-502(c) of the UCC or any similar legal requirements; and

(iv)    within 45 days (or such longer period as the Required Lenders may agree) after such request, cause the applicable Loan Party to provide the Administrative Agent with all geological data, reserve data, material existing mine maps, surveys, title insurance policies, title insurance, abstracts and other evidence of title, core hole logs and associated data, Coal measurements, Coal samples, lithologic data, Coal Reserve calculations or reports, washability analyses or reports, quality analyses, mine plans, mining permit applications and supporting data, engineering studies and all other information, maps, reports and data in the possession of such Loan Party and relating to or affecting the Real Property, including the Coal Reserves, Coal ownership, Real Property Leases, mining conditions, mines, and mining plans of such Loan Party as prepared and utilized by such Loan Party in its ordinary course of business.

Section 6.13.    *Compliance With Environmental Laws.* Except as otherwise excused by the Bankruptcy Court, (a) comply, and use commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits and obtain, to the extent necessary based on its current operations, and renew all Environmental Permits for its operations and properties, except in such instances in which (i) the requirement of an Environmental Permit is being contested in good faith by the Borrower or any of its Subsidiaries by appropriate proceedings diligently conducted, or (ii) the failure to so comply, obtain or renew, in addition to the risk thereof, has been disclosed in the Borrower's most recent annual, quarterly or other reports filed with the SEC or on Schedule 5.09; and (b) undertake and perform any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws, except in such instances in which (i) the requirement to undertake or perform is being contested in good faith by the Borrower or any of its Subsidiaries by appropriate proceedings diligently conducted, or (ii) the failure to so undertake or perform has been, in addition to the risk thereof, disclosed in the Borrower's most recent annual, quarterly or other reports filed with the SEC or on Schedule 5.09.

Section 6.14.    *Preparation of Environmental Reports.* Not more often than once per Property during the term of this Agreement (or more frequently during the continuance of an Event of Default), at the reasonable request of the Required Lenders, the Borrower shall provide to the Lenders within 60 days after such request, at the expense of the Borrower, an environmental or mining site assessment or audit report for any of its Properties described in such request, prepared by an environmental or mining consulting firm reasonably acceptable to the Required Lenders describing the presence or absence of Hazardous Materials and information otherwise reasonably requested by the Lenders.

Section 6.15.    *Further Assurances.* Promptly after knowledge by a Responsible Officer of the Borrower or upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments (including Mortgages) as are necessary or that the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by law, subject the Borrower's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents or the Orders, and (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and by the Orders.

Section 6.16.    *Delivery of Leases; Compliance with Terms of Leasehold.*

(a)      Within 14 days after the Closing Date, the Administrative Agent shall have received copies of all Real Property Leases of the Loan Parties, in addition to any information or documentation requested by any Lender in respect thereto.

(b)      Except as otherwise excused by the Bankruptcy Court, make all payments and otherwise perform all obligations in respect of all Real Property Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Real Property Leases in full force and effect and not allow such Real Property Leases to lapse or be terminated or any rights to renew such Real Property Leases to be forfeited or cancelled, except in connection with the rejection of any unexpired lease not prohibited by Section 8.01; provided that failure to make all payments or otherwise perform all obligations under any Real Property Lease with an annual payment of less than $100,000 per annum shall not breach this Section 6.16(b) if such non-compliance is reasonably determined by the Borrower to be necessary to re-negotiate the terms of such Real Property Lease or otherwise to help to decide whether to reject a Real Property Lease.

Section 6.17.    *[RESERVED]*

Section 6.18.    *First Day Orders.* Cause all proposed "first day" orders submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects.

Section 6.19.    *Mining Financial Assurances.* Maintain all material Mining Financial Assurances to the extent required pursuant to any Environmental Law.

Section 6.20.    *Post-Closing Obligations.* Perform the obligations set forth on Schedule 6.21, as and when set forth therein.

Section 6.21.    *Administration of Accounts and Inventory.* (a) If an Account of any Loan Party includes a charge for any taxes, the Administrative Agent is authorized, in its discretion, to pay the amount thereof to the proper taxing authority for the account of such Loan Party if such

Loan Party does not do so and to charge the Borrower therefor; *provided*, *however*, that neither the Administrative Agent nor the Lenders shall be liable for any taxes that may be due from the Loan Parties or with respect to any Collateral.

(b)    Whether or not a Default exists, the Administrative Agent shall have the right at any time, in the name of the Administrative Agent, any designee of the Administrative Agent or any Loan Party, to verify the validity, amount or any other matter relating to any Accounts of the Loan Party by mail, telephone or otherwise. The Loan Parties shall cooperate fully with the Administrative Agent in an effort to facilitate and promptly conclude any such verification process.

Section 6.22.  *Cash Management System*.

(a)    Upon the indefeasible repayment in full in cash of the ABL Obligations, and at all times thereafter, the applicable Loan Parties shall enter into and maintain a Blocked Account Agreement, satisfactory in form and substance to the Administrative Agent and the Required Lenders in their reasonable discretion, with respect to each Deposit Account into which payments in respect of the Accounts constituting ABL Priority Collateral are remitted.

(b)    Each Loan Party hereby acknowledges and agrees that (i) it has no right of withdrawal from the First Segregated Account, (ii) the funds on deposit in the Control Accounts shall at all times continue to be collateral security for all of the Obligations, and (iii) the funds on deposit in any Control Account shall, on the Termination Date and upon the exercise of remedies provided for in Section 9.02, be applied as provided in Section 9.03 of this Agreement and otherwise in accordance with Section 2.06 of this Agreement. In the event that, notwithstanding the provisions of this Section 6.22, a Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall promptly be deposited into the appropriate Control Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent. The Administrative Agent shall have sole access to the First Segregated Account at all times and each Loan Party shall take all actions necessary to grant the Administrative Agent such sole access. At no time shall any Loan Party remove any item from a lockbox or a Controlled Account without the prior written consent of the Administrative Agent (on behalf of the Required Lenders). If the amount on deposit in the First Segregated Account exceeds the Segregated Operating Account Cap, the Lenders agree that the Administrative Agent may comply with any request of the Borrower to transfer such excess to the Second Segregated Account.

(c)    The Borrower shall deposit or cause to be deposited:

(i)    into the First Segregated Account, all Net Cash Proceeds described in Section 2.06(b)(i) and all Extraordinary Receipts described in Section 2.06(b)(ii) in an amount up to the Segregated Operating Account Cap;

(ii)     into the Second Segregated Account, the excess of all amounts described in subclause (i) if an amount equal to or in excess of the Segregated Operating Account Cap is on deposit in the First Segregated Account; and

(iii)     into the DIP Loan Funding Account, all proceeds from any Borrowing.

(d)     Notwithstanding the foregoing or anything else herein to the contrary, the Loan Parties shall not be required to establish the DIP Loan Funding Account, the First Segregated Account or the Second Segregated Account until 15 days after the Closing Date (or such later date as the Required Lenders shall agree) and during such time cash required to be deposited into the DIP Loan Funding Account, First Segregated Account or Second Segregated Account shall instead be applied in accordance with the Interim Order (or when entered, the Final Order).  Within 30 days after the date hereof (or such later date as the Required Lenders shall agree in their sole discretion) the Borrower shall cause the DIP Loan Funding Account, the First Segregated Account and the Second Segregated Account to be made subject to a Blocked Account Agreement.

Section 6.23.   *[RESERVED]*

*Anti-Terrorism Laws*.  The Loan Parties, Subsidiaries and their respective Affiliates and agents shall not (a) conduct any business or engage in any transaction or dealing with any Sanctioned Entity, including the making or receiving any contribution of funds, goods or services to or for the benefit of any such Sanctioned Entity, except to the extent not in violation of Sanctions, or (b) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law or any Sanctions.

Section 6.25.   *No Unlawful Contributions or Other Payments*.  The Borrower and its Subsidiaries shall comply with the FCPA in all material respects and shall not use, directly or indirectly, any part of the proceeds of the Loans for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

Section 6.26.   *Milestones*.  The Loan Parties shall achieve the milestones set forth on Schedule 4.03 (collectively, the "**Milestones**" and individually a "**Milestone**") within the time on or prior to the corresponding dates set forth therein (as such time periods may be extended from time to time by the Required Lenders).

# ARTICLE 7
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than in respect of contingent obligations, indemnities and costs and expenses related thereto not then payable or in existence

as of the Termination Date), the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly:

Section 7.01.  *Liens.* Create, incur, assume or suffer to exist any Lien upon, or exception to title to, any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower or any of its Subsidiaries as debtor, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document and the Orders;

(b)    Liens on the property of the Borrower or any of its Subsidiaries existing on the date hereof and listed on Schedule 7.01;

(c)    Liens for (i) pre-petition Taxes that were not yet due on the Petition Date or which are being contested in good faith and by appropriate proceedings and (ii) post-petition Taxes not to exceed the Threshold Amount not yet due or which are being contested in good faith and by appropriate proceedings, *provided* that, adequate reserves with respect to both pre-petition and post-petition taxes are maintained on the books of the applicable Person in accordance with GAAP;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of the applicable Person.

(e)    easements, covenants, conditions, rights-of-way, zoning restrictions, other restrictions and other similar encumbrances which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(f)    Liens securing attachments or judgments for the payment of money not constituting an Event of Default under Section 9.01(h) or securing appeal or surety bonds related to such attachments or judgments;

(g)    Liens securing Indebtedness of the Borrower and its Subsidiaries permitted by Section 7.02(e) incurred to finance the acquisition of fixed or capital assets; *provided*, that (i) such Liens shall be created substantially simultaneously with the acquisition such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness (other than after-acquired title in or on such property and proceeds of the existing collateral in accordance with the instrument creating such Lien), (iii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the original purchase price of such property at the time it was acquired, and (iv) if the terms of such Indebtedness require any Lien hereunder to be subordinated to such Liens, then the Lien hereunder shall be subordinated on terms reasonably acceptable to the Required Lenders;

71

(h)     Liens securing Indebtedness of the Borrower and its Subsidiaries permitted by Section 7.02(c) and related obligations (in accordance with the priority set forth herein and in the Orders);

(i)     Liens on the property of the Borrower or any of its Subsidiaries, as a tenant under a lease or sublease entered into in the ordinary course of business by such Person, in favor of the landlord under such lease or sublease, securing the tenant's performance under such lease or sublease, as such Liens are provided to the landlord under applicable law and not waived by the landlord;

(j)     Liens arising from precautionary Uniform Commercial Code financing statement filings with respect to operating leases or consignment arrangements entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(k)     Liens on deposits of cash or Cash Equivalents securing letters of credit issued for the account of Debtors after the Closing Date; *provided, however*; the amount of such cash of Cash Equivalents shall not exceed 110% or the amount of any letter of credit secured;

(l)     Production Payments, royalties, dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with normal practices in the mining industry;

(m)     leases, subleases, licenses, sublicenses and rights-of-use granted to others incurred in the ordinary course of business and that do not materially and adversely affect the use of the property encumbered thereby for its intended purpose;

(n)     Liens in favor of a banking institution arising by operation of law or any contract encumbering deposits (including the right of set-off) held by such banking institutions incurred in the ordinary course of business and which are within the general parameters customary in the banking industry securing obligations not exceeding $1,000,000;

(o)     Liens on insurance policies and proceeds thereof or pledges and deposits in the ordinary course of business, in any such case, securing Indebtedness permitted by Section 7.02(n);

(p)     Liens on specific items of inventory and proceeds thereof securing the Borrower's or any Restricted Subsidiary's obligations (other than Indebtedness) in respect thereof arising in the ordinary course of business with respect to the purchase, shipment or storage of such inventory;

(q)     Deposits of cash to secure obligations permitted by Section 7.02(m);

(r)     rights of owners of interests in overlying, underlying or intervening strata and/or mineral interests not owned by Borrower or one of its Subsidiaries, with respect to tracts of real property where the Borrower or applicable Subsidiary's ownership is only surface or severed mineral or is otherwise subject to mineral severances in favor of one or more third parties; and

(s)    other defects and exceptions to title of real property where such defects or exceptions are not material to the value of such real property.

Section 7.02.    *Indebtedness.* Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 7.02;

(c)    Indebtedness under (i) the Existing ABL Credit Agreement, (ii) the Existing LC/Term Credit Agreement and (iii) the Existing Junior Notes, in each case in an amount not to exceed the aggregate principal amount outstanding on the Closing Date plus accrued but unpaid interest and fees thereon and in respect thereof, including any capitalized interest;

(d)    Guarantees of the Borrower or any of its Subsidiaries in respect of Indebtedness otherwise permitted hereunder of the Borrower or any other Loan Party;

(e)    Indebtedness in respect of Capital Lease Obligations and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(g); provided, however, that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $5,000,000 plus such Indebtedness in existence on the Closing Date and listed on Schedule 7.02; *provided, further*, that to the extent any such Indebtedness represents financing with respect to assets that eliminates the need to make cash expenditures for such assets, which cash expenditures were included as projected operating cash disbursements for "cap ex" in the Budget, the projected aggregate operating cash expenditures of the Debtors in the Budget for the Testing Period in which such Indebtedness was incurred shall be reduced to such extent;

(f)    Indebtedness in respect of Swap Contracts approved by the Bankruptcy Court incurred in the ordinary course of business for non-speculative purposes and consistent with past business practice; *provided, however* that the notional amount of (i) such Swap Contracts shall not exceed $5,000,000 in the aggregate at any one time outstanding;

(g)    Indebtedness of the Borrower or any other Loan Party to any other Loan Party and of any non-Loan Party Subsidiary to any Loan Party or any other non-Loan Party Subsidiary; *provided*, that such Indebtedness must be subordinated to the Obligations on customary terms;

(h)    Intercompany current liabilities between Loan Parties incurred in the ordinary course of business of such Loan Parties;

(i)    *[Reserved]*;

(j)    Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections and similar arrangements in each case in connection with deposit accounts and in the ordinary course of business;

73

(k)      Indebtedness representing deferred or equity compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(l)      letters of credit issued after the Closing Date in an aggregate face amount not to exceed $5,000,000;

(m)      Indebtedness in the form of bank guaranties, bid, performance and reclamation bonds, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and

(n)      Indebtedness consisting of the financing of insurance premiums.

Section 7.03.   *Investments.* Make or hold any Investments, except:

(a)      Investments held by the Borrower or any of its Subsidiaries in the form of Cash Equivalents;

(b)      advances to officers, directors and employees of the Borrower and Subsidiaries in an aggregate amount not to exceed $500,000 at any time outstanding subject to Bankruptcy Court approval, for travel, entertainment, relocation and analogous ordinary business purposes;

(c)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(d)      Investments (including debt obligations and Equity Interests) received in satisfaction of judgments or in connection with the bankruptcy or reorganization of suppliers and customers of the Borrower and its Subsidiaries and in settlement of delinquent obligations of, and other disputes with, such customers and suppliers arising in the ordinary course of business;

(e)      Investments in the nature of Production Payments, royalties, dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties with normal practices in the mining industry;

(f)      Investments existing on the date hereof and set forth on Schedule 7.03;

(g)      promissory notes, royalty payments and other similar non-cash consideration received by the Borrower and its Subsidiaries in connection with Dispositions not otherwise prohibited under this Agreement;

(h)      Permitted Land Swaps, to the extent constituting Investments;

(i)      Swap Contracts permitted under Section 7.02(f);

(j)      Investments by the Borrower or its Subsidiaries in any Loan Party and Investments by any non-Loan Party in any other non-Loan Party; *provided*, that if the Investment

is in the form of Indebtedness, such Indebtedness must be permitted pursuant to Section 7.02(g); and

(k)     Investments by the Borrower or any of its Subsidiaries not otherwise permitted under this Section 7.03 in an aggregate amount not in excess of $100,000.

Section 7.04.   *Fundamental Changes.* Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)     any Subsidiary may merge with (i) the Borrower, provided, that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, provided, that when any Subsidiary that is a Loan Party is merging with another Subsidiary, the Loan Party shall be the continuing or surviving Person and the security interests granted by such Loan Party pursuant to the Orders and the Collateral Documents shall remain in full force and effect;

(b)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary; provided, that if the transferor in such a transaction is a Loan Party, then the transferee must either be the Borrower or another Loan Party and the security interests granted by such Loan Party pursuant to the Orders and the Collateral Documents shall remain in full force and effect;

(c)     the Borrower and any Subsidiary may merge or consolidate with any other Person in a transaction in which the Borrower is the surviving or continuing Person;

(d)     the Borrower and its Subsidiaries may consummate any transaction that would be permitted as an Investment under Section 7.03; and

(e)     the Borrower and its Subsidiaries may consummate any transaction that is expressly permitted by the Acceptable Reorganization Plan.

Section 7.05.   *Dispositions.* Make any Disposition, except:

(a)     Dispositions of used, worn out, obsolete or surplus property by the Borrower or any of its Subsidiaries in the ordinary course of business or the abandonment or allowance to lapse or expire or other Disposition of Intellectual Property in the ordinary course of business that is, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the Borrower and its Subsidiaries taken as a whole;

(b)     Dispositions of inventory in the ordinary course of business;

(c)     Dispositions of equipment to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)     Permitted Land Swaps;

(e)     *[Reserved]*;

(f)     [*Reserved*];

(g)     Dispositions of Additional Assets by the Borrower and its Subsidiaries not otherwise permitted under this Section 7.05; *provided*, that, with respect to clauses (a), (b) and (e) of the definition of Additional Assets (but not for the avoidance of doubt clauses (c) and (d)), at least 75% of the consideration received in respect of any such Disposition shall be cash or Cash Equivalents; provided further that the following shall be deemed to be cash: (A) any liabilities (as shown on the Borrower's or Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) (including contingent reimbursement obligations with respect to letters of credit) of the Borrower or its Restricted Subsidiaries, other than liabilities that are by their terms subordinated to the payment in cash of the Secured Obligations, that are assumed by the transferee with respect to the applicable Disposition pursuant to a customary assumption or similar agreement and for which the Borrower and its Restricted Subsidiaries shall have been validly released by all applicable creditors in writing and (B) any letters of credit with respect to the reimbursement of which the Borrower or its Restricted Subsidiaries are obligated, to the extent such letters of credit related to the assets or business subject to such Disposition and are cancelled no later than 60 days following such Disposition;

(h)     so long as no Default shall occur and be continuing, the grant of any option or other right to purchase any asset in a transaction that would be permitted under the provisions of this Section 7.05;

(i)     assignments, licenses, sublicenses of Intellectual Property in the ordinary course of business and in accordance with the applicable Collateral Documents; *provided*, *however*, that any license or sublicense of intellectual property shall be on a non-exclusive basis;

(j)     sales or discounts (without recourse) of accounts receivable arising in the ordinary course of business in connection with the compromise of collection thereof;

(k)     sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangement between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements; and

(l)     transfers of property subject to casualty or condemnation events upon receipt of the Net Cash Proceeds constituting an Extraordinary Receipt.

*provided*, *however*, that any Disposition pursuant to Section 7.05(a), (b), (c), (g) and (l) and shall be for Fair Market Value.

Section 7.06.   *Restricted Payments.* Declare or make, directly or indirectly, any Restricted Payment; except that each Subsidiary may make Restricted Payments to the Borrower and the Subsidiary Guarantors, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made; *provided* that no Default shall

KL2 2896702.11

have occurred and be continuing at the time of such Restricted Payment or would result therefrom.

Section 7.07. *Change in Nature of Business.* Engage in any material line of business other than a Similar Business.

Section 7.08. *Transactions With Affiliates.* Enter into any transaction of any kind with any Affiliate, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, unless such transaction is (a) not prohibited by this Agreement and (b) upon fair and reasonable terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate. The foregoing restrictions shall not apply to the following:

(a)    transactions between or among the Borrower and any other Loan Parties or between and among any Loan Parties;

(b)    the payment of reasonable and customary fees and reimbursement of expenses payable to directors of the Borrower or any Subsidiary or to any Plan, Plan administrator or Plan trustee;

(c)    loans and advances to directors, officers and employees to the extent permitted by Section 7.03;

(d)    arrangements with respect to the procurement of services of directors, officers, independent contractors, consultants or employees in the ordinary course of business and the payment of customary compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and reasonable reimbursement arrangements in connection therewith;

(e)    payments to directors and officers of the Borrower and its Subsidiaries in respect of the indemnification of such Persons in such respective capacities from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, as the case may be, pursuant to the Organization Documents or other corporate action of the Borrower or its Subsidiaries, respectively, or pursuant to applicable law; and

(f)    Permitted Land Swaps between or among Loan Parties.

Section 7.09. *Burdensome Agreements.* Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrower or any Subsidiary Guarantor or to otherwise transfer property to or invest in the Borrower or any Subsidiary Guarantor, except (y) such Contractual Obligations could not reasonably be expected to materially hinder the Borrower's ability to meet its obligations under this Agreement and (z) restrictions on assets that are being sold or otherwise disposed of pending a sale of such assets; provided that such sale or other disposition shall be permitted hereunder or result in the repayment in full of the Obligations (other than contingent indemnity and reimbursement obligations).

Section 7.10.   *Use of Proceeds.* Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

Section 7.11.   *Variance from Budget and Projected Revenues..*  As of the last day of each calendar week  which is also the end of a Testing Period (for purposes of this section, each calendar week being deemed to end on Friday), permit (x) the amount of actual Cumulative Net Cash Flow for the Testing Period ending at the end of such week minus (y) the projected amount of Cumulative Net Cash Flow set forth in the Budget for such Testing Period, if (x) minus (y) is a positive number, to be greater than the greater of (A) $5.0 million and (B) 20% of the projected amount of Cumulative Net Cash Flow set forth in the Budget for such Testing Period.  For the avoidance of doubt, the parties hereto acknowledge and confirm that the covenant in this Section 7.11 measures, at the end of each applicable Testing Period, cumulative variance for the period from the first day of the first calendar week of the Budget and ending with the last day of such applicable Testing Period.  "***Cumulative Net Cash Flow***" shall mean, for any period of determination, the aggregate operating cash expenditures of the Debtors during such period (excluding professional fees and expenses and other "non-operating" line items in the Budget), expressed as a positive number, minus the amount of aggregate operating cash receipts for the Debtors during such period (in each case calculated on an actual and not a GAAP basis).

Section 7.12.   *Amendments of Organization Documents.* Amend any of its Organization Documents in any respect materially adverse to the Lenders.

Section 7.13.   *Accounting Changes.* Make any change in (a) its accounting policies or reporting practices, except as required or permitted by GAAP, or (b) its fiscal year.

Section 7.14.   *Prepayments, Etc. of Indebtedness.* Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any (i) Indebtedness of any Loan Party incurred prior to the Petition Date except as contemplated by the Orders, (ii) any Indebtedness under the Existing Credit Agreements, except as contemplated by the Orders, or (iii) any other Indebtedness that is subordinated to the Obligations.

Section 7.15.   *Amendment, Etc..* Amend, modify or change in any manner any First Day Order in any material respect without the prior consent of the Required Lenders or take any other action that would materially impair the value of the interest or rights of any Loan Party thereunder or that would materially impair the ability of the Lenders to be repaid hereunder.

Section 7.16.   *Limitation on Negative Pledge Clauses*.  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) after the Petition Date that limits the ability of the Borrower or any Subsidiary Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property to secure the Obligations hereunder; *provided*, *however*, that the foregoing clause shall not apply to Contractual Obligations which:

(a)        *[Reserved]*;

KL2 2896702.11

(b)     *[Reserved]*;

(c)     *[Reserved]*;

(d)     *[Reserved]*;

(e)     are restrictions on cash or other deposits that are subject to a Lien permitted by Section 7.01;

(f)     arise in connection with any Permitted Land Swap or other Disposition permitted by Section 7.05 or that are conditioned on payment in full of the Obligations (other than contingent indemnification and reimbursement obligations), with respect to the assets so Disposed;

(g)     *[Reserved]*;

(h)     Are customary restrictions on leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby, other than with respect to any Material Leased Real Property, so long as such restrictions relate to the assets subject thereto;

(i)     are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Subsidiary, other than with respect to any Material Leased Real Property;

(j)     are customary limitations (including financial maintenance covenants) existing under or by reason of leases entered into in the ordinary course, other than with respect to any Material Leased Real Property;

(k)     are restrictions on cash or other deposits imposed under contracts entered into in the ordinary course of business, other than with respect to any Material Leased Real Property; or

(l)     are customary provisions restricting assignment of any, other than agreements with respect to any Material Leased Real Property.

Section 7.17.  *Minimum Liquidity*. Permit Liquidity, as of the close of business on any day, to be less than $1,000,000.

## ARTICLE 8
### REAL PROPERTY LEASES

Section 8.01.  *Special Rights with respect to Real Property Leases*.  (a) No Loan Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, (x) reject a Real Property Lease or otherwise terminate a Real Property Lease (including, without limitation, as a result of the expiration of the assumption period provided for in Section 365(d)(4) of the Bankruptcy Code) or (y) sell or assign any Real Property Lease, in each case, during the continuance of an Event of Default without first providing 30 days' prior written notice (or, if applicable, notice that such Loan Party will seek to extend the Automatic Rejection Date as

provided in Section 365(d)(4) of the Bankruptcy Code) to the Administrative Agent (unless such notice provision is waived by the Required Lenders in their sole discretion) during which time the Lenders shall be permitted to find an acceptable (in the Required Lenders' good faith and reasonable discretion) replacement lessee (which may include a Lender or its Affiliates) to whom such Real Property Lease may be assigned. If such a prospective assignee is timely found, the Loan Parties shall (i) not seek to reject such Real Property Lease, (ii) promptly withdraw any previously filed rejection motion, (iii) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such Real Property Lease and assigning it to such prospective assignee and (iv) cure any defaults that have occurred and are continuing under such Real Property Lease; *provided* that this Section 8.01(a) shall not apply to Real Property Leases that are rejected, sold or assigned (A) pursuant to a filing which is acceptable to the Administrative Agent on the Petition Date or (B) on the effective date of an Acceptable Reorganization Plan. For the avoidance of doubt, it is understood and agreed that or prior to the 30th day prior to the Automatic Rejection Date, the Loan Parties shall have delivered (and hereby agree to deliver) written notice to the Administrative Agent of each outstanding Real Property Lease that they intend to reject (including, without limitation, through automatic rejection on the Automatic Rejection Date) from and after the date of such notice (or, if applicable, notice that the Loan Parties will seek to extend the Automatic Rejection Date as provided in Section 365(d)(4) of the Bankruptcy Code); *provided* that if the Loan Parties fail to deliver any such notice to the Administrative Agent prior to such date with respect to any such Real Property Lease (or a notice indicating that no such Real Property Leases shall be rejected), the Loan Parties shall be deemed, for all purposes hereunder, to have delivered notice to the Administrative Agent as of such date that it intends to reject all outstanding Real Property Leases.

(b)        If an Event of Default shall have occurred and be continuing, the Administrative Agent may exercise any Debtor's rights pursuant to section 365(f) of the Bankruptcy Code with respect to any Real Property Lease or group of Real Property Leases and, subject to the Bankruptcy Court's approval after notice and hearing, assign any such Real Property Lease in accordance with section 365 of the Bankruptcy Code notwithstanding any language to the contrary in any of the applicable lease documents or executory contracts. In connection with the exercise of such rights, the Administrative Agent or the Lenders may (but shall not be obligated to) (x) find an acceptable (in the Administrative Agent's or the Required Lenders' good faith and reasonable discretion) replacement lessee (which may include a Lender or its Affiliates) to whom a Real Property Lease may be assigned, (y) hold, and manage all aspects of, an auction or other bidding process to find such reasonably acceptable replacement lessee, and (z) in connection with any such auction, agree, on behalf of the Loan Parties, to a break-up fee or to reimburse fees and expenses of any stalking horse bidder up to an amount not to exceed 3.00% of the purchase price of such Real Property Lease and may make any such payments on behalf of such Loan Party and any amount used by the Lenders to make such payments shall, at the election of the Required Lenders in their sole discretion and subject to satisfaction of the conditions in Section 4.02, be deemed a Borrowing hereunder. Upon receipt of notice that the Administrative Agent or Required Lenders elect to exercise their rights under this Section 8.01(b), the Loan Parties shall promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of assuming such Real Property Lease and assigning it to such assignee and (iv) cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.01(b) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable

80

Reorganization Plan. Nothing in this Article 8 shall obligate the Administrative Agent to expend its own funds.

(c)    If an Event of Default shall have occurred and be continuing, the Administrative Agent shall have the right (but not the obligation) to direct any Debtor that is a lessee under a Real Property Lease to assign such Real Property Lease to the Administrative Agent, on behalf of the Secured Parties, as collateral for the Obligations and to direct such Debtor lessee to assume such Real Property Lease to the extent assumption is required under the Bankruptcy Code as a prerequisite to such assignment. Upon receipt of notice that the Administrative Agent elects to exercise its rights under this Section 8.01(c), the Loan Parties shall (i) promptly file a motion seeking expedited relief and a hearing on the earliest court date available for purposes of, if necessary, assuming such Real Property Lease and assigning it to the Administrative Agent and (ii) cure any defaults that have occurred and are continuing under such Real Property Lease. Notwithstanding the foregoing, this Section 8.01(c) shall not apply to Real Property Leases that are rejected on the effective date of an Acceptable Reorganization Plan.

(d)    Any order or the Bankruptcy Court approving the assumption of any Real Property Lease shall (i) specifically provide that the applicable Debtor shall be authorized to assign such Real Property Lease pursuant to section 365(f) of the Bankruptcy Code subsequent to the date of such assumption or (ii) provide for the assignment of such Real Property Lease, on the date of such order, to a reasonably acceptable (in the Required Lenders' good faith and reasonable discretion) replacement lessee (which may include a Lender or its Affiliates) designated by the Administrative Agent.

(e)    No Loan Party shall, nor shall it permit any of its Subsidiaries to, pursuant to Section 365 of the Bankruptcy Code, sell or assign a Real Property Lease without first providing 5 Business Days' prior written notice (the "**Initial Notice Period**") to the Administrative Agent (unless such notice provision is waived by the Required Lenders in their sole discretion), which Initial Notice Period may be extended up to a further 25 days by the Required Lenders in their sole discretion by delivering written notice of such extension to such Loan Party prior to expiration of the Initial Notice Period, and by any further period as is mutually agreeable between the Administrative Agent and such Loan Party (such notice period being the "**Aggregate Notice Period**"). During such Aggregate Notice Period, the Administrative Agent, on behalf of the Secured Parties, shall be permitted (but not obligated) to credit bid forgiveness of some or all of the outstanding Obligations (in an amount equal to at least the consideration offered by any other party in respect of such assignment) as consideration in exchange for any such Real Property Lease. In connection with the exercise of any of the Administrative Agent's rights under Sections 9.01 and 9.02(e) to direct or compel a sale or assignment of any Real Property Lease, the Administrative Agent, on behalf of the Secured Parties, shall be permitted (but not obligated) to credit bid forgiveness of a portion of the Indebtedness (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) outstanding under the Term Loans in exchange for such Real Property Lease. For the avoidance of doubt, the rights of the Administrative Agent under this Section 8.01(e) are in addition to any rights it may have under Section 7.05(g).

(f)    If any Loan Party is required to cure any monetary default under any Real Property Lease under this Section 8.01, or otherwise in connection with any assumption of such

81

Real Property Lease pursuant to section 365 of the Bankruptcy Code, and such monetary default is not cured within five Business Days of the receipt by such Loan Party of notice from the Administrative Agent under Section 8.01(a), (b) or (c) or any other notice from the Administrative Agent requesting the cure of such monetary default, then the Administrative Agent may (but shall not be obligated) cure any such monetary default on behalf of such Loan Party and any such payments shall, at the election of the Administrative Agent in its sole discretion and subject to satisfaction of the conditions in Section 4.02, be deemed a Borrowing hereunder.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

Section 9.01.   *Events of Default.* Any of the following shall constitute an Event of Default:

(a)   *Non-Payment*. The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan or (ii) within three days after the same becomes due, any interest on any Loan, any fee due hereunder, or any other amount payable hereunder or under any other Loan Document; or

(b)   *Specific Covenants*. (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03, 6.05, 6.07, 6.08, 6.10, 6.11, 6.12, 6.15, 6.16, 6.18, 6.20, 6.22, 6.23, 6.24, 6.25or 6.26  or Articles 7 or 8, (ii) any of the Subsidiary Guarantors to perform or observe any term, covenant or agreement contained in Article 11 of this Agreement (but only to the extent it relates to a default under one of the covenants listed in clause (i) above), (iii) any representation, warranty, certification or statement of fact made or deemed made under Section 2.04(a) by or on behalf of the Borrower shall be incorrect or misleading in any material respect when made or deemed made or (iv) any of the Loan Parties fails to perform or observe any term, covenant or agreement contained in Section 10 of the Security Agreement; or

(c)   *Other Defaults*. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 9.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)   *Representations and Warranties*. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)   *Cross-Default*. (i) The Borrower or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder, Indebtedness under Swap Contracts or Guarantees of the Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date), in each case having an aggregate principal amount (including undrawn committed or available amounts and including amounts

82

owing to all creditors under any combined or syndicated credit agreement) of more than the Threshold Amount, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee was created or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity, or such Guarantee to become due or payable; or (ii) there occurs under any Swap Contract (excluding any Swap Contract that was entered into prior to the Petition Date) an Early Termination Date (as defined under such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than the Threshold Amount; or

(f)     *[Reserved]*; or

(g)     *Challenges*. Any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations; or

(h)     *Judgments*. There is entered against the Borrower or any of its Subsidiaries one or more final judgments or orders with respect to any post-petition liability for the payment of money that arose post-petition in an aggregate amount (as to all such judgments and orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance), and, such judgments or orders are required to be satisfied as an administrative expense claim shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i)     *ERISA*. (i) The occurrence of any of the following events that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect: (i) an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in an actual obligation to pay money of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or

(j)     *Invalidity of Loan Documents*. Any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)     *Change of Control*. There occurs any Change of Control; or

(l)     *Collateral Documents*. Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 shall for any reason (other than pursuant to the terms hereof or thereof, including as a result of a transaction permitted by Section 7.04 or 7.05) cease to create a valid and perfected Lien, with the priority required hereby or thereby (subject to Liens permitted by Section 7.01), on the Collateral purported to be covered thereby, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied or failed to acknowledge coverage; or

(m)     *[Reserved]*.

(n)     *Dismissal or Conversion of Cases*. (i) Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any Case of any Debtor under Section 1112 of the Bankruptcy Code or otherwise, (ii) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within 30 days after the entry thereof;

(o)     *Superpriority Claims*. An order of the Bankruptcy Court shall be entered granting any Superpriority Claim or other claim or administrative expense (other than the Carve-Out) in any of the Cases of the Debtors that is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders against any Borrower or any other Loan Party hereunder or under any of the other Loan Documents, or any Debtor takes any action seeking or supporting the grant of any such claim, except as expressly permitted hereunder; or

(p)     *Relief from Automatic Stay*. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $10,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(q)     *Certain Orders*.  The Final Order Entry Date shall not have occurred by June 19, 2015; or

(i)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of five days or more, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or the Borrower or any Subsidiary of the Borrower shall apply for authority to do so,

84

without the prior written consent of the Required Lenders, and such order is not reversed or vacated within 5 days after the entry thereof; or

       (ii)     an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties; or

       (iii)    the Interim Order or Final Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

       (iv)    any of the Loan Parties shall fail to comply with the Orders; or

       (v)     a final non-appealable order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that is materially adverse to the Administrative Agent, the Lenders or their respective rights and remedies under the Facility in any of the Cases or inconsistent with any of the Loan Documents; or

       (r)    *Pre-Petition Payments*. Except as permitted by the Orders, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with "first day" orders of the Bankruptcy Court satisfactory to the Required Lenders or by other orders entered by the Bankruptcy Court with the consent of (or non-objection by) the Required Lenders; *provided*, *however*, that in no event shall the Debtors make any Pre-Petition Payment to the extent prohibited by the Interim Order; or

       (s)    *Invalid Plans*. Either (i) a Reorganization Plan that is not an Acceptable Reorganization Plan or (ii) a schedule providing for the idling, closing and/or sale of the Debtors' operations that is not an acceptable to the Required Lenders shall be confirmed in any of the Cases of the Debtors, or any order shall be entered by the Bankruptcy Court which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) or any other treatment of the Obligations or Commitments that is not acceptable to the Required Lenders, or any of the Debtors shall seek, support or fail to contest in good faith confirmation of any such plan or entry of any such order; or

       (t)    *Supportive Actions*. Any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in paragraphs (n) through (s), above or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

       (u)    Any Material Lease is terminated by the lessor of such Material Leased Real Property and such termination is not (a) being contested in good faith by appropriate proceedings diligently conducted or (b) stayed in its effectiveness by the Bankruptcy Code by virtue of the commencement of the Cases or by the Bankruptcy Court.

       Section 9.02.  *Remedies Upon Event of Default.*  (a) If any Event of Default occurs and is continuing, the Administrative Agent shall (subject to receipt of indemnification satisfactory to it

from the Required Lenders), at the direction of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(i)       declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(ii)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(iii)     subject to the provisions of Section 10 of the Security Agreement and the Orders, exercise on behalf of itself, the Lenders all rights and remedies available to it, such Lenders under the Loan Documents or applicable law (including in respect of the Collateral);

(iv)      require any Loan Party to promptly complete, pursuant to Section 363 and 365 of the Bankruptcy Code, subject to the rights of the Secured Parties to credit bid, a Disposition of its Real Property Leases or any portion thereof in one or more parcels at public or private sales, at any of the Administrative Agent's offices or elsewhere, for cash, at such time or times and at such price or prices and upon such other terms as the Administrative Agent may deem commercially reasonable; or

(v)       exercise any of its rights with respect to Real Property Leases under Section 8.01;

*provided*, *however*, that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (iii), (iv) and (v), the Administrative Agent shall provide the Borrower (with a copy to counsel for the Creditors' Committee in the Cases and to the United States Trustee) with three Business Days' prior written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing.

(b)       Upon the occurrence of the Termination Date, (i) the Commitments of each Lender to make Loans and the Commitments of each Lender shall each automatically be terminated, (ii) the Loans, all interest thereon and all other amounts and Obligations shall automatically become due and payable in cash, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrower and the other Loan Parties.

Section 9.03.  *Application of Funds.*  Subject to the Security Agreement and the Orders, on the Termination Date and after the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article 3) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender)) and amounts payable under Article 3, ratably among them in proportion to the respective amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause *Third* payable to them; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law;

*provided*, that the application to the Obligations pursuant to this Section 9.03 of amounts received in respect of Collateral that is ABL Priority Collateral is expressly subject to the priorities set forth in the Interim Order (and, when entered, the Final Order), and all such amounts shall first be allocated in accordance with such priorities before any remaining proceeds being applied to the Obligations pursuant to this Section 9.03.

# ARTICLE 10
### ADMINISTRATIVE AGENT

Section 10.01. *Authorization and Action.* (a) Each Lender hereby appoints Cantor as the Administrative Agent hereunder and each such Lender authorizes such Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to such Administrative Agent under such agreements and to exercise such powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby authorizes the Administrative Agent to execute and deliver, and to perform its obligations under, each of the Loan Documents to which the Administrative Agent is a party, to exercise all rights, powers and remedies that the Administrative Agent may have under such Loan Documents and, in the case of the Collateral Documents, to act as collateral agent for the Lenders and other Secured Parties under such Collateral Documents. The provisions of this Article 10 are solely for the benefits of the Administrative Agent and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any such provision

(b)     As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement or collection), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (accompanied by indemnity satisfactory to the Administrative Agent against all loss, liability and expense which may be incurred by it by

87

reason of taking such action or following such direction), (or such other number or percentage of the Lenders as shall be necessary, or that the Administrative Agent shall believe in good faith to be necessary), and such instructions shall be binding upon all Lenders; *provided*, that the Administrative Agent shall not be required to take any action that in its opinion or in the opinion of its counsel, may require it to expend its own funds, expose it to liability or that is contrary to the Loan Documents or applicable Requirements of Law, including, without limitation, any action that may be in violation of the automatic stay under any Requirement of Law relating to bankruptcy, insolvency or reorganization or relief of debtors. The Administrative Agent shall be deemed not to have knowledge of any Default or the event or events that give rise to any Default unless and until the Borrower or any Lender shall have given written notice to the Administrative Agent describing such Default and such event or events.

(c)     In performing its functions and duties hereunder and under the other Loan Documents, the Administrative Agent is acting solely on behalf of the Lenders (except to the limited extent provided in Section 12.06(c)), and its duties are entirely ministerial and administrative in nature. The Administrative Agent does not assume and shall not be deemed to have assumed any duties or obligations other than as expressly set forth herein and in the other Loan Documents. The Administrative Agent may perform any of its duties under any Loan Document by or through its agents or employees. It is understood and agreed that the use of the term "administrative agent" herein or in any other Loan Document (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, regardless of whether an Event of Default shall have occurred or be continuing. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(d)     Neither the Administrative Agent may perform any and all of its functions and duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its functions and duties and exercise its rights and powers by or through their respective Affiliates. Each such sub- and the Affiliates of the Administrative Agent and each such sub-agent shall be entitled to the benefits of all provisions of this Article 10 and Section 12.04 (as though such sub-agents were the "Administrative Agent" under the Loan Documents) as if set forth in full herein with respect thereto. Each such sub-agent shall be required to comply with the provisions of Article 3 to the same extent as if it were the Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any of its sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct, in each case, as determined by a court of competent jurisdiction in a final, non-appealable judgment, in the selection of such sub-agent.

(e)     The Administrative Agent nor any member of the Agent's Group shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty, representation or other information made or supplied in or in connection with this Agreement, any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith or the adequacy, accuracy and/or

completeness of the information contained therein, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the perfection or priority of any Lien or security interest created or purported to be created by the Orders or the Collateral Documents or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than (but subject to the foregoing clause (ii)) to confirm receipt of items expressly required to be delivered to the Administrative Agent. Neither the Administrative Agent nor any member of the Agent's Group shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for a failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by a Person serving as an agent or any of its Affiliates in any capacity.

(f)     Nothing in this Agreement or any other Loan Document shall require the Administrative Agent or any of its Related Parties to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Administrative Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Administrative Agent or any of its Related Parties.

Section 10.02. *Administrative Agent's Reliance, Etc.*  Neither the Administrative Agent nor any of its Affiliates or any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it, him, her or them under or in connection with this Agreement or the other Loan Documents, except for its, his, her or their gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment. Without limiting the foregoing, the Administrative Agent (a) may treat the payee of any Note as its holder until such Note has been assigned in accordance with Section 12.06(b) may rely on the Register to the extent set forth in Section 12.06(c), may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon, (d) may consult with legal counsel (including counsel to the Borrower or any other Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts, (e) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made by or on behalf of any Loan Party in or in connection with this Agreement or any other Loan Document, (f) shall not have any duty to ascertain or to inquire either as to the performance or observance of any term, covenant or condition of this Agreement or any other Loan Document, as to the financial condition of any Loan Party or as to the existence or possible existence of any Default or Event of Default, (g) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto or thereto and (h) shall be entitled to rely on, and shall incur no liability under or in respect of this Agreement or any other Loan Document by relying on or acting upon any notice, request, statement, document, consent, certificate or other instrument or writing (including any electronic message, internet or intranet website posting or other distribution) or any telephone message believed by it to be genuine and signed, sent or otherwise

89

authenticated by the proper party or parties. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless an officer of the Administrative Agent responsible for the transactions contemplated hereby shall have received notice to the contrary from such Lender prior to the making of such Loan, and in the case of a Borrowing, such Lender shall not have made available to the Administrative Agent, such Lender's Ratable Portion of such Borrowing.

Section 10.03. *Posting of Approved Electronic Communications.* (a) Each of the Lenders and each Loan Party agree that the Administrative Agent may, but shall not be obligated to, make the Approved Electronic Communications available to the Lenders by posting such Approved Electronic Communications on IntraLinks or a substantially similar electronic platform chosen by the Administrative Agent to be its electronic transmission system (the "Approved Electronic Platform").

(b)     Although the Approved Electronic Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a dual firewall and a User ID/Password Authorization System) and the Approved Electronic Platform is secured through a single-user-per-deal authorization method whereby each user may access the Approved Electronic Platform only on a deal-by-deal basis, each of the Lenders and each Loan Party acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution. In consideration for the convenience and other benefits afforded by such distribution and for the other consideration provided hereunder, the receipt and sufficiency of which is hereby acknowledged, each of the Lenders and each Loan Party hereby approves distribution of the Approved Electronic Communications through the Approved Electronic Platform and understands and assumes the risks of such distribution.

(c)     The Approved Electronic Platform and the Approved Electronic Communications are provided "as is" and "as available". Neither the Administrative Agent nor any of its Affiliates or any of their respective officers, directors, employees, agents, advisors or representatives (each, an "**Agent Affiliate**") warrant the accuracy, adequacy or completeness of the Approved Electronic Communications or the Approved Electronic Platform and each expressly disclaims liability for errors or omissions in the Approved Electronic Platform and the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Agent Affiliates in connection with the Approved Electronic Platform or the Approved Electronic Communications.

(d)     Each of the Lenders and each Loan Party agree that the Administrative Agent may, but (except as may be required by applicable law) shall not be obligated to, store the Approved Electronic Communications on the Approved Electronic Platform in accordance with the Administrative Agent's generally-applicable document retention procedures and policies.

(e)     The Borrower hereby acknowledges that certain of the Lenders may be "public-side" Lenders (*i.e.*, Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "**Public Lender**"). The Borrower hereby agrees that so long as the Borrower is the issuer of any outstanding debt or equity securities that are registered or issued pursuant to a private offering or is actively contemplating issuing any such securities (w) all materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat the Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent the Borrower Materials constitute Information, they shall be treated as set forth in Section 12.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (z) the Administrative Agent shall be entitled to treat the Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor." Notwithstanding the foregoing, the Borrower shall not be under any obligation to mark the Borrower Materials "PUBLIC." In connection with the foregoing, each party hereto acknowledges and agrees that the foregoing provisions are not in derogation of their confidentiality obligations under Section 12.07.

Section 10.04. *The Administrative Agent Individually*. With respect to its Ratable Portion, Cantor shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender. The terms "*Lenders*", "*Required Lenders*" and any similar terms shall, unless the context clearly otherwise indicates, include, without limitation, Cantor in its individual capacity as a Lender or as one of the Required Lenders. Cantor and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with, any Loan Party as if Cantor were not acting as the Administrative Agent.

Section 10.05. *Activities of Agent's Group*.  (a) Each Lender understands that Cantor, acting in its individual capacity, and its Affiliates (collectively, the "Agent's Group") are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (such services and businesses are collectively referred to in this Section 10.05(a) as "*Activities*") and may engage in the Activities with or on behalf of one or more of the Loan Parties or their respective Affiliates. Furthermore, the Agent's Group may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Loan Parties and their Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Borrower, other Loan Parties or their respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of one or more of the Loan Parties or their Affiliates. Each Lender understands and agrees that in engaging in the Activities, the Agent's Group may receive or otherwise obtain information concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) which information may not be available to any

91

of the Lenders that are not members of the Agent's Group. Neither the Administrative Agent nor any member of the Agent's Group shall have any duty to disclose to any Lender or use on behalf of the Lenders and shall not be liable for the failure to so disclose or use any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Parties) or to account for any revenue or profits obtained in connection with the Activities, except that the Administrative Agent shall deliver or otherwise make available to each Lender such documents as are expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lenders.

(b)     Each Lender further understands that there may be situations where members of the Agent's Group or their respective customers (including the Loan Parties and their Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Lenders (including the interests of the Lenders  hereunder and under the other Loan Documents). Each Lender agrees that no member of the Agent's Group is or shall be required to restrict its activities as a result of the Person serving as the Administrative Agent being a member of the Agent's Group, and that each member of the Agent's Group may undertake any Activities without further consultation with or notification to any Lender. None of (i) this Agreement nor any other Loan Document, (ii) the receipt by the Group of information (including Information) concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) nor (iii) any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) owing by the Administrative Agent or any member of the Agent's Group to any Lender including any such duty that would prevent or restrict the Agent's Group from acting on behalf of customers (including the Loan Parties or their Affiliates) or for its own account.

Section 10.06. *Lender Credit Decision*.  (a) Each Lender confirms to the Administrative Agent, each other Lender and each of their respective Related Parties that it (i) possesses (individually or through its Related Parties) such knowledge and experience in financial and business matters that it is capable, without reliance on the Administrative Agent, any other Lender or any of their respective Related Parties, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Agreement, (y) making Loans and other extensions of credit hereunder and under the other Loan Documents and (z) taking or not taking actions hereunder and thereunder, (ii) is financially able to bear such risks and (iii) has determined that entering into this Agreement and making Loans and other extensions of credit hereunder and under the other Loan Documents is suitable and appropriate for it.

(b)     Each Lender acknowledges that (i) it is solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with this Agreement and the other Loan Documents, (ii) that it has, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, made its own appraisal and investigation of all risks associated with, and its own credit analysis and decision to enter into, this Agreement based on such documents and information, as it has deemed appropriate and (iii) it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their respective Related Parties, continue to be solely

92

responsible for making its own appraisal and investigation of all risks arising under or in connection with, and its own credit analysis and decision to take or not take action under, this Agreement and the other Loan Documents based on such documents and information as it shall from time to time deem appropriate, which may include, in each case:

> (i)     the financial condition, status and capitalization of the Borrower and each other Loan Party;

> (ii)    the legality, validity, effectiveness, adequacy or enforceability of this Agreement and each other Loan Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Loan Document;

> (iii)   determining compliance or non-compliance with any condition hereunder to the making of a Loan and the form and substance of all evidence delivered in connection with establishing the satisfaction of each such condition;

> (iv)    the adequacy, accuracy and/or completeness of the other information delivered by the Administrative Agent, any other Lender or by any of their respective Related Parties under or in connection with this Agreement or any other Loan Document, the transactions contemplated hereby and thereby or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Loan Document.

Section 10.07. *Indemnification*. Each Lender agrees to indemnify the Administrative Agent, and each of its directors, officers, employees, members, partners, agents, trustees, representatives, attorneys, consultants and advisors (to the extent not reimbursed by the Borrower and without affecting the Borrower's indemnification obligations hereunder), from and against such Lender's aggregate Ratable Portion of any Indemnified Matters; *provided*, *however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or such Affiliate's, director's, officer's, employee's, member's, partner's, agent's, trustee's, representative's, attorney's, consultant's and advisor's gross negligence or willful misconduct by such Indemnitee, in each case, as determined by a court of competent jurisdiction in a final and non-appealable judgment. Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its Ratable Portion of any out-of-pocket expenses (including fees, expenses and disbursements of financial and legal advisors) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of its rights or responsibilities under, this Agreement or the other Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower or another Loan Party; *provided*, that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto; *provided*, *further*, that the failure of any Lender to indemnify or reimburse the Administrative Agent shall not relieve any other Lender of its obligation in respect thereof. In no event shall the Administrative Agent have any liability to the Borrower, any Lender

or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

Section 10.08. *Successor Administrative Agent*.  The Administrative Agent may at any time give notice of its resignation to the applicable Lenders and the Borrower or be removed, with or without cause, by the Required Lenders by notice given in writing to the Administrative Agent. Upon receipt of any such notice of resignation or termination, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the exiting Administrative Agent gives notice of its resignation or receives notice of termination, then such Administrative Agent may, with the consent of the Required Lenders, appoint a successor Administrative Agent; *provided, that* if the Administrative Agent notifies the Borrower, the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the exiting Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the applicable Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed), and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each applicable Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the exiting (or former) Administrative Agent, and the exiting Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 10.08). The fees payable by the Borrower to any successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the exiting Administrative Agent's resignation or termination hereunder and under the other Loan Documents, the provisions of this Article 10 and Section 12.04 shall continue in effect for the benefit of such exiting Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while such exiting Administrative Agent was Administrative Agent under this Agreement and the other Loan Documents.

Section 10.09. *Concerning the Collateral and the Collateral Documents*.  (a) Each Lender agrees that any action taken by the Administrative Agent or the Required Lenders (or, where required by the express terms of this Agreement, a greater proportion of the Lenders) in accordance with the provisions of this Agreement or of the other Loan Documents, and the exercise by the Administrative Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders and other Secured Parties. Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive right and authority to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection herewith and with the Collateral Documents, (ii) execute and deliver each Collateral Document and accept delivery of each such agreement delivered by any Loan Party, (iii) act as Administrative Agent for the

Lenders and the other Secured Parties for purposes of the perfection of all security interests and Liens created by such agreements and all other purposes stated therein, *provided*, *however*, that the Administrative Agent hereby appoints, authorizes and directs the Administrative Agent and each Lender to act as collateral sub-agent for the Administrative Agent and the for purposes of the perfection of all security interests and Liens with respect to the Collateral, including any deposit or securities accounts maintained by a Loan Party with, and cash and Cash Equivalents held by, such Lender, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such action as is necessary or desirable to maintain the perfection and priority of the security interests and Liens created or purported to be created by the Collateral Documents and (vi) except as may be otherwise specifically restricted by the terms hereof or of any other Loan Document, exercise all remedies given to the Administrative Agent, the Lenders and the other Secured Parties with respect to the Collateral under the Loan Documents relating thereto, applicable law or otherwise.

(b)    Each of the Lenders hereby consents to the release and hereby directs, in accordance with the terms hereof, the Administrative Agent to release (or, in the case of clause (ii) below, release or subordinate) any Lien held by the Administrative Agent for the benefit of the Lenders against any of the following:

(i)    all of the Collateral and all Loan Parties, upon termination of the Commitments and payment and satisfaction in full in cash of all Loans and all other Obligations that the Administrative Agent has been notified in writing are then due and payable

(ii)    any assets that are subject to a Lien permitted by Section 7.01(g); and

(iii)    any part of the Collateral sold or disposed of by a Loan Party if such sale or disposition is permitted by this Agreement (or permitted pursuant to a waiver of or consent to a transaction otherwise prohibited by this Agreement), subject to approval by the Bankruptcy Court.

(c)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each other Secured Party hereby agree that (i) no Secured Party other than the Administrative Agent shall have any right individually to realize upon any of the Collateral or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), the Administrative Agent may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of Secured Parties shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any

of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

(d)    Each of the Lenders hereby directs the Administrative Agent to execute and deliver or authorizing the filing of such termination and partial release statements and do such other things as are necessary to release Liens to be released pursuant to this Section 10.09 promptly upon the effectiveness of any such release.

(e)    Each of the Lenders hereby consents to the release of any Subsidiary Guarantor from its obligations under Article 11 if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

(f)    Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under Article 11 pursuant to this Section 10.09.

(g)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon or the continuation of any filings to perfect or maintain the perfection of the Administrative Agent's Lien, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 10.10. *[Reserved]*

*Delivery of Certain Financial Information*. The Borrower agrees and shall cause each other Loan Party to agree, that the Administrative Agent may make available to the Lenders all Approved Electronic Communications provided to the Administrative Agent pursuant to Section 6.01. The Borrower further agrees, and shall cause each other Loan Party to further agree, that the Administrative Agent may make available to the Lenders such other Approved Electronic Communications provided to the Administrative Agent, upon such Lenders' request.

Section 10.12. *Buyer Refinancing*. Each Lender agrees to comply with the terms of the Buyer Refinancing, including any assignment of its Loans, so long as the Required Lenders agree to the terms thereof.

## ARTICLE 11
### GUARANTEE

Section 11.01. *Guarantee.*  (a) Subject to the provisions of Section 11.01(b), each of the Subsidiary Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Borrower and each other Loan Party when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

96

(b)     Notwithstanding the foregoing or any other provision of this Agreement to the contrary, if the obligations of any Guarantor under Section 11.01(a) would (after giving effect to the right of contribution established in Section 11.02), in any action or proceeding involving any state or provincial corporate law, or any state, provincial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, otherwise be held or determined to be subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of a state, provincial or foreign law on account of the amount of its liability under Section 11.01(a), then the amount of such liability shall, without further action by such Guarantor, any other Loan Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding.

(c)     Each Subsidiary Guarantor agrees that the Obligations may at any time and from time to time exceed the maximum amount of the liability of such Subsidiary Guarantor under Section 11.01(b) without impairing the guarantee contained in this Article 11 or affecting the rights and remedies of the Secured Parties hereunder.

(d)     The guarantee contained in this Article 11 shall remain in full force and effect until all the Obligations (other than any contingent indemnification obligations not then due) shall have been satisfied by payment in full, and the Commitments shall be terminated, notwithstanding that from time to time during the term of the Credit Agreement the Borrower may be free from any Borrower Obligations.

(e)     No payment made by the Borrower, any of the Subsidiary Guarantors, any other Subsidiary Guarantor or any other Person or received or collected by any Secured Party from the Borrower, any of the Subsidiary Guarantors, any other Subsidiary Guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to reduce, release, modify or otherwise affect the liability of any Subsidiary Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Subsidiary Guarantor in respect of the Obligations or any payment received or collected from such Subsidiary Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Subsidiary Guarantor hereunder until the Obligations (other than any contingent indemnification obligations not then due) are paid in full, and the Commitments are terminated.

Section 11.02. *Right of Contribution.* Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder (including by way of set-off rights being exercised against it), such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 11.03. The provisions of this Section 11.02 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Secured Parties, and each Subsidiary Guarantor shall remain jointly and severally liable to the Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 11.03. *No Subrogation, Etc.*

(a)    Until all amounts owing to the Secured Parties by the Borrower and other Loan Parties on account of the Obligations are paid in full, and notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Secured Party:

(i)    each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor has or may have as of the Closing Date or thereafter against the Borrower or any Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (x) any right of subrogation, reimbursement or indemnification that such Guarantor has or may have as of the Closing Date or thereafter against the Borrower or any Guarantor with respect to the Obligations, (y) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party has or may have as of the Closing Date or thereafter against the Borrower or any Guarantor, and (z) any benefit of, and any right to participate in, any collateral or security held as of the Closing Date or thereafter held by any Secured Party;

(ii)    each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Obligations, including, without limitation, any such right of contribution as contemplated by Section 11.02; and

(iii)    each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor (including any other Guarantor), shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor (including any other Guarantor).

(b)    If any amount shall be paid to any Guarantor on account of such subrogation, reimbursement, indemnification or contribution rights at any time when all of the Obligations have not been Paid in Full, such amount shall be held by such Guarantor in trust for the Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Administrative Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, in accordance with Section 9.03.

Section 11.04. *Amendments, etc. with Respect to the Borrower Obligations.* Each Subsidiary Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Subsidiary Guarantor and without notice to or further assent by any Subsidiary Guarantor, any demand for payment of any of the Obligations made by any Secured Party may be rescinded by such Secured Party and any of the Borrower Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, increased, amended, modified, accelerated, compromised, waived, surrendered or released by any Secured Party, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (the direction of the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. No Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained herein or any property subject thereto.

Section 11.05. *Guarantee Absolute and Unconditional.* Each Subsidiary Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance that constitutes a legal or equitable discharge of a guarantor or a surety other than payment in full of the Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Subsidiary Guarantor agrees as follows:

(a)    The guarantee under this Article 11 is a guaranty of payment when due and not of collectability, and is a primary obligation of each Subsidiary Guarantor and not merely a contract of surety.

(b)    The Administrative Agent may enforce the guarantee under this Article 11 upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Beneficiary with respect to the existence of such Event of Default.

(c)    The obligations of each Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Guarantor), and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions.

(d)    Each Subsidiary Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by any Secured Party upon the guarantee contained in this Article 11 or acceptance of the guarantee contained in this Article 11.

(e)    The Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Article 11 and all dealings between the Borrower and any of the Subsidiary Guarantors, on the one hand, and the Secured Parties, on the other hand, likewise

KL2 2896702.11

shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Article 11.

(f)      To the fullest extent permitted by applicable law, each Subsidiary Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Subsidiary Guarantors with respect to the Obligations.

(g)      Each Subsidiary Guarantor understands and agrees that the guarantee contained in this Article 11 shall be construed as a continuing, absolute and unconditional guarantee of payment and performance without regard to

(i)      the validity or enforceability of the Credit Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party,

(ii)      any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against any Secured Party,

(iii)      any acts of any legislative body or governmental authority affecting the Borrower, including but not limited to, any restrictions on the conversion of currency or repatriation or control of funds or any total or partial expropriation of the Borrower's property, or by economic, political, regulatory or other events in the countries where the Borrower is located,

(iv)      any change, reorganization or termination of the corporate or other organizational structure or existence of any Loan Party or any of its Subsidiaries and to any corresponding restructuring of the Obligations, or

(v)      any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Subsidiary Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Obligations, or of such Subsidiary Guarantor under the guarantee contained in this, in bankruptcy or in any other instance.

(h)      When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Subsidiary Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Subsidiary Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any other Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Subsidiary Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Subsidiary Guarantor or any other Person or any such collateral security or guarantee or right of offset, shall not relieve any Subsidiary Guarantor of any obligation or liability hereunder,

100

and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Secured Parties against any Subsidiary Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

Section 11.06. *Waiver by Subsidiary Guarantors.* Each Subsidiary Guarantor hereby waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Subsidiary Guarantor, to (i) proceed against Borrower, any other Subsidiary Guarantor of the Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other Subsidiary Guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Secured Party in favor of Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Subsidiary Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Subsidiary Guarantor from any cause other than payment in full of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Subsidiary Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Subsidiary Guarantor's liability hereunder or the enforcement hereof, (iii) any rights of set offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including the acceptance hereof, notices of default hereunder, the Secured Hedge Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Obligations or any agreement related thereto, notices of extension of credit to Borrower; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate Subsidiary Guarantors or sureties, or which may conflict with the terms hereof.

Section 11.07.  *[Reserved]*

Section 11.08. *Releases.*  (a) At such time as the Obligations shall have been paid in full (other than any contingent indemnification obligations not then due), the Commitments have been terminated, all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Subsidiary Guarantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party. At the request and sole expense of any Subsidiary Guarantor following any such termination, the Administrative Agent shall execute and deliver to such Subsidiary Guarantor such documents as such Subsidiary Guarantor shall reasonably request to evidence such termination.

(b)      A Subsidiary Guarantor shall automatically be released from its obligations hereunder and the Guarantee of such Subsidiary Guarantor shall automatically be released under the circumstances described in Section 10.10(b).

Section 11.09. *Subordination of Other Obligations*. Any Indebtedness of the Borrower or any Subsidiary Guarantor held as of the Closing Date or thereafter by any Subsidiary Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf the Beneficiaries and shall forthwith be paid over to the Administrative Agent for the benefit of the Beneficiaries to be credited and applied against the Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

Section 11.10. *Authority of Subsidiary Guarantors or Borrower*. It shall not be necessary for any Beneficiary to inquire into the capacity or powers of any Subsidiary Guarantor or Borrower or the officers, directors or agents acting or purporting to act on behalf of any of them.

Section 11.11. *Financial Condition of Borrower*. Any Credit Extension may be made to the Borrower or continued from time to time, without notice to or authorization from any Subsidiary Guarantor regardless of the financial or other condition of Borrower at the time of such grant or continuation. No Beneficiary shall have any obligation to disclose or discuss with any Subsidiary Guarantor its assessment, or any Subsidiary Guarantor's assessment, of the financial condition of the Borrower. Each Subsidiary Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents, and each Subsidiary Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and all circumstances bearing upon the risk of nonpayment of the Obligations. Each Subsidiary Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower known as of the Closing Date or thereafter known by any Beneficiary.

Section 11.12. *Taxes and Payments*. The provisions of Section 3.01(a)-(d) shall apply *mutatis mutandis* to the Subsidiary Guarantors and payments thereby.

Section 11.13. *Assignments*. Each Subsidiary Guarantor acknowledges that the Administrative Agent or any Lender may assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, the Loans owing to it and any Note or Notes held by it) and such assignee, transferee or participant shall thereupon become vested with all the benefits in respect thereof granted to such party herein or otherwise, in each case as and to the extent provided in Section 12.06. No Subsidiary Guarantor shall have the right to assign its rights hereunder or any interest herein except in accordance with Section 12.06.

Section 11.14. *Reinstatement*. Each Subsidiary Guarantor agrees that if (a) any payment made by the Borrower or any other Person and applied to the Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise

required to be refunded or repaid, or (b) the proceeds of Collateral are required to be returned by any Beneficiary to the Borrower or its estate, trustee, receiver or any other Party including any Subsidiary Guarantor or its estate, trustee, or receiver under any Requirement of Law, then, to the extent of such payment or repayment, any such Subsidiary Guarantors liability hereunder shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, the guarantee under this Article 11 shall have been cancelled or surrendered (and, if any Lien or other Collateral securing such Subsidiary Guarantor's liability hereunder shall have been released or terminated by virtue of such cancellation or surrender), the guarantee under this Article 11 (and such Lien or other Collateral) shall be reinstated in full force and effect, and such prior cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Subsidiary Guarantor in respect of the amount of such payment (or any lien or other Collateral securing such obligation).

# ARTICLE 12
## MISCELLANEOUS

Section 12.01. *Amendments, Etc.*  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)    increase the Commitment of any Lender without the written consent of such Lender;

(b)    change any provision of this Section 12.01 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder without the written consent of each Lender adversely affected thereby;

(c)    other than as permitted by Section 11.08, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(d)    release all or substantially all of the Subsidiary Guarantors, without the written consent of each Lender, except to the extent the release of any Guarantor is permitted pursuant to Section 11.08 (in which case such release may be made by the Administrative Agent acting alone);

(e)    grant any Lien with respect to all or substantially all of the Collateral which is senior to the Liens created by the Loan Documents or *pari passu* with such Liens without the written consent of each Lender;

*provided*, *further*, that (i)  no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; and (ii) the Fee

103

Letter or the Administrative Agent Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Borrower may replace each non-consenting Lender in accordance with Section 12.13; *provided*, that such amendment, waiver, consent or release can be effected as a result of all such assignments.

Any such waiver and any such amendment or modification pursuant to this Section 12.01 shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default that is waived pursuant to this Section 12.01 shall be deemed to be cured and not continuing during the period of such waiver.

Section 12.02. *Notices; Effectiveness; Electronic Communications.* (a) *Notices Generally*. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Borrower or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 12.02; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire or on Schedule 1 to the Lender Addendum to which such Lender is a party.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)      *Electronic Communications*. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided*, that the foregoing shall not apply to notices to any Lender pursuant to Article 2 if such

Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided*, that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to the Lenders to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided*, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

Each Lender agrees that notice to it specifying that any Borrower Materials or other notices or communications have been posted to the Platform shall constitute effective delivery of such information, documents or other materials to such Lender for purposes of this Agreement; *provided* that if requested by any Lender, the Administrative Agent shall deliver a copy of the Borrower Materials, notices or other communications to such Lender by email or fax.

(c)      *The Platform*.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses have resulted from the gross negligence or willful misconduct of such Agent Party as determined by a court of competent jurisdiction in a final, non-appealable judgment; *provided*, *however*, that in no event shall the Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)      *Change of Address, Etc*. Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by

105

notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     *Reliance by Administrative Agent and Lenders.* The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Borrowing Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 12.03. *No Waiver; Cumulative Remedies.* None of the Secured Parties shall by any act (except by a written instrument pursuant to Section 12.01), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Secured Party would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Section 12.04. *Expenses; Indemnity; Damage Waiver.* (a) *Costs and Expenses.* The Borrower shall pay (i) all reasonable and documented fees and out-of-pocket expenses incurred by the Administrative Agent and its Affiliates and the Lenders (limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent and one primary counsel for the Lenders (taken as a whole) and additional regulatory or local counsel for the Administrative Agent and the Lenders (taken as a whole) as is reasonably necessary), in connection with the preparation, negotiation, execution, delivery, administration and enforcement of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent and one primary counsel for the Lenders (taken as a whole) and additional regulatory or local counsel for the Administrative Agent and the Lenders (taken as a whole) as is reasonably necessary) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made, including all such all reasonable and documented fees and out-of-pocket expenses incurred during

106

any workout, restructuring or negotiations in respect of such Loans. Each Subsidiary Guarantor agrees to pay or reimburse each Secured Party for all its reasonable and documented out-of-pocket expenses incurred in collecting against such Subsidiary Guarantor under the guarantee contained in Article 10 or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Subsidiary Guarantor is a party (limited in the case of legal fees to the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent and one primary counsel for the Secured Parties (taken as a whole) and additional regulatory or local counsel for the Administrative Agent and the Lenders (taken as a whole) as is reasonably necessary).

(b)     *Indemnification by the Loan Parties*. The Borrower and each Subsidiary Guarantor shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related reasonable fees and out-of-pocket costs and expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (collectively, the "**Indemnified Matters**"); *provided*, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses have resulted from the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction in a final, non-appealable judgment.  This Section 12.04(b) shall not apply with respect to Taxes other than Taxes that represent issues, claims, damages, etc. from any non-Tax claim.

(c)     *Reimbursement by Lenders*. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (based on the Loans and unused Commitments held by such Lender relative to the total Loans and unused Commitments then outstanding) of such unpaid amount, *provided*, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-

agent). The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.13(d).

(d)      *Waiver of Consequential Damages, Etc*. To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent such damages result from the gross negligence or willful misconduct of such Indemnitee, in each case, as determined by the final nonappealable judgment of a court of competent jurisdiction.

(e)      *Payments*. All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)      *Survival*. The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 12.05. *Payments Set Aside.* To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent, any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Interest Rate. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 12.06. *Successors and Assigns.*  (a) *Successors and Assigns Generally*. provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 12.06(b), (ii) by way of participation in accordance with the provisions of

Section 12.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 12.06(f). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      *Assignments by Lenders.* Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments or Loans; *provided*, that:

(i)      except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Acceptance, as of the Trade Date, shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)      [Reserved].

(iv)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; *provided*, *however*, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Acceptance, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the

extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 12.04 with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.06(d).

(c)     *Register.* The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, at any reasonable time and from time to time upon reasonable prior notice.  This Section shall be construed so that the Loans are at all times maintained in "registered form" within the meanings of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRC and any related regulations (and any successor provisions).

(d)     *Participations.* Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided*, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c) and (f) of the first proviso to Section 12.01 that affects such Participant. Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment; *provided*, *further*, that in the case of Section 3.01, such Participant shall have complied with the requirements of such section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.14 as though it were a Lender.

110

Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     *Limitations upon Participant Rights*. A Participant shall not be entitled receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 3.01(e) as though it were a Lender.

(f)     *Certain Pledges*. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided*, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     *Electronic Execution of Assignments*. The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

Section 12.07. *Treatment of Certain Information; Confidentiality*. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) on a need-to-know basis to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to

have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information becomes publicly available other than as a result of a breach of this Section.

For purposes of this Section, "**Information**" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, *provided*, that in the case of information received from the Borrower or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised reasonable care to protect such Information, and in no event less than the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities laws.

Section 12.08. *Right of Setoff.* Subject to the Orders, upon any amount becoming due and payable hereunder (whether at stated maturity, by acceleration or otherwise), each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency but excluding all payroll, trust and tax withholding accounts) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09. *Interest Rate Limitation.* Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 12.10. *Counterparts; Integration; Effectiveness.* This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement or of a Lender Addendum by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.11. *Survival of Representations and Warranties.* All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 12.12. *Severability.* If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 12.13. *Replacement of Lenders.* If (a) any Lender requests compensation under Section 3.04, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, (c) any Lender is

at such time a Defaulting Lender or has given notice pursuant to Section 3.02 or (d) any Lender becomes a Nonconsenting Lender (hereinafter defined), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to (and such Lender shall) assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee selected by the Borrower that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), *provided*, that:

(a) the Administrative Agent shall have received the assignment fee specified in Section 12.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d) such assignment does not conflict with applicable Laws; and

(e) neither the Administrative Agent nor any Lender shall be obligated to be or to find the assignee.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. In the event that (x) the Borrower or the Administrative Agent has requested the Lenders to consent to a departure or waiver of any provisions of the Loan Documents or to agree to any amendment thereto and (y) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Nonconsenting Lender.**" Any such replacement shall not be deemed a waiver of any rights that the Borrower shall have against the replaced Lender.

Section 12.14. *Governing Law; Jurisdiction; Etc.*  (a) *GOVERNING LAW*. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(b) *SUBMISSION TO JURISDICTION*. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT

OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)     *WAIVER OF VENUE*. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     *SERVICE OF PROCESS*. EACH PARTY HERETO (WITH THE EXCEPTION OF THE ADMINISTRATIVE AGENT) IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 12.15. *Waiver of Jury Trial.*  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.16. *[Reserved]*

Section 12.17. *No Advisory or Fiduciary Responsibility.* In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower and the other Loan Parties acknowledge and agree that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and any Lender are arm's-length commercial transactions between the Borrower, the other Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and such Lender, on the other hand, (B) the Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent deemed appropriate by such Loan Parties, and (C) the Borrower and the other Loan Parties are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent and any Lender each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, the other Loan Parties, their respective Affiliates or any other Person and (B) neither the Administrative Agent nor any Lender has any obligation to the Borrower, the other Loan Parties or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and any Lender and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its Affiliates, and neither the Administrative Agent nor any Lender has any obligation to disclose any of such interests to the Borrower or its Affiliates. To the fullest extent permitted by law, the Borrower and each other Loan Party hereby waives and releases any claims that it may have against the Administrative Agent and any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.18. *USA Patriot Act Notice.* Each Lender that is subject to the PATRIOT Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**PATRIOT Act**"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. Each Loan Party shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 12.19. *Time of the Essence.* Time is of the essence of the Loan Documents.

Section 12.20. *Independence of Covenants.* All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the

limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

Section 12.21. *Force Majeure*.  In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Administrative Agent shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 12.22. *Orders Govern*.  Notwithstanding anything herein to the contrary, the exercise of rights and remedies of the Secured Parties hereunder and under any other Loan Document is subject to the provisions of the Orders. In the event of any conflict between the terms of the Orders and the terms of this Agreement or any other Loan Document, the terms of the Orders shall govern and control.

[Signature Pages Follow]

117

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

PATRIOT COAL CORPORATION

By: _____

Name: R. W. BENNETT

Title: PRESIDENT & CEO

**Subsidiary Guarantors**:

BLACK STALLION COAL COMPANY, LLC
CATENARY COAL COMPANY, LLC
COYOTE COAL COMPANY LLC
DODGE HILL MINING COMPANY, LLC
KANAWHA EAGLE COAL, LLC
PANTHER LLC
PATRIOT COAL SALES LLC

as Subsidiary Guarantors

Executing this Agreement as an authorized officer of each of the 7 foregoing entities on behalf of and so as to bind the entities named above under the caption "Subsidiary Guarantors"

By: _____
Name: E Kent Hartsog
Title: Treasurer

APOGEE COAL COMPANY, LLC
EASTERN ASSOCIATED COAL, LLC
GATEWAY EAGLE COAL COMPANY, LLC
HERITAGE COAL COMPANY LLC
HIGHLAND MINING COMPANY, LLC
HOBET MINING, LLC

as Subsidiary Guarantors

Executing this Agreement as an authorized officer of each of the 6 foregoing entities on behalf of and so as to bind the entities named above under the caption "Subsidiary Guarantors"

By: _____
Name: Kenneth R. Bolyard
Title: TREASURER

[SIGNATURE PAGE TO CREDIT AGREEMENT]

**Additional Subsidiary Guarantors:**

APPALACHIA MINE SERVICES, LLC
BRODY MINING, LLC
CENTRAL STATES COAL RESERVES OF KENTUCKY, LLC
CORYDON RESOURCES LLC
EASTERN ROYALTY, LLC
EMERALD PROCESSING, L.L.C.
GRAND EAGLE MINING, LLC
HILLSIDE MINING COMPANY LLC
JUPITER HOLDINGS LLC
KANAWHA RIVER VENTURES III, LLC
LITTLE CREEK LLC
MIDLAND TRAIL ENERGY LLC
MIDWEST COAL RESOURCES II, LLC
PATRIOT COAL COMPANY, L.P.
PATRIOT COAL HOLDINGS I LLC
PATRIOT COAL HOLDINGS II LLC
PATRIOT COAL SERVICES LLC
PATRIOT LEASING COMPANY LLC
PATRIOT MIDWEST HOLDINGS, LLC
PATRIOT RESERVE HOLDINGS, LLC
PATRIOT VENTURES LLC
REMINGTON LLC
RHINO EASTERN JV HOLDING COMPANY LLC
ROBIN LAND COMPANY, LLC
SPEED MINING LLC
THUNDERHILL COAL LLC
WILDCAT, LLC
WILDCAT ENERGY LLC
WILL SCARLET PROPERTIES LLC
WWMV JV HOLDING COMPANY LLC

as Subsidiary Guarantors

Executing this Agreement as an authorized officer of each of the 30
foregoing entities on behalf of and so as to bind the entities named above
under the caption "Additional Subsidiary Guarantors"

By:

Name: E Kent Hartsog
Title: Treasurer

**Additional Subsidiary Guarantors:**

COLONY BAY COAL COMPANY LLC
MOUNTAIN VIEW COAL COMPANY, LLC
PINE RIDGE COAL COMPANY, LLC
RIVERS EDGE MINING LLC

as Subsidiary Guarantors

Executing this Agreement as an authorized officer of each of the 4 foregoing
entities on behalf of and so as to bind the entities named above under the caption
"Additional Subsidiary Guarantors"

By: _____

Name: _Kenneth P. Bolgard_

Title: _Treasurer_

**Cantor Fitzgerald Securities,**
as Administrative Agent and Lender

By: _____

Name:    James Bond

Title:    Chief Operating Officer

**Caspian SC Holdings, L.P.,**
    as Lender

By: _____
      Name:   Richard D. Holahan JR.
      Title:    Authorized Signatory


**Caspian HLSC1 LLC,**
    as Lender

By: _____
      Name:   Richard D. Holahan JR.
      Title:    Authorized Signatory


**Mariner LDC,**
    as Lender

By: _____
      Name:   Richard D. Holahan JR.
      Title:    Authorized Signatory


**Caspian Solitude Master Fund, L.P.,**
    as Lender

By: _____
      Name:   Richard D. Holahan JR.
      Title:    Authorized Signatory

**Caspian Select Credit Master Fund Ltd.,**
　　as Lender

By: _____
　　　Name:　Richard D. Holahan JR.
　　　Title:　Authorized Signatory


**Super Caspian Cayman Fund Limited,**
　　as Lender

By: _____
　　　Name:　Richard D. Holahan JR.
　　　Title:　Authorized Signatory

**Midtown Acquisitions L.P.,**
  as Lender
By: Midtown Acquisitions GP LLC, its General
Partner

By: _____
Name: Conor Bastable
Title: Authorized Signatory

**Knighthead Master Fund, L.P.,**
    as Lender
By: Knighthead Capital Management, LLC, its
Investment Manager

By: _____
Name:
Title:
    Laura Torrado
    Authorized Signatory


**LMA SPC for and on behalf of the MAP 84
Segregated Portfolio,**
    as Lender
By: Knighthead Capital Management, L.L.C., its
Investment Advisor

By: _____
Name:
Title:
    Laura Torrado
    Authorized Signatory


**Knighthead (NY) Fund, L.P.;**
    as Lender
By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____
Name:
Title:
    Laura Torrado
    Authorized Signatory


**Knighthead Annuity & Life Assurance
Company,**
    as Lender
By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____
Name:
Title:
    Laura Torrado
    Authorized Signatory


[SIGNATURE PAGE TO CREDIT AGREEMENT]

# EXHIBIT 2

## Budget

Summary Weekly CF Forecast – Patriot Coal

*Dollars in Thousands*
*Confidential and Non-Public Information*

Starting Week End

| Cash Flow Forecast | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First Day of Period | 5/9/2015 | 5/16/2015 | 5/23/2015 | 5/30/2015 | 6/6/2015 | 6/13/2015 | 6/20/2015 | 6/27/2015 | 7/4/2015 | 7/11/2015 | 7/18/2015 | 7/25/2015 | 8/1/2015 | 5/9/2015 |
| Last Day of Period | 5/15/2015 | 5/22/2015 | 5/29/2015 | 6/5/2015 | 6/12/2015 | 6/19/2015 | 6/26/2015 | 7/3/2015 | 7/10/2015 | 7/17/2015 | 7/24/2015 | 7/31/2015 | 8/7/2015 | 8/7/2015 |
| Week Ended Friday, | May 15 | May 22 | May 29 | June 5 | June 12 | June 19 | June 26 | July 3 | July 10 | July 17 | July 24 | July 31 | August 7 | 13-Week |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| Beginning Cash Balance – Book | $27,487 | $49,321 | $33,168 | $31,567 | $26,142 | $20,685 | $10,001 | $24,843 | $34,220 | $27,385 | $34,961 | $31,829 | $24,423 | $27,487 |
| **Receipts** | | | | | | | | | | | | | | |
| Total Receipts | $38,148 | $25,127 | $24,655 | $24,276 | $21,890 | $16,481 | $43,062 | $38,146 | $13,939 | $33,133 | $17,665 | $15,836 | $14,253 | $326,613 |
| **Disbursements** | | | | | | | | | | | | | | |
| Total Operating Disbursements | $4,955 | $38,815 | $23,218 | $26,476 | $25,504 | $25,271 | $26,705 | $24,627 | $19,015 | $23,346 | $19,372 | $20,901 | $23,333 | $301,539 |
| Total Non-Operating Disbursements | $8,551 | $1,292 | $1,913 | $1,966 | $717 | $767 | $494 | $2,995 | $731 | $1,066 | $404 | $1,211 | $2,879 | $24,985 |
| Total Disbursements | $13,506 | $40,107 | $25,131 | $28,442 | $26,221 | $26,039 | $27,199 | $27,622 | $19,745 | $24,412 | $19,776 | $22,112 | $26,212 | $326,524 |
| Net Cash Flow – Operating (Excl Restructure + Debt) | $24,642 | ($14,980) | ($475) | ($4,165) | ($4,331) | ($9,558) | $15,863 | $10,525 | ($5,807) | $8,721 | ($2,111) | ($6,276) | ($11,959) | $89 |
| Ending Cash Balance – Book (Excl Restructure + Debt | $52,129 | $34,341 | $32,693 | $27,402 | $21,811 | $11,127 | $25,864 | $35,368 | $28,413 | $36,106 | $32,850 | $25,553 | $12,464 | $27,576 |
| Total – Restructuring & Debt | $2,809 | $1,173 | $1,126 | $1,260 | $1,126 | $1,126 | $1,021 | $1,148 | $1,028 | $1,145 | $1,021 | $1,130 | $1,011 | $16,123 |
| Ending Cash Balance – Book (Inc Restructure + Debt) | $49,321 | $33,168 | $31,567 | $26,142 | $20,685 | $10,001 | $24,843 | $34,220 | $27,385 | $34,961 | $31,829 | $24,423 | $11,453 | $11,453 |

## **EXHIBIT 3**

**DIP Milestones**

**Final**

**Schedule 4.03**

**Milestones**

The failure by the Loan Parties to achieve the Milestones set forth below on or prior to the corresponding Deadline set forth below shall constitute breach of the covenant set forth in Section 6.26.  In addition, the obligation of any Lender to honor any Request for Credit Extension to make Term Loans to increase the Total Outstandings up to the Aggregate Funding Available set forth below is subject to the corresponding Milestones below being satisfied on or prior to corresponding Date below.  Any of such Dates may be extended and such Milestones may be waived or modified by the Required Lenders in their sole discretion in accordance with Section 12.01 of the Agreement:

| **Date (Deadline):** | **Milestone(s)** | **Aggregate Funding Available** |
|---|---|---|
| Closing Date | Entry of Interim Order | $30,000,000 |
| June 19, 2015 | Entry of Final Order in form and substance reasonably acceptable to the Required Lenders | $50,000,000 |
| June 30, 2015 | • Entry into binding stalking horse asset purchase agreement for sale of at least four mines and related assets ("APA") through a chapter 11 plan to a potential acquirer, in form and substance reasonably acceptable to the Required Lenders; and<br><br>• File bidding procedures motion in form and substance acceptable to the Required Lenders | $70,000,000 |
| July 31, 2015 | Order approving bid procedures motion in form and substance reasonably acceptable to the Required Lenders | $75,000,000 |
| August 1, 2015 | • File plan and disclosure statement incorporating APA, both in form and substance acceptable to the Required Lenders; and<br><br>• Either:<br><br> (a) Debtors reach agreement with UMWA for modification of collective bargaining agreements necessary to implement APA; or<br><br> (b) Debtors file a motion for relief under Bankruptcy Code sections 1113 and/or 1114 | $75,000,000 |
| August 31, 2015 | N/A | $90,000,000 |
| Sept. 21, 2015 | Competing bids due | $95,000,000 |
| Sept. 28, 2015 | Auction (if necessary) | $95,000,000 |
| Oct. 1, 2015 | • Order approving 1113/1114 motion (if no acceptable agreement is reached) with relief necessary to implement APA; and<br><br>• Order approving winning bidder (subject to confirmation) in form and substance reasonably acceptable to the Required Lenders | $100,000,000 |
| Oct. 15, 2015 | Entry of Order approving Disclosure Statement in form and substance reasonably acceptable to the Required Lenders | $100,000,000 |
| Nov. 23, 2015 | Entry of Order confirming Plan in form and substance reasonably acceptable to the Required Lenders | $100,000,000 |

| Nov. 30, 2015 | Closing / effective date of the Plan | $100,000,000 |