LOWENSTEIN SANDLER LLP
Sharon Levine (admitted *pro hac vice*)
Philip J. Gross (admitted *pro hac vice*)
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

*Counsel to the United Mine Workers of America*

KAPLAN VOEKLER CUNNINGHAM & FRANK, PLC
Troy Savenko (Va. Bar No. 44516)
1401 East Cary Street
Richmond, VA 23219
(804) 823-4000

*Local Counsel to the United Mine Workers of America*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.*, | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

### OBJECTION OF THE UNITED MINE WORKERS OF AMERICA TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) REJECT THEIR COLLECTIVE BARGAINING AGREEMENTS, (B) MODIFY CERTAIN UNION-RELATED RETIREE BENEFITS, AND (C) IMPLEMENT TERMS OF THEIR SECTION 1113 AND SECTION 1114 PROPOSAL, AND (II) GRANTING RELATED RELIEF

The United Mine Workers of America ("UMWA")—the representative of the interests of (i) more than 2,500 active and laid-off employees (collectively, the "UMWA Employees") at the above-captioned Debtors' mining complexes and (ii) approximately 17,647 retirees and dependents (the "UMWA Retirees", and together with the UMWA Employees, the "UMWA Represented Parties")—by and through its undersigned counsel, hereby objects (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of Their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No. 524] (the "Motion"). In support of its Objection, the UMWA submits the declaration of Brian Sanson, attached hereto as **Exhibit A**. In further support of its Objection, the UMWA respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

1.      Sections 1113 and 1114 of the Bankruptcy Code permit a debtor only to seek modifications to collective bargaining agreements ("CBAs") and retiree obligations that are absolutely necessary to permit the debtor to reorganize and emerge as a viable entity.   The burden is on the debtor to demonstrate that its proposed modifications are necessary, and it may not seek concessions that go beyond those minimally necessary.   Yet, the Debtors in their 1113/1114 Proposal seek sweeping modifications with respect to the Non-Blackhawk Assets without any business plan.   If the Debtors have not developed a business plan, they cannot demonstrate that their proposed contract modifications are necessary, and their 1113/1114 Proposal must be denied.   With respect to the Blackhawk Assets, the Debtors propose a complete rejection of the collective bargaining agreement, even though prior to the filing of the 1113/1114 Proposal, Blackhawk had proposed that it would hire the current workforce and operate under a modified UMWA agreement.   Blackhawk's proposal to hire the UMWA miners and operate under a modified UMWA contract is evidence that complete rejection of the contract (and termination of all job rights for the current work force) is not necessary.   Therefore, the 1113/1114 Proposal as it relates to the Blackhawk Assets must also be denied.

2.      Prior to the filing of the Debtors' chapter 11 cases on May 12, 2015, two deals were made that were designed to dictate the outcome of these proceedings.   First, the Debtors' senior secured lenders effectively took control of the Debtors.   Second, the senior secured lenders located an operator in Blackhawk Mining LLC ("Blackhawk"), agreed both to finance and obtain a substantial ownership interest in Blackhawk, and developed a plan pursuant to which the Debtors' most valuable assets would be conveyed to Blackhawk, leaving behind significant and unwanted obligations to (a) reclaim land; (b) pay injured workers; (c) pay

---

[1] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed below.

retirement health care and income; and (d) employ a large group of coal miners. The losers in this scheme would be the miners who generated profits over the years and the taxpayers of the State of West Virginia, the Commonwealth of Kentucky and the United States who ultimately pay for the reclamation of the environment and the income replacement for injured and breathless miners.

3.     Although some stakeholders, including certain lessors and vendors, suffer some losses as a part of the bankruptcy proceedings, the proposals made by the Debtors and Blackhawk most greatly and most disproportionately impact the UMWA workforce and UMWA Retirees. Blackhawk would be free to hire whoever it wants and, given the state of labor law, it will almost certainly not hire a majority of union workers. Retirement income and medical care will be cut dramatically by approximately $33 million and wages and paid time off will be significantly reduced by approximately $74 million. In short, families will be devastated by the relief the Debtors and Blackhawk are seeking to impose.

4.     While the UMWA was prepared to accept further cuts beyond those given in the Debtors' prior bankruptcy, the proposals made by the Debtors and supported by Blackhawk during this bankruptcy did not even approach shared sacrifice. In contrast to the draconian concessions that the UMWA Employees and retirees are being asked to bear, the Debtors' propose to pay post-petition lenders market rate interest, select trade creditors payment in full, provide customers with market pricing, and provide management employees significantly better go forward job opportunities and the potential for significant bonuses.

5.     As will be explained in more detail below, the Debtors' final "proposal" to the UMWA made on July 10, 2015 (the "1113/1114 Proposal") is revealing in two key respects. It represents a gigantic step backward from proposals developed by the parties in the weeks

immediately preceding the 1113/1114 Proposal.  And, it conforms in its central points to the terms of both the asset purchase agreement that the Debtors entered into with Blackhawk and filed on June 23, 2015 [Docket No. 385] and the Debtors' chapter 11 plan filed on July 13, 2015 [Docket No. 498], as if no discussions with the UMWA took place.

6.    Distressingly, the Debtors made the 1113/1114 Proposal well before the milestone deadline contained in the DIP Financing for seeking relief under sections 1113 and 1114 and provided that unless the UMWA accepted whatever the Debtors and Blackhawk offered, the free and clear sale structure developed and mandated by the Debtors' senior secured lenders would be imposed.

7.    The 1113/1114 Proposal seeks steep cuts relating to the proposed trust assets despite the fact that the Debtors acknowledge that they have not developed a business plan for the liquidation trust proposed under the Debtors' chapter 11 plan.  Federal, one of the proposed trust assets, actually generates positive free cash flow and the sale process remains ongoing – so it is unclear what if anything a new owner might truly require of the UMWA members.  It leaves the impression that the filing of the Motion was foreordained. The negotiating process contemplated by sections 1113 and 1114 of the Bankruptcy Code was made hollow.

8.    The Debtors made their one and only proposal regarding the Non-Blackhawk Assets in their final, arbitrary July 10, 2015 ultimatum.  Moreover, Blackhawk refused to meet with the UMWA directly, instead making all its proposals through the Debtors, who acknowledged they were not the ultimate party in interest.  Additionally, despite repeated requests by the UMWA, the Debtors never made clear what coal lands were included in the deal with Blackhawk and which would be retained.

9.    The process was flawed and the Motion must be denied.

## SUMMARY OF OBJECTION

10.    Having engaged in a hollow bargaining process, the Debtors now seek relief in the Motion that allows for immediate and drastic economic loss on the heels of prior concessions and cuts accepted by the UMWA and the UMWA Represented Parties less than two years ago as a result of the Debtors' prior chapter 11 bankruptcy cases (the "Prior Patriot Cases").  Already struggling workers face further reductions (if not outright rejection) after years of concessionary bargaining in the form of inordinately (and inappropriately) lengthy five year collective bargaining agreements with respect to the Debtors' other operating assets (including assets related to the Debtors' Hobet, Federal, and Apogee mine facilities) not being purchased by Blackhawk (the "Non-Blackhawk Operating Assets").  Retirees face a future life without promised health care, pension, and other benefits, including but not limited to the funding obligations to UMWA Retirees pursuant to the Patriot Retirees VEBA (the "Union VEBA"), the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–22 (the "Coal Act"), and the defined benefit multiemployer UMWA 1974 Pension Plan (the "UMWA 1974 Pension Plan") obligations with respect to the Blackhawk Assets and Non-Blackhawk Assets.

11.    In contrast, (i) senior executives are poised to receive up to $3.75 million in incentives; (ii) other non-union workers are poised to receive another $2.88 million in bonuses; (iii) lenders are not being forced to continue lending to the newly formed Blackhawk-controlled "Combined Company" (assuming the sale to Blackhawk proceeds) at below market rates; and (iv) trade creditors are not being asked to give up market pricing or to provide undermarket long-term supply contracts.

12.    Between late May and late June 2015, the UMWA engaged in various negotiations with the Debtors.  During that time, as part of those negotiations, the Debtors made

six written proposals (collectively, the "Blackhawk CBA Modification Proposals") solely with

respect to the CBAs governing the assets Blackhawk seeks to purchase (the "Blackhawk

Assets").  During those negotiations, the parties did not engage in any meaningful negotiations

with respect to CBAs relating to their Non-Blackhawk Assets.

13.     On July 10, 2015, the Debtors provided the 1113/1114 Proposal which (i) seeks

outright rejection (as opposed to modification) of the CBAs and retiree obligations with respect

to the Blackhawk Assets; (ii) seeks outright rejection with respect to CBAs governing the

Debtors' non-operating mines (the "Non-Operating Assets", and together with the Non-

Blackhawk Operating Assets, the "Non-Blackhawk Assets"); and (iii) for the first time proposes

CBA and retiree benefit modifications with respect to the Non-Blackhawk Operating Assets that

are not sold to Blackhawk (including assets related to the Debtors' Hobet, Federal, and Apogee

mine facilities).

14.     Contrary to the suggestions made in the Motion, the UMWA consistently

negotiated in good faith and was prepared to continue to do so with respect to the 1113/1114

Proposal when the Debtors precipitously filed the Motion on July 16, 2015 to implement the

1113/1114 Proposal, nearly two weeks before the deadlines set by the lenders under the DIP

Milestones.

15.     As a threshold matter, relief under sections 1113 and 1114 of the Bankruptcy

Code is not appropriate here because the Debtors are selling substantially all of their assets and

liquidating, as opposed to reorganizing.  A plain reading of sections 1113 and 1114 of the

Bankruptcy Code indicates that Congress intended this relief for reorganizing entities, not for

debtors that intend to sell substantially all of their assets and then file a chapter 11 plan that

provides for liquidation and distribution of proceeds of the assets to others, but not union workers or retirees.

16.     Even assuming, *arguendo*, that a liquidating debtor can seek relief under sections 1113 and 1114, at a minimum, a debtor must satisfy the requirements of sections 1113 and 1114 and demonstrate the ability to confirm a chapter 11 plan.  Here, in addition to failing to satisfy the requirements of section 1113 and 1114, the Debtors fail to demonstrate the ability to confirm a chapter 11 plan.  For example, the Debtors lack the funding needed to satisfy accrued but unpaid administrative claims, including environmental, pension, and certain other legacy retiree/employee liabilities (collectively, the "Legacy Liabilities").

17.     Further, the Motion inappropriately seeks to terminate the Debtors' obligations to its employees and retirees under the Coal Act.  Statutory Coal Act obligations cannot be modified under section 1114 of the Bankruptcy Code, and these obligations continue to accrue post-petition as an administrative expense that the Debtors must satisfy under a plan.

18.     Additionally, the Motion seeks procedurally improper relief, including the inappropriate rejection of the Debtors' substantive and/or administrative obligations with respect to the (i) Patriot-Peabody-UMWA Settlement Agreement; (ii) VEBA Funding Agreement; and (iii) Alcoa Assumed and Patriot Assumed Retirees.

19.     Aside from the plan confirmation issues, the Motion fails to satisfy the substantive requirements contained in sections 1113 and 1114 for many reasons including, but not limited to, the following:

- The 1113/1114 Proposal seeks rejection and/or modification of the UMWA collective bargaining agreements not necessary to permit the reorganization of the Debtors.  For example, the Debtors fail to provide a business plan to address the viability of the Non-Blackhawk Assets, or the proposed liquidating trust (or other post-emergence entity).  With respect to the Blackhawk Assets, the Debtors made proposals (including the "Sixth Proposal" made on June 22, 2015) prior to the 1113/1114 Proposal containing less drastic

cuts than the 1113/1114 Proposal which provides for full and complete rejection of all collective bargaining agreements and retiree obligations. Adding insult to injury, under the 1113/1114 Proposal, the Debtors overreached in demanding modification of certain non-economic terms of the collective bargaining agreements. Finally, the 1113/1114 Proposal provides for certain continuing royalty contributions to the Union VEBA of $0.20 per clean ton of coal mined (but only in years 2017 and 2018), but states that if legislation provides for other funding sources to the Union VEBA, the royalty payment obligation ends. The Debtors admit they can make the royalty payment and should be required to do so regardless of whether there is legislation passed.

- The Debtors fail to satisfy the "good faith" requirement under section 1113(b)(2) of the Bankruptcy Code because they failed to negotiate in good faith over their proposed CBA and retiree benefit modifications. First and foremost, the Debtors filed the Motion on July 16, 2015 notwithstanding that under the relevant DIP Milestones, they had until August 1, 2015 to file an 1113/1114 motion. The Debtors' failure to exhaust all negotiating possibilities through the August 1 deadline demonstrates their intent to unduly pressure the UMWA, rather than promote the negotiation process encouraged and required under sections 1113 and 1114. Again, the 1113/1114 Proposal seeks, in bad faith, full and complete rejection of all collective bargaining agreement and retiree obligations with respect to the Blackhawk Assets, despite the Debtors' six proposals and numerous discussions (prior to the 1113/1114 Proposal) providing for less drastic relief. The Debtors' 1113/1114 Proposal also (A) improperly provides (i) outright rejection of Coal Act obligations and the Debtors' participation in the UMWA 1974 Pension Plan; (ii) curtailment of use of certain unpaid allowed non-work days typical under UMWA contracts known as "Memorial Days"; and (iii) insistence on unreasonable modifications to work schedules, including unilateral control over work shifts which appear punitive and will actually decrease productivity; and (B) contained the Debtors' first meaningful proposal with respect to the Non-Blackhawk Assets, provided less than a week prior to the date of the filing of the Motion and without specific detail.

- Contrary to the Debtors' assertions, the UMWA refused to accept the 1113/1114 proposal with good cause. The UMWA spent weeks suggesting counterproposals and alternatives with respect to the terms of the CBAs governing the Blackhawk Assets, and was prepared to continue further negotiating when the Debtors prematurely filed the Motion despite (i) additional time to negotiate under the DIP Milestones; and (ii) no previous proposals being offered with respect to the Non-Blackhawk Assets.

- Finally, the 1113/1114 Proposal fails to treat all key stakeholders fairly and equitably, as mandated by 11 U.S.C. § 1113(b)(1)A), because it requires permanent, irreversible concessions from the UMWA Employees and UMWA Retirees over a long contract period, while (i) senior management is authorized to receive over $6 million in key

employee incentives; (ii) lenders receive a performing new loan; (iii) trade creditors keep a customer and market pricing; and (iv) other non-union employees receive stay bonuses and a better opportunity to maintain their jobs, and all except the UMWA Employees and UMWA Retirees have the opportunity to benefit from an upturn in the market.

20.     Accordingly, and for all the reasons set forth below, the Debtors' Motion should be denied.

## STATEMENT OF FACTS

### I.     The UMWA's Prior Concessions

21.     The Debtors commenced their Prior Patriot Cases on July 9, 2012, in the United States Bankruptcy Court for the Southern District of New York (the "SDNY Bankruptcy Court").  On December 19, 2012, the SDNY Bankruptcy Court entered an order transferring the Prior Patriot Cases to the United States Bankruptcy Court for the Eastern District of Missouri.

22.     During the Prior Patriot Cases, the Debtors and the UMWA had not reached an agreement and the Debtors filed a motion for relief under sections 1113 and 1114 of the Bankruptcy Code (the "1113/1114 Motion").  Following a contested trial, the court granted the 1113/1114 Motion, which the UMWA immediately appealed.  Ultimately, the Debtors and the UMWA reached a settlement (the "UMWA Settlement") which was ratified by the members of the UMWA.

23.     The UMWA Settlement provided for, among other things, modifications to the existing collective bargaining agreements that provided certain of the Debtors with significant savings, and the transition of provision and administration of the Debtors' retiree benefit obligations to the Union VEBA to be funded by the consideration set forth in a funding agreement (as amended, the "VEBA Funding Agreement"), which consideration included (a) a royalty contribution (of $0.20 to $1.00 per ton) for every ton of coal produced at all existing operating mining complexes; and (b) cash contributions of up to $75 million to be paid over the

four years following emergence, subject to certain financial conditions.  The compromises and

concessions from the UMWA under the UMWA Settlement relieved the Debtors of

approximately $1.6 billion of retiree healthcare liabilities and resulted in approximately $130

million in annual cost savings.

24.    On June 30, 2013, the UMWA and certain of the Debtors executed the 2013 Coal

Wage Agreements to replace the former agreement governing the parties' relationship.

## II.    The Debtors' Proposed Joint Chapter 11 Plan Of Liquidation

25.    On July 13, 2015, the Debtors filed a joint chapter 11 plan [Docket No. 499] (the

"Plan") and disclosure statement [Docket No. 498] (the "Disclosure Statement").

26.    The Plan (i) implements the proposed Blackhawk Transaction (*i.e.* sells all

Blackhawk assets free and clear of all CBA, pension, employee, retiree, and environmental

liability except liabilities Blackhawk explicitly chooses to assume); (ii) declares Blackhawk a

good faith buyer under 363(m); (iii) implements the proposed rights offering and debt financing

for the new Combined Company to be formed by Blackhawk; (iv) transfers all other Non-

Blackhawk Operating Assets (including the Federal assets, the Hobet assets and the Apogee

assets) to a liquidating trust to be administered/liquidated, apparently without disclosed funding,

purportedly for the benefit of allowed general unsecured claims; and (v) proposes very broad

debtor and third-party releases.

27.    Given the extensive cleanup and other environmental and Legacy Liabilities left

behind, it is unclear what funds would be available to operate the remaining assets and/or fund

the ongoing liabilities of the assets that are remaining.

28.    Moreover, during testimony at the hearing on July 22, 2015, the Debtors' chief

restructuring officer testified regarding hurdles to the Debtors' emergence from chapter 11, and

noted that the Debtors must still develop a business plan for a liquidating trust (referred to as a

"remainder entity") and come up with cash to meet projected operating and other expense targets once the Debtors emerge from bankruptcy.  *See* July 22, 2015 Hearing Transcript,[2] at 49:15-49:18 (noting, in response to question regarding hurdles to emergence from chapter 11, that the Debtors are "going to have to develop a business plan for the remainder entity that is financeable.  We're going to have to come up with the cash, once we meet these targets, that will allow us to emerge from bankruptcy.").

29.     The testimony made clear the Debtors do not have a business plan or working model for the Non-Blackhawk Assets, and cannot provide information as to exactly what cost savings may be necessary or required to (i) confirm a liquidating chapter 11 plan; and (ii) provide for a viable liquidating trust/remainder entity.  Indeed, during negotiations, the UMWA was not provided with any business plan or working models.

**III.     The Debtors' Chapter 11 Cases, DIP Milestones, And Bidding Procedures**

30.     On May 12, 2015, (the "Petition Date"), each of the Debtors again filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

31.     On June 4, 2015 the Court entered the *Final Order Authorizing the Debtors to Obtain Postpetition Financing, Authorizing Use Of Cash Collateral, Granting Liens and Superpriority Claims, Granting Adequate Protection, Modifying the Automatic Stay, Scheduling a Final Hearing, and Granting Related Relief* [Docket No. 230] (the "Final DIP Order").  The Final DIP Order authorized post-petition debtor-in-possession financing in the form of a term loan facility of up to $100 million (the "DIP Financing").

32.     The Final DIP Order conditioned the DIP Financing on the Debtors' achievement of certain milestones (the "DIP Milestones") throughout the chapter 11 cases, starting with the

---

[2] A true and correct copy of the relevant excerpt from the July 22, 2015 Hearing Transcript is attached hereto as **Exhibit B**.

Court's entry of the interim debtor-in-possession financing order, through a November 30, 2015 DIP Milestone deadline for the effective date of a plan of reorganization.

33.     Significantly, the DIP Financing provides for a DIP Milestone of August 1, 2015 for the Debtors' to either reach an agreement with the UMWA regarding the CBAs or file a motion pursuant to sections 1113 and 1114 of the Bankruptcy Code.

34.     On June 25, 2015, the Court entered an order (Docket No. 406, the "*Bidding Procedures Order*") approving the *Debtors' Motion for Entry of an Order Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, Approving the Form Manner of Notice, Scheduling Auctions and Sale Hearing, Approving Procedures for the Assumption of Assignment of Contracts, and Grating Related Relief* [Docket No. 200].

35.     Under the Bidding Procedures Order, the Court approved certain bid procedures and protections in connection with a proposed stalking horse sale ("Blackhawk Transaction") of a large portion of the Debtors' operating assets to Blackhawk Mining LLC ("Blackhawk").

36.     Blackhawk's proposed asset purchase agreement (filed at Docket No. 385) (the "Blackhawk APA") provides that Blackhawk's acquisition vehicle (the "Combined Company") proposes to assume no liabilities or obligations under: (a) the UMWA collective bargaining agreements; (b) any employee benefit plans maintained or sponsored by the Debtors; (c) any retiree medical or other retiree welfare benefits; or (d) any contributions to the UMWA 1974 Pension Plan, including any withdrawal liabilities under the plan.  Blackhawk APA at § 2.04(d). Further, the Blackhawk APA provides for no contributions to the Union VEBA.

37.     The Blackhawk Transaction seems to provide certain of the existing management and non-union workforce with ongoing jobs after the closing of one or more sale transactions.

38.     On July 3, 2015, while at the same time seeking drastic cuts from UMWA employees and retirees, the Debtors filed a motion (Docket No. 454, the "KEIP/KERP Motion") seeking authority to implement a key employee incentive plan (the "KEIP") and key employee retention plan (the "KERP").

39.     Under the KEIP, the Debtors received authorization to pay five senior level executives who are "insiders" aggregate bonuses of up to $3.75 million.  And, under the KERP the Debtors received authorization to pay $2.88 million in bonuses to management personnel, with a per-participant cost averaging $61,277.   None of the proposed KERP participants are members of the UMWA.

## IV.    The UMWA's Post-Petition Good Faith Negotiations And Debtors' Bad Faith 1113/1114 Proposal Which Moves Negotiations Backwards And Contains Completely New Asks

40.     Negotiations between the UMWA and the Debtors led to six Blackhawk CBA Modification Proposals from late May through early July 2015.  The Debtors allege that (i) the UMWA did not negotiate in good faith as it "provided its first (and only) counterproposal on June 12, 2015" which rejected the majority of the Debtors' proposals (including with respect to the UMWA 1974 Pension Plan, work rules, and job opportunity proposals and therefore was "a nonstarter"); and (ii) only the Debtors provided significantly better proposals which got rejected offhand.  However, the facts (and record to be adduced at trial) are to the contrary.

41.     First, the Debtors admit elsewhere in the Motion (at paragraph 56) that beginning on May 14, 2015 and over **the next two months**, "the Debtors formally met with the UMWA another four times, and the Debtors and their advisors participated in multiple conference calls and exchanged numerous e-mails with the UMWA and its advisors—contacts that often took place multiple times per day."  The UMWA agrees that it made numerous good faith proposals, provided important feedback and discussion which manifested itself in part in some of the

progress made in the later Blackhawk CBA Modification Proposals and continued to work on open issues up to and after the filing of the backward sliding 1113/1114 Proposal by the Debtors.

**A.      The UMWA's Good Faith Negotiations**

42.      Given the back drop of the sale of the Blackhawk Assets, nearly all of the proposals and counterproposals the UMWA made from late May through late June 2015 covered the CBAs that governed those assets.  In addition to the written counterproposals made by the UMWA directly, each of the Debtors' Blackhawk CBA Modification Proposals clearly built on the written and verbal counterproposals and additional points raised by the UMWA at each stage of the process.

43.      The parties focused on the Blackhawk Assets because these were the only assets with an actual stalking horse bid in place, and it was unknown (and remains unknown) what any future potential buyer of the Non-Blackhawk Operating Assets or the Non-Operating Assets would be willing to assume under CBAs and for retiree obligations.  The UMWA could not negotiate a deal with a ghost.

44.      At the time of the Debtors' Sixth Proposal, the UMWA raised the issue of job opportunities for UMWA members in the event the Federal, Hobet, Apogee or other mines closed at other Blackhawk facilities - not wages, work rules, or retiree obligations – simply jobs as they open up at other mines on the same terms and conditions otherwise offered at those facilities.  The Debtors, however, never engaged in substantive bargaining with the UMWA with respect to the Non-Blackhawk Assets.

45.      Further, despite good faith counterproposals from the UMWA, neither the Debtors nor Blackhawk – who incidentally never negotiated directly with the UMWA, only through the Debtors – refused to discuss certain issues, including, confusingly, some non-monetary yet critical to the UMWA Employees and UMWA Retirees.

46.    On July 10, 2015, the Debtors gave the UMWA an ultimatum and sent the 1113/1114 Proposal containing rejection of all CBAs and retiree obligations with respect to the Blackhawk Assets, and for the first time, modifications to CBA and retiree benefit obligations with regard to Non-Blackhawk Operating Asserts.

47.    The Debtors assert that after they made the July 10 1113/1114 Proposal, "the UMWA simply told the Debtors that there was nothing to discuss." *See* Motion, Exhibit E, Lucha Declaration, ¶ 51. That statement is wrong.

48.    Actually after reviewing the 1113/1114 Proposal, the UMWA informed the Debtors that it needed additional time to confer internally and respond because the proposal moved so far back from the prior negotiations relating to the Blackhawk Assets and for the first time included proposed rejection and/or material modifications with respect to the Non-Operating Assets and Non-Blackhawk Operating Assets, respectively.  Rather than negotiating, the Debtors filed the Motion on July 16, 2015, more than two weeks prior to the expiration of the applicable milestones contained in the DIP Financing.

49.    In addition to proposing rejection of all CBAs and retiree obligations with respect to the Blackhawk Assets, the Debtors for the first time propose rejection of all CBAs and retiree obligations with respect to the Non-Operating Assets and modifications to CBA and retiree benefit obligations with regard to Non-Blackhawk Operating Assets.  For example, the Debtors propose to modify the "Memorial Days"[3] by reducing the number to five from even just the ten days that survived the Debtors' prior chapter 11 cases.

50.    The 1113/1114 Proposal proposes a $1.25 wage reduction with less equal applications of the wage reductions when applied to the five different wage grades, representing

---

[3] Certain of the CBAs between the UMWA and the Debtors contain a provision entitled "Memorial Periods," which specifies the UMWA may designate up to ten Memorial Periods (otherwise known as "Memorial Days") during the CBA's term.  *See Chevron Mining,* 684 F.3d 1318, 1326 (D.C. Cir. 2012)    .

different levels of skilled workers.  On July 29, 2015, the UMWA submitted a counter-proposal (the "UMWA July 29 Proposal"), pursuant to which, among other things, the UMWA proposes to accept, with respect to the Blackhawk Assets, the Debtors' structure with regard to wage compression.

51.     The 1113/1114 Proposal seeks a reduction in paid days off. The UMWA offered significant concessions in this category.

52.     The 1113/1114 Proposal seeks to impose unilateral control over shift schedules, ignoring seniority and other factors that typically get covered by collective bargaining agreements. This proposed unilateral control harshly results in even more difficult lifestyles for UMWA Represented Parties and their families while conferring no material financial benefit. In fact, the UMWA strongly believes these changes reduce productivity, potentially increase accidents, and force older, more skilled workers into retirement.

53.     In addition to proposing significant changes that can hardly be characterized as "status quo" employment, including elimination of the UMWA 1974 Pension Plan, changes with respect to bargained for wage increases, wage rates, Memorial Days, and what appear to be punitive and unnecessary changes to the Union VEBA royalty payment obligations with respect to the Apogee, Hobet and Federal mines, the Debtors also propose to reject certain basic responsibilities related to the modest cost of administering the retiree benefits paid for by Peabody and Alcoa (without providing for any alternative methods to implement the administration of these benefits paid for by third parties).

54.     The UMWA Employees and/or UMWA Retirees (including legacy retirees that previously worked at Peabody and Arch, referred to as the "Alcoa Assumed Retirees" and the "Patriot Assumed Retirees") also participate in various benefit plans – including Coal Act plans

– administered by the Debtors at immaterial cost but actually funded by third-party non-debtors, including Peabody and Alcoa, pursuant to various prepetition agreements, including the Patriot-Peabody-UMWA Settlement Agreement and VEBA Funding Agreement.

55.     The Debtors assume that Peabody or Alcoa will be required under the Coal Act to "pick up" the terminated obligations of the Debtors.  However, these assertions, without support, provide little comfort to the UMWA and the UMWA Represented Parties.  Especially since, in an analogous—though factually unrelated—context, Peabody already apparently challenges its obligation to step in and pickup any funding shortfall with respect to the Debtors' other legacy liabilities.  *See Peabody Energy (BTU) Stock Down on Coal Industry Pension Lawsuit,* http://www.thestreet.com/story/13222257/1/peabody-energy-btu-stock-down-on-coal-industry-pension-lawsuit.html (quoting statement released by Peabody in connection with lawsuit brought by UMWA 1974 Pension Plan against Peabody and Arch Coal that "[n]o Peabody company is signatory to a labor agreement that requires contributions to the 1974 UMWA Pension Plan (multi-employer plan), and the company has no liability to the plan.  We believe the pension plan's claims are completely without merit, and we will vigorously defend against them.").

### B.     The UMWA Made Several Counterproposals, Not Just One Counterproposal On June 9, 2015

56.     While the parties clearly disagreed (and disagree) as to the Debtors' non-negotiable demand that any agreement required the complete rejection of any obligations owed with respect to the UMWA 1974 Pension Plan and other Legacy Liabilities, the UMWA engaged in good faith bargaining.  The Debtors' assertion that the UMWA made one counterproposal (on June 9, 2015) is simply false and mischaracterizes the negotiating process and dynamic.

57.     In addition to its June 9, 2015 written proposal, the UMWA made written proposals on June 15, 2015 and June 22, 2015.  The Debtors fail to mention not only these

written proposals, but the extensive and detailed discussions that took place between each of the

Debtors and UMWA revised proposals, which regardless of the scribe, reflect substantial

ongoing discussions, work and effort by the UMWA. Furthermore, as noted above, the UMWA

submitted another formal written proposal on July 29, 2015 which proposes further

concessions.

58.    In response to the UMWA's June 22 proposal, the Debtors provided their Sixth

Proposal on June 22, 2015, again limited to the Blackhawk Assets—namely the Black Oak mine,

the Gateway Eagle mine, the CC10 mine, Rocklick Plant, Wells Plant, and Fanco Plant and

Loadout. However, although the parties made progress on many issues, at this time they were

still apart on significant substantive deal terms, at least some of which remain the subject of

active discussions.

59.    Indeed, the UMWA continued to communicate with the Debtors. Yet, on July 10,

2015, the Debtors sent the startling 1113/1114 Proposal. As outlined below, the 1113/1114

Proposal is clearly unacceptable and something the UMWA membership will not live with.

Therefore, a discontinuation of work by UMWA members is far more likely to result.

60.    The 1113/1114 Proposal unacceptably proposes to modify the terms of the

Debtors' most recent CBAs and UMWA retiree obligations as follows:

- **Complete Rejection of Certain CBAs**: The Debtors propose to reject in full the 2013 Coal
Wage Agreement CBAs between the UMWA and Debtors (i) Colony Bay Coal Company;
(ii) Mountain View Coal Company LLC; (iii) Rivers Edge Coal Company, Inc. (iv) Pine
Ridge Coal Company, LLC; (v) Highland Mining, LLC; (vi) Heritage Coal Company, LLC;
(vii) Gateway Eagle Coal Company, LLC; and (viii) Eastern Associated Coal, LLC (with
respect to the Blackhawk Assets).

- **Pension:** Debtors propose to stop making contributions to, and permanently withdraw from,
the Debtors' participation in the UMWA 1974 Pension Plan, and would replace it with an
employer-sponsored 401(k) plan with certain employer contributions based on employee
contributions.

-18-

- **Health and Welfare Retiree Obligations:**

  - Debtors propose to reject the obligation to administer a cost-reimbursed health plan for certain Peabody and Alcoa retirees, a minimal cost for benefits funded by those third-parties and very important to the covered retirees.

  - Additionally, with respect to the Union VEBA, certain Debtors that hold Non-Blackhawk Operating Assets agree to contribute $0.20 per clean ton of coal mined at certain mines, but only starting on January 1, 2017 and through December 31, 2018, and only if no legislative funding is provided in the future; if such funding is provided, the Debtors' obligation to fund the Union VEBA would be terminated.  The Debtors seek to cancel all other Debtor obligations with respect to the Union VEBA.

- **Coal Act:**  The Debtors propose to cease making all payments required under the Coal Act.

- **Job Opportunities**:   Debtors propose to reject the "Memorandum of Understanding Regarding Job Opportunities" (the "Jobs MOU") which provides for job opportunities, to the extent they otherwise become available, for laid-off miners at the Debtors' various other mine facilities. This demand, non-monetary as it only exists to the extent another facility is hiring, is particularly confusing to the miners facing unemployment.

- **Other Proposals With Respect To Modified CBAs Regarding Non-Blackhawk Operating Assets**: With respect to Non-Blackhawk Operating Assets, Debtors would:

  - seek new five-year so-called Coal Wage agreements;
  - reduce vacations and holiday pay;
  - reduce wages;
  - reduce contractually bargained for "Memorial Days" from ten (10) to five (5), and only allow use of remaining Memorial Days based on reasons national in scope and based on observances that apply to other signatory operations located in West Virginia and Pennsylvania which are controlled by signatory employers other than the particular Debtor
  - be granted the unilateral and unfettered right to set and modify shift schedules, including rotating shifts without regard to seniority;
  - eliminate recall rights for laid off workers;
  - eliminate numerous job classifications at Hobet and Apogee, effectively resulting in additional layoffs and the elimination of jobs.

*See* Motion, Exhibit B.

61.     The Debtors failed to provide or justify the necessity for any of these savings, particularly with mines such as Federal that generate positive operating cash flow even without concessions.

62.     Furthermore, given that the disposition of Non-Blackhawk Operating Assets and other Non-Operating Assets remains unknown at this time, it is simply premature for the Debtors to determine the alleged necessity for the 1113/1114 Proposal or any proposed concessions.

63.     As noted in the current draft Plan, the Debtors' propose to transfer their Non-Blackhawk Operation Assets and Non-Operating Assets to a liquidating trust.  And, as described above, the Debtors admit they have no business plan upon which to base any request for modifications or concessions.

64.     The Debtors allege that with the 1113/1114 Proposal, they "have proposed necessary changes" but otherwise seek to maintain a "significant part of the UMWA's employment as 'status quo' for as long as the Debtors continue operating their Remaining Assets [*i.e.* Non-Blackhawk Operating Assets]".  *See* Motion, at ¶ 102.  However, the reality is quite the contrary.  As noted, the Debtors propose complete rejection of Non-Operating Assets, and propose drastic modifications to the CBAs governing the assets not being bought by Blackhawk.

## ARGUMENT

## I.     LIQUIDATING DEBTORS ARE NOT ELIGIBLE FOR SECTION 1113/1114 RELIEF

65.     The Debtors admit in the Motion that this case is not a true reorganization. Rather, the Debtors seek to sell substantially all of their assets and then liquidate their remaining assets through a liquidating trust.  Congress provided in sections 1113 and 1114 that the proposed modifications to CBAs and retiree obligations must be "necessary to permit the <u>reorganization</u> of the debtor."  11 U.S.C. §§ 1113(b)(1)(A), 1114(f)(1)(A) (emphasis added).

66.    While case law in other jurisdictions liberally construes the "necessary to permit the reorganization of the debtor" to mean '"necessary to accommodate confirmation of a Chapter 11 plan'" (*see* Motion, at ¶ 74 (citing cases)), this Court is not bound by such holdings.

67.    Rather, courts interpreting sections 1113 and 1114 of the Bankruptcy Code (as with all statutory provisions) must start with the plain language of the statute in interpreting its contours.  *See, e.g., In re Hoffman Bros.*, 173 B.R. 177, 185 (9th Cir. B.A.P. 1994) ("Under a plain meaning analysis, we start with the language of the statute itself.") (citing *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)); *In re Delta Air Lines, Inc.*, 359 B.R. 491, 503 n.5 (Bankr. S.D.N.Y. 2007) ("Statutes are to be construed and applied in accordance with the plain meaning of the words used by Congress.  It is not for the court to ignore what the statute actually says, or to employ strained or imaginative interpretations not consistent with the plain and ordinary usage and meaning of the statutory language.") (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 10 (2000) (when resolving questions of statutory interpretation, "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says").

68.    In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984), the Supreme Court held that rejection of a collective bargaining agreement is only permissible to aide a "successful rehabilitation of debtors", and thus CBA rejection should not be permitted without "a finding that that policy would be served by such action."   Congress enacted section 1113 (and later 1114) in response to the *Bildisco* decision.  *See, e.g., In re Rayman, Martin & Fader, Inc.*, 170 B.R. 286, 288-89 (D. Md. 1994).   While section 1113 (and later section 1114) imposed more stringent requirements with respect to CBA rejection (or retiree benefit obligation modifications

under section 1114) than existed at the time of *Bildisco*, Congress never weakened the *Bildisco*

requirement that rejection actually serve a rehabilitative purpose.

69.     The legislative history of section 1114 supports this assertion.   Section 1114's

sponsors expressed as follows:

> It is intended that the words "necessary for the reorganization of
> the debtor"…should be interpreted as the Third Circuit interpreted
> them in [Wheeling-Pittsburgh Steel]…[where] the court held that a
> proposal to modify a labor contract is "necessary to permit
> reorganization" when essential to the "goal of preventing the
> debtor's liquidation."

*See* 134 Cong. Rec. S. 6823-27 (daily ed. May 26, 1988) (Statement of Sen. Metzenbaum); *see*

*also* 134 Cong. Rec. S 6823-02, 13v (1988) (Statement of Sen. Heinz) ("The bill will protect

retirees . . .[ensuring that] benefits would be continued throughout the proceedings <u>unless it was</u>

<u>necessary to discontinue them to keep the company alive</u>.") (emphasis added).

70.     Congressional intention with respect to sections 1113 and 1114 was clearly to try

to "keep the company alive", something that does not exist with liquidating companies like these

Debtors.  Accordingly, the Motion should be denied.

**II.     EVEN ASSUMING SECTIONS 1113 AND 1114 APPLY TO A LIQUIDATING
DEBTOR, THE 1113/1114 PROPOSAL IS NOT CLEARLY NECESSARY TO
OBTAIN CONFIRMATION OF THE DEBTORS' PROPOSED PLAN**

71.     Assuming the Court were to disregard the plain language of sections 1113 and

1114 and *Bildisco,* and interpret "necessary to permit the reorganization of the debtor" to mean,

with respect to a liquidating debtor, "necessary to confirm a chapter 11 plan of liquidation", as

set forth above, there is no evidence as to what changes would in fact be necessary or whether

any such Plan could in fact be confirmed in these cases.  The Debtors must still develop a

business plan for a liquidating trust (referred to by the Debtors as a "remainder entity") and

determine how much cash is necessary to meet the projected operating and other expense targets

once the Debtors emerge from bankruptcy.  And, the business plan must be shared with the UMWA to allow good faith bargaining to proceed.

72.     The Debtors' CRO's prior testimony in these chapter 11 cases made clear that as of the filing of this Motion (and, indeed, post-filing of the Plan and Disclosure Statement), the Debtors have no finalized business plan, and cannot provide information as to what exact cost savings may be necessary or required to (i) confirm a liquidating chapter 11 plan and/or (ii) provide for a viable liquidating trust/remainder entity.

73.     The Disclosure Statement filed by the Debtors on July 13, 2015 also lacks sufficient information as to the ability of the Debtors' to satisfy their Legacy Liabilities, including those which continue to accrue on an ongoing post-petition basis and thus create administrative expense claims that must be paid in full under a chapter 11 plan.  Without knowledge of whether a chapter 11 plan could truly be confirmed here and/or what concessions may be necessary to allow for such confirmation, the UMWA cannot engage in a meaningful evaluation of the 1113/1114 Proposal, and thus, the relief sought in the Motion is premature at best.

### III.     COAL ACT (AND ANY OTHER STATUTORY OBLIGATIONS) CANNOT BE MODIFIED UNDER SECTION 1114

74.     The Motion (and underlying 1113/1114 Proposal) seeks, pursuant to section 1114, to reject any ongoing Coal Act liabilities of the Debtors to certain retirees.  Section 1114 does not authorize this relief, and therefore, it should not be granted.  While there is no case law in this jurisdiction regarding whether section 1114 applies to Coal Act liabilities, at least one court has held that section 1114 relief is not applicable to Coal Act liabilities. *See In re Westmoreland Coal Co.*, 213 B.R. 1, 19-20 (Bankr. D. Colo. 1997) ("retiree benefits" subject to section 1114 relief only applies to voluntary retiree benefit plans, and not to statutorily-imposed

obligations such as under the Coal Act or amounts due following prepetition termination of a

Coal Act individual employer plan); *but see In re Horizon Natural Resources Co.*, 316 B.R. 268,

275-279 (Bankr. E.D. Ky. 2004) (allowing rejection of Coal Act obligations pursuant to section

1114 of the Bankruptcy Code).

> 75.     The court in *Westmoreland* persuasively explained that the

> language of § 1114 suggests that Congress intended this provision
> only to apply to plans voluntarily created by a debtor which are in
> operation at the time of the bankruptcy filing.  The elaborate
> procedure for selecting a representative of the beneficiaries and for
> negotiation of modifications proposed by a debtor indicates that
> Congress was concerned with collectively bargained-for
> agreements rather than obligations [such as Coal Act liabilities]
> fixed by statute.

213 B.R. at 19.  This Court should adopt this holding and find that Coal Act liabilities (which,

upon information and belief, are administered via benefit plans established pursuant to statute)

cannot be rejected pursuant to section 1114, and the Debtors must continue to satisfy the

obligations on a post-petition basis.

76.     Furthermore, to the extent the Debtors' obligations with respect to other retirees

(such as Peabody or Alcoa retirees) arise pursuant to statute (such as Black Lung liabilities,

assumed Coal Act plan administration, etc.), the Debtors similarly should not be permitted to

impermissibly utilize section 1114 to reject such statutory obligations.

## IV.   THE MOTION IS LOADED WITH TRAPS AND PROCEDURALLY IMPROPER RELIEF

77.     The Motion seeks additional relief beyond that permissible under sections 1113

and 1114 and procedurally improper.  Further, the Motion seems to impermissibly impair the

rights of the UMWA Represented Parties with respect to obligations owed by third parties like

Peabody and Alcoa to the UMWA Represented Parties.

78.    As noted on pages 12-14 of the Motion, the Debtors currently administer benefits that are funded by Peabody and/or Alcoa under various settlement agreements and other documents with these third parties.  The Motion seeks to terminate the Debtors' administrative obligations with respect to these agreements.  These third parties may argue that their obligations to fund are waived due to the Debtors' breaches under the relevant agreements, and thus the Debtors failure to willingly continue its administrative role (which may cost very little in the way of actual dollars) could cause the UMWA Represented Parties to risk losing millions of dollars of promised payments from Peabody and/or Alcoa.

79.    The Motion also is a procedurally improper method for rejecting obligations under executory contracts (*i.e.* non-CBA agreements) governed by section 365 rejection standards.  Indeed, some of the proposed relief in this regard appears buried in footnotes and in vague statements in the Motion. Thus, there will undoubtedly be challenges by Peabody and others with regard to Coal Act future liabilities to the extent this aspect of the Motion is granted.

80.    The relief sought in the Motion with respect to the Debtors' Coal Act obligations should be denied.

## V.    THE DEBTORS FAIL TO MEET THE SUBSTANTIVE REQUIREMENTS OF BANKRUPTCY CODE SECTIONS 1113 AND 1114

81.    Section 1113 of the Bankruptcy Code limits the right of a debtor in possession to reject a collective bargaining agreement and requires under section 1113 subsections (b) and (c), the following:

> (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—
>
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of

such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the [debtor in possession] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the [debtor in possession] has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(b) – (c).

82.     In *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 241 (Bankr. S.D.W. Va. 1996), the Bankruptcy Court for the Southern District of West Virginia noted that in order to determine if a debtor has satisfied the requirements of § 1113 of the Bankruptcy Code, many courts utilize a nine part test as developed in *In re American Provision Co.,* 44 B.R. 909 (Bankr. D. Minn. 1984) ("While § 1113 is not a masterpiece of draftsmanship, I think nine requirements for court approval of the rejection of collective bargaining agreements can be gleaned from § 1113"). The test includes the following factors:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*In re American Provision Co.* at 909.

83.   Furthermore, "[t]he requirements for modification of retiree benefits [under section 1114 of the Bankruptcy Code] are . . .  substantially the same as the requirements for rejection of collective bargaining agreements [under section 1113 of the Bankruptcy Code], so *American Provision's* nine-part analysis is equally appropriate [with respect to rejection of retiree benefits pursuant to section 1114 of the Bankruptcy Code]." *In re Horizon Natural Resources Co.*, 316 B.R. 268, 281 (Bankr. E.D. Ky. 2004).

84.     The Debtors have the burden as to every element, and as to the ninth element, clear and convincing proof is required.  *In re Liberty Cab & Limousine Co. Inc.*, 194 B.R. 770, 776 (Bankr. E.D. Pa. 1996); *In re U.S. Truck Co. Holdings*, 2000 Bankr. LEXIS 1376 (Bankr. E.D. Mich. Sept. 29, 2000) (citing *In re Walway Co.*, 69 B.R. 967, 972 (Bankr. E.D. Mich. 1987)) and (*In re American Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984).

85.     Congress recognized that if a debtor could not meet every requirement of the statute, it might be forced to liquidate instead; yet, no element of sections 1113 or 1114 is optional.  It is not a set of suggestions but a series of requirements designed to prevent rejection in all but limited cases.  The court is not free to excuse *any* section 1113 requirement.  If even one of the nine elements is missing, the application must be denied.  *UFCW Local 211 v. Family Snacks, Inc. (In re Family Snacks Inc.)*, 257 B.R. 884, 898 (8th Cir. B.A.P. 2001); *In re United States Truck Co. Holdings*, 2000 Bankr. LEXIS 1376 (Bankr. E.D. Mich. Sept. 29, 2000) (citing *Walway,* 69 B.R. at 972).

86.     The UMWA does not dispute that the Debtors presented the 1113/1114 Proposal but the parties negotiated to the filing of the Motion with respect to the Blackhawk CBA Modification Proposals.  However, section 1113(b)(2) requires that after a proposal is made, but before a hearing on rejection, the debtor meet with the union at reasonable times to negotiate in good faith.  To satisfy the requirement of negotiating in good faith, a debtor cannot approach negotiations with a "take it or leave it" mentality. *In re Northwest Airlines Corp*, 346 B.R.307, 327 (Bankr. S.D.N.Y.2008) (quoting *In re Delta Air Lines*, 342 B.R.685 at 697( Bankr. S.D.N.Y. 2006).

> [A] debtor cannot be said to comply with its obligation under Section 1113(b)(2). . . when it steadfastly maintains that its initial proposal under subsection (b)(1)(A). is non-negotiable. . . . [T]he evident purpose and objective of Section 1113(b)(2) is to compel the debtor to

> negotiate in good faith to reach 'mutually satisfactory modifications.'
> With rare exceptions . . . true negotiation necessarily requires
> compromise in each side's bargaining positions. When one side
> presents a nonnegotiable, take-it-or-leave-it proposal, negotiation stalls
> because there is nothing of substance to bargain for when one side
> must bid against itself.

*Delta*, 342 B.R. at 697.  While courts recognize that "depending on the facts of the case, a debtor

may not be obligated to reduce the total amount of cost savings requested in its original proposal

to demonstrate good faith", *Northwest*, 346 B.R. at 327 (citation omitted), a debtor should not be

permitted to arbitrarily increase the ask to manipulate the process in bad faith by including terms

to stalemate negotiations and trigger an outright rejection, as opposed to negotiation and

compromise.  *See In re AMR Corp.,* 477 B.R. 384, 409 (Bankr. S.D.N.Y. 2012) (citing

*Northwest*, 346 B.R. at 327).

### A.   Debtors' Proposal Was Not Based On The Most Complete And Reliable Information Available At The Time Of The Proposal

87.   Bankruptcy Code section 1113(b)(1)(A) requires that subsequent to filing a

petition and prior to filing an application seeking rejection of a collective bargaining agreement,

the debtor in possession shall make a proposal "based on the most complete and reliable

information available at the time of such proposal." 11 U.S.C. § 1113(b)(1)(A).

88.   In determining whether a debtor's proposal was based on complete and reliable

information, courts have held that the information upon which the proposal was based must

include "a thorough analysis of all of the incidents of income and expense that would bear on

[the debtor's] ability to maintain a going concern in the future" and that the union's objections

must "go to whether the Debtor mustered a sufficiently comprehensive, detailed portrait of its

financial posture and prospects before it formulated its proposals."  *In re Mesaba Aviation, Inc*.,

341 B.R. 693, 712-13 (Bankr. D. Minn. 2006); *see also In re G & C Foundry Co*., 2006 Bankr.

LEXIS 4582, *24-27 (Bankr. N.D. Ohio July 19, 2006); *See Truck Drivers Local 807 v. Carey Transportation Inc.*, 816 F.2d 82, 89 (2d Cir. 1987) (explaining that it is "impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health").

89.     In *In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, at *24 (Bankr. N.D. Ohio July 19, 2006), the court held that the debtor failed to demonstrate its proposal was based on the most complete and reliable information available at the time of the proposal where the debtor based its proposal on its "zero-based budgeting analysis and simply took a snapshot view of its current financial situation."

90.     The court made this finding even where the debtors presented testimony regarding prospective new business and a $100,000 monthly increase in base sales within that year, explaining that there was no evidence that such projections were considered in developing the proposed modifications presented to the union. *Id.*  The court added that the limited presentation of the revenue side of the debtor's finances as a basis for rejection of the CBAs was especially inadequate where the proposed changes were permanent. *In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, *27 (Bankr. N.D. Ohio July 19, 2006).

91.     Here, the Debtors make the 1113/1114 Proposal with what they suggest include necessary modifications to the CBAs governing the Non-Blackhawk Operating Assets and Non-Operating Assets, yet cannot even provide a business plan for the expected post-emergence assets and liabilities or the payment of administrative expenses under the Plan.  While the UMWA received some information (including from the data room and discussions with the Debtors), the UMWA lacks sufficient information to assess the necessity of the Debtors' proposal.

### B.    The Proposed Modifications Are Not Necessary

92.    Section 1113(b)(l)(A) limits the debtor to proposing only "those necessary modifications in . . . benefits and protections that are necessary to permit the reorganization of the debtor." *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 88 (2d Cir. 1987). The use of "necessary" twice in the applicable section was done deliberately to emphasize the very limited nature of the changes allowed. *See* 130 Cong. Rec. S8898 (daily ed. June 29, 1984) (Remarks of Sen. Packwood) ("The word 'necessary' inserted twice into this provision clearly emphasizes this required aspect of the proposal"); *In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986). A debtor has the "burden to demonstrate that each of its proposed modifications, both economic and non-economic, are necessary to its business plan." *In re AMR Corp.,* 477 B.R. 384, 411 (Bankr. S.D.N.Y. 2012) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F.App'x. 46, 49 (2d Cir. 2005)).  A union has good cause to refuse to accept unnecessary changes.

93.    Generally, courts look to whether a debtor's proposed changes are narrowly tailored, and whether there is a causal connection between the proposed modification and the debtor's financial condition.  *See In re Pierce Terminal Warehouse, Inc.*, 133 B.R. 639, 647 (Bankr. N.D. Iowa 1991) (explaining the court must consider whether the employer "has sought changes to the contract which materially exceed such needs. The result of such overreaching is that rejection will be prohibited") *In re Mile Hi Metal Systems, Inc*., 899 F. 2d 887, 893 (10th Cir. 1990) ("the debtor may not overreach under the guise of proposing necessary modifications. [T]he proposals must be more than potentially helpful; they must be directly related to the debtor's financial condition.") (footnote omitted). *See In re William P. Brogna & Co.*, 64 B.R. 390, 392 (Bankr. E.D Pa. 1986); *In re Valley Kitchens, Inc.*, 52 B.R. 493, 495-96 (Bankr. S.D. Ohio 1985). "This latter requirement prevents the debtor from injecting economically irrelevant

issues into the bargaining process which would have no impact upon the debtor's financial condition." *In re K & B Mounting*, 50 B.R. 460, 464 (Bankr. N.D. Ind. 1985).

### 1.   The Debtors' Proposed Modifications Are Not Narrowly Tailored

94.     To determine whether changes are necessary for a successful reorganization, the Court must look "into the debtor's ultimate future and estimate what the debtor needs to attain financial health . . . . Thus, a court should focus on the long-term economic viability of the reorganized debtor, as opposed to the debtor's short-term economics." *In re AMR Corp.*, 477 B.R. 384, 407 (Bankr. S.D.N.Y. 2012) (internal citations omitted).  The "necessity" inquiry requires debtors to state what the "gap" is between its current financial performance and the performance needed to emerge, and what proportion of the gap is filled by the proposed labor concessions.  In effect the questions are "how big is the hole?" and "who will fill it?" *See Fiber Glass Industries, Inc.*, 49 B.R. 202, 206 (Bankr. N.D.N.Y. 1985); *see also Association of Flight Attendants v. Mesaba Aviation, Inc.*, 350 B.R. 435, 451 (D. Minn. 2006) (discusses an 8% EBIT margin as a measure of gap to be filled).

95.     In *In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, *35 (Bankr. N.D. Ohio July 19, 2006), the court found the debtor did not meet its burden of showing its proposal was necessary where the debtor did not make any projections of future revenue, but rather argued that because the current snap-shot of its financial condition revealed a need for labor cost savings, it was entitled to make the savings permanent.  The court rejected this argument, holding that a debtor's current need could not justify its demand for permanent savings. *In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, *30 (Bankr. N.D. Ohio July 19, 2006) ("Such a myopic view cannot be the sole basis for a good faith proposal that union members forego benefits previously negotiated by them and is insufficient proof in this case.").

96.    Similarly, in this case, allowing the Debtors to obtain permanent relief based upon a snap-shot of current finances, while the coal industry is in the trough of a business cycle, results in a windfall at the expense of UMWA Employees and retirees. The Debtors are only entitled to the quantum of relief that would allow it to emerge as a viable, rather than as a lucratively profitable enterprise. *Ass'n of Flight Attendants v. Mesaba Aviation, Inc.*, 350 B.R. 435, 449 (D. Minn. 2006). The Debtors fail to make any showing as to the future operations and financial performance of the assets for sale and/or the remaining assets and the request for drastic and permanent relief is not warranted.

97.    To the extent the Debtors argue that they are liquidating, they still must demonstrate the cost savings necessary to make the liquidating trust or other entity to be formed to continue operations post-emergence viable, and the savings with respect to the Blackhawk Assets cannot possibly be sufficiently narrow where Blackhawk concedes it would have agreed to better treatment. The Debtors fail to provide any such projections, and accordingly, for this reason alone, fail to satisfy the necessity prong.

## 2.    There Is An Insufficient Causal Link Between The Debtors' Proposed Modifications And The Debtor's Financial Condition

98.    Additionally, the *G & C Foundry* Court pointed out that "[t]he fact that a proposal will decrease a debtor's expenses is not alone sufficient evidence of necessity." In holding that the debtor was unable to prove the necessity of the proposal, the court explained that notwithstanding the fact that certain terms of the proposal would "obviously result in cost savings to Debtor," on the evidence before the court, it was unable to determine that each of these terms were necessary. This is especially true in light of Debtor's insistence that all modifications, including no further participation in the pension plan, be permanent. *In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, *33-34 (Bankr. N.D. Ohio July 19, 2006).

99.     Here, the Debtors have far overreached in demanding complete rejection of the CBAs with respect to the Blackhawk Assets and the Non-Operating Assets, and modification of many non-economic terms, including Memorial Days, unilaterally imposing and determining work-shifts, etc. with respect to Non-Blackhawk Operating Assets.   Many of these proposed changes are geared towards removing standard rights afforded union-represented employees. Most of the proposed changes have either no apparent or no material financial effect on the Debtors' businesses.   For example, the Debtors demand the following unfounded and facially punitive concessions from the UMWA Represented Parties (with respect to the Non-Blackhawk Operating Assets):

- Union VEBA Royalty Payments:  The Debtors propose to enter into modified CBAs with respect to the Non-Blackhawk Operating Assets that provide for $0.20  per ton mined royalty contributions in 2017 and 2018, but propose to "snap back" such payments if legislation is passed that otherwise provides for funding to the Union VEBA.   The UMWA fails to understand how such a "snap back" can be necessary – if the Debtors can make the payments lacking such government funding, it is wholly irrelevant whether the government ultimately kicks in additional funding.   And, if the government approves funding, the savings attributed to that funding should inure to the benefit of the retirees.

  Memorial Days:  Initially, the Debtors demanded to revoke all ten Memorial Days.  After continued discussions, the Debtors sought to allow the UMWA five (5) Memorial Days, but only to be used for issues national in scope.  This restriction offers no economic value

- Work Schedule Rotation:   The Debtors demand unilateral authority to impose shift schedules, including but not limited to, ignoring seniority and other factors that should be, and are routinely and typically, the subject of negotiations.

- Job Opportunities:  The Jobs MOU entered into following the Debtors' prior chapter 11 cases provided UMWA miners who lost their jobs with the opportunity to work at other locations, albeit only as jobs became available.  The Debtors inappropriately seek to delete this non-economic opportunity for these miners.

100.     Finally, it is impermissibly punitive through this Motion for the Debtors to seek to discontinue benefits provided by third parties, particularly Peabody and Alcoa, at no material cost to the Debtors.

### C.    The Proposed Modifications Do Not Treat All Parties Fairly And Equitably

101.    All creditors, the debtor, and all of the affected parties must be treated fairly and equitably, "to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree." *Century Brass,* 795 F. 2d at 265, 273 (2d Cir. 1986).

102.    Equity requires that the unionized employees not be the sole target of cost reductions and that there be some cost-cutting measures by management in connection with a chapter 11 filing.  *In re William P. Brogna & Co.*, 64 B.R. 390 (Bankr. E.D Pa. 1986); *In re Carey Transp., Inc.,* 50 B.R. 203, 210 (Bankr. S.D.N.Y. 1985); *In re Allied Delivery Sys.,* Inc., 49 B.R. 700, 702 (Bankr. N.D. Ohio 1985); *In re Lady H Coal Co.*, 193 B.R. 233, 242 (Bankr. S.D. W.Va. 1996); *In re Blue Diamond Coal Co.*, 131 B.R. 633 (Bankr. E.D. Tenn. 1991).

103.    Courts have found that "equitable treatment does not mean equivalent dollar for dollar treatment, but means fairness depending upon the facts of the situation." *In re Indiana Grocery Co.*, 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990).  The burden of proof rests with the Debtors to demonstrate that their proposal is fair and equitable to all creditors, the debtor and all of the affected parties.  Failure to meet this requirement is fatal to a Section 1113 motion, regardless of whether Debtors meet other statutory standards.  *See Ass'n of Flight Attendants v. Mesaba Aviation, Inc.*, 350 B.R. 435, 460-62 (D. Minn. 2006).  Here, the proposed modifications with respect to the Non-Blackhawk Operating Assets are inequitable because the UMWA constituents are being asked to shoulder a disproportionate share of the financial sacrifice.

104.    Modifications do not treat parties equitably and fairly where the debtor's top management takes no reduction in salary and receives bonuses while, at the same time, attempts to reject the CBA. *In re Indiana Grocery Co.*, 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990).  In *Indiana Grocery*, the court disallowed rejection of the CBAs where "in light of the serious

financial problems, the debtor failed to demonstrate that managers and creditors were bearing their share of the burden in the debtor's reorganization."

105.    Similarly, in *In re Lady H Coal Co., Inc.,* 193 B.R. 233, 242 (Bankr. S.D.W. Va. 1996), the court held the debtors' proposal was not fair and equitable where future compensation negotiated by the officers in the form of consulting and non-compete agreements which totaled $150,000 per officer was "at the cost of the rights of the represented employees," and thus, was unjust and unacceptable "in light of the officers total disregard for other employees of the Debtors." *Id.; see also Ass'n of Flight Attendants v. Mesaba Aviation, Inc.*, 350 B.R. 435, 460-62 (D. Minn. 2006) (revising bankruptcy court's granting of Section 1113 relief because court failed to consider how the owner of the debtor shared the burdens of reorganization); *In re Jefley, Inc.*, 219 B.R. 88, 93-94 (Bankr. E.D. Pa. 1998) (continued receipt by debtor's principals of high salaries prevent court from concluding that proposal was fair and equitable to union employees); *Walway*, 69 B.R. at 973 n. 15 ("In most cases, a financially troubled company should consider rejection of a labor contract as a last resort to help the company survive. The history of the collective bargaining agreement and its special treatment and protection lends support to this conclusion").

106.    The Debtors intend to pay incentives to their senior management, and bonuses to their other non-union employees, and neither trade creditors nor the Debtors' pre-petition secured lenders are being asked to make sacrifices similar to those being asked from UMWA Employees and UMWA Retirees.  This demonstrates precisely the type of unfair and inequitable treatment not permitted by sections 1113 and 1114.

**D.    The Debtors Did Not Provide The UMWA With Sufficient Information Necessary To Evaluate The Proposal**

107.    Congress codified an affirmative obligation to provide sufficient information to the union in §1113(b)(l)(B): "[T]he debtor in possession . . . shall . . . provide . . . the representative of the employees with such relevant information as is necessary to evaluate the proposal."  The requirement of completeness shows that Congress viewed the debtor's obligation expansively.  *See, e.g.*, 130 Cong. Rec.H7496 (daily ed. June 29, 1984) (Remarks of Rep. Morrison); 130 Cong. Rec. S8890 (daily ed. June 29, 1984) (Remarks of Sen. Dole); 130 Cong. Rec. S8893 (daily ed. June29,1984) (Remarks of Sen. Hatch);  130 Cong. Rec. S8899 (daily ed. June 29, 1984) (remarks of Sen. Kennedy) (reading Rep. Morrison's remarks).

108.    Courts interpret this obligation expansively.  Section 1113/1114 applications which fail to provide all relevant and necessary information are routinely denied.  *See, e.g., In re Mesaba Aviation*, 341 B.R. 693 (D. Minn. 2006) (rejection denied where company failed to provide dynamic model of business plan to union); *In re American Provision Co.*, 44 B.R. 907, 909 n. 2 (Bankr. D. Minn. 1984); *K & B Mounting*, supra, 50 B.R. at 467-468*; In re Fiber Glass Industries, Inc.*, 49 B.R. 202, 206 (Bankr. N.D.N.Y. 1985) (failure to disclose business plan to union); *see also In re Saco Local Dev. Com.*, 30 B.R. 862 (Bankr. D. Me. 1983) (court struck from evidence debtor's financial statements where debtor withheld notes to financial statements).

109.    In the case of *In re Fiber Glass Indus., Inc.,* 49 B.R. 202, 207 (Bankr. N.D.N.Y. 1985), at the time the proposal was presented to the union, no mention had been made of any anticipated lay off of union workers.  The court found that anticipated possibility or probability, as it were, that one-third of the union work force would have to be laid off appears to be "relevant information," as the term is used in § 1113(b)(1)(B), which ought to have been disclosed to the Union representative.

110.    Similarly, here, during the previous month of negotiations, the Debtors and UMWA only actively bargained regarding the CBAs governing the Blackhawk Assets.

**E.    The Debtors Did Not Confer In Good Faith To Reach Mutually Satisfactory Modifications**

111.    This factor requires that a debtor "confer in good faith in attempting to reach mutually satisfactory modifications of the [collective bargaining] agreement." 11 U.S.C. § 1113(b)(2). Where the debtor has met its burden with respect to meeting with union representatives, the burden of production on this factor shifts to the union. *See American Provision*, 44 B.R. at 910."Good faith bargaining is conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process." *Walway Co*., 69 B.R. at 973.

112.    *In re G & C Foundry Co.,* 2006 Bankr. LEXIS 4582, at *42 (Bankr. N.D. Ohio July 19, 2006), the court found that the debtor did not engage in good faith negotiations with the Union where the Debtors offered a "take it or leave it" proposal.  Although the union in *G & C* submitted several counterproposals that included concessions on its part, debtor's response was simply that it needed the relief it was requesting; the court found that the debtor's negotiation efforts were perfunctory at best.  *Id.* (citing *Northwest Airlines Corp.*, 346 B.R. 307, 327 (Bankr. S.D.N.Y. 2006) (recognizing that the good faith requirement has been held to preclude a debtor from simply offering a "take it or leave it" proposal)).

113.    Significantly, instructive here is *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 242 (Bankr. S.D.W. Va. 1996).  There, the Court found that the Debtors' motion to sell substantially all assets amounted to the Debtors' plan of reorganization, and the court explained (in denying the section 1113 relief sought) that:

> this form of reorganization does not mean a debtor can shortcut its duties or take unfair advantage of any particular group, as in this case, the employees. The Court finds that a debtor has a duty under § 1113 to not obligate itself prior to negotiations with its union employees, which would likely preclude

> reaching a compromise. "Good faith bargaining is conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process". *Matter of Walway Co.,* 69 B.R. at 973.  <u>In this case, the Debtors could not have bargained in good faith as the Debtors were, prior to any negotiations with the union, locked into at an agreement where the purchaser was not assuming the NBCWA.</u>  Also, *see Matter of GCI, Inc.,* 131 B.R. at 693.  <u>Further, there is evidence in this case that the officers did not pursue a possible sale to another buyer who was willing to assume the NBCWA.</u>

*Lady H Coal,* 193 B.R. at 242 (emphasis added).

114.    Given the agreement with Blackhawk, including that the Debtors agreed to deliver the assets free and clear (see Blackhawk APA at § 2.04(d)), the Debtors locked themselves into an agreement improperly obligating "itself prior to negotiations with its union employees, which would likely preclude reaching a compromise." *Lady H Coal*, 193 B.R.at 242.  It appears neither the Debtors nor Blackhawk intended to truly move to close the gap, despite extensive discussions with the UMWA  pre-dating the 1113/1114 Proposal.

115.    Further, because the focus of the negotiations with the UMWA centered only on the Blackhawk Transaction, the Debtors' proposals never covered Non-Blackhawk Assets such as Federal until the Sixth Proposal.  Additionally, discussions regarding Hobet were limited to job security issues.  In sum, the Debtors never bargained substantively or in good-faith with respect to Apogee, Federal or Hobet.  The 1113/1114 Proposal moves backwards from the previously discussed proposals and adds new asks.  The Debtors' strategy of filing the 1113/1114 Motion only six days after its 1113/1114 Proposal and two weeks before the DIP Milestone deadline appears designed solely to place undue leverage over the UMWA, in violation of the purpose and spirit of sections 1113 and 1114.

### F.    The UMWA Had Good Cause To Reject The Proposal

116.    A court may only grant section 1113 relief if it finds that the union lacked good cause for its rejection of the debtor's proposed contract modifications. *See* 11 U.S.C.

§1113(c)(2).   A debtor must prove that a union "has refused to accept [the] proposal without good cause."  11 U.S.C. § 1113(c)(2).  The Debtors have the burden under this requirement to show that the Union has refused to accept its proposal.  The burden of production then shifts to the Union to produce evidence that its refusal was not without good cause.  *American Provision*, 44 B.R. at 910.  As one court observed, "the result will almost invariably be compelled by the sum of the analysis performed up to this point: if a debtor-in-possession goes through the procedural prerequisites for its motion, and if the substance of the proposal ultimately passes muster under § 1113(b)(1), its union(s) will not have good cause to have rejected the proposal." *Mesaba Aviation*, 341 B.R. at 755.

117.    Here, the UMWA has good cause to reject the Proposal because it was not made in good faith.  In *In re Speco Corp.,* 195 B.R. 674, 679 (Bankr. S.D. Ohio 2006), the court explained that the retiree representative has good cause to reject a proposal to eliminate retiree health insurance for no returning consideration:

> The Court cannot conceive, at this time, of arriving at a decision that the retirees' refusal to accept nothing in exchange for their (retiree health benefit) rights constitutes a lack of good cause. The latest proposal constitutes nothing more than an attempt to unilaterally terminate the retiree benefits and is precisely what §1114 was intended to prevent.

118.    In this case, the substance of the proposal fails under section 1113(b)(1) since the Debtors fail to demonstrate (i) that their proposal was based on the most complete and reliable information available and (ii) the necessity of the terms of their proposal.  The 1113/1114 Proposal moves backward from the prior discussions, despite the Debtors claim that the 1113/1114 Proposal maintains the "status quo" with respect to the Non-Blackhawk Operating Assets, as discussed extensively above, the 1113/1114 Proposal insists for the first time on modifications with respect to the Non-Blackhawk Operating Assets, and further seeks to

eliminate benefits paid for by Peabody and/or Alcoa with little or no administrative cost to the Debtors' estates along with other non-monetary asks.

119.    As such, the UMWA had good cause to reject the proposal.  *See In re G & C Foundry Co.*, 2006 Bankr. LEXIS 4582, *44-45 (Bankr. N.D. Ohio July 19, 2006) (finding the unions had good cause to oppose the debtor's proposal since it contained several provisions that the court held substantively lacking under § 1113(b)(1)). The Debtors fail to satisfy their burden with respect to this factor.

### G.    The Balance of the Equities Does Not Clearly Favor Rejection of the Collective Bargaining Agreements

120.    Finally, balancing of the equities must "clearly favor rejection of the bargaining agreement." 11 U.S.C. § 1113(c)(2). The "balancing of equities" factor derives from the standard enunciated in *NLRB v. Bildisco*, 465 U.S. 513, 104 (1984).  In *Bildisco*, the Supreme Court held that the bankruptcy court must focus on the ultimate goal of chapter 11, successful reorganization, and how the equities relate to the success of the reorganization." 465 U.S. at 526-27. In *Carey Transportation*, the Second Circuit set forth six "permissible equitable considerations" for determining whether the balance of equities favors rejection:

> (1) the likelihood and consequences of liquidation if rejection is not permitted;
>
> (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;
>
> (3) the likelihood and consequences of a strike if the bargaining agreement is voided;
>
> (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;
>
> (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

(6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc.*, 816 F.2d 82, 93 (2d Cir. 1987).

121.    A union's right to strike after a bankruptcy court approves rejection of a collective bargaining agreement is well established, and this right cannot be enjoined by a bankruptcy court.  *See In re Hostess Brands, Inc.*, Bankr. S.D.N.Y., Case No. 12-22052, Transcript of November 19, 2012 Hearing (oral statement by Judge Robert Drain at a hearing held following the debtors' CBA rejection and in the context of imploring parties to participate in mediation to resolve a strike by the Bakery and Confectionary Union that "as my colleagues have said frequently across the country, it's a given, it's obvious that we [*i.e.* bankruptcy courts] do not have the power to enjoin a strike"); *Briggs Transp. Co. v. Int'l Bhd. of Teamsters*, 739 F.2d 341, 344 (8th Cir. 1984) (rejecting employer's request for injunctive relief against union picketing after rejection of CBA); *Northwest Airlines Corp. v. Assn. of Flight Attendants—CWA, AFL—CIO (In re Northwest Airlines Corp.*), 483 F.3d 160, 173 (2d Cir. 2007) (indicating, in context of affirming injunction against strike in airline case following rejection of CBA, that once a debtor obtains a section 1113 order granting the rejection of the CBA, a "union subject to the NLRA [which is not applicable in airlines cases] would become free to strike"); *In re Royal Composing Room, Inc.*, 62 B.R. 403, 405 (Bankr. S.D.N.Y. 1986) ("If the changes this Debtor imposes after [section 1113] rejection are unacceptable, the employees are free to resign or strike"), *aff'd*, 78 B.R. 671 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 345 (2d Cir. 1988); *In re Evans Prods. Co.*, 55 B.R. 231, 234 (Bankr. S.D. Fla. 1985); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797, 806 (Bankr. W.D. Ky. 1985).

122.    A bankruptcy court should seriously consider the likelihood that the affected employees will refuse to work when it decides a motion to reject a collective bargaining agreement.  *See Int'l Bhd. of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1463 (10th Cir. 1986) (reversing a bankruptcy court's decision permitting rejection because the bankruptcy court failed to consider that the antagonistic labor relations atmosphere made it likely that a damaging work stoppage could result from rejection); *In re Pesce Baking Co. Inc.*, 43 B.R. 949, 961 (Bankr. N.D. Ohio 1984) (denying rejection because "[c]onsidering the risk of a strike or decreased productivity, [the debtor'] projected savings is highly speculative.").

123.    In this respect, *International Brotherhood of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460 (10th Cir. 1986), is particularly instructive.  There, the court reversed a bankruptcy court's decision permitting the debtor to reject its collective bargaining agreement because the bankruptcy court failed to consider the impact of rejection.  The court specifically noted that the antagonistic labor relations atmosphere make it likely that a damaging strike could result from rejection and explained as follows:

> [T]he reality of the union's strongly stated opposition was dismissed [by the bankruptcy judge] with an expression of hope that the debtor would reach an accommodation with its employees. Such optimism would scarcely seem warranted in view of the pre-bankruptcy history, including unfair labor practice charges following unilateral wage cuts.

*Id.* at 1463.  Here, the possibility of labor unrest will only undermine financing and the value prospective purchasers are willing to pay for the Debtors' assets, limiting creditor recoveries.  Given the current 1113/1114 Proposal, the UMWA Employees may be left with no choice but to exercise their right to strike following rejection under section 1113.

124.    For the foregoing reasons, the balancing of equities strongly favors denying the Motion.  Accordingly, this Court has no alternative but to deny the Debtors' Motion for rejection of its collective bargaining agreements and modification of retiree benefits.

## CONCLUSION

125.    The Court should deny the Debtors' Motion in its entirety and grant further relief as may be just and appropriate.

Dated: August 3, 2015

Respectfully Submitted,
Sharon Levine (admitted *pro hac vice*)
Philip J. Gross (admitted *pro hac vice*)
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

*Counsel for the United Mine Workers of America*

-and-

/s/ Troy Savenko
Troy Savenko (Va. Bar No. 44516)
KAPLAN VOEKLER CUNNINGHAM
& FRANK, PLC
1401 East Cary Street
Richmond, VA   23219
(804) 823-4000

*Local Counsel for the United Mine Workers of America*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2015, I caused a copy of the foregoing to be served by electronic mail upon all parties receiving notice through the Court's CM/ECF Noticing System and on the "2002 List" as maintained pursuant to the Court's Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief [Docket No. 79].

/s/ Troy Savenko