LOWENSTEIN SANDLER LLP
Sharon Levine  (admitted *pro hac vice*)
Philip J. Gross (admitted *pro hac vice*)
65 Livingston Avenue
Roseland, New Jersey 07068
(973)  597- 2500

*Counsel to the United Mine Workers of America*

KAPLAN VOEKLER CUNNINGHAM & FRANK, PLC
Troy Savenko (Va. Bar No. 44516)
1401 East Cary Street
Richmond, VA  23219
(804) 823-4000

*Local Counsel to the United Mine Workers of America*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.*, | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## OBJECTION OF THE UNITED MINE WORKERS OF AMERICA
## TO DEBTORS' DISCLOSURE STATEMENT

The United Mine Workers of America ("UMWA")—the representative of the interests of
(i) more than 2,500 active and laid-off employees (collectively, the "UMWA Employees") at the
above-captioned  Debtors' mining  complexes  and  (ii)  approximately  17,647  retirees  and
dependents  (the  "UMWA Retirees," and  together  with  the  UMWA Employees,  the  "UMWA
Represented Parties")—by and through its undersigned counsel, hereby objects (the "Objection")
to  the  *Debtors'  Motion  For  Entry  Of  Order  (I)  Approving  The  Disclosure*  Statement  (the
"Disclosure  Statement")*;  (II)  Approving  Solicitation  And  Notice  Materials;  (III)  Approving*
*Forms  Of  Ballots;  (IV)  Establishing  Solicitation  And  Voting  Procedures;  (V)  Establishing*
*Procedures  For  Allowing  And  Estimating  Certain  Claims  For  Voting  Purposes;  (VI)  Scheduling*
*A  Confirmation  Hearing  And  (VII)  Establishing  Notice  And  Objection  Procedures*  [Docket  No.
497] (the "Motion").  In support of its Objection, the UMWA respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

---

[1] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed below.

1.      The Disclosure Statement should not be approved because it (a) does not provide "adequate information" as required by section 1125 of the Bankruptcy Code and (b) relates to a Joint Plan of Reorganization ("Plan") which is patently unconfirmable because, among other things, it contains impermissible third-party releases that would prohibit the UMWA (and others) from asserting future claims against non-debtor third parties as well as overly broad releases by the Debtors to a host of third parties.

2.      As described in the Disclosure Statement, the Plan, among other things, (i) implements the proposed Blackhawk Transaction (*i.e.* sells all Blackhawk assets free and clear of all CBA, pension, employee, retiree, and environmental liability except liabilities Blackhawk explicitly chooses to assume); (ii) declares Blackhawk a good faith buyer under 363(m); (iii) implements the proposed rights offering and debt financing for the new Combined Company to be formed by Blackhawk; (iv) transfers the Non-Blackhawk Operating Assets to a liquidating trust to be administered/liquidated, apparently without disclosed funding, purportedly for the benefit of allowed general unsecured claims; and (v) proposes very broad debtor and third-party releases.

3.      Despite its length, the Disclosure Statement is inadequate in numerous respects. Most strikingly, the Debtors do not even attempt to outline a strategy for funding the Liquidating Trust—the mechanism that is intended to administer all assets not sold to Blackhawk and which would provide the source of recovery for creditors including the UMWA.

4.      In addition, Disclosure Statement provides woefully inadequate information regarding, among other critical issues, (i) the value of unencumbered assets including real estate leases, avoidance actions, and commercial tort claims, which may be one of the only sources of recovery for the UMWA Represented Parties and other unsecured creditors; (ii) the potential cost

of a settlement with state regulatory agencies and the Debtors' surety parties in connection with environmental liabilities associated with the liquidating trust assets; (iii) the Debtors' ability to satisfy their Legacy Liabilities, including those liabilities which continue to accrue on an ongoing post-petition basis, thus creating administrative expense claims that must be paid in full in order to confirm a chapter 11 plan.; (iv) whether the Prepetition Secured Parties' deficiency claims will be waived or asserted; (v) the broad releases proposed under the Plan; and most fundamentally (vi) the expected recovery for general unsecured creditors.

5.      Further, the Disclosure Statement should not be approved because the Plan is patently unconfirmable and, therefore, it would be an unnecessary and wasteful use of administrative resources to move forward with the Plan solicitation and confirmation process.  In particular, the Debtors did not propose the Plan in good faith, as they implemented certain terms of the Blackhawk APA and the Plan—which the Debtors had never discussed with the UMWA—as part of the 1113/1114 Proposal. Notably, these terms include modifications to CBAs and retiree benefits with respect to Non-Blackhawk Assets. Moreover, the Debtor Releases and the nonconsensual Third-Party Releases proposed in the Plan are overly broad and patently unconfirmable.

6.      In sum, the Disclosure Statement should not be approved because it (a) fails to contain critical and "adequate information" as required by section 1125 of the Bankruptcy Code and (b) relates to a Plan that is patently unconfirmable.

## STATEMENT OF FACTS

## I.      The Debtors' Chapter 11 Cases, Dip Milestones, and Bidding Procedures

7.      On May 12, 2015, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.      On June 4, 2015 the Court entered the *Final Order Authorizing the Debtors to Obtain Postpetition Financing, Authorizing Use Of Cash Collateral, Granting Liens and Superpriority Claims, Granting Adequate Protection, Modifying the Automatic Stay, Scheduling a Final Hearing, and Granting Related Relief* [Docket No. 230] (the "Final DIP Order").  The Final DIP Order authorized post-petition debtor-in-possession financing in the form of a term loan facility of up to $100 million (the "DIP Financing").

9.      The Final DIP Order conditioned the DIP Financing on the Debtors' achievement of certain milestones (the "DIP Milestones") throughout the chapter 11 cases, starting with the Court's entry of the interim debtor-in-possession financing order, through a November 30, 2015 DIP Milestone deadline for the effective date of a plan of reorganization.

10.     Significantly, the DIP Financing provides for a DIP Milestone of August 1, 2015 for the Debtors' to either reach an agreement with the UMWA regarding the CBAs or file a motion pursuant to sections 1113 and 1114 of the Bankruptcy Code.

11.     On June 25, 2015, the Court entered an order (Docket No. 406, the "*Bidding Procedures Order*") approving the *Debtors' Motion for Entry of an Order Approving Bidding Procedures and Bid Protections in Connection With the Sales of Certain of the Debtors' Assets, Approving the Form Manner of Notice, Scheduling Auctions and Sale Hearing, Approving Procedures for the Assumption of Assignment of Contracts, and Grating Related Relief* [Docket No. 200].

12.     Under the Bidding Procedures Order, the Court approved certain bid procedures and protections in connection with a proposed stalking horse sale ("Blackhawk Transaction") of a large portion of the Debtors' operating assets to Blackhawk Mining LLC ("Blackhawk").

13. Blackhawk's proposed asset purchase agreement (filed at Docket No. 385) (the "Blackhawk APA") provides that Blackhawk's acquisition vehicle (the "Combined Company") proposes to assume no liabilities or obligations under: (a) the UMWA collective bargaining agreements; (b) any employee benefit plans maintained or sponsored by the Debtors; (c) any retiree medical or other retiree welfare benefits; or (d) any contributions to the UMWA 1974 Pension Plan, including any withdrawal liabilities under the plan. Blackhawk APA at § 2.04(d). Further, the Blackhawk APA provides for no contributions to the Union VEBA.

## II.    The Debtors' Proposed Rejection of UMWA Collective Bargaining Agreements

14. Between late May and late June 2015, the UMWA engaged in various negotiations with the Debtors. During that time, as part of those negotiations, the Debtors made six written proposals (collectively, the "Blackhawk CBA Modification Proposals") solely with respect to the collective bargaining agreements ("CBAs") governing the assets Blackhawk seeks to purchase (the "Blackhawk Assets"). During those negotiations, the parties did not engage in any meaningful negotiations with respect to CBAs relating to their Non-Blackhawk Assets (defined below).

15. On July 10, 2015, the Debtors provided their final proposal (the "1113/1114 Proposal") which (i) seeks outright rejection (as opposed to modification) of the CBAs and retiree obligations with respect to the Blackhawk Assets; (ii) seeks outright rejection with respect to CBAs governing the Debtors' non-operating mines (the "Non-Operating Assets", and together with the Non-Blackhawk Operating Assets, the "Non-Blackhawk Assets"); and (iii) for the first time proposes CBA and retiree benefit modifications with respect to the Non-Blackhawk Operating Assets that are not sold to Blackhawk (including assets related to the Debtors' Hobet, Federal, and Apogee mine facilities).

16.     The 1113/1114 Proposal is revealing in two key respects.   It represents an enormous step backward from proposals developed by the parties in the weeks immediately preceding the 1113/1114 Proposal.  And, it conforms in its central points to the terms of both the Blackhawk APA and the Debtors' Plan, as if no discussions with the UMWA took place.

17.     The Debtors made the 1113/1114 Proposal well before the August 1, 2015 milestone contained in the DIP Financing for seeking relief under sections 1113 and 1114 and provided that unless the UMWA accepted whatever the Debtors and Blackhawk offered, the free and clear sale structure developed and mandated by the Debtors' senior secured lenders would be imposed.

## III.     The Debtors' Proposed Joint Chapter 11 Plan Of Liquidation

18.     On July 13, 2015, the Debtors filed the Disclosure Statement [Docket No. 498] and related Plan [Docket No. 499].  The Plan implements the proposed Blackhawk Transaction (*i.e.* sells all Blackhawk assets free and clear of all CBA, pension, employee, retiree, and environmental liability except liabilities Blackhawk explicitly chooses to assume), declares Blackhawk a good faith buyer under 363(m), and implements the proposed rights offering and debt financing for the new Combined Company to be formed by Blackhawk.

### A.     The Liquidating Trust

19.     The Plan also transfers all Non-Blackhawk Assets to a liquidating trust (the "Liquidating Trust") to be created purportedly for the benefit of allowed general unsecured claims.  *See* Disclosure Statement, Article V.D.16.   However, the Disclosure Statement does not provide any disclosures regarding funding the ongoing liabilities of the assets that remain in the Liquidating Trust.

20.    Moreover, during testimony at the hearing on July 22, 2015, the Debtors' chief restructuring officer testified regarding hurdles to the Debtors' emergence from chapter 11, and noted that the Debtors must still develop a business plan for a liquidating trust (referred to as a "remainder entity") and come up with cash to meet projected operating and other expense targets once the Debtors emerge from bankruptcy.[2]  Thus, the Debtors have yet to disclose a strategy for funding the Liquidating Trust.

21.    Further, the Disclosure Statement does not describe the disposition of any excess funds upon termination of the Liquidating Trust.

22.    Given the extensive cleanup and other potential environmental and other liabilities left behind (as discussed below), it is unclear what funds would be available to operate the remaining assets and/or fund the ongoing liabilities of the assets that remain in the Liquidating Trust.

**B.    Environmental Obligations**

23.    The Debtors are subject to mine reclamation and restoration liabilities at closed and former mines pursuant to the Surface Mining Control and Reclamation Act ("SMCRA") and other state laws.  Several of the Debtors' mining facilities have incurred significant reclamation obligations, including Logan County Mining Complex, Bluegrass Mining Complex, Corridor G Mining Complex, Wells Mining Complex, and Paint Creek Mining Complex.  To guarantee performance of these reclamation obligations, Regulatory authorities require the Debtors to maintain surety bonds.  The Debtors' current estimated land and water reclamation obligations total approximately $233.37 million.  *See* Disclosure Statement, Article III.B.3.c.

---

[2] *See* July 22, 2015 Hearing Transcript,[2] at 49:15-49:18 (noting, in response to question regarding hurdles to emergence from chapter 11, that the Debtors are "going to have to develop a business plan for the remainder entity that is financeable.  We're going to have to come up with the cash, once we meet these targets, that will allow us to emerge from bankruptcy.").

24.    Further, the Debtors are subject to operational obligations set forth in certain consent decrees resulting from past environmental litigation.  For example the Debtors operate under a modified consent decree with, among others, the Sierra Club (the "Modified Consent Decree") which sets deadlines for the installation of water pollution control technologies at certain mining complexes and contains stipulated penalty provisions in the event Debtors fail to meet the pollution control technologies deadline.  While the Debtors disclose that they have spent approximately $77 million on these obligations to date, they provide no projection with respect to the estimated future expenditures.  The Debtors also fail to provide any details on the stipulated penalty provisions, or the risks associated with failing to meet the pollution control deadlines.  *See* Disclosure Statement, Article III.B.3.c.

25.    In addition to the operational obligations, the Debtors are also subject to active environmental litigation, enforcement proceedings, and compliance obligations.  In the Disclosure Statement, the Debtors identify nine (9) different ongoing environmental matters— yet only provide a cost estimate of liability with respect to four (4) of those matters.  Therefore, creditors are not able to ascertain the relative risks associated with each matter, or the potential cost required to satisfy any future obligations.   *See* Disclosure Statement, Article III.B.3.c.

**C.    Claims Against the Debtors**

26.    In addition to the environmental liabilities, the Plan does not distinguish between the secured and unsecured claims of the various Prepetition Secured Parties.

27.    As a result, the creditors are left unable to discern whether deficiency claims will be asserted or waived under the Plan, and thus, cannot determine whether their *pro rata* share of the Liquidating Trust will be depleted by the Prepetition Secured Parties' assertion of deficiency claims.

28.     The Disclosure Statement also fails to provide a method for paying administrative claims.  Thus, it is unclear whether Debtors have the funding necessary to satisfy accrued but unpaid administrative claims, including environmental, pension, and certain other legacy retiree/employee liabilities (collectively, the "Legacy Liabilities").  As a result, creditors cannot make an informed decision to accept or reject the Plan because they are unable to determine if enough value exists in the estate to provide for payment of administrative claims.

29.     The Disclosure Statement also provides that on the Plan's effective date, the Liquidating Trust will continue to reimburse the DIP Agents, DIP Lenders, and Prepetition Agents for the reasonable fees and expenses (including reasonable and documented legal fees and expenses) incurred in accordance with the DIP Loan Documents and the DIP Orders.  The provision requires the Debtors to fund a cash deposit (the "DIP Deposit") of some undisclosed amount, in order to pay for those anticipated fees, costs, and expenses.  The Debtors have not disclosed the estimated amount of the DIP Deposit.

**D.    The Debtors' Assets**

30.     The Debtors own certain unencumbered assets, including, but not limited to real property leases, avoidance actions, and commercial torts. While the Debtors have indicated the real property leases are unencumbered, they have also noted that the proceeds of the real property leases are subject to the DIP Lenders' liens.  To the extent there is value provided to the Debtors' estates on account of these real property leases, unsecured creditors are likely to have an interest in that value after satisfaction of the DIP Facility. It remains unclear at this point whether the real property leases are part of the Prepetition Secured Parties' collateral package.

31.     Additionally, the Debtors assert in the Disclosure Statement that selling the Federal mining complex (the "Federal Complex") could generate material value for their estates

and may provide a significant source of funding for the Liquidating Trust. Accordingly, the Debtors plan to market the Federal Complex through competitive bidding or an auction.   *See* Disclosure Statement, Article IV.B.5.c.  Missing from the Disclosure Statement is any discussion of the marketing efforts with respect to the Federal Complex, or a discussion regarding the likelihood that a section 363 sale will go forward.  Moreover, the Debtors have not disclosed whether the liens of the Prepetition Secured Parties will attach to the proceeds of any sale of the Federal Complex.

### E.   Release Provisions

32.   The Plan also provides for overly broad releases given by the Debtors (the "Debtor Releases") in favor of including, among others (i) current and former affiliates of the Debtors; (ii) current and former directors and officers of the Debtors; (iii) current and former partners, members, subsidiaries, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives; (iii) the Liquidating Trust; (iv) the Liquidating Trustee; [3] (v) Blackhawk; (vi) the Combined Company; (vii) the Prepetition Agents and Barclays Bank PLC, as predecessor Term Administrative Agent and any of their respective sub-agents; (viii) the Prepetition Term Lenders; (ix) the Prepetition LC Secured Parties; (x) the Prepetition ABL Secured Parties; (xi) the Prepetition Noteholders; (xii) the DIP Agent; (xiii) the DIP Lenders; (xiv) the Rights Offering Backstop Parties; and (xv) the Committee and each of its members (the "Committee Members") (collectively, the "Released Parties").  Neither the Plan nor the Disclosure Statement provides any information describing or disclosing why any of these releases should be approved.

---

[3] Capitalized terms referenced but not defined herein shall have the meaning attributed to them in the Plan and Disclosure Statement.

33.     The Plan also provides for overly broad releases given by third parties (the "Third-Party Releases") in favor of each of the Debtors, their Estates, and the Released Parties. Among the third parties granting releases in favor of the Debtors, their Estates, and the Released Parties in the Plan is "the Committee, including the Committee Members (regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third-Party Release set forth in Article VIII.D hereof)." *See* Plan, p. 16 ¶ 179.

34.     Thus, the Committee and each of its individual Committee Members (including the UMWA) are improperly deemed to grant nonconsensual Third-Party Releases to the Released Parties regardless of whether the individual Committee Members voted to accept or reject the Plan or timely submitted a ballot indicating its decision to opt out of the Third-Party Releases.

## OBJECTION

35.     The Court should not approve the Disclosure Statement because it (i) does not contain adequate information as required by section 1125 of the Bankruptcy Code; and (ii) describes a Plan that is patently unconfirmable on its face.

**IV.     The Disclosure Statement Cannot be Approved Because it Does Not Contain Adequate Information**

36.     The Disclosure Statement should not be approved because it fails to include adequate information necessary for creditors to make an informed decision as to whether to accept or reject the Plan.  It is well settled that a debtor may only solicit votes to accept or reject a chapter 11 plan after the court has approved the debtor's written disclosure statement for that plan as containing "adequate information."  11 U.S.C. § 1125(b); *see also In re A.H. Robins Co.,*

*Inc.*, 880 F.2d 694, 696 (4th Cir. 1989).   Section 1125(a) of the Bankruptcy Code defines

"adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records,
> including a discussion of the potential material Federal tax
> consequences of the plan to . . . a hypothetical investor typical of
> the holders of claims or interests in the case, that would enable
> such a hypothetical investor of the relevant class to make an
> informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

37.    Courts have emphasized the importance of adequate disclosure in connection with

proposed chapter 11 plans, stating that, given the reliance creditors and bankruptcy courts place

on disclosure statements, "we cannot overemphasize the debtor's obligation to provide sufficient

data to satisfy the Code['s] standard of adequate information."  *Oneida Motor Freight, Inc. v.*

*United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 1988); *see also Krystal Cadillac-Oldsmobile*

*GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 321 (3d Cir. 2003) (citing 11 U.S.C.

§1125(a)(1) and observing that the proponent of the proposed plan has "an affirmative duty to

provide creditors with a disclosure statement containing 'adequate information' to 'enable a

creditor to make an informed judgment'" about the proposed plan).

38.    Although courts assess adequacy on a case-by-case basis, a disclosure statement

must contain "simple and clear language delineating the consequences of the proposed plan on

[creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or

reject the Plan."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988);

*see also In re A.H. Robins Co., Inc.*, 880 F.2d 694, 696 (4th Cir. 1989).

39.     In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

40.     In determining whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts looks to among others the following topics:

> a) the events which led to the filing of a bankruptcy petition;
>
> b) the relationship of the debtor with its affiliates;
>
> c) a description of the available assets and their value;
>
> d) the anticipated future of the company;
>
> e) the source of information stated in the disclosure statement;
>
> f) the present condition of the debtor while in chapter 11;
>
> g) claims asserted against the debtor;
>
> h) the estimated return to creditors;
>
> i) the chapter 11 plan or a summary thereof;
>
> j) financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
>
> k) information relevant to the risks posed to creditors under the plan;
>
> l) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers;
>
> m) litigation likely to arise in a nonbankruptcy context; and
>
> n) tax attributes of the debtor.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996).

### A.     The Disclosure Statement Does Not Include A Description of the Available Assets and Their Value

41.    Significantly, the Disclosure Statement does not adequately describe certain potentially valuable assets, the value of which may inure to the benefit of general unsecured creditors.   The Debtors are required to disclose information about assets or causes of action which could generate income for the estate.    Here, the Debtors have provided insufficient information with respect to assets including real property leases, commercial torts, and avoidance actions, which could potentially benefit the estate and general unsecured creditors.    *See e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc.*, 337 F.3d at 321-22 (stating that a disclosure statement did  not contain adequate information when it failed to include causes of action which could generate significant assets for the estate).

42.    Additionally, because the Debtors have not disclosed whether, in a sale of the Federal Complex, the liens of the Prepetition Secured Creditors will attach to the sale proceeds, creditors are not able to determine the value of the Federal Complex.

### B.    The Disclosure Statement Does Not Include Adequate Information Regarding Claims Asserted Against the Debtor

43.    The Disclosure Statement does not provide adequate information regarding (i) the estimated costs and likelihood of the risks associated with the various ongoing environmental matters; (ii) the potential cost and/or likelihood of a settlement with state regulatory agencies and/or the Debtors' surety parties in connection with environmental liabilities associated with the Liquidating Trust assets; (iii) whether the Prepetition Secured Parties' deficiency claims will be waived or asserted;  and (iv) the amount of the DIP Deposit.

44.    As explained above, the Debtors identify nine (9) different ongoing environmental matters in the Disclosure Statement—yet only provide a cost estimate of liability with respect to four (4) of those matters. *See* Disclosure Statement, Article III.B.3.c.  Creditors

should be provided with an estimate for all matters, an explanation of the effect of these lawsuits, and the potential impact they may have on the overall claims pool or on the disposition of property of the estate. *In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982) (denying approval of a disclosure statement and noting that "[a]lthough the existence of the litigation is disclosed, there is no explanation of the effect that these lawsuits may have on the disposition of the property or on the claims of the creditors").

45.     Further explanation with respect to the above liabilities and potential claims against the debtor is necessary to determine what creditors may expect to recover in these Chapter 11 Cases.

### C.     The Disclosure Statement Does Not Provide Adequate Information Regarding the Anticipated Future of the Company

46.     The Debtors' CRO's prior testimony in these Chapter 11 Cases made clear that as of the filing of the Motion (and, indeed, post-filing of the Plan and Disclosure Statement), the Debtors had no finalized business plan, and cannot provide information as to what may be necessary or required to (i) confirm a liquidating chapter 11 plan; and/or (ii) provide for a viable liquidating trust/remainder entity.

47.     The Disclosure Statement also lacks sufficient information as to the ability of the Debtors' to satisfy their Legacy Liabilities, including those which continue to accrue on an ongoing post-petition basis and thus create administrative expense claims that must be paid in full under a chapter 11 plan. Without knowledge of whether a chapter 11 plan could truly be confirmed here and/or what concessions may be necessary to allow for such confirmation, creditors cannot engage in a meaningful evaluation of the Plan.

48.     Therefore, because the Disclosure Statement does not satisfy the most basic disclosure requirements of Bankruptcy Code Section 1125(a)—disclosures of the potential

recoveries to creditors under various scenarios—it cannot be approved. The UMWA submits that at a minimum this basic information must be included in the Disclosure Statement in order to enable creditors to make informed decisions when voting whether to accept or reject the Plan.  In its absence, the Disclosure Statement is legally insufficient.

## V.    The Disclosure Statement Cannot Be Approved As The Plan Is Not Confirmable

49.    Courts routinely hold that, if the related plan is patently unconfirmable as a matter of law, a disclosure statement should not be approved.  *In re American Capital Equipment, LLC*, 668 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing."); *In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile); *In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("it is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed"); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (noting that "[i]t has become standard Chapter 11 practice that when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face") (citation omitted); *In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991).

50.    The rationale for withholding approval of a disclosure statement in such circumstances is as follows:

> the court's equitable powers under 11 U.S.C. § 105 surely enable it
> to control its own docket and thus, a court should not proceed with
> the time-consuming and expensive proposition of hearings on a
> disclosure statement and plan when the plan may not be
> confirmable because it does not comply with confirmation
> requirements.

*In re American Capital Equipment, LLC,* 688 F.3d at 154 (citations omitted)*; In re Pecht*, 57

B.R. 137, 139 (Bankr. E.D. Va. 1986); *In re Franklin Indus. Complex*, 386 B.R. 5, 10-11 (Bankr.

N.D.N.Y. 2008).

51.    A plan is considered "patently unconfirmable" where (i) confirmation defects

cannot be overcome by creditor voting results, and (ii) those defects concern matters upon which

all material facts are not in dispute or have been fully developed at the disclosure statement

hearing.  *In re American Capital Equipment*, 688 F.3d at 154-55 (*citing In re Monroe Well Serv.*,

80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).

### A.    The Plan is Not Confirmable Because It Was Not Proposed in Good Faith

52.    The UMWA submits that the Plan is patently unconfirmable because it was not

proposed in good faith.  To be confirmable, a plan of reorganization must be "proposed in good

faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  In determining whether a

plan was proposed in good faith "the important point of inquiry is the plan itself and whether

such a plan will fairly achieve a result consistent with the objectives and purposes of the

Bankruptcy Code."  *See In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013).

53.    Here, the Plan was not proposed in good faith because the Debtors, as Plan

proponents, failed to negotiate in good-faith with respect to their proposed CBA modifications,

as outlined in the UMWA's 1113/1114 Objection, by (A) making certain non-negotiable

demands, including but not limited to (i) severely seeking curtailment of use of certain unpaid

non-work days typical under UMWA contracts known as "Memorial Days"; and (ii) proposed

termination of the Debtors' Coal Act obligations and Debtors' participation in the 1974 Plan; (B) making the 1113/1114 Proposal well before the milestone deadline contained in the DIP Financing for seeking relief under sections 1113 and 1114; and (C) making their first meaningful proposal with respect to certain of the Debtors' CBAs and certain retiree benefits on Friday evening, July 10, 2015—less than a week prior to the date of the filing of the Motion.

54.    Many of these proposed changes are geared towards removing standard rights afforded union-represented employees and have either no apparent or no material financial effect on the Debtors' businesses.  The Debtors' demand for these unfounded and facially punitive concessions from the UMWA Represented Parties in their 1113/1114 Proposal—which is ultimately implemented, via the asset sale to Blackhawk, by this Plan—illustrates a lack of the good faith required for this Court to confirm the Plan.

55.    The Debtors' disregarded months of negotiations with the UMWA by choosing to implement the terms of the Blackhawk APA and the Plan—which had never been discussed with the UMWA—into the 1113/1114 Proposal.  The Debtors' failure to participate in a good-faith 1113/1114 negotiation process significantly hinders their ability to assert their Plan (which seeks to implement the outcome of the 1113/1114 process through the Blackhawk Transaction and other potential transactions) was proposed in good faith.

56.    Accordingly, even if the Court were to approve the Disclosure Statement, the end result would be the same – the Plan cannot be confirmed because the Plan was proposed in bad faith and in contravention of Sections 1129(a)(3) and 1113(c) of the Bankruptcy Code.

**B.     The Plan is Unconfirmable on Its Face Due to The Inclusion of Overly Broad Releases**

57.     The proposed Plan includes impermissibly broad releases in favor of non-debtor third parties that violate applicable law and cannot be approved absent unusual circumstances that are clearly not present in these Chapter 11 Cases.

### 1.     The Debtor Releases Are Impermissible

58.     Article VIII.C of the Plan includes the proposed release of third parties by the Debtors.  The provision reads in pertinent part as follows:

> *Debtor Release*
>
> Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to this Plan, for good and valuable consideration, on and after the Effective Date, the Debtors and their Estates shall release each Released Party, and each Released Party shall be deemed released and discharged by the Debtors and their Estates, from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Blackhawk Transaction, the Prepetition Facilities, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date . . . .

*See* Plan, Article VIII.C (emphasis added).

59.     While the Fourth Circuit has not set out a specific test for determining whether releases by debtors are appropriate in the chapter 11 context, other courts have generally identified five factors that are relevant to determine whether a debtor's release of a non-debtor is appropriate:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;
>
> (2) a substantial contribution to the plan by the non-debtor;
>
> (3) the necessity of the release to the reorganization;
>
> (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*Zenith,* 241 B.R. at 110 (*citing In re Master Mortgage Inv. Fund, Inc*., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); *In re Washington Mut., Inc.,* 442 B.R. 314, 346 (Bankr. D. Del. 2011).

60.     The Debtor Releases proposed in the Plan are overly broad and inappropriate under the circumstances.   The Disclosure Statement does not provide any reason why the releases are essential to the reorganization, and does not even attempt to establish how the releases satisfy the factors courts apply when determining whether Debtor Releases are appropriate.

61.     Instead, the Debtors cut and paste the release provisions that are included in the Plan into the Disclosure Statement.  *See In re Exide Technologies,* 303 B.R. at 72 (observing that five factors have to be satisfied prior to authorizing the Debtor's release of third parties); *Behrmann v. National Heritage Found.,* 663 F.3d 704, 713 (4th Cir. 2011) (finding that simply listing the factors for third party releases "is meaningless in the absence of specific factual findings explaining why this is so.").

62.     Most significantly, the Debtors are providing a release for conduct "based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Blackhawk Transaction, the Prepetition Facilities . . . ." *See* Plan, Section VIII.C.  This language is impermissibly broad and could arguably encompass claims and conduct entirely unrelated to the Debtors' bankruptcy cases.

## 2.     The Third Party Releases Are Impermissible

63.     The Bankruptcy Code prohibits the release and permanent injunction of claims against non-debtors under most circumstances.  *See* 11 U.S.C. § 524(e) ("Except as provided in subsection (a)(3) . . . discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

64.     Indeed, courts in the Fifth, Ninth, and Tenth Circuits are of the view that the statutory language of section 524(e) provides an absolute prohibition against third-party releases. See *In re Pac. Lumber Co*., 584 F.3d 229, 253 (5th Cir. 2009); *see also In re Vitro S.A.B. DE C.V.,* 701 F.3d 1031, 1061 (2012) (noting prior Fifth Circuit precedent "seem[s] broadly to foreclose non-consensual non-debtor releases in permanent injunctions."); *Resorts Int'l, Inc. v. Lowenschuss* (*In re Lowenschuss*), 67 F.3d 1394, 1401 (9th Cir. 1995) ("This court has repeatedly held, without exception, that  § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *Landsing Diversified Props.-II v. First Nat'l Bank and Trust Co. of Tulsa* (*In re W. Real Estate Fund, Inc.*)*,* 922 F.2d 592, 600–02 (10th Cir. 1990) (discussing section 523 policy, concluding "[o]bviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders").

65.    Other Circuit Courts, including the Fourth Circuit, will only approve third-party releases under extraordinary circumstances, recognizing that third-party releases of non-debtor entities are the exception, not the rule.  *See Nat'l Heritage Found., Inc. v. Highbourne Found*., 760 F.3d 344, 351 (4th Cir. 2014) cert. denied, 135 S. Ct. 961 (2015) (explaining third-party releases are the exception not the norm, and that their approval requires exceptional circumstances); *In re Metromedia Fiber Network, Inc.,* 416 F.3d 142 (2d Cir. 2005) ("a nondebtor release is a device that lends itself to abuse . . . . In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code")*; In re Washington Mut., Inc.*, 442 B.R. 314, 351 (Bankr. D. Del. 2011) (citing  *In re Continental Airlines*, 203 F.3d 203, 212 (3d Cir. 2000)); *In re Exide Technologies*, 303 B.R. at 72 ("non-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases.'").

66.    Third party releases are only permissible where the debtor demonstrates "fairness, necessity to the reorganization, and specific factual findings to support these conclusions."  *In re Lower Bucks Hospital*, 571 Fed. Appx 139, 144 (3d Cir. 2014); *In re Dow Corning Corp.,* 255 B.R. 445, 459 (E.D. Mich. 2000) aff'd and remanded, 280 F.3d 648 (6th Cir. 2002) (holding third-party releases were impermissible because the bankruptcy court below "provided no explanation or discussion of the evidence underlying these findings.  Moreover, the findings did not discuss the facts as they related specifically to the various released parties, but merely made sweeping statements as to all released parties collectively").

67.    In determining whether third-party releases are permissible, the Fourth Circuit has adopted the six-factor test set out by the Sixth Circuit in *Class Five Nevada Claimants v. Dow*

*Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002).  In analyzing whether

to approve a third-party release, the Fourth Circuit looks to whether:

> (1) There is an identity of interests between the debtor and the third party;
>
> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to reorganization;
>
> (4) The impacted class, or classes, has overwhelmingly voted to accept the plan;
>
> (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; [and]
>
> (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.

*Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014) (citing *In*

*re Dow Corning Corp.*, 280 F.3d at 658).

68.    Here, Article VIII.D of the Plan provides, in pertinent part, for the following

release by holders of claims and interests:

> *Third-Party Release*
>
> As of the Effective Date, except as otherwise provided in the Plan, or in any contract, instrument or other agreement or document created pursuant to this Plan, the Releasing Parties[4] shall release the Debtors, their Estates, and the Released Parties, and each of the Debtors, their Estates, and the Released Parties shall be deemed released, from any and all claims, interests, obligations, rights,

---

[4] "Releasing Parties" is defined in Article I of the Plan as: (a) the Prepetition Agents; (b) the Prepetition Term Lenders; (c) the Prepetition LC Lenders and the Prepetition LC Facility Issuers; (d) the Prepetition ABL Lenders and the Prepetition ABL LC Issuers; (e) the Prepetition Noteholders; (f) the DIP Agent; (g) the DIP Lenders; (h) the Rights Offering Backstop Parties; (i) the Committee, including the Committee Members (regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third Party Release set forth in Article VIII.D hereof); and (j) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (other than any of the Committee Members) (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (z) who are in a Class that is deemed to reject the Plan.

suits, damages, Causes of Action, remedies and liabilities
whatsoever, including any derivative claims, asserted on behalf of
the Debtors, whether known or unknown, foreseen or unforeseen,
existing or hereinafter arising, in law, equity, or otherwise, that
such Entity would have been legally entitled to assert (whether
individually or collectively), based on or relating to, or in any
manner arising from, in whole or in part, the Debtors, the Debtors'
restructuring, the Chapter 11 Cases, the purchase, sale, or
rescission of the purchase or sale of any security of the Debtors,
the DIP Facility, the Blackhawk Transaction, the Blackhawk
Transaction Documents, the Prepetition Facilities, the subject
matter of, or the transactions or events giving rise to, any claim or
interest that is treated in the Plan, the business or contractual
arrangements between any Debtor and any Released Party, the
restructuring of Claims and Interests prior to or in the Chapter 11
Cases, the negotiation, formulation, or preparation of the
Restructuring Documents, or related agreements, instruments, or
other documents, upon any other act or omission, transaction,
agreement, event or other occurrence taking place on or before the
Effective Date . . . .

*See* Plan, Article VIII.D.

69.     Like the Debtor Releases, the Third-Party Releases included in the Plan are also overly broad and inappropriate under the circumstances and cannot satisfy the applicable Fourth Circuit standards.

70.     First, the Disclosure Statement provides no support that there exists an identity of interest between the Debtors and the myriad of Released Parties.  The Debtors have also provided no explanation for the second *Dow Corning* factor, which requires the Released Parties contribute substantial assets.

71.     The Third-Party Releases do not meet the third factor, as the Disclosure Statement provides no explanation why the third-party releases are reasonable or necessary.  Instead, the Disclosure Statement only recites verbatim the release provisions included in the Plan.[5]  *See In*

---

[5] *See* Article V, Section G of the Disclosure Statement.

*re Continental Airlines*, 203 F.3d 203, 214-15 (addressing the factors that must be satisfied prior to approval of a third-party release); *In re Washington Mut., Inc.*, 442 B.R. at 351 (same).

72.      Specifically, the Debtors seek to bind third parties from pursing claims "based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the DIP Facility, the Blackhawk Transaction . . . ." *See* Plan, Article VIII.D.  These releases would benefit among others the "each Debtor and the Debtors' current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns . . . ." *See* Plan, Article I.59.  The effect of these third-party releases would be to improperly insulate the Debtors' current and former officers, directors and other related parties from any and all pre-petition causes of action, including those that are still currently being investigated by the UMWA and other third parties, The Debtors have simply made no showing that these broad Third-Party Releases are necessary.

73.      The fourth Dow Corning factor weighs against approval because the Third-Party Releases are nonconsensual.  The impacted class cannot be said to have overwhelmingly voted to accept the plan where the Plan language presumes assent to the Third-Party Releases.   Here, the Plan improperly seeks to bind the UMWA Represented Parties to overly broad third-party releases "regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third-Party Release set forth in Article VIII.D hereof."  *See* Plan Article VIII.D.

74.     The Debtors cannot propose the inclusion of a third-party release provision that will impact the rights of creditors regardless of whether they manifest assent, while at the same time asserting that the impacted class has "overwhelmingly voted to accept the plan."

75.     While some courts have found that a consensual third-party release in the form of a vote in favor of the plan or a failure to return a ballot is acceptable, *see, e.g., In re Specialty Equip. Cos.,* 3 F.3d 1043 (7th Cir.1993), other courts have held that a vote in favor of the plan is not sufficient consent, requiring that a creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt." *In re Arrowmill Development Corp.,* 211 B.R. 497 (Bankr. D.N.J. 1997); *see also In re Congoleum Corp.,* 362 B.R. at 194.  ("this Court agrees with those courts that have held that a consensual release cannot be based solely on a vote in favor of a plan"); *In re Washington Mutual,* 442 B.R. at 255 ("the Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place).  Failing to return a ballot is not a sufficient manifestation of consent to a third party release.").

76.     Although the *National Heritage* decision did not directly decide the issue, noting uncertainty among the courts regarding whether an unimpaired class's presumed support for a reorganization plan is sufficient to satisfy the fourth *Dow Corning* "consent" factor, the court held the fourth factor weighed against the debtor because the class most affected by the release provision was not given the opportunity to accept or reject the plan.  *See Nat'l Heritage Found., Inc. v. Highbourne Found.,* 760 F.3d 344, 350 (4th Cir. 2014).  The Fourth Circuit then cited to the Seventh Circuit's decision in *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir.1993), explaining the third-party releases in that case, as opposed to those in *National Heritage,*  were consensual and valid when "each creditor could choose to grant, or not to grant, the release

irrespective of the vote of the class of creditors or interest holders of which he or she is a member," meaning that "a creditor who . . . abstains from voting may still pursue any claims against third-party nondebtors."  Implicit in the Fourth Circuit's decision was the assertion that a third-party release cannot be consensual where a creditor is unable to choose whether it grants a third-party release.

77.    Thus, the fourth *Dow Corning* factor cannot be said to weigh in favor of the Debtors, because creditors, including the UMWA, will be deemed subject to the impermissible non-consensual Third-Party Releases absent any manifestation of assent to the Third-Party Releases.

78.    Finally, the fifth and sixth *Dow Corning* factors have not been satisfied because the plan provides no mechanism to pay for substantially all of the classes affected by the Third-Party Releases and the plan provides no opportunity for those claimants who choose not to settle to recover in full.

79.    Accordingly, the UMWA submits that the releases contained in the Plan are impermissible as a matter of law under applicable Fourth Circuit case law and the Plan is therefore unconfirmable on its face.

## RESERVATION OF RIGHTS

80.    To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, the UMWA reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan.  Furthermore, to the extent that any Plan supplements, or amendments to the Disclosure Statement or the Plan may be filed after any Disclosure Statement or Plan confirmation objection deadline, the UMWA reserves its right to

object thereto.   The UMWA reserves the right to raise further and other objections to the

Disclosure Statement or any amendment thereto prior to or at the hearing thereon in the event the

UMWA's objections raised herein are not resolved prior to such hearing.

81.    The UMWA further expressly reserves its rights to seek to adjourn any scheduled

hearing on confirmation of the Plan, and to seek discovery requests at a later date in connection

with Plan confirmation.

**CONCLUSION**

WHEREFORE, the UMWA respectfully requests that the Court (i) deny the

Motion to approve the Disclosure Statement and (ii) grant such other and further relief as is just

and appropriate.

Dated: August 7, 2015                              Respectfully Submitted,

                                                   Sharon Levine (admitted *pro hac vice*)
                                                   Philip J. Gross (admitted *pro hac vice*)
                                                   LOWENSTEIN SANDLER LLP
                                                   65 Livingston Avenue
                                                   Roseland, New Jersey 07068
                                                   (973) 597-2500

                                                   *Counsel for the United Mine Workers*
                                                   *of America*

                                                   -and-

                                                   /s/ Troy Savenko
                                                   _____
                                                   Troy Savenko (Va. Bar No. 44516)
                                                   KAPLAN VOEKLER CUNNINGHAM
                                                   & FRANK, PLC
                                                   1401 East Cary Street
                                                   Richmond, VA  23219
                                                   (804) 823-4000

                                                   *Local Counsel for the United Mine Workers*
                                                   *of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2015, I caused a copy of the foregoing to be served by electronic mail upon all parties receiving notice through the Court's CM/ECF Noticing System and on the "2002 List" as maintained pursuant to the Court's Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief [Docket No. 79].

/s/ Troy Savenko