| **CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**<br>Karen M. Crowley, VSB #35881<br>Ann B. Brogan, VSB #25567<br>150 Boush Street, Suite 300<br>Norfolk, VA 23510<br>Telephone: (757) 333-4500<br>Facsimile: (757) 333-4501 | **MORGAN, LEWIS & BOCKIUS LLP**<br>John C. Goodchild, III (admitted *pro hac vice*)<br>Rachel Jaffe Mauceri (admitted *pro hac vice*)<br>1701 Market St.<br>Philadelphia, PA 19103-2921<br>Telephone: (215) 963-5000<br>Facsimile: (215) 963-5001 |
|---|---|
| **MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.**<br>Paul A. Green<br>John R. Mooney<br>1920 L Street, N.W., Suite 400<br>Washington, D.C. 20036<br>Telephone: (202) 783-0010<br>Facsimile: (202) 783-6088 | **OFFICE OF THE GENERAL COUNSEL UMWA HEALTH & RETIREMENT FUNDS**<br>David W. Allen<br>Barbara E. Locklin<br>2121 K Street, N.W.<br>Washington, D.C. 20037<br>(202) 521-2238 |

*Counsel for the UMWA 1992 Benefit Plan and its Trustees and*
*Counsel for the UMWA Combined Benefit Fund and its Trustees*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PATRIOT COAL CORPORATION, *et al.* | ) | Case No. 15-32450 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**OBJECTION OF THE COAL ACT FUNDS TO THE DEBTORS' MOTION FOR AUTHORIZATION TO MODIFY THEIR STATUTORY OBLIGATIONS USING SECTION 1114 OF THE BANKRUPTCY CODE**

The UMWA 1992 Benefit Plan and its Trustees (the "1992 Plan") and the UMWA Combined Benefit Fund and its Trustees (the "Combined Benefit Fund," and collectively with the 1992 Plan, the "Coal Act Funds"), object to the Debtors' request to use Section 1114 of the Bankruptcy Code to modify their obligations under federal law to provide health benefits to certain

DB1/ 84299599.1

retirees and their dependents, and to modify their obligation to make ongoing payments to the Coal Act Funds.  As discussed below, the Coal Act is unique and its statutory obligations to provide these benefits and to make these payments cannot be altered through negotiation, and cannot be modified under Section 1114, which applies to negotiable and contractual retiree benefits.  Under controlling authority, the ongoing payments to the Coal Act Funds are in the nature of non-negotiable taxes, and the obligations to make those payments arise and are incurred periodically.  In their effort to invoke Section 1114 and modify these non-negotiable statutory obligations, the Debtors ignore the controlling authority, and instead rely upon – without discussion – a single decision by a bankruptcy judge outside this circuit in an attempt to support of their argument.

This Court, therefore, should deny in relevant part the *Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* (Dkt. No. 524) (the "1114 Motion")  In support of their objection, the Coal Act Funds respectfully state as follows:

**THE DEBTORS' COAL ACT OBLIGATIONS**

Under the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, 3036-56, *codified at* 26 U.S.C. §§ 9701-9722 (the "Coal Act"), the Debtors have certain statutory, non-negotiable obligations to provide retiree health benefits to approximately 5,344 retired coal miners and their dependents.  As explained in more detail below, the Coal Act was enacted into law to ensure that certain retired coal miners and their eligible dependents receive the retiree health benefits promised them in collective bargaining agreements between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association

("BCOA"), a multiemployer bargaining association.

To accomplish this:

- The Coal Act requires employers (or related companies) that were providing retiree health benefits through an individual employer plan or "IEP" as of February 1, 1993, to continue providing such benefits as long as the signatory employer and "any related person" remains in business. *See* 26 U.S.C. § 9711(a). The Debtors currently provide such benefits to 5,344 plan participants.

- The statute also required the Debtors to pay annual premiums to the Combined Benefit Fund (currently in the amount of $3,964,798 per year), as well as monthly per beneficiary premiums to the 1992 Plan (currently in the amount of $24,770.86 per month).

- If the Debtors and their related persons cease providing the statutorily-mandated benefits through their individual employer plan or cease to fulfill their premium payment obligations to the Coal Act Funds, then those Coal Act-eligible miners and their dependents will be enrolled in the 1992 Plan, which will be obligated to provide and pay for these benefits.

As explained below, the Coal Act obligations are non-negotiable, statutory requirements imposed under a federal law which the Debtors cannot modify under Section 1114 of the Bankruptcy Code. The 1114 Motion in relevant part should therefore be denied.

## HISTORY OF THE RELEVANT STATUTES

The history of the UMWA Health & Retirement Funds is unique, and it has been summarized by numerous courts, including the U.S. Supreme Court on at least two occasions. *See, e.g.*, *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002); *Eastern Enters. v. Apfel*, 524 U.S. 498, 504-11 (1998) (plurality opinion); *see also* Report of the Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits (Nov. 5, 1990). Although it is not necessary to repeat this entire history here, a few aspects are instructive to place in context the enactment of the Coal Act, as well as the circumstances surrounding passage of Sections 1113 and 1114 of the Bankruptcy Code.

### A.     Retiree Health Benefits Before the Coal Act

Initially, retiree health benefits for coal workers were encompassed in wage agreements between coal operators and the UMWA, which explicitly promised miners with a certain number of years of service that they were "entitled to receive health benefits until death." *See LTV Steel Co. v. Shalala (In re Chateaugay Corp.),* 53 F.3d 478, 482-83 (2d Cir. 1995) ("<u>LTV Steel II</u>"). Since 1950, each National Bituminous Coal Wage Agreement ("<u>NBCWA</u>") negotiated between the UMWA and signatory coal mine operators represented by BCOA has contained provisions requiring the signatory operators to contribute to one or more multiemployer trust funds, and, beginning in 1978, to maintain their own individual plans, established to provide health benefits to active and retired coal miners and their dependents. Among other things, the UMWA 1950 Benefit Plan and Trust (the "<u>1950 Benefit Trust</u>"), and the UMWA 1974 Benefit Plan and Trust (the "<u>1974 Benefit Trust</u>") – each multiemployer plans – were established to implement this collectively bargained requirement.

Over the years, fewer and fewer signatory operators supported more and more "orphan retirees" covered by these multiemployer plans, *i.e.*, retirees of signatory operators that no longer were making any contributions to the multiemployer plans because they had gone out of business or had otherwise evaded their obligations through a sale of their assets or by leaving the coal industry. This problem of "dumping" retiree health benefit obligations on the funds contributed significantly to a financial crisis that threatened the solvency of the 1950 Benefit Trust and the 1974 Benefit Trust in the 1980s.

### B.     Section 1113 of the Bankruptcy Code

Another significant development preceding the passage of the Coal Act was the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984), which held that "from the

filing of a petition in bankruptcy until formal acceptance, the collective-bargaining agreement is not an enforceable contract within the meaning of NLRA § 8(d)." 465 U.S. at 532; *see also United Steel Workers of Am. v. Unimet Corp. (In re Unimet Corp.)*, 842 F.2d 879, 882 (6th Cir. 1988) (quoting *Bildisco,* 465 U.S. at 532). *Bildisco* permitted a debtor, under Section 365 of the Bankruptcy Code, to unilaterally reject collective bargaining agreements.

In response to the *Bildisco* decision, Congress enacted Section 1113 as part of its 1984 amendments to the Bankruptcy Code. Section 1113 precluded the unilateral modification of a collective bargaining agreement by a debtor-in-possession without first following the strict procedures set forth in the statute. The cornerstone of those procedures is the requirement that a debtor must negotiate with the union for the changes it believes it needs before asking a court to impose them, which presupposes that those changes are within the power of the union to agree to. 11 U.S.C. § 1113(b)(2) (requiring parties to meet and confer in attempt "to reach mutual satisfactory modification of such agreement."); *In re Mile Hi Metal Sys., Inc.*, 51 B.R. 509, 510 (Bankr. D. Colo. 1985) ("One of the primary purposes of [Section 1113] was to emphasize the private collective bargaining process in an effort to avoid recourse to the bankruptcy court."). The legislative history of Section 1113 indicates that Congress was concerned that "in the wake of *Bildisco, [a]ccrued pension rights,* for which employees may have worked years to accumulate, also may be eliminated by a single declaration of the company." *Unimet Corp.*, 842 F.2d at 883 (quoting 130 Cong. Rec. S8900 (daily ed. June 29, 1984)) (emphasis in original). By enacting Section 1113, therefore, Congress granted a heightened level of protection for contractual benefits for retirees pursuant to a collective bargaining agreement.

### C. Section 1114 of the Bankruptcy Code

Subsequent litigation demonstrated that additional protections were necessary to

specifically protect retiree health benefits. *See Retired W. Union Emps. Assoc. v. New Valley Corp. (In re New Valley Corp.)*, No. 92-4884, 1993 WL 818245, at *4 (D.N.J. Jan. 28, 1993) (citations omitted). According to the district court in *New Valley*, Congress enacted Section 1114 in response to efforts by companies (such as LTV Steel) to use the Chapter 11 proceeding to avoid paying their pre-existing retirement benefit obligations on the grounds that to do otherwise would favor one set of creditors over another. 1993 WL 818245, at *4; *see also In re Arclin U.S. Holding, Inc.*, 416 B.R. 117, 119 n.6 (Bankr. D. Del. 2009) (Section 1114 of the Bankruptcy Code enacted in response to the termination of health and insurance benefits of approximately 79,000 retires in the LTV Steel Chapter 11 case).

Congress responded in 1988 with Section 1114, which prohibits the termination or modification of obligations to provide retiree benefits without first following nearly the same negotiation procedures set forth in Section 1113. Again, the mechanism of Section 1113, on which Section 1114 is patterned, depends on the requirement that a debtor must negotiate for the changes it believes it needs before asking a court to impose them, which presupposes that those changes are within the power of the retirees' representative to agree to. *See*, *e.g.*, *Arclin*, 416 B.R. at 119-120 (Section 1114 "requires that a Chapter 11 debtor continue to pay all retiree benefits unless either the trustee or debtor in possession and an authorized representative of the retirees agree to a proposed modification or the debtor in possession convinced the court that a proposed modification is necessary to permit the debtor's reorganization and is equitable."); *In re Visteon Corp.*, 612 F.3d 210, 217 (3d Cir. 2010) (noting that, under Section 1114, trustee or debtor, after making a proposal, must meet with the union to "'confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits.'") (citations omitted); *see also In re Spirit Holding Co., Inc.*, 157 B.R. 879, 881 (Bankr. E.D. Mo. 1993) (recognizing that Section 1114 protects retirees because it

DB1/ 84299599.1                                    6

"established procedures by which the debtor can alter certain types of *contractual obligation*") (emphasis added)*; In re Arlene's Sportswear, Inc.*, 140 B.R. 25, 27 (Bankr. D. Mass. 1992) (indicating that Section 1114 "affirmatively mandates" the payment of retirement benefits by a debtor-in-possession, and sets forth "procedures to allow a debtor-in-possession to alter certain *contractual obligations*") (emphasis added).

### D. The Coal Act

After Sections 1113 and 1114 of the Bankruptcy Code already had been enacted, and after it became clear that those sections did not adequately protect the health benefits of retired coal miners and their spouses and dependents, Congress enacted the Coal Act to impose a *mandatory* and *non-negotiable* statutory obligation on current and former signatory coal operators to provide certain retiree health benefits and to pay contributions to the Coal Act Funds.

As explained briefly above, until the Coal Act, the obligation to provide retiree health benefits for coal workers, and the mechanism for funding those benefits, were encompassed in wage agreements between coal operators represented by BCOA and miners represented by the UMWA. Under those agreements, miners were promised that once they had a certain number of years of service they would be "entitled to receive health benefits until death." *See LTV Steel II*, 53 F.3d at 482.

The multiemployer benefit plans began to fail in the 1980s, as fewer and fewer signatory operators supported more and more "orphan retirees" *i.e.*, retirees of signatory operators that no longer were making any contributions to the multiemployer plans because they had gone out of business or had otherwise evaded their obligations through a sale of their assets or by leaving the coal industry.

Against this backdrop, it soon became apparent that Section 1114 prior to the enactment of

the Coal Act in 1992 did not provide ready protection for the coal industry's multiemployer plans. In the first case applying Section 1114 to the then-pending LTV Steel bankruptcy, the 1974 Benefit Trust unsuccessfully attempted to use Section 1114 as a basis to require LTV Steel – which was signatory to the NBCWA with respect to its coal operations – to continue making retiree health benefit payments.  *See LTV Steel Co. v. Connors (In re Chateaugay Corp.)*, 111 B.R. 399, 404 (S.D.N.Y. 1990), *aff'd* 945 F.2d 1205, 1210 (2d Cir. 1991) ("LTV Steel I"); *see also In re Doskocil Cos., Inc.*, 130 B.R. 870, 874-876 (Bankr. D. Kan. 1991); *New Valley Corp.*, 1993 WL 818245, at *4.  In *LTV Steel I,* the district court surveyed Section 1114's legislative history and recognized the limited protection offered by Section 1114:

> [w]hile thousands of retirees could lose their medical and life insurance benefits as a result of their employer's actions under a chapter 11 bankruptcy filing, these companies have a *legal* and *contractual* obligation to their retirees . . . This legislation will not guarantee continuation of these benefits, but it will provide a mechanism that will allow the retirees' position to be heard.

*LTV Steel I*, 111 B.R. at 405 (quoting 133 Cong. Rec. S2237-38 (Feb. 19, 1987) (remarks of cosponsor Senator Byrd)) (emphasis in original).  Moreover, the district court further held that LTV Steel did not have to continue making payments to the retiree benefit plan because the pre-existing contractual provision of the wage agreement provided that LTV Steel's obligation to pay had expired upon the expiration of the collective bargaining agreement.  *Id.; see also In re Federated Dep't Stores, Inc.*, 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) (indicating that *LTV Steel I* "stand[s] simply for the proposition that expiration of old contract rights involving retiree benefits may operate to short-circuit the modification process outlined above [under Section 1114]").

With the 1950 Benefit Trust and the 1974 Benefit Trust in financial distress, and in light of the growing realization that Section 1114 provided limited protection for the miners' retiree

health plans, Congress responded by enacting the Coal Act in 1992 to impose a mandatory and non-negotiable statutory obligation on current and former signatory operators to pay contributions for certain retiree health benefits. In enacting the Coal Act, Congress found that:

> (1) the production, transportation and use of coal substantially affects interstate and foreign commerce and the national public interest; and
>
> (2) in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

26 U.S.C. § 9701 note. Congress further stated that the policy of the Coal Act is:

> to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans to retirees in the coal industry . . . [and] to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.

*Id.* Congress thus enacted the Coal Act with the fundamental objective of ensuring, through the mandate of a federal statute, the uninterrupted continuation of health benefits to covered coal industry retirees. *See generally Apfel*, 524 U.S. 498 (1998) (plurality decision); *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefit Fund*, 249 F.3d 519, 522 (6th Cir. 2001).

The Coal Act contains several specific measures to advance these objectives. First, Congress required employers like the Debtors, which were, as of February 1, 1993, either maintaining individual employer plans covering their eligible retirees, survivors and dependents, or related to a company that had done so, to "continue to provide health benefits coverage" to those beneficiaries. 26 U.S.C. § 9711. Section 9711 of the Coal Act provides, in pertinent part:

> The last signatory operator of any individual who, as of February 1, 1993, is receiving retiree health benefits from an individual employer plan maintained pursuant to a 1978 or subsequent coal wage agreement shall continue to provide health benefits coverage

> to such individual and the individual's eligible beneficiaries. . . .
> Such coverage shall continue to be provided for as long as the last
> signatory (and any related person) remains in business.

26 U.S.C. § 9711(a). Congress thus made the fundamental policy choice that individual employer plans, funded directly by the coal operators, be the primary source of retiree health care for these retirees covered by the Coal Act. Their individual employer plan, and their obligations under it, are some of the obligations that the Debtors seek to eliminate using Section 1114.

Second, as part of the Coal Act, Congress created two new trust funds – the Combined Benefit Fund and the 1992 Plan – for the provision of health care benefits to retired miners and their survivors and dependents. The 1950 Benefit Trust and the 1974 Benefit Trust were merged together to form the Combined Benefit Fund. *See* 26 U.S.C. § 9702(a)(2). Accordingly, the Combined Benefit Fund now provides health and death benefits to coal industry retirees who, as of July 20, 1992, were eligible to receive, and were receiving, benefits from the 1950 Benefit Trust or the 1974 Benefit Trust. *See* 26 U.S.C. §§ 9703(a), (b), (e),(f). These benefits are paid in part through the collection of annual health benefit premiums from assigned coal operators. The Debtors here seek to terminate such payments.

The Coal Act also created the 1992 Plan, which provides benefits to two separate categories of persons. First, under Section 9712(b)(2)(A), benefits are provided to beneficiaries who, based on their age and service earned as of February 1, 1993, could have retired and received benefits from the 1950 Benefit Trust or the 1974 Benefit Trust had those trusts remained in existence, and who actually retired between July 20, 1992 and October 1, 1994. *See* 26 § 9712(b)(2)(A). Second, the 1992 Plan also provides benefits to coal miners who retired before October 1, 1994, and who should be covered by individual employer plans under the Coal Act, *see* 26 U.S.C. § 9711(b), but whose employers have failed to provide such coverage, for whatever reason. *See* 26 U.S.C. §

9712(b)(2)(B). Accordingly, if an employer fails to provide an individual employer plan pursuant to Section 9711 of the Coal Act, the retired coal miners will receive benefits through the 1992 Plan. These benefits in part are paid by monthly per beneficiary premiums from each operator. In addition to terminating their Coal Act obligation to provide retiree health care through an individual employer plan to their own retirees, the Debtors also seek termination of their obligation to make per beneficiary premium payments.

All of the Debtors are obligated under the Coal Act. Each signatory employer's "related persons," as defined in the Coal Act, are jointly and severally liable for these Coal Act obligations. Ever mindful of the crisis caused by coal mine operators seeking to evade their Coal Act obligations and dump their retirees on a dwindling number of coal companies, Congress expansively defined "related person" in the Coal Act to include: (i) members of a controlled group of corporations that includes a liable signatory operator, as well as (ii) trades or businesses that are under common control with such signatory employer. 26 U.S.C. § 9701(c)(2).

**ARGUMENT**

In the 1114 Motion, the Debtors, with little explanation, assert that the statutory obligations imposed under the Coal Act can be modified or terminated under Section 1114 of the Bankruptcy Code in the same way that a collective bargaining agreement can be modified or terminated under Section 1113. *See* 1114 Motion at 13. In support of their assertion, the Debtors make passing reference to *In re Horizon Natural Resources Co.*, 316 B.R. 268 (E.D. Kentucky 2004), a decision issued by the bankruptcy court in the Eastern District of Kentucky which has no precedential effect in this Circuit. *Id.* In addition, the Debtors not only ignore the fact that *Horizon* was an aberration and wrongly decided, but also fail to mention other authority that directly refutes their position. When placed in context, it should be evident that Section 1114 cannot be used to modify or

terminate the non-negotiable statutory requirements of the Coal Act.

### A. Debtors' Coal Act Obligations Cannot Be Modified Under Section 1114

The obligations imposed under the Coal Act have been addressed by several Courts of Appeals, including the Court of Appeals for the Fourth Circuit. These cases establish that the Coal Act's obligations: (a) are not based on collective bargaining agreements or other contracts but arise under federal statutory law; (b) cannot be changed through negotiations with the union; and (c) are in the nature of taxes that arise on an ongoing and periodic basis. This precedent, including controlling authority from this circuit, thus requires denial of the 1114 Motion.

After the enactment of the Coal Act, the Second Circuit was the first court to address the nature of the non-negotiable, statutory obligations imposed under the Coal Act. *See LTV Steel II*, 53 F.3d 478, In *LTV Steel II*, the debtor sought to use the Chapter 11 proceeding to escape its Coal Act obligations by arguing that such obligations were pre-petition debts that could be "disallowed because no timely proof of claim was filed." *Id*. at 496. The Second Circuit rejected this contention. It noted that pre-petition claims arise in relevant part out of relationships recognized under the law of contracts. *Id*. at 497. In contrast, the court held that the Coal Act's obligations were "exclusively statutory in origin." *Id*. Moreover, the Second Circuit affirmed the district court's finding that the Coal Act's obligations were "appropriately described as 'taxes' due to their overwhelming involuntary nature, their explicit stated public purpose, and their obvious potential to be imposed pursuant to a taxing power." *Id*. at 498.

The Fourth Circuit, relying on *LTV Steel II*, reached the same conclusion. *See Adventure Res., Inc. v. Holland*, 137 F.3d 786 (4th Cir. 1998) ("There is no doubt, then, that the [Coal Act] assessments meet this circuit's definition of a tax"); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996). In *Leckie Smokeless*, the Fourth Circuit recognized that Coal Act obligations are

taxes because such obligations are "involuntary pecuniary burdens imposed by Congress for the public purpose of restoring financial stability to coal miners' benefit plans and those burdens have been imposed as an exercise of Congress's taxing power." 99 F.3d at 583 (citations omitted).

The Tenth Circuit similarly has held that Coal Act obligations do not arise from old contractual obligations but are imposed by federal statute to protect the health benefits for retired miners in the coal industry. *See UMWA 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.)*, 146 F.3d 1273 (10th Cir. 1998) ("*Sunnyside II*"). *Sunnyside*, which the Debtors ignore, began as a Chapter 11 proceeding, and the underlying decision issued by the bankruptcy court is directly on point. *See In re Sunnyside Coal Co.*, No. 94-12794-CEM (Bankr. D. Colo. Jul. 29, 1994) (slip opinion) ("*Sunnyside I*"), attached as Attachment A. Specifically, the bankruptcy court in *Sunnyside* denied a debtor's motion to discontinue retiree benefits under Section 1114. In doing so, the bankruptcy court explained that the Coal Act benefits are statutory, not contractual, and cannot be modified by the negotiation procedures under Section 1114:

> [Section] 9711 is unequivocal. It is unequivocal. "The operator *shall continue* to provide these retiree health benefits, so long as the operator remains in business." It's a statutory obligation. It is not contractual. It is measured, it is true, by contractual measure, but it is statutory. 1114 permits, if applied to modify 9711, the union to do something that clearly it could not do outside the context of bankruptcy which is to come to a voluntary agreement with an employer to reduce retiree benefits below the levels provided for by the plan in existence on January 1, 1992.

*Sunnyside I*, No. 94-12784-CEM at 17-18 (emphasis added).[1] Based on this statutory language,

---

[1] Section 9711(a) of the Coal Act provides:

> **(a) Coverage of current recipients.** – The last signatory operator of any individual who, as of February 1, 1993, is receiving retiree health benefits from an individual employer plan maintained pursuant to a 1978 or subsequent coal wage agreement *shall continue* to provide health benefits coverage to such individual and the individual's eligible beneficiaries

the bankruptcy court concluded that "the Coal Act . . . require[s] Sunnyside to provide the ongoing benefits, health care benefits, to the retirees as mandated by 9711 and therefore, the union as the authorized representative had *good cause* not to bargain on the proposal of the debtor to terminate those benefits." *Id.* at 18 (emphasis added).

The Tenth Circuit subsequently approved the bankruptcy court's rejection of Sunnyside's attempt to avoid paying Coal Act premiums under Section 1114. *See Sunnyside II*, 146 F.3d at 1276. The Tenth Circuit further held that even though the debtors had subsequently converted the Chapter 11 proceeding to a Chapter 7 liquidation, that fact did not alter Sunnyside's statutory obligation to continue complying with the Coal Act until it was no longer in business. *Id.* at 1276, 1278. In reaching this result, the Tenth Circuit joined the Second and Fourth Circuits in holding that Coal Act obligations are considered taxes in bankruptcy, and are non-negotiable and entitled to administrative expense priority under Section 503(b) of the Bankruptcy Code. *Id.* at 1278-1280; *see also Adventure Res.*, 137 F.3d at 795; *LTV Steel II*, 53 F.3d at 498; *Leckie Smokeless*, 99 F.3d at 583.

In addition, the Tenth Circuit in *Sunnyside II* explicitly recognized that Coal Act premiums are federal statutory obligations created by Congress for the specific purpose of protecting health benefits for specified retirees of the Coal industry, not merely contractual agreements between the coal operators and the UMWA:

> The Trustee's contrary argument here disconnects Coal Act premiums from their historical roots and statutory context, attempting to refashion them into collectively bargained payments made under contractual agreements between coal operators and the

---

which is substantially the same as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992. Such coverage *shall continue* to be provided for as long as the last signatory operator (and any related persons) remains in business (emphasis added).

> UMWA . . . . Here, the obligation to pay derives from the Coal Act, not as the Trustee urges, from a contractual arrangement between the fund created and the operator.

*Sunnyside II*, 146 F.3d at 1277; *see also LTV Steel II*, 53 F.3d at 497 ("LTV's liability to the Combined Fund is newly imposed by the Coal Act, not a revival of old contractual obligations."). In short, the Tenth Circuit recognized that obligations under the Coal Act, unlike contractual obligations, are not subject to negotiation or modification.

Finally, the bankruptcy court in *In re Westmoreland Coal Co.*, 213 B.R. 1, 19-20 (Bankr. D. Colo. 1997) also recognized that "retiree benefits" as described in Section 1114 only applies to voluntary retiree benefit plans, and not to non-negotiable statutory obligations found under the Coal Act or amounts due following pre-petition termination of a Coal Act individual employer plan. As the bankruptcy court noted:

> [the] language of § 1114 suggests that Congress intended this provision only to apply to plans voluntarily created by a debtor which are in operation at the time of the bankruptcy filing. The elaborate procedure for selecting a representative of the beneficiaries and for negotiation of modifications proposed by a debtor indicates that Congress was concerned with collectively bargained-for agreements rather than obligations [such as Coal Act liabilities] fixed by statute.

213 B.R. at 19.

In summary, these cases confirm that Coal Act obligations are not contractual obligations subject to modification through negotiation but instead are non-negotiable statutory obligations imposed under federal law. Moreover, as the Fourth Circuit has held, Coal Act obligations are in the nature of non-negotiable taxes, arising periodically and are not susceptible to treatment as a single prepetition claim for all future obligations. Accordingly, this controlling precedent precludes this court from treating these obligations as negotiable or contractual, which is a

necessary precondition of applicability of Section 1114.

### B. The Debtors' Reliance On *Horizon* Cannot Change This Result

In the 1114 Motion, the Debtors ignore any discussion of the cases cited above from the Fourth, Second, and Tenth Circuits. Instead, they cite to, but do not discuss, a lone bankruptcy decision from outside the Fourth Circuit –*Horizon Natural Resources*, 316 B.R. 268. When doing so, they fail to address the distinction between non-negotiable statutory requirements imposed by the Coal Act and otherwise negotiable and contractual retirement benefits that can be modified under Section 1114. This omission – that the Coal Act involves non-negotiable statutory requirements – is fatal to the 1114 Motion.

In fact, instead of confronting this distinction, the *Horizon* court simply glosses over it, stating that "the statutory definition [of retiree benefits] makes no distinction between contractual and non-contractual benefits." *Horizon*, 316 B.R. at 275. This assertion is simply wrong. The important distinction, which is clearly reflected in the cases cited above and ignored by both the *Horizon* court and the Debtors here, is not between contractual and non-contractual benefits, but between *negotiable* benefits – subject to modification under Section 1114 – and *non-negotiable* statutory benefits mandated by Congress and not subject to modification under Section 1114. The *Horizon* court erred by concluding that, because "retiree benefits" under Section 1114 can encompass non-contractual benefits, it can also encompass federal statutory obligations under the Coal Act.

In the 1114 Motion, the Debtors ignore any discussion of this distinction or the broader purpose of the Coal Act in providing benefits to retired coal miners.[2] Instead, they merely assert,

---

[2] In their 1114 Motion, Debtors also claim that they do not believe that any of the affected retirees will be "negatively affected" by termination of the Debtors' Coal Act obligations because it is "Debtors' understanding" that the 1,018 beneficiaries receiving benefits directly from the Debtors will then receive

without discussion or acknowledgement of contrary authority, that their Coal Act "liabilities are subject to modification through Section 1114 of the Bankruptcy Code." 1114 Motion at 13. This naked statement not only contradicts the structure and legislative intent of both Section 1114 and the Coal Act, but does great violence to the state of the law with respect to the interplay between the Coal Act and the Bankruptcy Code. It is clear that Coal Act obligations are treated as taxes in bankruptcy, and are non-dischargeable, non-negotiable, and payable on an ongoing basis. *See Adventure Res.*, 137 F.3d at 793; *Leckie Smokeless*, 99 F.3d at 583; *see also LTV Steel II*, 53 F.3d at 498; *Sunnyside II*, 146 F.3d at 1278. For this reason, the bankruptcy court in *Sunnyside* drew the distinction between a debtor's non-negotiable Coal Act obligations and negotiated contract-based obligations, holding that, even if the debtor and the Union *wanted to modify* the debtor's Coal Act obligations, they would not be permitted to do so, as federally mandated obligations cannot be negotiated away. *See Sunnyside I*, No. 94-12784-CEM at 18. In sum, Section 1114 of the Bankruptcy Code cannot be used to modify non-negotiable statutory benefits provided by the Coal Act.

WHEREFORE, the Coal Act Funds hereby request that this Court (i) deny the 1114 Motion to the extent the Debtors seek to modify their obligations under federal law to provide health benefits to certain retirees and their dependents, and to modify their obligation to make ongoing payments to the Coal Act Funds and (ii) grant such other relief as the Court deems appropriate.

---

upon such termination benefits from Peabody Energy Co. ("Peabody") or Arch Coal Co. *See* 1114 Motion at 14, ¶ 25. This assertion misses the point. The issue of whether Section 1114 can be used to modify non-negotiable statutory obligations is separate and distinct from the issue of whether there is another entity with statutory obligations to provide the benefits. In addition, the "Debtors' understanding" may need some adjustment, for as recently as May 29, 2015, Peabody, when summarizing its potential liabilities stemming from the Debtors' bankruptcy, made no mention of any potential Coal Act retiree medical benefit liability. *See* Peabody Energy Corp. Form 8-K (filed May 19, 2015).

Dated: August 10, 2015

**CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.**

By: /s/ Karen M. Crowley

Karen M. Crowley, VSB #35881
Ann B. Brogan, VSB #25567
150 Boush Street, Suite 300
Norfolk, VA 23510
Telephone: (757) 333-4500
Facsimile: (757) 333-4501

**MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.**
Paul A. Green (admitted *pro hac vice*)
John R. Mooney, VSB #22212
1920 L Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 783-0010
Facsimile: (202) 783-6088

**MORGAN, LEWIS & BOCKIUS LLP**

John C. Goodchild, III (admitted *pro hac vice*)
Rachel Jaffe Mauceri (admitted *pro hac vice*)
1701 Market St.
Philadelphia, PA 19103-2921
Telephone:    (215) 963-5020
Facsimile:    (215) 963-5001

**OFFICE OF THE GENERAL COUNSEL
UMWA HEALTH & RETIREMENT FUNDS**
David W. Allen
Barbara E. Locklin
2121 K Street, N.W.
Washington, D.C. 20037
(202) 521-2238

*Attorneys for the UMWA 1992 Benefit Plan and its Trustees and the UMWA Combined Benefit Fund and its Trustees*