# Attachment A

1

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
IN BANKRUPTCY

3  - - - - - - - - - - - - - - - - - -

4  In Re.                                    :

5  SUNNYSIDE COAL COMPANY,                   :        94 12794 CEM

6  Debtor's Motion to Discontinue Retiree    :
   Benefits and Objections Thereto           :

7

8  - - - - - - - - - - - - - - - - - -

9

10

Courtroom C
721 19th Street
U.S. Customs House
Denver, Colorado  80202-2508

11

July 29, 1994

12

13     BEFORE THE HONORABLE CHARLES E. MATHESON, Judge.

14  APPEARANCES:

15     For the Debtor:                  Risa Wolf-Smith, Esq.

16

17     Also Present:                    Joan Burleson, Esq.
                                        Rubner & Kutner
18                                      303 E. 17th Ave.
                                        Denver, Colorado  80203

19

20

21

22

23

24

25     Proceedings recorded by electronic sound recording,
       transcript produced by transcription service.

2

1          FINDINGS OF FACT AND CONCLUSIONS OF LAW

2          THE COURT: Let me just deal with the last point.  Under

3    1114(d), it is provided that the Court, upon a motion by any

4    party-in-interest and after notice and hearing, shall appoint

5    a committee of retired employees if the debtor seeks to

6    modify or not pay the recovery benefits or if the Court

7    otherwise determines that it is appropriate to serve as the

8    authorized representative.  I'm not quite so sanguine that

9    this Court does not have the authority sua sponte. to

10   determine that the union is not the proper authorized

11   representative and that a committee ought to be so formed.

12   But, that's beside the point as far as this is concerned.

13          Let me say at the outset that--I said when we first

14   convened this hearing that there was undoubtedly some risk

15   that I would continuously refer to the debtor as Kaiser.  I

16   know that I've done that periodically.  The Sunnyside Coal is

17   a successor to another debtor in this Court; a successor in

18   the sense that Sunnyside acquired from Kaiser the particular

19   mine in Utah which it has operated.  I mentioned Kaiser this

20   morning because the observation has been made that in the

21   course of the administration of that estate this Court had

22   the opportunity to deal with in one form or another just

23   about every new threshold legal issue that can arise in a

24   reorganization proceeding.  And, we did, indeed, deal with

25   it.  We didn't deal with this one.  So, I suppose it is

3

1   fitting that the intricacies of 1114 and the impact of the

2   Coal Act come back to me like Marlee's ghost to haunt me in

3   the Sunnyside case like the specter of Kaiser as the

4   Christmas Past to be dealt with.

5          As an academic exercise, it is a very interesting

6   one.  As an exercise involved with human pathos, it is

7   charged with that, as well, although not quite to the same

8   degree as we saw in the Kaiser Coal case, because at that

9   time, there was not a similar kind of provision as the Coal

10  Act and there was not a mandate that the retiree benefits be

11  paid in any way.  There wasn't any money with which to pay

12  the retiree benefits in Kaiser Coal, a circumstance which has

13  led the unions to seek the further modification of 1114

14  before Congress to require lenders to fund retiree health

15  benefits in a reorganization proceeding; an effort, one of

16  the few, I would guess, that the unions have at least, thus

17  far, found to be fruitless.  But, I'm sure they will

18  persevere in their efforts.

19         Be that as it may, the case that we have before us

20  today, the facts would show that Sunnyside as the successor

21  to Kaiser in the operations of this particular mine did fall

22  under the ambit of the 1988 Bituminous Coal Wage Agreement

23  which is Debtor's Exhibit 1.  And, while that agreement has

24  since terminated, there are subsequent agreements; and, while

25  the debtor has maintained consistently the argument that it

4

1   believes that it is not bound by the subsequent agreements, I

2   disagree.  The 1993 interim agreement provides explicitly

3   that the employer in the agreement and the union agree to be

4   bound by and comply fully with the terms and conditions of

5   the successor national agreement.  And, while it does specify

6   that the parties intended to sign such an agreement, I can't

7   find that the failure of that to have occurred has served to

8   release those obligations and, indeed, I have no doubt,

9   whatsoever, that had Sunnyside been hit by a wildcat strike

10  by the union employees, it would have been the first to argue

11  while it was operating under that interim agreement that the

12  union was bound by the terms of the successor agreement and

13  could not go out on such a wildcat strike.  Further, it is

14  clear that the company to its credit has continued to comply

15  with the terms of that agreement on its operation and in the

16  utilization of the employees.  So, just in case that issue is

17  thought to be important in the resolution of the matter

18  that's before the Court, at least for purposes of today, the

19  Court finds that the debtor is indeed party to the successor

20  agreement and bound to the terms of that agreement.

21       The agreement, that successor agreement--the 1988

22  agreement and the successor agreement make provision for the

23  payment of health benefits to retirees and Sunnyside comes to

24  the Court under Section 1114 of the Bankruptcy Code seeking

25  to terminate the obligation to pay retiree benefits.  If

5

1  that's all that we have on the plate, it would be enough, but

2  it isn't.

3       The union lobbied for and obtained additional

4  legislation represented by the Coal Act hidden away in the

5  recesses of the Internal Revenue Code.  Section 9711 of Title

6  26 to the United States Code places a burden--I mean, it's

7  always wonderful to read the language as it comes to us out

8  of the Internal Revenue Code.  It's almost unintelligible.

9  "The last signatory operator of any individual," I mean it

10 sounds like indentured servitude--"of any individual who as

11 of February 1, 1993, is receiving retiree health benefits

12 from an individual employer plan maintained pursuant to 1978

13 or subsequent Coal Wage Agreement, the last signatory

14 operator shall continue to provide health benefits coverage

15 to such individual which is substantially the same as the

16 coverage provided by the plan as of January 1, 1992."  And,

17 there is no suggestion, no argument made that part of the

18 filing of the bankruptcy petition, Sunnyside was obligated

19 under that statutory mandate to provide retiree benefits.

20      Mr. Gillman argues that really--and, Mr. Smith--

21 that 9711(a) of the Internal Revenue Code is all predicated

22 on a voluntary agreement.  If they didn't have the voluntary

23 agreement in place, if there is such a thing as a coal mine

24 in this country operated on a non-union basis, that operation

25 would not be subject to the provisions of 9711 if it had not

6

1   instituted its own voluntary plan to provide retiree

2   benefits.  Even that kind of an operator would be subject to

3   9711 if it had a voluntary plan of its own in effect, it

4   would appear, as of February 1, 1993.  It would be required

5   under 9711 to continue that plan.  Had Congress thought that

6   it was sufficient to have voluntary plans, then it wouldn't

7   have been necessary to have 9711.  Congress could have gone

8   further, I suppose, and specified that every operator of a

9   coal mine shall have a plan, but Congress didn't do that.

10  Congress did, it is true, limit the obligation to maintain to

11  continue to provide retiree benefits to those employers who

12  already had a voluntary plan in place.  But, Congress found

13  some need to be sure that such an employer would not

14  terminate that voluntary plan at some time in the future,

15  either on its own or by complicity with a bargaining

16  representative.

17          It's always difficult to divine the public policy

18  behind legislation, such as the Coal Act, but it's certainly

19  --this kind of legislation is certainly consistent with the

20  view of Congress that the coal industry is certainly a more

21  dangerous workplace than the courtroom.  Well, maybe not.

22  But, generally, it is less injurious to your health to be in

23  the courtroom than it is in a coal mine and the health

24  problems of coal miners and the costs and care required to

25  provide for them can be considered perhaps to be a national

7

1  problem to the point where Congress felt it necessary to
2  mandate that employers will continue to have health benefit
3  plans in effect for retirees.

4  And, certainly, 9711 by its terms does not suggest
5  that those obligations imposed by that statute shall be
6  maintained, unless and until, the employer and the union
7  agree to change it.  I could certainly see the possibility
8  that for a given mine operation, in bargaining for benefits,
9  et cetera, considering the depressed coal prices, whatever,
10 that the union might decide that it is better for the
11 employees of that employer to accept lower wages and reduce
12 health benefits in exchange for the opportunity to continue
13 to have jobs and keep the mine open.  After all, what's what
14 collective bargaining is all about.  But, 9711 would remove
15 that opportunity from the union.

16 The debtor argues that 1114 provides that vehicle.
17 The evidence that we have is that once the bankruptcy
18 petition was filed, Sunnyside ceased or had ceased active
19 mining operations.  It was in the process of closing down the
20 mine and indeed, by May, had shut off the power and allowed
21 the mine to fill; thereby, foreclosing any possibility of
22 reopening the mine and conducting operations.  It does not
23 intend to again engage in active coal mining.  It intends to
24 proceed within the context of a liquidating plan; to sell its
25 remaining assets, preserve and protect, and care for them,

8

1   and pending that, comply with its environmental obligations

2   to reclaim environmental damage done to the land by reason of

3   its operations.   And, to take whatever it receives out of the

4   liquidation of those assets and out of the expenses and

5   distribute that among the creditors.

6           Now, this Court has prodded on several occasions

7   the debtor as to why it is here, why it is in Chapter 11, and

8   the answer that I got is altruism.   That's the answer I got.

9   And, I've found in the course of human events that altruism

10  is not usually a very reliable motivation; at least, on an

11  ongoing basis.   But, it is admirable when it exists and

12  certain it is that it is desirable in this proceeding to

13  maximize the possibility of return to the creditors, all the

14  creditors; to retirees, the trade creditors, the secured

15  creditors, the taxing authorities, everyone.   And, I have no

16  question, whatsoever, of the representations made that Mr.

17  Burnham and the debtor believe that they're in a position to

18  achieve that kind of a return that would be significantly in

19  excess of what could be received in Chapter 7.   I think

20  that's an honest belief.   And, indeed, it may very well be a

21  justifiable belief.   I still have this residual question that

22  perhaps I ought not to have as to why they are motivated to

23  do so.   But, if it is only altruism, as I say, the goal that

24  they seek to achieve is laudable and worthwhile and ought not

25  to be lightly rejected.   And, I say that in large part

9

1  because I don't want there to be some lingering thought at

2  this stage of this proceeding that my view is that this

3  debtor ought not to be in Chapter 11 and that the case ought

4  to be converted.  Certainly, the creditors' committee has

5  actively supported the concept of allowing this debtor to

6  remain in Chapter 11 and to be able to move forward with a

7  plan.  I think that with all due regards to Judge Scholl and

8  his opinion, even he has to recognize in that opinion that

9  Ms. LyBurski tendered me that it is well-established that a

10  liquidating plan is a plan of reorganization and it can be

11  pursued and fulfilled as a part of Chapter 11.  There isn't

12  anything in Chapter 11 that says that reorganization means

13  sending the company back out into the world with an ability

14  to generate a profit.

15       Now, there are lots of issues to be dealt with and

16  they are significantly interrelated.  Perhaps, in order that

17  the parties can focus on how I'm getting to where I'm going,

18  the parties ought to know up front where I'm going to get to.

19  Having considered the evidence, reviewed the briefs that have

20  been filed--and, as usual in this kind of case, the legal

21  work has been of the highest quality--reviewed those briefs,

22  reviewed the exhibits, heard the testimony, considered the

23  provisions of Section 1114 of the Code, and for purposes

24  which I'm about to explain, I will deny the debtor's

25  application.  I suspect that comes as a surprise in some

10

1  quarters.

2         I do that for a variety of reasons.  First of all,

3  setting aside the impact of the Coal Act, I think Mr.

4  LyBurski is correct that the debtor has not made the showing

5  required, particularly by the provisions of 1114(g)(1).  That

6  is, that the debtor has prior to the hearing made a proposal

7  that fulfills the requirements of (f) which requires the

8  debtor to make a proposal which provides for those necessary

9  modifications in the retiree benefits that are necessary to

10 permit the reorganization of the debtor and assures that all

11 creditors to the debtor and all of the affected parties are

12 treated fairly and equitably.

13         The proposal put forth by the debtor was

14 unequivocal and a one-liner that the debtor will terminate

15 the payment of health care benefits to the retirees, period.

16 To be sure, the termination of those benefit payments will

17 enhance the ultimate payout to creditors.  Anything that the

18 debtor does not have to pay to or for and on account of

19 retirees, leaves more money in the debtor's pocket.  So, it

20 enhances the return.  But, there has been nothing to show me

21 that it is necessary to terminate all of those benefits in

22 order to permit the reorganization.  If they are paid for a

23 shorter period of time, if they are paid in a lesser amount,

24 if they're provided in a different way that is less

25 expensive, any of those factors might serve to be considered

11

1  by the union and by the Court and might still permit the

2  reorganization.  It is a proposal that must be made to the

3  authorized representative by the debtor.  That is the

4  proposal that the debtor must make.  I understand that the

5  debtor may wish to invite negotiation, but--and to do so from

6  the farthest pole position, but nonetheless, it is ultimately

7  the obligation of the debtor to come forth with the proposal

8  to the authorized representative that this is what we must do

9  in order to make it necessary to permit the reorganization.

10  So, I find that that has not been done.

11       I further find that the debtor has not met the

12  showing required under 1114(g)(2); that is, that the union as

13  the authorized representative of the retirees has refused to

14  accept such proposal without good cause.  Now, I'm obviously

15  bothered by the role of the union as the authorized

16  representative because I think that the union clearly wears

17  two hats, and when it puts on one, it necessarily acts to the

18  detriment of its position when it puts on the other.  I think

19  that any reasonable group of people who are told that, look,

20  you can get your retiree benefits on an ongoing basis from a

21  fund that's been established pursuant to the law passed by

22  Congress to be there for your exclusive benefit or you can

23  gamble on getting them in the future if the debtor has future

24  cash flows available, in fact, to pay them; which would you

25  like to have?  I think the response of the retirees would be

12

1  clear, unless we might conclude that the retirees are imbued

2  with this altruistic view, as well, and would rather give up

3  the safety of those in order to support the future of the

4  funds and the other sociological purposes served by the

5  union.

6          But, nonetheless, the response of the union was we

7  cannot consider that because Sunnyside is mandated by 26 USC

8  9711 to provide these benefits.  So, this isn't something

9  that we can negotiate.  And, if that's true, I think that is

10 good cause.  It's kind of a back door way of recognizing that

11 the obligations imposed by the Coal Act probably do play

12 within the context of 1114.  1114 defines under 1114(a),

13 "retiree benefits", "any payment to any purpose for medical,

14 surgical, or hospital care under any plan, fund, or program

15 maintained or established in whole or in part by the debtor

16 prior to filing the petition and commencing a case under this

17 Title."

18         Is the Coal Act obligation, under 9711(a) of the

19 Internal Revenue Code, a plan, fund, or program maintained or

20 established in whole or in part by the debtor; is, I suppose,

21 one question.  Maybe one answer is that, at least as to the

22 date of the filing of the Act, the obligation to pay was not

23 evidenced under Section 9711, but was evidenced under the

24 voluntary agreement, which is what Mr. Gillman is kind of

25 arguing.  And, that, in fact, is true.

13

1    The second question is if it is a plan, fund, or

2  program maintained to establish in whole or in part by the

3  debtor prior to filing a petition commencing this Chapter 11,

4  can it be modified under 1114?  Well, I suppose there's an

5  interim question.  And, that is the question of whether, if

6  it is one of those things, does 9711 impose a present

7  obligation on the debtor to provide retiree benefits?  And,

8  that, of course, focuses on the fact that coverage under 9711

9  is to be provided for as long as the last signatory operator

10  remains in business.  And, Congress has defined for us what

11  business means.  In the simplest terms, business means

12  business.  That's what 9701(c)(7) says; "For purposes of this

13  chapter, a person shall be considered to be in business if

14  such person conducts business."  Not very helpful.  "Whether

15  or not in the coal industry"--well, that does help clarify

16  things a little bit--"conducts or derives revenues from any

17  business activity."

18    The legislative history certainly indicates that

19  Congress viewed the language that it was using as being as

20  all inclusive as they thought they could make it.  I think

21  part of the history behind this kind of legislation stems

22  from a view that these persons who are retirees spent some

23  significant portion of their lives in developing the assets

24  working at Sunnyside and its predecessor mining the coal.

25  And then, Sunnyside shuts down and takes the fruits of those

14

1   labors, the coal that's sitting there, and sells it and that

2   it ought not to profit at the expense of those who produced

3   it.  And, there is a bit of that here; not, let me hasten to

4   say, maliciously.  But, just the reality that when Sunnyside

5   sat down there remained some stores of mined coal on the

6   property and it is used employees, paid for in accordance and

7   treated in accordance with the terms of the collective

8   bargaining agreement, to clean that coal and sell it.

9          The argument that the debtor makes is that business

10  activity should be read to mean net income oriented; business

11  activity that is meant to produce a profit.  And, indeed,

12  that is the focus of the Carpenter Town opinion.  But, 9701

13  doesn't talk about profit; it talks about revenues, revenue

14  from any business activity conducts--conducts any business

15  activity.  It doesn't even have to be revenue generating if

16  it conducts a business activity.  Well, what's a business

17  activity?  What was the business activities of this debtor

18  before it shut the mine down?  Well, some of those certainly

19  were mining coal.  And, it's not doing that any more.  But,

20  in connection with that business activity and with the fact

21  that it owned coal mine properties, it was also engaging

22  constantly in environmental care and reclamation, in

23  maintenance and repair, in liquidation of excess equipment,

24  in paying its creditors.  This debtor has a business

25  obligation to wind up its affairs, liquidate its assets, pay

1   its creditors.  If it had enough money to pay its obligations

2   on a current basis outside of this Court, but desired to

3   terminate all operations, that's what it would do.

4           The other opinion of Carpenter Town is a little

5   unclear.  We do know in that case that the debtor had

6   finished all of those things, the reclamation and the sale of

7   its assets.  It held some cash which it was going to pay.

8   That's all it had left to do.  And, perhaps, that's not the

9   conduct of a business activity.  It was not generating

10   revenue other than maybe some interest on the monies it was

11   holding, but the Judge doesn't tell us.  And, it's not clear

12   --to me, at least, in reading the opinion--whether the claim

13   for contributions under the Coal Act was being made on a

14   basis that reached back to the period of time during which

15   the debtor had been in the process of reclamation and

16   liquidation; although the inference certainly is that that

17   was the case, but it isn't abundantly clear that that was

18   true.  But, nonetheless, I don't agree with the Judge's focus

19   in that case where he makes the immediate quantum leap from

20   revenue to profits because that's simply not what 9702 is

21   about.

22           So, here, we know that the debtor has post-petition

23   liquidated remaining stocks of coal inventory and continues

24   to do so to some limited extent, but does continue to do so

25   which certainly is a business activity even though not one

16

1    calculated to put this debtor back into the mining business.

2    But, it is a business activity.  And, it continues to carry

3    on all of the other accouterments of this kind of a business

4    short of actually going down into the mine and taking out

5    coal.  So, I have to conclude that Sunnyside is at the

6    present time conducting or deriving revenue from a business

7    activity and, therefore, is subject to the mandate of 9711(a)

8    to provide continuing retiree coverage as required by the

9    statute.

10            And then, the question is can this Court, under

11   1114, permit this debtor to terminate its statutory

12   obligation to provide these benefits?  If it can, then the

13   position of the union in categorically refusing to sit down

14   and discuss this was not with good cause.  But, if it cannot,

15   then the position with the union, I think, must be viewed to

16   be with good cause.  So, it's a long way around to

17   considering the impact of the Coal Act within the context of

18   1114.

19            1114 was outstanding and in effect when Congress

20   addressed itself to the Coal Act.  Mr. Gillman suggests that

21   the institutional memory of Congress, therefore, should have

22   remembered what it had done in 1114 shortly before the Coal

23   Act and have acted to have intelligently told us what the

24   impact was going to be.  And, having failed to explicitly

25   remove the Coal Act from the long arm of 1114, the Court

17

1    should conclude that it can, under 1114, terminate that

2    obligation.

3         I understand that argument. It's one of the

4    problems that haunts us continually in bankruptcy. This

5    enactment of special legislation, either within or without

6    the Bankruptcy Code, to solve a specific problem without much

7    attention being given to what kind of damage it does to the

8    legislative scenario in another area. And, we are sometimes

9    accused, those of us who sit on a specialized Court, of

10   having a kind of judicial myopia where we're unable to see

11   the broader scope of other kinds of remedial legislation or

12   to apply it in the context of a bankruptcy proceeding because

13   we are too focused on the remedial effects and desires of

14   implementing the bankruptcy system. I think the reality is

15   that we have to plead guilty to that charge, all of us, at

16   least to some degree at some time.

17        9711 is unequivocal. It is unequivocal. "The

18   operator shall continue to provide these retiree health

19   benefits, so long as the operator remains in business." It's

20   a statutory obligation. It is not contractual. It is

21   measured, it is true, by contractual measure, but it is

22   statutory. 1114 permits, if applied to modify 9711, the

23   union to do something that clearly it could not do outside

24   the context of bankruptcy which is to come to a voluntary

25   agreement with an employer to reduce retiree benefits below

18

1   the levels provided for by the plan in existence on January

2   1, 1992.  1114 tells us that we don't get to this point of

3   having a hearing to determine whether the company ought to be

4   allowed to reduce the benefits if the authorized

5   representative and the company have agreed.

6        I don't think that 9711 could have been made much

7   clearer by Congress.  Even if the Court makes the leap to

8   determine that it is or constitutes a plan, fund, or a

9   program maintained or established in whole or in part by the

10  debtor, I don't think Congress could have been much clearer

11  in 9711 than to send a message to say it doesn't make any

12  difference where you are or what you're doing, whether you're

13  a debtor-in-possession, in what kind of a business you are,

14  or anything else; so long as you remain in business, you

15  shall pay these health benefits unless it's determined that

16  it isn't necessary.  And, I am unable to find my way to reach

17  a conclusion that says notwithstanding that explicit language

18  that is enacted after--I can ignore it until Sunnyside--

19  others perhaps could do that.  Perhaps, a higher Court can

20  find that it--this Court under 1114 can't--I will certainly

21  credit the parties--

22        The reality is that it is a point subject to

23  argument, but you are here asking for my judgment in this

24  proceeding and that's what you get.  I'm sure that this

25  problem will haunt other Courts, but for today the judgment

19

1  that we have to deal with is mine based on the case that is

2  in front of me.  I must conclude that the Coal Act does

3  require Sunnyside to provide the ongoing benefits, health

4  care benefits, to the retirees as mandated by 9711 and,

5  therefore, the union as the authorized representative had

6  good cause to not bargain on the proposal of the debtor to

7  terminate those benefits.  And, because, therefore, the Court

8  has concluded that the debtor has failed to make the showings

9  required by 1114(g)(1) and 1114(g)(2), the application of the

10  debtor to terminate the retiree benefits at this time must be

11  denied.

12       I thank counsel for bringing this wonderfully

13  interesting problem to this Court.  We'll be in recess.

14       (Whereupon, at 11:40 a.m., the hearing was concluded.)

15

16       I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  August 2, 1994

        *Doneita Gitzen*
20      Federal Reporting Service, Inc.
        17454 E. Asbury Place
21      Aurora, Colorado  80013
        (303) 751-2777

22

23

24

25