**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| PATRIOT COAL CORPORATION, *et al.* | ) | |
| | ) | Case No. 15-32450 (KLP) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF
ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) APPROVING
SOLICITATION AND NOTICE MATERIALS; (III) APPROVING FORMS OF
BALLOTS; (IV) ESTABLISHING SOLICITATION AND VOTING PROCEDURES;
(V) ESTABLISHING PROCEDURES FOR ALLOWING AND ESTIMATING CERTAIN
CLAIMS FOR VOTING PURPOSES; (VI) SCHEDULING A CONFIRMATION
HEARING; AND (VII) ESTABLISHING NOTICE AND OBJECTION PROCEDURES**

Lorenzo Marinuzzi, Esquire (admitted *pro hac vice*)
Jennifer L. Marines, Esquire (admitted *pro hac vice*)
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

Counsel for the Official Committee
of Unsecured Creditors of Patriot Coal Corp., *et al.*
ny-1197357

Lynn L. Tavenner, Esquire (VA Bar No. 30083)
Paula S. Beran, Esquire (VA Bar No. 34679)
Tavenner & Beran, PLC
20 North Eighth Street, Second Floor
Richmond, VA 23219
Telephone:  (804)783-8300
Facsimile:  (804) 783-0178

Counsel for the Official Committee
of Unsecured Creditors of Patriot Coal Corp., *et al.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 4

    I.      The Chapter 11 Cases ....................................................................... 4

    II.     The Proposed Sale Transactions ........................................................ 5

    III.    The Disclosure Statement and Plan ................................................... 6

OBJECTION ......................................................................................................... 7

    I.      The Disclosure Statement Cannot be Approved as the Plan is Patently
        Unconfirmable ................................................................................. 7

        A.    The Plan is Patently Unconfirmable Because It Fails to Provide a
            Workable Exit Strategy In Compliance with the Bankruptcy Code .......... 9

        B.    The Plan is Not Confirmable Because it Fails to Provide Properly
            for Satisfaction of Administrative Claims as Prescribed by Section
            1129(a)(9) of the Bankruptcy Code ....................................... 14

        C.    The Third Party Release Provisions of the Plan Are Improper ............... 16

    II.     The Court Should Not Approve the Disclosure Statement Because It Fails
        to Provide Adequate Information and Will Require Material Modifications ...... 20

        A.    The Debtors' Disclosures Regarding the Funding of the
            Liquidating Trust Are Inadequate ........................................... 22

        B.    The Disclosure Statement Fails to Provide Any Information With
            Respect to the Value of Unencumbered Assets and the Allocation
            Thereof ................................................................................. 23

        C.    The Disclosure Statement Contains Ambiguity With Respect to the
            Prepetition Secured Parties' Deficiency Claims, If Any ........................ 26

        D.    The Disclosure Statement Does Not Provide Adequate Information
            to Assess the "Best Interests Test".......................................... 27

        E.    The Debtors' Disclosures With Respect to the Release and Waiver
            of Causes of Action Is Lacking............................................... 29

        F.    The Disclosure Statement Lacks Any Information Related to the
            Treatment of the Debtors' Reclamation Obligations Not Assumed
            by Blackhawk...................................................................... 31

    III.    Material Modifications to the Disclosure Statement and Plan Are
        Necessary That Will Require Re-solicitation of the Plan .................... 34

    IV.    The Solicitation Procedures Must Be Modified................................. 35

THE COMMITTEE DOES NOT SUPPORT THE PROPOSED PLAN ................... 36

ny-1197357

# TABLE OF CONTENTS
(continued)

**Page**

RESERVATION OF RIGHTS ................................................................................................... 36

ny-1197357

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Behrmann v. National Heritage Foundation,*
    663 F.3d 704 (4th Cir. 2011) ...................................................................16, 17, 18

*Chase Manhattan Mortgage and Realty Trust v. Bergman (In re Bergman),*
    585 F.2d 1171 (2d Cir. 1978).................................................................................11

*CIT Communication Financial Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.),*
    406 F.3d 229 (4th Cir. 2005) ................................................................................15

*Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),*
    280 F.3d 648 (6th Cir. 2002) ...........................................................................17, 18

*In re A.H. Robins Co.,*
    216 B.R. 175 (E.D. Va. 1997)...............................................................................21

*In re A.H. Robins Co., Inc.,*
    880 F.2d 694 (4th Cir. 1989) ................................................................................21

*In re American Capital Equipment, LLC,*
    688 F.3d 145 (3d Cir. 2012)........................................................................ passim

*In re American Coastal Energy Inc.,*
    399 B.R. 805 (Bankr. S.D. Tex. 2009) .................................................................14

*In re Arrowmill Development Corp.,*
    211 B.R. 497 (Bankr. D.N.J. 1997) ......................................................................18

*In re Chassix Holdings, Inc.,*
    533 B.R. 64 (Bankr. S.D.N.Y. Jul. 9, 2015) ........................................................19

*In re Circuit City Stores, Inc.,*
    447 B.R. 475 (Bankr. E.D. Va. 2009)...................................................................15

*In re Congoleum Corp.,*
    362 B.R. 167 (Bankr. D.N.J. 2007) ......................................................................18

*In re Coram Healthcare Corp.,*
    315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................31

*In re Criimi Mae, Inc.,*
    251 B.R. 796 (Bankr. D. Md. 2000) .......................................................................8

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re Crowthers McCall Pattern, Inc.*,
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ....................................................................................28

*In re The Dolan Co., et al.*,
No 14-10614 (BLS), (Bankr. D. Del. Jun. 9, 2014) ..............................................................19

*In re Exide Technologies*,
No. 13-11482 (KJC), (Bankr. D. Del. Feb. 4, 2015) ............................................................19

*In re Ferretti*,
128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................................................22, 23

*In re Hurricane Memphis, LLC*,
405 B.R. 616 (Bankr. W.D. Tenn. 2009) ..............................................................................10

*In re Indianapolis Downs, LLC, et al.*,
Case No. 11-11046 (BLS), (Bankr. D. Del. Jun 21, 2012) ...................................................19

*In re Korea Chosun Daily Times, Inc.*,
337 B.R. 773 (Bankr. E.D.N.Y. 2005) ..................................................................................15

*In re Made in Detroit, Inc.*,
299 B.R. 170 (Bankr. E.D. Mich. 2003) ...............................................................................10

*In re Main St. AC Inc.*,
234 B.R. 771 (Bankr. N.D. Cal. 1999) ....................................................................................8

*In re Olde Prairie Block Owner, LLC*,
467 B.R. 165 (Bankr. N.D. Ill. 2012) .................................................................................9, 10

*In re Patriot Coal Corp., et al.*,
Case No. 15-32450 (Bankr. E.D. Va. July, 22, 2015) (KLP) .................................................34

*In re Pecht*,
57 B.R. 137 (Bankr. E.D. Va. 1986) ........................................................................................8

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................................8, 21

*In re Quigley Co., Inc.*,
377 B.R. 110 (Bankr. S.D.N.Y. 2007) .....................................................................................8

*In re Quigley Co., Inc.*,
437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...................................................................................11

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re Radco Properties, Inc.,*
402 B.R. 666 (Bankr. E.D.N.C. 2009) .............................................................28, 29

*In re Railworks Corp.,*
345 B.R. 529 (Bankr. D. Md. 2006) ..................................................................17, 18

*In re Scott Cable Communications, Inc.,*
227 B.R. 596 (Bankr. D. Conn. 1998) ....................................................................14

*In re Trans Max Technologies, Inc.,*
349 B.R. 80 (Bankr. D. Nev. 2006) ........................................................................10

*In re Trump Entertainment Resorts, Inc.,*
Case No. 14-12103 (KG), (Bankr. D. Del. Nov. 14, 2014) ....................................35

*In re U.S. Brass Corp.,*
194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................................24

*In re Valley Park Group, Inc.,*
96 B.R. 16 (Bankr. N.D.N.Y. 1989) ........................................................................15

*In re Walker,*
165 B.R. 994 (E.D. Va. 1994)..............................................................................9, 10

*In re Wall Tube & Metal Products Co.,*
831 F.2d 118 (6th Cir. 1987) .............................................................................32, 34

*In re Washington Mutual, Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) .......................................................................24

*Midlantic Nat'l Bank v. New Jersey Department of Environmental Protection,*
474 U.S. 494 (1986)............................................................................................32, 34

*United Mine Workers of America 1974 Pension Plan, et al. v. Peabody Energy Corp., et al.,*
Case No. 15-cv-01138 (D.D.C. (BAH)) .................................................................16

*WCI Cable, Inc. v. Alaska Railroad Corp. (In re WCI Cable, Inc.),*
274 B.R. 529 (Bankr. D. Or. 2002)....................................................................15, 31

**STATUTES**

11 U.S.C. § 503(b) ....................................................................................................15

11 U.S.C. § 507(a)(2)...........................................................................................14, 15

# TABLE OF AUTHORITIES
(continued)

**Page**

11 U.S.C. § 507(a)(3)...................................................................................................14

11 U.S.C. § 1102(a)(3).................................................................................................4

11 U.S.C. § 1107(a)......................................................................................................4

11 U.S.C. § 1108..........................................................................................................4

11 U.S.C. § 1123(a)(5)........................................................................................9, 10, 14

11 U.S.C. § 1125..................................................................................2, 20, 21, 22

11 U.S.C. § 1125(a)(1).................................................................................................21

11 U.S.C. § 1129(a)(2).................................................................................................22

11 U.S.C. § 1129(a)(3)......................................................................9, 10, 11, 14

11 U.S.C. § 1129(a)(5)........................................................................................9, 10, 14

11 U.S.C. § 1129(a)(7).........................................................................................2, 27, 28

11 U.S.C. § 1129(a)(9)..............................................................8, 14, 15, 16

11 U.S.C. § 1129(a)(11)....................................................................9, 10, 11, 14

28 U.S.C. § 959(b)...........................................................................................31, 32

29 U.S.C. §§ 1001, *et seq.*.........................................................................................16

30 U.S.C. §§ 801, *et seq.*..........................................................................................32

30 U.S.C. §§ 1201, *et seq.*........................................................................................32

33 U.S.C. §§ 1251, *et seq.*........................................................................................33

42 U.S.C. §§ 7401, *et seq.*........................................................................................33

OTHER AUTHORITIES

Fed. R. Bankr. P. 9019.................................................................................................31

The Official Committee of Unsecured Creditors (the "Committee") of Patriot Coal Corporation, *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this objection ("Objection") to the *Debtors' Motion for Entry of Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Notice Materials; (III) Approving Forms of Ballots; (IV) Establishing Solicitation and Voting Procedures; (V) Establishing Procedures for Allowing and Estimating Certain Claims for Voting Purposes; (VI) Scheduling a Confirmation Hearing; and (VII) Establishing Notice and Objection Procedures* [Docket No. 497] (the "Motion").[1]  In support of the Objection, the Committee submits the Declaration of Leon Szlezinger (the "Szlezinger Declaration") contemporaneously herewith, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      From the inception of these chapter 11 cases, the Prepetition Secured Parties have sought to accelerate the Debtors' exit from these bankruptcy proceedings at the expense of the Debtors' unsecured creditors.  The Plan and Disclosure Statement filed by the Debtors is no different.  As proposed, the Debtors' Plan is nothing more than a masked attempt to quickly dispose of the estate's valuable assets – many of which are unencumbered – for the benefit of the prepetition secured and debtor-in-possession lenders, without providing value to, or a viable exit strategy for, the remaining estate.[2]

2.      To their credit, the Debtors have been tackling numerous complex issues in a compressed timeframe.  However, the Debtors self-admittedly, as is evidenced by the incomplete

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or the Motion, as applicable.

[2] The Committee is aware that the Debtors are in the process of negotiating a transaction with a third-party to acquire the assets not included in the Blackhawk Transaction.  Earlier today, the Committee was provided with a draft asset purchase agreement, and is in the process of reviewing this draft asset purchase agreement in order to better understand the transaction economics and its benefits to the estate.  Accordingly, the Committee reserves its rights to supplement this Objection further.

Plan and lack of adequate accompanying disclosures, are unable to propose a plan that addresses

key terms, such as how the wind down of the remaining estate will be funded, how the estate

recovers value for its unencumbered assets, and how claims other than those held by secured

lenders will be satisfied, including administrative and other priority claims, legacy liabilities, and

general unsecured claims.  The absence of these critical components to the Plan not only renders

the Disclosure Statement defective under section 1125 of the Bankruptcy Court, it also renders

the Plan patently unconfirmable.

      3.    Specifically, and as discussed in more detail in the body of this Objection, the

Plan that the Debtors propose to solicit is unconfirmable because, among other reasons, it:

> (a) does not provide an adequate means for implementing the terms of the Plan and is not feasible, because there isn't a committed funding mechanism in place to allow for the orderly wind down of the Debtors' remaining assets once the Blackhawk Sale closes;

> (b) fails to provide for payment in full of administrative claims on the Effective Date in violation of section 1129(a)(9) of the Bankruptcy Code, as well as failing to provide a mechanism to fully satisfy administrative claims that are allowed after the Effective Date; and

> (c) seeks to impose non-consensual third-party releases on members of the Committee without satisfying the applicable legal standards in this Circuit, and also seeks to impose third party releases on the larger creditor body without obtaining the respective creditors' unambiguous consent to such releases.

      4.    Furthermore, the Motion should not be approved because the Disclosure

Statement does not contain "adequate information" from which the Debtors' creditors could

make an informed judgment on whether to support or reject the Plan.  In particular, the

Disclosure Statement:

> (a) is entirely lacking of any material information as to the funding of the Liquidating Trust that would enable creditors to properly assess the feasibility of the Plan, namely the manner in which the Liquidating Trust will effectuate the Wind Down;

(b) fails to provide any information with respect to the value of certain unencumbered assets and the manner in which such value will flow to the Debtors' unsecured creditors;

(c) fails to set forth any information with respect to the treatment of the claims of the Prepetition Secured Parties to the extent they are undersecured;

(d) provides a liquidation analysis that is lacking necessary information, making it impossible for creditors to assess whether the Plan satisfies the "Best Interests Test" of section 1129(a)(7) of the Bankruptcy Code;

(e) fails to provide adequate disclosures with respect to causes of action, including Avoidance Actions, that will not be preserved for the benefit of unsecured creditors under the Plan; and

(f) fails to provide sufficient information with respect to the treatment of certain Environmental Claims, including reclamation liabilities.

Accordingly, the Disclosure Statement lacks critical information that is necessary for creditors to assess the feasibility of the Plan and the level of recovery unsecured creditors can expect under the Plan, the two most basic functions of a disclosure statement in a chapter 11 case.

5.    Given the numerous and serious deficiencies within the Plan and Disclosure Statement, the Debtors should be provided additional time to develop a Plan that supports a *feasible,* value-maximizing exit from these chapter 11 cases.  Allowing the Debtors to solicit a Plan that is, on its face, unconfirmable will only result in unnecessary administrative expense.  Accordingly, the Committee respectfully requests that the Motion be denied without prejudice to the Debtors' ability to refile if and when the Debtors have substantially finalized a confirmable chapter 11 plan that can be properly presented to the Court.

3

# BACKGROUND

## I.  The Chapter 11 Cases

6.  On May 12, 2015 (the "Petition Date"), the Debtors filed their voluntary chapter 11 petitions for relief, thereby commencing the above-captioned cases.[3]  By order dated May 13, 2015 [Docket No. 48], these chapter 11 cases are being jointly administered.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, neither a trustee nor an examiner has been appointed in these chapter 11 cases.  On May 21, 2015, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 115].[4]

7.  On June 4, 2015, the Court entered the *Final Order (A) Authorizing the Debtors to Obtain Post-Petition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* [Docket No. 230] (the "Final DIP Order").  The Final DIP Order provides, in pertinent part, that Avoidance Actions and the proceeds thereof are unencumbered, and are not subject to either the DIP Liens or Adequate Protection Liens. (Final DIP Order, ¶ 14.)

8.  On July 16, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to (A) Reject Their Collective Bargaining Agreements, (B) Modify Certain Union-Related Retiree Benefits, and (C) Implement Terms of*

---

[3] The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Ray Dombrowski, Chief Restructuring Officer of Patriot Coal Corporation, et al., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22].

[4] The Committee is presently composed of the following seven creditors:  (i) U.S. Bank National Association, as trustee; (ii) United Mine Workers of America 1974 Pension Plan and Trust; (iii) Strata Mine Services, LLC; (iv) Crown Parts & Machine, Inc.; (v) United Mine Workers of America; (vi) Raleigh Mine & Industrial; and (vii) Enviromine, Inc.

ny-1197357

*Their Section 1113 and Section 1114 Proposal, and (II) Granting Related Relief* [Docket No.

524] (the "1113/1114 Motion").  The hearing with respect to the 1113/1114 Motion is scheduled

to occur immediately after the hearing with respect to the Motion.

## II.    The Proposed Sale Transactions

9.     On June 25, 2015, the Court entered the Bidding Procedure Order, which, among

other things, (i) approved Blackhawk as the stalking horse bidder for the sale of substantially all

of the Debtors' operating assets (the "Blackhawk Assets"), and (ii) authorized the Debtors to

solicit bids for the highest or otherwise best price for the Debtors' assets.  The Blackhawk Assets

include all of the Debtors' reserves (active and inactive), equipment and other assets located at

the following mining complexes and reserve areas—Panther, Rock Lick, Wells, Kanawha Eagle,

Midland Trail/Blue Creek, Paint Creek, Logan County (Stanley Fork, Cub Branch and the Fanco

preparation plant and load-out), and all related river docks.[5]  Blackhawk has agreed to purchase

the Blackhawk Assets and assume certain liabilities, pursuant to the terms of that certain Asset

Purchase Agreement, dated June 22, 2015 [Docket No. 385] (the "Blackhawk APA"), through

the creation of a new company (the "Combined Company") that will be capitalized with a

combination of debt, equity, and cash (the "Blackhawk Transaction").

10.     Pursuant to Section 2.01(j) of the Blackhawk APA, Blackhawk will be acquiring

"all Avoidance Actions against the Persons set forth on Schedule 2.01(j) (which schedule shall

be delivered on or prior to the Closing Date)[6] with whom it is necessary, as determined by

---

[5] In addition to these mining assets, the Blackhawk Assets also include, among other things, all owned office buildings, furniture, equipment, technology, software, leases associated with the Blackhawk Assets, all contracted sale agreements related to the Blackhawk Assets, and any related contracts with respect to service providers, trucking, suppliers, and vendors.  Blackhawk will not acquire the Federal Complex, Corridor G, Jupiter, all other Logan County assets, and certain other related assets (collectively, the "Excluded Assets").

[6] On July 29, 2015, the Debtors filed more than 700 pages of documents constituting the schedules to the Blackhawk APA.  *See Notice of Filing of Schedules as of June 22, 2015, By and Among Blackhawk Mining LLC, Patriot Coal Corporation, the Subsidiaries of Patriot Coal Corporation Listed on Schedule A Thereto, and Patriot Coal Corporation, As Sellers' Representative* [Docket No. 694].  However, these disclosures do not include any

5

[Blackhawk] in its discretion, for [Blackhawk] to conduct business in order to operate the Purchased Business, each of which will be released and waived." (emphasis added).  Further, pursuant to Section 6.04 of the Blackhawk APA, within 180 days of the Closing Date, well after the Debtors expect to obtain confirmation of the Plan, Blackhawk may modify the Schedule 2.01(j) and thereby release and waive additional Avoidance Actions without providing any consideration for such unencumbered assets.

11.    While the Debtors solicit bids for the Blackhawk Assets, the Bidding Procedures Order also authorizes the Debtors to solicit bids for the Debtors' other assets, including bids for the Federal No. 2 longwall mine, a 1,350 TPH preparation plant,[7] and certain related assets (collectively, the "Federal Complex").  The Bidding Procedures Order required the Debtors to identify a stalking horse bidder for the Federal Complex by July 21, 2015; however, the Debtors were unable to enter into a stalking horse agreement prior to this deadline.  As such, the Debtors are continuing to market the Federal Complex to potential purchasers, but it remains unclear if the Debtors will be able to sell the Federal Complex prior to the deadlines set forth in the Blackhawk APA, namely that the Blackhawk Transaction be effectuated and consummated through a confirmed chapter 11 plan by October 9, 2015. (Blackhawk APA, § 11.01.)

### III.    The Disclosure Statement and Plan

12.    On July 13, 2015, the Debtors filed the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 499] (the "Plan") and the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 498] (the "Disclosure Statement").  The Blackhawk Transaction is the cornerstone of the Plan.  Assuming there is no overbid for the Blackhawk

---

preliminary disclosures as to those Avoidance Actions that will be acquired by Blackhawk, and thereafter waived and released.

[7] "TPH" refers to "tons per hour."

Assets, the Debtors will seek to consummate the Blackhawk Transaction through the Plan in a debt-for-debt/equity exchange under which the Prepetition Secured Parties and the DIP Lenders will accept new debt and equity securities, as applicable, in the Combined Company in satisfaction of their secured claims against the Debtors. (Plan, Art. III)  Notably, though the Disclosure Statement discusses the marketing and sale process in connection with the Federal Complex and other Excluded Assets, the Plan does not address the actual sale of these assets nor does it disclose the distribution of any consideration received through such sale in any material detail.

13.    Contemporaneously with the sale of the Blackhawk Assets, the Plan contemplates transferring the Debtors' remaining assets to the Liquidating Trust.  "The Liquidating Trust will be established for the primary purpose of liquidating the Liquidating Trust Assets and winding down the Debtors' estates, including satisfying certain environmental liabilities, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust." (Disclosure Statement, Art. VI.B.)  Certain causes of action, including Avoidance Actions not otherwise waived or released through the Plan or the Blackhawk APA, may be pursued by the Liquidating Trust. (Plan, Art. IV.N.)

## OBJECTION

### I.    The Disclosure Statement Cannot be Approved as the Plan is Patently Unconfirmable

14.    The Court should not approve the Disclosure Statement because the Plan is materially defective, rendering it unconfirmable.  Although considerations of whether a plan satisfies the conditions of section 1129 of the Bankruptcy Code are generally addressed at a confirmation hearing, the Court may refuse to approve the Disclosure Statement if it is apparent

7

that the Plan is not confirmable.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("Courts have recognized that if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.") (internal quotation omitted); *In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile); *see also In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("it is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed"); *In re Pecht,* 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate").

15.    Denying approval of a disclosure statement relating to an unconfirmable plan avoids the wasteful and fruitless exercise of solicitation when the plan cannot be confirmed regardless of creditor approval.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("[U]ndertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed.") (internal citation omitted).  If a plan cannot on its face be confirmed, then the court should deny approval of the disclosure statement in order to prevent the diminution of estate assets that would result from the expense of soliciting votes on the plan and proceeding with a confirmation hearing.  *See In re Main St. AC Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *Pecht*, 57 B.R. at 139.  Here, the Plan is patently unconfirmable because it (a) is not feasible and was not filed in good faith due to the inadequate means to implement the Plan; (b) fails to adhere to the requirements of

section 1129(a)(9) of the Bankruptcy Code with respect to Administrative Claims; and (c) seeks to impose improper non-consensual third-party releases on creditors, including on members of the Committee.

### A. The Plan is Patently Unconfirmable Because It Fails to Provide a Workable Exit Strategy In Compliance with the Bankruptcy Code

16.     The Court should not approve the Disclosure Statement because the Plan does provide for a viable exit strategy in compliance with sections 1123(a)(5), 1129(a)(3) and 1129(a)(11) of the Bankruptcy Code, and as such, the Plan is patently unconfirmable.  The Plan does not provide a sufficient means to fund the Liquidating Trust established by the Plan, and therefore, fails to provide an adequate means for implementation.   Under the Plan, the Liquidating Trust will neither have the necessary funding to undertake the obligations imposed on it by the Plan and Blackhawk APA, nor will it have the capability of addressing its own administrative burdens.  In the absence of an identified and sufficient funding mechanism for the Liquidating Trust, the Debtors' proposed exit strategy cannot be implemented consistent with sections 1129(a)(3) and 1129(a)(11) of the Bankruptcy Code.

17.     Section 1123(a)(5) provides that "a plan <u>shall</u>—provide adequate means for the plan's implementation[.]"  (emphasis added).  Section 1123(a)(5) contains a non-exclusive list of means of adequate implementation. 11 U.S.C. § 1123(a)(5)(A)-(J).  In this case, the Plan does not specify any source of funds available to enable the Liquidating Trust to effectuate the Wind Down, and therefore, the Plan lacks an adequate means for implementation.  *See In re Olde Prairie Block Owner, LLC*, 467 B.R. 165, 172 (Bankr. N.D. Ill. 2012) (holding plan unconfirmable under section 1123(a)(5) of the Bankruptcy Code because of a lack of funding to satisfy payments under the Plan); *In re Walker*, 165 B.R. 994, 1003 (E.D. Va. 1994) (refusing to confirm plan due to lack of funding to implement plan).  The lack of an adequate means to

implement the Plan, as required by section 1123(a)(5) of the Bankruptcy Code, provides evidence of a lack of good faith, which is required to confirm a Plan pursuant to section 1129(a)(3) of the Bankruptcy Code. *Id.* ("Several courts have confronted [a lack of funding for a plan] and have determined that the absence of an adequate means of implementation demonstrates a lack of good faith thereby precluding confirmation of the plan"). Moreover, speculative and uncertain means to obtain the funding necessary to implement the Plan does not satisfy the "adequate means" for implementation required under section 1123(a)(5) of the Bankruptcy Code. *See Old Prairie Block Owner*, 467 B.R. at 172 (plan unconfirmable because "[t]here are too many uncertainties . . . to rely on the Debtor's ability to . . . obtain new financing in time to meet the Plan timetable"); *In re Trans Max Technologies, Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006) ("[t]he debtor must offer more than speculation about the source of funding for the plan." (quoting *Walker,* 165 B.R. at 1003)); *In re Made in Detroit, Inc.,* 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003) ("As a practical matter, the [d]ebtor's plan is not sufficiently concrete as to be feasible because it is contingent on exit financing").

18.     Additionally, pursuant to section 1129(a)(11) of the Bankruptcy Code, the Plan may only be confirmed if the Debtors are able to demonstrate that the Plan is "feasible." *Am. Capital*, 688 F.3d at 156 ("[e]ven a planned liquidation 'must be feasible'"). Although section 1129 of the Bankruptcy Code does not require a plan's success to be guaranteed, the plan must nevertheless propose "a realistic and workable framework[.]" *Id.* (citing *In re Hurricane Memphis, LLC*, 405 B.R. 616, 624 (Bankr. W.D. Tenn. 2009)). The inquiry into whether a plan is feasible turns on whether the provisions of the plan in question can be carried out such that the payments promised thereunder can actually be made. *See In re Made in Detroit, Inc.*, 299 B.R. at 176 (to be "feasible," a plan must be "doable"). Feasibility means "the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient

10

to make the plan feasible, and neither are any visionary promises.  [Rather,] the test is whether

the things which are to be done after confirmation can be done as a practical matter under the

facts." *Chase Manhattan Mortg. and Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171,

1179 (2d Cir. 1978).

19.    Here, the Plan contains a multitude of brackets and blanks and fails to provide

creditors with critical information about the Debtors' assets and liabilities and how the Debtors

intend to facilitate the Wind Down of those assets and liabilities not addressed through the

Blackhawk Transaction.[8]  In *American Capital*, the United States Court of Appeals for the Third

Circuit declined to approve the debtor's disclosure statement, *inter alia*, because it found the

proposed plan "patently unconfirmable," as it was not feasible under section 1129(a)(11) of the

Bankruptcy Code.   688 F.3d at 156.   The Third Circuit's decision was grounded in its

determination that the debtor lacked the necessary funding to fulfill the terms of the plan.  *Id.*

Likewise, in *In re Quigley Co., Inc.*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010), the Court found

that the debtor's proposed plan was not feasible where the funding source was "speculative at

best and visionary at worst."  Accordingly, the above case law dictates that if the Plan does not

provide an adequate means to fund the operation of the Liquidating Trust to effectuate the

contemplated Wind Down, then the Plan not only demonstrates a lack of good faith under section

1129(a)(3) of the Bankruptcy Code, but also is not feasible under section 1129(a)(11) of the

Bankruptcy Code, thereby precluding confirmation of the Plan.

20.    The Plan provides that the Liquidating Trustee will implement and oversee the

Wind Down pursuant to the Liquidating Trust Agreement (Plan, Art. IV.O); however, the Plan

---

[8] *See* Disclosure Statement, Art. I.D (failing to disclose creditors' estimated recoveries); Art. VI.C & D (failing to
disclose the extent of parties with interests in the Liquidating Trust); Art. IX.B.4 (failing to provide any information
with respect to the Backstop Rights Purchase Agreements); Art. VII.D (failing to provide financial projections with
respect to the Liquidating Trust to enable creditors to assess feasibility); *see also* Plan, Art. I.A.108 (failing to
provide any detail as to the "Liquidating Trust Funding Mechanism").

ny-1197357

does not provide any, let alone adequate, means through which to fund the Liquidating Trust. The Disclosure Statement only identifies two possible sources of funding of the Liquidating Trust—(i) a "Liquidating Trust Funding Mechanism," but neither the Disclosure Statement nor the Plan identify the source or amount of such funding; and (ii) an entirely undisclosed and undetermined amount of "free cash flow" from the continued operation of the Excluded Assets, including the Federal Complex in the event the Debtors are unable to sell these assets prior to the Effective Date. However, if the Debtors sell the Federal Complex before the Effective Date, the Plan is unclear as to how any consideration received would be utilized. Neither the Plan nor the Disclosure Statement provides any information as to whether the consideration received through a sale of the Federal Complex will be utilized to fund the Liquidating Trust, or if the Prepetition Secured Parties will assert their liens over such consideration.

21.      This is particularly troubling in these chapter 11 cases because the Plan provides that the Liquidating Trust will be responsible for, among other things: (i) satisfying an undisclosed amount of Allowed Administrative Claims that are not paid on the Effective Date (Plan, Art. VI.B); (ii) settling or otherwise resolving all Environmental Claims (including no less than an estimated $90 million in reclamation liabilities) and other legacy liabilities (Plan, Art. IV.O; Disclosure Statement, Art. III.B.3.c.),[9] some of which have asserted entitlement to treatment as administrative priority;[10] (iii) pursuing Avoidance Actions and other retained

---

[9] Article III.B.3.c of the Disclosure Statement provides that "[t]he Debtors' current estimated asset retirement obligations total approximately $233.37 million, based on individual bonding obligations at the Debtors' mining facilities…." Of the $233.37 million, Article III.B.3.c of the Disclosure Statement attributes $4.12 million to the Big Mountain complex/facility, $2.71 million to the Federal Complex, $5.48 million to the Jupiter complex/facility, $30.45 million to the Bluegrass complex/facility, and $50.31 million to the Corridor G complex/facility. These mining complexes/facilities are only a portion of the Excluded Assets, and by the Debtors' own statements carry with them approximately $93 million in Environmental Claims related to reclamation obligations. The Committee further recognizes that there are substantially more asset retirement obligation liabilities related to the Excluded Assets, however, the Disclosure Statement does not provide an exact value associated with such reclamation liabilities.

[10] Certain of the Debtors' surety bond providers, including Indemnity National Insurance Company, Travelers Casualty & Surety Company of America, US Specialty Insurance, and Westchester Fire Insurance Company, have

ny-1197357

Causes of Action; (iv) preparing and submitting the final federal, state and local tax returns for each of the forty-eight (48) Debtor entities (Plan, Art. IV.O); (v) adhering to and funding the costs associated with document retention obligations imposed on the Liquidating Trust under the terms of the Blackhawk APA (Disclosure Statement, Art. V.G.11); (vi) compensating the Liquidating Trustee as well as satisfying all of the Liquidating Trustee's reasonable costs and expenses including the fees and expenses of the Liquidating Trustee's retained professionals (Plan, Art. II.B.3 & IV.Q); (vii) funding the reasonable fees and expenses of the DIP Agent, the DIP Lenders and the Prepetition Agents post-Effective Date (Plan, Art. II.C);[11] (viii) funding the Liquidating Trustee's efforts and operations to liquidate the Liquidating Trust Assets and effectuating the Wind Down and dissolution of the Debtor entities (Plan, Art. IV.O); and (ix) making distributions to creditors on account of their claims, including substantial claims related to the Debtors' legacy liabilities.

22.    The above-listed obligations being shouldered by the Liquidating Trust will carry substantial costs; however, once again, the Plan does not provide any evidence of a means to fund the Liquidating Trust to carry these obligations and to make distributions to creditors.  The information in the Disclosure Statement, which is entirely inadequate, points to the inevitable conclusion that as of the Effective Date, the Liquidating Trust will be administratively insolvent and unable to carry out its Wind Down functions.  Nonetheless, the Debtors seek to solicit votes on the Plan that is entirely dependent upon two speculative funding sources.

---

already asserted administrative priority claims against many of the Debtors' estates.  *See* Proof of Claim Nos. 1578, 1586, 1591, 1611, 1628, 1630, 1632, 1636, 1637, 1639, 1643, 1644, 1652, 1653, 1654, 1655, 1660, 1663, 2235, 2236, 2238, 2239, 2241, 2242, 2243, 2244, 2248, 2251, 2253, 2255, 2256, 2257, 2260, and 2261.

[11]  Neither the Disclosure Statement nor the Plan provides any information as to why the DIP Agent, the DIP Lenders, and the Prepetition Agents are entitled to obtain payment of their legal fees and expenses from the Liquidating Trust when the Holders of all DIP Claims, Prepetition ABL Facility Claims, Prepetition LC Facility Claims, and Prepetition Term Loan Facility Claims (each of which are defined to include the payment of their respective advisors' fees in accordance with the Final DIP Order), are receiving their respective distributions in full and final satisfaction, settlement, release, and discharge of such claims pursuant to Article II and III of Plan.

23.     Until the Plan is substantially modified to provide the necessary funding to

implement the Wind Down through the Liquidating Trust, the Plan will not be feasible because it

lacks an adequate means for implementation and demonstrates a lack of good faith by the

Debtors.  Accordingly, the Plan violates sections 1123(a)(5), 1129(a)(3), and 1129(a)(11) of the

Bankruptcy Code, and therefore, the Court should not approve the Disclosure Statement as the

Plan is patently unconfirmable.

> **B.      The Plan is Not Confirmable Because it Fails to Provide Properly for
> Satisfaction of Administrative Claims as Prescribed by Section
> 1129(a)(9) of the Bankruptcy Code**

24.     The Plan's ambiguity concerning payment of Administrative Claims also makes

the Plan non-confirmable under section 1129 of the Bankruptcy Code.  Section 1129(a)(9) of the

Bankruptcy Code requires, in order for a chapter 11 plan to be confirmed, that ". . . with respect

to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date

of the plan, the holder of such claim will receive on account of such claim cash equal to the

allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A).  Article II.A of the Plan provides

that holders of Allowed Administrative Claims will receive, in full and final satisfaction of their

Allowed Administrative Claims, cash on the Effective Date, but "in no event later than thirty

days after the Effective Date[.]"  (Plan, Art. II.A.)  However, the Disclosure Statement provides

that "[t]he Debtors may not be able to satisfy all Administrative Claims" (Disclosure Statement,

Art. X.A.6), but does not provide any information as to the extent of Administrative Claims

against the Debtors' estates.

25.     It is well-settled that a chapter 11 plan cannot be confirmed without full payment

of administrative claims, regardless of whether there are any estate assets to pay them.  *See In re

Scott Cable Commc'ns., Inc.*, 227 B.R. 596, 599-600 (Bankr. D. Conn. 1998).  It is equally

well-settled that such claims must be paid on the Effective Date of the Plan, unless the holders of

such claim agree to different treatment.  *In re Am. Coastal Energy Inc.,* 399 B.R. 805, 808 (Bankr. S.D. Tex. 2009) (holding that in a chapter 11 case, the debtor must pay administrative expenses in full on the effective date of the plan); *WCI Cable, Inc. v. Alaska R.R. Corp. (In re WCI Cable, Inc.)*, 274 B.R. 529, 532 n.2 (Bankr. D. Or. 2002); *CIT Commc'ns. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 242 (4th Cir. 2005) (administrative expense under section 503(b) of the Bankruptcy Code must be paid in cash on the effective date of the plan in a chapter 11 proceeding);  *In re Circuit City Stores, Inc.,* 447 B.R. 475, 511-12 (Bankr. E.D. Va. 2009) (finding that rent claims were accorded administrative priority expense treatment under sections 503(b) and 507(a)(2) of the Bankruptcy Code, and shall be payable upon the effective date of any plan);  *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 784 (Bankr. E.D.N.Y. 2005) (same); *In re Valley Park Grp., Inc.*, 96 B.R. 16, 22 (Bankr. N.D.N.Y. 1989) (holding that chapter 11 plan cannot be confirmed under section 1129(a) of the Bankruptcy Code where plan proposed to pay administrative expense claimants on an unspecified "distribution date" in violation of section 1129(a)(9)).

26.     The Plan does not provide for payment of all Allowed Administrative Claims on the Effective Date, if at all.   First, the Plan, in violation of section 1129(a)(9)(A) of the Bankruptcy Code, provides that the Debtors will have an additional thirty (30) days to pay Allowed Administrative Claims.   Second, the Debtors acknowledge their inability to pay all Administrative Claims.   (Disclosure Statement, Art. X.A.6.)   Finally, as discussed above, the Plan does not provide adequate means of funding the Liquidating Trust, and therefore, fails to provide for payment of Administrative Claims that become Allowed Administrative Claims after the Effective Date, including those claims associated with the Debtors' reclamation obligations

15

that may possibly be afforded administrative priority.[12]  Without establishing that the Liquidating

Trust has sufficient funds to satisfy its numerous operational obligations, it would appear that the

Liquidating Trust will be administratively insolvent on the Effective Date with no ability to make

payments with respect to Administrative Claims, priority claims, or general unsecured claims.

Due to the Liquidating Trust's inability to satisfy Administrative Claims, the Plan cannot pass

confirmation scrutiny under section 1129(a)(9)(A) of the Bankruptcy Code, and therefore, the

Disclosure Statement cannot be approved.

### C.    The Third Party Release Provisions of the Plan Are Improper

27.    Article VIII of the Plan purports to provide consensual third-party releases to the

Released Parties,[13] which include a broad range of non-debtor parties, including the Debtors'

"former Affiliates."[14]  (Plan Art. I.A.206; Art. VIII.)  The release provisions of the Plan are

---

[12] *See* supra, n.10

[13] The Plan defined "Released Parties" as "collectively, the Debtor Releasees and the Third Party Releasees." (Plan, Art. I.A.178.).  The term "Debtors Releasees" is defined as "collectively, each Debtor and the Debtors' current and former Affiliates, partners, members, subsidiaries, officers, directors, principals, employees, agents, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, and their respective successors and assigns, each in their capacity as such, and only if serving in such capacity." (Plan, Art. I.A.59.)  The term "Third Party Releasees" is defined as "collectively, (a) each Debtor Release; (b) the Liquidating Trust; (c) the Liquidating Trustee; (d) Blackhawk; (e) the Combined Company; (f) the Prepetition Agents and Barclays Bank PLC, as predecessor Term Administrative Agent (under and as defined in the Prepetition LC/Term Loan Agreement) and any of their respective sub-agents; (g) the Prepetition Term Lenders; (h) the Prepetition LC Secured Parties; (i) the Prepetition ABL Secured Parties; (j) the Prepetition Noteholders; (k) the DIP Agent; (l) the DIP Lenders; (m) the Rights Offering Backstop Parties; (n) the Committee, including the Committee Members (solely in their official capacity and regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third Party Release set forth in Article VIII.D hereof); and (o) with respect to each of the foregoing Entities in clauses (a) through (n) (other than with respect to a final fee application of a Professional), all such Entities' respective current and former Affiliates and all such Entities' and such Affiliates' respective current and former attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managers, administrators, trustees, managed funds, fund managers and representatives, and successors and assigns of each of the foregoing in their respective capacities as such; provided that any Holder of a Claim (other than a Committee Member) who votes to reject the Plan or who does not vote to accept or reject the Plan but who submits a Ballot opting out of the Third Party Release shall not be a Third Party Releasee." (Plan, Art. I.A.206.)

[14] On July 16, 2015, the United Mine Workers of America 1974 Pension Plan filed a complaint against Peabody Energy Corp., Peabody Holding Company, LLC, and Arch Coal, Inc. seeking to enforce its rights under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq*.  *See United Mine Workers of America 1974 Pension Plan, et al. v. Peabody Energy Corp., et al.*, Case No. 15-cv-01138 (D.D.C. (BAH)).  The broad language of the Plan's definition of the term "Released Parties" which includes the Debtors' "former affiliates," and the

structured in such a manner that the only way to not grant the Third Party Release is for a creditor to (a) vote to reject the Plan and (b) check the box to opt-out of the Third Party Release on the creditor's ballot. (*See* Mot. 26; Plan Art. VIII.) Creditors that vote to accept the Plan and those creditors who abstain from voting are deemed to consent to the Third Party Release. Further, each member of the Committee "regardless of whether [it] vote[s] to accept or reject the Plan or timely submit[s] a Ballot indicating its decision to not participate in the Third Party Release" is deemed to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties from any and all Causes of Action. (*See* Plan Art. I.A.179; Art. VIII.)[15]  This structure is entirely improper.

28.    In *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011), the Fourth Circuit concluded that imposing nonconsensual third-party releases on creditors "should be granted cautiously and infrequently."  In assessing nonconsensual non-debtor releases provided under a plan, the Fourth Circuit looked to the holdings of *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002)[16] and *Hoge v.*

---

breadth of the releases provided to the Released Parties under Article VIII of the Plan, may have the effect of releasing Peabody Energy Corp., Peabody Holding Company, LLC, and Arch Coal, Inc. from any claims asserted by the Debtors' creditors, including the claims of the United Mine Workers of America 1974 Pension Plan.  This outcome is entirely improper under the law of this Circuit.  *See Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011).

[15] The Plan defines the term "*Releasing Parties*" means, collectively:  "(a) the Prepetition Agents; (b) the Prepetition Term Lenders; (c) the Prepetition LC Lenders and the Prepetition LC Facility Issuers; (d) the Prepetition ABL Lenders and the Prepetition ABL LC Issuers; (e) the Prepetition Noteholders; (f) the DIP Agent; (g) the DIP Lenders; (h) the Rights Offering Backstop Parties; (i) the Committee, including the Committee Members (*regardless of whether individual Committee Members voted to accept or reject the Plan or timely submitted a Ballot indicating its decision to not participate in the Third Party Release set forth in Article VIII.D hereof*); and (j) all other Holders of Claims or Equity Interests, except Holders of any Claims or Equity Interests (*other than any of the Committee Members*) (x) who vote to reject the Plan, (y) who do not vote to accept or reject the Plan but who timely submit a Ballot indicating their decision to not participate in the Third Party Release set forth in Article VIII.D hereof, or (z) who are in a Class that is deemed to reject the Plan." (Plan, Art.I.A.179 (emphasis added).)

[16] Under *Dow Corning,* "when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

*Moore) In re Railworks Corp.*, 345 B.R. 529 (Bankr. D. Md. 2006) as "instructive" in determining whether to approve non-debtor releases under a chapter 11 plan.[17]  In these chapter 11 cases, the Debtors have not provided any basis to satisfy either of the *Dow Corning* or *Railworks* standards, because the Debtors have not established that the Third Party Releases are "essential" to the success of these chapter 11 cases.   Accordingly, the non-consensual Third Party Release being imposed on members of the Committee is in violation of the law in this Circuit and cannot be approved.

29.     Further, with respect to all other creditors, the opt-out structure provided under the Plan is equally improper.   Releases of non-debtors must be accompanied by the releasing creditor's unambiguous consent.  *See In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (quoting *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (for a release to be consensual, the creditor must have "unambiguously manifested assent to the release of the nondebtor from liability on its debt.")).  The release provisions of the Plan fail to elicit the necessary unambiguous consent and are therefore improper.   Creditors that accept the Plan are deemed to consent to the Third Party Release.   Creditors that reject the Plan, but do not opt-out, are deemed to consent to the Third Party Release.   Moreover, creditors that abstain from voting are deemed to consent to the Third Party Releases.   In each of these instances, the subject creditor never provides its affirmative consent to the Third Party Release.   Requiring that creditors opt-out of a release is not the same as a creditor knowingly and unambiguously

---

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) The bankruptcy court made a record of specific factual findings that support its conclusions."  *Behrmann*, 663 F.3d at 711-12 (quoting *In re Dow Corning Corp.*, 280 F.3d at 658).

[17] The *Railway Corp.* test requires the bankruptcy court to consider the following factors when determining whether non-debtor releases are appropriate: "(1) overwhelming approval for the plan; (2) a close connection between the causes of action against the third party and the causes of action against the debtor; (3) that the injunction is essential to the reorganization; and (4) that the plan of reorganization provides for payment of substantially all of the claims affected by the injunction."  *Behrmann*, 663 F.3d at 712 (citing *In re Railworks Corp.*, 345 B.R. at 536).

consenting to a release.  Accordingly, the Third Party Release should only be effective if the subject creditor affirmatively "opts-in" to the release.

30.      Given the circumstances of these chapter 11 cases, where unsecured creditors stand to receive minimal recoveries, if any, an even higher-than-usual degree of inattentiveness or inaction among affected creditors is possible, which could lead to creditors inadvertently consenting to the Third Party Release.  Recently, the court in *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. Jul. 9, 2015), addressed a similar situation and observed that "[c]harging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id.* at 81. By requiring the affirmative consent through an opt-in mechanism for all creditors, the Court can ensure that creditors truly "consent" to the Third Party Release.

31.      Moreover, the Debtors may not enforce non-debtor releases against a creditor who merely votes in favor of the Plan.  In fact, courts recently held that plan proponents must provide accepting creditors with the ability to choose whether to grant third-party releases.  *See In re Exide Technologies,* No. 13-11482 (KJC), (Bankr. D. Del. Feb. 4, 2015) [Docket No. 3092] (holders voting to reject the plan were not bound by the third-party release and holders voting to accept the plan or that did not vote could elect to grant release); *In re The Dolan Co., et al.,* No 14-10614 (BLS), (Bankr. D. Del. Jun. 9, 2014) [Docket No. 422] (same); *In re Indianapolis Downs, LLC, et al.*, Case No. 11-11046 (BLS), (Bankr. D. Del. Jun 21, 2012) [Docket No. 1170] (option to grant the third party release offered to holders who voted on the plan, irrespective of whether they voted in favor or against the Plan).  Here, the Plan does not seek the consent of the creditors; rather, it seeks to impose the inappropriate non-debtor releases in circumstances that

do not warrant the granting of such releases.  Additionally, the injunction provisions of the Plan

go well beyond the scope of the discharge against the Debtors to apply to all Released Parties,

but are not subject to the safeguards of an opt-in process.  Therefore, both the release and

injunction provisions found in Article VIII of the Plan violate applicable law and make the Plan

unconfirmable.

**II.      The Court Should Not Approve the Disclosure Statement Because It Fails to
Provide Adequate Information and Will Require Material Modifications**

32.      In the instant case, the Disclosure Statement does not contain "adequate

information" from which the Debtors' creditors could make an informed judgment on whether to

support the Plan.  In particular, the Disclosure Statement:   (a) fails to provide adequate

information as to the funding of the Liquidating Trust that would enable creditors to properly

assess the feasibility of the Plan; (b) fails to provide any information with respect to the value of

certain unencumbered assets and the manner in which such value will flow to the Debtors'

unsecured creditors; (c) fails to set forth any information with respect to the treatment of any of

the Prepetition Secured Parties' deficiency claims; (d) fails to provide the necessary information

to enable creditors to assess whether the Plan is in their best interests; (e) fails to provide

adequate disclosures with respect to Causes of Action, including Avoidance Actions, that will

not be preserved for the benefit of unsecured creditors under the Plan; and (f) fails to provide

sufficient information with respect to the treatment of certain Environmental Claims and other

legacy liabilities.  For these reasons, as more fully discussed herein, the Court should not

approve the Disclosure Statement in its current form because it does not comply with the

requirements of section 1125 of the Bankruptcy Code and will require material modifications.

33.      The Committee acknowledges that the inadequacy of the Disclosure Statement is

not due to the Debtors' failure to provide information in their possession.  Rather, the Disclosure

Statement cannot satisfy the requirements of section 1125 of the Bankruptcy Code because the Debtors have not yet developed key elements of the Plan. Therefore, the Debtors are incapable of providing the necessary material information that must be incorporated into the Disclosure Statement, as the Debtors do not yet know what this information will eventually include.

34.    The fundamental purpose of a disclosure statement is to provide creditors with adequate information to make an informed decision regarding whether to vote to accept or reject a proposed plan of reorganization.[18]    Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1). "The determination of whether [a] disclosure statement has adequate information is made on a case by case basis and is largely within the discretion of the bankruptcy court." *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 696 (4th Cir. 1989).

35.    "Creditors form their ideas about what they will receive out of the debtor's estate from [a] disclosure statement. It plays a pivotal role in the give and take among creditors and between creditors and the debtor and leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties so they can make their own decisions on the plan's

---

[18] Courts interpreting section 1125 have enumerated a list of items that should be evaluated in determining the sufficiency of disclosures by a plan proponent. The relevant factors may include: (1) the events which led to the filing of the bankruptcy petition; (2) a description of available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtors; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtors; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtors; and (19) the relationship of the debtors with any affiliates. *See, e.g.*, *In re Phoenix Petroleum Co.*, 278 B.R. at 393, n.6.

acceptability." *In re A.H. Robins Co.*, 216 B.R. 175, 180 (E.D. Va. 1997). "In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). If a disclosure statement does not contain adequate information within the meaning of section 1125 of the Bankruptcy Code, then the related plan is not eligible for confirmation. *See* 11 U.S.C. § 1129(a)(2).[19] Here, the Disclosure Statement is rife with deficiencies and unanswered questions, and therefore, the Disclosure Statement fails to provide "adequate information" as defined in section 1125 of the Bankruptcy Code.

### A.    The Debtors' Disclosures Regarding the Funding of the Liquidating Trust Are Inadequate

36.    The Disclosure Statement fails to provide any information as to how the Debtors intend to facilitate the Wind Down of the Liquidating Trust Assets as well as the Liquidating Trusts' numerous other obligations. Such information is of vital importance to permit unsecured creditors to assess the level of recovery they can expect under the Plan. Furthermore, the Debtors' lack of disclosure as to the means by which the Liquidating Trust will be funded prevents creditors from assessing the feasibility of the Plan. As discussed above, the lack of any funding to implement the Plan makes the Plan patently unconfirmable, and therefore, it is not surprising that the Disclosure Statement does not contain any material information as to the funding necessary to effectuate the Wind Down by the Liquidating Trust. Until the Debtors are able to identify a funding source to adequately implement the Plan, the Disclosure Statement cannot provide the necessary disclosures for creditors to make an informed decision as to whether to accept or reject the Plan.

---

[19] Section 1129(a)(2) of the Bankruptcy Code provides that the court shall confirm a plan only if "[t]he proponent of the plan complies with the applicable provisions of this title."

37.     Given the central role that the feasibility requirement plays in the chapter 11 process, it is well settled that the Debtors must provide sufficient information in the Disclosure Statement to allow creditors to assess for themselves whether the proposed plan is feasible.  *See, e.g., In re Ferretti*, 128 B.R. at 21 (where debtor's disclosure statement stated that based on experience the debtor believed the plan was feasible, the court held, "[t]his is totally inadequate for any unsecured creditor to vote on this plan").  Courts should not approve disclosure statements that do not sufficiently disclose the funding through which a plan will be implemented.  *See In re Am. Capital Equip., LLC*, 688 F.3d at 156 (declining to approve disclosure statement due to lack of disclosures and insufficiency of funding to implement the plan).

38.     Without providing additional information related to the sources and uses of the funding for the Liquidating Trust, the Disclosure Statement fails to provide sufficient information to allow creditors to properly assess the feasibility of the Plan and determine whether the Liquidating Trust will be able to fulfill its purpose.  For this reason, the Court should require the Debtors to supplement the disclosures and include the information necessary to demonstrate that there is an adequate means to implement the Plan and demonstrate that the Plan is feasible.

### B.     The Disclosure Statement Fails to Provide Any Information With Respect to the Value of Unencumbered Assets and the Allocation Thereof

39.     The Disclosure Statement fails to address the most fundamental question a "hypothetical investor" standing in the shoes of the Debtors' unsecured creditors would have in these chapter 11 cases:  what value can unsecured creditors expect to recover on account of their claims?

ny-1197357

40.     The Disclosure Statement and Plan are entirely devoid of any information related to the value of the Debtors' assets,[20] most notably the value of the Debtors' unencumbered assets and the distribution of that value for the benefit of unsecured creditors.  The information associated with the value of the Debtors' assets is vital to the Debtors' creditors so that they can assess whether the Plan is properly distributing value on account of the unencumbered assets and also to understand the value of the Liquidating Trust Assets, both of which are the basis of general unsecured creditors' recoveries in these chapter 11 cases.  Such information is also essential to permit the Debtors' creditors to assess whether the Debtors are in compliance with section 1129(a)(7) of the Bankruptcy Code (the so called "Best Interests Test").[21]

41.     A critical component of a creditor's decision to vote for or against a plan is the value of the distributions provided to various classes.  *See In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (denying confirmation, based in part, on the inability of certain stakeholders to "vote intelligently" because the plan failed to specify whether they would get a distribution).  The Court should not lose sight of the fact that "the purpose of the disclosure statement is . . . to provide enough information to interested persons so they may make an informed choice between two alternatives."  *See In re U.S. Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996).  Here, creditors are unable to make an informed choice because the Debtors fail to include any information as to the value of unencumbered assets in the form of: (i) Avoidance Actions and the proceeds thereof, and (ii) certain of the Debtors' Real Property Leases (as defined in the Final DIP Order), which constitute "Excluded Property" to which the

---

[20] While the Disclosure Statement provides a book value of assets and potential liquidation values of the Debtors' assets in connection with its liquidation analysis, the Disclosure Statement does not provide any information as to the value of the Debtors' assets as a going concern.  Additionally, the Disclosure Statement does not provide any valuation with respect to the Liquidating Trust Assets.

[21] The lack of information with respect to the value of the Debtors' assets, specifically the Unencumbered Assets (as defined herein), renders the Disclosure Statement utterly deficient such that the Court should not approve the Motion.

ny-1197357

Prepetition Secured Parties' liens do not attach pursuant to the terms of the Prepetition Financing Documents ((i) and (ii) together, the "Unencumbered Assets").   Further, the Disclosure Statement and Plan fail to provide any information as to the estimated distributable value unsecured creditors may obtain on account of the Unencumbered Assets.   At a minimum, the Disclosure Statement should ascribe a projected value to distributions for each impaired creditor class (i.e., a value or percentage distribution or range thereof).   *See* Disclosure Statement, Art. I.D (failing to disclosure creditors' estimated recoveries).

42.    Given the facts and circumstances of these chapter 11 cases, a valuation of the Unencumbered Assets should be included in the Disclosure Statement to permit informed voting by creditors.   Most importantly, through the Blackhawk Transaction, Blackhawk is intending to acquire an undisclosed portion of the Avoidance Actions, which the Debtors have failed to value, and a number of the Debtors' unencumbered Real Property Leases, which the Debtors have also failed to value.   It is the Committee's belief that the unencumbered Real Property Leases that Blackhawk is seeking to acquire may have substantial value. (Szlezinger Decl., ¶ 11.) [22] Additionally, upon a review and analysis of the Debtors' *Amended Statement of Financial Affairs* [Docket No. 487] (the "SOFAs"), it appears that there may be substantial value associated with the Avoidance Actions being acquired by Blackhawk. (Szlezinger Decl., ¶ 8.) [23]   The Plan, however, currently provides no consideration from the Blackhawk Transaction to flow to holders of General Unsecured Claims.   In voting on the Plan, unsecured creditors are entitled to adequate information to assess the reasons why the Debtors believe it is appropriate to deliver

---

[22] Blackhawk is acquiring a total of 84 leased or owned property interests from the Debtors, and no less than 54 of these property interests constitute unencumbered leasehold interests.

[23]  As described above, Avoidance Actions and the proceeds thereof remain unencumbered pursuant to the terms of the Final DIP Order, and section 2.01(j) of the Blackhawk APA provides that Blackhawk is acquiring certain Avoidance Action "against the persons . . . with whom it is necessary, as determined by [Blackhawk] in its discretion, for [Blackhawk] to conduct business with in order to operate the Purchased Business, each of which will be released and waived[.]" (Blackhawk APA, § 2.01(j).)

ny-1197357

substantially all of the consideration received under the Blackhawk Transaction to the Prepetition

Secured Parties, notwithstanding the fact that Blackhawk is acquiring substantial Unencumbered

Assets.  The lack of disclosure with respect to the value of the Unencumbered Assets, the

disposition of such assets to Blackhawk and the allocation of such consideration only to the

Prepetition Secured Creditors and the DIP Lenders renders the information contained in the

Disclosure Statement utterly deficient.

> ### C.    The Disclosure Statement Contains Ambiguity With Respect to the Prepetition Secured Parties' Deficiency Claims, If Any

43.    The Disclosure Statement fails to clearly disclose whether the Prepetition Secured

Parties will maintain unsecured deficiency claims against the Debtors' estates after receiving

their respective distributions set forth in Article III of the Plan.[24]  As such, the Disclosure

Statement lacks significant information necessary to enable creditors to make an informed

decision to accept or reject the Plan.

44.    Article III of the Plan provides that all of the consideration received by the

Debtors' estates on account of the Blackhawk Transaction is being distributed to the Prepetition

Secured Parties, notwithstanding the fact that substantial portions of the Blackhawk Assets are

Unencumbered Assets.[25]  Article III of the Plan further provides that the Prepetition Secured

Parties are receiving such distributions "in exchange for <u>full and final</u> satisfaction, settlement,

release and compromise" of their respective claims against the Debtors' estates.  (*See* Plan,

Art. III.B.3-7 (emphasis added).)  By comparison, Article III.B.8 of the Plan provides that

holders of General Unsecured Claims will receive their pro rata share of the Liquidating Trust

Assets, less the Liquidating Trust Funding Mechanism (which is yet to be disclosed).

---

[24] *See* Plan, Art. I.A.90 & Art. III (failing to account for any deficiency claim by the Prepetition Secured Parties).

[25] *See supra*, II.B.

ny-1197357

45.     The Plan defines General Unsecured Claims to be "any Unsecured Claim that is not: (a) an Administrative Claim (including, for the avoidance of doubt, any Professional Fee Claim); (b) DIP Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; or (e) an Intercompany Claim." (Plan, Art. I.A.90.)[26] If the Prepetition Secured Parties are entitled to assert an unsecured deficiency claim against the Debtors' estates, then such deficiency claims should be classified as General Unsecured Claims, which would be entitled to their pro rata portion of the Liquidating Trust Assets. The confusion created by an ambiguous definition of "General Unsecured Claim" is compounded by the numerous placeholders in Article VI.C of the Disclosure Statement, which does not identify all of the specific beneficiaries of the Liquidating Trust. Because any deficiency claim asserted by the Prepetition Secured Parties will dilute any distributions available to holders of General Unsecured Claims, the Disclosure Statement must (i) make clear whether or not the Prepetition Secured Parties are entitled to unsecured deficiency claims, and if so, (ii) quantify the amount of such deficiency claims.

> **D.     The Disclosure Statement Does Not Provide Adequate Information to Assess the "Best Interests Test"**

46.     Pursuant to section 1129(a)(7) of the Bankruptcy Code, confirmation of a plan must meet the "best interests of creditors" test, which requires a finding that, with respect to each impaired class of claims and interests, *each holder* of an allowed claim or interest will receive or retain property of a value, as of the Effective Date, which is not less than the amount such holder would receive or retain if the debtor were to be liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7)(A)(ii). Since this is a condition to confirmation, a plan that

---

[26] The Committee also finds it odd that Article IV.Q of the Plan provides that "the Liquidating Trustee shall be designated by the Debtors, after consultation with the DIP Lenders," especially in light of the fact that Article III of the Plan provides that only holders of General Unsecured Claims will have an interest in the Liquidating Trust Assets, and the Plan defines the term "General Unsecured Claim" to specifically exclude DIP Claims. Thus, it is unclear why the DIP Lenders maintain any consultation rights with respect to the Liquidating Trust or the appointment of the Liquidating Trustee.

27

fails to satisfy this test is unconfirmable.  The Disclosure Statement fails to provide sufficient information to enable creditors to assess whether confirmation of the Plan is in their "best interests" within the meaning of section 1129(a)(7) of the Bankruptcy Code.

47.    "Disclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire."  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300-01 (Bankr. S.D.N.Y. 1990).  The Debtors provide a liquidation analysis as Exhibit F to the Disclosure Statement, which provides that in a liquidation scenario, holders of General Unsecured Claims will receive a 0.00% recovery.  However, the Debtors' liquidation analysis provides insufficient information to assess whether value associated with the unencumbered Real Property Leases is properly allocated to unsecured creditors.  Additionally, the Debtors' liquidation analysis entirely fails to account for value for unsecured creditors on account of the pursuit of Avoidance Actions.  As currently contemplated under the Plan, holders of General Unsecured Claims stand to receive an unknown distribution on account of an interest in a potentially administratively-insolvent Liquidating Trust with a value the Debtors have not endeavored to provide.  It is the Committee's belief, subject to continuing discovery and ongoing analysis, that if the Debtors' liquidation analysis (i) accounted for value associated with the Unencumbered Assets, and (ii) properly allocated the value of the Unencumbered Assets, unsecured creditors may obtain a recovery materially greater than $0.00.  (Szlezinger Decl., ¶12.)

48.    In assessing the Best Interests Test, courts must determine if the liquidation analysis provided by a debtor is "materially erroneous."  *Crowthers McCall*, 120 B.R. at 299-300 (finding plan unconfirmable because debtor's liquidation analysis incorporated material valuation errors).  Additionally, courts must consider whether the Debtors have provided sufficient evidence to support a finding that a plan is in the best interests of creditors.  *In re*

28

*Radco Props., Inc.,* 402 B.R. 666 (Bankr. E.D.N.C. 2009) (finding debtor failed to satisfy the best interests test due to lack of evidence as to value of assets to enable the court to properly assess best interests).  As an initial matter, the Disclosure Statement fails to explain the reasons behind the assumptions made in preparing the liquidation analysis, making it impossible for creditors to assess the validity of the values contained therein.   Additionally, the Debtors' liquidation analysis does not ascribe a separate value for any Unencumbered Assets, and it fails to properly allocate the value of the Unencumbered Assets to the holders of General Unsecured Claims.  Further compounding the deficiency of the Disclosure Statement is the lack of any valuation with respect to the unsecured creditors' interest in the Liquidating Trust.  In failing to quantify the value of the interests in the Liquidating Trust (likely 0% recovery), and failing to provide any value associated with the Unencumbered Assets, the Debtors have not provided the Court (or creditors) with sufficient evidence to determine whether the Best Interests Test is satisfied.

> ### E.    The Debtors' Disclosures With Respect to the Release and Waiver of Causes of Action Is Lacking

49.    The Disclosure Statement also fails to provide any information with respect to the Causes of Action, including Avoidance Actions, which will not be preserved for the benefit of unsecured creditors under the Plan, notwithstanding the fact that both the Prepetition Secured Parties and the DIP Lenders maintain no interest in the Avoidance Actions or the proceeds thereof. (Final DIP Order, ¶ 14.)   The Plan provides that the Liquidating Trust will pursue recoveries for the benefit of unsecured creditors through the prosecution of Causes of Action, which have not otherwise been released under the Plan, the Blackhawk Transaction Documents, and/or the Final DIP Order.  However, Section 2.01(j) of the Blackhawk APA provides that an undisclosed number of Avoidance Actions will be "released and waived."  Causes of Action,

including Avoidance Actions, are one of the few assets currently available under the Plan for distribution to general unsecured creditors. As discussed above,[27] the Committee believes there is significant value associated with the Avoidance Actions (Szlezinger Decl., 8), and the consideration received on account of the Avoidance Actions should flow to the Debtors' unsecured creditors. Because such unencumbered assets are being disposed of, the Debtors should be required to provide disclosures as to the specific Causes of Action and Avoidance Actions that are being waived and/or released. In particular, the Disclosure Statement should provide an estimated value associated with the Avoidance Actions that are being waived and released under the Blackhawk Transaction Documents in order to permit unsecured creditors to evaluate what consideration the Debtors' estates are receiving from Blackhawk in exchange for the estates (and the Liquidating Trust) losing the opportunity to monetize these unencumbered assets for their creditors' benefit.

50.    Moreover, with respect to the Debtor Releases provided under the Plan, supplementary disclosure is necessary as to the steps undertaken by the Debtors to determine if the estates have any claims against any of those parties, the nature of any such potential claims, and the strengths and weaknesses of those claims, or the conclusions reached by the Debtors regarding the value (if any) of such potential claims. Pursuant to Article VIII.C of the Plan, the Debtors' estates are releasing each Released Party from all Causes of Action that are:

> based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the DIP Facility, the Blackhawk Transaction, the Prepetition Facilities, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments or

---

[27] *See* supra II.B.

other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. . .

(Plan, Art. VIII.C.)

51.      The Disclosure Statement fails to identify any consideration provided by any of the Released Parties in exchange for the Debtor Release—possibly because there is none. Absent substantially greater detail on the Debtor Release and the consideration provided for such release, creditors cannot determine whether the release is in the best interests of the estates. *See In re Coram Healthcare Corp.,* 315 B.R. 321, 334-336 (Bankr. D. Del. 2004) (applying Bankruptcy Rule 9019 standard to debtor releases under a plan); *WCI Cable*, 282 B.R. at 469 (holding in the context of a debtor plan release, "a debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable.")  Because the Disclosure Statement lacks any of the information described above, it fails to provide adequate information to enable creditors to make an informed decision as to whether to accept or reject the Plan.

**F.      The Disclosure Statement Lacks Any Information Related to the Treatment of the Debtors' Reclamation Obligations Not Assumed by Blackhawk**

52.      Finally, the Court should not approve the Disclosure Statement because it lacks adequate information as to the treatment of the Debtors' reclamation obligations.  Article IV.O of the Plan contemplates that the Liquidating Trust will be responsible for reclamation obligations associated with the Liquidating Trust Assets; however, the Disclosure Statement fails to adequately describe the nature and extent of these reclamation obligations, as well as how such liabilities will be addressed by the Liquidating Trust.

53.      A debtor-in-possession is required to "manage and operate property . . . according to the requirements of the valid laws of the State in which such property is situated . . . ."  28

ny-1197357

U.S.C. § 959(b).  In the context of complying with environmental laws, this statute does not allow a bankruptcy estate to abandon property that exhibits ongoing environmental hazards. *Midlantic Nat'l Bank v. New Jersey Dep't of Envt'l. Prot.*, 474 U.S. 494, 505-507 (1986) (preventing bankruptcy trustee from abandoning contaminated property by interpreting 28 U.S.C. § 959(b) to require a bankruptcy trustee to adhere to the requirements of environmental laws, notwithstanding the bankruptcy trustee's otherwise broad powers to abandon property).  The Supreme Court noted that a bankruptcy trustee's otherwise broad abandonment power is curtailed by laws designed to "protect the public health or safety from imminent and identifiable harm."  *Id.* at 507 n.9.  Accordingly, the *Midlantic* decision clearly states that principals under the Bankruptcy Code are superseded by laws that are intended to protect the public from environmental conditions that pose imminent threats of harm.

54.     Similarly, in *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 122 (6th Cir. 1987), the court applied *Midlantic*'s holding and stated:  "It follows that if the . . . trustee could not have abandoned the estate in contravention of the State's environmental law, neither then should he have maintained or possessed the estate in continuous violation of the same law."  The United States Court of Appeals for the Sixth Circuit further found that 28 U.S.C. § 959(b) is applicable to liquidating trustees and recognized that the Supreme Court "noted Congress' intentions that the trustee's efforts 'to marshal and distribute the assets of the estate give way to the governmental interest in public health and safety."  *Id.*  Therefore, even in liquidation, the Debtors are required to comply with environmental laws, such as the Surface Mining Control and Reclamation Act ("SMCRA")[28] and the Mine Safety and Health Act of 1977 ("MSHA"),[29] which are intended to protect public health and safety.

---

[28] 30 U.S.C. §§ 1201, *et seq.*

[29] 30 U.S.C. §§ 801, *et seq.*

55.    The Debtors' operations are heavily regulated under many state and federal environmental and mine safety laws,[30] including, among others, SMCRA, MSHA, and the relevant states' implementation of these acts.  For example, a key feature of SMCRA and its state counterparts is that mining and related operations may be conducted only under authority of a permit issued by the applicable regulatory authority.  One of the principal elements of a mining company's compliance with SMCRA is reclaiming the land disturbed by mining—*i.e.,* restoring the land to pre-mining or other acceptable condition in accordance with the terms of the permit.  The permitee must also provide a reclamation surety bond or other financial assurance mechanism to guarantee the company's land restoration.[31]

56.    The Liquidating Trust Assets, which are comprised of those assets not being acquired by Blackhawk, will include mining operations and the associated permits to be managed by the Liquidating Trustee; however, the Disclosure Statement lacks any coherent explanation as to how this feat may be accomplished, and how the Liquidating Trust is going to fund no less than $90 million in reclamation obligations associated with the Liquidating Trust Assets (*See* Disclosure Statement, Art. III.3.B.c.)[32]  One of the limited relevant disclosures on this point provides that "if the Debtors determine a sale of the Excluded Assets does not maximize value, the Excluded Assets will become Liquidating Trust Assets and the free cash flow generated from operations of the Excluded Assets would be used to fund the Liquidating

---

[30] Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*; Clean Water Act, 33 U.S.C. §§ 1251, *et seq.*

[31] In addition to the Debtors' substantial reclamation obligations, "the Modified Consent Decree sets out deadlines for the installation of certain water pollution control technologies to address selenium exceedances of effluent limitations in discharges from certain permitted outfalls at Corridor G Mining Complex, Logan County Mining Complex, and Paint Creek Mining Complex… In addition, the Debtors are subject to selenium-related liabilities, compliance obligations and costs at other locations not directly governed by the Modified Consent Decree." (Disclosure Statement, Art. III.B.3.c.)  The costs associated with the Debtors' obligations under the Modified Consent Decree and other selenium-related liabilities are believed to be just as substantial as the costs associated with the Debtors' reclamation liabilities, yet the Disclosure Statement also fails to provide any information as to how the Liquidating Trust will satisfy such obligations.

[32] *See* supra, n.9.

Trust for the benefit of unsecured creditors and to satisfy other obligations." (Disclosure Statement, Art. VI.C.)  The Disclosure Statement, however, fails to provide any information as to the manner in which the Excluded Assets will provide sufficient "free cash flow" to satisfy the Environmental Claims, as well as make distributions on account of the approximately $2.3 billion in estimated unsecured claims against the Debtors' estates.[33]

57.     If the Debtors, at the insistence of the Prepetition Secured Parties, want to deliver substantially all of their operating assets to Blackhawk, then adequate provisions must first be made to address human health and safety as prescribed by *Midlantic* and *Wall Tube*.  The Disclosure Statement does not enable creditors to properly make an informed decision to accept or reject the Plan, because creditors do not know the degree to which reclamation liabilities left with the Liquidating Trust will directly reduce the funds available for distributions to general unsecured creditors.  Again, the disclosures made in the Disclosure Statement are wholly inadequate due to the premature, ill-conceived, and entirely flawed exit strategy the Debtors are being compelled to pursue for the benefit of the Prepetition Secured Parties and Blackhawk.

### III.    Material Modifications to the Disclosure Statement and Plan Are Necessary That Will Require Re-solicitation of the Plan

58.     For the numerous reasons discussed above, the Plan, as currently drafted, presents an unworkable framework that fails to adhere to the requirements of the Bankruptcy Code and other applicable non-bankruptcy law.  The Plan's inadequacies, in turn, render the Disclosure Statement devoid of the necessary information creditors require to make an informed decision as to whether to accept or reject the Plan.  Accordingly, solicitation of the Plan is premature.  The Plan and Disclosure Statement must undergo substantial modifications[34] when, and if, the

---

[33] Exhibit F to the Disclosure Statement, the Liquidation Analysis, provides that there are an estimated $2.285 billion in unsecured claims against the Debtors' estates.

[34] Transcript of Hearing, 6:17; 7:5-6, *In re Patriot Coal Corp., et al.*, Case No. 15-32450 (Bankr. E.D. Va. July, 22,

ny-1197357

Debtors are able to formulate a viable exit strategy and provide creditors with adequate information. Such modifications represent material modifications because they will substantially affect the level of creditors' recoveries, and necessarily affect creditors' decisions to accept or reject that Plan. *See also* Transcript of Hearing, 18:10-14, 16-21, *In re Trump Ent'mt Resorts, Inc.*, Case No. 14-12103 (KG), (Bankr. D. Del. Nov. 14, 2014) [Docket No. 489] ("See one thing that's changed for me and which concerns me today is that with the prior plan, . . . [a] disclosure wasn't as critical because unsecureds weren't voting . . . unsecured weren't receiving anything. They now have to review a plan and understand a plan, and I don't think that what I received from what I read frankly would be comprehensible to unsecured creditors with all of the what ifs. I don't think they would know what really they were voting on at this point."). As a result, re-solicitation is virtually unavoidable. It would be an unnecessary waste of estate resources to permit the Debtors to solicit votes on the Plan as currently proposed.

### IV.   The Solicitation Procedures Must Be Modified

59.     Through the Motion, the Debtors are also seeking approval of certain solicitation procedures in connection with voting on the Plan. The following procedures should be amended and/or clarified as set forth below:

- The Voting Record Date (as defined in the proposed order attached to the Motion) should be amended to mean the date that an order approving the Disclosure Statement has been entered as opposed to August 17, 2015 as currently proposed;

- The Plan Supplement, which includes numerous critical documents necessary for the Debtors to implement the Plan, including the Liquidating Trust Agreement and a list of "Non-Released Parties," must be filed at least seven (7) days prior to the Voting Deadline as opposed to prior to the Confirmation Hearing;

---

2015) (KLP) [Docket No. 720] (Debtors' counsel acknowledged "[w]e certainly anticipate we will be filing an amended plan and disclosure statement" and further noted that aspects of the funding of the Liquidating Trust are "very much still in flux.").

ny-1197357

- The Debtors should be required to file the Voting Report with the Bankruptcy Court at least one Business Day in advance of the Confirmation Hearing, rather than simply "prior to the Confirmation Hearing";

- The Solicitation Procedures and Ballot should be modified to remove the provision that "any Class that contains Claims or Interest entitled to vote but [as to which] no votes are returned for such Class shall be deemed to have accepted the Plan."

## THE COMMITTEE DOES NOT SUPPORT THE PROPOSED PLAN

60.    The Court has not yet approved the Disclosure Statement and the Committee does not support the Plan in its current form.  Accordingly, the Committee does not believe the Plan (as drafted) is in the best interests of all creditors.

## RESERVATION OF RIGHTS

61.    To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, the Committee reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan.  Furthermore, to the extent that any Plan Supplements or amendments to the Disclosure Statement or the Plan may be filed after any Disclosure Statement or Plan confirmation objection deadline, the Committee reserves its right to object thereto.  The Committee reserves the right to raise further and other objections to the Disclosure Statement or any amendment thereto, prior to or at the hearing thereon, in the event the Committee's objections raised herein are not resolved prior to such hearing.

ny-1197357

WHEREFORE, the Committee respectfully requests that the Court:  (a) deny the Motion

without prejudice to the Debtors' ability to re-file a proper Disclosure Statement; and (b) grant

such other and further relief as the Court may deem just and proper.

Dated: Richmond, Virginia
   August 10, 2015

          **MORRISON & FOERSTER LLP**
          Lorenzo Marinuzzi
          Jennifer Marines
          250 West 55th Street
          New York, New York 10019-9601
          Telephone:  (212) 468-8000
          Facsimile:  (212) 468-7900
          E-mail:  lmarinuzzi@mofo.com
             jmarines@mofo.com

            -and-

          */s/ Lynn L. Tavenner*
          Lynn L. Tavenner (Va. Bar No. 30083)
          Paula Beran (Va. Bar No. 34679)
          **TAVENNER & BERAN, PLC**
          20 North Eighth Street
          Richmond, Virginia 23219
          Telephone: (804) 783-8300
          Facsimile:  (804) 783-0178
          E-mail:  ltavenner@tb-lawfirm.com
             pberan@tb-lawfirm.com

          *Counsel for the Official Committee of Unsecured*
          *Creditors of Patriot Coal Corporation, et al.*